1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNG KIM, Individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>            v.<br><br>ALLAKOS INC., ROBERT ALEXANDER, and LEO REDMOND,<br><br><br><br>            Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sung Kim ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Allakos Inc. ("Allakos" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

- 1 -

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Allakos between August 5, 2019 and December 17, 2019, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

**JURISDICTION AND VENUE**

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and the Company is headquartered in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff, as set forth in the accompanying Certification, purchased Allakos securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Allakos is a clinical stage biopharmaceutical company that focuses on developing therapeutic antibodies targeting allergic, inflammatory, and proliferative diseases. The

Class Action Complaint for Violation of the Federal Securities Laws

Company is developing AK002 for the treatment of eosinophilic gastritis and eosinophilic gastroenteritis, urticaria, indolent systemic mastocytosis, and severe allergic conjunctivitis. The Company is incorporated in Delaware and its principal executive offices are located at 975 Island Drive, Suite 201 Redwood City, California. Allakos securities are traded on the NASDAQ ("NASDAQ") under the ticker symbol "ALLK."

8.      Defendant Robert Alexander ("Alexander") has been the Company's Chief Executive Officer ("CEO") throughout the Class Period.

9.      Defendant Leo Redmond ("Redmond") has been the Company's Chief Financial Officer ("CFO") throughout the Class Period.

10.     Defendants Alexander and Redmond are sometimes referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

(a)      directly participated in the management of the Company;

(b)      was directly involved in the day-to-day operations of the Company at the highest levels;

(c)      was privy to confidential proprietary information concerning the Company and its business and operations;

(d)      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)      approved or ratified these statements in violation of the federal securities laws.

- 3 -

Class Action Complaint for Violation of the Federal Securities Laws

12.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under respondeat superior and agency principles.

14.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

### SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

15.     On August 5, 2019, Allakos issued a press release announcing that AK002 had met all prespecified primary and secondary endpoints in its Phase 2 clinical trial (the "ENIGMA Trial"), stating, in pertinent part:

> REDWOOD CITY, Calif., Aug. 05, 2019 (GLOBE NEWSWIRE) -- Allakos Inc. (the "Company") (Nasdaq: ALLK) today announced positive results from its Phase 2 randomized, double-blind, placebo-controlled trial of AK002 in patients with eosinophilic gastritis and/or eosinophilic gastroenteritis. All AK002 dose arms showed clinically meaningful and statistically significant benefits compared to placebo on all prespecified primary and secondary endpoints, including gastrointestinal tissue eosinophil counts and patient reported disease symptoms. Statistically significant differences in patient symptoms between the active and placebo groups occurred one day following AK002 administration. In addition, patients with comorbid eosinophilic esophagitis treated with AK002 experienced statistically significant decreases in esophageal eosinophil counts and substantial reductions in patient reported dysphagia symptoms.

> "Eosinophilic gastritis, eosinophilic gastroenteritis, and eosinophilic esophagitis are severe debilitating diseases with no approved therapies. AK002 is unique in that it targets both eosinophils and mast cells, two major effector cell types that cause disease-related tissue damage. In this study, AK002 reduced eosinophil and mast cell counts and showed a statistically significant improvement in disease symptoms one day after administration," said Dr. Evan Dellon, M.D., a principal investigator of the study and Professor of Gastroenterology at the University of North Carolina, Chapel Hill. "These are clinically meaningful changes, and these data suggest that AK002 could provide rapid and sustained benefit in patients with eosinophil gastrointestinal diseases. I look forward to the continued development of AK002 in these severe orphan conditions."

- 4 -

\*       \*       \*

AK002 showed a statistically significant benefit when compared to placebo on all primary and secondary endpoints for each of the high dose, the low dose, and the combined high/low dose AK002 groups. The data demonstrate that AK002 produced histological resolution of gastrointestinal tissue eosinophilia and improved disease symptoms, and that these benefits occurred in the same individuals.

16.     On August 7, 2019, the Company filed a Preliminary Prospectus Supplement on Form 424B5 with the SEC, offering 4,545,454 shares of common stock at $77.00 per share (the "Prospectus"). The Prospectus touted the positive results of the ALK002 Phase 2 Trial, stating, in pertinent part:

We recently reported data from a randomized, double-blind, placebo-controlled phase 2 trial of AK002 in patients with active, biopsy-confirmed EG and/or EGE. 38% of the patients in the study also had EoE, allowing us to evaluate the effects of AK002 on EoE. All AK002 dose arms showed clinically meaningful and statistically significant benefit compared to placebo on all prespecified primary and secondary endpoints, including gastrointestinal tissue eosinophil counts and patient reported disease symptoms. Statistically significant differences in patient symptoms between the active and placebo groups occurred one day following AK002 administration. In addition, patients with comorbid eosinophilic esophagitis treated with AK002 experienced statistically significant decreases in esophageal eosinophil counts and substantial reductions in patient reported dysphagia symptoms. Based on the positive results from this phase 2 study, we plan to develop AK002 for the treatment of these conditions.

\*       \*       \*

AK002 showed a statistically significant benefit when compared to placebo on all primary and secondary endpoints for each of the high dose, the low dose, and the combined high/low dose AK002 groups. The data demonstrate that AK002 produced histological resolution of gastrointestinal tissue eosinophilia and improved disease symptoms, and that these benefits occurred in the same individuals.

17.     On November 12, 2019, Allakos filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended September 30, 2019 (the "3Q 2019 10-Q"). Attached to the 3Q 2019 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants

Class Action Complaint for Violation of the Federal Securities Laws

Pan and Yuan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.    The statements referenced in ¶¶15-17 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the ENIGMA Trial was poorly designed;  (2) Allakos cherrypicked timeframes and to engineer results; (3) Allakos used superficial endpoints in the ENIGMA Trial relative to FDA guidance; (4) Allakos misrepresented the number of adverse incidents that occurred during the ENIGMA Trial; (5) the ENIGMA Trial was not well-controlled; (6) Allakos failed to report key data from the ENIGMA Trial; and (7) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

19.    On December 18, 2019, Seligman Investments published a report entitled "A Suspect Biotech with a Phase 2 Farce, Incredulous Trial Investigators, and Warning Signs of Potential Fraud." The article identified several concerns regarding the AK002 Phase 2 trial, including:

- The Company appeared to have conducted the ENIGMA phase 2 EG/EGE trial itself;
- Flagrant nepotism in key clinical roles;
- Poor controls as well as Allakos' role in running the study itself rendered the ENIGMA trial – purportedly randomized and double-blind - essentially unblinded;
- A last minute, unexplained expansion of the ENIGMA trial, with insufficient time for new patients to complete the study's pre-specified protocol, then followed by the exclusion of patients for a cherry-picked "Per Protocol" group around which the topline results are framed;
- ENIGMA trial allowed steroid use in a liberal, widespread manner, rendering the results utterly flawed and compromised;
- Fatal discrepancies and internal contradictions in the August 5th topline results;
- The trial results are compromised by 1) glaring omissions, 2) cherry-picked measures, and 3) statistical gimmicks and obfuscation;

- Allakos' representation of only one drug-related serious adverse event in the ENIGMA trial conflicts with numerous Facebook posts by trial participants;
- Suggestions of cherrypicking timeframes to engineer favorable result;
- The ENIGMA endpoints were superficial relative to competing EGID trials and FDA guidance; and
- Failure to disclose blood eosinophil and mast cell data.

20.     The report stated, among other things, the following regarding the ENIGMA Trial's poor controls:

> Numerous posts by trial participants on Facebook, as well as expert consultations with six investigators from the trial, lead us to conclude that PRO scores were plagued by bias and unreliability. One trial participant even posted that *"being able to see the test results, biopsies, bloodwork while on the drug was so great."*

*          *          *

> Trial investigators stated that Allakos ran the study itself vs. through a CRO. We wonder how a trial is blinded is the sponsor is intimately involved with trial sites and knows which patients are on drug or placebo. A parent of a trial participant posted on Facebook that she spoke with an Allakos co-founder and member of its scientific advisory board, and her post appears to suggest that she also spoke with the Chief Medical Officer. This strikes us as reckless and makes a farce of a "blinded" trial, and raises concerns about tampering and Allakos' conduct in general.

*          *          *

> Three separate ENIGMA investigators indicated concerns around the veracity of the trial's blinding. Two are prominent KOL's in the space. Investigators indicated that the occurrence of adverse effects could easily have unblinded patients as to whether they were on drug, versus placebo. They also indicated that patients could easily get an eosinophil count themselves in a standard blood panel, and indicated further unblinding via ongoing endoscopies during the trial.

21.     The report explained that allowing steroid use during the trial rendered the results "flawed and compromised," stating in pertinent part the following:

> Biostatisticians, trial design experts, and ENIGMA trial investigators echoed concerns of steroids as a confounding factor. Absurdly, greater than 10mg of Prednisone use was an exclusion criteria, yet doctors predosed patients with an amount 8X or higher prior to infusion of AK002.

*          *          *

*Given that steroids are the first line of treatment in EG/EGE and are extremely effective in rapidly and significantly reducing eosinophil levels and in driving symptom improvement, their usage muddies the waters and makes it impossible to determine whether AK002 or steroids drove the purported improvements.* Whether this was intentional feature in order to create "positive" results or an accidental flaw and confounding factor is for investors to independently determine.

*     *     *

*The EG/EGE study protocol allowed steroid use in at least three different settings: 1) continuation of previous, ongoing usage by the patient; 2) acute administration to medicate patients prior to AK002 infusions; and 3) acute usage to manage side effects from the infusion.* Given the widespread use of steroids and their prominence as a confounding factor, the ambiguity of the disclosures below is remarkable: what dosages were used prior to infusion? Were steroids given prior to every infusion, and to every patient? What dosages were given to manage reactions? What was the duration of usage?

*     *     *

*Our research suggests that steroid use was a defining feature of the trial.* Participants were prolific in posting their real-time experiences on a Facebook group for eosinophilic gastritis. The posts indicate pre-dosing prior to AK002 infusions with steroids such as prednisone, Medrol (25% more potent than prednisone), as well as antihistamines such as Benadryl and Zyrtec, not to mention Tylenol and perhaps other undisclosed medications that can sway patient-reported symptom scores. The open label extension study appears to be now predosing patients with a whopping 80 mg of prednisone – 8X the daily 10 mg dose listed as an exclusion criteria in the ENIGMA protocol.

22.     The report detailed the discrepancies and contradictions in the reported ENIGMA Trial data, stating, in pertinent part:

1. The low dose AK002 cohort failed to show statistically significant symptom reduction despite eliminating eosinophils, bewildering trial investigators and undermining the entire Siglec-8 premise upon which Allakos is based.

2. Allakos states that eosinophils actually increased by 10% in the placebo group, yet the placebo group symptoms still improved by 25%, further undermining their entire hypothesis.

3. As another worrisome discrepancy, ENIGMA's table of p-values suggests that steroids made symptoms worse, which is absurd as steroids are the standard of care and drive symptom improvement in the vast majority of patients

4. Despite n=43 in the active arms, one or at most two outlier patients swung the TSS p-values into statistical significance, according to a number of biostatisticians and experts in clinical trial design we asked to analyze the data.

- 8 -

Their analyses were unanimous in indicating that the ENIGMA trial barely scraped over the finish line.

5. Allakos claims that AK002 reduced dysphagia (trouble swallowing) in the EoE subgroup in the EG/EGE trial, yet dysphagia wasn't even a symptom measured in the PRO.

*      *      *

Virtually every page employs a different statistical gimmick in an attempt - we believe - to mislead investors. None of this would fly with credible medical journals – much less the FDA – and explains the conspicuous lack of validation and peer review. In particular, we note the company's selective and inconsistent fascination with p-values.

23.     The report provided evidence that Allakos had misrepresented the number of adverse incidents in the ENIGMA trial:

During the topline results call, the Chief Medical Officer added, "And we didn't find any other significant adverse event. So worthwhile to mention here that there don't seem to be any adverse event outside the infusion windows."

This claim is in contrast to Facebook posts by participants in the trial, which indicate a number of severe adverse events by multiple patients. The prevalence of these posts suggests that adverse events may have occurred in other patients who weren't posting online.

One patient reported being admitted to the hospital three times, after which she was "pulled off the study." Allakos says the only reaction during the trial resolved within 24 hours, but the patient describes one hospital admission lasting a week, and that she was only discharged because her insurance wouldn't cover a longer stay. She listed other reaction symptoms as "severe" and "super severe."

24.     The report also demonstrated that the ENIGMA Trial's endpoints were "superficial relative to competing EGID trials and FDA guidance," stating:

Aside from a flawed PRO, we note other problems in the Allakos EG/EGE trial design and endpoints, which only consisted of tissue eosinophil reductions and patient-reported symptom scores. Competing EGID trials, taking their cue from the clinical literature and FDA guidance, utilize a far more robust set of endpoints across 1) symptomatic (using reliable, validated PRO's), 2) histologic (across multiple measures), and 3) endoscopic measures (using established scoring systems) – providing a roadmap for what we expect the FDA will require in phase 3. Allakos would have been reckless to not collect histologic data like blood eosinophil reduction as well on endoscopic features in the EG/EGE trial, and the company's silence on these measures points to problems in phase 3.

*      *      *

Class Action Complaint for Violation of the Federal Securities Laws

Allakos' failure to disclose endoscopic information is an acute problem, given the availability of a validated, reliable visual scoring system especially in EoE. We note papers by multiple Allakos trial investigators, including Principal Investigator Evan Dellon, attesting to the accuracy of the EoE Endoscopic Reference Scoring System (EREFS), a "classification and grading system" for "major endoscopically identified, esophageal features of EoE (edema, rings, exudates, furrows, strictures)." We spoke with an influential ENIGMA investigator, who bluntly opined that the "The FDA will use endoscopic findings more than eosinophil levels [in phase 3]. They are very objectively and quantitatively measurable, especially for EoE where there's a score and they're developing one for EG."

25.     On this news, shares of Allakos fell $13.25 per share, or nearly 10%, to close at $119.28 on December 18, 2019, damaging investors.

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Allakos during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Allakos securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- •     whether the federal securities laws were violated by Defendants' acts as alleged herein;

- •     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- •     whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- •     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- •     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- •     whether the prices of Allakos securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- •     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

Class Action Complaint for Violation of the Federal Securities Laws

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

33.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- •   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- •   the omissions and misrepresentations were material;
- •   Allakos securities are traded in efficient markets;
- •   the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- •   the Company traded on the NASDAQ, and was covered by multiple analysts;
- •   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- •   Plaintiff and members of the Class purchased and/or sold Allakos securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

34.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

35.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

Class Action Complaint for Violation of the Federal Securities Laws

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against All Defendants**

36.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

38.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Allakos securities during the Class Period.

40.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

Class Action Complaint for Violation of the Federal Securities Laws

securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

41.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

42.     As a result of the foregoing, the market price of Allakos securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Allakos securities during the Class Period in purchasing Allakos securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

43.     Had Plaintiff and the other members of the Class been aware that the market price of Allakos securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Allakos securities at the artificially inflated prices that they did, or at all.

44.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

45.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the

Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Allakos securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

46.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

47.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

48.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

49.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Allakos securities.

50.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the

Class Action Complaint for Violation of the Federal Securities Laws

1  Individual Defendants exercised control over the general operations of the Company and possessed
2  the power to control the specific activities which comprise the primary violations about which
3  Plaintiff and the other members of the Class complain.

4       51.     By reason of the above conduct, the Individual Defendants are liable pursuant to
5  Section 20(a) of the Exchange Act for the violations committed by the Company.

6  **PRAYER FOR RELIEF**

7       WHEREFORE, Plaintiff demands judgment against Defendants as follows:

8       A.     Determining that the instant action may be maintained as a class action under Rule
9  23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

10      B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason
11 of the acts and transactions alleged herein;

12      C.     Awarding Plaintiff and the other members of the Class prejudgment and post-
13 judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

14      D.     Awarding such other and further relief as this Court may deem just and proper.

15 **DEMAND FOR TRIAL BY JURY**

16      Plaintiff hereby demands a trial by jury.

17

18 Dated: March 10, 2020                      Respectfully submitted,

19                                       **THE ROSEN LAW FIRM, P.A.**

20

21                                       By: /s/ Laurence M. Rosen
                                      Laurence M. Rosen, Esq. (SBN 219683)

22                                       355 S. Grand Avenue, Suite 2450
                                      Los Angeles, CA 90071

23                                         Telephone: (213) 785-2610
                                      Facsimile: (213) 226-4684

24                                         Email: lrosen@rosenlegal.com

25                                         Counsel for Plaintiff

26

27

28

*Class Action Complaint for Violation of the Federal Securities Laws*