# Exhibit A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

(Mark One)

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2019

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM                TO

Commission File Number 001-38582

# Allakos Inc.

(Exact name of Registrant as specified in its Charter)

| | |
|---|---|
| **Delaware** | **45-4798831** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **975 Island Drive, Suite 201** | |
| **Redwood City, California** | **94065** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (650) 597-5002

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, par value $0.001 | ALLK | The Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☐ NO ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The aggregate market value of the common stock held by non-affiliates of the Registrant based on the closing price of the Registrant's Common Stock on the Nasdaq Global Select Market as of June 28, 2019 was $959.2 million.

The number of shares of Registrant's Common Stock outstanding as of February 20, 2020 was 48,708,305.

Portions of the Registrant's Definitive Proxy Statement relating to the registrant's 2020 Annual Meeting of Shareholders are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. Such Definitive Proxy Statement will be filed with the Securities and Exchange Commission within 120 days after the end of the registrant's 2019 fiscal year ended December 31, 2019.

|  |  | Page |
|---|---|---:|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 37 |
| Item 1B. | Unresolved Staff Comments | 76 |
| Item 2. | Properties | 76 |
| Item 3. | Legal Proceedings | 76 |
| Item 4. | Mine Safety Disclosures | 76 |
| | | |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 77 |
| Item 6. | Selected Financial Data | 79 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 80 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 90 |
| Item 8. | Financial Statements and Supplementary Data | 92 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 117 |
| Item 9A. | Controls and Procedures | 117 |
| Item 9B. | Other Information | 120 |
| | | |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 121 |
| Item 11. | Executive Compensation | 121 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 121 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 121 |
| Item 14. | Principal Accounting Fees and Services | 121 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 122 |
| Item 16. | Form 10-K Summary | 124 |
| | Signatures | 125 |

i

**Item 1. Business.**

**Overview**

We are a clinical stage biotechnology company developing antolimab (AK002), our wholly owned monoclonal antibody, for the treatment of various mast cell and eosinophil related diseases. Antolimab (AK002) selectively targets both mast cells and eosinophils, two types of white blood cells that are widely distributed in the body and play a central role in the inflammatory response. Inappropriately activated mast cells and eosinophils have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. As such, antolimab (AK002) has the potential to treat a large number of severe diseases. Antolimab (AK002) completed a randomized, double-blind, placebo-controlled Phase 2 study in patients with eosinophilic gastritis ("EG") and/or eosinophilic gastroenteritis ("EGE"; the "ENIGMA study"). The ENIGMA study met all prespecified primary and secondary endpoints when compared to placebo. Additionally, patients in the ENIGMA study with co-morbid eosinophilic esophagitis ("EoE") treated with antolimab (AK002) showed histological and symptomatic improvement when compared to placebo. Based on these results from the ENIGMA study, we plan to initiate a Phase 3 study in patients with EG and/or EGE and a Phase 2/3 study in patients with EoE.

Antolimab (AK002) also showed promising activity in clinical studies in chronic urticaria ("CU"), indolent systemic mastocytosis ("ISM"), and severe allergic conjunctivitis ("SAC"). In addition, improvements also were observed in atopic comorbidities such as asthma, atopic dermatitis, and allergic rhinitis. The activity observed in these studies suggests that antolimab (AK002) could provide significant benefit to patients suffering from these diseases and highlights the potential of antolimab (AK002) to broadly inhibit mast cells and deplete eosinophils in different disease settings.

**Figure 1. Select Mast Cell and Eosinophil Related Diseases**



**Figure 1: We have completed studies in the indications shown in bold**

1

Despite the knowledge that mast cells and eosinophils drive many pathological conditions, there are no approved therapies that selectively target both mast cells and eosinophils. Antolimab (AK002) binds to Siglec-8, an inhibitory receptor found on mast cells and eosinophils, which represents a novel way to selectively deplete or inhibit these important immune cells and thereby potentially resolve inflammation. We believe antolimab (AK002) is the only Siglec-8 targeting antibody currently in clinical development and may have advantages over current treatment options available to patients for the diseases we are pursuing.

Antolimab (AK002) has received orphan drug designation for EG and EGE from the U.S. Food and Drug Administration ("FDA"). EG and EGE are a group of orphan gastrointestinal diseases characterized by severe abdominal pain, nausea, diarrhea, bloating, cramping, early satiety, loss of appetite, and vomiting resulting from inflammation caused by mast cells and eosinophils. There are no approved therapies for EG and EGE and their estimated prevalence in the United States is approximately 50,000 patients. However, based on our conversations with gastroenterologists and our own work, we believe these diseases may be significantly under-diagnosed or mis-diagnosed as other gastrointestinal diseases and are conducting a non-interventional study to further understand the prevalence of EG and EGE. In the ENGIMA study, tissue eosinophils were reduced by 95% in patients treated with antolimab (AK002) versus a 10% increase in tissue eosinophils for patients receiving placebo over the same treatment period. Symptoms were reduced by 53% for patients receiving antolimab (AK002) versus a decrease in symptoms of 24% for patients receiving placebo. Furthermore, 69% of patients receiving antolimab (AK002) met the predefined response criteria versus 5% of patients receiving placebo. All antolimab (AK002) results were statistically significant relative to placebo. Patients completing the ENIGMA study, including those included in the placebo arm, were offered the opportunity to enter a long-term extension for which they will receive antolimab (AK002). Of the total patients eligible to participate, 92% elected to enter the long-term extension study. We expect to report efficacy and safety results from the long-term extension study in the first half of 2020. Based on the results of the ENIGMA study, we are planning to initiate a Phase 3 study in patients with EG and/or EGE in the first quarter of 2020.

In addition, in the ENIGMA study approximately 40% of the patients had comorbid EoE, a severe orphan gastrointestinal disease characterized by dysphagia, or difficulty swallowing, nausea, and vomiting resulting from inflammation caused by mast cells and eosinophils. Antolimab (AK002) has received orphan drug designation for EoE from the FDA. The estimated prevalence of EoE in the United States is approximately 200,000 patients and there are no treatments currently approved specifically for this disease. In the ENIGMA study, patients with co-morbid EoE receiving antolimab (AK002) had tissue eosinophil reductions and improvements in dysphagia. Specifically, 93% of patients receiving antolimab (AK002) showed a tissue response $\leq 6$ eosinophils per high powered field ("HPF") versus 11% of patients receiving placebo. Additionally, dysphagia improved by 53% in patients receiving antolimab (AK002) versus 17% for patients receiving placebo. Based on these observations, we are planning to initiate a double-blind, randomized, placebo-controlled Phase 2/3 study in patients with EoE in the first quarter of 2020.

During the enrollment phase of the ENIGMA study, we identified a group of patients that had elevated stomach and/or duodenal mast cell counts in the absence of elevated eosinophils but had similar symptoms and symptom burden as EG and/or EGE patients. Because of the elevated mast cell counts and lack of other elevated cell types, these patients appear to suffer from mast cell driven gastrointestinal symptoms. We have labelled these conditions Mast Cell Gastrointestinal Disease ("MGID"). We are currently conducting a six-month open-label Phase 1 study in patients with MGID using antolimab (AK002) and expect to report safety and efficacy results from this study in the first quarter of 2020. We are also working to further characterize the MGID patient population and are conducting a non-interventional prevalence study to further understand the prevalence of MGID in the US.

Antolimab (AK002) has also demonstrated activity in three forms of CU, ISM, and SAC. CU is a group of inflammatory skin diseases characterized by hives and severe itching resulting from the inappropriate activation of mast cells in the skin. In a Phase 2 open-label six-month multiple dose study of antolimab (AK002) in 45 antihistamine refractory patients with chronic spontaneous urticaria, cholinergic urticaria or dermatographic urticaria, patients reported high levels of disease control and some patients experienced complete resolution of symptoms. Importantly, antolimab (AK002) also produced high levels of response in patients that were refractory to omalizumab ("Xolair"), the only biologic treatment option currently approved for use in patients with CU. This suggests that antolimab (AK002), if approved, could become the treatment of choice for antihistamine refractory CU patients. ISM is a disorder caused by the release of mast cell derived inflammatory mediators throughout the body

2

resulting in severe symptoms in the skin, gastrointestinal tract, central nervous system, joints, and muscles. There are treatments currently approved for ISM. In a Phase 1 open-label six-month multiple dose study of antolimab (AK002) in 11 patients with ISM, patients reported substantial improvements in symptoms and improved quality of life measures. SAC is a group of severe ocular disorders resulting from allergic inflammation of the conjunctiva, and symptoms include persistent severe ocular pain, itching, sensitivity to light ("photophobia"), foreign body sensation, watering eyes, redness, swelling and the formation of papillae.  In a Phase 1 open-label six-month multiple dose study of antolimab (AK002) in 29 patients with SAC, patients administered antolimab (AK002) reported a 78% median improvement in ocular symptoms by Allergic Conjunctivitis Symptom ("ACS") Score and a 71% median improvement in physician assessed signs and symptoms using the Ocular Symptom Score ("OSS"). In addition, patients suffering from comorbid atopic dermatitis, asthma and allergic rhinitis, despite treatment with currently available therapies, reported improvements in their symptoms while receiving antolimab (AK002).  The activity observed in CU, ISM, and SAC suggest that antolimab (AK002) could provide meaningful benefit to patients suffering from these diseases and highlight the potential of antolimab (AK002) in multiple disease settings.

Antolimab (AK002) has generally been well tolerated in each of our clinical trials. The most common adverse event has been the occurrence of mild to moderate infusion related reactions ("IRRs"), consisting of flushing, feeling of warmth, headache, nausea or dizziness, which occurred mostly during the first infusion and diminished or did not occur on subsequent infusions. To date, antolimab (AK002) has been administered intravenously in our completed and ongoing clinical studies. We also have developed a high concentration formulation of antolimab (AK002) for subcutaneous administration. We expect to complete a Phase 1 study in healthy volunteers evaluating the safety, tolerability and pharmacokinetics of a subcutaneous formulation of antolimab (AK002) in the second half of 2020.

Ongoing or planned studies are listed in Figure 2.  See "Antolimab (AK002) Clinical Development" for further detail on these studies.

**Figure 2. Antolimab (AK002) Ongoing and Planned Studies**

| Study | Milestone |
| --- | --- |
| Phase 3 Eosinophilic Gastritis and/or Gastroenteritis | Initiation Q1 2020 |
| Phase 2/3 Eosinophilic Esophagitis | Initiation Q1 2020 |
| Phase 1 Mast Cell Gastrointestinal Disease | Data Q1 2020 |
| Phase 2 Eosinophilic Gastritis and/or Gastroenteritis Extension | Data H1 2020 |
| Phase 1 Bioavailability Study (Intravenous and Subcutaneous Administration) | Data H2 2020 |
| Non-Interventional EG, EGE, and MGID Prevalence | Data H2 2020 |

**Understanding the Foundation of Our Approach**

***Background on Mast Cells, Eosinophils and Siglec-8***

Mast cells and eosinophils and are involved in many inflammatory conditions and therefore represent attractive drug targets. Mast cells and eosinophils can respond to signals from allergens, tissues, bacteria, viruses and also cells of the innate and adaptive immune system. In response, they release a large variety of mediators which can result in tissue damage, fibrosis and the recruitment and activation of other innate and adaptive immune cells. The ability to respond to signals from multiple cell types and the diverse array of mediators that they produce place mast cells and eosinophils in the center of multiple aspects of the inflammatory response.

Eosinophils are normally present in the blood and tissues, especially in the mucosal linings of the respiratory and gastrointestinal tract. However, they can be recruited to any site of the body in the setting of inflammation. Mast cells reside within tissues and all vascularized organs, often located in close proximity to blood vessels, nerves and lymphatics. Sites include the dermis, gut mucosa and submucosa, conjunctiva and pulmonary alveoli and airways. As a result of their widespread location and potent inflammatory activity, mast cells and eosinophils have been identified as key drivers in a number of severe diseases of the gastrointestinal tract, eyes, skin and lungs as well as diseases which affect multiple organ systems.

Siglec-8 is an inhibitory receptor selectively expressed on eosinophils, mast cells and, to a lesser extent, on basophils. Because Siglec-8 is expressed in high abundance only on mast cells and eosinophils, it presents a novel way to selectively target these important immune cells. As an inhibitory receptor, the natural function of Siglec-8 is to counteract activating signals within mast cells and eosinophils that lead to an inflammatory response. By binding to Siglec-8, antolimab (AK002) is able to selectively target mast cells and eosinophils to resolve inflammation.

***Mast cells and Eosinophils are Effector Cells That are Central to Initiating and Maintaining Inflammatory Responses***

Mast cells and/or eosinophils respond to a variety of activating signals including those from cell-cell contact, allergens bound to IgE, neuropeptides, cytokines including IL-33, thymic stromal lymphopoietin ("TSLP"), IL-5, IL-4 and IL-13 and viruses through Toll-Like Receptor-3. In response to these and other activating signals, mast cells and eosinophils produce a broad range of inflammatory mediators that cause tissue damage and contribute to acute and chronic inflammation. These mediators include vasoactive amines, bioactive lipids, proteases, chemokines and cytokines. The mediators, their functions and their contribution to disease pathogenesis are described in more detail below.

- *Mast cells play an important role in inflammation as the main producer of histamine.* Histamine causes vasodilation and produces intense itching. It is believed to contribute to increased gastrointestinal peristalsis (diarrhea), the skin symptoms of urticaria and ISM, the diffuse vasodilation of anaphylaxis and bronchospasm in asthma.

- *Proteases secreted from mast cells and eosinophils are the key cause of tissue damage and contribute to tissue fibrosis.* Eosinophil and mast cell secretions are toxic to surrounding cells and break down tissues, resulting in fibrosis and tissue remodeling.

- *Mast cells and eosinophils drive inflammation by signaling to other cells of the immune system.* Mast cells and eosinophils release lipid mediators and a large variety of cytokines including TNFa, IL-1, IL-3, IL-4, IL-5, IL-6, IL-8, IL-9, IL-13, MCP-1, CCL2, CCL3, CCL5, CCL17, TGFa, TGFb and granulocyte-macrophage colony stimulating factor, that attract and activate cells of the innate and adaptive immune system, such as neutrophils, monocytes, macrophages, basophils, B-cells, T-cells and dendritic cells, as well as other mast cells and eosinophils.

**Figure 3. Mast Cell and Eosinophil Functions**

 

Due to their ability to respond to signals from multiple cell types and elicit responses from others, mast cells and eosinophils mediate the immediate hypersensitivity and late phase responses responsible for allergies and many innate and adaptive immune responses.

4

*Siglec-8 is an Attractive Target for Mast Cell and Eosinophil Driven Diseases*

Siglec-8 (sialic acid immunoglobulin-like lectin 8) is a constitutively expressed inhibitory receptor that is restricted to eosinophils, mast cells and to a lesser extent, basophils (approximately 1/100 the level on mast cells and eosinophils). The physiological function of Siglec-8 is to provide an inhibitory signal to mast cells and eosinophils. Siglec-8 exerts these effects through an intracellular immunoreceptor, tyrosine-based inhibitory motif ("ITIM") and ITIM-like motif. In contrast to approaches which block a single activating cytokine or receptor, targeting the ITIM signaling cascade (via Siglec-8) has the potential to counteract a broad array of activating signals, which could allow for the treatment of multiple diseases. Antibodies to Siglec-8 have been shown to trigger antibody-dependent cellular cytotoxicity ("ADCC") of blood eosinophils and apoptosis of tissue eosinophils and to inhibit the release of inflammatory mediators from mast cells. In the human clinical studies, antolimab (AK002) has depleted eosinophils and demonstrated mast cell inhibitory activity in multiple disease settings including EG, EGE, EoE, CU, SAC, and ISM. In summary, the expression pattern and broad inhibitory function make Siglec-8 an attractive target for treatment of mast cell and eosinophil driven diseases.

**Figure 4. Siglec-8 Triggers Apoptosis of Eosinophils and Inhibition of Mast Cells**



**Our Strategy**

Antolimab (AK002) has shown activity in humans as well as activity in a broad array of animal disease models of mast cell and eosinophil driven diseases. We have prioritized our antolimab (AK002) development efforts based on our assessment of the probability of clinical and regulatory success, unmet medical need and potential market opportunity. We have assembled a team with a proven track record and deep experience in antibody discovery and in clinical development, commercialization, operations and finance from companies such as Genentech, Gilead, Intermune, Novo Nordisk, Pfizer, ZS Pharma and others.

The key elements of our strategy are to:

- ***Rapidly advance antolimab (AK002) through clinical development in EG, EGE and EoE.*** Antolimab (AK002) has secured orphan drug designation for the treatment of EG, EGE from the FDA. We believe the positive results from our ENIGMA study in patients with EG and/or EGE, in conjunction with our planned Phase 3 study, will serve as the basis for demonstrating safety and efficacy in our biologics license application ("BLA") and market authorization application submissions.

   Antolimab (AK002) has secured orphan drug designation for the treatment of EoE from the FDA. We plan to initiate a Phase 2/3 study in patients with EoE following observed improvements in the pathology and symptoms of patients with EoE as part of the ENIGMA study.

5

- *Evaluate additional eosinophilic and mast cell driven conditions.* We are currently conducting a study in MGID, and have completed trials for CU, ISM, and SAC. We will continue to evaluate development opportunities in these, as well as other indications.

- *Build commercial capability and retain rights in key markets.* We intend to retain the rights to antolimab (AK002) in key markets for the time being, and plan to commercialize antolimab (AK002) in the U.S through a specialty sales force.

- *Coordinate clinical and manufacturing process development.* Antolimab (AK002) has been produced under current good manufacturing practices ("cGMP") at commercial scale utilizing the commercial process at Lonza Sales AG ("Lonza"), a Contract Development Manufacturing Organization ("CDMO").

**Antolimab (AK002) Clinical Development**

Antolimab (AK002) was designed to take advantage of the selective expression pattern and inhibitory function of Siglec-8, an inhibitory receptor found on eosinophils, mast cells, and to a lesser extent, on basophils. Antolimab (AK002) is a humanized antibody that binds to Siglec-8 with high affinity (bivalent binding avidity (KD) = 17 pM, determined by surface plasmon resonance analysis). Binding of antolimab (AK002) to Siglec-8 on mast cells and eosinophils triggers apoptosis of eosinophils and inhibition of mast cells. Antolimab (AK002) is a non-fucosylated IgG1 antibody engineered to have potent ADCC. ADCC is a mechanism whereby the binding of an antibody like antolimab (AK002) to a target cell in the blood, such as an eosinophil, triggers a natural killer ("NK") cell, to bind to the Fc portion of the antibody bound to the target cell, thereby destroying the antibody-bound cell. This provides antolimab (AK002) with an additional mechanism to deplete eosinophils present in blood. As a result of these dual modes of action, antolimab (AK002) has been shown to deplete eosinophils in blood and tissue, and to inhibit the release of inflammatory mediators from mast cells.

Antolimab (AK002) has demonstrated activity in a broad array of animal disease models of eosinophilic and mast cell-driven diseases. Consistent with these experiments, human trials have shown that antolimab (AK002) depletes blood eosinophils and inhibits mast cells in multiple different diseases including EG, EGE, EoE, CU, ISM, and SAC. Based on the promising results in the ENIGMA study, we are initiating a Phase 3 study in EG and/or EGE and a Phase 2/3 study in EoE. Antolimab (AK002) has generally been well tolerated in our clinical studies. The most common adverse event has been the occurrence of mild to moderate IRRs, such as flushing, feeling of warmth, headache, nausea or dizziness, which occurred mostly during the first infusion and diminished or did not occur on subsequent infusions.

*Eosinophilic Gastrointestinal Diseases ("EGIDs")*

EGIDs are a collection of chronic inflammatory disorders that share a similar eosinophilic driven inflammation that occurs along different segments of the gastrointestinal ("GI") tract. Based on the site of eosinophilic infiltration, EGIDs are categorized into EoE (esophagus), EG (stomach), EGE (duodenum and small intestine) and Eosinophilic Colitis (colon). While EGIDs are estimated to affect up to 300,000 patients in the United States in total, individually they each are considered orphan diseases. To date, antolimab (AK002) has secured orphan drug designation for EG, EGE, and EoE from the FDA.

It is believed that EGIDs arise in some patients from food allergies or other allergens that cause a hypersensitivity reaction that leads to recruitment of eosinophils to the GI tract. Mast cells are also elevated and believed to play a significant role. The gastrointestinal symptoms are believed to be due to the release of inflammatory mediators from activated eosinophils and mast cells. Elevated serum immunoglobulin E ("IgE") levels and food-specific IgE are correlated with EG in some patients and provide evidence for the allergy hypothesis and mast cell involvement. We have recently demonstrated that in biopsies of patients with symptomatic EG, mast cells are present in elevated numbers compared to normal controls and that the mast cells are also in an increased activation state, providing additional evidence for a pathogenic role of mast cells in EGIDs.

6

**Figure 5. Mast Cells and Eosinophils are Elevated in EGIDs**



Because antolimab (AK002) directly depletes eosinophils and broadly inhibits mast cells, we believe it has the potential to be a superior treatment in comparison to agents acting only on one cell type or pathway.

*Eosinophilic Gastritis and Eosinophilic Gastroenteritis*

EG and EGE are orphan diseases characterized by chronic inflammation due to infiltration of eosinophils and mast cells into layers of the stomach. Symptoms commonly include abdominal pain, nausea, vomiting, diarrhea, early satiety, loss of appetite, abdominal cramping, bloating, malnutrition and weight loss. EG can occur with eosinophilia isolated to the stomach, or often in combination with eosinophilia of the small intestine. Diagnosis is established based on clinical presentation (gastrointestinal symptoms) combined with increased tissue eosinophils in biopsy specimens from the stomach and/or duodenum without any other cause for the eosinophilia. The presence of greater than or equal to 30 eosinophils per HPF in 5 HPFs indicates the presence of EG and the presence of greater than or equal to 30 eosinophils per HPF in 3 HPFs indicates the presence of EGE. Based on ICD-9 codes, the estimated prevalence of EG and EGE in the United States is approximately 50,000 patients. Based on our conversations with gastroenterologists and our own work, we believe these diseases may be significantly under-diagnosed or mis-diagnosed as other gastrointestinal diseases, such as irritable bowel syndrome or functional dyspepsia. We are conducting a non-interventional study to further understand the prevalence of EG and EGE in the United States.

*Eosinophilic Esophagitis*

EoE is an orphan disease characterized by eosinophil and mast cell driven inflammation of the esophagus. Common symptoms of EoE include dysphagia (difficulty swallowing), food impaction, nausea and vomiting. Diagnosis is established based on clinical presentation (dysphagia) combined with increased tissue eosinophils in biopsy specimens from the esophagus without any other cause for the eosinophilia. The presence of greater than 15 eosinophils per HPF in an esophagus biopsy identifies the presence of EoE. The estimated prevalence of EoE in the United States is approximately 200,000 patients.

*Current Therapies and Limitations*

There are no FDA-approved treatments for EG, EGE or EoE. Current therapies and disease management strategies include restricted/elemental diets and systemic or topical corticosteroids. Restricted/elemental diets are designed to avoid foods which trigger symptoms. Unfortunately for most patients the restricted/elemental diets are only partially effective and mainly used as a strategy to provide nutrition despite continuing symptoms. Corticosteroids, systemic or topical, can provide symptom relief, but are not appropriate for long-term treatment due to their numerous side effects.

*Phase 2 Study in Patients with EG and/or EGE*

*Study Design*

The ENIGMA study, a randomized, double-blind, placebo-controlled Phase 2 study of antolimab (AK002) enrolled patients with active, biopsy-confirmed EG and/or EGE. Patients were required to be moderately to severely symptomatic based on a patient reported symptom questionnaire and to subsequently have biopsy confirmed eosinophilia of the stomach ($\geq$ 30 eosinophils/HPF in 5 HPFs) and/or duodenum ($\geq$ 30 eosinophils/HPF in 3 HPFs). Qualifying patients were randomized 1:1:1 to receive: (a) 0.3 mg/kg of antolimab (AK002) for the first month followed by three doses of 1.0 mg/kg given monthly, (b) 0.3 mg/kg of antolimab (AK002) for the first month followed by 1.0 mg/kg, 3.0 mg/kg and 3.0 mg/kg given monthly, or (c) a monthly placebo. Disease symptoms were measured daily using a patient reported symptom questionnaire that scored 8 symptoms on a scale from 0 to 10 (abdominal pain, nausea, vomiting, early satiety, loss of appetite, abdominal cramping, bloating, and diarrhea). Endpoints were assessed per protocol in a prespecified hierarchical order using biopsies collected at the end of study and symptom questionnaires collected over the last two weeks of study prior to biopsy. The primary endpoint was the percent change from baseline in the number of tissue eosinophils obtained from gastric or duodenal biopsies. The secondary endpoints were (1) proportion of patients with a greater than 75% reduction in tissue eosinophil counts from biopsies and a greater than 30% reduction in Total Symptom Score ("TSS") from the patient reported questionnaire and (2) the percent change from baseline in the TSS.

*Study Results*

Antolimab (AK002) showed a statistically significant benefit when compared to placebo on all primary and secondary endpoints for each of the high dose, the low dose, and the combined high/low dose antolimab (AK002) groups. The data demonstrate that antolimab (AK002) produced histological resolution of gastrointestinal tissue eosinophilia and improved disease symptoms, and that these benefits occurred in the same individuals.

**Figure 6: Topline results from the ENIGMA study**

| Primary and Secondary Endpoints | Placebo (n=20) | High Dose antolimab (AK002) (n=20) | Low Dose antolimab (AK002) (n=19) | Combined antolimab (AK002) (n=39) |
|---|---|---|---|---|
| 1° Endpoint: change in gastric or duodenal eosinophil counts | +10% | -97% | -92% | -95% |
| p–value | — | <0.0001 | <0.0001 | <0.0001 |
| 2° Endpoint: treatment responders [1] | 5% | 70% | 68% | 69% |
| p–value | — | 0.0009 | 0.0019 | 0.0008 |
| 2° Endpoint: change in TSS [2] | -24% | -58% | -49% | -53% |
| p–value | — | 0.0012 | 0.0150 | 0.0012 |

[1] Treatment responders defined as patients with greater than a 75% reduction in biopsy eosinophil counts and a greater than 30% reduction in TSS.

[2] TSS is the sum of all 8 patient reported symptoms each measured on a scale from 0 to 10 (abdominal pain, nausea, vomiting, early satiety, loss of appetite, abdominal cramping, bloating, and diarrhea).

8

*Safety*

Antolimab (AK002) was generally well tolerated. The only treatment emergent adverse event occurring more frequently on antolimab (AK002) than on placebo was mild to moderate IRRs, such as flushing, feeling of warmth, headache, nausea, and/or dizziness, which occurred in 60% of patients receiving antolimab (AK002) versus 23% of patients receiving placebo. There was 1 drug-related serious adverse event ("SAE") in the study, consisting of an IRR that resolved within 24 hours. Treatment emergent SAEs occurred in 9% of patients receiving antolimab (AK002) versus 14% of patients receiving placebo.

*Results in Patients with EoE*

Esophageal eosinophil counts and dysphagia improved in patients with comorbid eosinophilic esophagitis.

**Figure 7: EoE endpoints from the ENIGMA study**

| Exploratory Endpoints | Placebo | Combined antolimab (AK002) |
| --- | --- | --- |
| EoE: proportion of patients with esophageal eosinophil counts <5/HPF | 1/9 (11%) | 13/14 (93%) |
| EoE: change in patient reported dysphagia questionnaire | -17% | -53% |

*Steroid Use*

All allowed baseline medications remained constant throughout the baseline period and study. Acute steroids could be used at the physician's discretion to prevent or treat IRRs. Acute steroid use was balanced between antolimab (AK002) and placebo groups with 28% and 35% of patients in the antolimab (AK002) and placebo group receiving acute steroids. Statistically significant results were also observed on all primary and secondary endpoints in the subgroup of patients who did not receive acute steroids.

*Long-Term Extension Study*

Ninety-two percent of eligible patients from the ENIGMA study elected to enter the long-term extension study. We expect to report efficacy and safety results from the long-term extension study in the first half of 2020.

In the long-term extension study, we evaluated the effect of pre-treating patients with oral prednisone one day prior to receiving a 1.0 mg/kg first dose of antolimab (AK002). This evaluation included antolimab (AK002) naïve patients receiving 1.0 mg/kg of antolimab (AK002). No IRRs were observed in patients pre-treated with prednisone the day prior to receiving antolimab (AK002) despite using a higher initial dose than the 0.3 mg/kg dose used in the ENIGMA study. These results suggest prednisone may be a useful pre-treatment to reduce or eliminate IRRs in future studies of antolimab (AK002).

*Future Studies*

Antolimab (AK002) has secured orphan drug designation for EG, EGE, and EoE from the FDA. Based on the promising results from the ENIGMA study, we plan to initiate a Phase 3 study in patients with EG and/or EGE during the first quarter of 2020. Based on communications with the FDA, we believe the results of the ENIGMA study, in conjunction with the results from a Phase 3 study, if successful, will be sufficient for regulatory approval. We also plan to initiate a Phase 2/3 study in patients EoE during the first quarter of 2020.

**Mast Cell Gastrointestinal Disease**

During the enrollment phase of the ENIGMA study, we identified a group of patients who were symptomatic but upon biopsy had elevated stomach and/or duodenal mast cell counts in the absence of elevated eosinophils (Figure 8). Because of the elevated mast cell counts and lack of elevated eosinophils and other elevated cell types, these patients appear to suffer from mast cell driven gastrointestinal symptoms. We have labelled these conditions Mast Cell Gastrointestinal Disease ("MGID"). We are currently conducting a six-month open-label Phase 1 study in patients with MGID using antolimab (AK002) and expect to report safety and efficacy results from this study in the first quarter of 2020. We are also working to further characterize the MGID patient population and are conducting a non-interventional study to further understand the prevalence of MGID in the United States.

**Figure 8: Symptoms of patients with EG and/or EGE compared to patients with MGID**



*EG, EGE, and MGID Prevalence Study*

During the enrollment phase of the ENIGMA study, our investigational sites screened 51 patients that had not been previously diagnosed with an EGID. Many of these patients, identified as potential study candidates after presenting with chronic GI symptoms, had received prior diagnoses of irritable bowel syndrome ("IBS"), functional dyspepsia ("FD"), or nonspecific gastritis. Of the 51 patients with no prior EGID diagnosis, 26 met the symptomatic threshold and received biopsies. Of the 26 patients biopsied, 15 patients (58%) were found to have EG or EGE and were therefore eligible for enrollment in the ENGIMA study and 11 (42%) patients were found to have MGID. The high rate of discovery among previously undiagnosed patients suggests that some patients with chronic GI symptoms (including those with IBS, FD or nonspecific gastritis) may have EG, EGE, or MGID. Based on these observations, we are conducting a non-interventional study to assess the prevalence of EG, EGE, and MGID in approximately 200 patients with chronic moderate to severe GI symptoms, including those with IBS, FD, or gastritis, with no prior diagnosis of EG, EGE, or elevated mast cell counts. We expect to report results from this disease prevalence study in the second half of 2020. Results from the study may point to a larger EG and EGE population than the ICD-9 based prevalence estimate of 50,000 US patients and establish an estimate of the prevalence of MGID.

***Chronic Urticarias***

*Disease Overview*

CU is a group of mast cell driven skin conditions which are characterized by recurrent transient pruritic wheal and flare type skin reactions and, in roughly 40% of patients, angioedema. Symptoms include hives, itching, redness, raised welts, burning, warmth, tingling and irritation of the skin. Patients with CU are often severely impaired in their quality of life, with negative effects on sleep, daily activities, school/work life and social interactions. Urticaria symptoms are caused by degranulation of dermal mast cells, with IgE signaling believed to contribute to mast cell activation in many cases. The most common forms of CU are chronic spontaneous urticaria ("CSU"), cholinergic urticaria and symptomatic dermatographism.

10

Despite sharing similar inflammatory pathology, urticarias differ in the triggers that cause the inflammatory response. Cholinergic urticaria patients typically develop symptoms a few minutes after exercise or passive warming in a bath or shower. In some cholinergic patients, emotional stress or hot and spicy food or beverages can also elicit symptoms. Symptomatic dermatographism is characterized by hiving and itching following a minor stroking pressure, rubbing or scratching of the skin. In CSU, itchy, wheal-and-flare-type skin reactions spontaneously appear on the skin at any time of the day or night. In most CSU patients, an underlying cause of CSU cannot be identified making a causal and/or curative treatment difficult. We conservatively estimate that approximately 200,000-500,000 patients with severe CSU, cholinergic urticaria and symptomatic dermatographism could be candidates for therapy with antolimab (AK002) in the United States.

*Current Therapies and Limitations*

The current treatment guidelines for the management of all forms of urticaria recommend the use of non-sedating oral H1-antihistamines as first-line therapy. For patients that do not respond to standard doses of H1-antihistamines, doses are increased to as high as four times the standard dose. Though this can increase the response rates, side effects also increase, including sedation and anticholinergic effects, such as dry mouth, blurred vision, urinary retention and constipation. Patients that do not respond to or are unable to tolerate high dose antihistamines have few options. For cholinergic urticaria and symptomatic dermatographism patients, it is recommended that they avoid target triggers such as overheated spaces, hot baths/showers, exercise, specific food allergens and excessive contact. For antihistamine refractory patients with CSU, the only currently approved treatment is Xolair, a monoclonal anti-IgE antibody. Unfortunately, approximately 60% of CSU patients continue to have symptoms despite treatment with Xolair.

*Study Design and Results*

We conducted an open-label Phase 2 study with antolimab (AK002) in patients with uncontrolled CU despite treatment with H1 antihistamines at up to 4x the labeled dose. The study enrolled four cohorts consisting of 13 Xolair naïve patients with CSU, 11 Xolair refractory patients with CSU (average duration of Xolair treatment 10 months at doses as high as 600mg/month), 11 patients with cholinergic urticaria, and 10 patients with symptomatic dermographism. Baseline symptom scores, as measured by Urticaria Control Test ("UCT") and Urticaria Activity Score ("UAS7") were collected over a 4-week screening period. Patients with baseline UCT scores of less than 12, indicative of poorly controlled urticaria, were enrolled in the study and treated with up to 6 doses of antolimab (AK002) given once monthly. Patients received an initial dose of 0.3 mg/kg at baseline, followed by a dose of 1.0 mg/kg on day 28, and then received monthly doses of either 1.0 or 3.0 mg/kg for a total of 6 doses. The primary endpoint of the trial was patient-reported symptoms measured by the UCT. Secondary endpoints include safety and tolerability, as well as patient-reported symptoms as measured by UAS7 (CSU patients only), pulse controlled ergometry (cholinergic urticaria patients only), and Fric testing (symptomatic dermographism patients only).

Results for each cohort are shown in Figure 9. Patients in all cohorts reported high levels of disease control and some patients experienced complete resolution of symptoms while receiving antolimab (AK002). Importantly, antolimab (AK002) also produced high levels of response in patients that were refractory to Xolair. This suggests that antolimab (AK002), if approved, could become the treatment of choice for antihistamine refractory CU patients. Additionally, antolimab (AK002) depleted blood eosinophils in subjects throughout the dosing period.

**Figure 9. Data from the Phase 2 CU clinical trial**

| Xolair Naïve CSU Cohort (N=13) | Baseline | Week 22 |
| --- | --- | --- |
| Average UCT Score | 3.2 | 14.2 |
| UCT Complete Response | — | 12/13 (92%) |
| UCT Partial Response | — | 0/13 (0%) |
| UCT No Response | — | 1/13 (8%) |
| Average UAS7 Score | 18.5 | 4.6 (-75%) |
| Proportion with UAS7 ≤ 6 | 0% | 8/13 (62%) |
| Proportion with UAS7 = 0 | 0% | 7/13 (54%) |
| Proportion with ISS7 = 0 | 0% | 7/13 (54%) |
| Proportion with HSS7 = 0 | 0% | 10/13 (77%) |

| Xolair Failure CSU Cohort (N=11) | Baseline | Week 22 |
|---|---|---|
| Average UCT Score | 3.7 | 8.5 |
| UCT Complete Response | — | 4/11 (36%) |
| UCT Partial Response | — | 2/11 (18%) |
| UCT No Response | — | 5/11 (45%) |
| Average UAS7 | 28.7 | 14.7 (-49%) |
| Proportion with UAS7 ≤ 6 | 0% | 2/11 (18%) |
| Proportion with UAS7 = 0 | 0% | 1/11 (9%) |
| Proportion with ISS7 = 0 | 0% | 1/11 (9%) |
| Proportion with HSS7 = 0 | 0% | 1/11 (9%) |

| Cholinergic Urticaria Cohort (N=11) | Baseline | Week 22 |
|---|---|---|
| Average UCT Score | 5.4 | 11.8 |
| UCT Complete Response | — | 9/11 (82%) |
| UCT Partial Response | — | 0/11 (0%) |
| UCT No Response | — | 2/11 (18%) |
| Pulse Control Ergometry Exercise Test Negative | 0% | 7/7 (100%) |

| Symptomatic Dermographism Cohort (N=10) | Baseline | Week 22 |
|---|---|---|
| Average UCT Score | 5.7 | 9.1 |
| UCT Complete Response | — | 4/10 (40%) |
| UCT Partial Response | — | 3/10 (30%) |
| UCT No Response | — | 3/10 (30%) |
| Fric Test Itch Negative | 0% | 5/10 (50%) |
| Fric Test Hives Negative (Critical Friction Threshold) | 0% | 4/10 (40%) |

Antolimab (AK002) was generally well tolerated in the Phase 2 CU study. The most common adverse event was the occurrence of mild to moderate IRRs such as flushing, feeling of warmth, headache, nausea or dizziness, which occurred in 34% of first infusions and only 4% of subsequent infusions.

12

*Severe Allergic Conjunctivitis*

### *Disease Overview*

Atopic keratoconjunctivitis ("AKC"), vernal keratoconjunctivitis ("VKC") and perennial allergic conjunctivitis ("PAC") are a set of allergic ocular conjunctival diseases primarily associated with an IgE-mediated hypersensitivity reaction. We are focused on SAC, the severe forms of these collective diseases. These conditions are often caused by airborne allergens, such as grass and tree pollens, coming into contact with the eyes, which induces IgE mediated mast cell degranulation and allergic inflammation. The inflammatory mediators released by the mast cell result in inflammation and the infiltration of eosinophils, neutrophils and other immune cells. Eosinophils and mast cells are believed to be the main effector cells, with protease secretions directly damaging the conjunctiva, and play a key role in triggering and maintaining the inflammatory response. Symptoms include itching, hyperemia, light sensitivity (or "photophobia"), pain, eye discharge and the sensation of having a foreign body in the eye. These symptoms can affect quality of life and daily activities, such as reading, driving and being in bright outdoor environments. In addition, patients with untreated disease, in particular those with VKC and AKC, can experience remodeling of the ocular surface tissues that can lead to vision loss. In addition to the primary symptoms of allergic conjunctivitis, a high correlation of allergic rhinitis, allergic asthma and atopic dermatitis comorbidities occur in this patient population. We believe that approximately 50,000-150,000 patients in the United States suffer from SAC and could be candidates for treatment with antolimab (AK002).

### *Current Therapies and Limitations*

PAC is treated with topical antihistamines and mast cell stabilizers. More serious forms are treated with topical and systemic corticosteroids, cyclosporine and other immunomodulatory drugs. There are no drugs approved for AKC and VKC, and as a result, patients are typically treated similarly to patients with PAC. Unfortunately, many patients continue to have symptoms despite these topical and/or systemic treatments and many of the drugs are not suitable for long-term treatment due to undesirable side effects.

### *Study Design and Results*

We conducted an open-label Phase 1 trial with antolimab (AK002) in patients with SAC. The trial was open-label, multi-dose, six-month study and enrolled 29 total SAC patients. Of the 29 patients, 13 patients had AKC, 15 patients had PAC, and one patient had VKC. Patients received a 0.3 mg/kg dose of antolimab (AK002) for the first month, followed by a 1 mg/kg dose the next month, then monthly doses of 1 or 3 mg/kg for four additional months. The primary endpoint of the trial was safety and tolerability. Key secondary endpoints included patient-reported symptom measures of ocular itch, pain, lacrimation, photophobia and foreign body sensation. Patients administered antolimab (AK002) reported a 78% median improvement in ocular symptoms by ACS and a 71% median improvement in physician assessed signs and symptoms using the OSS. In addition, a number of patients enrolled in the trial also had concomitant allergic rhinitis, asthma, and atopic dermatitis. Patients suffering from comorbid atopic dermatitis, asthma and allergic rhinitis, despite treatment with currently available therapies, reported improvements in their symptoms while receiving antolimab (AK002).

Antolimab (AK002) was generally well tolerated. The most common adverse event was mild to moderate IRRs, such as flushing, feeling of warmth, headache, nausea, dizziness, which occurred mostly during the first infusion.

13

**Figure 10. SAC Phase 1 Trial Results**

| ACS Symptom (N=29) | Patient Assessed<br>Median Change from Baseline to Weeks 21 to 22 |
| --- | --- |
| Itching | -75% |
| Light Sensitivity | -57% |
| Eye Pain | -75% |
| Foreign Body Sensation | -80% |
| Watering Eyes | -76% |

| OSS Symptom (N=29) | Investigator Assessed<br>Median Change from Baseline to Day 140 |
| --- | --- |
| Itching | -67% |
| Redness | -67% |
| Tearing | -50% |
| Chemosis | -100% |

| Comorbid Condition | Patient Assessed<br>Change in Median Global Severity from<br>Baseline to Weeks 21 to 22 |
| --- | --- |
| Asthma (N = 9) | -72% |
| Atopic Dermatitis (N = 11) | -65% |
| Rhinitis (N = 11) | -69% |

*Indolent Systemic Mastocytosis*

*Disease Overview*

ISM is a rare disease characterized by the clonal proliferation and accumulation of mast cells in the bone marrow, respiratory and gastrointestinal tracts, and organs such as the skin, liver, spleen and brain. Common symptoms include pruritus, flushing, headache, cognitive impairment, fatigue, diarrhea, gastrointestinal cramps, hypotension and skin lesions, as well as an increased risk for osteoporosis and anaphylaxis, which in some cases can be life threatening. The symptoms of ISM are attributed to mast cell activation and the systemic release of mediators. Approximately 30,000 patients in the United States suffer from ISM. Antolimab (AK002) has received orphan drug designation from the FDA and the European Medicines Agency ("EMA") for the treatment of ISM.

*Current Therapies and Limitations*

There are currently no drugs approved for the treatment of ISM by the FDA or EMA. ISM is treated with drugs targeting mast cell mediators, including antihistamines, cromolyn sodium and leukotriene blocking agents. Most patients' symptoms remain poorly controlled by these treatments. Glucocorticoids can provide temporary relief in some cases; however long-term treatment with steroids is not appropriate due to their many side effects.

*Study Design and Results*

Antolimab (AK002) has been evaluated in an open-label, single and multiple ascending dose Phase 1 study in patients with ISM. The single dose portion of this trial was completed during the second quarter of 2017, with subsequent completion of the six-month multi-dose portion in the first quarter of 2019. The primary endpoints of the trial were safety and tolerability. Key secondary endpoints were the pharmacokinetic and pharmacodynamic profile of antolimab (AK002), including peripheral counts of eosinophils and patient-reported mastocytosis disease

14

symptoms including itching, hives, skin flushing, diarrhea, abdominal pain, fatigue, headache, difficulty concentrating and muscle and joint pain. In the single dose portion, 13 patients received single escalating doses of 0.0003 to 1.0 mg/kg, including three patients receiving 0.3 mg/kg and three patients receiving 1.0 mg/kg of antolimab (AK002). Five out of six patients receiving 0.3 or 1.0 mg/kg reported to the study investigators that they had improvements in symptoms, including diarrhea, abdominal pain, fatigue, pruritus, difficulty concentrating and headaches.

In the multi-dose portion of the trial, 6 patients received six doses of 1.0 mg/kg of antolimab (AK002) given monthly and 5 patients received 1.0 mg/kg for the first month and then monthly doses of 3.0 to 10 mg/kg of antolimab (AK002) for the five months thereafter. Depletion of eosinophils was observed for all patients throughout the dosing period with antolimab (AK002). ISM symptoms and quality of life were assessed using the Mastocytosis Questionnaire ("MSQ"), an internally developed Patient Reported Outcome ("PRO") instrument, the Mastocytosis Questionnaire ("MSQ"), as well as two published questionnaires, the Mastocytosis Activity and Symptom Severity questionnaire ("MAS") and the Mastocytosis Quality of Life questionnaire ("MC-QoL"). The MSQ is a proprietary daily PRO Mastocytosis Questionnaire that we developed based on published guidance from the FDA on the development of PRO instruments and is expected to be used to help determine safety and efficacy in future clinical trials. The MSQ consists of nine symptom assessments, with each symptom being scored on a 0-10 scale with higher values representing greater symptom burden. Total score for the MSQ ranges from 0-90 points. For each PRO, baseline scores were collected over 14 to 28 days and compared to scores at Weeks 21 to 22, two weeks after the final dose of antolimab (AK002). PRO data obtained from patients in the multidose portion of the trial are presented in Figure 11. Consistent with the improvements reported in the single ascending dose study, antolimab (AK002) produced clinically meaningful improvement in patient symptoms for multiple symptoms across all three PROs used in the study.

15

**Figure 11. Patient Reported Outcomes from multi-dose portion of ISM trial**

| MSQ Symptom (N=8) [1] | Median Change from Baseline at Weeks 21 to 22 |
|---|---|
| Itching | -56% |
| Hives | -38% |
| Flushing (#) | -46% |
| Abdominal Pain | -60% |
| Diarrhea | -49% |
| Headache | -50% |
| Fatigue | -47% |
| Difficulty Concentrating | -59% |
| Muscle Pain | -27% |
| Joint Pain | -26% |

[1]     The MSQ was not available for use in 3 patients.

| MAS2 Symptom (N=11) | Median Change from Baseline at Weeks 21 to 22 |
|---|---|
| Itching | -53% |
| Hives | -59% |
| Flushing | -57% |
| Abdominal Pain | -84% |
| Diarrhea | -72% |
| Headache | -57% |
| Fatigue | -22% |
| Difficulty Concentrating | -30% |
| Bone-Joint-Muscle Pain | -22% |

| MC-QoL Domain (N=11) | Median Change from Baseline at Day 145 |
|---|---|
| Symptoms | -39% |
| Social Life / Functioning | -42% |
| Emotions | -57% |
| Skin | -44% |

Antolimab (AK002) was generally well tolerated in the Phase 1 ISM study. The most common adverse event was the occurrence of mild to moderate IRRs, such as flushing, feeling of warmth, headache, nausea or dizziness, which occurred mostly during the first infusion.

*Subcutaneous Formulation*

To date, antolimab (AK002) has been administered intravenously in all of our completed and ongoing clinical studies. We have also developed a high concentration formulation of antolimab (AK002) for subcutaneous administration. We expect to complete a Phase 1 study in healthy volunteers evaluating the safety, tolerability and pharmacokinetics of a subcutaneous formulation of antolimab (AK002) in the second half of 2020.

**Preclinical Results**

*Antolimab (AK002) Results in Animal Disease Models Suggest Broad Activity*

Because Siglec-8 is found only in cells of humans and certain other primates, we have developed a proprietary Siglec-8 transgenic mouse, in which Siglec-8 is expressed with a similar tissue distribution to humans and is

16

functionally active. The transgenic mouse provides us with a proprietary tool to assess the safety, tolerability and activity of anti-Siglec-8 antibodies.

Antolimab (AK002) has completed short- and long-term toxicity studies in Siglec-8 transgenic mice. Chronic weekly dosing for six months with antolimab (AK002) in transgenic mice at dose levels of 50 or 100 mg/kg resulted in no adverse drug-related findings in mortality, clinical observations, body weight, food consumption and anatomic pathology after the end of dosing. Non-adverse findings included decreases in eosinophil counts in both sexes at 50 mg/kg/week, which persisted through the recovery period. These findings reflect the expected pharmacology of antolimab (AK002). The no-observed-adverse-effect-level of antolimab (AK002) after chronic dosing for six months was 100 mg/kg/week.

We have shown that antolimab (AK002) or antibodies to Siglec-8 have broad activity in animal disease models (eosinophilic gastroenteritis, anaphylaxis, fibrosis and chronic obstructive pulmonary disease) and in human *ex vivo* diseased tissue (eosinophilic gastrointestinal disease, mastocytosis, atomic dermatitis and lung). In these models, anti-Siglec-8 antibodies have significantly reduced eosinophils and inhibited mast cells. The activity in these models suggests antolimab (AK002) has the potential to treat eosinophil and mast cell inflammation in a number of disease settings and highlights the ability of antolimab (AK002) to inhibit the inflammatory cascade triggered by different activating signals.

*Anti-Siglec-8 Antibody Inhibits IgE Mediated Systemic Anaphylaxis in Mouse Model*

The ability of an anti-Siglec-8 antibody to inhibit IgE-mediated mast cell activation was demonstrated in a mouse model of systemic anaphylaxis. Anaphylaxis occurs due to IgE-mediated release of inflammatory mediators and cytokines from mast cells, which results in vasodilation, a reduction in core body temperature, itchiness and bronchoconstriction, among other symptoms. In this model, "humanized" mice engrafted with human immune cells were pretreated with an anti-Siglec-8 antibody or an isotype control antibody, administered an allergen-specific IgE, and 24 hours later, anaphylaxis was triggered using an allergen. Mice treated with the isotype control antibody plus IgE and allergen displayed symptoms of anaphylaxis and body temperature decreases that peaked 10 to 40 minutes after inducing anaphylaxis. In contrast, mice treated with the anti-Siglec-8 antibody plus IgE and allergen displayed no observable symptoms and had no significant changes in core body temperature.

**Figure 12. Effects of Anti-Siglec-8 in a Mouse Model of Systemic Anaphylaxis**



*Anti-Siglec-8 Antibody Decreases Bleomycin Induced Lung Fibrosis in Mouse Model*

Lung fibrosis induced by bleomycin is believed to be due to the increased expression of IL-33. IL-33 induces mast cells to release mediators that activate fibroblasts leading to fibrosis and collagen deposition. In this model, lung fibrosis was induced by administering bleomycin to Siglec-8 transgenic mice every other day for 30 days. On days 14, 21 and 28, an anti-Siglec-8 or isotype control antibody was administered. Fibrosis was assessed on day 30

for anti-Siglec-8 or isotype control antibody treated mice and compared to sham treated mice (mice that did not receive bleomycin). Relative to control antibody mice, mice treated with an anti-Siglec-8 antibody displayed minimal fibrotic changes. In addition, the bronchoalveolar lavage ("BAL") of anti-Siglec-8 treated mice displayed reduced levels of infiltrating leukocytes that were similar to sham treated animals.

**Figure 13. Leukocyte Counts and Lung Fibrosis in Bleomycin Lung Fibrosis Model**



*Anti-Siglec-8 Antibody Inhibits IL-33/TSLP Activation of Mast Cells from Human Skin*

IL-33 combined with TSLP is a potent activator of mast cells and results in increased expression of the mast cell activation marker CD63. Mast cells isolated from skin showed a 20% increase in the expression of CD63 after overnight exposure to IL-33 and TSLP. In contrast, skin mast cells treated with antolimab (AK002) along with IL-33 and TSLP did not show increased activation, with CD63 levels remaining similar to control levels (no IL-33 and TSLP exposure). In addition, the levels of chemokines CCL2 and ENA78 did not increase after stimulation with IL-33 and TSLP in the presence of antolimab (AK002). Chemokines are known to recruit and activate cells of the innate and adaptive immune system. By normalizing chemokine secretions, antolimab (AK002) may be able to prevent further recruitment of immune cells and thereby interrupt the inflammatory cascade.

**Figure 14.** *Ex Vivo* **Skin Tissue Response to IL33/TSLP**



*Anti-Siglec-8 Antibody Reduces Eosinophil and Mast Cell Levels in EG/EGE Model*

In this model, two groups of Siglec-8 transgenic mice were sensitized with ovalbumin to induce eosinophil and mast cell driven gastrointestinal inflammation similar to that observed in EG and other EGIDs. A third group of animals was administered phosphate buffered saline to serve as normal unsensitized sham controls ("sham"). Treatment with a single dose of anti-Siglec-8 antibody led to lower levels of eosinophils in the blood, stomach and small intestine and reduced numbers of mast cells in the stomach and small intestine compared to mice that received an isotype control antibody ("ISO").

**Figure 15. EG/EGE Model Eosinophil and Mast Cell Counts in Blood, Stomach and Small Intestine**



Anti-Siglec-8 treatment also reduced the levels of multiple important chemokines (CCL5/Rantes, CCL2/MCP-1, CCL17) to the levels of sham control animals. Chemokines are known to recruit and activate cells of the innate and adaptive immune system. By normalizing chemokine secretions, antolimab (AK002) may be able to reduce further recruitment of immune cells and thereby interrupt the inflammatory cascade.

19

**Figure 16. Chemokine Levels in the EG/EGE Mouse Model**



**Preclinical Programs**

We are developing additional antibodies targeting novel immune system receptors. These antibodies are being assessed in a variety of animal models.

**Competition**

The biotechnology and pharmaceutical industries are characterized by rapid technological advancement, significant competition and an emphasis on intellectual property. We face potential competition from many different sources, including major and specialty pharmaceutical and biotechnology companies, academic research institutions, governmental agencies and public and private research institutions. Any product candidates that we successfully develop and commercialize will compete with current therapies and new therapies that may become available in the future. We believe that the key competitive factors affecting the success of any of our product candidates will include efficacy, safety profile, convenience, cost, level of promotional activity devoted to them and intellectual property protection.

We are not aware of any other company or organization that is conducting clinical trials of a product candidate that targets both mast cells and eosinophils, including any product candidate that specifically targets Siglec-8. The competition we may face with respect to each of the indications we are targeting with antolimab (AK002) includes:

- *EG, EGE and EoE.* Currently, there are no therapies that have been approved by the FDA specifically for EG, EGE or EoE. Several companies, including but not limited to, Regeneron, AstraZeneca, Celgene, Shire, and Dr. Falk Pharma have or are conducting studies in these indications.

- *ISM.* We are not aware of any FDA-approved treatments for ISM. Blueprint Medicines initiated a phase 2 trial evaluating avapritinib in smoldering systemic mastocytosis and ISM in the second half of 2018.

- *CU.* Xolair is an FDA-approved drug approved for the treatment of CSU. We are not aware of any FDA-approved treatment options for cholinergic urticaria or symptomatic dermatographism. Companies conducting studies in chronic spontaneous urticaria include: Novartis Pharmaceuticals (ligelizumab), Genentech (fenebrutinib), and Gossamer Bio (GB100).

- *SAC.* The products that are currently available for treatment of SAC only provide temporary relief for most patients and have little effect on moderate to severe cases. We are not aware of any other company specifically targeting SAC.

Many of the companies against which we may compete have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, obtaining regulatory approvals and marketing approved products than we do. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These competitors also compete with us in recruiting and retaining qualified scientific and management personnel

and establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our programs.

**Sales and Marketing**

In light of our stage of development, we currently have limited marketing and sales capabilities. We hold worldwide commercialization rights to all of our product candidates. We intend to retain the rights to our compounds in key markets for the time being, and plan to build our own focused, specialty sales force to commercialize approved products in the United States.

**Manufacturing**

We must manufacture drug product for clinical trial use in compliance with cGMP regulations. The cGMP regulations include requirements relating to organization of personnel, buildings and facilities, equipment, control of components and drug product containers and closures, production and process controls, packaging and labeling controls, holding and distribution, laboratory controls, records and reports and returned or salvaged products. The manufacturing facilities for our product candidates must meet cGMP requirements and FDA or comparable foreign regulatory authority's satisfaction before any product is approved and our commercial products can be manufactured. Our third-party manufacturers will also be subject to periodic inspections of facilities by the FDA and other foreign authorities, including procedures and operations used in the testing and manufacture of our products to assess our compliance with applicable regulations.

We do not currently have the infrastructure or internal capability to manufacture our product candidates for use in clinical development and commercialization. We rely, and expect to continue to rely, on third-party manufacturers for the production of our product candidates in compliance with cGMP requirements clinical trials under our guidance. In the case of antolimab (AK002), we rely on a single third-party manufacturer, Lonza, and we currently have no alternative manufacturer in place. We do not have long-term supply agreements and we purchase our required drug product on a purchase order basis. We expect to continue to rely on third-party manufacturers for the commercial supply of any of our product candidates for which we obtain marketing approval. We have personnel with significant technical, manufacturing, analytical, quality, regulatory, cGMP and project management experience to oversee our third-party manufacturers and to manage manufacturing and quality data and information for regulatory compliance purposes.

Failure to comply with statutory and regulatory requirements subjects a manufacturer to possible legal or regulatory action, including warning letters, the seizure or recall of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations and civil and criminal penalties. Contract manufacturers often encounter difficulties involving production yields, quality control and quality assurance, as well as shortages of qualified personnel. Any of these actions or events could have a material impact on the availability of our products.

**In-Licensing Agreements**

We have entered into two in-licensing agreements with third-parties for the development, manufacturing and commercialization of our products including antolimab (AK002). The specific terms of the individual agreements are discussed in further detail below.

*Exclusive License Agreement with The Johns Hopkins University*

We have exclusively licensed intellectual property from The Johns Hopkins University ("JHU") in a license agreement dated December 20, 2013 and amended and restated September 30, 2016. In December 2013, we entered into an agreement with JHU for an exclusive worldwide license to develop and commercialize for the treatment and prevention of disease products covered by the JHU licensed patent rights or derived from materials provided by JHU. In September 2016, we and JHU amended and restated the license agreement to an exclusive worldwide license to develop and commercialize in all fields products covered by the licensed patent rights, or derived from materials provided by JHU.

Under the license agreement we are obligated to make payments to JHU for therapeutic products aggregating up to $4.0 million based on achieving specified development and regulatory approval milestones. We will also pay single-digit royalties to JHU based on net sales of each licensed therapeutic product by us and our affiliates and sublicensees and have up to a low six-digit dollar minimum annual royalty payment. In addition, in the event we sublicense the JHU intellectual property, we are obligated to pay JHU a specified portion of income we receive from sublicensing.

Our royalty obligation with respect to each licensed product in a country extends until the later of the expiration of the last-to-expire patent licensed from JHU covering the licensed product in the country or the expiration of a specified number of years after the first commercial sale of any licensed product in any country. The latest possible expiration date of patents licensed under the agreement is 2021 in all applicable countries, in the absence of any patent extensions that may be available for such patents.

*Non-Exclusive License Agreement with BioWa Inc. and Lonza Sales AG*

We have licensed on a non-exclusive basis intellectual property from BioWa Inc. ("BioWa") and Lonza pursuant to a license agreement dated October 31, 2013. The agreement grants Allakos a non-exclusive worldwide license to develop and commercialize certain products manufactured in a particular mammalian host cell line for the prevention, diagnosis or treatment of human disease.

Under the license agreement, we are obligated to pay BioWa an annual commercial license fee of $40,000 until such time as BioWa receives royalty payments. We may also become obligated to make payments to BioWa aggregating up to $41.0 million based on achieving specified milestones, and to pay low single-digit royalties to BioWa based on net sales of licensed product by us and our affiliates and sublicensees. Our royalty obligation to BioWa with respect to each licensed product in a country extends until the later of the expiration of the last-to-expire licensed patent covering the licensed product in the country or the expiration of either regulatory exclusivity or a specified number of years after the first commercial sale of the licensed product in the country, whichever is later.

We may also pay low single-digit royalties to Lonza based on net sales of each licensed product by us and our affiliates and sublicensees. We will be required to pay an annual license fees to Lonza if we (or our strategic partner) manufactures a particular product using the particular cell line, or if we utilize a third party CMO to manufacture a product using such system. Our royalty obligation to Lonza with respect to each licensed product in a country extends until the later of the expiration of the last-to-expire licensed patent covering the licensed product in the country or a specified number of years after the first commercial sale of the licensed product in the country, whichever is later. The latest possible expiration date of patents licensed under the agreement is 2021 or 2023, depending on the country, in the absence of any patent extensions that may be available for such patents.

22

*Total Royalty Burden*

In aggregate, we anticipate our total royalty obligation on antolimab (AK002) from our in-licensing agreements will be a mid-single digit percentage of net sales by us and our affiliates and sublicensees.

**Government Regulation**

Government authorities in the United States at the federal, state and local level and in other countries regulate, among other things, the research, development, testing, manufacture, quality control, approval, labeling, packaging, storage, record-keeping, promotion, advertising, distribution, post-approval monitoring and reporting, marketing and export and import of drug and biological products. Generally, before a new drug or biologic can be marketed, considerable data demonstrating its quality, safety and efficacy must be obtained, organized into a format specific for each regulatory authority, submitted for review and approved by the regulatory authority.

*U.S. Drug Development*

In the United States, the FDA regulates drugs under the Federal Food, Drug, and Cosmetic Act ("FDCA") and its implementing regulations, and biologics under the FDCA, the Public Health Service Act ("PHSA") and their implementing regulations. Both drugs and biologics also are subject to other federal, state and local statutes and regulations. The process of obtaining regulatory approvals and the subsequent compliance with appropriate federal, state, local and foreign statutes and regulations requires the expenditure of substantial time and financial resources. Failure to comply with the applicable U.S. requirements at any time during the product development process, approval process or post-market may subject an applicant to administrative or judicial sanctions. These sanctions could include, among other actions, the FDA's refusal to approve pending applications, withdrawal of an approval, a clinical hold, untitled or warning letters, product recalls or market withdrawals, product seizures, total or partial suspension of production or distribution, injunctions, fines, refusals of government contracts, restitution, disgorgement and civil or criminal penalties. Any agency or judicial enforcement action could have a material adverse effect on us.

Any future product candidates must be approved by the FDA through either a BLA or New Drug Application ("NDA") process before they may be legally marketed in the United States. The process generally involves the following:

- completion of extensive preclinical studies in accordance with applicable regulations, including studies conducted in accordance with good laboratory practice ("GLP"), requirements;

- submission to the FDA of an Investigational New Drug ("IND") application, which must become effective before human clinical trials may begin;

- approval by an independent institutional review board ("IRB"), or ethics committee at each clinical trial site before each trial may be initiated;

- performance of adequate and well-controlled human clinical trials in accordance with applicable IND regulations, good clinical practice ("GCP"), requirements and other clinical trial-related regulations to establish the safety and efficacy of the investigational product for each proposed indication;

- submission to the FDA of an NDA or BLA;

- a determination by the FDA within 60 days of its receipt of an NDA or BLA to accept the filing for review;

- satisfactory completion of a FDA pre-approval inspection of the manufacturing facility or facilities where the drug or biologic will be produced to assess compliance with cGMP requirements to assure that the facilities, methods and controls are adequate to preserve the drug or biologic's identity, strength, quality and purity;

- potential FDA audit of the preclinical and/or clinical trial sites that generated the data in support of the NDA or BLA;

23

- FDA review and approval of the NDA or BLA, including consideration of the views of any FDA advisory committee, prior to any commercial marketing or sale of the drug or biologic in the United States; and

- compliance with any post-approval requirements, including the potential requirement to implement a Risk Evaluation and Mitigation Strategy ("REMS"), and the potential requirement to conduct post-approval studies.

The data required to support an NDA or BLA are generated in two distinct developmental stages: preclinical and clinical. The preclinical and clinical testing and approval process requires substantial time, effort and financial resources, and we cannot be certain that any approvals for any future product candidates will be granted on a timely basis, or at all.

### Preclinical Studies and IND

The preclinical developmental stage generally involves laboratory evaluations of drug chemistry, formulation and stability, as well as studies to evaluate toxicity in animals, which support subsequent clinical testing. The sponsor must submit the results of the preclinical studies, together with manufacturing information, analytical data, any available clinical data or literature and a proposed clinical protocol, to the FDA as part of the IND. An IND is a request for authorization from the FDA to administer an investigational product to humans, and must become effective before human clinical trials may begin.

Preclinical studies include laboratory evaluation of product chemistry and formulation, as well as *in vitro* and animal studies to assess the potential for adverse events and in some cases to establish a rationale for therapeutic use. The conduct of preclinical studies is subject to federal regulations and requirements, including GLP regulations for safety/toxicology studies. An IND sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and plans for clinical studies, among other things, to the FDA as part of an IND. Some long-term preclinical testing, such as animal tests of reproductive adverse events and carcinogenicity, may continue after the IND is submitted. An IND automatically becomes effective 30 days after receipt by the FDA, unless before that time, the FDA raises concerns or questions related to one or more proposed clinical trials and places the trial on clinical hold. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. As a result, submission of an IND may not result in the FDA allowing clinical trials to commence.

### Clinical Trials

The clinical stage of development involves the administration of the investigational product to healthy volunteers or patients under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control, in accordance with GCP requirements, which include the requirement that all research subjects provide their informed consent for their participation in any clinical trial. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria and the parameters to be used to monitor subject safety and assess efficacy. Each protocol, and any subsequent amendments to the protocol, must be submitted to the FDA as part of the IND. Furthermore, each clinical trial must be reviewed and approved by an IRB for each institution at which the clinical trial will be conducted to ensure that the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the informed consent form that must be provided to each clinical trial subject or his or her legal representative, and must monitor the clinical trial until completed. There also are requirements governing the reporting of ongoing clinical trials and completed clinical trial results to public registries.

A sponsor who wishes to conduct a clinical trial outside of the United States may, but need not, obtain FDA authorization to conduct the clinical trial under an IND. If a foreign clinical trial is not conducted under an IND, the sponsor may submit data from the clinical trial to the FDA in support of an NDA or BLA. The FDA will accept a well-designed and well-conducted foreign clinical trial not conducted under an IND if the trial was conducted in accordance with GCP requirements and the FDA is able to validate the data through an onsite inspection if deemed necessary.

24

Clinical trials in the United States generally are conducted in three sequential phases, known as Phase 1, Phase 2 and Phase 3, and may overlap.

- Phase 1 clinical trials generally involve a small number of healthy volunteers or disease-affected patients who are initially exposed to a single dose and then multiple doses of the product candidate. The primary purpose of these clinical trials is to assess the metabolism, pharmacologic action, tolerability and safety of the drug.

- Phase 2 clinical trials involve studies in disease-affected patients to determine the dose required to produce the desired benefits. At the same time, safety and further PK and PD information is collected, possible adverse effects and safety risks are identified and a preliminary evaluation of efficacy is conducted.

- Phase 3 clinical trials generally involve a large number of patients at multiple sites and are designed to provide the data necessary to demonstrate the effectiveness of the product for its intended use, its safety in use and to establish the overall benefit/risk relationship of the product and provide an adequate basis for product approval. These trials may include comparisons with placebo and/or other comparator treatments. The duration of treatment is often extended to mimic the actual use of a product during marketing.

Post-approval trials, sometimes referred to as Phase 4 clinical trials, may be conducted after initial marketing approval. These trials are used to gain additional experience from the treatment of patients in the intended therapeutic indication. In certain instances, the FDA may mandate the performance of Phase 4 clinical trials as a condition of approval of an NDA or BLA.

Progress reports detailing the results of the clinical trials, among other information, must be submitted at least annually to the FDA and written IND safety reports must be submitted to the FDA and the investigators for serious and unexpected suspected adverse events, findings from other studies suggesting a significant risk to humans exposed to the drug or biologic, findings from animal or *in vitro* testing that suggest a significant risk for human subjects and any clinically important increase in the rate of a serious suspected adverse reaction over that listed in the protocol or investigator brochure.

Phase 1, Phase 2 and Phase 3 clinical trials may not be completed successfully within any specified period, if at all. The FDA or the sponsor may suspend or terminate a clinical trial at any time on various grounds, including a finding that the research subjects or patients are being exposed to an unacceptable health risk. Similarly, an IRB can suspend or terminate approval of a clinical trial at its institution if the clinical trial is not being conducted in accordance with the IRB's requirements or if the drug or biologic has been associated with unexpected serious harm to patients. Additionally, some clinical trials are overseen by an independent group of qualified experts organized by the clinical trial sponsor, known as a data safety monitoring board or committee. This group provides authorization for whether a trial may move forward at designated check points based on access to certain data from the trial. Concurrent with clinical trials, companies usually complete additional animal studies and also must develop additional information about the chemistry and physical characteristics of the drug or biologic as well as finalize a process for manufacturing the product in commercial quantities in accordance with cGMP requirements. The manufacturing process must be capable of consistently producing quality batches of the product and, among other things, companies must develop methods for testing the identity, strength, quality and purity of the final product. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that our product candidates do not undergo unacceptable deterioration over their shelf life.

### *NDA/BLA Review Process*

Following completion of the clinical trials, data are analyzed to assess whether the investigational product is safe and effective for the proposed indicated use or uses. The results of preclinical studies and clinical trials are then submitted to the FDA as part of an NDA or BLA, along with proposed labeling, chemistry and manufacturing information to ensure product quality and other relevant data. In short, the NDA or BLA is a request for approval to market the drug or biologic for one or more specified indications and must contain proof of safety and efficacy for a drug or safety, purity and potency for a biologic. The application may include both negative and ambiguous results of preclinical studies and clinical trials, as well as positive findings. Data may come from company-sponsored

clinical trials intended to test the safety and efficacy of a product's use or from a number of alternative sources, including studies initiated by investigators. To support marketing approval, the data submitted must be sufficient in quality and quantity to establish the safety and efficacy of the investigational product to the satisfaction of FDA. FDA approval of an NDA or BLA must be obtained before a drug or biologic may be marketed in the United States.

Under the Prescription Drug User Fee Act ("PDUFA"), as amended, each NDA or BLA must be accompanied by a user fee. FDA adjusts the PDUFA user fees on an annual basis. According to the FDA's fee schedule, effective through September 30, 2020, the user fee for an application requiring clinical data, such as an NDA or BLA, is $2.9 million. PDUFA also imposes an annual program fee for human drugs and biologics of $0.3 million. Fee waivers or reductions are available in certain circumstances, including a waiver of the application fee for the first application filed by a small business. Additionally, no user fees are assessed on NDAs or BLAs for products designated as orphan drugs, unless the product also includes a non-orphan indication.

The FDA reviews all submitted NDAs and BLAs before it accepts them for filing, and may request additional information rather than accepting the NDA or BLA for filing. The FDA must make a decision on accepting an NDA or BLA for filing within 60 days of receipt. Once the submission is accepted for filing, the FDA begins an in-depth review of the NDA or BLA. Under the goals and policies agreed to by the FDA under PDUFA, the FDA has ten months, from the filing date, in which to complete its initial review of a new molecular-entity NDA or original BLA and respond to the applicant, and six months from the filing date of a new molecular-entity NDA or original BLA designated for priority review. The FDA does not always meet its PDUFA goal dates for standard and priority NDAs or BLAs, and the review process is often extended by FDA requests for additional information or clarification.

Before approving an NDA or BLA, the FDA will conduct a pre-approval inspection of the manufacturing facilities for the new product to determine whether they comply with cGMP requirements. The FDA will not approve the product unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. The FDA also may audit data from clinical trials to ensure compliance with GCP requirements. Additionally, the FDA may refer applications for novel drug products or drug products which present difficult questions of safety or efficacy to an advisory committee, typically a panel that includes clinicians and other experts, for review, evaluation and a recommendation as to whether the application should be approved and under what conditions, if any. The FDA is not bound by recommendations of an advisory committee, but it considers such recommendations when making decisions on approval. The FDA likely will reanalyze the clinical trial data, which could result in extensive discussions between the FDA and the applicant during the review process. After the FDA evaluates an NDA or BLA, it will issue an approval letter or a Complete Response Letter. An approval letter authorizes commercial marketing of the drug with specific prescribing information for specific indications. A Complete Response Letter indicates that the review cycle of the application is complete and the application will not be approved in its present form. A Complete Response Letter usually describes all of the specific deficiencies in the NDA or BLA identified by the FDA. The Complete Response Letter may require additional clinical data, additional pivotal Phase 3 clinical trial(s) and/or other significant and time-consuming requirements related to clinical trials, preclinical studies or manufacturing. If a Complete Response Letter is issued, the applicant may either resubmit the NDA or BLA, addressing all of the deficiencies identified in the letter, or withdraw the application. Even if such data and information are submitted, the FDA may decide that the NDA or BLA does not satisfy the criteria for approval. Data obtained from clinical trials are not always conclusive and the FDA may interpret data differently than we interpret the same data.

### *Orphan Drugs*

Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making the product available in the United States for this type of disease or condition will be recovered from sales of the product.

Orphan drug designation must be requested before submitting an NDA or BLA. After the FDA grants orphan drug designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the

26

FDA. Orphan drug designation does not convey any advantage in or shorten the duration of the regulatory review and approval process.

If a product that has orphan designation subsequently receives the first FDA approval for the disease or condition for which it has such designation, the product is entitled to orphan drug exclusivity, which means that the FDA may not approve any other applications to market the same drug for the same indication for seven years from the date of such approval, except in limited circumstances, such as a showing of clinical superiority to the product with orphan exclusivity by means of greater effectiveness, greater safety or providing a major contribution to patient care or in instances of drug supply issues. Competitors, however, may receive approval of either a different product for the same indication or the same product for a different indication but that could be used off-label in the orphan indication. Orphan drug exclusivity also could block the approval of one of our products for seven years if a competitor obtains approval before we do for the same product, as defined by the FDA, for the same indication we are seeking approval, or if a product candidate is determined to be contained within the scope of the competitor's product for the same indication or disease. If one of our products designated as an orphan drug receives marketing approval for an indication broader than that which is designated, it may not be entitled to orphan drug exclusivity. Orphan drug status in the European Union has similar, but not identical, requirements and benefits.

*Expedited Development and Review Programs*

The FDA has a fast track program that is intended to expedite or facilitate the process for reviewing new drugs and biologics that meet certain criteria. Specifically, new drugs and biologics are eligible for fast track designation if they are intended to treat a serious or life threatening condition and preclinical or clinical data demonstrate the potential to address unmet medical needs for the condition. Fast track designation applies to both the product and the specific indication for which it is being studied. The sponsor can request the FDA to designate the product for fast track status any time before receiving NDA or BLA approval, but ideally no later than the pre-NDA or pre-BLA meeting.

Any product submitted to the FDA for marketing, including under a fast track program, may be eligible for other types of FDA programs intended to expedite development and review, such as priority review and accelerated approval. Any product is eligible for priority review if it treats a serious or life-threatening condition and, if approved, would provide a significant improvement in safety and effectiveness compared to available therapies.

A product may also be eligible for accelerated approval, if it treats a serious or life-threatening condition and generally provides a meaningful advantage over available therapies. In addition, it must demonstrate an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality ("IMM"), which is reasonably likely to predict an effect on IMM or other clinical benefit. As a condition of approval, the FDA may require that a sponsor of a drug or biologic receiving accelerated approval perform adequate and well-controlled post-marketing clinical trials. If the FDA concludes that a drug or biologic shown to be effective can be safely used only if distribution or use is restricted, it may require such post-marketing restrictions, as it deems necessary to assure safe use of the product.

Additionally, a drug or biologic may be eligible for designation as a breakthrough therapy if the product is intended, alone or in combination with one or more other drugs or biologics, to treat a serious or life-threatening condition and preliminary clinical evidence indicates that the product may demonstrate substantial improvement over currently approved therapies on one or more clinically significant endpoints. The benefits of breakthrough therapy designation include the same benefits as fast track designation, plus intensive guidance from the FDA to ensure an efficient drug development program. Fast track designation, priority review, accelerated approval and breakthrough therapy designation do not change the standards for approval, but may expedite the development or approval process.

*Abbreviated Licensure Pathway of Biological Products as Biosimilar or Interchangeable*

The Patient Protection and Affordable Care Act, or Affordable Care Act ("ACA"), signed into law in 2010, includes a subtitle called the Biologics Price Competition and Innovation Act of 2009 ("BPCIA"), created an abbreviated approval pathway for biological products shown to be highly similar to an FDA-licensed reference biological product. The BPCIA attempts to minimize duplicative testing, and thereby lower development costs and increase patient access to affordable treatments. An application for licensure of a biosimilar product must include information demonstrating biosimilarity based upon the following, unless the FDA determines otherwise:

- analytical studies demonstrating that the proposed biosimilar product is highly similar to the approved product notwithstanding minor differences in clinically inactive components;

- animal studies (including the assessment of toxicity); and

- a clinical trial or trials (including the assessment of immunogenicity and PK or PD) sufficient to demonstrate safety, purity and potency in one or more conditions for which the reference product is licensed and intended to be used.

In addition, an application must include information demonstrating that:

- the proposed biosimilar product and reference product utilize the same mechanism of action for the condition(s) of use prescribed, recommended or suggested in the proposed labeling, but only to the extent the mechanism(s) of action are known for the reference product;

- the condition or conditions of use prescribed, recommended or suggested in the labeling for the proposed biosimilar product have been previously approved for the reference product;

- the route of administration, the dosage form and the strength of the proposed biosimilar product are the same as those for the reference product; and

- the facility in which the biological product is manufactured, processed, packed or held meets standards designed to assure that the biological product continues to be safe, pure and potent.

Biosimilarity means that the biological product is highly similar to the reference product notwithstanding minor differences in clinically inactive components; and that there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity and potency of the product. In addition, the law provides for a designation of "interchangeability" between the reference and biosimilar products, whereby the biosimilar may be substituted for the reference product without the intervention of the health care provider who prescribed the reference product. The higher standard of interchangeability must be demonstrated by information sufficient to show that:

- the proposed product is biosimilar to the reference product;

- the proposed product is expected to produce the same clinical result as the reference product in any given patient; and

- for a product that is administered more than once to an individual, the risk to the patient in terms of safety or diminished efficacy of alternating or switching between the biosimilar and the reference product is no greater than the risk of using the reference product without such alternation or switch.

FDA approval is required before a biosimilar may be marketed in the United States. However, complexities associated with the large and intricate structures of biological products and the process by which such products are manufactured pose significant hurdles to the FDA's implementation of the law that are still being worked out by the FDA. For example, the FDA has discretion over the kind and amount of scientific evidence—laboratory, preclinical and/or clinical—required to demonstrate biosimilarity to a licensed biological product.

The FDA intends to consider the totality of the evidence, provided by a sponsor to support a demonstration of biosimilarity, and recommends that sponsors use a stepwise approach in the development of their biosimilar products. Biosimilar product applications thus may not be required to duplicate the entirety of preclinical and clinical testing used to establish the underlying safety and effectiveness of the reference product. However, the FDA

may refuse to approve a biosimilar application if there is insufficient information to show that the active ingredients are the same or to demonstrate that any impurities or differences in active ingredients do not affect the safety, purity or potency of the biosimilar product. In addition, as with BLAs, biosimilar product applications will not be approved unless the product is manufactured in facilities designed to assure and preserve the biological product's safety, purity and potency.

The submission of a biosimilar application does not guarantee that the FDA will accept the application for filing and review, as the FDA may refuse to accept applications that it finds are insufficiently complete. The FDA will treat a biosimilar application or supplement as incomplete if, among other reasons, any applicable user fees assessed under the Biosimilar User Fee Act of 2012 have not been paid. In addition, the FDA may accept an application for filing but deny approval on the basis that the sponsor has not demonstrated biosimilarity, in which case the sponsor may choose to conduct further analytical, preclinical or clinical studies and submit a BLA for licensure as a new biological product.

The timing of final FDA approval of a biosimilar for commercial distribution depends on a variety of factors, including whether the manufacturer of the branded product is entitled to one or more statutory exclusivity periods, during which time the FDA is prohibited from approving any products that are biosimilar to the branded product. The FDA cannot approve a biosimilar application for twelve years from the date of first licensure of the reference product. Additionally, a biosimilar product sponsor may not submit an application for four years from the date of first licensure of the reference product. A reference product may also be entitled to exclusivity under other statutory provisions. For example, a reference product designated for a rare disease or condition (an "orphan drug") may be entitled to seven years of exclusivity, in which case no product that is biosimilar to the reference product may be approved until either the end of the twelve-year period provided under the biosimilarity statute or the end of the seven-year orphan drug exclusivity period, whichever occurs later. In certain circumstances, a regulatory exclusivity period can extend beyond the life of a patent, and thus block biosimilarity applications from being approved on or after the patent expiration date. In addition, the FDA may under certain circumstances extend the exclusivity period for the reference product by an additional six months if the FDA requests, and the manufacturer undertakes, studies on the effect of its product in children, a so-called pediatric extension.

The first biological product determined to be interchangeable with a branded product for any condition of use is also entitled to a period of exclusivity, during which time the FDA may not determine that another product is interchangeable with the reference product for any condition of use. This exclusivity period extends until the earlier of: (1) one year after the first commercial marketing of the first interchangeable product; (2) 18 months after resolution of a patent infringement against the applicant that submitted the application for the first interchangeable product, based on a final court decision regarding all of the patents in the litigation or dismissal of the litigation with or without prejudice; (3) 42 months after approval of the first interchangeable product, if a patent infringement suit against the applicant that submitted the application for the first interchangeable product is still ongoing or (4) 18 months after approval of the first interchangeable product if the applicant that submitted the application for the first interchangeable product has not been sued.

*Post-Approval Requirements*

Following approval of a new product, the manufacturer and the approved product are subject to continuing regulation by the FDA, including, among other things, monitoring and record-keeping requirements, requirements to report adverse experiences and comply with promotion and advertising requirements, which include restrictions on promoting drugs for unapproved uses or patient populations (known as "off-label use") and limitations on industry-sponsored scientific and educational activities. Although physicians may prescribe legally available drugs for off-label uses, manufacturers may not market or promote such uses. Prescription drug promotional materials must be submitted to the FDA in conjunction with their first use. Further, if there are any modifications to the drug or biologic, including changes in indications, labeling or manufacturing processes or facilities, the applicant may be required to submit and obtain FDA approval of a new NDA/BLA or NDA/BLA supplement, which may require the development of additional data or preclinical studies and clinical trials.

29

The FDA may also place other conditions on approvals including the requirement for a REMS, to assure the safe use of the product. A REMS could include medication guides, physician communication plans or elements to assure safe use, such as restricted distribution methods, patient registries and other risk minimization tools. Any of these limitations on approval or marketing could restrict the commercial promotion, distribution, prescription or dispensing of products. Product approvals may be withdrawn for non-compliance with regulatory standards or if problems occur following initial marketing.

The FDA may withdraw approval if compliance with regulatory requirements and standards is not maintained or if problems occur after the product reaches the market. Later discovery of previously unknown problems with a product, including adverse events of unanticipated severity or frequency, or with manufacturing processes, or failure to comply with regulatory requirements, may result in revisions to the approved labeling to add new safety information; imposition of post-market studies or clinical studies to assess new safety risks or imposition of distribution restrictions or other restrictions under a REMS program. Other potential consequences include, among other things:

- restrictions on the marketing or manufacturing of the product, complete withdrawal of the product from the market or product recalls;

- fines, warning letters or holds on post-approval clinical studies;

- refusal of the FDA to approve pending applications or supplements to approved applications;

- applications, or suspension or revocation of product license approvals;

- product seizure or detention, or refusal to permit the import or export of products; or

- injunctions or the imposition of civil or criminal penalties.

The FDA strictly regulates marketing, labeling, advertising and promotion of products that are placed on the market. Drugs and biologics may be promoted only for the approved indications and in accordance with the provisions of the approved label. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.

### Other U.S. Regulatory Matters

Manufacturing, sales, promotion and other activities following product approval are also subject to regulation by numerous regulatory authorities in the United States in addition to the FDA, including the Centers for Medicare & Medicaid Services, other divisions of the Department of Health and Human Services, the Department of Justice, the Drug Enforcement Administration, the Consumer Product Safety Commission, the Federal Trade Commission, the Occupational Safety & Health Administration, the Environmental Protection Agency and state and local governments.

For example, in the United States, sales, marketing and scientific and educational programs also must comply with state and federal fraud and abuse laws. These laws include the federal Anti-Kickback Statute, which makes it illegal for any person, including a prescription drug manufacturer (or a party acting on its behalf), to knowingly and willfully solicit, receive, offer or pay any remuneration that is intended to induce or reward referrals, including the purchase, recommendation, order or prescription of a particular drug, for which payment may be made under a federal healthcare program, such as Medicare or Medicaid. Violations of this law are punishable by up to five years in prison, criminal fines, administrative civil money penalties and exclusion from participation in federal healthcare programs. Moreover, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act.

Pricing and rebate programs must comply with the Medicaid rebate requirements of the U.S. Omnibus Budget Reconciliation Act of 1990 and more recent requirements in the ACA. If products are made available to authorized users of the Federal Supply Schedule of the General Services Administration, additional laws and requirements apply. Products must meet applicable child-resistant packaging requirements under the U.S. Poison Prevention Packaging Act. Manufacturing, sales, promotion and other activities also are potentially subject to federal and state consumer protection and unfair competition laws.

The distribution of biologic and pharmaceutical products is subject to additional requirements and regulations, including extensive record-keeping, licensing, storage and security requirements intended to prevent the unauthorized sale of pharmaceutical products.

The failure to comply with any of these laws or regulatory requirements subjects firms to possible legal or regulatory action. Depending on the circumstances, failure to meet applicable regulatory requirements can result in criminal prosecution, fines or other penalties, injunctions, requests for recall, seizure of products, total or partial suspension of production, denial or withdrawal of product approvals or refusal to allow a firm to enter into supply contracts, including government contracts. Any action against us for violation of these laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. Prohibitions or restrictions on sales or withdrawal of future products marketed by us could materially affect our business in an adverse way.

Changes in regulations, statutes or the interpretation of existing regulations could impact our business in the future by requiring, for example: (i) changes to our manufacturing arrangements; (ii) additions or modifications to product labeling; (iii) the recall or discontinuation of our products; or (iv) additional record-keeping requirements. If any such changes were to be imposed, they could adversely affect the operation of our business.

*U.S. Patent-Term Restoration and Marketing Exclusivity*

Depending upon the timing, duration and specifics of FDA approval of any future product candidates, some of our U.S. patents may be eligible for limited patent term extension under the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"). The Hatch-Waxman Act permits restoration of the patent term of up to five years as compensation for patent term lost during product development and FDA regulatory review process. Patent-term restoration, however, cannot extend the remaining term of a patent beyond a total of 14 years from the product's approval date. The patent-term restoration period is generally one-half the time between the effective date of an IND and the submission date of an NDA or BLA plus the time between the submission date of an NDA or BLA and the approval of that application, except that the review period is reduced by any time during which the applicant failed to exercise due diligence. Only one patent applicable to an approved drug is eligible for the extension and the application for the extension must be submitted prior to the expiration of the patent. The U.S. PTO, in consultation with the FDA, reviews and approves the application for any patent term extension or restoration. In the future, we may apply for restoration of patent term for our currently owned or licensed patents to add patent life beyond its current expiration date, depending on the expected length of the clinical trials and other factors involved in the filing of the relevant NDA or BLA.

Market exclusivity provisions under the FDCA also can delay the submission or the approval of certain applications. The FDCA provides a five-year period of non-patent marketing exclusivity within the United States to the first applicant to gain approval of a NDA for a new chemical entity. A drug is a new chemical entity if the FDA has not previously approved any other new drug containing the same active moiety, which is the molecule or ion responsible for the action of the drug substance. During the exclusivity period, the FDA may not accept for review an abbreviated new drug application ("ANDA"), or a 505(b)(2) NDA submitted by another company for another version of such drug where the applicant does not own or have a legal right of reference to all the data required for approval. However, an application may be submitted after four years if it contains a certification of patent invalidity or non-infringement. The FDCA also provides three years of marketing exclusivity for a NDA, 505(b)(2) NDA or supplement to an existing NDA if new clinical investigations, other than bioavailability studies, that were conducted or sponsored by the applicant are deemed by the FDA to be essential to the approval of the application, for example, new indications, dosages or strengths of an existing drug. This three-year exclusivity covers only the conditions of use associated with the new clinical investigations and does not prohibit the FDA from approving ANDAs for drugs containing the original active agent. Five-year and three-year exclusivity will not delay the submission or approval of a full NDA. However, an applicant submitting a full NDA would be required to conduct or obtain a right of reference to all of the preclinical studies and adequate and well-controlled clinical trials necessary to demonstrate safety and effectiveness.

31

A reference biological product is granted twelve years of data exclusivity from the time of first licensure of the product, and the FDA will not accept an application for a biosimilar or interchangeable product based on the reference biological product until four years after the date of first licensure of the reference product. "First licensure" typically means the initial date the particular product at issue was licensed in the United States. Date of first licensure does not include the date of licensure of (and a new period of exclusivity is not available for) a biological product if the licensure is for a supplement for the biological product or for a subsequent application by the same sponsor or manufacturer of the biological product (or licensor, predecessor in interest or other related entity) for a change (not including a modification to the structure of the biological product) that results in a new indication, route of administration, dosing schedule, dosage form, delivery system, delivery device or strength or for a modification to the structure of the biological product that does not result in a change in safety, purity or potency. Therefore, one must determine whether a new product includes a modification to the structure of a previously licensed product that results in a change in safety, purity or potency to assess whether the licensure of the new product is a first licensure that triggers its own period of exclusivity. Whether a subsequent application, if approved, warrants exclusivity as the "first licensure" of a biological product is determined on a case-by-case basis with data submitted by the sponsor.

*European Union Drug Development*

As in the United States, medicinal products can be marketed only if a marketing authorization from the competent regulatory agencies has been obtained.

Similar to the United States, the various phases of preclinical and clinical research in the European Union are subject to significant regulatory controls. Although the EU Clinical Trials Directive 2001/20/EC has sought to harmonize the EU clinical trials regulatory framework, setting out common rules for the control and authorization of clinical trials in the EU, the EU Member States have transposed and applied the provisions of the Directive differently. This has led to significant variations in the member state regimes. Under the current regime, before a clinical trial can be initiated it must be approved in each of the EU countries where the trial is to be conducted by two distinct bodies: the National Competent Authority ("NCA"), and one or more Ethics Committees ("ECs"). Under the current regime all suspected unexpected serious adverse reactions to the investigated drug that occur during the clinical trial have to be reported to the NCA and ECs of the Member State where they occurred.

The EU clinical trials legislation currently is undergoing a transition process mainly aimed at harmonizing and streamlining clinical-trial authorization, simplifying adverse-event reporting procedures, improving the supervision of clinical trials and increasing their transparency. Recently enacted Clinical Trials Regulation EU No 536/2014 ensures that the rules for conducting clinical trials in the EU will be identical. In the meantime, Clinical Trials Directive 2001/20/EC continues to govern all clinical trials performed in the EU.

*European Union Drug Review and Approval*

In the European Economic Area ("EEA"), which is comprised of the 27 Member States of the European Union (including Norway and excluding Croatia), Iceland and Liechtenstein, medicinal products can only be commercialized after obtaining a Marketing Authorization ("MA"). There are two types of marketing authorizations.

- The Community MA is issued by the European Commission through the Centralized Procedure, based on the opinion of the Committee for Medicinal Products for Human Use ("CHMP"), of the EMA, and is valid throughout the entire territory of the EEA. The Centralized Procedure is mandatory for certain types of products, such as biotechnology medicinal products, orphan medicinal products, advanced-therapy medicines such as gene-therapy, somatic cell-therapy or tissue-engineered medicines and medicinal products containing a new active substance indicated for the treatment of HIV, AIDS, cancer, neurodegenerative disorders, diabetes, auto-immune and other immune dysfunctions and viral diseases. The Centralized Procedure is optional for products containing a new active substance not yet authorized in the EEA, or for products that constitute a significant therapeutic, scientific or technical innovation or which are in the interest of public health in the EU.

- National MAs, which are issued by the competent authorities of the Member States of the EEA and only cover their respective territory, are available for products not falling within the mandatory scope of the Centralized Procedure. Where a product has already been authorized for marketing in a Member State of the EEA, this National MA can be recognized in another Member States through the Mutual Recognition Procedure. If the product has not received a National MA in any Member State at the time of application, it can be approved simultaneously in various Member States through the Decentralized Procedure. Under the Decentralized Procedure an identical dossier is submitted to the competent

32

authorities of each of the Member States in which the MA is sought, one of which is selected by the applicant as the Reference Member State ("RMS"). The competent authority of the RMS prepares a draft assessment report, a draft summary of the product characteristics ("SPC"), and a draft of the labeling and package leaflet, which are sent to the other Member States (referred to as the Member States Concerned) for their approval. If the Member States Concerned raise no objections, based on a potential serious risk to public health, to the assessment, SPC, labeling or packaging proposed by the RMS, the product is subsequently granted a national MA in all the Member States (i.e., in the RMS and the Member States Concerned).

Under the above described procedures, before granting the MA, the EMA or the competent authorities of the Member States of the EEA make an assessment of the risk-benefit balance of the product on the basis of scientific criteria concerning its quality, safety and efficacy.

*Coverage and Reimbursement*

Sales of our products will depend, in part, on the extent to which our products will be covered by third-party payors, such as government health programs, commercial insurance and managed healthcare organizations. In the United States no uniform policy of coverage and reimbursement for drug or biological products exists. Accordingly, decisions regarding the extent of coverage and amount of reimbursement to be provided for any of our products will be made on a payor-by-payor basis. As a result, the coverage determination process is often a time-consuming and costly process that will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that coverage and adequate reimbursement will be obtained.

The United States government, state legislatures and foreign governments have shown significant interest in implementing cost containment programs to limit the growth of government-paid health care costs, including price-controls, restrictions on reimbursement and requirements for substitution of generic products for branded prescription drugs. For example, the ACA contains provisions that may reduce the profitability of drug products through increased rebates for drugs reimbursed by Medicaid programs, extension of Medicaid rebates to Medicaid managed care plans, mandatory discounts for certain Medicare Part D beneficiaries and annual fees based on pharmaceutical companies' share of sales to federal health care programs. Adoption of general controls and measures, coupled with the tightening of restrictive policies in jurisdictions with existing controls and measures, could limit payments for pharmaceutical drugs.

The Medicaid Drug Rebate Program requires pharmaceutical manufacturers to enter into and have in effect a national rebate agreement with the Secretary of the Department of Health and Human Services as a condition for states to receive federal matching funds for the manufacturer's outpatient drugs furnished to Medicaid patients. The ACA made several changes to the Medicaid Drug Rebate Program, including increasing pharmaceutical manufacturers' rebate liability by raising the minimum basic Medicaid rebate on most branded prescription drugs from 15.1% of average manufacturer price ("AMP"), to 23.1% of AMP and adding a new rebate calculation for "line extensions" (i.e., new formulations, such as extended release formulations) of solid oral dosage forms of branded products, as well as potentially impacting their rebate liability by modifying the statutory definition of AMP. The ACA also expanded the universe of Medicaid utilization subject to drug rebates by requiring pharmaceutical manufacturers to pay rebates on Medicaid managed care utilization and by enlarging the population potentially eligible for Medicaid drug benefits. The Centers for Medicare & Medicaid Services ("CMS"), have proposed to expand Medicaid rebate liability to the territories of the United States as well.

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), established the Medicare Part D program to provide a voluntary prescription drug benefit to Medicare beneficiaries. Under Part D, Medicare beneficiaries may enroll in prescription drug plans offered by private entities that provide coverage of outpatient prescription drugs. Unlike Medicare Part A and B, Part D coverage is not standardized. While all Medicare drug plans must give at least a standard level of coverage set by Medicare, Part D prescription drug plan sponsors are not required to pay for all covered Part D drugs, and each drug plan can develop its own drug formulary that identifies which drugs it will cover and at what tier or level. However, Part D prescription drug formularies must include drugs within each therapeutic category and class of covered Part D drugs, though not necessarily all the drugs in each category or class. Any formulary used by a Part D prescription drug plan must be developed and reviewed by a pharmacy and therapeutic committee. Government payment for some of the costs of prescription drugs may increase demand for products for which we receive marketing approval. However, any

33

negotiated prices for our products covered by a Part D prescription drug plan likely will be lower than the prices we might otherwise obtain. Moreover, while the MMA applies only to drug benefits for Medicare beneficiaries, private payors often follow Medicare coverage policy and payment limitations in setting their own payment rates. Any reduction in payment that results from the MMA may result in a similar reduction in payments from non-governmental payors.

For a drug product to receive federal reimbursement under the Medicaid or Medicare Part B programs or to be sold directly to U.S. government agencies, the manufacturer must extend discounts to entities eligible to participate in the 340B drug pricing program. The required 340B discount on a given product is calculated based on the AMP and Medicaid rebate amounts reported by the manufacturer. As of 2010, the ACA expanded the types of entities eligible to receive discounted 340B pricing, although, under the current state of the law, with the exception of children's hospitals, these newly eligible entities will not be eligible to receive discounted 340B pricing on orphan drugs. In addition, as 340B drug prices are determined based on AMP and Medicaid rebate data, the revisions to the Medicaid rebate formula and AMP definition described above could cause the required 340B discount to increase.

As noted above, the marketability of any products for which we receive regulatory approval for commercial sale may suffer if the government and third-party payors fail to provide adequate coverage and reimbursement. An increasing emphasis on cost containment measures in the United States has increased and we expect will continue to increase the pressure on pharmaceutical pricing. Coverage policies and third-party reimbursement rates may change at any time. Even if favorable coverage and reimbursement status is attained for one or more products for which we receive regulatory approval, less favorable coverage policies and reimbursement rates may be implemented in the future.

In addition, in most foreign countries, the proposed pricing for a drug must be approved before it may be lawfully marketed. The requirements governing drug pricing and reimbursement vary widely from country to country. For example, the European Union provides options for its member states to restrict the range of medicinal products for which their national health insurance systems provide reimbursement and to control the prices of medicinal products for human use. A member state may approve a specific price for the medicinal product or it may instead adopt a system of direct or indirect controls on the profitability of the company placing the medicinal product on the market. There can be no assurance that any country that has price controls or reimbursement limitations for pharmaceutical products will allow favorable reimbursement and pricing arrangements for any of our products. Historically, products launched in the European Union do not follow price structures of the United States and generally prices tend to be significantly lower.

## Employees

As of December 31, 2019, we had 90 full-time employees, 61 of whom were engaged in research and development activities. None of our employees are represented by a labor union or covered under a collective bargaining agreement, and we consider our relationship with our employees to be good.

## Facilities

Our corporate headquarters are currently located in Redwood City, California, where we lease 25,136 square feet of office, research and development and laboratory space pursuant to a lease agreement that expires on July 31, 2029. The lease agreement includes an option to extend the term for an additional period of five years, and provides us a right of first offer to expand into available space on the first floor of the building. We are responsible for payment of our proportionate share of taxes and operating expenses for the building, in addition to monthly base rent in the initial amount of $0.1 million, with 3% annual increases, which monthly base rent is abated for the first nine months of the lease term. We provided a security deposit under the lease in the form of a letter of credit in the initial amount of $0.8 million, subject to a reduction to $0.4 million following the 45th month of the term and the satisfaction of certain conditions. On December 4, 2019, we entered into a lease agreement for approximately 98,000 square feet of office space to be constructed in San Carlos, California. We expect these premises to be delivered in November 2020, and we expect to move into this new headquarters in mid-2021 after making certain improvements. The lease term will expire 123 months following the rent commencement date, which is expected to be the earlier of nine months after the premises are delivered or the date our tenant improvements are substantially completed. Upon commencement of the lease term, we will be responsible for monthly base rent payments of $5.75

34

per rentable square foot. We provided a security deposit in the form of a letter of credit in the amount of $1.5 million. This lease agreement includes an option to extend the term for an additional period of five years and provides us a right of first refusal for certain additional office space. We believe that these facilities will be adequate for our near-term needs. If required, we believe that suitable additional or alternative space would be available in the future on commercially reasonable terms.

**Legal Proceedings**

From time to time, we may become involved in litigation or other legal proceedings. We are not currently a party to any litigation or legal proceedings that, in the opinion of our management, are likely to have a material adverse effect on our business. Regardless of outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**Intellectual Property**

Our success depends in part on our ability to obtain and maintain proprietary protection for our product candidates, technology and know-how, to operate without infringing the proprietary rights of others and to prevent others from infringing our proprietary rights. Our policy is to seek to protect our proprietary position by, among other methods, pursuing and obtaining patent protection in the United States and in jurisdictions outside of the United States related to our proprietary technology, inventions, improvements and product candidates that are important to the development and implementation of our business. Our patent portfolio is intended to cover our product candidates and components thereof, their methods of use and processes for their manufacture, our proprietary reagents and assays and any other inventions that are commercially important to our business. We also rely on trade secret protection of our confidential information and know-how relating to our proprietary technology, platforms and product candidates.

We believe that we have substantial know-how and trade secrets relating to our technology and product candidates. Our patent portfolio as of February 25, 2020 contains six issued and unexpired U.S. patents and seven pending U.S. patent applications that are solely owned or exclusively licensed by us and numerous foreign counterparts of these patents and patent applications.

We have exclusively licensed from JHU four issued and unexpired U.S. patents and also foreign counterparts, with claims granted in Europe and Japan. The JHU licensed patent rights include issued U.S. patents with claims that recite anti-Siglec-8 antibodies comprising the CDRs of a particular antibody and methods of use a class of antibodies that bind to Siglec-8 for treating particular diseases. We own two granted U.S. patents that claim the active component of antolimab (AK002), an anti-Siglec-8 antibody, pharmaceutical compositions comprising antolimab (AK002), and methods for the treatment of particular diseases using antibodies to Siglec-8, with a projected expiration date in 2035 in the absence of patent extensions. Similar patent applications are pending in Europe and Japan. We have eight further pending families of patent applications that include U.S. and foreign applications relating to methods of treatment for treating particular diseases using antibodies to Siglec-8 and methods of delivering antibodies to Siglec-8. We have also filed patent applications with claims pending relating to antibodies in preclinical development and methods for treating cancer with these antibodies. We also have a non-exclusive license to intellectual property from BioWa and Lonza regarding the expression and manufacturing of monoclonal antibodies in particular mammalian host cell lines.

The term of individual patents depends upon the legal term for patents in the countries in which they are granted. In most countries, including the United States, the patent term is generally 20 years from the earliest claimed filing date of a non-provisional patent application in the applicable country. In the United States, a patent's term may, in certain cases, be lengthened by patent term adjustment, which compensates a patentee for administrative delays by the U.S. Patent and Trademark Office in examining and granting a patent, or may be shortened if a patent is terminally disclaimed over a commonly owned patent or a patent naming a common inventor and having an earlier expiration date. The Hatch-Waxman Act permits a patent term extension of up to five years beyond the expiration date of a U.S. patent as partial compensation for the length of time the drug is under regulatory review while the patent is in force. A patent term extension cannot extend the remaining term of a patent beyond a total of 14 years from the date of product approval, only one patent applicable to each regulatory review

period may be extended and only those claims covering the approved drug, a method for using it or a method for manufacturing it may be extended.

Similar provisions are available in the European Union and certain other foreign jurisdictions to extend the term of a patent that covers an approved drug. In the future, if and when our product candidates, including antolimab (AK002), receive approval by the FDA or foreign regulatory authorities, we expect to apply for patent term extensions on issued patents covering those products, depending upon the length of the clinical trials for each drug and other factors. Expiration dates referred to above are without regard to potential patent term extension or other market exclusivity that may be available to us.

We also rely, in some circumstances, on trade secrets to protect our technology. However, trade secrets can be difficult to protect. We seek to protect our proprietary technology and processes, in part, by confidentiality agreements with our employees, consultants, scientific advisors and contractors. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems.

**Corporate Information**

We were incorporated in Delaware in March 2012. Our website is www.allakos.com. We use our website as a channel of distribution for company information, and financial and other material information regarding our company is routinely posted and accessible on our website.

On the Investor Relations section of our website, we post or will post, as applicable, the following filings as soon as reasonably practicable after they are electronically filed with or furnished to the Securities and Exchange Commission (the "SEC"): our Annual Report on Form 10-K (the "Annual Report"), our Proxy Statement on Schedule 14A, our Quarterly Reports on Form 10-Q, our Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended.

All of the information on our Investor Relations web page is available to be viewed free of charge. Information contained on our website is not part of this Annual Report or our other filings with the SEC. We assume no obligation to update or revise any forward-looking statements in this Annual Report whether as a result of new information, future events or otherwise, unless we are required to do so by law.

The SEC also maintains a website (www.sec.gov) that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC.

36

**Item 1A. Risk Factors.**

*Investing in our common stock involves a high degree of risk. The following discussion of risk factors contains forward-looking statements. You should carefully consider the risks described below, as well as the other information in this Annual Report on Form 10-K, including our financial statements and the related notes and the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations." The occurrence of any of the events or developments described below could materially harm our business, financial condition, results of operations and growth prospects. In such an event, the market price of our common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial also may impair our business, financial condition, results of operations and growth prospects.*

**Risks Related to Our Financial Position and Need for Additional Capital**

***We are in the early stages of clinical drug development and have a very limited operating history and no products approved for commercial sale, which may make it difficult for you to evaluate our current business and predict our future success and viability.***

We are an early clinical stage biopharmaceutical company with a limited operating history. We were incorporated and commenced operations in 2012, have no products approved for commercial sale and have not generated any revenue. Our operations to date have been limited to organizing and staffing our company, business planning, raising capital, identifying and developing potential product candidates, conducting preclinical and clinical studies of our product candidates, including Phase 1 and Phase 2 clinical trials of antolimab (AK002), our lead compound. All of our product candidates currently under development, other than antolimab (AK002), are in preclinical development. We have not yet demonstrated our ability to successfully complete any large-scale, pivotal clinical trials, obtain marketing approvals, manufacture a commercial-scale drug or arrange for a third-party to do so on our behalf or conduct sales and marketing activities. As a result, it may be more difficult for you to accurately predict our future success or viability than it could be if we had a longer operating history.

In addition, as a business with a limited operating history, we may encounter unforeseen expenses, difficulties, complications, delays and other known and unknown factors and risks frequently experienced by early-stage biopharmaceutical companies in rapidly evolving fields. We also may need to transition from a company with a research focus to a company capable of supporting commercial activities. We have not yet demonstrated an ability to successfully overcome such risks and difficulties, or to make such a transition. If we do not adequately address these risks and difficulties or successfully make such a transition, our business will suffer.

37

*We have incurred significant net losses since inception and we expect to continue to incur significant net losses for the foreseeable future.*

We have incurred net losses in each reporting period since our inception, have not generated any revenue to date and have financed our operations principally through the sale and issuance of common stock and preferred stock. Our net losses were $85.4 million, $43.5 million and $23.6 million for the years ended December 31, 2019, 2018 and 2017. As of December 31, 2019, we had an accumulated deficit of $189.5 million. We have devoted substantially all of our resources and efforts to research and development. Our lead compound, antolimab (AK002), is in clinical development, and our other product candidates are in preclinical development. As a result, we expect that it will be several years, if ever, before we generate revenue from product sales. Even if we succeed in receiving marketing approval for and commercializing one or more of our product candidates, we expect that we will continue to incur substantial research and development and other expenses in order to develop and market additional potential products.

We expect to continue to incur significant expenses and increasing operating losses for the foreseeable future. The net losses we incur may fluctuate significantly from quarter-to-quarter such that a period-to-period comparison of our results of operations may not be a good indication of our future performance. The size of our future net losses will depend, in part, on the rate of future growth of our expenses and our ability to generate revenue. Our prior losses and expected future losses have had and will continue to have an adverse effect on our working capital and our ability to achieve and maintain profitability.

*Our ability to generate revenue and achieve profitability depends significantly on our ability to achieve a number of objectives.*

Our business depends entirely on the successful development and commercialization of our product candidates. We currently generate no revenues from sales of any products. We have no products approved for commercial sale and do not anticipate generating any revenue from product sales until sometime after we have successfully completed clinical development and received marketing approval for the commercial sale of a product candidate, if ever. Our ability to generate revenue and achieve profitability depends significantly on our ability to achieve a number of objectives, including:

- successful and timely completion of preclinical and clinical development of our lead compound, antolimab (AK002), and any other future product candidates;

- timely receipt of marketing approvals for antolimab (AK002) and any future product candidates for which we successfully complete clinical development and clinical trials from applicable regulatory authorities;

- the extent of any required post-marketing approval commitments to applicable regulatory authorities;

- developing an efficient and scalable manufacturing process for antolimab (AK002) and any future product candidates, including establishing and maintaining commercially viable supply and manufacturing relationships with third-parties to obtain finished products that are appropriately packaged for sale;

- successful launch of commercial sales following any marketing approval, including the development of a commercial infrastructure, whether in-house or with one or more collaborators;

- a continued acceptable safety profile following any marketing approval;

- commercial acceptance of antolimab (AK002) and any future product candidates as viable treatment options by patients, the medical community and third-party payors;

- addressing any competing technological and market developments;

- identifying, assessing, acquiring and developing new product candidates;

38

- obtaining and maintaining patent protection, trade secret protection and regulatory exclusivity, both in the United States and internationally;

- protection of our rights in our intellectual property portfolio, including our licensed intellectual property;

- negotiating favorable terms in any collaboration, licensing or other arrangements that may be necessary to develop, manufacture or commercialize our product candidates; and

- attracting, hiring and retaining qualified personnel.

We may never be successful in achieving our objectives and, even if we do, may never generate revenue that is significant or large enough to achieve profitability. If we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. Our failure to become and remain profitable would decrease the value of our company and could impair our ability to maintain or further our research and development efforts, raise additional necessary capital, grow our business and/or continue our operations.

*We will require substantial additional capital to finance our operations. If we are unable to raise such capital when needed, or on acceptable terms, we may be forced to delay, reduce and/or eliminate one or more of our research and drug development programs or future commercialization efforts.*

Developing pharmaceutical products, including conducting preclinical studies and clinical trials, is a very time-consuming, expensive and uncertain process that takes years to complete. We expect our expenses to increase in connection with our ongoing activities, particularly as we conduct clinical trials of, and seek marketing approval for, antolimab (AK002) and our other product candidates. In addition, if we obtain marketing approval for any of our product candidates, we expect to incur significant commercialization expenses related to drug sales, marketing, manufacturing and distribution. We have also incurred and expect to continue to incur additional costs associated with operating as a public company. Accordingly, we will need to obtain substantial additional funding in order to maintain our continuing operations. If we are unable to raise capital when needed or on acceptable terms, we may be forced to delay, reduce and/or eliminate one or more of our research and drug development programs or future commercialization efforts.

As of December 31, 2019, we had $495.9 million in cash, cash equivalents and marketable securities, which includes proceeds from our July 2018 IPO and concurrent private placement that we completed on July 23, 2018 and from our August 2019 Offering. We believe that our existing cash, cash equivalents and marketable securities will enable us to fund our operating expenses and capital expenditure requirements through at least the next 12 months. Our estimate as to how long we expect our existing cash, cash equivalents and marketable securities to continue to fund our operations is based on assumptions that may prove to be wrong, and we could use our available capital resources sooner than we currently expect. Changing circumstances, some of which may be beyond our control, could cause us to consume capital significantly faster than we currently anticipate, and we may need to seek additional funds sooner than planned.

We plan to use our existing cash, cash equivalents and marketable securities to fund our development of antolimab (AK002) and for other research and development activities, working capital and other general corporate purposes. This may include additional research, hiring additional personnel, capital expenditures and the costs of operating as a public company. Advancing the development of antolimab (AK002) and any other product candidates will require a significant amount of capital. Our existing cash, cash equivalents and marketable securities will not be sufficient to fund all of the actions that are necessary to complete the development of antolimab (AK002) or any of our other product candidates. We will be required to obtain further funding through public or private equity offerings, debt financings, collaborations and licensing arrangements or other sources, which may dilute our stockholders or restrict our operating activities. We do not have any committed external source of funds. Adequate additional financing may not be available to us on acceptable terms, or at all. Our failure to raise capital as and when needed would have a negative impact on our financial condition and our ability to pursue our business strategy.

**Risks Related to the Discovery, Development and Commercialization of Our Product Candidates**

*We are dependent on the success of our lead compound, antolimab (AK002), which is currently in multiple clinical trials. If we are unable to obtain approval for and commercialize antolimab (AK002) for one or more indications in a timely manner, our business could be materially harmed.*

Our future success is dependent on our ability to timely complete clinical trials and obtain marketing approval for, and then successfully commercialize antolimab (AK002), our lead compound, for one or more indications. Antolimab (AK002) is in the early stages of development and we are investing the majority of our efforts and financial resources in the research and development of antolimab (AK002) for multiple indications. Antolimab (AK002) will require additional clinical development, evaluation of clinical, preclinical and manufacturing activities, marketing approval from government regulators, substantial investment and significant marketing efforts before we generate any revenues from product sales. We are not permitted to market or promote antolimab (AK002), or any other product candidates, before we receive marketing approval from the U.S. Food and Drug Administration ("FDA") and comparable foreign regulatory authorities, and we may never receive such marketing approvals.

The success of antolimab (AK002) will depend on several factors, including the following:

- successful and timely completion of our clinical trials of antolimab (AK002);

- initiation and successful patient enrollment and completion of additional clinical trials on a timely basis;

- efficacy, safety and tolerability profiles that are satisfactory to the FDA or any comparable foreign regulatory authority for marketing approval;

- timely receipt of marketing approvals for antolimab (AK002) from applicable regulatory authorities;

- the extent of any required post-marketing approval commitments to applicable regulatory authorities;

- the maintenance of existing or the establishment of new supply arrangements with third-party drug product suppliers and manufacturers;

- the maintenance of existing or the establishment of new scaled production arrangements with third-party manufacturers to obtain finished products that are appropriately packaged for sale;

- obtaining and maintaining patent protection, trade secret protection and regulatory exclusivity, both in the United States and internationally;

- protection of our rights in our intellectual property portfolio, including our licensed intellectual property;

- successful launch of commercial sales following any marketing approval;

- a continued acceptable safety profile following any marketing approval;

- commercial acceptance by patients, the medical community and third-party payors; and

- our ability to compete with other therapies.

We do not have complete control over many of these factors, including certain aspects of clinical development and the regulatory submission process, potential threats to our intellectual property rights and the manufacturing, marketing, distribution and sales efforts of any future collaborator.

*The regulatory approval processes of the FDA, European Medicines Agency ("EMA") and comparable foreign regulatory authorities are lengthy, time-consuming and inherently unpredictable. If we are ultimately unable to obtain regulatory approval for our product candidates, we will be unable to generate product revenue and our business will be substantially harmed.*

The time required to obtain approval by the FDA, EMA and comparable foreign regulatory authorities is unpredictable, typically takes many years following the commencement of clinical trials, and depends upon numerous factors, including the type, complexity and novelty of the product candidates involved. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions, which may cause delays in the approval or the decision not to approve an application. Regulatory authorities have substantial discretion in the approval process and may refuse to accept any application or may decide that our data are insufficient for approval and require additional preclinical, clinical or other data. Even if we eventually complete clinical testing and receive approval of any regulatory filing for our product candidates, the FDA, EMA and comparable foreign regulatory authorities may approve our product candidates for a more limited indication or a narrower patient population than we originally requested. We have not submitted for, or obtained regulatory approval for any product candidate, and it is possible that none of our existing product candidates or any product candidates we may seek to develop in the future will ever obtain regulatory approval.

Applications for our product candidates could fail to receive regulatory approval in an initial or subsequent indication for many reasons, including but not limited to the following:

- the FDA, EMA or comparable foreign regulatory authorities may disagree with the design, implementation or results of our clinical trials;

- the FDA, EMA or comparable foreign regulatory authorities may determine that our product candidates are not safe and effective, only moderately effective or have undesirable or unintended side effects, toxicities or other characteristics that preclude our obtaining marketing approval or prevent or limit commercial use;

- the population studied in the clinical program may not be sufficiently broad or representative to assure efficacy and safety in the full population for which we seek approval;

- the FDA, EMA or comparable foreign regulatory authorities may disagree with our interpretation of data from preclinical studies or clinical trials;

- the data collected from clinical trials of our product candidates may not be sufficient to support the submission of a Biologics License Application ("BLA") or New Drug Application ("NDA"), or other submission or to obtain regulatory approval in the United States or elsewhere;

- we may be unable to demonstrate to the FDA, EMA or comparable foreign regulatory authorities that a product candidate's risk-benefit ratio for its proposed indication is acceptable;

- the FDA, EMA or comparable foreign regulatory authorities may fail to approve the manufacturing processes, test procedures and specifications or facilities of third-party manufacturers with which we contract for clinical and commercial supplies; and

- the approval policies or regulations of the FDA, EMA or comparable foreign regulatory authorities may significantly change in a manner rendering our clinical data insufficient for approval.

This lengthy approval process, as well as the unpredictability of the results of clinical trials, may result in our failing to obtain regulatory approval to market any of our product candidates, which would significantly harm our business, results of operations and prospects.

41

*If we experience delays or difficulties in the enrollment of patients in clinical trials, our receipt of necessary marketing approvals could be delayed or prevented.*

We may not be able to initiate or continue clinical trials for our product candidates if we are unable to locate and enroll a sufficient number of eligible patients to participate in these trials as required by the FDA or comparable foreign regulatory authorities. Patient enrollment is a significant factor in the timing of clinical trials. In particular, our ability to enroll eligible patients may be limited or may result in slower enrollment than we anticipate.

Patient enrollment may be affected if our competitors have ongoing clinical trials for product candidates that are under development for the same indications as our product candidates, and patients who would otherwise be eligible for our clinical trials instead enroll in clinical trials of our competitors' product candidates. Patient enrollment may also be affected by other factors, including:

- size and nature of the patient population;

- severity of the disease under investigation;

- availability and efficacy of approved drugs for the disease under investigation;

- patient eligibility criteria for the trial in question;

- perceived risks and benefits of the product candidate under study;

- efforts to facilitate timely enrollment in clinical trials;

- patient referral practices of physicians;

- the ability to monitor patients adequately during and after treatment;

- proximity and availability of clinical trial sites for prospective patients; and

- continued enrollment of prospective patients by clinical trial sites.

Our inability to enroll a sufficient number of patients for our clinical trials would result in significant delays or may require us to abandon one or more clinical trials altogether. Enrollment delays in our clinical trials may result in increased development costs for our product candidates and jeopardize our ability to obtain marketing approval for the sale of our product candidates.

*The clinical trials of our product candidates may not demonstrate safety and efficacy to the satisfaction of regulatory authorities or otherwise produce positive results.*

Before obtaining marketing approval from regulatory authorities for the sale of our product candidates, we must complete preclinical development and then conduct extensive clinical trials to demonstrate the safety and efficacy of our product candidates. Clinical testing is expensive, difficult to design and implement, can take many years to complete and its ultimate outcome is uncertain. A failure of one or more clinical trials can occur at any stage of the process. The outcome of preclinical studies and early-stage clinical trials may not be predictive of the success of later clinical trials. Moreover, preclinical and clinical data are often susceptible to varying interpretations and analyses, and many companies that have believed their product candidates performed satisfactorily in preclinical studies and clinical trials have nonetheless failed to obtain marketing approval of their drugs.

We do not know whether our future clinical trials will begin on time or enroll patients on time, or whether our ongoing and/or future clinical trials will be completed on schedule or at all. Clinical trials can be delayed for a variety of reasons, including delays related to:

- obtaining marketing approval to commence a trial;

- reaching agreement on acceptable terms with prospective CROs and clinical trial sites;

- obtaining institutional review board approval at each clinical trial site;

- recruiting suitable patients to participate in a trial;

- patients failing to comply with trial protocol or dropping out of a trial;

42

- clinical trial sites deviating from trial protocol or dropping out of a trial;

- the need to add new clinical trial sites; or

- manufacturing sufficient quantities of product candidate for use in clinical trials.

We may experience numerous unforeseen events during, or as a result of, clinical trials that could delay or prevent receipt of marketing approval or our ability to commercialize our product candidates, including:

- receipt of feedback from regulatory authorities that requires us to modify the design of our clinical trials;

- negative or inconclusive clinical trial results that may require us to conduct additional clinical trials or abandon certain drug development programs;

- the number of patients required for clinical trials being larger than anticipated, enrollment in these clinical trials being slower than anticipated or participants dropping out of these clinical trials at a higher rate than anticipated;

- third-party contractors failing to comply with regulatory requirements or meet their contractual obligations to us in a timely manner, or at all;

- the suspension or termination of our clinical trials for various reasons, including non-compliance with regulatory requirements, a finding that our product candidates have undesirable side effects or other unexpected characteristics or risks;

- the cost of clinical trials of our product candidates being greater than anticipated;

- the supply or quality of our product candidates or other materials necessary to conduct clinical trials of our product candidates being insufficient or inadequate; and

- regulators revising the requirements for approving our product candidates.

If we are required to conduct additional clinical trials or other testing of our product candidates beyond those that we currently contemplate, if we are unable to successfully complete clinical trials of our product candidates or other testing, if the results of these trials or tests are not positive or are only modestly positive or if there are safety concerns, we may incur unplanned costs, be delayed in obtaining marketing approval, if at all, receive more limited or restrictive marketing approval, be subject to additional post-marketing testing requirements or have the drug removed from the market after obtaining marketing approval.

***The outcome of preclinical testing and early clinical trials may not be predictive of the success of later clinical trials, and the results of our clinical trials may not satisfy the requirements of the FDA or comparable foreign regulatory authorities.***

We currently have no drugs approved for sale and we cannot guarantee that we will ever have marketable drugs. Clinical failure can occur at any stage of clinical development. Clinical trials may produce negative or inconclusive results, and we or any future collaborators may decide, or regulators may require us, to conduct additional clinical trials or preclinical studies. We will be required to demonstrate with substantial evidence through well-controlled clinical trials that our product candidates are safe and effective for use in a diverse population before we can seek marketing approvals for their commercial sale. Success in preclinical studies and early-stage clinical trials does not mean that future larger registration clinical trials will be successful. This is because product candidates in later-stage clinical trials may fail to demonstrate sufficient safety and efficacy to the satisfaction of the FDA and non-U.S. regulatory authorities despite having progressed through preclinical studies and early-stage clinical trials. In particular, no compound with the mechanism of action of antolimab (AK002) has been commercialized, and the outcome of preclinical studies and early-stage clinical trials may not be predictive of the success of later-stage clinical trials.

From time to time, we may publish or report interim or preliminary data from our clinical trials. Interim or preliminary data from clinical trials that we may conduct may not be indicative of the final results of the trial and are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues

43

and more patient data become available. Interim or preliminary data also remain subject to audit and verification procedures that may result in the final data being materially different from the interim or preliminary data. As a result, interim or preliminary data should be viewed with caution until the final data are available.

In some instances, there can be significant variability in safety and efficacy results between different clinical trials of the same product candidate due to numerous factors, including changes in trial protocols, differences in size and type of the patient populations, differences in and adherence to the dosing regimen and other trial protocols and the rate of dropout among clinical trial participants. In addition, we use patient-reported outcome assessments in our clinical trials, which involve patients' subjective assessments of efficacy of the treatments they receive in the trial. Such assessments can vary widely from day to day for a particular patient, and from patient to patient and site to site within a clinical trial. This subjectivity can increase the uncertainty of, and adversely impact, our clinical trial outcomes.

We do not know whether any clinical trials we may conduct will demonstrate consistent or adequate efficacy and safety sufficient to obtain marketing approval to market our product candidates.

***Our product candidates may not achieve adequate market acceptance among physicians, hospitals, patients, healthcare payors and others in the medical community necessary for commercial success.***

Even if our product candidates receive regulatory approval, they may not gain adequate market acceptance among physicians, hospitals, patients, healthcare payors and others in the medical community. The degree of market acceptance of any of our approved product candidates will depend on a number of factors, including:

- the efficacy and safety profile as demonstrated in planned clinical trials;

- the timing of market introduction of the product candidate as well as competitive products;

- the clinical indications for which the product candidate is approved;

- restrictions on the use of our products, if approved, such as boxed warnings or contraindications in labeling, or a Risk Evaluation and Mitigation Strategy ("REMS"), if any, which may not be required of alternative treatments and competitor products;

- the potential and perceived advantages of product candidates over alternative treatments;

- the cost of treatment in relation to alternative treatments;

- the availability of coverage and adequate reimbursement and pricing by third-parties and government authorities;

- relative convenience and ease of administration;

- the effectiveness of sales and marketing efforts;

- unfavorable publicity relating to the product candidate; and

- the approval of other new therapies for the same indications.

If any product candidate is approved but does not achieve an adequate level of acceptance by physicians, hospitals, healthcare payors and patients, we may not generate or derive sufficient revenue from that product candidate and our financial results could be harmed. Antolimab (AK002) is currently administered as an intravenous treatment, which is less convenient for patients than some other methods of administration, such as an orally delivered drug.

***The sizes of the patient populations suffering from some of the diseases we are targeting are small and based on estimates that may not be accurate.***

Our projections of both the number of people who have some of the diseases we are targeting, as well as the subset of people with these diseases who have the potential to benefit from treatment with antolimab (AK002) and any other future product candidates, are estimates. These estimates have been derived from a variety of sources, including scientific literature, surveys of clinics, physician interviews, patient foundations and market research, and may prove to be incorrect. Further, new studies may change the estimated incidence or prevalence of these diseases. The number of patients may turn out to be lower than expected. Additionally, the potentially addressable patient

44

population for antolimab (AK002) and any other future product candidates may be limited or may not be amenable to treatment with antolimab (AK002) and any other products, if and when approved. Even if we obtain significant market share for antolimab (AK002) and any other products (if and when they are approved), small potential target populations for certain indications means we may never achieve profitability without obtaining market approval for additional indications.

***Our business will be impacted by our ability to advance additional product candidates beyond antolimab (AK002) into clinical development and through to regulatory approval and commercialization. Our other product candidates are at even earlier stages of development than antolimab (AK002) and may fail in development or suffer delays that adversely affect their commercial viability.***

All of our product candidates are in the early stages of development and may fail in development or suffer delays that adversely affect their commercial viability. A product candidate can unexpectedly fail at any stage of preclinical and clinical development. The historical failure rate for product candidates is high due to risks relating to safety, efficacy, clinical execution, changing standards of medical care and other unpredictable variables. The results from preclinical testing or early clinical trials of a product candidate may not be predictive of the results that will be obtained in later-stage clinical trials of the product candidate.

Our future operating results are dependent on our ability to successfully develop, obtain regulatory approval for, and then successfully commercialize other product candidates in addition to antolimab (AK002). The success of any product candidates we may develop will depend on many factors, including, among other things, the following:

- generating sufficient data to support the initiation or continuation of clinical trials;

- obtaining regulatory permission to initiate clinical trials;

- contracting with the necessary parties to conduct clinical trials;

- successful enrollment of patients in, and the completion of, clinical trials;

- the timely manufacture of sufficient quantities of the product candidate for use in clinical trials; and

- adverse events in the clinical trials.

Even if we successfully advance any other product candidates into clinical development, their success will be subject to all of the clinical, regulatory and commercial risks described elsewhere in this "Risk Factors" section. Accordingly, we cannot assure you that we will ever be able to develop, obtain regulatory approval of, commercialize or generate significant revenue from any other product candidates.

***Any drugs we develop may become subject to unfavorable third-party reimbursement practices and pricing regulations.***

The availability and extent of coverage and adequate reimbursement by governmental and private payors is essential for most patients to be able to afford expensive treatments. Sales of any of our product candidates that receive marketing approval will depend substantially, both in the United States and internationally, on the extent to which the costs of our product candidates will be paid by health maintenance, managed care, pharmacy benefit, and similar healthcare management organizations or reimbursed by government health administration authorities, private health coverage insurers and other third-party payors. If reimbursement is not available, or is available only to limited levels, we may not be able to successfully commercialize our product candidates. Even if coverage is provided, the approved reimbursement amount may not be high enough to allow us to establish or maintain pricing sufficient to realize an adequate return on our investment. Coverage and reimbursement may impact the demand for, or the price of, any product candidate for which we obtain marketing approval. If coverage and reimbursement are not available or reimbursement is available only to limited levels, we may not successfully commercialize any product candidate for which we obtain marketing approval.

There is significant uncertainty related to insurance coverage and reimbursement of newly approved products. In the United States, principal decisions about reimbursement for new products are typically made by the Centers for Medicare & Medicaid Services ("CMS"), an agency within the U.S. Department of Health and Human Services. CMS decides whether and to what extent a new product will be covered and reimbursed under Medicare, and private payors often follow CMS's decisions regarding coverage and reimbursement to a substantial degree. However, one payor's determination to provide coverage for a drug product does not assure that other payors will also provide

45

coverage for the drug product. As a result, the coverage determination process is often time-consuming and costly. This process will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance.

Increasingly, third-party payors are requiring that drug companies provide them with predetermined discounts from list prices and are challenging the prices charged for medical products. Further, such payors are increasingly challenging the price, examining the medical necessity and reviewing the cost effectiveness of medical drug products. There may be especially significant delays in obtaining coverage and reimbursement for newly approved drugs. Third-party payors may limit coverage to specific drug products on an approved list, known as a formulary, which might not include all FDA-approved drugs for a particular indication. We may need to conduct expensive pharmaco-economic studies to demonstrate the medical necessity and cost effectiveness of our products. Nonetheless, our product candidates may not be considered medically necessary or cost effective. We cannot be sure that coverage and reimbursement will be available for any product that we commercialize and, if reimbursement is available, what the level of reimbursement will be.

Outside the United States, international operations are generally subject to extensive governmental price controls and other market regulations, and we believe the increasing emphasis on cost containment initiatives in Europe, Canada and other countries has and will continue to put pressure on the pricing and usage of therapeutics such as our product candidates. In many countries, particularly the countries of the European Union, medical product prices are subject to varying price control mechanisms as part of national health systems. In these countries, pricing negotiations with governmental authorities can take considerable time after a product receives marketing approval. To obtain reimbursement or pricing approval in some countries, we may be required to conduct a clinical trial that compares the cost-effectiveness of our product candidate to other available therapies. In general, product prices under such systems are substantially lower than in the United States. Other countries allow companies to fix their own prices for products but monitor and control company profits. Additional foreign price controls or other changes in pricing regulation could restrict the amount that we are able to charge for our product candidates. Accordingly, in markets outside the United States, the reimbursement for our products may be reduced compared with the United States and may be insufficient to generate commercially reasonable revenue and profits.

If we are unable to establish or sustain coverage and adequate reimbursement for any future product candidates from third-party payors, the adoption of those products and sales revenue will be adversely affected, which, in turn, could adversely affect the ability to market or sell those product candidates, if approved. Coverage policies and third-party reimbursement rates may change at any time. Even if favorable coverage and reimbursement status is attained for one or more products for which we receive regulatory approval, less favorable coverage policies and reimbursement rates may be implemented in the future.

***If our competitors develop and market products that are more effective, safer or less expensive than our product candidates, our commercial opportunities will be negatively impacted.***

The biotechnology industry is highly competitive and subject to rapid and significant technological change. Products we may develop in the future are likely to face competition from other drugs and therapies, some of which we may not currently be aware. In addition, our products may need to compete with off-label drugs used by physicians to treat the indications for which we seek approval. This may make it difficult for us to replace existing therapies with our products.

We are not aware of any other company or organization that is conducting clinical trials of a product candidate that targets both eosinophils and mast cells, including any product candidate that specifically targets Siglec-8. The competition we may face with respect to the indications we are targeting with antolimab (AK002) includes, without limitation, Regeneron, AstraZeneca, Celgene, Shire, and Dr. Falk Pharma for EGIDs, Blueprint Medicines for ISM, and Novartis Pharmaceuticals, Genentech, and Gossamer Bio for CU. In addition, we are currently evaluating a host of other indications, and if we were to initiate trials in any such indication, we would likely face significant competition from a number of additional competitors. These companies, or other major multinational pharmaceutical and biotechnology companies, emerging and start-up companies, universities and other research institutions, could focus their future efforts on developing competing therapies and treatments for any of the indications we are currently targeting or may target in the future. Many of these current and potential competitors have significantly greater financial, manufacturing, marketing, drug development, technical and human resources and commercial expertise than we do. Large pharmaceutical and biotechnology companies, in particular, have

46

extensive experience in clinical testing, obtaining regulatory approvals, recruiting patients and manufacturing biotechnology products. These companies also have significantly greater research and marketing capabilities than we do and may also have products that have been approved or are in late stages of development, and collaborative arrangements in our target markets with leading companies and research institutions. Established pharmaceutical and biotechnology companies may also invest heavily to accelerate discovery and development of novel compounds or to in-license novel compounds that could make the product candidates that we develop obsolete. As a result of all of these factors, our competitors may succeed in obtaining approval from the FDA or foreign regulatory authorities or discovering, developing and commercializing products in our field before we do.

Smaller and other early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These companies compete with us in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and patient registration for planned clinical trials, as well as in acquiring technologies complementary to, or necessary for, our programs. In addition, the biotechnology industry is characterized by rapid technological change. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our technologies or product candidates obsolete, less competitive or not economical.

*We have limited resources and are currently focusing our efforts on developing antolimab (AK002) for particular indications. As a result, we may fail to capitalize on other product candidates or indications that may ultimately have proven to be more profitable.*

We are currently focusing our efforts on a small number of indications. As a result, we may forego or delay pursuit of opportunities for other indications or with other product candidates that may have greater commercial potential. Our resource allocation decisions may cause us to fail to capitalize on viable commercial drugs or profitable market opportunities. Our spending on current and future research and development activities for specific indications may not yield any commercially viable drugs. If we do not accurately evaluate the commercial potential or target markets for a particular product candidate, we may relinquish valuable rights to that product candidate through collaboration, licensing or other strategic arrangements in cases in which it would have been more advantageous for us to retain sole development and commercialization rights to such product candidate.

*Our business entails a significant risk of product liability and if we are unable to obtain sufficient insurance coverage such inability could have an adverse effect on our business and financial condition.*

Our business exposes us to significant product liability risks inherent in the development, testing, manufacturing and marketing of therapeutic treatments. Product liability claims could delay or prevent completion of our development programs. If we succeed in marketing products, such claims could result in an FDA investigation of the safety and effectiveness of our products, our manufacturing processes and facilities or our marketing programs. FDA investigation could potentially lead to a recall of our products or more serious enforcement action, limitations on the approved indications for which they may be used or suspension or withdrawal of approvals. Regardless of the merits or eventual outcome, liability claims may also result in decreased demand for our products, injury to our reputation, costs to defend the related litigation, a diversion of management's time and our resources and substantial monetary awards to trial participants or patients. We currently have product liability insurance that we believe is appropriate for our stage of development and may need to obtain higher levels prior to marketing any of our product candidates, if approved. Any insurance we have or may obtain may not provide sufficient coverage against potential liabilities. Furthermore, clinical trial and product liability insurance is becoming increasingly expensive. As a result, we may be unable to obtain sufficient insurance at a reasonable cost to protect us against losses caused by product liability claims that could have an adverse effect on our business and financial condition.

**Risks Related to Regulatory Approval and Other Legal Compliance Matters**

*We may be unable to obtain U.S. or foreign regulatory approval and, as a result, unable to commercialize our product candidates.*

Our product candidates are subject to extensive governmental regulations relating to, among other things, research, testing, development, manufacturing, safety, efficacy, approval, recordkeeping, reporting, labeling, storage, packaging, advertising and promotion, pricing, marketing and distribution of drugs and therapeutic biologics. Rigorous preclinical testing and clinical trials and an extensive regulatory approval process must be

successfully completed in the United States and in many foreign jurisdictions before a new drug or therapeutic biologic can be marketed. Satisfaction of these and other regulatory requirements is costly, time-consuming, uncertain and subject to unanticipated delays. For example, despite the recent completion of our Phase 2 clinical trial in patients with EG and/or EGE, significant regulatory hurdles remain, both near term and long term, before antolimab (AK002) can obtain regulatory approval in the United States. In the near term, we must conduct an end of Phase 2 meeting with the FDA and if we are unable to do so in a timely manner, our timeline for the commercialization of our product candidate could be extended. In the longer term, we will need to reach agreement with the FDA on the design for our Phase 3 clinical trial, and of course conduct of such trial. There can be no assurance we will be able to successfully conclude these undertakings in a timely manner, and it is possible that none of the product candidates we may develop will obtain the regulatory approvals necessary for us to begin selling them.

Our company has not conducted or managed clinical trials through regulatory approval, including FDA approval. The time required to obtain FDA and other approvals is unpredictable but typically takes many years following the commencement of clinical trials, depending upon the type, complexity and novelty of the product candidate. The standards that the FDA and its foreign counterparts use when regulating us require judgment and can change, which makes it difficult to predict with certainty how they will be applied. Any analysis we perform of data from preclinical and clinical activities is subject to confirmation and interpretation by regulatory authorities, which could delay, limit or prevent regulatory approval. We may also encounter unexpected delays or increased costs due to new government regulations. Examples of such regulations include future legislation or administrative action, or changes in FDA policy during the period of product development, clinical trials and FDA regulatory review. It is impossible to predict whether legislative changes will be enacted, or whether FDA or foreign regulations, guidance or interpretations will be changed, or what the impact of such changes, if any, may be.

Any delay or failure in obtaining required approvals could have a material and adverse effect on our ability to generate revenue from the particular product candidate for which we are seeking approval. Furthermore, any regulatory approval to market a product may be subject to limitations on the approved uses for which we may market the product or the labeling or other restrictions. In addition, the FDA has the authority to require a REMS as part of a BLA or NDA, or after approval, which may impose further requirements or restrictions on the distribution or use of an approved drug or biologic. These requirements or restrictions might include limiting prescribing to certain physicians or medical centers that have undergone specialized training, limiting treatment to patients who meet certain safe-use criteria and requiring treated patients to enroll in a registry. These limitations and restrictions may limit the size of the market for the product and affect reimbursement by third-party payors.

48

We are also subject to numerous foreign regulatory requirements governing, among other things, the conduct of clinical trials, manufacturing and marketing authorization, pricing and third-party reimbursement. The foreign regulatory approval process varies among countries and may include all of the risks associated with FDA approval described above as well as risks attributable to the satisfaction of local regulations in foreign jurisdictions. Moreover, the time required to obtain approval may differ from that required to obtain FDA approval. Approval by the FDA does not ensure approval by regulatory authorities outside the United States and vice versa.

***Our clinical trials may reveal significant adverse events, toxicities or other side effects and may result in a safety profile that could inhibit regulatory approval or market acceptance of any of our product candidates.***

In order to obtain marketing approval for any of our product candidates, we must demonstrate the safety and efficacy of the product candidate for the relevant clinical indication or indications through preclinical studies and clinical trials as well as additional supporting data. If our product candidates are associated with undesirable side effects in preclinical studies or clinical trials, or have unexpected characteristics, we may need to interrupt, delay or abandon their development or limit development to more narrow uses or subpopulations in which the undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective.

We have conducted Phase 1 and Phase 2 clinical trials in healthy volunteers, as well as in patients with EG, EGE, CU, ISM and SAC. However, we do not know the predictive value of these trials for our future clinical trials, and we cannot guarantee that any positive results in preclinical studies or previous clinical trials will successfully translate to patients in our future clinical trials. It is not uncommon to observe results in clinical trials that are unexpected based on preclinical testing, and many product candidates fail in clinical trials despite promising preclinical results. Moreover, preclinical and clinical data are often susceptible to varying interpretations and analyses, and many companies that believed their product candidates performed satisfactorily in preclinical studies and clinical trials have nonetheless failed to obtain marketing approval for their products. Because Siglec-8 is only naturally expressed in humans and certain other primates, there is no standard animal toxicology model for anti-Siglec-8 therapies, and the acceptability of our preclinical safety data for antolimab (AK002) depends on the continued acceptance by the FDA and EMA, and the acceptance by other regulatory authorities, of the use of our proprietary transgenic mice models for toxicology studies.

Antolimab (AK002) has generally been well tolerated in our clinical trials. The most common adverse event has been the occurrence of mild to moderate infusion-related reactions ("IRRs") (consisting of flushing, feeling of warmth, headache, nausea or dizziness) which occurred mostly, but not exclusively, during the first infusion. Temporal interruption of the antolimab (AK002) infusion and minimal intervention generally resulted in prompt resolution of symptoms and ability to resume the infusion without further complications, although there have been instances when an IRR has resulted in a subject being discontinued from a trial. Subjects in our ongoing and planned clinical trials may in the future suffer other significant adverse events or other side effects not observed in our preclinical studies or previous clinical trials. If clinical trials of our product candidates fail to demonstrate efficacy to the satisfaction of regulatory authorities or do not otherwise produce positive results, we may incur additional costs or experience delays in completing, or ultimately be unable to complete, development and commercialization of our product candidates.

If further significant adverse events or other side effects are observed in any of our current or future clinical trials, we may have difficulty recruiting patients to the clinical trials, patients may drop out of our trials, or we may be required to abandon the trials or our development efforts of that product candidate altogether. We, the FDA, the EMA, other applicable regulatory authorities or an institutional review board may suspend clinical trials of a product candidate at any time for various reasons, including a belief that subjects in such trials are being exposed to unacceptable health risks or adverse side effects. Some potential therapeutics developed in the biotechnology industry that initially showed therapeutic promise in early-stage studies have later been found to cause side effects that prevented their further development. Even if the side effects do not preclude the drug from obtaining or maintaining marketing approval, undesirable side effects may inhibit market acceptance of the approved product due to its tolerability relative to other therapies. Any of these developments could materially harm our business, financial condition and prospects.

49

Further, if any of our product candidates obtains marketing approval, toxicities associated with our product candidates may also develop after such approval and lead to a requirement to conduct additional clinical safety trials, additional warnings being added to the labeling, significant restrictions on the use of the product or the withdrawal of the product from the market. We cannot predict whether our product candidates will cause toxicities in humans that would preclude or lead to the revocation of regulatory approval based on preclinical studies or early-stage clinical testing.

*The FDA, EMA and applicable foreign regulatory authorities may not accept data from trials conducted in locations outside of their jurisdiction.*

We currently conduct clinical trials both in the United States and in other countries. We may in the future choose to conduct additional clinical trials in countries outside the United States, including in Europe. The acceptance of study data by the FDA, EMA or applicable foreign regulatory authority from clinical trials conducted outside of their respective jurisdictions may be subject to certain conditions. In cases where data from foreign clinical trials are intended to serve as the basis for marketing approval in the United States, the FDA will generally not approve the application on the basis of foreign data alone unless (i) the data are applicable to the United States population and United States medical practice and (ii) the trials are performed by clinical investigators of recognized competence and pursuant to current good clinical practices regulations. Additionally, the FDA's clinical trial requirements, including sufficient size of patient populations and statistical powering, must be met. Many foreign regulatory bodies have similar approval requirements. In addition, such foreign trials would be subject to the applicable local laws of the foreign jurisdictions where the trials are conducted. There can be no assurance that the FDA, EMA or any applicable foreign regulatory authority will accept data from trials conducted outside of its applicable jurisdiction. If the FDA, EMA or any applicable foreign regulatory authority does not accept such data, it would result in the need for additional trials, which would be costly and time-consuming and delay aspects of our business plan, and which may result in our product candidates not receiving approval or clearance for commercialization in the applicable jurisdiction.

*Obtaining and maintaining regulatory approval of our product candidates in one jurisdiction does not mean that we will be successful in obtaining regulatory approval of our product candidates in other jurisdictions.*

Obtaining and maintaining regulatory approval of our product candidates in one jurisdiction does not guarantee that we will be able to obtain or maintain regulatory approval in any other jurisdiction. For example, even if the FDA or EMA grants marketing approval of a product candidate, comparable regulatory authorities in foreign jurisdictions must also approve the manufacturing, marketing and promotion of the product candidate in those countries. However, a failure or delay in obtaining regulatory approval in one jurisdiction may have a negative effect on the regulatory approval process in others. Approval procedures vary among jurisdictions and can involve requirements and administrative review periods different from those in the United States, including additional preclinical studies or clinical trials as clinical trials conducted in one jurisdiction may not be accepted by regulatory authorities in other jurisdictions. In many jurisdictions outside the United States, a product candidate must be approved for reimbursement before it can be approved for sale in that jurisdiction. In some cases, the price that we intend to charge for our products is also subject to approval.

Obtaining foreign regulatory approvals and compliance with foreign regulatory requirements could result in significant delays, difficulties and costs for us and could delay or prevent the introduction of our products in certain countries. If we or any partner we work with fail to comply with the regulatory requirements in international markets or fail to receive applicable marketing approvals, our target market will be reduced and our ability to realize the full market potential of our product candidates will be harmed.

50

*Even if our product candidates receive regulatory approval, they will be subject to significant post-marketing regulatory requirements.*

Any regulatory approvals that we may receive for our product candidates will require surveillance to monitor the safety and efficacy of the product candidate, may contain significant limitations related to use restrictions for specified age groups, warnings, precautions or contraindications, and may include burdensome post-approval study or risk management requirements. For example, the FDA may require a REMS in order to approve our product candidates, which could entail requirements for a medication guide, physician communication plans or additional elements, such as boxed warning on the packaging, to ensure safe use, such as restricted distribution methods, patient registries and other risk minimization tools. In addition, if the FDA or foreign regulatory authorities approve our product candidates, the manufacturing processes, labeling, packaging, distribution, adverse event reporting, storage, advertising, promotion, import, export and recordkeeping for our product candidates will be subject to extensive and ongoing regulatory requirements. These requirements include submissions of safety and other post-marketing information and reports, registration, as well as continued compliance with current good manufacturing practices ("cGMPs") and good clinical practices ("GCPs"), for any clinical trials that we conduct post-approval. In addition, manufacturers of drug products and their facilities are subject to continual review and periodic inspections by the FDA and other regulatory authorities for compliance with cGMP regulations and standards. If we or a regulatory agency discover previously unknown problems with a product, such as adverse events of unanticipated severity or frequency, or problems with the facilities where the product is manufactured, a regulatory agency may impose restrictions on that product, the manufacturing facility or us, including requiring recall or withdrawal of the product from the market or suspension of manufacturing. In addition, failure to comply with FDA and foreign regulatory requirements may, either before or after product approval, if any, subject our company to administrative or judicially imposed sanctions, including:

- restrictions on our ability to conduct clinical trials, including full or partial clinical holds on ongoing or planned trials;
- restrictions on the products, manufacturers or manufacturing process;
- warning or untitled letters;
- civil and criminal penalties;
- injunctions;
- suspension or withdrawal of regulatory approvals;
- product seizures, detentions or import bans;
- voluntary or mandatory product recalls and publicity requirements;
- total or partial suspension of production;
- imposition of restrictions on operations, including costly new manufacturing requirements; and
- refusal to approve pending BLAs or supplements to approved BLAs.

The occurrence of any event or penalty described above may inhibit our ability to commercialize our product candidates and generate revenue.

51

*We may not be able to obtain orphan drug designation or obtain or maintain orphan drug exclusivity for our product candidates and, even if we do, that exclusivity may not prevent the FDA or the EMA from approving competing products.*

Regulatory authorities in some jurisdictions, including the U.S. and the European Union, may designate drugs for relatively small patient populations as orphan drugs. Under the Orphan Drug Act, the FDA may designate a product as an orphan drug if it is a drug intended to treat a rare disease or condition, which is generally defined as a patient population of fewer than 200,000 individuals annually in the U.S., or a patient population greater than 200,000 in the United States where there is no reasonable expectation that the cost of developing the drug will be recovered from sales in the United States. We have obtained orphan drug designation for EG, EGE and EoE in the U.S. and for ISM in the U.S. and European Union and we may seek orphan drug designations for other indications or for other of our product candidates. There can be no assurances that we will be able to obtain such designations.

In the U.S., orphan drug designation entitles a party to financial incentives such as opportunities for grant funding towards clinical trial costs, tax advantages and user-fee waivers. In addition, if a product that has orphan drug designation subsequently receives the first FDA approval for the disease for which it has such designation, the product is entitled to orphan drug exclusivity. Orphan drug exclusivity in the U.S. provides that the FDA may not approve any other applications, including a full BLA or NDA, to market the same drug for the same indication for seven years, except in limited circumstances. The applicable exclusivity period is ten years in Europe. The European exclusivity period can be reduced to six years if a drug no longer meets the criteria for orphan drug designation or if the drug is sufficiently profitable so that market exclusivity is no longer justified.

Even if we obtain orphan drug designation for a product candidate, we may not be able to obtain or maintain orphan drug exclusivity for that product candidate. We may not be the first to obtain marketing approval of any product candidate for which we have obtained orphan drug designation for the orphan-designated indication due to the uncertainties associated with developing pharmaceutical products. In addition, exclusive marketing rights in the U.S. may be limited if we seek approval for an indication broader than the orphan-designated indication or may be lost if the FDA later determines that the request for designation was materially defective or if we are unable to assure sufficient quantities of the product to meet the needs of patients with the rare disease or condition. Further, even if we obtain orphan drug exclusivity for a product, that exclusivity may not effectively protect the product from competition because different drugs with different active moieties may be approved for the same condition. Even after an orphan drug is approved, the FDA can subsequently approve the same drug with the same active moiety for the same condition if the FDA concludes that the later drug is clinically superior in that it is shown to be safer, more effective or makes a major contribution to patient care or the manufacturer of the product with orphan exclusivity is unable to maintain sufficient product quantity. Orphan drug designation neither shortens the development time or regulatory review time of a drug nor gives the drug any advantage in the regulatory review or approval process.

*Although we may seek a breakthrough therapy designation for antolimab (AK002) or one or more of our other product candidates, we might not receive such designation, and even if we do, such designation may not lead to a faster development or regulatory review or approval process.*

We may seek a breakthrough therapy designation for antolimab (AK002) in one or more indications or for other product candidates. A breakthrough therapy is defined as a drug that is intended, alone or in combination with one or more other drugs, to treat a serious condition, and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. For drugs and biologics that have been designated as breakthrough therapies, interaction and communication between the FDA and the sponsor of the trial can help to identify the most efficient path for clinical development while minimizing the number of patients placed in ineffective control regimens. Drugs designated as breakthrough therapies by the FDA may also be eligible for priority review if supported by clinical data at the time the NDA is submitted to the FDA.

Designation as a breakthrough therapy is within the discretion of the FDA. Accordingly, even if we believe that one of our product candidates meets the criteria for designation as a breakthrough therapy, the FDA may disagree and instead determine not to make such designation. Even if we receive breakthrough therapy designation, the receipt of such designation for a product candidate may not result in a faster development or regulatory review or approval process compared to drugs considered for approval under conventional FDA procedures and does not assure ultimate approval by the FDA. In addition, even if one or more of our product candidates qualify as breakthrough therapies, the FDA may later decide that the product candidates no longer meet the conditions for qualification or decide that the time period for FDA review or approval will not be shortened.

*We may face difficulties from changes to current regulations and future legislation.*

Existing regulatory policies may change and additional government regulations may be enacted that could prevent, limit or delay regulatory approval of our product candidates. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the U.S. or abroad. If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we are not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained and we may not achieve or sustain profitability.

The Trump Administration and certain members of Congress have made various efforts to repeal all or portions of the Affordable Care Act ("ACA"), including suspending the penalties for failing to comply with the individual insurance mandate, removing funds designed to drive enrollment in the program, repealing the "Cadillac tax" on certain high-cost, employee-sponsored health insurance plans and coming within a single vote in the U.S. Senate of repealing the ACA altogether. There is uncertainty with respect to the impact future actions by the Trump Administration, Congress or the courts may have and any changes likely will take time to unfold, and could have an impact on coverage and reimbursement for healthcare items and services covered by plans that were authorized by the ACA. However, we cannot predict the ultimate content, timing or effect of any further healthcare reform legislation or the impact of potential legislation on us. In addition, other legislative changes have been proposed and adopted since the ACA was enacted. These changes included aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, effective April 1, 2013, which, due to subsequent legislative amendments, will stay in effect through 2025 unless additional Congressional action is taken. In January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, reduced Medicare payments to several providers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. These laws may result in additional reductions in Medicare and other healthcare funding, which could have a material adverse effect on customers for our drugs, if approved, and accordingly, our financial operations.

We expect that the ACA, as well as other healthcare reform measures that may be adopted in the future, may result in more rigorous coverage criteria and in additional downward pressure on the price that we receive for any approved product. For example, the Trump Administration has contemplated certain executive actions and campaigned upon policies aiming to lower the cost of prescription drugs in the U.S., including possibly implementing a "most favored nations" clause where the U.S. would pay no more than the country with the lowest prescription drug prices. Similarly, many of Democratic candidates for the 2020 Presidential election have made drug price reform a focal point of their presidential campaigns. Any reduction in reimbursement from Medicare or other government programs may result in a similar reduction in payments from private payors. The implementation of cost containment measures or other healthcare reforms may prevent us from being able to generate sufficient revenue, attain profitability or commercialize our product candidates.

Legislative and regulatory proposals have been made to expand post-approval requirements and restrict sales and promotional activities for biotechnology products. We cannot be sure whether additional legislative changes will be enacted, or whether FDA regulations, guidance or interpretations will be changed, or what the impact of such changes on the marketing approvals of our product candidates, if any, may be. In addition, increased scrutiny by the U.S. Congress of the FDA's approval process may significantly delay or prevent marketing approval, as well as subject us to more stringent product labeling and post-marketing testing and other requirements.

53

***If we fail to comply with applicable U.S. and foreign privacy and data protection laws and regulations, we may be subject to liabilities that adversely affect our business, operations and financial performance.***

We are subject to federal and state laws and regulations requiring that we take measures to protect the privacy and security of certain information we gather and use in our business. For example, federal and state security breach notification laws, state health information privacy laws and federal and state consumer protection laws impose requirements regarding the collection, use, disclosure and storage of personal information. In addition, in June 2018, California enacted the California Consumer Privacy Act (the "CCPA"), which took effect on January 1, 2020. The CCPA gives California residents expanded rights to access and require deletion of their personal information, opt out of certain personal information sharing, and receive detailed information about how their personal information is used. The CCPA provides for civil penalties for violations, as well as a private right of action for data breaches that may increase data breach litigation. Although the CCPA includes exemptions for certain clinical trials data, and HIPAA protected health information, the law may increase our compliance costs and potential liability with respect to other personal information we collect about California residents. The CCPA has prompted a number of proposals for new federal and state privacy legislation that, if passed, could increase our potential liability, increase our compliance costs and adversely affect our business.

We may also be subject to or affected by foreign laws and regulations, including regulatory guidance, governing the collection, use, disclosure, security, transfer and storage of personal data, such as information that we collect about patients and healthcare providers in connection with clinical trials and our other operations in the U.S. and abroad. The global legislative and regulatory landscape for privacy and data protection continues to evolve, and implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future. This evolution may create uncertainty in our business, result in liability or impose additional costs on us. The cost of compliance with these laws, regulations and standards is high and is likely to increase in the future. For example, the EU has adopted the General Data Protection Regulation (the "GDPR"), which introduces strict requirements for processing personal data. The GDPR increases our compliance burden with respect to data protection, including by mandating potentially burdensome documentation requirements and granting certain rights to individuals to control how we collect, use, disclose, retain and leverage information about them. The processing of sensitive personal data, such as information about health conditions, entails heightened compliance burdens under the GDPR and is a topic of active interest among foreign regulators. In addition, the GDPR provides for breach reporting requirements, more robust regulatory enforcement and fines of up to the greater of 20 million euros or 4% of annual global revenue. While companies are afforded some flexibility in determining how to comply with the GDPR's various requirements, significant effort and expense are required to ensure continuing compliance with the GDPR. Moreover, the requirements under the GDPR and guidance issued by different EU member states may change periodically or may be modified, and such changes or modifications could have an adverse effect on our business operations if compliance becomes substantially costlier than under current requirements. It is also possible that each of these privacy laws may be interpreted and applied in a manner that is inconsistent with our practices. Further, Brexit, which occurred on January 31, 2020, has created uncertainty with regard to data protection regulation in the UK. In particular, it is unclear whether, post Brexit, the UK will enact data protection legislation equivalent to the GDPR and how data transfers to and from the United Kingdom will be regulated. Any failure or perceived failure by us to comply with federal, state, or foreign laws or self-regulatory standards could result in negative publicity, diversion of management time and effort, proceedings against us by governmental entities or others, and fines. In many jurisdictions, enforcement actions and consequences for noncompliance are rising. As we continue to expand into other foreign countries and jurisdictions, we may be subject to additional laws and regulations that may affect how we conduct business.

54

*Our relationships with customers and third-party payors will be subject to applicable anti-kickback, fraud and abuse, transparency and other healthcare laws and regulations, which could expose us to, among other things, criminal sanctions, civil penalties, contractual damages, reputational harm, administrative burdens and diminished profits and future earnings.*

Healthcare providers and third-party payors play a primary role in the recommendation and prescription of any product candidates for which we obtain marketing approval. Our future arrangements with third-party payors and customers may expose us to broadly applicable fraud and abuse and other healthcare laws and regulations that may constrain the business or financial arrangements and relationships through which we market, sell and distribute our products for which we obtain marketing approval. Restrictions under applicable federal and state healthcare laws and regulations, include the following:

- the federal Anti-Kickback Statute prohibits, among other things, persons and entities from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce or reward, or in return for, either the referral of an individual for, or the purchase, order or recommendation of, any good or service, for which payment may be made under a federal healthcare program such as Medicare and Medicaid;

- the federal false claims and civil monetary penalties laws, including the civil False Claims Act, impose criminal and civil penalties, including civil whistleblower or qui tam actions, against individuals or entities for, among other things, knowingly presenting, or causing to be presented, to the federal government, claims for payment that are false or fraudulent or making a false statement to avoid, decrease or conceal an obligation to pay money to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), imposes criminal and civil liability for, among other things, executing or attempting to execute a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act and its implementing regulations, also imposes obligations, including mandatory contractual terms, with respect to safeguarding the privacy, security and transmission of individually identifiable health information;

- the federal Physician Payments Sunshine Act requires applicable manufacturers of covered drugs, devices, biologics and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program, with specific exceptions, to annually report to CMS information regarding payments and other transfers of value to physicians and teaching hospitals as well as information regarding ownership and investment interests held by physicians and their immediate family members. The information was made publicly available on a searchable website in September 2014 and will be disclosed on an annual basis; and

- analogous state and foreign laws and regulations, such as state anti-kickback and false claims laws, may apply to sales or marketing arrangements and claims involving healthcare items or services reimbursed by non-governmental third-party payors, including private insurers.

Some state laws require biotechnology companies to comply with the biotechnology industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government and may require drug manufacturers to report information related to payments and other transfers of value to physicians and other healthcare providers or marketing expenditures. State and foreign laws also govern the privacy and security of health information in some circumstances, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts.

55

Efforts to ensure that our current and future business arrangements with third-parties will comply with applicable healthcare laws and regulations will involve substantial costs. It is possible that governmental authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law involving applicable fraud and abuse or other healthcare laws and regulations. If our operations are found to be in violation of any of these laws or any other governmental regulations that may apply to us, we may be subject to significant penalties, including civil, criminal and administrative penalties, damages, fines, disgorgement, imprisonment, exclusion from participation in government funded healthcare programs, such as Medicare and Medicaid, contractual damages, reputational harm, diminished profits and future earnings and the curtailment or restructuring of our operations. Defending against any such actions can be costly, time-consuming and may require significant financial and personnel resources. Therefore, even if we are successful in defending against any such actions that may be brought against us, our business may be impaired. Further, if any of the physicians or other healthcare providers or entities with whom we expect to do business is found to be not in compliance with applicable laws, they may be subject to criminal, civil or administrative sanctions, including exclusions from government funded healthcare programs.

***Our employees may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements.***

We are exposed to the risk of employee fraud or other misconduct. Misconduct by employees could include failures to comply with FDA regulations, provide accurate information to the FDA, comply with federal and state health care fraud and abuse laws and regulations, accurately report financial information or data or disclose unauthorized activities to us. In particular, sales, marketing and business arrangements in the health care industry are subject to extensive laws and regulations intended to prevent fraud, misconduct, kickbacks, self-dealing and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. Employee misconduct could also involve the improper use of information obtained in the course of clinical trials, which could result in regulatory sanctions and serious harm to our reputation. We have adopted a code of conduct, but it is not always possible to identify and deter employee misconduct, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws or regulations. If any such actions are instituted against us, and we are not successful in defending ourselves or asserting our rights, those actions could have a significant impact on our business, including the imposition of significant fines or other sanctions.

***If we fail to comply with environmental, health and safety laws and regulations, we could become subject to fines or penalties or incur costs that could have a material adverse effect on our business.***

We are subject to numerous environmental, health and safety laws and regulations, including those governing laboratory procedures and the handling, use, storage, treatment and disposal of hazardous materials and wastes. Our operations involve the use of hazardous and flammable materials, including chemicals and biological materials. Our operations also produce hazardous waste products. We generally contract with third-parties for the disposal of these materials and wastes. We cannot eliminate the risk of contamination or injury from these materials. In the event of contamination or injury resulting from our use of hazardous materials, we could be held liable for any resulting damages, and any liability could exceed our resources. We also could incur significant costs associated with civil or criminal fines and penalties.

Although we maintain workers' compensation insurance to cover us for costs and expenses we may incur due to injuries to our employees resulting from the use of hazardous materials, this insurance may not provide adequate coverage against potential liabilities. We do not maintain insurance for environmental liability or toxic tort claims that may be asserted against us in connection with our storage or disposal of hazardous and flammable materials, including chemicals and biological materials.

In addition, we may incur substantial costs in order to comply with current or future environmental, health and safety laws and regulations. These current or future laws and regulations may impair our research, development or commercialization efforts. Failure to comply with these laws and regulations also may result in substantial fines, penalties or other sanctions.

*Our business activities may be subject to the Foreign Corrupt Practices Act ("FCPA"), the UK Bribery Act 2010 ("UK Bribery Act"), and other similar anti-bribery and anti-corruption laws of other countries in which we operate.*

We have conducted and have ongoing studies in international locations, and may in the future initiate additional studies in countries other than the U.S. Our business activities may be subject to the FCPA, the UK Bribery Act and other similar anti-bribery or anti-corruption laws, regulations or rules of other countries in which we operate. The FCPA generally prohibits offering, promising, giving or authorizing others to give anything of value, either directly or indirectly, to a non-U.S. government official in order to influence official action or otherwise obtain or retain business. The FCPA also requires public companies to make and keep books and records that accurately and fairly reflect the transactions of the corporation and to devise and maintain an adequate system of internal accounting controls. Our business is heavily regulated and therefore involves significant interaction with public officials, including officials of non-U.S. governments. Additionally, in many other countries, the health care providers who prescribe pharmaceuticals are employed by their government, and the purchasers of pharmaceuticals are government entities; therefore, our dealings with these prescribers and purchasers are subject to regulation under the FCPA. Recently the SEC and Department of Justice have increased their FCPA enforcement activities with respect to biotechnology and pharmaceutical companies. There is no certainty that all of our employees, agents or contractors, or those of our affiliates, will comply with all applicable laws and regulations, particularly given the high level of complexity of these laws. Violations of these laws and regulations could result in fines, criminal sanctions against us, our officers or our employees, the closing down of our facilities, requirements to obtain export licenses, cessation of business activities in sanctioned countries, implementation of compliance programs and prohibitions on the conduct of our business. Any such violations could include prohibitions on our ability to offer our products in one or more countries and could materially damage our reputation, our brand, our international expansion efforts, our ability to attract and retain employees and our business, prospects, operating results and financial condition.

**Risks Related to Employee Matters, Managing Our Growth and Other Risks Related to Our Business**

*Our success is highly dependent on the services of our Chief Executive Officer, Dr. Robert Alexander, and our President and Chief Operating Officer, Dr. Adam Tomasi, and our ability to attract and retain highly skilled executive officers and employees.*

To succeed, we must recruit, retain, manage and motivate qualified clinical, scientific, technical and management personnel, and we face significant competition for experienced personnel. We are highly dependent on the principal members of our management and scientific and medical staff, particularly our Chief Executive Officer, Dr. Robert Alexander, and our President and Chief Operating Officer, Dr. Adam Tomasi. If we do not succeed in attracting and retaining qualified personnel, particularly at the management level, it could adversely affect our ability to execute our business plan and harm our operating results. In particular, the loss of one or more of our executive officers, including Dr. Alexander or Dr. Tomasi, could be detrimental to us if we cannot recruit suitable replacements in a timely manner. The competition for qualified personnel in the biotechnology field is intense and as a result, we may be unable to continue to attract and retain qualified personnel necessary for the future success of our business. In addition to competition for personnel, the San Francisco Bay Area in particular is characterized by a high cost of living. We could in the future have difficulty attracting experienced personnel to our company and may be required to expend significant financial resources in our employee recruitment and retention efforts.

Many of the other biotechnology companies that we compete against for qualified personnel have greater financial and other resources, different risk profiles and a longer history in the industry than we do. They also may provide more diverse opportunities and better prospects for career advancement. Some of these characteristics may be more appealing to high-quality candidates than what we have to offer. If we are unable to continue to attract and retain high-quality personnel, the rate and success at which we can discover, develop and commercialize our product candidates will be limited and the potential for successfully growing our business will be harmed.

*If we are unable to establish sales or marketing capabilities or enter into agreements with third-parties to sell or market our product candidates, we may not be able to successfully sell or market our product candidates that obtain regulatory approval.*

We currently have a small commercial team which will need to be expanded substantially to support the marketing, sales and distribution of any of our product candidates that may be able to obtain regulatory approval. In order to commercialize any product candidates, we must build marketing, sales, distribution, managerial and other non-technical capabilities or make arrangements with third-parties to perform these services for each of the territories in which we may have approval to sell or market our product candidates. We may not be successful in accomplishing these required tasks.

Establishing an internal sales or marketing team with technical expertise and supporting distribution capabilities to commercialize our product candidates will be expensive and time-consuming, and will require significant attention of our executive officers to manage. Any failure or delay in the development of our internal sales, marketing and distribution capabilities could adversely impact the commercialization of any of our product candidates that we obtain approval to market, if we do not have arrangements in place with third-parties to provide such services on our behalf. Alternatively, if we choose to collaborate, either globally or on a territory-by-territory basis, with third-parties that have direct sales forces and established distribution systems, either to augment our own sales force and distribution systems or in lieu of our own sales force and distribution systems, we will be required to negotiate and enter into arrangements with such third-parties relating to the proposed collaboration. If we are unable to enter into such arrangements when needed on acceptable terms, or at all, we may not be able to successfully commercialize any of our product candidates that receive regulatory approval or any such commercialization may experience delays or limitations. If we are unable to successfully commercialize our approved product candidates, either on our own or through collaborations with one or more third-parties, our future product revenue will suffer and we may incur significant additional losses.

*In order to successfully implement our plans and strategies, we will need to grow the size of our organization, and we may experience difficulties in managing this growth.*

At December 31, 2019, we had 90 full-time employees, including 61 employees engaged in research and development. In order to successfully implement our development and commercialization plans and strategies, and as we transition into operating as a public company, we expect to need additional managerial, operational, sales, marketing, financial and other personnel. Future growth would impose significant added responsibilities on members of management, including:

- identifying, recruiting, integrating, maintaining and motivating additional employees;

- managing our internal development efforts effectively, including the clinical and FDA review process for antolimab (AK002) and any other future product candidates, while complying with any contractual obligations to contractors and other third-parties we may have; and

- improving our operational, financial and management controls, reporting systems and procedures.

Our future financial performance and our ability to successfully develop and, if approved, commercialize antolimab (AK002) and any other future product candidates will depend, in part, on our ability to effectively manage any future growth, and our management may also have to divert a disproportionate amount of its attention away from day-to-day activities in order to devote a substantial amount of time to managing these growth activities.

We currently rely, and for the foreseeable future will continue to rely, in substantial part on certain independent organizations, advisors and consultants to provide certain services, including substantially all aspects of clinical management and manufacturing. We cannot assure you that the services of independent organizations, advisors and consultants will continue to be available to us on a timely basis when needed, or that we can find qualified replacements. In addition, if we are unable to effectively manage our outsourced activities or if the quality or accuracy of the services provided by third-party service providers is compromised for any reason, our clinical trials may be extended, delayed or terminated, and we may not be able to obtain marketing approval of antolimab (AK002) and any other future product candidates or otherwise advance our business. We cannot assure you that we will be able to manage our existing third-party service providers or find other competent outside contractors and consultants on economically reasonable terms, or at all.

If we are not able to effectively expand our organization by hiring new employees and/or engaging additional third-party service providers, we may not be able to successfully implement the tasks necessary to further develop and commercialize antolimab (AK002) and any other future product candidates and, accordingly, may not achieve our research, development and commercialization goals.

*We may experience disruptions and delays or incur financial damages as a result of system failures or security breaches.*

Despite the implementation of security measures, any of the internal computer systems belonging to us or our third-party service providers are vulnerable to damage from computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failure. Any system failure, accident or security breach that causes interruptions in our own or in third-party service providers' operations could result in a material disruption of our drug discovery and development programs. A system failure or security breach that causes the loss of clinical trial data from completed or future clinical trials could result in delays in our regulatory approval efforts and significantly increase our costs in order to recover or reproduce the lost data. In addition, to the extent that any disruption or security breach results in a loss or damage to our data or applications, or inappropriate disclosure of confidential or proprietary information, we may incur liability as a result, our drug discovery programs and competitive position may be adversely affected, and further development of our product candidates may be delayed. Any such disruption, failure or security breach could also cause us to incur additional costs to remedy the damages that arise from such disruption, failure or security breach.

Our insurance policies may not be adequate to compensate us for the potential losses arising from any such disruption, failure or security breach. In addition, such insurance may not be available to us in the future on economically reasonable terms, or at all. Further, our insurance may not cover all claims made against us and could have high deductibles in any event, and defending a suit, regardless of its merit, could be costly and divert management attention.

*Our operations are vulnerable to interruption by fire, earthquake, power loss, telecommunications failure, terrorist activity and other events beyond our control, which could harm our business.*

Our facility is located in a seismically active region and in a state which also experiences large scale wildfires from time to time. We have not undertaken a systematic analysis of the potential consequences to our business and financial results from a major earthquake, fire, power loss, terrorist activity or other disasters and do not have a recovery plan for such disasters. In addition, we do not carry sufficient insurance to compensate us for actual losses from interruption of our business that may occur, and any losses or damages incurred by us could harm our business. We maintain multiple copies of each of our antibody sequences and electronic data records, most of which we maintain at our headquarters. If our facility were impacted by a seismic event, we could lose all our antibody sequences, which would have an adverse effect on our ability to perform our obligations under our collaborations and discover new targets.

*Our ability to utilize our net operating loss carryforwards and certain other tax attributes may be limited.*

As of December 31, 2019, we had gross U.S. federal and state net operating loss carryforwards of $210.2 million and $42.4 million, respectively, which expire beginning in 2032. As of December 31, 2019, the Company had federal and California research and other tax credit carryforwards of $8.8 million and $4.0 million, respectively. It is possible that we will not generate taxable income in time to use our net operating loss carryforwards before their expiration or at all. Under Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, if a corporation undergoes an "ownership change" (generally defined as a greater than 50 percentage points change (by value) in the ownership of its equity over a rolling three-year period), the corporation's ability to use its pre-change net operating loss carryforwards and certain other pre-change tax attributes to offset its post-change income and taxes may be limited. We have not yet undertaken an analysis under Sections 382 and 383 of the Internal Revenue Code to see if any of our net operating loss carryforwards were limited as a result of our prior stock sales, including those made as part of our initial public offering. As a result, we may have experienced such ownership changes in the past, and we may experience ownership changes in the future as a result of shifts in our stock ownership, some of which are outside our control. Accordingly, our ability to utilize our net operating loss carryforwards could be limited by an "ownership change" as described above, which could result in increased tax liability to our company.

59

**Risks Related to Intellectual Property**

*If we are unable to obtain or protect intellectual property rights, we may not be able to compete effectively in our market.*

Our success depends in significant part on our and our current or future licensors' ability to establish, maintain and protect patents and other intellectual property rights and operate without infringing the intellectual property rights of others. We have filed numerous patent applications both in the United States and in foreign jurisdictions to obtain patent rights to inventions we have developed. We have also licensed from third-parties rights to patent portfolios. Some of these licenses give us the right to prepare, file and prosecute patent applications and maintain and enforce patents we have licensed, and other licenses may not give us such rights.

The patent prosecution process is expensive and time-consuming, and we and our current or future licensors may not be able to prepare, file and prosecute all necessary or desirable patent applications at a reasonable cost or in a timely manner. It is also possible that we or our current and future licensors will fail to identify patentable aspects of inventions made in the course of development and commercialization activities before it is too late to obtain patent protection on them. Moreover, in some circumstances, we may not have the right to control the preparation, filing and prosecution of patent applications, or to maintain the patents, covering technology that we license from third-parties and are reliant on our current and future licensors. Therefore, these patents and applications may not be prosecuted and enforced in a manner consistent with the best interests of our business. If our current or future licensors fail to establish, maintain or protect such patents and other intellectual property rights, such rights may be reduced or eliminated. If our current and future licensors are not fully cooperative or disagree with us as to the prosecution, maintenance or enforcement of any patent rights, such patent rights could be compromised.

The patent position of biotechnology companies generally is highly uncertain, involves complex legal and factual questions and has in recent years been the subject of much litigation. As a result, the issuance, scope, validity, enforceability and commercial value of our and our current or future licensors' patent rights are highly uncertain. Our and our current or future licensors' pending and future patent applications may not result in patents being issued which protect our technology or products, in whole or in part, or which effectively prevent others from commercializing competitive technologies and products. The patent examination process may require us or our current and future licensors to narrow the scope of the claims of our or our current and future licensors' pending and future patent applications, which may limit the scope of patent protection that may be obtained.

We cannot assure you that all of the potentially relevant prior art relating to our patents and patent applications has been found. If such prior art exists, it can invalidate a patent or prevent a patent from issuing from a pending patent application. Even if patents do successfully issue and even if such patents cover our product candidates, third-parties may initiate an opposition, interference, re-examination, post-grant review, *inter partes* review, nullification or derivation action in court or before patent offices, or similar proceedings challenging the validity, enforceability or scope of such patents, which may result in the patent claims being narrowed or invalidated. Our and our current or future licensors' patent applications cannot be enforced against third-parties practicing the technology claimed in such applications unless and until a patent issues from such applications, and then only to the extent the issued claims cover the technology.

Because patent applications in the United States and most other countries are confidential for a period of time after filing, and some remain so until issued, we cannot be certain that we or our current and future licensors were the first to file any patent application related to a product candidate. Furthermore, if third-parties have filed such patent applications on or before March 15, 2013, an interference proceeding in the United States can be initiated by such third-parties to determine who was the first to invent any of the subject matter covered by the patent claims of our applications. If third-parties have filed such applications after March 15, 2013, a derivation proceeding in the United States can be initiated by such third-parties to determine whether our invention was derived from theirs. Even where we have a valid and enforceable patent, we may not be able to exclude others from practicing our invention where the other party can show that they used the invention in commerce before our filing date or the other party benefits from a compulsory license. In addition, patents have a limited lifespan. In the United States, if all maintenance fees are timely paid, the natural expiration of a patent is generally 20 years from its earliest U.S. filing date. Various extensions may be available, but the life of a patent, and the protection it affords, is limited. Even if patents covering our product candidates are obtained, once the patent life has expired for a product, we may

60

be open to competition from competitive medications, including biosimilar or generic medications. For example, some of the patents that we exclusively licensed from The Johns Hopkins University will expire in 2021, one of our owned patent families that claims one of the product candidates will expire in 2035 in the United States and similar patent applications are pending in foreign jurisdictions with a projected expiration date in 2034, at which time the underlying technology covered by such patents can be used by any third-party, including competitors. Although the patent term extensions under the Hatch-Waxman Act in the United States may be available to extend the patent term, we cannot provide any assurances that any such patent term extension will be obtained and, if so, for how long.

Due to the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours. We expect to seek extensions of patent terms where these are available in any countries where we are prosecuting patents. This includes in the United States under the Drug Price Competition and Patent Term Restoration Act of 1984, which permits a patent term extension of up to five years beyond the expiration of the patent. However, the applicable authorities, including the FDA and the U.S. Patent and Trademark Office ("USPTO") in the United States, and any equivalent foreign regulatory authority, may not agree with our assessment of whether such extensions are available, and may refuse to grant extensions to our patents, or may grant more limited extensions than we request. If this occurs, our competitors may take advantage of our investment in development and clinical trials by referencing our clinical and preclinical data and launch their product earlier than might otherwise be the case.

***We may not be able to protect our intellectual property rights throughout the world.***

Filing, prosecuting, enforcing and defending patents on product candidates in all countries throughout the world would be prohibitively expensive, and our or our current and future licensors' intellectual property rights may not exist in some countries outside the United States or may be less extensive in some countries than in the United States. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent as federal and state laws in the United States. Consequently, we and our current and future licensors may not be able to prevent third-parties from practicing our and our current or future licensors' inventions in all countries outside the United States, or from selling or importing products made using our and our current or future licensors' inventions in and into the United States or other jurisdictions. Competitors may use our and our current or future licensors' technologies in jurisdictions where we have not obtained patent protection to develop their own products and, further, may export otherwise infringing products to territories where we and our current and future licensors have patent protection, but enforcement is not as strong as that in the United States. These products may compete with our product candidates, and our and our current or future licensors' patents or other intellectual property rights may not be effective or sufficient to prevent them from competing.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, particularly those relating to biotechnology, which could make it difficult for us and our current and future licensors to stop the infringement of our and our current or future licensors' patents or marketing of competing products in violation of our and our current or future licensors' proprietary rights generally. Proceedings to enforce our and our current or future licensors' patent rights in foreign jurisdictions could result in substantial costs and divert our and our current or future licensors' efforts and attention from other aspects of our business, could put our and our current or future licensors' patents at risk of being invalidated or interpreted narrowly and our and our current or future licensors' patent applications at risk of not issuing and could provoke third-parties to assert claims against us or our current and future licensors. We or our current and future licensors may not prevail in any lawsuits that we or our current and future licensors initiate, and the damages or other remedies awarded, if any, may not be commercially meaningful.

Many countries have compulsory licensing laws under which a patent owner may be compelled to grant licenses to third-parties. In addition, many countries limit the enforceability of patents against government agencies or government contractors. In these countries, the patent owner may have limited remedies, which could materially diminish the value of such patent. If we or our current and future licensors are forced to grant a license to third-

parties with respect to any patents relevant to our business, our competitive position may be impaired, and our business, financial condition, results of operations and prospects may be adversely affected.

***Changes in patent law could diminish the value of patents in general, thereby impairing our ability to protect our product candidates.***

Obtaining and enforcing patents in the biopharmaceutical industry involves both technological and legal complexity and is therefore costly, time-consuming and inherently uncertain. Changes in either the patent laws or interpretation of the patent laws in the United States could increase the uncertainties and costs. Recent patent reform legislation in the United States and other countries, including the Leahy-Smith America Invents Act ("Leahy-Smith Act"), signed into law on September 16, 2011, could increase those uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents. The Leahy-Smith Act includes a number of significant changes to U.S. patent law. These include provisions that affect the way patent applications are prosecuted, redefine prior art and provide more efficient and cost-effective avenues for competitors to challenge the validity of patents. These include allowing third-party submission of prior art to the USPTO during patent prosecution and additional procedures to attack the validity of a patent by USPTO administered post-grant proceedings, including post-grant review, *inter partes* review and derivation proceedings. After March 15, 2013, under the Leahy-Smith Act, the United States transitioned to a first inventor to file system in which, assuming that the other statutory requirements are met, the first inventor to file a patent application will be entitled to the patent on an invention regardless of whether a third-party was the first to invent the claimed invention. However, the Leahy-Smith Act and its implementation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents, all of which could have a material adverse effect on our business, financial condition, results of operations and prospects.

The U.S. Supreme Court has ruled on several patent cases in recent years, either narrowing the scope of patent protection available in certain circumstances or weakening the rights of patent owners in certain situations. Depending on future actions by the U.S. Congress, the U.S. courts, the USPTO and the relevant law-making bodies in other countries, the laws and regulations governing patents could change in unpredictable ways that would weaken our ability to obtain new patents or to enforce our existing patents and patents that we might obtain in the future.

***Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.***

Periodic maintenance and annuity fees on any issued patent are due to be paid to the USPTO and foreign patent agencies in several stages over the lifetime of the patent. The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. While an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules, there are situations in which noncompliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If we or our current and future licensors fail to maintain the patents and patent applications covering our product candidates, our patent protection could be reduced or eliminated and our competitors might be better able to enter the market with competing products.

***If our trademark and tradenames are not adequately protected, then we may not be able to build name recognition in our markets and our business may be adversely affected.***

We cannot assure you that competitors will not infringe our trademarks or that we will have adequate resources to enforce our trademarks. In addition, we do not own any registered trademarks for the mark "ALLAKOS." We cannot assure you that any future trademark applications that we will file will be approved. During trademark registration proceedings, we may receive rejections and although we are given an opportunity to respond to those rejections, we may be unable to overcome such rejections. In addition, in proceedings before the USPTO and in proceedings before comparable agencies in many foreign jurisdictions, third-parties are given an opportunity to oppose pending trademark applications and to seek to cancel registered trademarks. Opposition or cancellation proceeding may be filed against our trademarks and our trademarks may not survive such proceedings, which may force us to rebrand our name.

***If we breach the license agreements related to our product candidates, we could lose the ability to continue the development and commercialization of our product candidates.***

Our commercial success depends upon our ability, and the ability of our current and future licensors, to develop, manufacture, market and sell our product candidates and use our and our current or future licensors' wholly-owned technologies without infringing the proprietary rights of third-parties. A third-party may hold intellectual property, including patent rights that are important or necessary to the development of our products. As a result, we are a party to a number of technology licenses that are important to our business. For example, we have obtained an exclusive license under certain intellectual property related to Siglec-8 from The Johns Hopkins University to develop certain products and a non-exclusive license from BioWa and Lonza to develop and commercialize products manufactured in a particular mammalian host cell line. If we fail to comply with the obligations under these agreements, including payment and diligence terms, our current and future licensors may have the right to terminate these agreements, in which event we may not be able to develop, manufacture, market or sell any product that is covered by these agreements or may face other penalties under the agreements. Such an occurrence could adversely affect the value of the product candidate being developed under any such agreement. Termination of these agreements or reduction or elimination of our rights under these agreements may result in our having to negotiate new or reinstated agreements, which may not be available to us on equally favorable terms, or at all, or cause us to lose our rights under these agreements, including our rights to intellectual property or technology important to our development programs.

Disputes may arise regarding intellectual property subject to a licensing agreement, including:

- the scope of rights granted under the license agreement and other interpretation-related issues;

- the extent to which our technology and processes infringe on intellectual property of the licensor that is not subject to the licensing agreement;

- the sublicensing of patent and other rights under any collaboration relationships we might enter into in the future;

- our diligence obligations under the license agreement and what activities satisfy those diligence obligations;

- the inventorship and ownership of inventions and know-how resulting from the joint creation or use of intellectual property by our current and future licensors and us; and

- the priority of invention of patented technology.

If disputes over intellectual property that we have licensed prevent or impair our ability to maintain our current licensing arrangements on acceptable terms, we may be unable to successfully develop and commercialize the affected product candidates.

***Third-parties may initiate legal proceedings against us alleging that we infringe their intellectual property rights or we may initiate legal proceedings against third-parties to challenge the validity or scope of intellectual property rights controlled by third-parties, the outcome of which would be uncertain and could have an adverse effect on the success of our business.***

Third-parties may initiate legal proceedings against us or our current and future licensors alleging that we or our current and future licensors infringe their intellectual property rights, or we or our current and future licensors

63

may initiate legal proceedings against third-parties to challenge the validity or scope of intellectual property rights controlled by third-parties, including in oppositions, interferences, reexaminations, *inter partes* reviews or derivation proceedings in the United States or other jurisdictions. These proceedings can be expensive and time-consuming, and many of our or our current and future licensors' adversaries in these proceedings may have the ability to dedicate substantially greater resources to prosecuting these legal actions than we or our current and future licensors.

Parties making claims against us may obtain injunctive or other equitable relief, which could effectively block our ability to further develop and commercialize one or more of our product candidates. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of management and employee resources from our business. An unfavorable outcome could require us or our current and future licensors to cease using the related technology or developing or commercializing our product candidates, or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us or our current and future licensors a license on commercially reasonable terms or at all. Even if we or our current and future licensors obtain a license, it may be non-exclusive, thereby giving our competitors access to the same technologies licensed to us or our current and future licensors. In addition, we could be found liable for monetary damages, including treble damages and attorneys' fees, if we are found to have willfully infringed a patent. A finding of infringement could prevent us from commercializing our product candidates or force us to cease some of our business operations, which could harm our business.

***We may be subject to claims by third-parties asserting that our employees or we have misappropriated their intellectual property, or claiming ownership of what we regard as our own intellectual property.***

Many of our employees, including our senior management, were previously employed at other biopharmaceutical companies, including potential competitors. Some of these employees executed proprietary rights, non-disclosure and/or non-competition agreements in connection with such previous employment. Although we try to ensure that our employees do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or these employees have used or disclosed confidential information or intellectual property, including trade secrets or other proprietary information, of any such employee's former employer. Litigation may be necessary to defend against these claims.

64

If we fail in prosecuting or defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel or sustain damages. Such intellectual property rights could be awarded to a third-party, and we could be required to obtain a license from such third-party to commercialize our technology or products. Such a license may not be available on commercially reasonable terms or at all. Even if we successfully prosecute or defend against such claims, litigation could result in substantial costs and distract management.

***Our inability to protect our confidential information and trade secrets would harm our business and competitive position.***

In addition to seeking patents for some of our technology and products, we also rely on trade secrets, including unpatented know-how, technology and other proprietary information, to maintain our competitive position. Trade secrets can be difficult to protect. We seek to protect these trade secrets, in part, by entering into non-disclosure and confidentiality agreements with parties who have access to them, such as our employees, contract manufacturers, consultants, advisors and other third-parties. We also enter into confidentiality and invention or patent assignment agreements with our employees and consultants. Despite these efforts, any of the parties may breach the agreements and disclose our proprietary information, including our trade secrets, and we may not be able to obtain adequate remedies for such breaches. Misappropriation or unauthorized disclosure of our trade secrets could significantly affect our competitive position and may have a material adverse effect on our business. Enforcing a claim that a party illegally disclosed or misappropriated a trade secret is difficult, expensive and time-consuming, and the outcome is unpredictable. Some courts both within and outside the United States may be less willing or unwilling to protect trade secrets. Furthermore, trade secret protection does not prevent competitors from independently developing substantially equivalent information and techniques and we cannot guarantee that our competitors will not independently develop substantially equivalent information and techniques. If a competitor lawfully obtained or independently developed any of our trade secrets, we would have no right to prevent such competitor from using that technology or information to compete with us. Failure on our part to adequately protect our trade secrets and our confidential information would harm our business and our competitive position.

**Risks Related to Our Dependence on Third-Parties**

***We rely on third-parties to conduct our clinical trials and those third-parties may not perform satisfactorily, including failing to meet deadlines for the completion of such trials, research and studies.***

We do not have the ability to independently conduct our clinical trials. We currently rely on third-parties, such as CROs, clinical data management organizations, medical institutions and clinical investigators, to conduct our clinical trials of antolimab (AK002) and expect to continue to rely upon third-parties to conduct additional clinical trials of antolimab (AK002) and our other product candidates. Third-parties have a significant role in the conduct of our clinical trials and the subsequent collection and analysis of data. These third-parties are not our employees, and except for remedies available to us under our agreements, we have limited ability to control the amount or timing of resources that any such third-party will devote to our clinical trials. Some of these third-parties may terminate their engagements with us at any time. If we need to enter into alternative arrangements, it would delay our drug development activities.

Our reliance on these third-parties for research and development activities will reduce our control over these activities but will not relieve us of our regulatory responsibilities. For example, we will remain responsible for ensuring that each of our clinical trials is conducted in accordance with the general investigational plan and protocols for the trial. Moreover, the FDA requires us to comply with GCP standards, regulations for conducting, recording and reporting the results of clinical trials to assure that data and reported results are credible and accurate and that the rights, integrity and confidentiality of trial participants are protected. The EMA also requires us to comply with similar standards. Regulatory authorities enforce these GCP requirements through periodic inspections of trial sponsors, principal investigators and trial sites. If we or any of our CROs fail to comply with applicable GCP requirements, the clinical data generated in our clinical trials may be deemed unreliable and the FDA, EMA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under current cGMP regulations. Our failure to comply with these regulations may require us to repeat clinical trials, which would delay the marketing approval process. We also are required to register certain ongoing clinical trials and post the results of certain completed clinical trials on a

government-sponsored database, ClinicalTrials.gov, within certain timeframes. Failure to do so can result in fines, adverse publicity and civil and criminal sanctions.

The third-parties we rely on for these services may also have relationships with other entities, some of which may be our competitors. If these third-parties do not successfully carry out their contractual duties, meet expected deadlines or conduct our clinical trials in accordance with regulatory requirements or our stated protocols, we will not be able to obtain, or may be delayed in obtaining, marketing approvals for our product candidates and will not be able to, or may be delayed in our efforts to, successfully commercialize our product candidates.

***We contract with third-parties for the production of our product candidates for preclinical studies and, in the case of antolimab (AK002), our ongoing clinical trials, and expect to continue to do so for additional clinical trials and ultimately for commercialization. This reliance on third-parties increases the risk that we will not have sufficient quantities of our product candidates or drugs or such quantities at an acceptable cost, which could delay, prevent or impair our development or commercialization efforts.***

We do not currently have the infrastructure or internal capability to manufacture supplies of our product candidates for use in development and commercialization. We rely, and expect to continue to rely, on third-party manufacturers for the production of our product candidates for preclinical studies and clinical trials under the guidance of members of our organization. In the case of antolimab (AK002), we rely on a single third-party manufacturer, Lonza, and we currently have no alternative manufacturer in place. We do not have long-term supply agreements and we purchase our required drug product on a purchase order basis. If we were to experience an unexpected loss of supply of antolimab (AK002), or any of our other product candidates, for any reason, whether as a result of manufacturing, supply or storage issues or otherwise, we could experience delays, disruptions, suspensions or terminations of, or be required to restart or repeat, any pending or ongoing clinical trials. Replacement of our sole manufacturer of antolimab (AK002) would result in substantial delay and interrupt our clinical trials involving antolimab (AK002).

We expect to continue to rely on third-party manufacturers for the commercial supply of any of our product candidates for which we obtain marketing approval. We may be unable to maintain or establish required agreements with third-party manufacturers or to do so on acceptable terms. Even if we are able to establish agreements with third-party manufacturers, reliance on third-party manufacturers entails additional risks, including:

- the possible failure of the third-party to manufacture our product candidate according to our schedule, or at all, including if our third-party contractors give greater priority to the supply of other products over our product candidates or otherwise do not satisfactorily perform according to the terms of the agreements between us and them;

- the possible termination or nonrenewal of agreements by our third-party contractors at a time that is costly or inconvenient for us;

- the possible breach by the third-party contractors of our agreements with them;

- the failure of third-party contractors to comply with applicable regulatory requirements;

- the possible failure of the third-party to manufacture our product candidates according to our specifications;

- the possible mislabeling of clinical supplies, potentially resulting in the wrong dose amounts being supplied or active drug or placebo not being properly identified;

- the possibility of clinical supplies not being delivered to clinical sites on time, leading to clinical trial interruptions, or of drug supplies not being distributed to commercial vendors in a timely manner, resulting in lost sales; and

- the possible misappropriation of our proprietary information, including our trade secrets and know-how.

We do not have complete control over all aspects of the manufacturing process of, and are dependent on, our contract manufacturing partners, including Lonza, for compliance with cGMP regulations for manufacturing both active drug substances and finished drug products. Third-party manufacturers may not be able to comply with cGMP regulations or similar regulatory requirements outside of the United States. If our contract manufacturers, including Lonza, cannot successfully manufacture material that conforms to our specifications and the strict regulatory requirements of the FDA or others, they will not be able to secure and/or maintain marketing approval for their manufacturing facilities. In addition, we do not have control over the ability of our contract manufacturers to maintain adequate quality control, quality assurance and qualified personnel. If the FDA or a comparable foreign regulatory authority does not approve these facilities for the manufacture of our product candidates or if it withdraws any such approval in the future, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain marketing approval for or market our product candidates, if approved. Our failure, or the failure of our third-party manufacturers, to comply with applicable regulations could result in sanctions being imposed on us, including fines, injunctions, civil penalties, delays, suspension or withdrawal of approvals, license revocation, seizures or recalls of product candidates or drugs, operating restrictions and criminal prosecutions, any of which could significantly and adversely affect supplies of our drugs and harm our business and results of operations.

Our current and anticipated future dependence upon others for the manufacture of our product candidates or drugs may adversely affect our future profit margins and our ability to commercialize any drugs that receive marketing approval on a timely and competitive basis.

***We may not gain the efficiencies we expect from further scale-up of manufacturing of antolimab (AK002), and our third-party manufacturers may be unable to successfully scale-up manufacturing in sufficient quality and quantity for antolimab (AK002) or our other product candidates, which could delay or prevent the conducting of our clinical trials or the development or commercialization of our other product candidates.***

Our third-party manufacturer, Lonza, is currently manufacturing antolimab (AK002) at a scale that is sufficient for us to complete our planned clinical trials and, if we receive marketing approval, to commercialize antolimab (AK002) for the indications we are currently targeting. However, we may consider increasing the batch scale to gain cost efficiencies. If Lonza is unable to scale-up the manufacture of antolimab (AK002) at such time, we may not gain such cost efficiencies and may not realize the benefits that would typically be expected from further scale-up of manufacturing of antolimab (AK002).

In addition, in order to conduct clinical trials of any of our other product candidates, we may need to manufacture them in large quantities. Our third-party manufacturers, including Lonza, may be unable to successfully increase the manufacturing capacity for any of these product candidates in a timely or cost-effective manner, or at all. In addition, quality issues may arise during scale-up activities. If our third-party manufacturers are unable to successfully scale up the manufacture of our other product candidates in sufficient quality and quantity, the development, testing and clinical trials of that product candidate may be delayed or become infeasible, and marketing approval or commercial launch of any resulting product may be delayed or not obtained, which could significantly harm our business.

***Changes in methods of product candidate manufacturing or formulation may result in additional costs or delay.***

As product candidates progress through preclinical and late stage clinical trials to marketing approval and commercialization, it is common that various aspects of the development program, such as manufacturing methods and formulation, are altered along the way in an effort to optimize yield, manufacturing batch size, minimize costs and achieve consistent quality and results. Such changes carry the risk that they will not achieve these intended objectives. Any of these changes could cause our product candidates to perform differently and affect the results of planned clinical trials or other future clinical trials conducted with the altered materials. This could delay completion of clinical trials, require the conduct of bridging clinical trials or the repetition of one or more clinical trials, increase clinical trial costs, delay approval of our product candidates and jeopardize our ability to commercialize our product candidates and generate revenue.

***The manufacture of biologics is complex and our third-party manufacturers may encounter difficulties in production. If any of our third-party manufacturers encounter such difficulties, our ability to provide adequate***

67

*supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or prevented.*

Manufacturing biologics, especially in large quantities, is complex and may require the use of innovative technologies to handle living cells. Each lot of an approved biologic must undergo thorough testing for identity, strength, quality, purity and potency. Manufacturing biologics requires facilities specifically designed for and validated for this purpose, and sophisticated quality assurance and quality control procedures are necessary. Slight deviations anywhere in the manufacturing process, including filling, labeling, packaging, storage and shipping and quality control and testing, may result in lot failures, product recalls or spoilage. Lonza, our current third-party manufacturer, has, and our future third-party manufacturers may have, multiple locations at which they conduct manufacturing. However, antolimab (AK002) and our other product candidates are currently only being manufactured at one of Lonza's locations. If this location becomes unavailable at its anticipated capacity or the location of the manufacture of antolimab (AK002) or our other product candidates is changed for any reason, it could result in a delay or disruption to the manufacturing process or lead to difficulties that we did not experience at the original manufacturing location. When changes are made to the manufacturing process, we may be required to provide preclinical and clinical data showing the comparable identity, strength, quality, purity or potency of the products before and after such changes. If microbial, viral or other contaminations are discovered at the facilities of our manufacturer, such facilities may need to be closed for an extended period of time to investigate and remedy the contamination, which could delay clinical trials and adversely harm our business. The use of biologically derived ingredients can also lead to allegations of harm, including infections or allergic reactions, or closure of product facilities due to possible contamination. If our manufacturers are unable to produce sufficient quantities for clinical trials or for commercialization as a result of these challenges, our development and commercialization efforts would be impaired, which would have an adverse effect on our business, financial condition, results of operations and growth prospects.

*If we engage in future acquisitions or strategic partnerships, this may increase our capital requirements, dilute our stockholders, cause us to incur debt or assume contingent liabilities, and subject us to other risks.*

We may evaluate various acquisition opportunities and strategic partnerships, including licensing or acquiring complementary products, intellectual property rights, technologies or businesses. Any potential acquisition or strategic partnership may entail numerous risks, including:

- increased operating expenses and cash requirements;

- the assumption of additional indebtedness or contingent liabilities;

- the issuance of our equity securities;

- assimilation of operations, intellectual property and products of an acquired company, including difficulties associated with integrating new personnel;

- the diversion of our management's attention from our existing product programs and initiatives in pursuing such a strategic merger or acquisition;

- retention of key employees, the loss of key personnel and uncertainties in our ability to maintain key business relationships;

- risks and uncertainties associated with the other party to such a transaction, including the prospects of that party and their existing products or product candidates and marketing approvals; and

- our inability to generate revenue from acquired technology and/or products sufficient to meet our objectives in undertaking the acquisition or even to offset the associated acquisition and maintenance costs.

In addition, if we undertake acquisitions, we may issue dilutive securities, assume or incur debt obligations, incur large one-time expenses and acquire intangible assets that could result in significant future amortization expense. Moreover, we may not be able to locate suitable acquisition opportunities, and this inability could impair our ability to grow or obtain access to technology or products that may be important to the development of our business.

*If we decide to establish collaborations, but are not able to establish those collaborations, we may have to alter our development and commercialization plans.*

Our drug development programs and the potential commercialization of our product candidates will require substantial additional cash to fund expenses. We may seek to selectively form collaborations to expand our capabilities, potentially accelerate research and development activities and provide for commercialization activities by third-parties.

We would face significant competition in seeking appropriate collaborators. Whether we reach a definitive agreement for a collaboration will depend, among other things, upon our assessment of the collaborator's resources and expertise, the terms and conditions of the proposed collaboration and the proposed collaborator's evaluation of a number of factors. Those factors may include the design or results of clinical trials, the likelihood of approval by the FDA or comparable foreign regulatory authorities, the potential market for the subject product candidate, the costs and complexities of manufacturing and delivering such product candidate to patients, the potential of competing drugs, the existence of uncertainty with respect to our ownership of intellectual property and industry and market conditions generally. The potential collaborator may also consider alternative product candidates or technologies for similar indications that may be available to collaborate on and whether such a collaboration could be more attractive than the one with us for our product candidate.

Collaborations are complex and time-consuming to negotiate and document. In addition, there have been a significant number of recent business combinations among large pharmaceutical companies that have resulted in a reduced number of potential future collaborators. Even if we are successful in entering into a collaboration, the terms and conditions of that collaboration may restrict us from entering into future agreements on certain terms with potential collaborators.

If and when we seek to enter into collaborations, we may not be able to negotiate collaborations on a timely basis, on acceptable terms, or at all. If we are unable to do so, we may have to curtail the development of a product candidate, reduce or delay its development program or one or more of our other development programs, delay its potential commercialization or reduce the scope of any sales or marketing activities, or increase our expenditures and undertake development or commercialization activities at our own expense.

**Risks Related to Ownership of Our Common Stock**

*The market price of our stock may continue to be volatile, which could result in substantial losses for investors.*

The trading price of our common stock has been, and is likely to continue to be, highly volatile and subject to wide fluctuations in response to various factors, some of which we cannot control. We priced our IPO at $18.00 per share on July 19, 2018 and, our common stock reached a high of $139.99 per share during the fourth quarter of 2019. As of February 20, 2020, the closing price of our common stock was $63.86. The trading price of our common stock could be subject to wide fluctuations in response to various factors, which in addition to the factors discussed in this "Risk Factors" section and elsewhere in this Annual Report on Form 10-K, include:

- the timing and results of preclinical studies and clinical trials of our product candidates or those of our competitors;

- the success of competitive products or announcements by potential competitors of their product development efforts;

- regulatory actions with respect to our products or our competitors' products;

- actual or anticipated changes in our growth rate relative to our competitors;

- regulatory or legal developments in the United States and other countries;

- developments or disputes concerning patent applications, issued patents or other proprietary rights;

- the recruitment or departure of key scientific or management personnel;

69

- announcements by us or our competitors of significant acquisitions, strategic collaborations, joint ventures, collaborations or capital commitments;

- actual or anticipated changes in estimates as to financial results, development timelines or recommendations by securities analysts;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- market conditions in the pharmaceutical and biotechnology sector;

- changes in the structure of healthcare payment systems;

- share price and volume fluctuations attributable to inconsistent trading volume levels of our shares;

- announcement or expectation of additional financing efforts;

- sales of our common stock by us, our insiders or our other stockholders;

- expiration of market stand-off or lock-up agreements; and

- general economic, industry and market conditions.

In addition, the stock market in general, and pharmaceutical and biotechnology companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. Broad market and industry factors may negatively affect the market price of our common stock, regardless of our actual operating performance. The realization of any of the above risks or any of a broad range of other risks, including those described in this "Risk Factors" section, could have a dramatic and adverse impact on the market price of our common stock.

***If securities or industry analysts do not publish research or reports about our business, or if they issue an adverse or misleading opinion regarding our stock, our stock price and trading volume could decline.***

The trading market for our common stock is influenced by the research and reports that industry or securities analysts publish about us or our business. If any of the analysts covering us issue an adverse or misleading opinion regarding us, our business model, our intellectual property or our stock performance, or if our operating results fail to meet the expectations of analysts, our stock price would likely decline. In addition, if one or more of these analysts cease coverage of us or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline.

***Raising additional capital may restrict our operations or require us to relinquish rights to our technologies or product candidates, and if we sell shares of our common stock in future financings, stockholders may experience immediate dilution and, as a result, our stock price may decline.***

Until such time, if ever, as we can generate substantial product revenues, we expect to finance our cash needs through a combination of equity offerings, debt financings, partnerships and marketing, distribution or licensing arrangements. We do not have any committed external source of funds. We may also from time to time issue additional shares of common stock at a discount from the then current trading price of our common stock. As a result, our stockholders would experience immediate dilution upon the purchase of any shares of our common stock sold at such discount. In addition, as opportunities present themselves, we may enter into financing or similar arrangements in the future, including the issuance of debt securities, preferred stock or common stock. If we issue common stock or securities convertible into common stock, our common stockholders would experience additional dilution and, as a result, our stock price may decline. Debt financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends.

If we raise additional funds through partnerships or marketing, distribution or licensing arrangements with third parties, we may have to relinquish valuable rights to our technologies, future revenue streams or product candidates or to grant licenses on terms that may not be favorable to us. If we are unable to raise additional funds through equity or debt financings when needed, we may be required to delay, limit, reduce or terminate our product

70

development or future commercialization efforts or grant rights to develop and market product candidates that we would otherwise prefer to develop and market ourselves.

***Our operating results may fluctuate significantly, which makes our future operating results difficult to predict and could cause our operating results to fall below expectations or our guidance.***

Our quarterly and annual operating results may fluctuate significantly in the future, which makes it difficult for us to predict our future operating results. From time to time, we may enter into license or collaboration agreements or strategic partnerships with other companies that include development funding and significant upfront and milestone payments and/or royalties, which may become an important source of our revenue. These upfront and milestone payments may vary significantly from period to period and any such variance could cause a significant fluctuation in our operating results from one period to the next.

In addition, we measure compensation cost for stock-based awards made to employees at the grant date of the award, based on the fair value of the award as determined by our board of directors, and recognize the cost as an expense over the employee's requisite service period. As the variables that we use as a basis for valuing these awards change over time, including our underlying stock price and stock price volatility, the magnitude of the expense that we must recognize may vary significantly.

Furthermore, our operating results may fluctuate due to a variety of other factors, many of which are outside of our control and may be difficult to predict, including the following:

- the timing and cost of, and level of investment in, research and development activities relating to our current and any future product candidates, which will change from time to time;

- our ability to enroll patients in clinical trials and the timing of enrollment;

- the cost of manufacturing our current and any future product candidates, which may vary depending on FDA guidelines and requirements, the quantity of production and the terms of our agreements with manufacturers;

- expenditures that we will or may incur to acquire or develop additional product candidates and technologies;

- the timing and outcomes of clinical trials for antolimab (AK002) and any of our future product candidates or competing product candidates;

- the need to conduct unanticipated clinical trials or trials that are larger or more complex than anticipated;

- competition from existing and potential future products that compete with antolimab (AK002) and any of our future product candidates, and changes in the competitive landscape of our industry, including consolidation among our competitors or partners;

- any delays in regulatory review or approval of antolimab (AK002) or any of our future product candidates;

- the level of demand for antolimab (AK002) and any of our future product candidates, if approved, which may fluctuate significantly and be difficult to predict;

71

- the risk/benefit profile, cost and reimbursement policies with respect to our products candidates, if approved, and existing and potential future products that compete with antolimab (AK002) and any of our future product candidates;

- our ability to commercialize antolimab (AK002) and any of our future product candidates, if approved, inside and outside of the United States, either independently or working with third-parties;

- our ability to establish and maintain collaborations, licensing or other arrangements;

- our ability to adequately support future growth;

- potential unforeseen business disruptions that increase our costs or expenses;

- future accounting pronouncements or changes in our accounting policies; and

- the changing and volatile global economic environment.

The cumulative effect of these factors could result in large fluctuations and unpredictability in our quarterly and annual operating results. As a result, comparing our operating results on a period-to-period basis may not be meaningful. Investors should not rely on our past results as an indication of our future performance. This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our revenue or operating results fall below the expectations of analysts or investors or below any forecasts we may provide to the market, or if the forecasts we provide to the market are below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any previously publicly stated guidance we may provide.

***Our principal stockholders and management own a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.***

As of December 31, 2019, our executive officers, directors, holders of 5% or more of our capital stock and their respective affiliates beneficially owned approximately 92.9% of our outstanding voting stock. As a result, this group of stockholders has the ability to significantly influence all matters requiring stockholder approval, including the election of directors, amendments of our organizational documents or approval of any merger, sale of assets or other major corporate transaction. This may prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may feel are in your best interest as one of our stockholders. The interests of this group of stockholders may not always coincide with your interests or the interests of other stockholders and they may act in a manner that advances their best interests and not necessarily those of other stockholders, including seeking a premium value for their common stock, and might affect the prevailing market price for our common stock.

***Because we ceased to be an emerging growth company, we will no longer be able to take advantage of certain reduced disclosure requirements in our public filings.***

We ceased to be an emerging growth company, as defined in the JOBS Act and, as of December 31, 2019, we are a large accelerated filer. As a result, we anticipate that costs and compliance initiatives will increase as a result of the fact that we ceased to be an "emerging growth company." In particular, we are now, or will be, subject to certain disclosure requirements that are applicable to other public companies that had not been applicable to us as an emerging growth company. These requirements include:

- compliance with the auditor attestation requirements in the assessment of our internal control over financial reporting;

- compliance with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements;

- full disclosure and analysis obligations regarding executive compensation; and

- compliance with regulatory requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

There can be no assurance that we will be able to comply with the applicable regulations in a timely manner, if at all.

*We have incurred, and will likely continue to incur, significant additional costs in order to comply with the SEC rules implementing Section 404 of the Sarbanes-Oxley Act.*

We have incurred, and will likely continue to incur, significant additional costs in order to comply with the SEC rules implementing Section 404 of the Sarbanes-Oxley Act. Under these rules, beginning with this annual report on Form 10-K for the year ending December 31, 2019, because we ceased to be an emerging growth company, we are required to make a formal assessment of the effectiveness of our internal control over financial reporting. We are also required to include an attestation report on internal control over financial reporting issued by our independent registered public accounting firm. To achieve compliance with Section 404, we engaged in and will continue to engage in a process to document and evaluate our internal control over financial reporting, which is both costly and challenging. In this regard, we will need to continue to dedicate internal resources, engage outside consultants and adopt a detailed work plan to assess and document the adequacy of our internal control over financial reporting, continue steps to improve control processes as appropriate, validate through testing that controls are designed and operating effectively, and implement a continuous reporting and improvement process for internal control over financial reporting.

The rules governing the standards that must be met for management to assess our internal control over financial reporting are complex and require significant documentation, testing and possible remediation to meet the detailed standards under the rules. During the course of its testing, our management may identify material weaknesses or deficiencies which may not be remedied in time to meet the deadline imposed by the Sarbanes-Oxley Act. These reporting and other obligations have placed and will continue to place significant demands on our management and administrative and operational resources, including accounting resources. Any failure to maintain effective controls or any difficulties encountered in their implementation or improvement could cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on Nasdaq.

*Our disclosure controls and procedures may not prevent or detect all errors or acts of fraud.*

We are subject to the periodic reporting requirements of the Exchange Act. We designed our disclosure controls and procedures to reasonably assure that information we must disclose in reports we file or submit under the Exchange Act is accumulated and communicated to management, and recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. We believe that any disclosure controls and procedures or internal controls and procedures, no matter how well-conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met.

These inherent limitations include the facts that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by an unauthorized override of the controls. Accordingly, because of the inherent limitations in our control system, misstatements due to error or fraud may occur and not be detected.

*We may be subject to securities litigation, which is expensive and could divert management attention.*

The market price of our common stock may be volatile and, in the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. We may be the target of this type of litigation in the future. Securities litigation against us could result in substantial costs and divert our management's attention from other business concerns, which could seriously harm our business.

*We have not paid and do not intend to pay dividends on our common stock so any returns will be limited to the value of our stock.*

We have never declared or paid any cash dividends on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any return to stockholders will therefore be limited to any appreciation in the value of their stock.

*Provisions in our amended and restated certificate of incorporation and amended and restated bylaws and Delaware law might discourage, delay or prevent a change in control of our company or changes in our management and, therefore, depress the market price of our common stock.*

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that could depress the market price of our common stock by acting to discourage, delay or prevent a change in control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions, among other things:

- establish a classified board of directors so that not all members of our board are elected at one time;

- permit only the board of directors to establish the number of directors and fill vacancies on the board;

- provide that directors may only be removed "for cause" and only with the approval of two-thirds of our stockholders;

- authorize the issuance of "blank check" preferred stock that our board could use to implement a stockholder rights plan (also known as a "poison pill");

- eliminate the ability of our stockholders to call special meetings of stockholders;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- prohibit cumulative voting;

- authorize our board of directors to amend the bylaws;

- establish advance notice requirements for nominations for election to our board or for proposing matters that can be acted upon by stockholders at annual stockholder meetings; and

- require a super-majority vote of stockholders to amend some provisions described above.

In addition, Section 203 of the General Corporation Law of the State of Delaware ("DGCL"), prohibits a publicly-held Delaware corporation from engaging in a business combination with an interested stockholder, generally a person which together with its affiliates owns, or within the last three years has owned, 15% of our voting stock, for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner.

Any provision of our amended and restated certificate of incorporation, amended and restated bylaws or Delaware law that has the effect of delaying or preventing a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our capital stock and could also affect the price that some investors are willing to pay for our common stock.

74

*Our amended and restated certificate of incorporation provides that the Court of Chancery of the State of Delaware and the federal district courts of the United States of America will be the exclusive forums for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.*

Our amended and restated certificate of incorporation provides that the Court of Chancery of the State of Delaware is the exclusive forum for:

- any derivative action or proceeding brought on our behalf;

- any action asserting a claim of breach of fiduciary duty;

- any action asserting a claim against us arising under the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws; and

- any action asserting a claim against us that is governed by the internal-affairs doctrine.

Our amended and restated certificate of incorporation further provides that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act (such provision, the "Federal Forum Provision"). However, on December 19, 2018, the Delaware Court of Chancery issued a decision in Matthew Sciabacucchi v. Matthew B. Salzberg et al., C.A. No. 2017-0931-JTL (Del. Ch.), finding that such provisions such as the Federal Forum Provision are not valid under Delaware law. In light of this decision of the Delaware Court of Chancery, we do not intend to enforce the federal forum provision in our amended and restated certificate of incorporation unless and until such time there is a final determination by the Delaware Supreme Court regarding the validity of such provisions. If the decision is not appealed or if the Delaware Supreme Court affirms the Delaware Chancery Court's decision, then we will seek approval by our stockholders to amend our certificate of incorporation at our next regularly-scheduled annual meeting of stockholders to remove the Federal Forum Provision.

These exclusive-forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage lawsuits against us and our directors, officers and other employees. If a court were to find either exclusive-forum provision in our amended and restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could seriously harm our business.

75

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

Our corporate headquarters are currently located in Redwood City, California, where we lease 25,136 square feet of office, research and development and laboratory space pursuant to a lease agreement that commenced on November 1, 2018 and expires on July 31, 2029, with an option to extend for five years.

On December 4, 2019, we entered into a lease agreement for approximately 98,000 square feet of office space to be constructed in San Carlos, California. We expect these premises to be delivered in November 2020, and we expect to move into this new headquarters in mid-2021 after making certain improvements. The lease term will expire 123 months following the rent commencement date, which is expected to be the earlier of nine months after the premises are delivered or the date our tenant improvements are substantially completed. This lease agreement includes an option to extend the term for an additional period of five years and provides us a right of first refusal for certain additional office space.

We believe that our facilities will be sufficient for our needs over the next twelve months. We may need additional space as we expand our business and believe that additional space when needed, will be available on commercially reasonable terms.

**Item 3. Legal Proceedings.**

From time to time, we may become involved in litigation or other legal proceedings. We are not currently a party to any litigation or legal proceedings that, in the opinion of our management, are likely to have a material adverse effect on our business. Regardless of outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**Item 4. Mine Safety Disclosures.**

Not applicable.

PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

Our common stock has been listed on the NASDAQ Global Select Market under the symbol "ALLK".

**Holders of Common Stock**

As of February 20, 2020, there were 17 holders of record of our common stock. Because many of our shares of common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of beneficial owners of our common stock represented by these record holders.

**Dividend Policy**

We have never declared or paid any cash dividends on our common stock or any other securities. We anticipate that we will retain all available funds and any future earnings, if any, for use in the operation of our business and do not anticipate paying cash dividends in the foreseeable future. In addition, future debt instruments may materially restrict our ability to pay dividends on our common stock. Payment of future cash dividends, if any, will be at the discretion of the board of directors after taking into account various factors, including our financial condition, operating results, current and anticipated cash needs, the requirements of current or then-existing debt instruments and other factors the board of directors deems relevant.

77

**Performance Graph**

*This graph below is not "soliciting material" or deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act, or otherwise subject to liabilities under that Section, and shall not be deemed incorporated by reference into this Annual Report on Form 10-K or into any other filing of Allakos Inc. under the Securities Act, as amended, except to the extent that we specifically incorporate this information by reference therein, whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.*

The following graph compares the cumulative total return to stockholder return on our common stock relative to the cumulative total returns of the NASDAQ Composite Index and the NASDAQ Biotechnology Index. An investment of $100 is assumed to have been made in our common stock and each index on July 19, 2018 (the first day of trading of our common stock) and its relative performance is tracked through December 31, 2019. Pursuant to applicable Securities and Exchange Commission rules, all values assume reinvestment of the full amount of all dividends, however no dividends have been declared on our common stock to date. The stockholder returns shown on the graph below are based on historical results and are not indicative of future performance, and we do not make or endorse any predictions as to future stockholder returns.

**COMPARISON OF CUMULATIVE TOTAL RETURN**
among Allakos Inc., the NASDAQ Composite Index
and the NASDAQ Biotechnology Index



| | 7/19/2018 | 9/30/2018 | 12/31/2018 | 3/31/2019 | 6/30/2019 | 9/30/2019 | 12/31/2019 |
|---|---|---|---|---|---|---|---|
| Allakos Inc. | $ 100.00 | $ 143.97 | $ 167.26 | $ 129.60 | $ 138.66 | $ 251.62 | $ 305.15 |
| NASDAQ Composite | 100.00 | 103.06 | 85.24 | 99.56 | 103.42 | 103.60 | 116.51 |
| NASDAQ Biotechnology | 100.00 | 103.09 | 81.92 | 94.65 | 92.52 | 84.54 | 102.49 |

**Recent Sales of Unregistered Securities**

Not applicable

**Use of Proceeds from Registered Securities**

Not applicable

**Issuer Purchases of Equity Securities**

Not applicable

**Item 6. Selected Financial Data.**

The following tables summarize our selected financial data for the periods and as of the dates indicated. We have derived our selected statements of operations and comprehensive loss data for the years ended December 31, 2019, 2018 and 2017, and the balance sheets data as of December 31, 2019, 2018 and 2017, from our audited financial statements and related notes included elsewhere in this Annual Report on Form 10-K.

Our historical results are not necessarily indicative of the results that may be expected in the future. You should read the financial and other data below in conjunction with the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes included elsewhere in this Annual Report on Form 10-K.

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2019** | **2018** | **2017** | **2016** |
| | **(in thousands, except per share data)** | | | |
| **Statements of Operations Data:** | | | | |
| Loss from operations | $ (91,418) | $ (45,721) | $ (22,254) | $ (17,060) |
| Net loss | $ (85,372) | $ (43,538) | $ (23,552) | $ (17,100) |
| Net loss per share, basic and diluted [1] | $ (1.89) | $ (2.20) | $ (14.54) | $ (13.03) |
| Weighted-average shares of common stock outstanding, basic and diluted [1] | 45,191 | 19,833 | 1,620 | 1,312 |

[1] See our statements of operations and comprehensive loss and Note 2 to our financial statements for further details on the calculation of net loss per share, basic and diluted, attributable to common stockholders and the weighted-average number of shares used in the computation of the per share amounts.

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2019** | **2018** | **2017** | **2016** |
| | **(in thousands)** | | | |
| **Balance Sheet Data:** | | | | |
| Cash and cash equivalents and marketable securities | $ 495,901 | $ 178,906 | $ 85,207 | $ 13,416 |
| Working capital [1] | 486,809 | 176,353 | 83,452 | 11,031 |
| Total assets | 516,894 | 191,259 | 87,029 | 14,176 |
| Total liabilities | 21,173 | 7,265 | 2,828 | 7,616 |
| Convertible preferred stock | — | — | 142,969 | 42,996 |
| Accumulated deficit | (189,484) | (104,112) | (60,574) | (37,022) |
| Total stockholders' equity (deficit) | 495,721 | 183,994 | (58,768) | (36,436) |

[1] Working capital is defined as current assets less current liabilities. See our financial statements included elsewhere in this Annual Report on Form 10-K for further details regarding our current assets and current liabilities.

79

*You should read the following discussion and analysis of our financial condition and results of operations together with our financial statements and the other financial information appearing elsewhere in this Annual Report on Form 10-K. These statements generally relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. The following discussion and analysis contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Our actual results and the timing of events may differ materially from those discussed in our forward-looking statements as a result of various factors, including those discussed below and those discussed in the section entitled "Risk Factors" included in this Annual Report on Form 10-K. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect to those or other forward-looking statements. Additional information concerning these and other risks and uncertainties is contained in our other periodic filings with the SEC.*

*Forward-looking statements include, but are not limited to, statements about:*

- *the impact that the adoption of new accounting pronouncements will have on our financial statements;*

- *the ability of our clinical trials to demonstrate safety and efficacy of our product candidates, and other positive results;*

- *the timing and focus of our future clinical trials, and the reporting of data from those trials;*

- *our plans relating to commercializing antolimab (AK002), if approved, including the geographic areas of focus and sales strategy;*

- *the size of the market opportunity for antolimab (AK002) in each of the diseases we are targeting;*

- *the number of diseases represented in the patient population enrolled in our clinical trials, and our ability to evaluate response to treatment of antolimab (AK002) in diseases other than the primary indication in our clinical trials;*

- *our estimates of the number of patients in the United States who suffer from the diseases we are targeting and the number of patients that will enroll in our clinical trials;*

- *the beneficial characteristics, safety, efficacy and therapeutic effects of antolimab (AK002);*

- *the timing or likelihood of regulatory filings and approvals, including our expectation to seek special designations, such as orphan drug designation, for antolimab (AK002) or our other product candidates for various diseases;*

- *our ability to obtain and maintain regulatory approval of antolimab (AK002) or our other product candidates;*

- *our plans relating to the further development of antolimab (AK002) and our other product candidates;*

- *existing regulations and regulatory developments in the United States and other jurisdictions;*

- *our plans and ability to obtain or protect intellectual property rights, including extensions of existing patent terms where available;*

- *our continued reliance on third-parties to conduct additional clinical trials of antolimab (AK002) and our other product candidates, and for the manufacture of our product candidates for preclinical studies and clinical trials;*

- *the need to hire additional personnel and our ability to attract and retain such personnel;*

- *the accuracy of our estimates regarding expenses, future revenue, capital requirements and needs for additional financing;*

- *our financial performance;*

80

- *the sufficiency of our existing cash, cash equivalents and marketable securities to fund our future operating expenses and capital expenditure requirements; and*

- *our anticipated use of the proceeds from our initial public offering and the concurrent private placement in July 2018 and subsequent follow-on offering in August 2019.*

*These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including, but not limited to, those described in "Risk Factors." In some cases, you can identify these statements by terms such as "anticipate," "believe," "could," "estimate," "expects," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or the negative of those terms, and similar expressions that convey uncertainty of future events or outcomes. These forward-looking statements reflect our beliefs and views with respect to future events and are based on estimates and assumptions as of the date of this Annual Report on Form 10-K and are subject to risks and uncertainties. We discuss many of these risks in greater detail in the section entitled "Risk Factors" included in Part I, Item 1A and elsewhere in this Report. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. Given these uncertainties, you should not place undue reliance on these forward-looking statements. We qualify all of the forward-looking statements in this Annual Report on Form 10-K by these cautionary statements. Except as required by law, we assume no obligation to update these forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in any forward-looking statements, whether as a result of new information, future events or otherwise.*

Our discussion and analysis below are focused on our financial results and liquidity and capital resources for the years ended December 31, 2019 and 2018, including year-over-year comparisons of our financial performance and condition for these years. Discussion and analysis of the year ended December 31, 2017 specifically, as well as the year-over-year comparison of our financial performance and condition for the years ended December 31, 2018 and 2017, are located in Part II, Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations in our Annual Report on Form 10-K for the year ended December 31, 2018, filed with the SEC on March 14, 2019.

**Overview**

We are a clinical stage biotechnology company developing antolimab (AK002), our wholly owned monoclonal antibody, for the treatment of various mast cell and eosinophil related diseases. Antolimab (AK002) selectively targets both mast cells and eosinophils, two types of white blood cells that are widely distributed in the body and play a central role in the inflammatory response. Inappropriately activated mast cells and eosinophils have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. As such, antolimab (AK002) has the potential to treat a large number of severe diseases. Antolimab (AK002) completed a double-blind, randomized, placebo-controlled Phase 2 study in patients with eosinophilic gastritis ("EG") and/or eosinophilic gastroenteritis ("EGE"; the "ENIGMA study"). The ENIGMA study met all prespecified primary and secondary endpoints when compared to placebo. Additionally, patients in the ENIGMA study with co-morbid eosinophilic esophagitis ("EoE") showed histological and symptom improvement when treated with antolimab (AK002) compared to placebo. Based on these results from the ENIGMA study, we plan to initiate a Phase 3 study in patients with EG and/or EGE and a Phase 2/3 study in patients with EoE.

Antolimab (AK002) also showed promising activity in clinical studies in chronic urticaria ("CU"), indolent systemic mastocytosis ("ISM"), and severe allergic conjunctivitis ("SAC"). In addition, improvements were also observed in atopic comorbidities such as asthma, atopic dermatitis, and allergic rhinitis. The activity observed in these studies suggests that antolimab (AK002) could provide significant benefit to patients suffering from these diseases and highlights the potential of antolimab (AK002) to broadly inhibit mast cells and deplete eosinophils in different disease settings.

Despite the knowledge that mast cells and eosinophils drive many pathological conditions, there are no approved therapies that selectively target both mast cells and eosinophils. Antolimab (AK002) binds to Siglec-8, an inhibitory receptor found on mast cells and eosinophils, which represents a novel way to selectively deplete or

81

inhibit these important immune cells and thereby potentially resolve inflammation. We believe antolimab (AK002) is the only Siglec-8 targeting antibody currently in clinical development and may have advantages over current treatment options available to patients for the diseases we are pursuing.

Since our inception in 2012, we have devoted substantially all of our resources and efforts towards the research and development of our product candidates. Our lead product candidate, antolimab (AK002), a monoclonal antibody targeting Siglec-8, entered clinical trials in 2016. In addition to activities conducted internally at our facilities, we have utilized significant financial resources to engage contractors, consultants and other third parties to conduct various preclinical and clinical development activities on our behalf.

To date, we have not had any products approved for sale and have not generated any revenue nor been profitable. Further, we do not expect to generate revenue from product sales until such time, if ever, that we are able to successfully complete the development and obtain marketing approval for one of our product candidates. We will continue to require additional capital to develop our product candidates and fund operations for the foreseeable future. We have incurred significant operating losses to date and expect to incur significant operating losses for the foreseeable future. Our net losses were $85.4 million and $43.5 million for the years ended December 31, 2019 and 2018, respectively. As of December 31, 2019, we had an accumulated deficit of $189.5 million.

Prior to completing our IPO in July 2018 and subsequent follow-on offering in August 2019, our operations had been historically financed primarily through the private placements of convertible debt instruments and convertible preferred stock. These private placements provided gross proceeds of $146.9 million. As of December 31, 2019, we had cash, cash equivalents and marketable securities of $495.9 million, which we believe will be sufficient to fund our planned operations for at least the next 12 months from the issuance of our financial statements.

### *July 2018 Initial Public Offering*

On July 23, 2018, we completed an IPO, selling 8,203,332 shares of common stock at $18.00 per share (the "July 2018 IPO"). Proceeds from our July 2018 IPO, net of underwriting discounts and commissions, were $137.3 million. Concurrently with our July 2018 IPO, we completed a private placement of 250,000 shares of common stock at $18.00 per share to an existing stockholder. Proceeds from this private placement were $4.5 million.

In connection with the completion of the July 2018 IPO, all then outstanding shares of convertible preferred stock converted into 30,971,627 shares of common stock.

### *August 2019 Follow-On Offering*

On August 9, 2019, we closed an underwritten public offering (the "August 2019 Offering") under our shelf registration statement on Form S-3 (File No. 333-233018) pursuant to which we sold an aggregate of 5,227,272 shares of our common stock at a public offering price of $77.00 per share. We received aggregate net proceeds of $377.5 million, after deducting the underwriting discounts and commissions and offering expenses.

### Components of Operating Results

### *Revenue*

We have not generated any revenue from product sales or otherwise, and do not expect to generate any revenue for at least the next several years.

### *Operating Expenses*

We classify operating expenses into two categories: (i) research and development and (ii) general and administrative.

82

*Research and Development Expenses*

Research and development expenses represent the following costs incurred by us for the discovery, development and manufacturing of our product candidates:

- consultant and personnel-related costs including salaries, benefits, travel and stock-based compensation expense;

- costs incurred under service agreements with contract research organizations ("CROs") that conduct nonclinical and clinical research activities on our behalf;

- costs incurred under service agreements with contract development and manufacturing organizations ("CDMOs") for the manufacture and fill finish of our preclinical and clinical materials;

- costs related to in-house research and development activities conducted at our facilities including laboratory supplies, non-capital laboratory equipment and depreciation of capital laboratory equipment and leasehold improvements to laboratories;

- costs incurred under exclusive and non-exclusive license agreements with third-parties; and

- allocated facility and other costs including the rent and maintenance of our facilities, insurance premiums, depreciation of shared-use leasehold improvements and general office supplies.

The successful development of our product candidates is highly uncertain. Accordingly, it is difficult to estimate the nature, timing and extent of costs necessary to complete the remainder of the development of our product candidates. We are also unable to predict when, if ever, we will be able to generate revenue from our product candidates. This is due to the numerous risks and uncertainties associated with developing drugs, including the uncertainty surrounding:

- demonstrating sufficient safety and tolerability profiles of product candidates;

- successful enrollment and completion of clinical trials;

- requisite clearance and approvals from applicable regulatory authorities;

- establishing and maintaining commercial manufacturing capabilities with CDMOs;

- obtaining and maintaining protection of intellectual property; and

- commercializing product candidates, if and when approved, alone or in collaboration with third-parties.

A change pertaining to any of these variables would significantly impact the timing and extent of costs incurred with respect to the development and commercialization of our product candidates.

External costs incurred from CROs and CDMOs have comprised a significant portion of our research and development expenses since inception. We track CRO and CDMO costs on a program-by-program basis following the advancement of a product candidate into clinical development. Consulting and personnel-related costs, laboratory supplies and non-capital equipment utilized in the conduct of in-house research, in-licensing fees and general overhead, are not tracked on a program-by-program basis, nor are they allocated, as they commonly benefit multiple projects, including those still in our pipeline.

The following table summarizes our research and development expenses for the periods indicated (in thousands):

|  | Year Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Antolimab (AK002) contract research and development costs | $ 30,806 | $ 12,990 | $ 5,133 |
| Consulting and personnel-related costs | 23,967 | 14,144 | 6,033 |
| Other unallocated research and development costs | 7,085 | 6,153 | 7,340 |
| Total | $ 61,858 | $ 33,287 | $ 18,506 |

83

*General and Administrative Expenses*

General and administrative expenses consist of fees paid to consultants, salaries, benefits and other personnel-related costs, including stock-based compensation, for our personnel in executive, finance, accounting and other administrative functions, legal costs, fees paid for accounting and tax services and facility costs not otherwise included in research and development expenses. Legal costs include general corporate and patent legal fees and related costs.

We anticipate that our general and administrative expenses will increase in the future to support our continued research and development activities including costs related to personnel, outside consultants, attorneys and accountants, among others. Additionally, we expect to incur incremental costs associated with continuing to operate as a public company, including expenses related to maintaining compliance with the rules and regulations of the SEC, and those of any national securities exchange on which our securities are traded, additional insurance premiums, investor relations activities and other ancillary administrative and professional services.

*Interest Income (Expense), Net*

Interest income, net primarily consists of interest and investment income earned on our cash, cash equivalents and marketable securities included on the balance sheets.

*Other Income (Expense), Net*

Other expense, net, primarily consists of amounts realized from gains and losses related to fluctuations in foreign currencies.

**In-Licensing Agreements**

We have entered into a number of exclusive and nonexclusive, royalty bearing license agreements with third-parties for certain intellectual property. Under the terms of the license agreements described below, we are obligated to pay milestone payments upon the achievement of specified clinical, regulatory and commercial milestones. Actual amounts due under the license agreements vary depending on factors including, but not limited to, the number of product candidates we develop and our ability to successfully develop and commercialize our product candidates covered under the respective agreements. In addition to milestone payments, we are also subject to future royalty payments based on sales of our product candidates covered under the agreements, as well as certain minimum annual royalty and commercial reservation fees. Because the achievement of milestones and the timing and extent of future royalties is not probable, these contingent amounts have not been included on our balance sheets or as part of Contractual Obligations and Commitments discussion below.

We did not incur any milestone expense for the year ended December 31, 2019. We recognized $0.3 million of milestone expense for the year ended December 31, 2018. Milestone payments are not creditable against royalties. As of December 31, 2019, we have not incurred any royalty liabilities related to our license agreements, as product sales have not yet commenced.

*Exclusive License Agreement with The Johns Hopkins University*

In December 2013, we entered into a license agreement with JHU for a worldwide exclusive license to develop, use, manufacture and commercialize covered product candidates including antolimab (AK002), which was amended in September 2016. Under the terms of the agreement, we have made upfront and milestone payments of $0.3 million through December 31, 2019 and we may be required to make aggregate additional milestone payments of up to $4.0 million. We also issued 88,887 shares of common stock as consideration under the JHU license agreement. In addition to milestone payments, we are also subject to single-digit royalties to JHU based on future net sales of each licensed therapeutic product candidate by us and our affiliates and sublicensees, with up to a low six-digit dollar minimum annual royalty payment.

84

*Non-exclusive License Agreement with BioWa Inc. and Lonza Sales AG*

In October 2013, we entered into a tripartite agreement with BioWa and Lonza for the non-exclusive worldwide license to develop and commercialize product candidates including antolimab (AK002) that are manufactured using a technology jointly developed and owned by BioWa and Lonza. Under the terms of the agreement, we have made milestone payments of $0.4 million through December 31, 2019 and we may be required to make aggregate additional milestone payments of up to $41.0 million. In addition to milestone payments, we are also subject to minimum annual commercial license fees of $40,000 per year to BioWa until such time as BioWa receives royalty payments, as well as low single-digit royalties to BioWa and to Lonza. Royalties are based on future net sales by us and our affiliates and sublicensees and vary dependent on Lonza's participation as sole manufacturer for commercial production.

**Critical Accounting Policies and Use of Estimates**

Our management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP"). The preparation of our financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

*Accrued Contract Research and Development Expense*

As part of our preparation of the financial statements, we are required to estimate our accrued expenses as of each balance sheet date. This process involves reviewing open contracts and purchase orders, as well as working with internal personnel to identify the existence and extent of services that have been performed on our behalf which have not yet been invoiced. We make estimates of our accrued expenses as of each balance sheet date based on facts and circumstances known to us at that time. We periodically confirm the accuracy of our estimates, recording adjustments, if necessary.

Estimates underlying accrued contract research and development expense primarily relate to our evaluation of the timing and extent of services performed by CROs and CDMOs that conduct various research and development activities on our behalf. As the financial terms included within service agreements with such CROs and CDMOs vary from contract to contract and often include uneven payment flows, our evaluation focuses on the level of effort and resources expended. Accordingly, the calculation of accrued contract research and development expense requires us to analyze a significant amount of inputs and data from multiple internal and external sources, including information from communications with clinical operations and technical operations personnel.

Although we do not expect our estimates to be materially different from amounts actually incurred, if our estimates of the status and timing of services performed differ from the actual status and timing of services performed, it could result in us reporting amounts that are higher or lower in any particular period. To date, there have been no material differences between our estimates of such expenses and the amounts actually incurred for the periods reported.

*Stock-Based Compensation*

We account for stock-based compensation expense resulting from stock-based awards granted to employees and nonemployees in accordance with ASC 718, Compensation—Stock Compensation, ("ASC 718"). Per ASC 718, we measure the fair value of stock-based awards on the date of grant and recognize the associated compensation expense, net of impact from estimated forfeitures, over the requisite service period on a straight-line basis. The vesting period of the stock-based award has historically served as the requisite service period for the respective grants to our employees, nonemployee directors and consultants. At each subsequent reporting date, we are required

85

to evaluate whether the achievement of any associated vesting conditions is probable and whether or not any such events have occurred that would have resulted in the acceleration of vesting.

Determining the amount of stock-based compensation expense to be recorded requires us to develop estimates of the fair value of stock options as of the date of grant. We estimate the fair value of each stock-based award using the Black-Scholes option-pricing model. The Black-Scholes option-pricing model uses highly subjective inputs such as the fair value of our common stock, as well as other assumptions including the expected volatility of our common stock, the expected term of the respective stock-based award, the risk-free interest rate for a period that approximates the expected term of the stock-based award being valued and the expected dividend yield on our common stock over the expected term.

*Expected volatility*. As we do not have sufficient trading history for our common stock, we have based our computation of expected volatility on the historical volatility of a representative group of public life science companies with similar characteristics to us, including company age and stage of product development. The historical volatility data is calculated based on a period of time commensurate with the expected term of the stock-based award being valued. We will continue to utilize this approach until a sufficient amount of historical information regarding the volatility of our own stock price becomes available or until other relevant circumstances change, such as our assessment that our identified entities are no longer appropriate to use as representative companies. In the latter case, more suitable, similar entities with publicly available stock prices will be incorporated in the calculation.

*Expected term*. In order to estimate the expected term of a stock-based award, we use the simplified method prescribed by SEC Staff Accounting Bulletin No. 107, *Share-Based Payment*, as we do not have sufficient historical exercise data to provide a reasonable basis upon which to estimate the expected term. Under this approach, the expected term is presumed to be the average of the contractual term (ten years) and the vesting term (generally four years) of the stock-based award. We have not historically experienced, nor do we expect there to be substantially different exercise or post-vesting termination behavior among our employees and directors.

*Risk-free interest rate*. The risk-free interest rate is based on publicly available yields of U.S. Treasury instruments with maturities consistent with the expected term of the stock-based award.

*Expected dividend yield*. The expected dividend yield is assumed to be zero as we have never paid dividends and have no current plans to pay any dividends on our common stock.

### Income Taxes

We account for income taxes under the asset and liability method. Current income tax expense or benefit represents the amount of income taxes we expect to pay or have refunded in the current year. Our deferred income tax assets and liabilities are determined based on differences between financial statement reporting and tax basis accounting of assets and liabilities and net operating loss and credit carryforwards, which we measure using the enacted tax rates and laws that will be in effect when such items are expected to reverse. We reduce deferred income tax assets, as necessary, by applying a valuation allowance to the extent that we determined it is more likely than not that some or all of our tax benefits will not be realized.

We account for uncertain tax positions in accordance with ASC 740-10, *Accounting for Uncertainty in Income Taxes*. We assess all material positions reflected in our income tax returns, including all significant uncertain positions, for all tax years that are subject to assessment or challenge by relevant taxing authorities. Upon determining the sustainability of our positions, we measure the largest amount of benefit possessing greater than fifty percent likelihood of being realized upon ultimate settlement. We reassess such positions at each balance sheet date to determine whether any factors underlying the sustainability assertion have changed and whether or not the amount of the recognized tax benefit is still appropriate.

As of December 31, 2019, our gross deferred tax assets were $61.5 million. Due to our lack of earnings history and uncertainties surrounding our ability to generate future taxable income, we have offset the total net deferred tax assets with a full valuation allowance. The deferred tax assets were primarily comprised of federal and

86

state tax net operating losses, ("NOLs"), which may be limited by certain rules governing changes in ownership, as defined in Section 382 of the Internal Revenue Code of 1986, as amended. Similar rules may apply under state tax laws. Our ability to use our remaining NOLs may be further limited if we experience future ownership changes.

The recognition and measurement of tax benefits requires significant judgment, especially in assessing uncertain tax positions. Judgments concerning the recognition and measurement of our tax benefits, as well as limitations surrounding their realizability, might change as new information becomes available.

### *Recent Accounting Pronouncements*

See Note 2 to our financial statements for recently issued accounting pronouncements, including the respective effective dates of adoption and effects on our results of operations and financial condition.

### **Results of Operations**

The following table summarizes our results of operations for the periods indicated (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Operating expenses | | | |
| Research and development | $ 61,858 | $ 33,287 | $ 18,506 |
| General and administrative | 29,560 | 12,434 | 3,748 |
| Total operating expenses | 91,418 | 45,721 | 22,254 |
| Loss from operations | (91,418) | (45,721) | (22,254) |
| Interest income (expense), net | 6,201 | 2,375 | (1,302) |
| Other expense, net | (155) | (192) | (287) |
| Loss before benefit from income taxes | (85,372) | (43,538) | (23,843) |
| Benefit from income taxes | — | — | (291) |
| Net loss | (85,372) | (43,538) | (23,552) |
| Unrealized gain (loss) on marketable securities, net of tax | 152 | (15) | — |
| Comprehensive loss | $ (85,220) | $ (43,553) | $ (23,552) |

### *Comparison of the Years Ended December 31, 2019 and 2018*

#### *Research and Development Expenses*

Research and development expenses were $61.9 million for the year ended December 31, 2019 compared to $33.3 million for the year ended December 31, 2018, an increase of $28.6 million. The period-over-period increase in research and development expenses includes $17.9 million of incremental antolimab (AK002) contract research and development costs, primarily attributable to $15.9 million of CDMO services and $2.0 million of CRO services. Increased hiring of R&D personnel during fiscal year 2019 contributed to an additional $9.8 million of consulting and personnel-related costs and an additional $1.3 million increase of other unallocated research and development costs related to the conduct of in-house research. Period-over-period increases were offset by a decrease of $1.1 million related to reduced spend on historical product candidates that are no longer in development and a $0.3 million license fee that was recognized during the first quarter of 2018.

#### *General and Administrative Expenses*

General and administrative expenses were $29.6 million for the year ended December 31, 2019 compared to $12.4 million for the year ended December 31, 2018, an increase of $17.2 million. The period-over-period increase in general and administrative expenses was primarily attributable to an additional $12.1 million of personnel-related costs resulting from our increased hiring of G&A personnel, as well as $2.3 million of incremental expense incurred from outside professional service providers for legal, information technology, and investor relations activities associated with becoming a publicly traded company in July 2018. Finally, we incurred incremental facilities and

other administrative costs of $1.8 million, which includes general business insurance premiums and other such costs not otherwise included in research and development expenses.

*Interest Income (Expense), Net*

Interest income, net, was $6.2 million for the year ended December 31, 2019 compared to $2.4 million for the year ended December 31, 2018, an increase of $3.8 million. The year-over-year increase is directly attributable to increased interest income earned on capital raised by our July 2018 IPO and our August 2019 Offering.

*Other Expense, Net*

There were no significant period-over-period changes in other expense, net, for the years ended December 31, 2019 and 2018.

*Benefit from Income Taxes*

There was no benefit from income taxes during the years ended December 31, 2019 and 2018.

**Liquidity and Capital Resources**

*Sources of Liquidity*

We are a clinical stage biotechnology company with a limited operating history. As a result of our significant research and development expenditures, we have generated net losses since our inception. Prior to completing our July 2018 IPO and August 2019 Offering, we historically financed our operations primarily through the private placement of convertible preferred stock. These private placements provided gross proceeds of $146.9 million. We also had a debt facility with SVB, for an aggregate of $5.0 million, which was fully repaid and terminated during 2017.

In connection with our July 2018 IPO, we sold 8,203,332 shares of common stock at a price of $18.00 per share. Proceeds from the July 2018 IPO, net of underwriting discounts and commissions, were $137.3 million. Concurrently with our July 2018 IPO, we completed a private placement of 250,000 shares of common stock at $18.00 per share to an existing stockholder. Proceeds from this private placement were $4.5 million.

We closed the August 2019 Offering under our shelf registration statement on Form S-3 (File No. 333-233018) pursuant to which we sold an aggregate of 5,227,272 shares of our common stock at a public offering price of $77.00 per share. We received aggregate net proceeds of $377.5 million, after deducting the underwriting discounts and commissions and offering expenses.

As of December 31, 2019, we had cash, cash equivalents and marketable securities of $495.9 million.

Based on our existing business plan, we believe that our current cash, cash equivalents and marketable securities will be sufficient to fund our anticipated level of operations through at least the next 12 months from the issuance of our financial statements.

*Summary Cash Flows*

The following table summarizes the primary sources and uses of our cash, cash equivalents, and restricted cash for the periods indicated (in thousands):

|  | Year Ended December 31, | | | | | |
|  | 2019 | | 2018 | | 2017 | |
| --- | --- | --- | --- | --- | --- | --- |
| Net cash used in operating activities | $ | (63,012) | $ | (38,450) | $ | (22,568) |
| Net cash used in investing activities | | (311,971) | | (151,047) | | (264) |
| Net cash provided by financing activities | | 381,163 | | 138,752 | | 94,623 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | $ | 6,180 | $ | (50,745) | $ | 71,791 |

88

*Comparison of the Years Ended December 31, 2019 and 2018*

### Cash Used in Operating Activities

Net cash used in operating activities was $63.0 million for the year ended December 31, 2019, which was primarily attributable to our net loss of $85.4 million adjusted for net noncash charges of $14.9 million and net changes in operating assets and liabilities of $7.5 million. Noncash charges included $15.8 million in stock-based compensation expense, $1.5 million in depreciation and amortization expense and $0.3 million in amortization of right-of-use asset, partially offset by $2.7 million in net amortization of premiums and discounts on marketable securities.

Net cash used in operating activities was $38.5 million for the year ended December 31, 2018, which was primarily attributable to our net loss of $43.5 million adjusted for net noncash charges of $3.4 million and net changes in operating assets and liabilities of $1.6 million. Noncash charges included $4.6 million in stock-based compensation expense and $0.2 million in depreciation and amortization expense, partially offset by $1.3 million in net amortization of premiums and discounts on marketable securities and $0.1 million accretion of tenant improvement allowances.

### Cash Used in Investing Activities

Net cash used in investing activities was $312.0 million for the year ended December 31, 2019, which consisted of $541.7 million for the purchases of marketable securities and $0.8 million for the purchases of property and equipment, partially offset by $231.0 million for maturities of marketable securities.

Net cash used in investing activities was $151.0 million for the year ended December 31, 2018, which consisted of $236.6 million for the purchases of marketable securities and $6.9 million for the purchases of property and equipment, partially offset by $92.5 million for maturities of marketable securities.

### Cash Provided by Financing Activities

Net cash provided by financing activities was $381.2 million for the year ended December 31, 2019, which consisted primarily of $377.5 million in net proceeds from the issuance of common stock, $2.4 million in proceeds received from employees for the exercise of stock options and $1.2 million in proceeds from the issuance of common stock under the 2018 ESPP.

Net cash provided by financing activities was $138.8 million for the year ended December 31, 2018, which consisted primarily of $138.4 million in proceeds from the issuance of common stock, $0.3 million in proceeds received from employees for the exercise of stock options and $0.1 million in proceeds from the repayment of recourse promissory notes.

## Funding Requirements

We will continue to require additional capital to develop our product candidates and fund operations for the foreseeable future. We may seek to raise funding through private or public equity or debt financings, or other sources such as strategic collaborations. Adequate additional funding may not be available to us on acceptable terms or at all. Our failure to raise capital as and when needed could have a negative impact on our financial condition and our ability to pursue our business strategies.

The timing and amount of our capital expenditures will depend on many factors, including:

- the number and scope of clinical indications and clinical trials we decide to pursue;
- the scope and costs of commercial manufacturing activities;
- the extent to which we acquire or in-license other product candidates and technologies, if any;
- the cost, timing and outcome of regulatory review of our product candidates;
- the cost and timing of establishing sales and marketing capabilities for product candidates receiving marketing approval, if any;

89

- the costs of preparing, filing and prosecuting patent applications, maintaining and enforcing our intellectual property rights and defending intellectual property-related claims;

- our efforts to enhance operational systems and our ability to attract, hire and retain qualified personnel, including personnel to support the development of our product candidates; and

- the costs associated with being a public company.

If we are unable to raise additional funds when needed, we may be required to delay, reduce or terminate some or all of our development and commercialization efforts. We may also be required to sell or license to others rights to our product candidates in certain territories or indications that we would prefer to develop and commercialize ourselves.

The issuance of additional equity securities may cause our stockholders to experience dilution. Future equity or debt financings may contain terms that are not favorable to us or our stockholders including debt instruments imposing covenants that restrict our operations and limit our ability to incur liens, issue additional debt, pay dividends, repurchase our common stock, make certain investments or engage in certain merger, consolidation, licensing or asset sale transactions.

**Contractual Obligations and Commitments**

The following table outlines our contractual obligations and commitments at December 31, 2019 (in thousands):

| | | | | | | Payments Due by Period | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | | Less than 1 Year | | 1-3 Years | | 3-5 Years | | More than 5 Years |
| Operating lease obligations (1) | $ | 91,105 | $ | 1,233 | $ | 9,998 | $ | 17,071 | | $62,803 |
| Purchase obligations (2) | | 8,719 | | 7,216 | | 1,503 | | — | | — |
| Total | $ | 99,824 | $ | 8,449 | $ | 11,501 | $ | 17,071 | | $62,803 |

(1)   Operating lease obligations represent future minimum lease payments due under our two lease agreements.
(2)   Purchase obligations represent noncancelable minimum service fees due to counterparties under various master service agreements.

In addition to the amounts included in the table above, we enter into contracts in the normal course of business with CROs and other counterparties assisting with our preclinical studies and clinical trials. Such contracts are generally cancellable, with varying provisions regarding termination. In the event of a contract being terminated, we would only be obligated for services received as of the effective date of the termination, along with cancellation fees, as applicable.

**Off-Balance Sheet Arrangements**

Since our inception, we have not entered into any off-balance sheet arrangements as defined in the rules and regulations of the SEC.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk.**

*Interest Rate Sensitivity*

We are exposed to market risk related to changes in interest rates. Our primary exposure to market risk is interest rate sensitivity, which is affected by changes in the general level of U.S. interest rates, particularly because our investments, including cash equivalents, are in money market funds that invest in U.S. Treasury obligations. The primary objective of our investment activities is to preserve capital to fund our operations. We also seek to maximize income from our investments without assuming significant risk. Due to the short-term maturities and low

90

credit risk profile of our balances held in money market funds, a hypothetical 10% change in interest rates would not have a material effect on the fair market value of our cash equivalents and marketable securities.

*Foreign Currency Sensitivity*

Our primary operations are transacted in U.S. Dollars, however, certain service agreements with third parties are denominated in currencies other than the U.S. Dollar, primarily the British Pound and Euro. As such, we are subject to foreign exchange risk and therefore, fluctuations in the value of the U.S. Dollar against the British Pound and Euro may impact the amounts reported for expenses and obligations incurred under such agreements. We do not currently engage in any hedging activity to reduce our potential exposure to currency fluctuations, although we may choose to do so in the future. A hypothetical 10% change in foreign exchange rates during any of the periods presented would not have had a material impact on our financial condition or results of operations.

**Item 8. Financial Statements and Supplementary Data.**

**ALLAKOS INC.**
**INDEX TO FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 93 |
| Audited Financial Statements: | |
| Balance Sheets | 95 |
| Statements of Operations and Comprehensive Loss | 96 |
| Statements of Stockholders' Equity (Deficit) | 97 |
| Statements of Cash Flows | 98 |
| Notes to Financial Statements | 99 |

92

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Allakos Inc.

**Opinion on the Financial Statements**

We have audited the accompanying balance sheets of Allakos Inc. (the Company) as of December 31, 2019 and 2018, the related statements of operations and comprehensive loss, statements of convertible preferred stock and stockholders' equity (deficit) and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 25, 2020 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Accrued contract research and development expenses*

| | |
|---|---|
| *Description of the Matter* | During 2019, the Company incurred $61.9 million of research and development expenses and accrued $5.0 million for contract research and development expenses as of December 31, 2019. As described in Note 2 to the Financial Statements, service agreements with third party service providers including contract research organizations ("CROs") and contract development and manufacturing organizations ("CDMOs") comprise a significant component of the Company's research and development activities. External costs owed to third parties are accrued and expensed based upon estimates of the proportion of work completed over the term of the individual clinical trial and manufacturing activities in accordance with signed agreements. The timing and the amount of payments required under each individual arrangement are often different from the pattern of costs actually incurred. The Company accrues the cost of the services with these third-party organizations based on the extent of activities completed by vendors and measured by internal project managers. |
| | Auditing management's accounting for accrued contract research and development expenses is especially challenging because the evaluation is dependent upon on a high-volume of data exchanged between the third-party service providers, internal clinical and manufacturing personnel and the company's finance team. Determining the accrued amounts is based on an evaluation of the unique terms and conditions set in each respective CRO and CDMO agreement. Additionally, due to the duration of clinical-related development activities and the timing of invoices received from third parties, the determination of the accrual for services incurred requires application of judgment by management. The lack of timely information related to certain manufacturing activities in determining the progress to completion of specific tasks conducted for each project can increase the risk of inaccurate assumptions applied to project completion when estimating the costs to be accrued. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's accounting for accrued contract research and development expenses process, including controls over management's review of clinical trial and manufacturing activity progress in comparison to budgets and invoices received from third parties. |
| | To test accrued contract research and development expense, our audit procedures included, among others, testing the accuracy and completeness of the inputs used in management's analysis to determine costs incurred. We also inspected terms and conditions for material vendor contracts and change orders and compared these to the cost models management used in tracking progress of service agreements. We evaluated estimated services incurred by third parties by understanding the terms and timeline of significant projects, evaluating management's estimate of work performed and costs incurred, and obtaining external confirmation of key terms and conditions for a sample of contracts. We met with internal clinical and manufacturing personnel to understand the status of significant contract research and development activities. Further, we inspected material invoices received from third parties after the balance sheet date and evaluated whether services performed prior to the balance sheet date had been properly included in the accrual. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2016.

Redwood City, California
February 25, 2020

94

**ALLAKOS INC.**
**BALANCE SHEETS**
**(in thousands, except per share data)**

| | | December 31, | | |
|---|---|---|---|---|
| | | 2019 | | 2018 |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 38,367 | $ | 33,660 |
| Investments in marketable securities | | 457,534 | | 145,246 |
| Prepaid expenses and other current assets | | 3,969 | | 2,703 |
| Total current assets | | 499,870 | | 181,609 |
| Property and equipment, net | | 8,410 | | 8,848 |
| Operating lease right-of-use assets | | 5,775 | | — |
| Other long-term assets | | 2,839 | | 802 |
| Total assets | $ | 516,894 | $ | 191,259 |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 5,963 | $ | 2,092 |
| Accrued expenses and other current liabilities | | 7,098 | | 3,164 |
| Total current liabilities | | 13,061 | | 5,256 |
| Other long-term liabilities | | 8,112 | | 2,009 |
| Total liabilities | | 21,173 | | 7,265 |
| Commitments and contingencies (Note 6) | | | | |
| Stockholders' equity: | | | | |
| Preferred stock, $0.001 par value per share; 20,000 shares authorized as of December 31, 2019 and 2018; no shares issued and outstanding as of December 31, 2019 and 2018 | | — | | — |
| Common stock, $0.001 par value per share; 200,000 shares authorized as of December 31, 2019 and 2018; 48,668 and 42,117 shares issued and outstanding as of December 31, 2019 and 2018, respectively | | 48 | | 42 |
| Additional paid-in capital | | 685,020 | | 288,079 |
| Accumulated other comprehensive gain (loss) | | 137 | | (15) |
| Accumulated deficit | | (189,484) | | (104,112) |
| Total stockholders' equity | | 495,721 | | 183,994 |
| Total liabilities and stockholders' equity | $ | 516,894 | $ | 191,259 |

*See accompanying notes to financial statements*

95

**ALIJAKOS INC.**
**STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(in thousands, except per share data)**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | | 2017 |
| Operating expenses | | | | | | |
|    Research and development | $ | 61,858 | $ | 33,287 | $ | 18,506 |
|    General and administrative | | 29,560 | | 12,434 | | 3,748 |
|      Total operating expenses | | 91,418 | | 45,721 | | 22,254 |
| Loss from operations | | (91,418) | | (45,721) | | (22,254) |
| Interest income (expense), net | | 6,201 | | 2,375 | | (1,302) |
| Other expense, net | | (155) | | (192) | | (287) |
| Loss before benefit from income taxes | | (85,372) | | (43,538) | | (23,843) |
| Provision for (benefit from) income taxes | | — | | — | | (291) |
| Net loss | | (85,372) | | (43,538) | | (23,552) |
| Unrealized gain (loss) on marketable securities, net of tax | | 152 | | (15) | | — |
| Comprehensive loss | $ | (85,220) | $ | (43,553) | $ | (23,552) |
| Net loss per common share: | | | | | | |
|    Basic and diluted | $ | (1.89) | $ | (2.20) | $ | (14.54) |
| Weighted-average number of common shares outstanding: | | | | | | |
|    Basic and diluted | | 45,191 | | 19,833 | | 1,620 |

*See accompanying notes to financial statements*

96

**AELAKOS INC.**

## STATEMENTS OF CONVERTIBLE PREFERRED STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)

**(in thousands)**

| | Convertible Preferred Stock | | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance as of December 31, 2016 | 20,866 | $ 42,996 | 1,605 | $ 2 | $ 584 | $ — | $ (37,022) | $ (36,436) |
| Issuance of Series B convertible preferred stock for cash, net of issuance costs of $168 | 9,334 | 92,331 | — | — | — | — | — | — |
| Issuance of Series B convertible preferred stock upon conversion of convertible promissory notes | 771 | 7,642 | — | — | — | — | — | — |
| Stock-based compensation expense | — | — | — | — | 402 | — | — | 402 |
| Repurchase of unvested restricted common stock | — | — | (34) | — | — | — | — | — |
| Issuance of common stock upon exercise of stock options | — | — | 543 | 1 | 227 | — | — | 228 |
| Vesting of restricted common stock | — | — | — | — | 28 | — | — | 28 |
| Recognition of beneficial conversion feature related to convertible promissory notes payable to related parties, net of $966 tax benefit | — | — | — | — | 1,867 | — | — | 1,867 |
| Reclassification of beneficial conversion feature related to convertible promissory notes payable to related parties, net of $675 tax expense | — | — | — | — | (1,305) | — | — | (1,305) |
| Net loss | — | — | — | — | — | — | (23,552) | (23,552) |
| Balance as of December 31, 2017 | 30,971 | $ 142,969 | 2,114 | $ 3 | $ 1,803 | $ — | $ (60,574) | $ (58,768) |
| Proceeds from repayment of recourse promissory note | — | — | — | — | 50 | — | — | 50 |
| Conversion of preferred stock upon initial public offering | (30,971) | (142,969) | 30,972 | 30 | 142,939 | — | — | 142,969 |
| Issuance of common stock upon initial public offering, net of offering costs of $3,466 | — | — | 8,453 | 8 | 138,349 | — | — | 138,357 |
| Stock-based compensation expense | — | — | — | — | 4,570 | — | — | 4,570 |
| Issuance of common stock upon exercise of stock options | — | — | 531 | 1 | 344 | — | — | 345 |
| Issuance of common stock upon exercise of warrants | — | — | 47 | — | — | — | — | — |
| Vesting of restricted common stock | — | — | — | — | 24 | — | — | 24 |
| Unrealized loss on marketable securities, net of tax | — | — | — | — | — | (15) | — | (15) |
| Net loss | — | — | — | — | — | — | (43,538) | (43,538) |
| Balance as of December 31, 2018 | — | $ — | 42,117 | $ 42 | $ 288,079 | $ (15) | $ (104,112) | $ 183,994 |
| Stock-based compensation expense | — | — | — | — | 15,764 | — | — | 15,764 |
| Issuance of common stock upon exercise of stock options | — | — | 1,250 | 1 | 2,447 | — | — | 2,448 |
| Issuance of common stock upon 2018 ESPP purchase | — | — | 74 | — | 1,190 | — | — | 1,190 |
| Issuance of common stock upon follow-on offering, net of offering costs of $24,975 | — | — | 5,227 | 5 | 377,520 | — | — | 377,525 |
| Vesting of restricted common stock | — | — | — | — | 20 | — | — | 20 |
| Unrealized gain on marketable securities, net of tax | — | — | — | — | — | 152 | — | 152 |
| Net loss | — | — | — | — | — | — | (85,372) | (85,372) |
| Balance as of December 31, 2019 | — | $ — | 48,668 | $ 48 | $ 685,020 | $ 137 | $ (189,484) | $ 495,721 |

*See accompanying notes to financial statements*

97

**AELAKOS, INC.**
**STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| **Cash flows from operating activities** | | | |
| Net loss | $ (85,372) | $ (43,538) | $ (23,552) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Stock-based compensation | 15,764 | 4,570 | 402 |
| Net amortization of premiums and discounts on marketable securities | (2,664) | (1,310) | — |
| Amortization of beneficial conversion feature related to convertible promissory notes payable to related parties | — | — | 853 |
| Benefit from deferred income taxes | — | — | (291) |
| Depreciation and amortization | 1,508 | 242 | 241 |
| Noncash lease expense | 275 | — | — |
| Noncash interest related to convertible promissory notes payable to related parties | — | — | 228 |
| Loss on extinguishment of debt facility | — | — | 159 |
| Noncash interest related to debt facility | — | — | 101 |
| Accretion of tenant improvement allowance | — | (82) | — |
| Changes in operating assets and liabilities: | | | |
| Prepaid expenses and other current assets | 463 | (1,489) | (637) |
| Other long-term assets | (564) | 313 | (150) |
| Accounts payable | 3,571 | 76 | 510 |
| Accrued expenses and other current liabilities | 4,077 | 2,063 | (432) |
| Other long-term liabilities | (70) | 705 | — |
| Net cash used in operating activities | (63,012) | (38,450) | (22,568) |
| **Cash flows from investing activities** | | | |
| Purchases of marketable securities | (541,701) | (236,601) | — |
| Proceeds from maturities of marketable securities | 230,500 | 92,500 | — |
| Purchases of property and equipment | (770) | (6,946) | (264) |
| Net cash used in investing activities | (311,971) | (151,047) | (264) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of common stock, net of issuance costs | 377,525 | 138,357 | — |
| Proceeds from issuance of convertible preferred stock, net of issuance costs | — | — | 92,331 |
| Proceeds from issuance of convertible promissory notes, net of issuance costs | — | — | 7,414 |
| Repayment of debt facility | — | — | (5,250) |
| Proceeds from exercise of stock options, net of repurchases | 2,448 | 345 | 228 |
| Proceeds from issuance of common stock under 2018 ESPP | 1,190 | — | — |
| Payments for deferred financing costs | — | — | (100) |
| Proceeds from repayment of recourse promissory note | — | 50 | — |
| Net cash provided by financing activities | 381,163 | 138,752 | 94,623 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 6,180 | (50,745) | 71,791 |
| Cash, cash equivalents and restricted cash, beginning of period | 34,462 | 85,207 | 13,416 |
| Cash, cash equivalents and restricted cash, end of period | $ 40,642 | $ 34,462 | $ 85,207 |
| **Supplemental disclosures** | | | |
| Cash paid for interest | $ — | $ — | $ 228 |
| Noncash investing and financing items: | | | |
| Right-of-use assets obtained in exchange for lease obligations | $ 6,050 | $ — | $ — |
| Conversion of convertible promissory notes payable to related parties | $ — | $ — | $ 7,642 |
| Recognition of beneficial conversion feature related to convertible promissory notes to related parties, net of benefit for income taxes | $ — | $ — | $ 1,867 |
| Lessor funded lease incentives included in property and equipment | $ — | $ 1,386 | $ — |
| Reclassification of beneficial conversion feature related to convertible promissory notes payable to related parties, net of tax expense | $ — | $ — | $ 1,305 |
| Property and equipment purchased in accounts payable | $ — | $ 313 | $ 89 |
| Deferred initial public offering costs in accounts payable | $ — | $ — | $ 63 |
| Vesting of restricted common stock subject to repurchase | $ 20 | $ 24 | $ 28 |

*See accompanying notes to financial statements*

**ALLAKOS INC.**

**NOTES TO FINANCIAL STATEMENTS**

## 1. Organization and Business

Allakos Inc. ("Allakos" or the "Company") was incorporated in the state of Delaware in March 2012. Allakos is a clinical stage biopharmaceutical company focused on the development of antolimab (AK002) for the treatment of eosinophil and mast cell related diseases. The Company's primary activities to date have included establishing its facilities, recruiting personnel, conducting research and development of its product candidates and raising capital. The Company's operations are located in Redwood City, California.

### Liquidity Matters

Since inception, the Company has incurred net losses and negative cash flows from operations. During the year ended December 31, 2019, the Company incurred a net loss of $85.4 million and used $63.0 million of cash in operations. As of December 31, 2019, the Company had an accumulated deficit of $189.5 million and does not expect to experience positive cash flows from operating activities in the foreseeable future. The Company has financed its operations to date primarily through the sale of common stock and issuance of convertible preferred stock. Management expects to incur additional operating losses in the future as the Company continues to further develop, seek regulatory approval for and, if approved, commence commercialization of its product candidates. The Company had $495.9 million of cash, cash equivalents and marketable securities at December 31, 2019. Management believes that this amount is sufficient to fund the Company's operations for at least the next 12 months from the issuance date of these financial statements.

### July 2018 Initial Public Offering and Related Transactions

On July 23, 2018, the Company completed an initial public offering ("IPO"), selling 8,203,332 shares of common stock at an offering price of $18.00 per share (the "July 2018 IPO"). Proceeds from the IPO, net of underwriting discounts and commissions, were $137.3 million. Concurrently with the July 2018 IPO, the Company completed a private placement of 250,000 shares of common stock at the IPO offering price of $18.00 per share to an existing stockholder. Proceeds from this private placement were $4.5 million.

In connection with the completion of the July 2018 IPO on July 23, 2018, all then outstanding shares of convertible preferred stock were converted into 30,971,627 shares of common stock.

Upon the completion of the July 2018 IPO, the Company's certificate of incorporation was amended and restated. Under the amended and restated certificate of incorporation, the Company's authorized capital stock consists of 200,000,000 shares of common stock with a par value $0.001 per share and 20,000,000 shares of convertible preferred stock with a par value $0.001 per share.

### August 2019 Follow-On Offering

On August 9, 2019, the Company closed an underwritten public offering (the "August 2019 Offering") under its shelf registration statement on Form S-3 (File No. 333-233018) pursuant to which the Company sold an aggregate of 5,227,272 shares of common stock of the Company at a public offering price of $77.00 per share. The Company received aggregate net proceeds of $377.5 million, after deducting the underwriting discounts and commissions and offering expenses.

### Reverse Stock Split

On July 6, 2018, the Company amended its certificate of incorporation to effect a 1-for-1.25 reverse stock split of every outstanding share of its convertible preferred stock and common stock. All issued and outstanding common stock and convertible preferred stock and related per share amounts contained in the Company's audited financial statements and accompanying notes have been adjusted to reflect the reverse stock split.

99

**2. Summary of Significant Accounting Policies**

*Basis of Presentation*

The financial statements have been prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP"). The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures reported in the financial statements and accompanying notes.

*Use of Estimates*

Management uses significant judgment when making estimates related to common stock valuation and related stock-based compensation expense, accrued expenses related to clinical trials and deferred tax valuation allowances. Management bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results could differ from those estimates under different assumptions or conditions, and those differences could be material to the financial position and results of operations.

*Concentration of Credit Risk and Other Risks and Uncertainties*

Financial instruments that potentially subject the Company to credit risk principally consist of cash, cash equivalents and marketable securities. These financial instruments are held in accounts at a single financial institution that management believes possesses high credit quality. Amounts on deposit with this financial institution have and will continue to exceed federally-insured limits. The Company has not experienced any losses on its cash deposits. Additionally, the Company's investment policy limits its investments to certain types of securities issued by the United States government and its agencies.

The Company is subject to a number of risks similar to that of other early-stage biopharmaceutical companies, including, but not limited to, the need to obtain adequate additional funding, possible failure of current or future clinical trials, its reliance on third-parties to conduct its clinical trials, the need to obtain regulatory and marketing approvals for its product candidates, competitive developments, the need to successfully commercialize and gain market acceptance of the Company's product candidates, its right to develop and commercialize its product candidates pursuant to the terms and conditions of the licenses granted to the Company, protection of proprietary technology, the ability to make milestone, royalty or other payments due under licensing agreements, and the need to secure and maintain adequate manufacturing arrangements with third-parties. If the Company does not successfully commercialize or partner its product candidates, it will be unable to generate product revenue or achieve profitability.

*Cash, Cash Equivalents and Restricted Cash*

The Company considers all highly liquid investments with original maturities of three months or less from the date of purchase to be cash equivalents. The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the Company's balance sheets and which, in aggregate, represent the amounts reported in the statements of cash flows (in thousands):

| | December 31, | | |
| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Cash and cash equivalents | $ 38,367 | $ 33,660 | $ 85,207 |
| Restricted cash | 2,275 | 802 | — |
| Total | $ 40,642 | $ 34,462 | $ 85,207 |

Restricted cash at December 31, 2019 represents $2.3 million of security deposits for the lease of the Company's facilities in Redwood City, California and San Carlos, California. Both security deposits are in the form of letters of credit secured by restricted cash. Restricted cash amounts are included within other long-term assets on the Company's balance sheets.

*Marketable Securities*

The Company invests in marketable securities, primarily securities issued by the United States government and its agencies. The Company's marketable securities are considered available-for-sale and are classified as current

100

assets even when the stated maturities of the underlying securities exceed one year from the date of the current balance sheet being reported. This classification reflects management's ability and intent to utilize proceeds from the sale of such investments to fund ongoing operations. Unrealized gains and losses are excluded from earnings and are reported as a component of accumulated comprehensive income (loss). The cost of securities sold is determined using the specific-identification method. Interest earned and adjustments for the amortization of premiums and discounts on investments are included in interest income, net, on the statements of operations and comprehensive loss. Realized gains and losses and declines in fair value judged to be other than temporary, if any, on investments in marketable securities are included in other expense, net, on the statements of operations and comprehensive loss.

*Fair Value Measurements*

The Company accounts for fair value of its financial instruments in accordance with Financial Accounting Standards Board (the "FASB") Accounting Standards Codification ("ASC") Topic No. 820, *Fair Value Measurements* ("ASC 820"). ASC 820 establishes a common definition for fair value, establishes a framework for measuring fair value and expands disclosures about such fair value measurements. Additionally, ASC 820 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

The Company measures fair value based on a three-level hierarchy of inputs, of which the first two are considered observable and the last unobservable. Unobservable inputs reflect the Company's own assumptions about current market conditions. The three-level hierarchy of inputs is as follows:

*Level 1* – Quoted prices in active markets for identical assets or liabilities.

*Level 2* – Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

*Level 3* – Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of assets or liabilities.

To the extent that the valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by the Company in determining fair value is greatest for instruments categorized in Level 3. A financial instrument's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.

The carrying amounts reflected in the Company's balance sheets for cash and cash equivalents, prepaid expenses and other current assets, other long-term assets, accounts payable, and accrued expenses and other current liabilities approximate fair value, due to their short-term nature. The Company's investments in marketable securities are measured at fair value in accordance with the levels above.

*Property and Equipment, Net*

Property and equipment are stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. The useful lives of property and equipment are as follows:

Laboratory equipment – 3 to 5 years

Leasehold improvements – Shorter of remaining lease term or estimated life of the assets

Upon retirement or sale, the cost of disposed assets and their related accumulated depreciation are removed from the balance sheet. Any resulting gains or losses on dispositions of property and equipment are included as a component of other income (expense), net, within the Company's statements of operations and comprehensive loss. Repair and maintenance costs that do not significantly add value to the property and equipment, or prolong its life, are charged to operating expense as incurred.

*Leases*

Effective January 1, 2019, the Company accounts for its leases in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 842, "Leases" ("ASC 842"). Prior period amounts continue to be reported in accordance with the Company's historic accounting under previous lease guidance. Additionally, the Company elected a number of optional practical expedients made available under the ASC 842 transition guidance. Such elections include (i) carrying forward the Company's historical lease classifications, (ii) foregoing a re-evaluation of historical contracts to identify embedded leases, (iii) foregoing a re-assessment of initial direct costs related to leases that existed prior to adoption, (iv) combining lease and non-lease components, and (v) recognizing lease expense for all contracts with an initial term of 12 months or less within the statements of operations and comprehensive loss on a straight-line basis over the requisite lease term.

The Company accounts for its leases by recording right-of-use assets and lease liabilities on the Balance Sheet. Right-of-use assets represent the Company's right to use an underlying asset over the lease term and include any lease payments made prior to the lease commencement date and exclude lease incentives. Lease liabilities represent the present value of the total lease payments over the lease term, calculated using the Company's incremental borrowing rate. In determining the Company's incremental borrowing rate, consideration is given to the term of the lease and the Company's credit risk. The Company's recognizes options to extend or terminate a lease when it is reasonably certain that the Company will exercise any such options. Lease expense is recognized on a straight-line basis over the expected lease term.

### *Accrued Contract Research and Development Expense*

Costs associated with research and development services performed on behalf of the Company by third-party CROs and CDMOs comprise a significant component of total research and development expense included on the statements of operations and comprehensive loss. Services performed by these CROs and CDMOs include various research and development activities supporting the Company's preclinical studies, clinical trials and drug manufacturing activities, which are governed by executed service agreements. Underlying amounts included in these service agreements with CROs and CDMOs are expensed as incurred. The Company accrues for expenses related to services performed by CROs and CDMOs during the reporting period that had not yet been invoiced as of the balance sheet date.

Accrued contract research and development expense requires certain estimates by management surrounding the extent of unbilled services received and the extent and duration of remaining services still to be performed. Management's estimates are based on the evaluation of data obtained from multiple internal and external sources including, but not limited to, clinical site activity logs, subject visit reports, and project management timelines. Results from these evaluations are reviewed by internal personnel from the Company's clinical and technical operations departments. The actual timing and amount of services billed by CROs and CDMOs may vary from management's estimates, which would require adjustments to research and development expense in future periods. To date, management's estimates have not been materially different from actual amounts recorded for the periods reported.

### *Research and Development Expense*

Research and development costs are expensed as incurred. Research and development costs include, among others, consulting fees, salaries, benefits, travel, stock-based compensation, laboratory supplies and other non-capital equipment utilized for in-house research, allocations of facilities and overhead costs, amounts owed under in-licensing agreements, and amounts paid to CROs and CDMOs that conduct research and development activities on the Company's behalf.

Goods or services incurred for research and development activities that have not yet been invoiced are recorded as liabilities within accrued expenses and other current liabilities on the Company's balance sheets. Amounts recorded for unbilled services often represent estimates, which are typically based on contracted amounts for the proportion of work performed and determined through analysis with internal personnel and external service providers as to the progress or stage of completion of the associated services.

102

Non-refundable advance payments for goods or services to be rendered as part of future research and development activities are capitalized on the Company's balance sheets. Classification between current and long-term assets is based on an evaluation of when the goods will be delivered and/or services will be performed, with such amounts subsequently amortized to expense once realized.

### Segments

Operating segments are defined as components of an entity about which separate discrete information is available for evaluation by the chief operating decision maker or decision-making group, in deciding how to allocate resources and in assessing performance. The Company's chief operating decision maker, its Chief Executive Officer, views its operations and manages its business in one operating segment operating exclusively in the United States.

### Patent Costs

The Company expenses patent application and related legal costs as incurred and classifies such costs as general and administrative expenses in the statements of operations and comprehensive loss

### Stock-Based Compensation

The Company accounts for its stock-based compensation in accordance with FASB ASC Topic 718, *Compensation—Stock Compensation* ("ASC 718"). ASC 718 requires all stock-based awards issued to employees and nonemployees to be recognized as expense in the statements of operations and comprehensive loss based on their grant date fair values. Stock-based awards issued to nonemployee consultants are accounted for based on the fair value of services to be received or of the intrinsic value of equity instruments to be issued, whichever is more reliably measured. The measurement date for awards issued to nonemployee consultants is the date of grant.

For purposes of determining the estimated fair value of stock options granted to employees and nonemployees, the Company uses the Black-Scholes option pricing model. The Black-Scholes option pricing model requires the input of certain assumptions that involve judgment, for which changes can materially affect the resulting estimates of fair value. The assumptions used to determine the fair value of stock options granted were as follows:

*Expected volatility* – As there is insufficient trading history for the Company's common stock, the Company has based its computation of expected volatility on the historical volatility of a representative group of public companies with similar characteristics to the Company, including stage of product development and life science industry focus. The historical volatility is calculated based on a period of time commensurate with the expected term assumption.

*Expected term* – The Company determines the expected term in accordance with the "simplified method" described by SEC Staff Accounting Bulletin No. 107, *Share-Based Payment*, as it does not have sufficient historical exercise data to provide a reasonable basis upon which to estimate the expected term.

*Risk-free interest rate* – The Company bases the risk-free interest rate on United States Treasury securities with terms consistent to the expected term of the stock option being valued.

*Expected dividends* – The expected dividend yield is assumed to be zero as the Company has never paid dividends and has no current plans to pay any dividends on its common stock.

The fair value of restricted stock units ("RSUs") is determined using the quoted market price of the Company's common stock on the date of grant.

The Company uses historical data to estimate pre-vesting forfeitures and records stock-based compensation expense only for those awards expected to vest. To the extent that actual forfeitures differ from estimates, the difference is recorded as a cumulative adjustment in the period the estimate are revised. The Company expenses the fair value of its stock-based compensation awards to employees and nonemployees on a straight-line basis over the requisite service period, which is generally the vesting period.

*Income Taxes*

In December 2017, the Tax Cuts and Jobs Act of 2017 (the "Tax Act") was signed into law. The Tax Act, among other changes, lowered the Company's federal tax rate from 34% to 21%. Based on provisions of the Tax Act, the Company remeasured its deferred tax assets and liabilities at December 31, 2017 to reflect the lower statutory tax rate, however, since the Company established a full valuation allowance to offset its deferred tax assets, there was no impact to the effective tax rate. The deferred tax remeasurement was provisional and represented our reasonable estimate within the meaning of Staff Accounting Board 118, which provided a measurement period that should not extend beyond one year from the Tax Act's enactment date for companies to complete the accounting under ASC 740. As of December 31, 2018, the Company has completed its analysis of the income tax effects of the Tax Act. The results of this analysis have been reflected in the Company's financial statements and related footnotes.

*Comprehensive Loss*

Comprehensive loss is defined as the change in stockholders' equity (deficit) during a period from transactions and other events and circumstances from non-owner sources. The difference between net loss and comprehensive loss for the years ended December 31, 2019 and 2018 are a result of unrealized gains and losses on the Company's investments in marketable securities included in current assets on the balance sheets.

*Net Loss per Share*

The Company calculates basic net loss per share by dividing the net loss attributable to common stockholders by the weighted-average shares of common stock outstanding during the period. The Company calculates diluted net loss per share after giving consideration to all potentially dilutive securities outstanding during the period using the treasury-stock and if-converted methods, except where the effect of including such securities would be anti-dilutive. Because the Company has reported net losses since inception, the effect from potentially dilutive securities would have been anti-dilutive and therefore has been excluded from the calculation of diluted net loss per share.

Basic and diluted net loss per share was calculated as follows (in thousands, except per share data):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Numerator: | | | |
| Net loss | $ (85,372) | $ (43,538) | $ (23,552) |
| Denominator: | | | |
| Weighted-average shares of common stock outstanding, basic and diluted | 45,191 | 19,833 | 1,620 |
| Net loss per share, basic and diluted | $ (1.89) | $ (2.20) | $ (14.54) |

The following table sets forth the potentially dilutive securities that have been excluded from the calculation of diluted net loss per share due to their anti-dilutive effect for the periods indicated (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Series A convertible preferred stock | — | — | 20,866 |
| Series B convertible preferred stock | — | — | 10,105 |
| Options to purchase common stock | 7,148 | 7,811 | 4,884 |
| Unvested restricted stock units | 542 | — | — |
| Warrants to purchase common stock | — | — | 48 |
| Unvested restricted common stock | — | 47 | 104 |
| Shares issuable under employee stock purchase plans | 31 | 29 | — |
| Total | 7,721 | 7,887 | 36,007 |

104

*Foreign Currency Transactions*

The Company is party to multiple contract manufacturing and clinical research agreements for which services to be performed are denominated in foreign currencies other than the United States Dollar. The Company records gains and losses attributable to fluctuations in foreign currencies as a component of other income (expense), net, on the statements of operations and comprehensive loss.

*Recently Adopted Accounting Pronouncements*

In February 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Codification ("ASC") 842 which became effective for fiscal years beginning after December 15, 2018. ASC 842 requires an entity to recognize a right-of-use asset and lease liability for all leases with terms of more than 12 months. The recognition, measurement and presentation of expenses will depend on the lease's classification as a finance or operating lease. ASC 842 also requires certain quantitative and qualitative disclosures about leasing arrangements. The Company adopted ASC 842 using a modified retrospective approach effective January 1, 2019, recording a right-of-use asset of $6.1 million and a long-term lease liability of $8.2 million. Adoption of ASC 842 did not result in a cumulative effect adjustment to accumulated deficit. See Note 6 for further disclosure.

On January 1, 2019, the Company adopted Accounting Standards Update ("ASU") No. 2018-07, *Compensation-Stock Compensation* (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting (ASU 2018-07), which simplifies several aspects of the accounting for nonemployee share-based payment transactions resulting from expanding the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from nonemployees. The Company's adoption of this standard did not have a material impact on its financial statements.

*Recently Issued Accounting Pronouncements Not Yet Adopted*

In December 2019, the FASB issued ASU No. 2019-12, *Income Taxes* (Topic 740): Simplifying the Accounting for Income Taxes. This ASU affects general principles within Topic 740 and are meant to simplify the accounting for income taxes by removing certain exceptions to the general framework. The ASU further adds guidance to reduce complexity in certain areas, including recognizing a franchise (or similar) tax that is partially based on income as an income-based tax and incremental amounts incurred as a non-income-based tax and recognizing deferred taxes for tax goodwill. The amendments in this ASU are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020. Early adoption of the amendments is permitted, including adoption in any interim period for which financial statements have not yet been issued. An entity that elects to early adopt the amendments in an interim period should reflect any adjustments as of the beginning of the annual period that includes that interim period. Additionally, an entity that elects early adoption must adopt all the amendments in the same period. The Company is currently evaluating the effects of this ASU on its financial statements and related disclosures.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement* (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement. This ASU eliminates, modifies and adds disclosure requirements for fair value measurements. The amendments in this ASU are effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, with early adoption permitted. The Company does not expect the adoption of this ASU to have a material impact on its financial statements and related disclosures.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments – Credit Losses* (Topic 326): Measurement of Credit Losses on Financial Instruments, as clarified in ASU No. 2019-04 and ASU No. 2019-05. This guidance will require companies to recognize an allowance for credit losses on available-for-sale debt securities rather than the current approach of recording a reduction to the carrying value of the asset. The ASU is effective for fiscal years beginning after December 15, 2019 and interim periods therein. Early adoption is permitted for annual periods beginning after December 15, 2018 and interim periods therein. The Company is currently evaluating the effects of this ASU on its financial statements and related disclosures and does not expect there to be a material impact.

**3. Fair Value Measurements**

The Company measures and reports certain financial instruments as assets and liabilities at fair value on a recurring basis. The Company's financial assets measured at fair value on a recurring basis were as follows (in thousands):

| | December 31, 2019 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Cash equivalents | | | | |
| Money market funds | $ 35,935 | $ — | $ — | $ 35,935 |
| Total cash equivalents | 35,935 | — | — | 35,935 |
| Marketable securities | | | | |
| U.S. treasuries | 457,534 | — | — | 457,534 |
| Total marketable securities | 457,534 | — | — | 457,534 |
| Total cash equivalents and marketable securities | $ 493,469 | $ — | $ — | $ 493,469 |

| | December 31, 2018 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Cash equivalents | | | | |
| Money market funds | $ 31,555 | $ — | $ — | $ 31,555 |
| Total cash equivalents | 31,555 | — | — | 31,555 |
| Marketable securities | | | | |
| U.S. treasuries | 145,246 | — | — | 145,246 |
| Total marketable securities | 145,246 | — | — | 145,246 |
| Total cash equivalents and marketable securities | $ 176,801 | $ — | $ — | $ 176,801 |

The Company evaluates transfers between levels at the end of each reporting period. There were no transfers of assets or liabilities between levels during the years ended December 31, 2019 and 2018.

**4. Marketable Securities**

All marketable securities were considered available-for-sale at December 31, 2019 and 2018. The amortized cost, gross unrealized holding gains or losses, and fair value of the Company's marketable securities by major security type are summarized in the table below (in thousands):

| | December 31, 2019 | | | |
| | Amortized Cost Basis | Unrealized Gains | Unrealized Losses | Fair Value |
|---|---|---|---|---|
| Available-for-sale securities | | | | |
| U.S. treasuries classified as investments | $ 457,397 | $ 161 | $ (24) | $ 457,534 |
| Total | $ 457,397 | $ 161 | $ (24) | $ 457,534 |

| | December 31, 2018 | | | |
| | Amortized Cost Basis | Unrealized Gains | Unrealized Losses | Fair Value |
|---|---|---|---|---|
| Available-for-sale securities | | | | |
| U.S. treasuries classified as investments | $ 145,261 | $ — | $ (15) | $ 145,246 |
| Total | $ 145,261 | $ — | $ (15) | $ 145,246 |

The amortized cost of available-for-sale securities is adjusted for amortization of premiums and accretion of discounts to maturity. As of December 31, 2019 and 2018, the aggregate fair value of securities held by the Company in an unrealized loss position for less than twelve months was $187.4 million and $132.2 million, respectively. All of these securities had remaining maturities of less than one year. The Company has the intent and

106

ability to hold such securities until recovery and has determined that there has been no material change to their credit risk. As a result, the Company determined it did not hold any investments with any other-than-temporary impairment as of December 31, 2019 and 2018.

There were no material realized gains or losses recognized on the sale or maturity of available-for-sale securities during the years ended December 31, 2019 or 2018, and as a result, there were no material reclassifications out of accumulated other comprehensive gain (loss) for the same periods.

## 5. Balance Sheet Components and Supplemental Disclosures

### *Property and Equipment, Net*

Property and equipment, net, consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Laboratory equipment | $ 4,170 | $ 3,272 |
| Furniture and office equipment | 1,695 | 1,666 |
| Leasehold improvements | 4,581 | 4,545 |
| | 10,446 | 9,483 |
| Less accumulated depreciation | (2,036) | (635) |
| Property and equipment, net | $ 8,410 | $ 8,848 |

Depreciation and amortization expense for the years ended December 31, 2019, 2018 and 2017 was $1.5 million, $0.2 million and $0.2 million, respectively.

### *Accrued Expenses and Other Current Liabilities*

Accrued expenses and other current liabilities consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Accrued contract research and development expense | $ 4,990 | $ 1,866 |
| Accrued compensation and benefits expense | 1,608 | 1,041 |
| Lease liability, current | 410 | — |
| Lease incentive obligation, current | — | 123 |
| Other current liabilities | 90 | 134 |
| Total | $ 7,098 | $ 3,164 |

## 6. Commitments and Contingencies

### *Lease Obligations*

The Company's lease obligations primarily relate to leased office and laboratory space under noncancelable operating leases.

In January 2018, the Company entered into a lease agreement for approximately 25,000 square feet of office and laboratory space in Redwood City, California (the "2018 Redwood City Lease"). The 2018 Redwood City Lease includes a contractual lease term commencing upon substantial completion and delivery of the premises, which occurred in November 2018. The Company subsequently terminated its previous lease agreement for office and laboratory space in San Carlos, California (the "2015 San Carlos Lease").

The base term of the 2018 Redwood City Lease is 10.75 years and contains a one-time option to extend the lease term for five years. This option to extend the lease term has not been included in the Company's calculations under ASC 842 as the exercise of the option is highly uncertain and therefore deemed not probable.

The 2018 Redwood City Lease also included a $1.4 million tenant improvement allowance that has been applied to the total cost of tenant improvements made to the leased premises. Tenant improvement allowances received under the 2018 Redwood City Lease were recorded as leasehold improvements with an offsetting adjustment included in the Company's calculation of its right-of-use asset under ASC 842. Leasehold improvements are depreciated over the term of the lease.

In December 2019, the Company entered into an additional lease agreement for approximately 98,000 square feet of office and laboratory space in San Carlos, California (the "2019 San Carlos Lease"). The 2019 San Carlos Lease provides for certain limited rent abatement and annual scheduled rent increases over the contractual lease term. The contractual lease term is expected to commence in November 2020 and terminate in August 2031. Future minimum rental payments under the 2019 San Carlos Lease total $77.6 million, which does not include rental payments related to the Company's one-time option to extend for an additional five years. There was no right-of-use asset or lease liability reflected on the balance sheet as of December 31, 2019 for the 2019 San Carlos Lease as the Company has not yet obtained possession of the space.

The 2018 Redwood City Lease and the 2019 San Carlos Lease required security deposits of $0.8 million and $1.5 million, respectively, which the Company satisfied by establishing letters of credit secured by restricted cash. Restricted cash related to the Company's lease agreements are recorded in other long-term assets on the Company's balance sheets.

As described in Note 2, the Company adopted ASC 842 effective January 1, 2019. In accordance with ASC 842, the Company has performed an evaluation of its other contracts with vendors and has determined that, except for the leases described above, none of its other contracts contain a lease.

Classification of the Company's lease liabilities included on the Balance Sheet at December 31, 2019 was as follows (in thousands):

| Operating lease liabilities | | |
|---|---|---|
| Current portion included in accrued expenses and other current liabilities | $ | 410 |
| Non-current portion included in other long-term liabilities | | 8,112 |
| Total operating lease liabilities | $ | 8,522 |

The components of lease costs, which are included in operating expenses in the Company's statements of operations and comprehensive loss were as follows (in thousands):

| | Year ended December 31, 2019 | |
|---|---|---|
| Operating lease cost | $ | 1,118 |
| Variable cost | | 346 |
| Total lease costs | $ | 1,464 |

In addition to the minimum future lease commitments presented below, the lease requires the Company to pay property taxes, insurance, maintenance and repair costs. Rent expense is recognized using the straight-line method over the respective terms. The Company records a deferred rent liability calculated as the difference between rent expense and cash rental payments. The current portion of the liability is included within accrued expenses and other current liabilities on the Company's balance sheets. The remaining non-current portion is classified in other long-term liabilities.

Future minimum lease payments required under operating leases included on the Company's Balance Sheet at December 31, 2019 are as follows (in thousands):

| Fiscal Year Ending December 31, | | |
|---|---|---:|
| 2020 | $ | 1,233 |
| 2021 | | 1,270 |
| 2022 | | 1,308 |
| 2023 | | 1,348 |
| 2024 | | 1,388 |
| Thereafter | | 6,916 |
| Total minimum future lease payments [1] | | 13,463 |
| Less: | | |
| Present value adjustment | | 4,941 |
| Operating lease liabilities | $ | 8,522 |

[1]   Excludes minimum future lease payments of $77.6 million related to the Company's 2019 San Carlos Lease.

Net rent expense was $1.1 million, $1.0 million and $0.5 million for the years ended December 31, 2019, 2018 and 2017, respectively.

Operating lease liabilities are based on the net present value of the remaining lease payments over the remaining lease term. In determining the present value of lease payments, the Company used its incremental borrowing rate based on the information available at the lease commencement date. As of December 31, 2019, the remaining lease term is 9.6 years and the discount rate used to determine the operating lease liability was 10.0%.

As of December 31, 2019, the Company is not party to any lease agreements containing material residual value guarantees or material restrictive covenants.

### Purchase Obligations

The Company has entered into contractual agreements with various research and development organizations and suppliers in the normal course of its business. All contracts are terminable, with varying provisions regarding termination. If a contract were to be terminated, the Company would only be obligated for the products or services that the Company had received through the time of termination as well as any noncancelable minimum payments contractually agreed upon prior to the effective date of termination. In the case of terminating a clinical trial agreement with an investigational site conducting clinical activities on behalf of the Company, the Company would also be obligated to provide continued support for appropriate safety procedures through completion or termination of the associated study. As of December 31, 2019, the Company had $8.7 million of noncancelable purchase obligations under these agreements.

### In-Licensing Agreements

The Company has entered into exclusive and non-exclusive, royalty bearing license agreements with third-parties for certain intellectual property. Under the terms of the license agreements, the Company is obligated to pay milestone payments upon the achievement of specified clinical, regulatory and commercial milestones. Actual amounts due under the license agreements will vary depending on factors including, but not limited to, the number of products developed and the Company's ability to further develop and commercialize the licensed products. The Company is also subject to future royalty payments based on sales of the licensed products. In-licensing payments to third-parties for milestones are recognized as research and development expense in the period of achievement.

The Company did not incur any milestone expense for the years ended December 31, 2019 and 2017. The Company recognized $0.3 million in milestone expense for the years ended December 31, 2018. Milestone payments are not creditable against royalties. As of December 31, 2019, the Company has not incurred any royalty liabilities related to its license agreements, as product sales have not yet commenced.

*Exclusive License Agreement with The Johns Hopkins University*

In December 2013, the Company entered into a license agreement with The Johns Hopkins University ("JHU") for a worldwide exclusive license to develop, use, manufacture and commercialize covered product candidates including antolimab (AK002), which was amended in September 30, 2016. Under the terms of the agreement, the Company has made upfront and milestone payments of $0.3 million through December 31, 2019 and may be required to make aggregate additional milestone payments of up to $4.0 million. The Company also issued 88,887 shares of common stock as consideration under the JHU license agreement. In addition to milestone payments, the Company is also subject to single-digit royalties to JHU based on future net sales of each licensed therapeutic product candidate by the Company and its affiliates and sublicensees, with up to a low six-digit dollar minimum annual royalty payment.

*Non-exclusive License Agreement with BioWa Inc. and Lonza Sales AG*

In October 2013, the Company entered into a tripartite agreement with BioWa Inc. ("BioWa"), and Lonza Sales AG ("Lonza"), for the non-exclusive worldwide license to develop and commercialize product candidates including antolimab (AK002) that are manufactured using a technology jointly developed and owned by BioWa and Lonza. Under the terms of the agreement, the Company has made milestone payments of $0.4 million through December 31, 2019 and may be required to make aggregate additional milestone payments of up to $41.0 million. In addition to milestone payments, the Company is also subject to minimum annual commercial license fees of $40,000 per year to BioWa until such time as BioWa receives royalty payments, as well as low single-digit royalties to BioWa and to Lonza. Royalties are based on future net sales by the Company and its affiliates and sublicensees and vary dependent on Lonza's participation as sole manufacturer for commercial production.

### Indemnification Agreements

The Company has entered into indemnification agreements with certain directors and officers that require the Company, among other things, to indemnify them against certain liabilities that may arise by reason of their status or service as directors or officers. To date, no such matters have arisen and the Company does not believe that the outcome of any claims under indemnification arrangements will have a material adverse effect on its financial positions, results of operations or cash flows. Accordingly, the Company has not recorded a liability related to such indemnifications at December 31, 2019.

### 7. Stockholders' Equity

The Company's amended and restated certificate of incorporation filed on July 23, 2018 authorizes the issuance of a total of 220,000,000 shares of stock. Of these shares, 200,000,000 are designated as common stock and 20,000,000 are designated as preferred stock.

### Common Stock

There were 48,667,809 shares of common stock issued and outstanding at December 31, 2019. Common shares reserved for future issuance upon the exercise, issuance or conversion of the respective equity instruments are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
| Exercise of common stock options outstanding | 7,148 | 7,811 |
| Shares reserved for issuance under equity incentive plans | 3,762 | 2,785 |
| Vesting of restricted stock units | 542 | — |
| Shares reserved for issuance under employee stock purchase plans | 848 | 500 |
| Total | 12,300 | 11,096 |

Common stockholders are entitled to dividends if and when declared by the Board of Directors subject to the prior rights of preferred stockholders. As of December 31, 2019, no dividends on common stock had been declared by the Board of Directors.

*Preferred Stock*

There were no shares of preferred stock issued and outstanding at December 31, 2019.

**8. Stock-Based Compensation**

Total stock-based compensation expense recognized is as follows (in thousands):

|  | Year Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Research and development | $ 5,351 | $ 1,792 | $ 175 |
| General and administrative | 10,413 | 2,778 | 227 |
| Total | $ 15,764 | $ 4,570 | $ 402 |

No income tax benefits for stock-based compensation expense have been recognized for the years ended December 31, 2019, 2018 and 2017 as a result of the Company's full valuation allowance applied to net deferred tax assets and net operating loss carryforwards.

*Equity Incentive Plans*

In July 2018, the Board of Directors adopted the 2018 Equity Incentive Plan (the "2018 Plan"). The 2018 Plan provides for the grant of incentive stock options, non-statutory stock options, restricted stock awards, restricted stock units ("RSUs"), stock appreciation rights and other stock-based awards. The Company initially reserved 4,000,000 shares of common stock for issuance under the 2018 Plan. The number of shares of common stock that may be issued under the 2018 Plan will automatically increase on each January 1, beginning with the fiscal year ending December 31, 2019, equal to the least of (i) 5,000,000 shares, (ii) 5% of the outstanding shares of common stock as of the last day of the preceding fiscal year and (iii) such other amount as the Board of Directors may determine. Stock options and RSUs granted under the 2018 Plan generally vest over four years and expire no more than 10 years from the date of grant.

Following the IPO and upon the effectiveness of the 2018 Plan, the Company's 2012 Equity Incentive Plan, as amended, (the "2012 Plan"), terminated and no further awards will be granted thereunder. All outstanding awards under the 2012 Plan will continue to be governed by their existing terms. Any shares subject to awards granted under the 2012 Plan that, on or after the termination of the 2012 Plan, expire or terminate and shares previously issued pursuant to awards granted under the 2012 Plan that, on or after the termination of the 2012 Plan, are forfeited or repurchased by the Company will be transferred into the 2018 Plan. As of December 31, 2019, the maximum number of shares that may be added to the 2018 Plan pursuant to the preceding clause is 5,276,050 shares.

Prior to its termination, the 2012 Plan provided for the grant of stock options, stock appreciation rights, restricted stock and restricted stock units to employees, directors and consultants. Stock options granted under the 2012 Plan generally vest over four years and expire no more than 10 years from the date of grant.

111

*Stock Options*

Stock option activity under the 2018 Plan and the 2012 Plan is summarized as follows (in thousands, except per share data):

| | Options Outstanding | | Weighted-Average Exercise Price | Weighted-Average Remaining Years | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Balance at December 31, 2018 | 7,811 | $ | 8.60 | 8.2 | $ | 342,292 |
| Granted | 645 | $ | 46.75 | | | |
| Exercised | (1,251) | $ | 2.11 | | | |
| Forfeited | (57) | $ | 35.60 | | | |
| Balance at December 31, 2019 | 7,148 | $ | 12.96 | 8.0 | $ | 589,114 |
| Options exercisable | 3,982 | $ | 5.10 | 7.6 | $ | 359,399 |
| Options vested and expected to vest | 7,119 | $ | 12.91 | 8.0 | $ | 587,065 |

The following weighted-average assumptions were used to calculate the fair value of stock options granted during the periods indicated:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Risk-free interest rate | 1.91% | 2.79% | 1.83% |
| Expected volatility | 67.22% | 73.47% | 77.59% |
| Expected dividend yield | — | — | — |
| Expected term (in years) | 6.01 | 6.01 | 6.08 |

The weighted-average fair value of options granted during the years ended December 31, 2019, 2018 and 2017 was $28.66, $11.05 and $0.54 per share, respectively.

The aggregate fair value of stock options that vested during the years ended December 31, 2019, 2018 and 2017 was $12.6 million, $1.8 million and $0.2 million, respectively.

The aggregate intrinsic value of stock options is calculated as the difference between the exercise price of the stock options and the fair value of the Company's common stock for those stock options that had exercise prices lower than the fair value of the Company's common stock. Following the IPO, the aggregate intrinsic value represents the value of the Company's closing stock price on the last trading day of the year in excess of the weighted-average exercise price multiplied by the number of options outstanding or exercisable. The aggregate intrinsic value of stock options exercised during the years ended December 31, 2019, 2018 and 2017 was $55.8 million, $ 2.0 million and $0.1 million, respectively.

During the years ended December 31, 2019 and 2018, the Company did not grant any stock options with performance-based or market-based vesting conditions.

As of December 31, 2019, total unrecognized stock-based compensation expense relating to unvested stock options was $41.6 million. This amount is expected to be recognized over a weighted-average period of 2.9 years.

*Restricted Stock Awards*

The 2012 Plan allows for the issuance of restricted common stock and early exercise of unvested stock options in exchange for restricted common stock. Unvested shares of restricted common stock are subject to repurchase by the Company at the original issuance price in the event of the employee's termination, either voluntarily or involuntarily. Consideration received for unvested stock-based awards is initially recorded as a liability and subsequently reclassified into stockholders' deficit as the related awards vest.

112

A summary of the restricted common stock activity during the year ended December 31, 2019 is as follows (in thousands, except per share data):

| | Number of Shares | | Weighted-Average Grant Date Fair Value |
|---|---|---|---|
| Balance at December 31, 2018 | 47 | $ | 0.43 |
| Vested | (47) | $ | 0.43 |
| Balance at December 31, 2019 | — | $ | — |

The fair value of restricted common stock that vested during the years ended December 31, 2019 and 2018 was $20,000 and $24,000, respectively.

There were no unvested shares of restricted common stock at December 31, 2019.

*Restricted Stock Units*

RSU activity under the 2018 Plan is summarized as follows (in thousands, except per share data):

| | Number of Shares | | Weighted-Average Grant Date Fair Value |
|---|---|---|---|
| Balance at December 31, 2018 | — | $ | — |
| Granted | 542 | $ | 93.67 |
| Balance at December 31, 2019 | 542 | $ | 93.67 |

The weighted-average fair value of RSUs granted during the year ended December 31, 2019 was $93.67. No RSUs were granted during the years ended December 31, 2018 and 2017.

As of December 31, 2019, total unrecognized stock-based compensation expense relating to unvested RSUs was $48.7 million and the weighted-average remaining vesting period was 3.9 years.

The aggregate intrinsic value of RSUs is calculated as the closing price per share of the Company's common stock on the last trading day of the fiscal period, multiplied by the number of RSUs expected to vest as of December 31, 2019. As of December 31, 2019, the aggregate intrinsic value of RSUs was $51.7 million

113

*Employee Stock Purchase Plan*

In July 2018, the Company's Board of Directors and stockholders approved the 2018 Employee Stock Purchase Plan (the "2018 ESPP"). There were 500,000 shares of common stock initially reserved for issuance under the 2018 ESPP. The number of shares of common stock that may be issued under the 2018 ESPP shall automatically increase on each January 1, beginning with the fiscal year ending December 31, 2019, equal to the least of (i) 1,000,000 shares, (ii) 1% of the outstanding shares of common stock as of the last day of the immediately preceding fiscal year and (iii) such other amount determined by the 2018 ESPP administrator. Under the 2018 ESPP, employees may purchase shares of the Company's common stock at a price per share equal to 85% of the lower of the fair market value of the common stock on the first trading day of the offering period or on the exercise date. The 2018 ESPP provides for consecutive, overlapping 24-month offering periods, each of which will include purchase periods. The first offering period commenced on July 18, 2018 and will end on the first trading day on or before August 15, 2020. The second and third offering periods commenced on February 15, 2019 and August 16, 2019, respectively.

During the year ended December 31, 2019 and 2018, stock-based compensation related to the 2018 ESPP was $0.7 million and $0.2 million, respectively.

The following weighted-average assumptions were used to calculate the fair value of ESPP shares during the periods indicated:

|  | Year Ended December 31, | |
|  | 2019 | 2018 |
|---|---|---|
| Risk-free interest rate | 2.37% | 2.42% |
| Expected volatility | 64.26% | 65.92% |
| Expected dividend yield | — | — |
| Expected term (in years) | 1.22 | 1.24 |

As of December 31, 2019, total unrecognized compensation expense relating to shares to be purchased under ESPP was $0.6 million over a weighted-average period of 1.0 years.

## 9. Income Taxes

The Company's deferred income tax assets include operating losses and tax credit carryforwards, as well as certain temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Total deferred income tax assets, net of valuation allowance, at December 31, 2019 and 2018 were as follows (in thousands):

|  | December 31, | | | |
|  | 2019 | | 2018 | |
|---|---|---|---|---|
| Deferred tax assets |  |  |  |  |
| Net operating loss carryforwards | $ | 47,003 | $ | 24,091 |
| Research and development credits |  | 8,644 |  | 3,995 |
| Accruals and reserves |  | 1,199 |  | 260 |
| Stock-based compensation |  | 2,870 |  | 611 |
| Lease liability |  | 1,798 |  | — |
| Gross deferred tax assets |  | 61,514 |  | 28,957 |
| Less: valuation allowance |  | (59,901) |  | (28,892) |
| Deferred tax assets, net of valuation allowance |  | 1,613 |  | 65 |
| Deferred tax liabilities |  |  |  |  |
| Fixed and intangible assets |  | 395 |  | 65 |
| Right-of-use asset |  | 1,218 |  | — |
| Gross deferred tax liabilities |  | 1,613 |  | 65 |
| Net deferred tax assets | $ | — | $ | — |

114

Management has evaluated the positive and negative evidence surrounding the realizability of its deferred tax assets and has determined that it is more likely than not that the Company will not recognize the benefits of its federal and state deferred tax assets, and as a result, a valuation allowance of $59.9 million and $28.9 million has been established at December 31, 2019 and 2018, respectively. The change in the valuation allowance was $31.0 million and $10.8 million for the years ended December 31, 2019 and 2018, respectively. The Company has incurred net operating losses ("NOL") since inception. As of December 31, 2019, the Company had federal and state NOL carryforwards of $210.2 million and $42.4 million, respectively. Federal NOL carryforwards of $148.3 million, which were generated after December 31, 2017, do not expire. The remaining $61.9 million of Federal NOL carryforwards expire beginning in 2032. As of December 31, 2019, the Company had federal and California research and other tax credit carryforwards of $8.8 million and $4.0 million, respectively. The federal tax credits expire beginning in 2033. The California tax credits can be carried forward indefinitely.

The Internal Revenue Code of 1986, as amended (the "Code"), provides for a limitation of the annual use of net operating losses and other tax attributes (such as research and development tax credit carryforwards) following certain ownership changes defined by the Code that could limit the Company's ability to utilize these carryforwards in the future. At this time, the Company has not completed a study to assess whether an ownership change under Section 382 of the Code has occurred, or whether there have been multiple ownership changes since the Company's formation. The Company may have experienced ownership changes, as defined by the Code, as a result of past financing transactions and may not be able to take full advantage of these carryforwards for federal or state income tax purposes.

The effective tax rate for the years ended December 31, 2019 and 2018 is different from the federal statutory rate primarily due to the valuation allowance against deferred tax assets as a result of insufficient income. The Company's effective tax rate differs from the federal statutory tax rate as follows:

|  | Year Ended December 31, | |
|  | 2019 | 2018 |
|---|---|---|
| Federal statutory tax rate | 21.0% | 21.0% |
| Change in deferred tax asset valuation allowance | (36.4)% | (24.8)% |
| State taxes, net of federal benefit | 1.1% | 0.9% |
| Research and development tax credits | 4.4% | 3.3% |
| Stock-based compensation | 9.9% | (0.2)% |
| Other | —% | (0.2)% |
| Effective tax rate | —% | —% |

*Uncertain Tax Positions*

The Company accounts for its uncertain tax positions in accordance with FASB ASC Topic No. 740-10, *Accounting for Uncertainty in Income Taxes* ("ASC 740-10"). Per ASC 740-10, the Company determines its uncertain tax positions based on a determination of whether and how much of a tax benefit taken by the Company in its tax filings is more likely than not to be sustained upon examination by the relevant income tax authorities.

A reconciliation of the beginning and ending amount of unrecognized benefits is as follows (in thousands):

|  | Year Ended December 31, | | | |
|  | 2019 | | 2018 | |
|---|---|---|---|---|
| Balance at the beginning of the year | $ | 1,827 | $ | 1,149 |
| Increase related to current year tax positions |  | 1,718 |  | 678 |
| Balance at the end of the year | $ | 3,545 | $ | 1,827 |

The entire amount of the unrecognized tax benefits would not impact the Company's effective tax rate if recognized. During the years ended December 31, 2019 and 2018, the Company did not recognize accrued interest

115

and penalties related to unrecognized tax benefits. The Company does not anticipate that the amount of existing unrecognized tax benefits will significantly increase or decrease during the next twelve months.

The Company files income tax returns in the U.S. federal and California tax jurisdictions. The federal and state income tax returns from inception to December 31, 2019 remain subject to examination.

It is the Company's policy to include penalties and interest expense related to income taxes as a component of the income tax provision as necessary. Management determined that no accrual for interest and penalties was required at December 31, 2019 and 2018. Since the Company is in a loss carryforward position, it is generally subject to examination by the U.S. federal, state and local income tax authorities for all tax years in which a loss carryforward is available.

*Recent Changes to U.S. Tax Law*

In December 2017, the 2017 Tax Cuts and Jobs Act (the "2017 Tax Act") was enacted and includes a broad range of provisions, many of which differ significantly from those contained in previous U.S. tax law. The Company accounts for changes in tax law in accordance with ASC 740 which requires companies to recognize the effect of such changes in the period of enactment. However, the SEC staff issued Staff Accounting Bulletin 118 which will allow companies to record provisional amounts during a measurement period that is similar to the measurement period used when accounting for business combinations. Accordingly, the Company adjusted its deferred taxes and related valuation allowances on a provisional basis to reflect the reduction in U.S. federal corporate tax rate from 35% to 21%, based on current understanding of the new law. As of December 31, 2018, the Company has completed its analysis of the income effects of the 2017 Tax Act. There was no material impact on the Company's financial statements as a result of the analysis.

## 10. Defined Contribution Plans

In July 2013, the Company established a Savings Incentive Match Plan (the "SIMPLE IRA plan") for its employees, allowing for both employee and employer contributions for those employees who meet defined minimum age and service requirements. The SIMPLE IRA plan allows participants to defer a portion of their annual compensation on a pretax basis. During the year ended December 31, 2017, the Company made contributions to the SIMPLE IRA plan of $0.1 million.

In January 2018, the Company terminated and replaced the SIMPLE IRA with a defined contribution plan under Section 401(k) of the Internal Revenue Code (the "401(k) plan"). The 401(k) plan covers all employees who meet defined minimum age and service requirements. Employee contributions are voluntary and are determined on an individual basis, limited to the maximum amount allowable under U.S. federal tax regulations. The Company makes matching contributions of up to 4% of the eligible employees' compensation to the 401(k) plan. During the years ended December 31, 2019 and 2018, the Company made contributions to the 401(k) plan of $0.5 million and $0.3 million, respectively.

## 11. Selected Quarterly Financial Data (Unaudited)

The following tables summarize the Company's quarterly results for the years ended December 31, 2019 and 2018 (in thousands, except per share data):

| | Quarter Ended | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **2019** | **March 31, 2019** | | **June 30, 2019** | | **September 30, 2019** | | **December 31, 2019** | |
| Loss from operations | $ | (20,927) | $ | (20,057) | $ | (23,584) | $ | (26,850) |
| Net loss | $ | (19,953) | $ | (19,072) | $ | (21,732) | $ | (24,615) |
| Net loss per common share, basic and diluted | $ | (0.47) | $ | (0.44) | $ | (0.47) | $ | (0.51) |

116

| 2018 | Quarter Ended | | | |
|---|---|---|---|---|
| | March 31, 2018 | June 30, 2018 | September 30, 2018 | December 31, 2018 |
| Loss from operations | $ (8,709) | $ (9,524) | $ (11,975) | $ (15,513) |
| Net loss | $ (8,485) | $ (9,377) | $ (11,148) | $ (14,528) |
| Net loss per common share, basic and diluted | $ (4.19) | $ (4.17) | $ (0.34) | $ (0.35) |

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

As of December 31, 2019, our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to management, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2019, the design and operation of our disclosure controls and procedures were effective at the reasonable assurance level.

*Management's Annual Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of the financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

Our management, with the participation of our principal executive officer and principal financial officer, conducted an evaluation of the effectiveness of our internal control over financial reporting based on criteria established in the *Internal Control–Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2019.

The effectiveness of our internal control over financial reporting as of December 31, 2019 has also been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in its report included in this Annual Report on Form 10-K.

*Inherent Limitations on the Effectiveness of Internal Control*

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

*Changes in Internal Control over Financial Reporting*

There was no significant change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the fourth quarter

of the year ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

118

To the Stockholders and the Board of Directors of Allakos Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Allakos Inc.'s internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Allakos Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the balance sheets of the Company as of December 31, 2019 and 2018, the related statements of operations and comprehensive loss, statements of convertible preferred stock and stockholders' equity (deficit) and cash flows for each of the three years in the period ended December 31, 2019, and the related notes and our report dated February 25, 2020 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Redwood City, California
February 25, 2020

**Item 9B. Other Information.**

None.

120

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance.**

The information required under this item is incorporated herein by reference to our definitive proxy statement pursuant to regulation 14A, or the Proxy Statement, which proxy statement is expected to be filed with Securities and Exchange Commission not later than 120 days after the close of our fiscal year ended December 31, 2019.

**Item 11. Executive Compensation.**

The information required by this item will be set forth in the Proxy Statement and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The information required by this item will be set forth in the Proxy Statement and is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

The information required by this item will be set forth in the Proxy Statement and is incorporated herein by reference.

**Item 14. Principal Accounting Fees and Services.**

The information required by this item will be set forth in the Proxy Statement and is incorporated herein by reference.

121

**Item 15. Exhibits, Financial Statement Schedules.**

(a)    The following documents are filed as part of this Annual Report on Form 10-K:

    (1)    Financial Statements

        See Index to Financial Statements included in Part II Item 8 of this Annual Report on Form 10-K

    (2)    Financial Statement Schedules

        All schedules are omitted because they are not applicable or the required information is shown in the financial statements or notes thereto.

    (3)    List of Exhibits required by Item 601 of Regulation S-K

| Exhibit Number | Description | Form | File No. | Number | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| | | | Incorporated by Reference | | | |
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant. | 8-K | 001-38582 | 3.1 | 7/24/2018 | |
| 3.2 | Amended and Restated Bylaws of the Registrant. | 8-K | 001-38582 | 3.2 | 7/24/2018 | |
| 4.2 | Specimen common stock certificate of the Registrant. | S-1/A | 333-225836 | 4.2 | 7/09/2018 | |
| 10.1+ | Form of Indemnification Agreement between the Registrant and each of its directors and executive officers. | S-1 | 333-225836 | 10.1+ | 6/22/2018 | |
| 10.2+ | 2012 Equity Incentive Plan, as amended, and forms of agreement thereunder. | S-1 | 333-225836 | 10.2+ | 6/22/2018 | |
| 10.3+ | 2018 Equity Incentive Plan and forms of agreements thereunder. | S-1/A | 333-225836 | 10.3+ | 7/09/2018 | |
| 10.4+ | 2018 Employee Stock Purchase Plan. | S-1/A | 333-225836 | 10.4 | 7/09/2018 | |
| 10.5+ | Employment Letter between the Registrant and Robert Alexander, Ph.D. | S-1/A | 333-225836 | 10.5+ | 7/09/2018 | |
| 10.6+ | Employment Letter between the Registrant and Adam Tomasi, Ph.D. | S-1/A | 333-225836 | 10.6+ | 7/09/2018 | |
| 10.7+ | Employment Letter between the Registrant and Henrik Rasmussen, M.D., Ph.D. | S-1/A | 333-225836 | 10.7+ | 7/09/2018 | |
| 10.8+ | Employment Letter between the Registrant and Leo Redmond | 10-Q | | 10.8+ | 8/05/2019 | |
| 10.9+ | Executive Incentive Compensation Plan. | S-1 | 333-225836 | 10.9+ | 6/22/2018 | |
| 10.10+ | Outside Director Compensation Policy. | S-1/A | 333-225836 | 10.10+ | 7/09/2018 | |
| 10.11+ | Change in Control and Severance Policy. | S-1/A | 333-225836 | 10.11+ | 7/09/2018 | |
| 10.12 | Lease Agreement between the Registrant and Westport Office Park, LLC, dated January 4, 2018, as amended. | S-1 | 333-225836 | 10.12 | 6/22/2018 | |
| 10.13* | Lease Agreement between the Registrant and ARE-San Francisco No. 63, LLC, dated December 4, 2019. | | | | | X |

122

| | | | | | | |
|---|---|---|---|---|---|---|
| 10.14# | Non-exclusive License Agreement between the Registrant, BioWa, Inc. and Lonza Sales AG, dated October 31, 2013. | S-1/A | 333-225836 | 10.14# | 7/17/2018 | |
| 10.15# | Amended and Restated Exclusive License Agreement between the Registrant and the Johns Hopkins University, dated September 30, 2016. | S-1/A | 333-225836 | 10.15# | 7/17/2018 | |
| 23.1* | Consent of Independent Registered Public Accounting Firm. | | | | | X |
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 32.1** | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 32.2** | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | | | | | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | | | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | | | X |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | | | | | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | | | X |
| 104 | Cover Page Interactive Data File (formatted in Inline XBRL) | | | | | X |

---

\*     Filed herewith.
\*\*    Furnished herewith.
+      Indicated management contract or compensatory plan.
#     Portions of this exhibit (indicated by asterisks) have been omitted pursuant to a request for confidential treatment and this exhibit has been filed separately with the SEC.

123

**Item 16. Form 10-K Summary**

None.

124

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized**.**

ALLAKOS INC.

Date: February 25, 2020                                   By:           /s/ Robert Alexander

**Robert Alexander, Ph.D.**
**Chief Executive Officer**
**(Principal Executive Officer)**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Robert Alexander<br>**Robert Alexander, Ph.D.** | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 25, 2020 |
| /s/ Leo Redmond<br>**Leo Redmond** | Chief Financial Officer<br>*(Principal Financial and Accounting Officer)* | February 25, 2020 |
| /s/ Adam Tomasi<br>**Adam Tomasi, Ph.D.** | President and Chief Operating Officer | February 25, 2020 |
| /s/ Daniel Janney<br>**Daniel Janney** | Chair of the Board | February 25, 2020 |
| /s/ Robert Andreatta<br>**Robert Andreatta** | Director | February 25, 2020 |
| /s/ Steve James<br>**Steve James** | Director | February 25, 2020 |
| /s/ John McKearn<br>**John McKearn, Ph.D.** | Director | February 25, 2020 |
| /s/ Paul Walker<br>**Paul Walker** | Director | February 25, 2020 |

125

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is made this 4th day of December, 2019, between **ARE-SAN FRANCISCO NO. 63, LLC**, a Delaware limited liability company ("**Landlord**"), and **ALLAKOS INC.**, a Delaware corporation ("**Tenant**").

**Building:** That certain to-be-constructed 6-story building to be known as 825 Industrial Road, San Carlos, California

**Premises:** A portion of the Building consisting of the entire 5th floor and the entire 6th floor, containing approximately 98,133 rentable square feet, as shown on **Exhibit A**, subject to re-measurement and adjustment pursuant to Section 5 hereof.

**Project:** The real property on which the Building in which the Premises are located, together with all improvements thereon and appurtenances thereto as described on **Exhibit B**.

**Base Rent:** $5.75 per rentable square foot of the Premises per month, subject to adjustment pursuant to Section 4 hereof.

**Rentable Area of Premises:** 98,133 sq. ft., subject to adjustment pursuant to Section 5 hereof.

**Rentable Area of Building:** 282,190 sq. ft., subject to adjustment pursuant to Section 5 hereof.

**Rentable Area of Project:** 526,178 sq. ft., subject to adjustment pursuant to Section 5 hereof.

**Tenant's Share of Operating Expenses of Building:** 34.77%, subject to adjustment pursuant to Section 5 hereof.

**Building's Share of Project:** 53.63% sq. ft., subject to adjustment pursuant to Section 5 hereof.

**Security Deposit:** $1,472,475.00 **Target Commencement Date:** November 1, 2020

**Rent Adjustment Percentage:** 3%

**Base Term:** Beginning on the Commencement Date and ending 123 months from the first day of the first full month following the Rent Commencement Date. For clarity, if the Rent Commencement Date occurs on the first day of a month, the expiration of the Base Term shall be measured from that date. If the Rent Commencement Date occurs on a day other than the first day of a month, the expiration of the Base Term shall be measured from the first day of the following month.

**Permitted Use:** Research and development laboratory, related office and other related uses consistent with the character of the Project and otherwise in compliance with the provisions of Section 7 hereof.

**Address for Rent Payment:**
P.O Box 975383
Dallas, TX 75397-5383

**Landlord's Notice Address:**
26 North Euclid Avenue
Pasadena, CA 91101
Attention: Corporate Secretary

 Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW    Document 34-1    Filed 11/25/20    Page 130 of 396

**Tenant's Notice Address**

**Prior to the Commencement Date:**
975 Island Drive, Suite 201
Redwood City, California 94065
Attention: Adam Tomasi, President and COO

**Tenant's Notice Address**

**After the Commencement Date:**
825 Industrial Road, 5th Floor
San Carlos, California 94070
Attention: Lease Administrator

The following Exhibits and Addenda are attached hereto and incorporated herein by this reference:

[X] **EXHIBIT A** - PREMISES DESCRIPTION          [X] **EXHIBIT B** - DESCRIPTION OF PROJECT
[X] **EXHIBIT C** - WORK LETTER                   [X] **EXHIBIT D** - COMMENCEMENT DATE
[X] **EXHIBIT E** - RULES AND REGULATIONS         [X] **EXHIBIT F** - TENANT'S PERSONAL PROPERTY

1.          **Lease of Premises**.  Upon and subject to all of the terms and conditions hereof, Landlord hereby leases the Premises to Tenant and Tenant hereby leases the Premises from Landlord.  The portions of the Project which are for the non-exclusive use of tenants of the Project are collectively referred to herein as the "**Common Areas**."  Tenant shall have the non-exclusive right during the Term to use the Common Areas along with others having the right to use the Common Areas. Landlord reserves the right to modify Common Areas, provided that such modifications do not materially adversely affect Tenant's access to or use of the Premises for the Permitted Use. From and after the Commencement Date through the expiration of the Term, Tenant shall have access to the Building and the Premises 24 hours a day, 7 days a week, except in the case of emergencies, as the result of Legal Requirements, the performance by Landlord of any installation, maintenance or repairs, or any other temporary interruptions, and otherwise subject to the terms of this Lease.

2.          **Delivery; Acceptance of Premises; Commencement Date**.  Landlord shall use reasonable efforts to deliver the Premises ("**Delivery**" or "**Deliver**") for Tenant's construction of the Tenant Improvements pursuant to the Work Letter in Tenant Improvement Work Readiness Condition on or before the Target Commencement Date. If Landlord fails to timely Deliver the Premises, Landlord shall not be liable to Tenant for any loss or damage resulting therefrom, and this Lease shall not be void or voidable except as provided herein.  Notwithstanding anything to the contrary contained herein, if Landlord fails to Deliver the Premises to Tenant on or before the date that is 90 days after the Target Commencement Date (as such date may be extended for Force Majeure delays, the "**Abatement Date**"), then, commencing immediately following the Abatement Period (as defined below), Base Rent shall be abated 1 day for each day from and including the Abatement Date (as such date may be amended for Force Majeure) that Landlord fails to Deliver the Premises to Tenant.  If Landlord does not Deliver the Premises within 150 days of the Target Commencement Date for any reason other than no more than six (6) months of Force Majeure delays, this Lease may be terminated by Tenant by written notice to Landlord, and if so terminated by Tenant:  (a) the Security Deposit, or any balance thereof (i.e., after deducting therefrom all amounts to which Landlord is entitled under the provisions of this Lease), shall be returned to Tenant, and (b) neither Landlord nor Tenant shall have any further rights, duties or obligations under this Lease, except with respect to provisions which expressly survive termination of this Lease.  As used herein, the terms "**Tenant Improvements**" and "**Tenant Improvement Work Readiness Condition**" shall have the meanings set forth for such terms in the Work Letter.  If Tenant does not elect to void this Lease within 5 business days of the lapse of such 150 day period (as extended for Force Majeure as provided for above), such right to void this Lease shall be waived and this Lease shall remain in full force and effect.

The "**Commencement Date**" shall be the date that Landlord Delivers the Premises to Tenant for Tenant's construction of the Tenant Improvements pursuant to the Work Letter.  The "**Rent Commencement Date**" shall be the earlier to occur of (i) the date that is 9 months after the Commencement Date, or (ii) the date that the Tenant Improvements are Substantially Completed (as defined in the Work Letter); provided, however, if the Rent Commencement Date occurs prior to the date that Landlord's Work is substantially completed, then the Rent Commencement Date shall be delayed until the date Landlord substantially completes Landlord's Work.  Upon request of Landlord, Tenant shall execute and deliver a written acknowledgment of the Commencement Date, the Rent Commencement Date and the expiration date of the Term when such are established in the form of the "Acknowledgement of Commencement Date"


Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 131 of 396

attached to this Lease as **Exhibit D**; provided however, Tenant's failure to execute and deliver such acknowledgment shall not affect Landlord's rights hereunder.  The "**Term**" of this Lease shall be the Base Term, as defined above on the first page of this Lease and the Extension Term which Tenant may elect pursuant to Section 40 hereof.

Except as set forth in the Work Letter:  (i) Tenant shall accept the Premises in their condition as of the Commencement Date; (ii) Landlord shall have no obligation for any defects in the Premises; and (iii) Tenant's taking possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken.  Any occupancy of the Premises by Tenant before the Commencement Date or the Rent Commencement Date shall be subject to all of the terms and conditions of this Lease, excluding the obligation to pay Base Rent and Operating Expenses.

Tenant agrees and acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty with respect to the condition of all or any portion of the Premises or the Project, and/or the suitability of the Premises or the Project for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises or the Project are suitable for the Permitted Use.  This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof and supersedes any and all prior representations, inducements, promises, agreements, understandings and negotiations which are not contained herein.  Landlord in executing this Lease does so in reliance upon Tenant's representations, warranties, acknowledgments and agreements contained herein.

3.          **Rent**.

(a)          **Base Rent**.  The first month's Base Rent and the Security Deposit shall be due and payable on delivery of an executed copy of this Lease to Landlord.  Tenant shall pay to Landlord in advance, without demand, abatement, deduction or set-off, monthly installments of Base Rent on or before the first day of each calendar month during the Term hereof after the Rent Commencement Date, in lawful money of the United States of America, at the office of Landlord for payment of Rent set forth above, or to such other person or at such other place as Landlord may from time to time designate in writing.  Payments of Base Rent for any fractional calendar month shall be prorated.  The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations.  Tenant shall have no right at any time to abate, reduce, or set-off any Rent (as defined in Section 5) due hereunder except for any abatement or set-off as may be expressly provided in this Lease.

Notwithstanding anything contained herein to the contrary, so long as Tenant is not then in default under this Lease (beyond any applicable notice or cure periods), Base Rent shall be abated for the period commencing on the Rent Commencement Date through the date that is 90 days after the Rent Commencement Date (the "**Abatement Period**").  Tenant shall commence paying full Base Rent with respect to the entire Premises on the day immediately following the expiration of the Abatement Period.

(b)          **Additional Rent**.  In addition to Base Rent, Tenant agrees to pay to Landlord as additional rent ("**Additional Rent**"):  (i) commencing on the Rent Commencement Date, Tenant's Share of "Operating Expenses" (as defined in Section 5), and (ii) any and all other amounts Tenant assumes or agrees to pay under the provisions of this Lease, including, without limitation, any and all other sums that may become due by reason of any default of Tenant or failure to comply with the agreements, terms, covenants and conditions of this Lease to be performed by Tenant, after any applicable notice and cure period.

4.          **Base Rent Adjustments**.

(a)          **Annual Adjustments**.  Base Rent shall be increased on each annual anniversary of the Rent Commencement Date (or, if the Rent Commencement Date occurs on a date other than the first day of a calendar month, then on each annual anniversary of the first day of the full calendar month immediately following the Rent Commencement Date) (each an "**Adjustment Date**") by multiplying the Base Rent payable immediately before such Adjustment Date by the Rent Adjustment Percentage and adding the

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 132 of 396

resulting amount to the Base Rent payable immediately before such Adjustment Date. Base Rent, as so adjusted, shall thereafter be due as provided herein. Base Rent adjustments for any fractional calendar month shall be prorated.

(b) **Additional TI Allowance**. In addition to the Tenant Improvement Allowance (as defined in the Work Letter), Landlord shall, subject to the terms of the Work Letter, make available to Tenant the Additional Tenant Improvement Allowance (as defined in the Work Letter). Commencing on the first day immediately following the expiration of the Abatement Period and continuing thereafter on the first day of each month during the Base Term, Tenant shall pay the amount necessary to fully amortize the portion of the Additional Tenant Improvement Allowance actually funded by Landlord, if any, in equal monthly payments with interest at a rate of 8% per annum over the Base Term, which interest shall begin to accrue on the date that Landlord first disburses such Additional Tenant Improvement Allowance or any portion(s) thereof ("**TI Rent**"). Any TI Rent remaining unpaid as of the expiration or earlier termination of this Lease shall be paid to Landlord in a lump sum at the expiration or earlier termination of this Lease.

5. **Operating Expense Payments**. Landlord shall deliver to Tenant a written estimate of Operating Expenses for each calendar year during the Term (the "**Annual Estimate**"), which may be revised by Landlord from time to time during such calendar year. Commencing on the Rent Commencement Date and continuing thereafter on the first day of each month during the Term, Tenant shall pay Landlord an amount equal to 1/12th of Tenant's Share of the Annual Estimate. Payments for any fractional calendar month shall be prorated.

The term "**Operating Expenses**" means all costs and expenses of any kind or description whatsoever incurred or accrued each calendar year by Landlord with respect to the Project (including, without duplication, (v) Taxes (as defined in Section 9), (w) capital repairs, improvements and replacements for Permitted Capital Expenditures (as defined below) provided that the same are amortized over the useful life of such capital items consistent with GAAP (except for capital repairs, replacements and improvements to the roof, which shall be amortized over 15 years), as reasonably adjusted by Landlord to take into account, the operation of the Building and Building Systems 24 hours per day, 7 days per week and 365 days per year (provided that those Operating Expenses incurred or accrued by Landlord with respect to any capital repairs, replacements or improvements which are for the intended purpose of promoting sustainability (for example, without limitation, by reducing energy usage at the Project) (a "**Capital Sustainability Expenditure**") may be amortized over a shorter period, at Landlord's discretion, to the extent the cost of a Capital Sustainability Expenditure is offset by a reduction in Operating Expenses), (x) the cost (including, without limitation, any subsidies which Landlord may provide in connection with the common area amenities (the "**Common Area Amenities**")) of the Common Area Amenities now or hereafter located at the Project, (y) costs related to any parking structure or parking areas serving the Project and costs for transportation services (including costs associated with Landlord's operation of or participation in a shuttle service), and (z) and the costs of Landlord's third party property manager (not to exceed 3% of Base Rent) or, if there is no third party property manager, administration rent in the amount of 3% of Base Rent (provided that during the Abatement Period, Tenant shall nonetheless be required to pay administration rent each month equal to the amount of the administration rent that Tenant would have been required to pay in the absence of there being an Abatement Period)), excluding only:

(a) the original construction costs of the Project and renovation prior to the Rent Commencement Date and costs of correcting defects in such original construction or renovation;

(b) capital expenditures for expansion of the Project and capital expenditures other than Permitted Capital Expenditures;

(c) interest, principal payments of Mortgage (as defined in Section 27) debts of Landlord, financing costs and amortization of funds borrowed by Landlord, whether secured or unsecured, and all payments of base rent (but not taxes or operating expenses) under any ground lease or other underlying lease of all or any portion of the Project;

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 133 of 396

(d)          depreciation of the Project (except for capital improvements, the cost of which are includable in Operating Expenses);

(e)                    advertising, legal and space planning expenses and leasing commissions and other costs and expenses incurred in procuring and leasing space to tenants for the Project, including any leasing office maintained in the Project, free rent and construction allowances for tenants;

(f)                    legal and other expenses incurred in the negotiation or enforcement of leases;

(g)                    completing, fixturing, improving, renovating, painting, redecorating or other work, which Landlord pays for or performs for other tenants within their premises, and costs of correcting defects in such work;

(h)                    costs to be reimbursed by other tenants of the Project or Taxes to be paid directly by Tenant or other tenants of the Project, whether or not actually paid;

(i)                    salaries, wages, benefits and other compensation paid to (i) personnel of Landlord or its agents or contractors above the position of the person, regardless of title, who has day-to-day management responsibility for the Project or (ii) officers and employees of Landlord or its affiliates who are not assigned in whole or in part to the operation, management, maintenance or repair of the Project; provided, however, that with respect to any such person who does not devote substantially all of his or her employed time to the Project, the salaries, wages, benefits and other compensation of such person shall be prorated to reflect time spent on matters related to operating, managing, maintaining or repairing the Project in comparison to the time spent on matters unrelated to operating, managing, maintaining or repairing the Project;

(j)                    general organizational, administrative and overhead costs relating to maintaining Landlord's existence, either as a corporation, partnership, or other entity, including general corporate, legal and accounting expenses;

(k)                    costs (including attorneys' fees and costs of settlement, judgments and payments in lieu thereof) incurred in connection with disputes with tenants, other occupants, or prospective tenants, and costs and expenses, including legal fees, incurred in connection with negotiations or disputes with employees, consultants, management agents, leasing agents, purchasers or mortgagees of the Building;

(l)                    costs incurred by Landlord due to the violation by Landlord, its employees, agents or contractors or any tenant of the terms and conditions of any lease of space in the Project or any Legal Requirement (as defined in Section 7);

(m)                    penalties, fines or interest incurred as a result of Landlord's inability or failure to make payment of Taxes and/or to file any tax or informational returns when due, or from Landlord's failure to make any payment of Taxes required to be made by Landlord hereunder before delinquency;

(n)                    overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services in or to the Project to the extent the same exceeds the costs of such goods and/or services rendered by unaffiliated third parties on a competitive basis;

(o)                    costs of Landlord's charitable or political contributions, or of fine art maintained at the Project;

(p)                    costs in connection with services (including electricity), items or other benefits of a type which are not standard for the Project and which are not available to Tenant without specific charges therefor, but which are provided to another tenant or occupant of the Project, whether or not such other tenant or occupant is specifically charged therefor by Landlord;

(q)                    costs incurred in the sale or refinancing of the Project;

ALEXANDRIA.   Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW    Document 34-1    Filed 11/25/20    Page 134 of 396

(r) net income taxes of Landlord or the owner of any interest in the Project, franchise, capital stock, gift, estate or inheritance taxes or any federal, state or local documentary taxes imposed against the Project or any portion thereof or interest therein;

(s) reserves;

(t) any costs incurred to remove, study, test or remediate, or otherwise related to the presence of Hazardous Materials in or about the Building or the Project for which Tenant is not responsible under this Lease;

(u) (i) insurance deductibles in excess of deductibles that Tenant can demonstrate are in excess of customary deductible amounts carried by institutional owners of Class A laboratory/office buildings in the San Carlos area and (ii) the cost of any uninsured casualty to the extent Tenant's Share thereof exceeds $750,000 provided, however, Tenant's Share of any insurance deductible or uninsured casualty which Landlord is permitted to include as part of Operating Expenses exceeding $100,000 shall be amortized over a period of 10 years (with interest not to exceed 8% per annum); and

(v) any expenses otherwise includable within Operating Expenses to the extent actually reimbursed by persons other than tenants of the Project under leases for space in the Project.

"**Permitted Capital Expenditures**" shall mean capital expenditures (i) required in order to comply with Legal Requirements (other than Legal Requirements that the Building structure and Common Areas of the Project were specifically required to comply with as of the Delivery Date); (ii) intended to reduce Operating Expenses (including, without limitation, Capital Sustainability Expenditures intended to reduce Operating Expenses); (iii) following the first 120 months after the Delivery Date, intended to maintain or improve the utility, efficiency or capacity of any Building Systems, (iv) incurred in connection with replacement of any capital items (not including any replacements performed solely for cosmetic reasons) to keep the Project, Building and/or Building Systems in good working order and repair; (v) triggered by Tenant's particular use of the Premises or Tenant's Alterations; and/or (vi) incurred in connection with repairs that extend the life of any capital items. Notwithstanding the foregoing, with respect to those Permitted Capital Expenditures incurred by Landlord which are solely intended to reduce Operating Expenses, Landlord shall be limited to passing through as part of Operating Expenses each year no more than the actual annual savings of such Permitted Capital Expenditures.

Within 90 days after the end of each calendar year (or such longer period as may be reasonably required), Landlord shall furnish to Tenant a statement (an "**Annual Statement**") showing in reasonable detail: (a) the total and Tenant's Share of actual Operating Expenses for the previous calendar year, and (b) the total of Tenant's payments in respect of Operating Expenses for such year. If Tenant's Share of actual Operating Expenses for such year exceeds Tenant's payments of Operating Expenses for such year, the excess shall be due and payable by Tenant as Rent within 30 days after delivery of such Annual Statement to Tenant. If Tenant's payments of Operating Expenses for such year exceed Tenant's Share of actual Operating Expenses for such year Landlord shall pay the excess to Tenant within 30 days after delivery of such Annual Statement, except that after the expiration, or earlier termination of the Term or if Tenant is delinquent in its obligation to pay Rent, Landlord shall pay the excess to Tenant after deducting all other amounts due Landlord. Landlord's and Tenant's obligations to pay any overpayments or deficiencies due pursuant to this paragraph shall survive the expiration or earlier termination of this Lease.

The Annual Statement shall be final and binding upon Tenant unless Tenant, within 120 days after Tenant's receipt thereof, shall contest any item therein by giving written notice to Landlord, specifying each item contested and the reason therefor. If, during such 120 day period, Tenant reasonably and in good faith questions or contests the accuracy of Landlord's statement of Tenant's Share of Operating Expenses, Landlord will provide Tenant with access to Landlord's books and records relating to the operation of the Project and such information as Landlord reasonably determines to be responsive to Tenant's questions (the "**Expense Information**"). If after Tenant's review of such Expense Information, Landlord and Tenant cannot agree upon the amount of Tenant's Share of Operating Expenses, then Tenant shall have the right

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 135 of 396

to have a regionally or nationally recognized independent public accounting firm selected by Tenant and approved by Landlord (which approval shall not be unreasonably withheld or delayed), working pursuant to a fee arrangement other than a contingent fee (at Tenant's sole cost and expense), audit and/or review the Expense Information for the year in question (the "**Independent Review**").  The results of any such Independent Review shall be binding on Landlord and Tenant.  If the Independent Review shows that the payments actually made by Tenant with respect to Operating Expenses for the calendar year in question exceeded Tenant's Share of Operating Expenses for such calendar year, Landlord shall at Landlord's option either (i) credit the excess amount to the next succeeding installments of estimated Operating Expenses or (ii) pay the excess to Tenant within 30 days after delivery of such statement, except that after the expiration or earlier termination of this Lease or if Tenant is delinquent in its obligation to pay Rent, Landlord shall pay the excess to Tenant after deducting all other amounts due Landlord.  If the Independent Review shows that Tenant's payments with respect to Operating Expenses for such calendar year were less than Tenant's Share of Operating Expenses for the calendar year, Tenant shall pay the deficiency to Landlord within 30 days after delivery of such statement.  If the Independent Review shows that Tenant has overpaid with respect to Operating Expenses by more than 5% then Landlord shall reimburse Tenant for all costs incurred by Tenant for the Independent Review.  Operating Expenses for the calendar years in which Tenant's obligation to share therein begins and ends shall be prorated.  Notwithstanding anything set forth herein to the contrary, if the Building is not at least 95% occupied on average during any year of the Term, Tenant's Share of Operating Expenses for such year shall be computed as though the Building had been 95% occupied on average during such year.

"**Tenant's Share**" shall be the percentage set forth on the first page of this Lease as Tenant's Share as reasonably adjusted by Landlord for changes in the physical size of the Premises or the Project occurring thereafter.  Landlord shall, prior to the Rent Commencement Date, cause the rentable square footage of the Premises, the Building and/or the Project to be re-measured by the Architect (as defined in the Work Letter) in accordance with the Building Owners and Managers Association (ANSI/BOMA Z65.1-2017), as customarily modified for office/laboratory properties in the San Carlos area.  Such re-measurement shall be subject to Tenant's reasonable verification with an architect reasonably acceptable to Landlord.  If the actual rentable square footage of the Premises, the Building or the Project deviates from the amount specified in the definitions of "**Premises**," "**Rentable Area of Premises**," "**Rentable Area of Building**" or "**Rentable Area of Project**" on page 1 of this Lease, then, promptly following such measurement, this Lease shall be amended so as to (i) reflect the actual rentable square footage thereof in the definitions of "**Premises,**" "**Rentable Area of Premises**" and "**Rentable Area of Project**," and (ii) appropriately adjust the amount set forth in the definition of "**Tenant's Share of Operating Expenses of Building**" and "**Building's Share of Operating Expenses of Project**" which were calculated based on the rentable square footages of the Premises, Building and Project originally set forth on page 1.  Landlord may equitably increase Tenant's Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that benefits only the Premises or only a portion of the Project that includes the Premises or that varies with occupancy or use.  Base Rent, Tenant's Share of Operating Expenses and all other amounts payable by Tenant to Landlord hereunder are collectively referred to herein as "**Rent**."

6.          **Security Deposit**.  Tenant shall deposit with Landlord, upon delivery of an executed copy of this Lease to Landlord, a security deposit (the "**Security Deposit**") for the performance of all of Tenant's obligations hereunder in the amount set forth on page 1 of this Lease, which Security Deposit shall be in the form of an unconditional and irrevocable letter of credit (the "**Letter of Credit**"):  (i) in form and substance reasonably satisfactory to Landlord, (ii) naming Landlord as beneficiary, (iii) expressly allowing Landlord to draw upon it at any time from time to time by delivering to the issuer notice that Landlord is entitled to draw thereunder, (iv) issued by an FDIC-insured financial institution reasonably satisfactory to Landlord, and (v) redeemable by presentation of a sight draft in the State of California.  If Tenant does not provide Landlord with a substitute Letter of Credit complying with all of the requirements hereof at least 10 days before the stated expiration date of any then current Letter of Credit, Landlord shall have the right to draw the full amount of the current Letter of Credit and hold the funds drawn in cash without obligation for interest thereon as the Security Deposit.  The Security Deposit shall be held by Landlord as security for the performance of Tenant's obligations under this Lease.  The Security Deposit is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default.  Upon each occurrence of a Default (as defined in Section 20), Landlord may use all or any part of the Security Deposit to pay delinquent payments due under

ALEXANDRIA.   Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 136 of 396

this Lease, future rent damages under California Civil Code Section 1951.2, and the cost of any damage, injury, expense or liability caused by such Default, without prejudice to any other remedy provided herein or provided by law.  Landlord's right to use the Security Deposit under this Section 6 includes the right to use the Security Deposit to pay future rent damages following the termination of this Lease pursuant to Section 21(c) below.  Upon any use of all or any portion of the Security Deposit, Tenant shall pay Landlord on demand the amount that will restore the Security Deposit to the amount set forth on Page 1 of this Lease.  Tenant hereby waives the provisions of any law, now or hereafter in force, including, without limitation, California Civil Code Section 1950.7, which provide that Landlord may claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of Rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums reasonably necessary to compensate Landlord for any other loss or damage, foreseeable or unforeseeable, caused by the act or omission of Tenant or any officer, employee, agent or invitee of Tenant.  Upon bankruptcy or other debtor-creditor proceedings against Tenant, the Security Deposit shall be deemed to be applied first to the payment of Rent and other charges due Landlord for periods prior to the filing of such proceedings.  If Tenant shall fully perform every provision of this Lease to be performed by Tenant, the Security Deposit, or any balance thereof (i.e., after deducting therefrom all amounts to which Landlord is entitled under the provisions of this Lease), shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within 90 days after the expiration or earlier termination of this Lease.

If Landlord transfers its interest in the Project or this Lease, Landlord shall either (a) transfer any Security Deposit then held by Landlord to a person or entity assuming Landlord's obligations under this Section 6, or (b) return to Tenant any Security Deposit then held by Landlord and remaining after the deductions permitted herein.  Upon such transfer to such transferee or the return of the Security Deposit to Tenant, Landlord shall have no further obligation with respect to the Security Deposit, and Tenant's right to the return of the Security Deposit shall apply solely against Landlord's transferee.  The Security Deposit is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default.  Landlord's obligation respecting the Security Deposit is that of a debtor, not a trustee, and no interest shall accrue thereon.

7.    **Use**.  The Premises shall be used solely for the Permitted Use set forth in the basic lease provisions on page 1 of this Lease, and in compliance with all laws, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises, and to the use and occupancy thereof, including, without limitation, the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. (together with the regulations promulgated pursuant thereto, "**ADA**") (collectively, "**Legal Requirements**" and each, a "**Legal Requirement**").  Tenant shall, upon 5 days' written notice from Landlord, discontinue any use of the Premises which is declared by any Governmental Authority (as defined in Section 9) having jurisdiction to be a violation of a Legal Requirement.  Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, increase the insurance risk, or cause the disallowance of any sprinkler or other credits.  Tenant shall not permit any part of the Premises to be used as a "place of public accommodation", as defined in the ADA or any similar legal requirement.  Tenant shall reimburse Landlord promptly upon demand for any additional premium charged for any such insurance policy by reason of Tenant's failure to comply with the provisions of this Section or otherwise caused by Tenant's use and/or occupancy of the Premises.  Tenant will use the Premises in a careful, safe and proper manner and will not commit or permit waste, overload the floor or structure of the Premises, subject the Premises to use that would damage the Premises or obstruct or interfere with the rights of Landlord or other tenants or occupants of the Project, including conducting or giving notice of any auction, liquidation, or going out of business sale on the Premises, or using or allowing the Premises to be used for any unlawful purpose.  Tenant shall cause any equipment or machinery to be installed in the Premises so as to reasonably prevent sounds or vibrations from the Premises from extending into Common Areas, or other space in the Project.  Tenant shall not place any machinery or equipment which would overload the floor in or upon the Premises or transport or move such items through the Common Areas of the Project or in the Project elevators without the prior written consent of Landlord.  Except as may be provided under the Work Letter, Tenant shall not, without the prior written consent of Landlord, use the Premises in any manner which will require ventilation, air exchange, heating, gas, steam, electricity or water beyond the existing capacity of the Project as

ALEXANDRIA. Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 137 of 396

proportionately allocated to the Premises based upon Tenant's Share as usually furnished for the Permitted Use.

Landlord shall be responsible for the compliance of the Common Areas of the Project and Landlord's Work with Legal Requirements as of the Rent Commencement Date. Following the Commencement Date, Landlord shall, as an Operating Expense (to the extent such Legal Requirement is generally applicable to similar buildings in the area in which the Project is located) and at Tenant's expense (to the extent such Legal Requirement is triggered by reason of Tenant's, as compared to other tenants of the Project, specific use of the Premises or Tenant's Alterations) make any alterations or modifications to the Common Areas or the exterior of the Building that are required by Legal Requirements. Except as provided in the two immediately preceding sentence, Tenant, at its sole expense, shall make any alterations or modifications to the interior or the exterior of the Premises or the Project that are required by Legal Requirements (including, without limitation, compliance of the Premises with the ADA) related to Tenant's use or occupancy of the Premises.  Notwithstanding any other provision herein to the contrary, Tenant shall be responsible for any and all demands, claims, liabilities, losses, costs, expenses, actions, causes of action, damages or judgments, and all reasonable expenses incurred in investigating or resisting the same (including, without limitation, reasonable attorneys' fees, charges and disbursements and costs of suit) (collectively, "**Claims**") arising out of or in connection with Legal Requirements related to Tenant's use or occupancy of the Premises, the Tenant Improvements or Tenant's Alterations (but not including Landlord's Work), and Tenant shall indemnify, defend, hold and save Landlord harmless from and against any and all Claims arising out of or in connection with any breach of this sentence.

Tenant acknowledges that Landlord may, but shall not be obligated to, seek to obtain Leadership in Energy and Environmental Design (LEED), WELL Building Standard, or other similar "green" certification with respect to the Project and/or the Premises, and Tenant agrees, at no material cost to Tenant, to reasonably cooperate with Landlord, and to provide such information and/or documentation as Landlord may reasonably request, in connection therewith.

8.          **Holding Over**.  If, with Landlord's express written consent, Tenant retains possession of the Premises after the termination of the Term, (i) unless otherwise agreed in such written consent, such possession shall be subject to immediate termination by Landlord at any time, (ii) all of the other terms and provisions of this Lease (including, without limitation, the adjustment of Base Rent pursuant to Section 4 hereof) shall remain in full force and effect (excluding any expansion or renewal option or other similar right or option) during such holdover period, (iii) Tenant shall continue to pay Base Rent in the amount payable upon the date of the expiration or earlier termination of this Lease or such other amount as Landlord and Tenant may agree in such written consent, and (iv) all other payments shall continue under the terms of this Lease.  If Tenant remains in possession of the Premises after the expiration or earlier termination of the Term without the express written consent of Landlord, (A) Tenant shall become a tenant at sufferance upon the terms of this Lease except that the monthly rental shall be equal to 150% of Base Rent (plus 100% of all Additional Rent) in effect during the last 30 days of the Term, and (B) Tenant shall be responsible for all damages suffered by Landlord resulting from or occasioned by Tenant's holding over, including consequential damages; provided, however, that if Tenant delivers a written inquiry to Landlord within 30 days prior to the expiration or earlier termination of the Term, Landlord will notify Tenant whether the potential exists for consequential damages.  No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Section 8 shall not be construed as consent for Tenant to retain possession of the Premises.  Acceptance by Landlord of Rent after the expiration of the Term or earlier termination of this Lease shall not result in a renewal or reinstatement of this Lease.

9.          **Taxes**.  Landlord shall pay, as part of Operating Expenses, all taxes, levies, fees, assessments and governmental charges of any kind, existing as of the Commencement Date or thereafter enacted (collectively referred to as "**Taxes**"), imposed by any federal, state, regional, municipal, local or other governmental authority or agency, including, without limitation, quasi-public agencies (collectively, "**Governmental Authority**") during the Term, including, without limitation, all Taxes:  (i) imposed on or measured by or based, in whole or in part, on rent payable to (or gross receipts received by) Landlord under this Lease and/or from the rental by Landlord of the Project or any portion thereof, or (ii) based on the

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW     Document 34-1     Filed 11/25/20     Page 138 of 396

square footage, assessed value or other measure or evaluation of any kind of the Premises or the Project, or (g) assessed or imposed by or on the operation or maintenance of any portion of the Premises or the Project, including parking, or (iv) assessed or imposed by, or at the direction of, or resulting from Legal Requirements, or interpretations thereof, promulgated by any Governmental Authority, or (v) imposed as a license or other fee, charge, tax, or assessment on Landlord's business or occupation of leasing space in the Project.  Landlord may contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens securing Taxes.  Notwithstanding anything to the contrary herein, Landlord shall only charge Tenant for assessments as if those assessments were paid by Landlord over the longest possible term which Landlord is permitted to pay for the applicable assessments without additional charge other than interest, if any, provided under the terms of the underlying assessments.  Taxes shall not include any net income taxes imposed on Landlord except to the extent such net income taxes are in substitution for any Taxes payable hereunder.  If any such Tax is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require.  Tenant shall pay, prior to delinquency, any and all Taxes levied or assessed against any personal property or trade fixtures placed by Tenant in the Premises, whether levied or assessed against Landlord or Tenant.  If any Taxes on Tenant's personal property or trade fixtures are levied against Landlord or Landlord's property, or if the assessed valuation of the Project is increased by a value attributable to improvements in or alterations to the Premises, whether owned by Landlord or Tenant and whether or not affixed to the real property so as to become a part thereof, higher than the base valuation on which Landlord from time-to-time allocates Taxes to all tenants in the Project, Landlord shall have the right, but not the obligation, to pay such Taxes.  Landlord's determination of any excess assessed valuation shall be binding and conclusive, absent manifest error.  The amount of any such payment by Landlord shall constitute Additional Rent due from Tenant to Landlord immediately upon demand.

10.          **Parking**.  Subject to all applicable Legal Requirements, Force Majeure, a Taking (as defined in <u>Section 19</u> below) and the exercise by Landlord of its rights hereunder, Tenant shall have the right to use 2.85 parking spaces per 1,000 rentable square feet of the Premises, in common with other tenants of the Project, which parking spaces shall be in those areas designated for non-reserved parking, subject in each case to Landlord's rules and regulations.  Landlord may allocate parking spaces among Tenant and other tenants in the Project pro rata as described above if Landlord determines that such parking facilities are becoming crowded.  Landlord shall not oversubscribe parking among tenants leasing space at the Project.

Subject to compliance with Legal Requirements, Landlord shall, at Landlord's cost and expense, install, and, as part of Operating Expenses, power and maintain, approximately 21 dual-charging electric vehicle charging stations in the parking areas of the Project, which shall be available on a non-reserved basis.

If applicable to the Project, Tenant shall comply with the requirements of any TDMP (as defined below) which may be required by the City of San Carlos or other Governmental Authority with respect to the parking areas at the Project which are binding on tenants in the Project or tenants using the parking lots or structures available at the Project.  A copy of any TDMP in effect from time to time during the Term shall be made available to Tenant.  Notwithstanding anything to the contrary contained in this Lease, if applicable to the Project, Tenant shall be required to comply with the requirements of (and Operating Expenses shall expressly include any costs incurred by Landlord to comply with) any transportation demand management plan ("**TDMP**") and any other permit conditions (e.g. rider sharing and carpooling initiatives) imposed by the City of San Carlos or other Governmental Authority.

11.          **Utilities, Services**. Landlord shall provide, subject to the terms of this <u>Section 11</u> and the other provisions of this Lease, water, electricity, HVAC (twenty-four hours per day, seven days per week), light, power, sewer, and other utilities (including gas and fire sprinklers to the extent the Project is plumbed for such services), and, with respect to the Common Areas, refuse and trash collection and janitorial services (collectively, "**Utilities**").  Landlord shall pay, as Operating Expenses or subject to Tenant's reimbursement obligation, for all Utilities used on the Premises, all maintenance charges for Utilities, and any storm sewer charges or other similar charges for Utilities imposed by any Governmental Authority or Utility provider, and any taxes, penalties, surcharges or similar charges thereon.  Landlord may cause, at

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 139 of 396

Tenant's expense, any Utilities to be separately metered or charged directly to Tenant by the provider.  Tenant shall pay directly to the Utility provider, prior to delinquency, any separately metered Utilities and services which may be furnished to Tenant or the Premises during the Term.  Tenant shall pay, as part of Operating Expenses, its share of all charges for jointly metered Utilities based upon consumption, as reasonably determined by Landlord.  No interruption or failure of Utilities, from any cause whatsoever other than Landlord's willful misconduct, shall result in eviction or constructive eviction of Tenant, termination of this Lease or the abatement of Rent.  Tenant agrees to limit use of water and sewer with respect to Common Areas to normal restroom use. Tenant shall retain third parties reasonably acceptable to Landlord to provide janitorial services and trash collection services to the Premises and Tenant shall pay such third parties directly for such janitorial and trash collection services.

Notwithstanding anything to the contrary set forth herein, if (i) a stoppage of an Essential Service (as defined below) to the Premises shall occur and such stoppage is due solely to the gross negligence or willful misconduct of Landlord and not due in any part to any act or omission on the part of Tenant or any Tenant Party or any matter beyond Landlord's reasonable control (any such stoppage of an Essential Service being hereinafter referred to as a "**Service Interruption**"), and (ii) such Service Interruption continues for more than 5 consecutive business days after Landlord shall have received written notice thereof from Tenant, and (iii) as a result of such Service Interruption, the conduct of Tenant's normal operations in the Premises are materially and adversely affected, then there shall be an abatement of one day's Base Rent for each day during which such Service Interruption continues after such 5 business day period; provided, however, that if any part of the Premises is reasonably useable for Tenant's normal business operations or if Tenant conducts all or any part of its operations in any portion of the Premises notwithstanding such Service Interruption, then the amount of each daily abatement of Base Rent shall only be proportionate to the nature and extent of the interruption of Tenant's normal operations or ability to use the Premises.  The rights granted to Tenant under this paragraph shall be Tenant's sole and exclusive remedy resulting from a failure of Landlord to provide services, and Landlord shall not otherwise be liable for any loss or damage suffered or sustained by Tenant resulting from any failure or cessation of services.  For purposes hereof, the term "**Essential Services**" shall mean the following services:  HVAC service, water, sewer and electricity, but in each case only to the extent that Landlord has an obligation to provide same to Tenant under this Lease.  The provisions of this paragraph shall only apply as long as the original Tenant is the tenant occupying the Premises under this Lease and shall not apply to any assignee or sublessee

Landlord's sole obligation for either providing emergency generators or providing emergency back-up power to Tenant shall be: (i) to provide  an emergency generator with not less than the capacity of the emergency generator located in the Building as of the Rent Commencement Date which will be designed to have a capacity of 1.25mW, and (ii) to contract with a third party to maintain the emergency generator as per the manufacturer's standard maintenance guidelines.  Except as otherwise provided in the immediately preceding sentence, Landlord shall have no obligation to provide Tenant with operational emergency generators or back-up power or to supervise, oversee or confirm that the third party maintaining the emergency generators is maintaining the generators as per the manufacturer's standard guidelines or otherwise.  Notwithstanding anything to the contrary contained herein, Landlord shall, on a weekly basis, as part of the maintenance of the Building, run the emergency generator for a period reasonably determined by Landlord for the purpose of determining whether it operates when started.  Landlord shall, upon written request from Tenant (not more frequently than twice per calendar year), make available for Tenant's inspection the maintenance contracts (including contracts regarding provision of fuel for the emergency generators) and maintenance records for the emergency generators for the 6 month period immediately preceding Landlord's receipt of Tenant's written request.  During any period of replacement, repair or maintenance of the emergency generator when the emergency generator is not operational, including any delays thereto due to the inability to obtain parts or replacement equipment, Landlord shall have no obligation to provide Tenant with an alternative back-up generator or generators or alternative sources of back-up power.  Tenant expressly acknowledges and agrees that Landlord does not guaranty that such emergency generator will be operational at all times or that emergency power will be available to the Premises when needed.

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 140 of 396

Tenant agrees to provide Landlord with access to Tenant's water and/or energy usage data on a monthly basis, either by providing Tenant's applicable utility login credentials to Landlord's Measurabl online portal, or by another delivery method reasonably agreed to by Landlord and Tenant. The costs and expenses incurred by Landlord in connection with receiving and analyzing such water and/or energy usage data (including, without limitation, as may be required pursuant to applicable Legal Requirements) shall be included as part of Operating Expenses.

12. **Alterations and Tenant's Property**.  Any alterations, additions, or improvements made to the Premises by or on behalf of Tenant, including additional locks or bolts of any kind or nature upon any doors or windows in the Premises, but excluding installation, removal or realignment of furniture systems (other than removal of furniture systems owned or paid for by Landlord) not involving any modifications to the structure or connections (other than by ordinary plugs or jacks) to Building Systems (as defined in Section 13) ("**Alterations**") shall be subject to Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion if any such Alteration affects the structure or Building Systems and shall not be otherwise unreasonably withheld, conditioned or delayed. Tenant may construct nonstructural, Alterations in the Premises from time to time without Landlord's prior approval if the cost of the applicable Alteration project does not exceed $100,000 (a "**Notice-Only Alteration**"), provided Tenant notifies Landlord in writing (which written notice may be given by email to persons designated by Landlord in writing from time to time as Landlord's representatives for the purpose of receiving such notices) of such intended Notice-Only Alteration, and such notice shall be accompanied by plans, specifications and such other information concerning the nature and cost of the Notice-Only Alteration as may be reasonably requested by Landlord, which notice and accompanying materials shall be delivered to Landlord not less than 5 business days in advance of any proposed construction.  If Landlord approves any Alterations, Landlord may impose such conditions on Tenant in connection with the commencement, performance and completion of such Alterations as Landlord may deem appropriate in Landlord's reasonable discretion.  Any request for approval shall be in writing, delivered not less than 15 business days in advance of any proposed construction, and accompanied by plans, specifications, bid proposals, work contracts and such other information concerning the nature and cost of the alterations as may be reasonably requested by Landlord, including the identities and mailing addresses of all persons performing work or supplying materials.  Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to ensure that such plans and specifications or construction comply with applicable Legal Requirements.  Tenant shall cause, at its sole cost and expense, all Alterations to comply with insurance requirements and with Legal Requirements and shall implement at its sole cost and expense any alteration or modification required by Legal Requirements as a result of any Alterations.  Tenant shall pay to Landlord, as Additional Rent, on demand an amount equal to 3% of all charges incurred by Tenant or its contractors or agents in connection with any Alteration to cover Landlord's overhead and expenses for plan review, coordination, scheduling and supervision.  Before Tenant begins any Alteration, Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law.  Tenant shall reimburse Landlord for, and indemnify and hold Landlord harmless from, any expense incurred by Landlord by reason of faulty work done by Tenant or its contractors, delays caused by such work, or inadequate cleanup.

Tenant shall complete all Alterations work free and clear of liens, and shall provide (and cause each contractor or subcontractor to provide) certificates of insurance for workers' compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction.  Upon completion of any Alterations, Tenant shall deliver to Landlord:  (i) sworn statements setting forth the names of all contractors and subcontractors who did the work and final lien waivers from all such contractors and subcontractors; and (ii) "as built" plans for any such Alteration.

Except for Removable Installations (as hereinafter defined), all Installations (as defined in the immediately following paragraph) shall be and shall remain the property of Landlord during the Term and following the expiration or earlier termination of the Term, shall not be removed by Tenant at any time during the Term, and shall remain upon and be surrendered with the Premises as a part thereof.  Notwithstanding the foregoing, Landlord shall, if Tenant makes a request in writing at the time its approval of any such Installation is requested or at the time Tenant delivers notice to Landlord of a Notice-Only Alteration, notify

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 141 of 396

Tenant whether Landlord will require that Tenant remove such Installation upon the expiration or earlier termination of the Term.  If removal is so required by Landlord, Tenant shall remove such Installation in accordance with the immediately succeeding sentence.  Upon the expiration or earlier termination of the Term, Tenant shall remove (i) if required by applicable Legal Requirements, all wires, cables or similar equipment which Tenant has installed in the Premises or in the risers or plenums of the Building, (ii) any Installations for which Landlord has given Tenant notice of removal in accordance with the immediately preceding sentence, and (iii) all of Tenant's Property (as hereinafter defined), and Tenant shall restore and repair any damage caused by or occasioned as a result of such removal, including, without limitation, capping off all such connections behind the walls of the Premises and repairing any holes.  During any restoration period beyond the expiration or earlier termination of the Term, Tenant shall pay Rent to Landlord as provided herein as if said space were otherwise occupied by Tenant.  If Landlord is requested by Tenant or any lender, lessor or other person or entity claiming an interest in any of Tenant's Property to waive any lien Landlord may have against any of Tenant's Property, and Landlord consents to such waiver, then Landlord shall be entitled to be paid as administrative rent a fee of $1,000 per occurrence for its time and effort in preparing and negotiating such a waiver of lien.  Notwithstanding anything to the contrary, in no event shall Tenant be required to remove or restore (nor shall Tenant have the right to remove) the Tenant Improvements (including any Installations installed in the Premises as part of the Tenant Improvements).

For purposes of this Lease, (x) "**Removable Installations**" means any items listed on **Exhibit F** attached hereto and any items agreed by Landlord in writing to be included on **Exhibit F** in the future, (y) "**Tenant's Property**" means Removable Installations and, other than Installations, any personal property or equipment of Tenant that may be removed without material damage to the Premises, and (z) "**Installations**" means all property of any kind paid for with the TI Fund, all Alterations, all fixtures, and all partitions, hardware, built-in machinery, built-in casework and cabinets and other similar additions, equipment, property and improvements built into the Premises so as to become an integral part of the Premises, including, without limitation, fume hoods which penetrate the roof or plenum area, built-in cold rooms, built-in warm rooms, walk-in cold rooms, walk-in warm rooms, deionized water systems, glass washing equipment, autoclaves, chillers, built-in plumbing, electrical and mechanical equipment and systems, and any power generator and transfer switch.

13.        **Landlord's Repairs**.  Landlord, as an Operating Expense, shall maintain all of the structural, exterior, parking and other Common Areas of the Project, and the HVAC, plumbing, fire sprinklers, elevators and all other building systems serving the Premises and other portions of the Project ("**Building Systems**"), in good repair, reasonable wear and tear and uninsured losses and damages caused by Tenant, or by any of Tenant's assignees, sublessees, licensees, agents, servants, employees, invitees and contractors (or any of Tenant's assignees, sublessees and/or licensees respective agents, servants, employees, invitees and contractors) (collectively, "**Tenant Parties**") excluded.  Losses and damages caused by Tenant or any Tenant Party shall be repaired by Landlord, to the extent not covered by insurance, at Tenant's sole cost and expense.  Landlord reserves the right to stop Building Systems services when necessary (i) by reason of accident or emergency, or (ii) for planned repairs, alterations or improvements, which are, in the judgment of Landlord, desirable or necessary to be made, until said repairs, alterations or improvements shall have been completed.  Landlord shall have no responsibility or liability for failure to supply Building Systems services during any such period of interruption; provided, however, that Landlord shall, except in case of emergency, give Tenant 48 hours advance notice of any planned stoppage of Building Systems services for routine maintenance, repairs, alterations or improvements.  Tenant shall promptly give Landlord written notice of any repair required by Landlord pursuant to this Section, after which Landlord shall make a commercially reasonable effort to effect such repair.  Landlord shall not be liable for any failure to make any repairs or to perform any maintenance unless such failure shall persist for an unreasonable time after Tenant's written notice of the need for such repairs or maintenance.  Tenant waives its rights under any state or local law to terminate this Lease or to make such repairs at Landlord's expense and agrees that the parties' respective rights with respect to such matters shall be solely as set forth herein.  Repairs required as the result of fire, earthquake, flood, vandalism, war, or similar cause of damage or destruction shall be controlled by Section 18.

ALEXANDRIA.    Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 142 of 396

14.      **Tenant's Repairs**.  Subject to Section 23 hereof, Tenant, at its expense, shall repair, replace and maintain in good condition all portions of the Premises, including, without limitation, entries, doors, ceilings, interior windows, interior walls, and the interior side of demising walls.  Should Tenant fail to make any such repair or replacement or fail to maintain the Premises, Landlord shall give Tenant notice of such failure.  If Tenant fails to commence cure of such failure within 10 days of Landlord's notice, and thereafter diligently prosecute such cure to completion, Landlord may perform such work and shall be reimbursed by Tenant within 10 days after demand therefor; provided, however, that if such failure by Tenant creates or could create an emergency, Landlord may immediately commence cure of such failure and shall thereafter be entitled to recover the costs of such cure from Tenant.  Subject to Sections 17 and 18, Tenant shall bear the full uninsured cost of any repair or replacement to any part of the Project that results from damage caused by Tenant or any Tenant Party.

15.      **Mechanic's Liens**.  Tenant shall discharge, by bond or otherwise, any mechanic's lien filed against the Premises or against the Project for work claimed to have been done for, or materials claimed to have been furnished to, Tenant within 10 days after Tenant receives written notice of the filing thereof, at Tenant's sole cost and shall otherwise keep the Premises and the Project free from any liens arising out of work performed, materials furnished or obligations incurred by Tenant.  Should Tenant fail to discharge any lien described herein, Landlord shall have the right, but not the obligation, to pay such claim or post a bond or otherwise provide security to eliminate the lien as a claim against title to the Project and the cost thereof shall be immediately due from Tenant as Additional Rent.  If Tenant shall lease or finance the acquisition of office equipment, furnishings, or other personal property of a removable nature utilized by Tenant in the operation of Tenant's business, Tenant warrants that any Uniform Commercial Code Financing Statement filed as a matter of public record by any lessor or creditor of Tenant will upon its face or by exhibit thereto indicate that such Financing Statement is applicable only to removable personal property of Tenant located within the Premises.  In no event shall the address of the Project be furnished on the statement without qualifying language as to applicability of the lien only to removable personal property, located in an identified suite held by Tenant.

16.      **Indemnification**.  Tenant hereby indemnifies and agrees to defend, save and hold Landlord, its officers, directors, employees, managers, agents, sub-agents, constituent entities and lease signators (collectively, "**Landlord Indemnified Parties**") harmless from and against any and all Claims for injury or death to persons or damage to property occurring within or about the Premises or the Project arising directly or indirectly out of use or occupancy of the Premises or the Project by Tenant or any Tenant Parties (including, without limitation, any act, omission or neglect by Tenant or any Tenant's Parties in or about the Premises or at the Project) or the a breach or default by Tenant in the performance of any of its obligations hereunder, except to the extent caused by the willful misconduct, gross negligence or active negligence of Landlord Indemnified Parties.  Landlord shall not be liable to Tenant for, and Tenant assumes all risk of damage to, personal property (including, without limitation, loss of records kept within the Premises).  Tenant further waives any and all Claims for injury to Tenant's business or loss of income relating to any such damage or destruction of personal property (including, without limitation, any loss of records).  Landlord Indemnified Parties shall not be liable for any damages arising from any act, omission or neglect of any tenant in the Project or of any other third party or Tenant Parties.

17.      **Insurance**.  Landlord shall maintain all risk property and, if applicable, sprinkler damage insurance covering the full replacement cost of the Project.  Landlord shall further procure and maintain commercial general liability insurance with a single loss limit of not less than $2,000,000 for bodily injury and property damage with respect to the Project.  Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to, flood, environmental hazard and earthquake, loss or failure of building equipment, errors and omissions, rental loss during the period of repair or rebuilding, workers' compensation insurance and fidelity bonds for employees employed to perform services and insurance for any improvements installed by Tenant or which are in addition to the standard improvements customarily furnished by Landlord without regard to whether or not such are made a part of the Project.  All such insurance shall be included as part of the Operating Expenses.  The Project may be included in a blanket policy (in which case the cost of such insurance allocable to the Project will be determined by Landlord based upon the insurer's cost calculations).  Tenant

ALEXANDRIA.   Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 143 of 396

shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises.

Tenant, at its sole cost and expense, shall maintain during the Term: all risk property insurance with business interruption and extra expense coverage, covering the full replacement cost of all property and improvements installed or placed in the Premises by Tenant at Tenant's expense; workers' compensation insurance with no less than the minimum limits required by law; employer's liability insurance with employers liability limits of $1,000,000 bodily injury by accident – each accident, $1,000,000 bodily injury by disease – policy limit, and $1,000,000 bodily injury by disease – each employee; and commercial general liability insurance, with a minimum limit of not less than $2,000,000 per occurrence for bodily injury and property damage with respect to the Premises. The commercial general liability insurance maintained by Tenant shall name Alexandria Real Estate Equities, Inc., and Landlord, its officers, directors, employees, managers, agents, sub-agents, constituent entities and lease signators (collectively, "**Landlord Insured Parties**"), as additional insureds; insure on an occurrence and not a claims-made basis; be issued by insurance companies which have a rating of not less than policyholder rating of A and financial category rating of at least Class X in "Best's Insurance Guide"; not contain a hostile fire exclusion; contain a contractual liability endorsement; and provide primary coverage to Landlord Insured Parties (any policy issued to Landlord Insured Parties providing duplicate or similar coverage shall be deemed excess over Tenant's policies, regardless of limits). Tenant shall (i) provide Landlord with 30 days advance written notice of cancellation of such commercial general liability policy, and (ii) request Tenant's insurer to endeavor to provide 30 days advance written notice to Landlord of cancellation of such commercial general liability policy (or 10 days in the event of a cancellation due to non-payment of premium). Certificates of insurance showing the limits of coverage required hereunder and showing Landlord as an additional insured, along with reasonable evidence of the payment of premiums for the applicable period, shall be delivered to Landlord by Tenant prior to (i) the earlier to occur of  (x) the Commencement Date, or (y) the date that Tenant accesses the Premises under this Lease, and (ii) each renewal of said insurance. Tenant's policy may be a "blanket policy" with an aggregate per location endorsement which specifically provides that the amount of insurance shall not be prejudiced by other losses covered by the policy. Tenant shall, at least 5 days prior to the expiration of such policies, furnish Landlord with renewal certificates.

In each instance where insurance is to name Landlord as an additional insured, Tenant shall upon written request of Landlord also designate and furnish certificates so evidencing Landlord as additional insured to: (i) any lender of Landlord holding a security interest in the Project or any portion thereof, (ii) the landlord under any lease wherein Landlord is tenant of the real property on which the Project is located, if the interest of Landlord is or shall become that of a tenant under a ground or other underlying lease rather than that of a fee owner, and/or (iii) any management company retained by Landlord to manage the Project.

The property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and all rights based upon an assignment from its insured, against Landlord or Tenant, and their respective officers, directors, employees, managers, agents, invitees and contractors ("**Related Parties**"), in connection with any loss or damage thereby insured against. Neither party nor its respective Related Parties shall be liable to the other for loss or damage caused by any risk insured against under property insurance required to be maintained hereunder, and each party waives any claims against the other party, and its respective Related Parties, for such loss or damage. The failure of a party to insure its property shall not void this waiver. Landlord and its respective Related Parties shall not be liable for, and Tenant hereby waives all claims against such parties for, business interruption and losses occasioned thereby sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises or the Project from any cause whatsoever. If the foregoing waivers shall contravene any law with respect to exculpatory agreements, the liability of Landlord or Tenant shall be deemed not released but shall be secondary to the other's insurer.

Landlord may require insurance policy limits to be raised to conform with requirements of Landlord's lender and/or to bring coverage limits to levels then being generally required of new tenants within the Project; provided, however, that the increased amount of coverage is consistent with coverage amounts then being required by institutional owners of similar projects with tenants occupying similar size premises in the geographical area in which the Project is located.

 Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 144 of 396

18.          **Restoration**. If, at any time during the Term, the Project or the Premises are damaged or destroyed by a fire or other casualty, Landlord shall notify Tenant within 60 days after discovery of such damage as to the amount of time Landlord reasonably estimates it will take to restore the Project or the Premises, as applicable (the "**Restoration Period**").  If the Restoration Period is estimated to exceed 12 months (the "**Maximum Restoration Period**"), Landlord may, in such notice, elect to terminate this Lease as of the date that is 75 days after the date of discovery of such damage or destruction; provided, however, that notwithstanding Landlord's election to restore, Tenant may elect to terminate this Lease by written notice to Landlord delivered within 5 business days of receipt of a notice from Landlord estimating a Restoration Period for the Premises longer than the Maximum Restoration Period.  Unless either Landlord or Tenant so elects to terminate this Lease, Landlord shall, subject to receipt of sufficient insurance proceeds (with any deductible to be treated as a current Operating Expense, subject to the terms of Section 5 above), promptly restore the Premises (excluding the improvements installed by Tenant or by Landlord and paid for by Tenant), subject to delays arising from the collection of insurance proceeds, from Force Majeure events or as needed to obtain any license, clearance or other authorization of any kind required to enter into and restore the Premises issued by any Governmental Authority having jurisdiction over the use, storage, handling, treatment, generation, release, disposal, removal or remediation of Hazardous Materials (as defined in Section 30) in, on or about the Premises (collectively referred to herein as "**Hazardous Materials Clearances**"); provided, however, that if repair or restoration of the Premises is not substantially complete as of the end of the Maximum Restoration Period or, if longer, the Restoration Period, Landlord may, in its sole and absolute discretion, elect not to proceed with such repair and restoration, or Tenant may by written notice to Landlord delivered within 5 business days of the expiration of the Maximum Restoration Period or, if longer, the Restoration Period, elect to terminate this Lease, in which event Landlord shall be relieved of its obligation to make such repairs or restoration and this Lease shall terminate as of the date that is 75 days after the later of:  (i) discovery of such damage or destruction, or (ii) the date all required Hazardous Materials Clearances are obtained, but Landlord shall retain any Rent paid and the right to any Rent payable by Tenant prior to such election by Landlord or Tenant.

Promptly following the date that Landlord makes the Premises available to Tenant for Tenant's repairs and restoration, Tenant, at its expense, shall promptly perform, subject to delays arising from the collection of insurance proceeds, from Force Majeure (as defined in Section 34) events or to obtain Hazardous Material Clearances, shall make all repairs or restoration to the improvements in the Premises installed by Tenant or by Landlord and paid for by Tenant and improvements in the Premises required to be insured by Tenant.  Notwithstanding the foregoing, either Landlord or Tenant may terminate this Lease upon written notice to the other if the Premises are damaged during the last year of the Term and Landlord reasonably estimates that it will take more than 2 months to repair such damage; provided, however, that such notice is delivered within 10 business days after the date that Landlord provides Tenant with written notice of the estimated Restoration Period.  Notwithstanding anything to the contrary contained herein, Landlord shall also have the right to terminate this Lease if insurance proceeds are not available for such restoration.  Rent shall be abated from the date all required Hazardous Material Clearances are obtained until the Premises are repaired and restored, in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises, unless Landlord provides Tenant with other space during the period of repair that is suitable for the temporary conduct of Tenant's business.  In the event that no Hazardous Material Clearances are required to be obtained by Tenant with respect to the Premises, rent abatement shall commence on the date of discovery of the damage or destruction. Such abatement shall be the sole remedy of Tenant, and except as provided in this Section 18, Tenant waives any right to terminate this Lease by reason of damage or casualty loss.

The provisions of this Lease, including this Section 18, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, or any other portion of the Project, and any statute or regulation which is now or may hereafter be in effect shall have no application to this Lease or any damage or destruction to all or any part of the Premises or any other portion of the Project, the parties hereto expressly agreeing that this Section 18 sets forth their entire understanding and agreement with respect to such matters.

19.                **Condemnation**.  If the whole or any material part of the Premises or the Project is taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 145 of 396

domain, or by private purchase in lieu thereof (a "**Taking**" or "**Taken**"), and the Taking would in Landlord's reasonable judgment, materially interfere with or impair Landlord's ownership or operation of the Project or would in the reasonable judgment of Landlord and Tenant either prevent or materially interfere with Tenant's use of the Premises (as resolved, if the parties are unable to agree, by arbitration by a single arbitrator with the qualifications and experience appropriate to resolve the matter and appointed pursuant to and acting in accordance with the rules of the American Arbitration Association), then upon written notice by Landlord or Tenant to the other this Lease shall terminate and Rent shall be apportioned as of said date.  If part of the Premises shall be Taken, and this Lease is not terminated as provided above, Landlord shall promptly restore the Premises and the Project as nearly as is commercially reasonable under the circumstances to their condition prior to such partial Taking and the rentable square footage of the Building, the rentable square footage of the Premises, Tenant's Share of Operating Expenses and the Rent payable hereunder during the unexpired Term shall be reduced to such extent as may be fair and reasonable under the circumstances.  Upon any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award.  Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to improvements paid for by Tenant and Tenant's trade fixtures, if a separate award for such items is made to Tenant.  Tenant hereby waives any and all rights it might otherwise have pursuant to any provision of state law to terminate this Lease upon a partial Taking of the Premises or the Project.

20.         **Events of Default**.  Each of the following events shall be a default ("**Default**") by Tenant under this Lease:

(a)         **Payment Defaults**.  Tenant shall fail to pay any installment of Rent or any other payment hereunder when due; provided, however, that Landlord will give Tenant notice and an opportunity to cure any failure to pay Rent within 5 days of any such notice not more than once in any 12 month period and Tenant agrees that such notice shall be in lieu of and not in addition to, or shall be deemed to be, any notice required by law.

(b)         **Insurance**.  Any insurance required to be maintained by Tenant pursuant to this Lease shall be canceled or terminated or shall expire or shall be reduced or materially changed, or Landlord shall receive a notice of nonrenewal of any such insurance and Tenant shall fail to obtain replacement insurance at least 20 days before the expiration of the current coverage.

(c)         **Abandonment**.  Tenant shall abandon the Premises.

(d)         **Improper Transfer**.  Tenant shall assign, sublease or otherwise transfer or attempt to transfer all or any portion of Tenant's interest in this Lease or the Premises except as expressly permitted herein, or Tenant's interest in this Lease shall be attached, executed upon, or otherwise judicially seized and such action is not released within 90 days of the action.

(e)         **Liens**.  Tenant shall fail to discharge or otherwise obtain the release of any lien placed upon the Premises in violation of this Lease within 10 days after Tenant receives written notice that any such lien is filed against the Premises.

(f)         **Insolvency Events**.  Tenant or any guarantor or surety of Tenant's obligations hereunder shall:  (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "**Proceeding for Relief**"); (C) become the subject of any Proceeding for Relief which is not dismissed within 90 days of its filing or entry; or (D) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 146 of 396

(g) **Estoppel Certificate or Subordination Agreement**. Tenant fails to execute any document required from Tenant under Sections 23 or 27 within 5 days after a second notice requesting such document.

(h) **Other Defaults**. Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 20, and, except as otherwise expressly provided herein, such failure shall continue for a period of 30 days after written notice thereof from Landlord to Tenant.

Any notice given under Section 20(h) hereof shall: (i) specify the alleged default, (ii) demand that Tenant cure such default, (iii) be in lieu of, and not in addition to, or shall be deemed to be, any notice required under any provision of applicable law, and (iv) not be deemed a forfeiture or a termination of this Lease unless Landlord elects otherwise in such notice; provided that if the nature of Tenant's default pursuant to Section 20(h) is such that it cannot be cured by the payment of money and reasonably requires more than 30 days to cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said 30 day period and thereafter diligently prosecutes the same to completion; provided, however, that such cure shall be completed no later than 90 days from the date of Landlord's notice.

21. **Landlord's Remedies**.

(a) **Payment By Landlord; Interest**. Upon a Default by Tenant hereunder, Landlord may, without waiving or releasing any obligation of Tenant hereunder, make such payment or perform such act. All sums so paid or incurred by Landlord, together with interest thereon, from the date such sums were paid or incurred, at the annual rate equal to 12% per annum or the highest rate permitted by law (the "**Default Rate**"), whichever is less, shall be payable to Landlord on demand as Additional Rent. Nothing herein shall be construed to create or impose a duty on Landlord to mitigate any damages resulting from Tenant's Default hereunder.

(b) **Late Payment Rent**. Late payment by Tenant to Landlord of Rent and other sums due will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult and impracticable to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord under any Mortgage covering the Premises. Therefore, if any installment of Rent due from Tenant is not received by Landlord within 5 days after the date such payment is due, Tenant shall pay to Landlord an additional sum equal to 6% of the overdue Rent as a late charge. Notwithstanding the foregoing, before assessing a late charge the first time in any calendar year, Landlord shall provide Tenant written notice of the delinquency and will waive the right if Tenant pays such delinquency within 5 days thereafter. The parties agree that this late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. In addition to the late charge, Rent not paid when due shall bear interest at the Default Rate from the 5th day after the date due until paid.

(c) **Remedies**. Upon the occurrence of a Default, Landlord, at its option, without further notice or demand to Tenant, shall have in addition to all other rights and remedies provided in this Lease, at law or in equity, the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

(i) Terminate this Lease, or at Landlord's option, Tenant's right to possession only, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim for damages therefor;

(ii) Upon any termination of this Lease, whether pursuant to the foregoing Section 21(c)(i) or otherwise, Landlord may recover from Tenant the following:

 Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 147 of 396

(A)                    The worth at the time of award of any unpaid rent which has been earned at the time of such termination; plus

(B)                    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(C)                    The worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(D)                    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including, but not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant; and

(E)                    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

The term "**rent**" as used in this Section 21 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others.  As used in Sections 21(c)(ii)(A) and (B), above, the "**worth at the time of award**" shall be computed by allowing interest at the Default Rate.  As used in Section 21(c)(ii)(C) above, the "**worth at the time of award**" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1%.

(iii)                    Landlord may continue this Lease in effect after Tenant's Default and recover rent as it becomes due (Landlord and Tenant hereby agreeing that Tenant has the right to sublet or assign hereunder, subject only to reasonable limitations).  Accordingly, if Landlord does not elect to terminate this Lease following a Default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies hereunder, including the right to recover all Rent as it becomes due.

(iv)                    Whether or not Landlord elects to terminate this Lease following a Default by Tenant, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements.  Upon Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

(v)                    Independent of the exercise of any other remedy of Landlord hereunder or under applicable law, Landlord may conduct an environmental test of the Premises as generally described in Section 30(d) hereof, at Tenant's expense.

(d)                    **Effect of Exercise**.  Exercise by Landlord of any remedies hereunder or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, it being understood that such surrender and/or termination can be effected only by the express written agreement of Landlord and Tenant.  Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 148 of 396

manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same and shall not be deemed a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default.  A receipt by Landlord of Rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord.  To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter, re-take or otherwise obtain possession of the Premises as provided in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge.  Any reletting of the Premises or any portion thereof shall be on such terms and conditions as Landlord in its sole discretion may determine.  Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting or otherwise to mitigate any damages arising by reason of Tenant's Default.

22.          **Assignment and Subletting**.

(a)          **General Prohibition**.  Without Landlord's prior written consent subject to and on the conditions described in this Section 22, Tenant shall not, directly or indirectly, voluntarily or by operation of law, assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises, and any attempt to do any of the foregoing shall be void and of no effect.  If Tenant is a corporation, partnership or limited liability company, the shares or other ownership interests thereof which are not actively traded upon a stock exchange or in the over-the-counter market, a transfer or series of transfers whereby 49% or more of the issued and outstanding shares or other ownership interests of such corporation are, or voting control is, transferred (but excepting transfers upon deaths of individual owners) from a person or persons or entity or entities which were owners thereof at time of execution of this Lease to persons or entities who were not owners of shares or other ownership interests of the corporation, partnership or limited liability company at time of execution of this Lease, shall be deemed an assignment of this Lease requiring the consent of Landlord as provided in this Section 22.

(b)          **Permitted Transfers**.  If Tenant desires to assign, sublease, hypothecate or otherwise transfer this Lease or sublet the Premises other than pursuant to a Permitted Assignment (as defined below), then at least 15 business days, but not more than 4 months, before the date Tenant desires the assignment or sublease to be effective (the "**Assignment Date**"), Tenant shall give Landlord a notice (the "**Assignment Notice**") containing such information about the proposed assignee or sublessee, including the proposed use of the Premises and any Hazardous Materials proposed to be used, stored handled, treated, generated in or released or disposed of from the Premises, the Assignment Date, any relationship between Tenant and the proposed assignee or sublessee, and all material terms and conditions of the proposed assignment or sublease, including a copy of any proposed assignment or sublease in its final form, and such other information as Landlord may deem reasonably necessary or appropriate to its consideration whether to grant its consent. Landlord may, by giving written notice to Tenant within 15 days after receipt of the Assignment Notice:  (i) grant such consent (provided that Landlord shall further have the right to review and approve or disapprove the proposed form of sublease prior to the effective date of any such subletting), (ii) refuse such consent, in its reasonable discretion; or (iii) in the event of an assignment or a sublease that would result in more than 50% of the Premises being subleased for substantially the remainder of the Term, terminate this Lease with respect to the space described in the Assignment Notice as of the Assignment Date (an "**Assignment Termination**"). Among other reasons, it shall be reasonable for Landlord to withhold its consent in any of these instances:  (1) the proposed assignee or subtenant is a governmental agency; (2) in Landlord's reasonable judgment, the use of the Premises by the proposed assignee or subtenant would entail any alterations that would lessen the value of the leasehold improvements in the Premises, or would require increased services by Landlord; (3) in Landlord's reasonable judgment, the proposed assignee or subtenant is engaged in areas of scientific research or other business concerns that are controversial; (4) in Landlord's reasonable judgment, the proposed assignee or subtenant lacks the creditworthiness to support the financial obligations it will incur under the proposed assignment or sublease; (5) in Landlord's reasonable judgment, the character, reputation, or business of the proposed assignee or subtenant is inconsistent with the desired tenant-mix or the quality

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

of other tenancies in the Project or is inconsistent with the type and quality of the nature of the Building; (6) [intentionally omitted]; (7) Landlord has experienced previous defaults by or is in litigation with the proposed assignee or subtenant; (8) the use of the Premises by the proposed assignee or subtenant will violate any applicable Legal Requirement; (9) the proposed assignee or subtenant, or any entity that, directly or indirectly, controls, is controlled by, or is under common control with the proposed assignee or subtenant, is then an occupant of the Project and Landlord has comparable space available which is suitable for the needs of such proposed assignee or subtenant; or (10) the proposed assignee or subtenant is an entity with whom Landlord is negotiating to lease space in the Project. If Landlord delivers notice of its election to exercise an Assignment Termination, Tenant shall have the right to withdraw such Assignment Notice by written notice to Landlord of such election within 5 business days after Landlord's notice electing to exercise the Assignment Termination.  If Tenant withdraws such Assignment Notice, this Lease shall continue in full force and effect.  If Tenant does not withdraw such Assignment Notice, this Lease, and the term and estate herein granted, shall terminate as of the Assignment Date with respect to the space described in such Assignment Notice.  No failure of Landlord to exercise any such option to terminate this Lease, or to deliver a timely notice in response to the Assignment Notice, shall be deemed to be Landlord's consent to the proposed assignment, sublease or other transfer.  Tenant shall pay to Landlord a fee equal to Two Thousand Five Hundred Dollars ($2,500) in connection with its consideration of any Assignment Notice and/or its preparation or review of any consent documents.  Notwithstanding the foregoing, Landlord's consent to an assignment of this Lease  or a subletting of any portion of the Premises to any entity controlling, controlled by or under common control with Tenant (a "**Control Permitted Assignment**") shall not be required, provided that Landlord shall have the right to approve the form of any such sublease or assignment.  In addition, Tenant shall have the right to assign this Lease, upon 30 days prior written notice to Landlord ((x) unless Tenant is prohibited from providing such notice by applicable Legal Requirements or confidentiality restrictions, in which case Tenant shall notify Landlord within 10 days after the closing of such Control Permitted Assignment) but without obtaining Landlord's prior written consent, to a corporation or other entity which is a successor-in-interest to Tenant, by way of merger, consolidation or corporate reorganization, or by the purchase of all or substantially all of the assets or the ownership interests of Tenant provided that (i) such merger or consolidation, or such acquisition or assumption, as the case may be, is for a good business purpose and not principally for the purpose of transferring this Lease, and (ii) the net worth (as determined in accordance with generally accepted accounting principles ("**GAAP**")) of the assignee (or the successor entity, to the extent Tenant remains the tenant under this Lease following such Corporate Permitted Assignment) is not less than the net worth (as determined in accordance with GAAP) of Tenant immediately prior to such assignment, and (iii) such assignee shall agree in writing to assume all of the terms, covenants and conditions of this Lease (a "**Corporate Permitted Assignment**").  Control Permitted Assignments and Corporate Permitted Assignments are hereinafter referred to as "**Permitted Assignments**."

(c)        **Additional Conditions**.  As a condition to any such assignment or subletting, whether or not Landlord's consent is required, Landlord may require:

(i)                    that any assignee or subtenant agree, in writing at the time of such assignment or subletting, that if Landlord gives such party notice that Tenant is in default under this Lease, such party shall thereafter make all payments otherwise due Tenant directly to Landlord, which payments will be received by Landlord without any liability except to credit such payment against those due under this Lease, and any such third party shall agree to attorn to Landlord or its successors and assigns should this Lease be terminated for any reason; provided, however, in no event shall Landlord or its successors or assigns be obligated to accept such attornment; and

(ii)                    A list of Hazardous Materials, certified by the proposed assignee or sublessee to be true and correct, which the proposed assignee or sublessee intends to use, store, handle, treat, generate in or release or dispose of from the Premises, together with copies of all documents relating to such use, storage, handling, treatment, generation, release or disposal of Hazardous Materials by the proposed assignee or subtenant in the Premises or on the Project, prior to the proposed assignment or subletting, including, without limitation:  permits; approvals; reports and correspondence; storage and management plans; plans relating to the installation of any storage tanks to be installed in or under the Project (provided, said installation of tanks shall only be

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 150 of 396

permitted after Landlord has given its written consent to do so, which consent may be withheld in Landlord's sole and absolute discretion); and all closure plans or any other documents required by any and all federal, state and local Governmental Authorities for any storage tanks installed in, on or under the Project for the closure of any such tanks.  Neither Tenant nor any such proposed assignee or subtenant is required, however, to provide Landlord with any portion(s) of the such documents containing information of a proprietary nature which, in and of themselves, do not contain a reference to any Hazardous Materials or hazardous activities.

(d)          **No Release of Tenant, Sharing of Excess Rents**.  Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully and primarily responsible and liable for the payment of Rent and for compliance with all of Tenant's other obligations under this Lease.  If the Rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto in any form, excluding consideration for services or furniture, fixtures and equipment paid for exclusively by Tenant, to the extent such consideration does not exceed fair market value for such items) exceeds the sum of the rental payable under this Lease, (excluding however, any Rent payable under this Section) and actual and reasonable brokerage fees, legal costs, reasonable free rent periods and other market financial concessions and any design or construction fees directly related to and required pursuant to the terms of any such sublease, and the unamortized cost of any Alterations or other improvements paid for by Tenant) ("**Excess Rent**"), then Tenant shall be bound and obligated to pay Landlord as Additional Rent hereunder 50% of such Excess Rent within 10 days following receipt thereof by Tenant.  If Tenant shall sublet the Premises or any part thereof, Tenant hereby immediately and irrevocably assigns to Landlord, as security for Tenant's obligations under this Lease, all rent from any such subletting, and Landlord, or a receiver for Tenant appointed on Landlord's application, may collect such rent and apply it toward Tenant's obligations under this Lease; except that, until the occurrence of a Default, Tenant shall have the right to collect such rent.

(e)          **No Waiver**.  The consent by Landlord to an assignment or subletting shall not relieve Tenant or any assignees of this Lease or any sublessees of the Premises from obtaining the consent of Landlord to any further assignment or subletting nor shall it release Tenant or any assignee or sublessee of Tenant from full and primary liability under this Lease.  The acceptance of Rent hereunder, or the acceptance of performance of any other term, covenant, or condition thereof, from any other person or entity shall not be deemed to be a waiver of any of the provisions of this Lease or a consent to any subletting, assignment or other transfer of the Premises.

(f)          **Prior Conduct of Proposed Transferee**.  Notwithstanding any other provision of this Section 22, if (i) the proposed assignee or sublessee of Tenant has been required by any prior landlord, lender or Governmental Authority to take remedial action in connection with Hazardous Materials contaminating a property, where the contamination resulted from such party's action or use of the property in question, (ii) the proposed assignee or sublessee is subject to an enforcement order issued by any Governmental Authority in connection with the use, storage, handling, treatment, generation, release or disposal of Hazardous Materials (including, without limitation, any order related to the failure to make a required reporting to any Governmental Authority), or (iii) because of the existence of a pre-existing environmental condition in the vicinity of or underlying the Project, the risk that Landlord would be targeted as a responsible party in connection with the remediation of such pre-existing environmental condition would be materially increased or exacerbated by the proposed use of Hazardous Materials by such proposed assignee or sublessee, Landlord shall have the absolute right to refuse to consent to any assignment or subletting to any such party. This Section 22(f) shall not apply to any Corporate Permitted Assignment.

23.          **Estoppel Certificate**.  Tenant shall, within 10 business days of written notice from Landlord, execute, acknowledge and deliver a statement in writing in any form reasonably requested by a proposed lender or purchaser, (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect) and the dates to which the rental and other charges are paid in advance, if any, (ii) acknowledging that, to Tenant's knowledge, there are not any uncured defaults on the part of Landlord

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL
RIGHTS RESERVED.  Confidential and Proprietary – Do Not
Copy or Distribute.  Alexandria and the Alexandria Logo are
registered trademarks of Alexandria Real Estate Equities, Inc.

ALEXANDRIA.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 151 of 396

hereunder, or specifying such defaults if any are claimed, and (iii) setting forth such further information with respect to the status of this Lease or the Premises as may be requested thereon.  Any such statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the real property of which the Premises are a part.  Tenant's failure to deliver such statement within such time shall, at the option of Landlord, constitute a Default under this Lease, and, in any event, shall be conclusive upon Tenant that this Lease is in full force and effect and without modification except as may be represented by Landlord in any certificate prepared by Landlord and delivered to Tenant for execution.

24.        **Quiet Enjoyment**.  So long as Tenant is not in Default under this Lease, Tenant shall, subject to the terms of this Lease, at all times during the Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

25.        **Prorations**.  All prorations required or permitted to be made hereunder shall be made on the basis of a 360 day year and 30 day months.

26.        **Rules and Regulations**.  Tenant shall, at all times during the Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Project.  The current rules and regulations are attached hereto as **Exhibit E**.  If there is any conflict between said rules and regulations and other provisions of this Lease, the terms and provisions of this Lease shall control.  Landlord shall not have any liability or obligation for the breach of any rules or regulations by other tenants in the Project and shall not enforce such rules and regulations in a discriminatory manner.

27.        **Subordination**.  This Lease and Tenant's interest and rights hereunder are hereby made and shall be subject and subordinate at all times to the lien of any Mortgage now existing or hereafter created on or against the Project or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant; provided, however that so long as there is no Default hereunder, Tenant's right to possession of the Premises and rights under this Lease shall not be disturbed by the Holder of any such Mortgage.  Tenant agrees, at the election of the Holder of any such Mortgage, to attorn to any such Holder.  Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination, and such instruments of attornment as shall be requested by any such Holder, provided any such instruments contain appropriate non-disturbance provisions assuring Tenant's quiet enjoyment of the Premises as set forth in Section 24 hereof.  Notwithstanding the foregoing, any such Holder may at any time subordinate its Mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such Mortgage without regard to their respective dates of execution, delivery or recording and in that event such Holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such Mortgage and had been assigned to such Holder.  The term "**Mortgage**" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "**Holder**" of a Mortgage shall be deemed to include the beneficiary under a deed of trust.  As of the date of this Lease, there is no existing Mortgage encumbering  the Project.

Upon written request from Tenant, Landlord agrees to use reasonable efforts to cause the Holder of any future Mortgage to enter into a subordination, non-disturbance and attornment agreement ("**SNDA**") with Tenant with respect to this Lease.  The SNDA shall be on the form reasonably proscribed by the Holder and Tenant shall pay the Holder's fees and costs in connection with obtaining such SNDA; provided, however, that Landlord shall request that Holder make any reasonable changes to the SNDA requested by Tenant.  Landlord's failure to cause the Holder to enter into the SNDA with Tenant (or make any of the changes requested by Tenant) despite such efforts shall not be a default by Landlord under this Lease.

28.        **Surrender**.  Upon the expiration of the Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, subject to any Alterations or Installations permitted under this Lease to remain in the Premises, free of Hazardous Materials brought upon, kept, used, stored, handled, treated, generated in, or released or disposed of from,


Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 152 of 396

the Premises by any person other than a Landlord Party (collectively, "**Tenant HazMat Operations**") and released of all Hazardous Materials Clearances, broom clean, ordinary wear and tear and casualty loss and condemnation covered by Sections 18 and 19 excepted.  At least 3 months prior to the surrender of the Premises or such earlier date as Tenant may elect to cease operations at the Premises, Tenant shall deliver to Landlord a narrative description of the actions proposed (or required by any Governmental Authority) to be taken by Tenant in order to surrender the Premises (including any Installations permitted by Landlord to remain in the Premises) at the expiration or earlier termination of the Term, free from any residual impact from the Tenant HazMat Operations and otherwise released for unrestricted use and occupancy (the "**Decommissioning and HazMat Closure Plan**").  Such Decommissioning and HazMat Closure Plan shall be accompanied by a current listing of (i) all Hazardous Materials licenses and permits held by or on behalf of any Tenant Party with respect to the Premises, and (ii) all Hazardous Materials used, stored, handled, treated, generated, released or disposed of from the Premises, and shall be subject to the review and approval of Landlord's environmental consultant.  In connection with the review and approval of the Decommissioning and HazMat Closure Plan, upon the request of Landlord, Tenant shall deliver to Landlord or its consultant such additional non-proprietary information concerning Tenant HazMat Operations as Landlord shall request.  On or before such surrender, Tenant shall deliver to Landlord evidence that the approved Decommissioning and HazMat Closure Plan shall have been satisfactorily completed and Landlord shall have the right, subject to reimbursement at Tenant's expense as set forth below, to cause Landlord's environmental consultant to inspect the Premises and perform such additional procedures as may be deemed reasonably necessary to confirm that the Premises are, as of the effective date of such surrender or early termination of this Lease, free from any residual impact from Tenant HazMat Operations.  Tenant shall reimburse Landlord, as Additional Rent, for the actual out-of-pocket expense incurred by Landlord for Landlord's environmental consultant to review and approve the Decommissioning and HazMat Closure Plan and to visit the Premises and verify satisfactory completion of the same, which cost shall not exceed $5,000.  Landlord shall have the unrestricted right to deliver such Decommissioning and HazMat Closure Plan and any report by Landlord's environmental consultant with respect to the surrender of the Premises to third parties.

If Tenant shall fail to prepare or submit a Decommissioning and HazMat Closure Plan approved by Landlord, or if Tenant shall fail to complete the approved Decommissioning and HazMat Closure Plan, or if such Decommissioning and HazMat Closure Plan, whether or not approved by Landlord, shall fail to adequately address any residual effect of Tenant HazMat Operations in, on or about the Premises, Landlord shall have the right to take such actions as Landlord may deem reasonable or appropriate to assure that the Premises and the Project are surrendered free from any residual impact from Tenant HazMat Operations, the cost of which actions shall be reimbursed by Tenant as Additional Rent, without regard to the limitation set forth in the first paragraph of this Section 28.

Tenant shall immediately return to Landlord all keys and/or access cards to parking, the Project, restrooms or all or any portion of the Premises furnished to or otherwise procured by Tenant.  If any such access card or key is lost, Tenant shall pay to Landlord, at Landlord's election, either the cost of replacing such lost access card or key or the cost of reprogramming the access security system in which such access card was used or changing the lock or locks opened by such lost key.  Any Tenant's Property, Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and/or disposition of such property.  All obligations of Tenant hereunder not fully performed as of the termination of the Term, including the obligations of Tenant under Section 30 hereof, shall survive the expiration or earlier termination of the Term, including, without limitation, indemnity obligations, payment obligations with respect to Rent and obligations concerning the condition and repair of the Premises.

29.          **Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY LAW, TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LANDLORD AND TENANT ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

(a)     **Prohibition/Compliance/Indemnity**.  Tenant shall not cause or permit any Hazardous Materials (as hereinafter defined) to be brought upon, kept, used, stored, handled, treated, generated  in or about, or released or disposed of from, the Premises or the Project in violation of applicable Environmental Requirements (as hereinafter defined) by Tenant or any Tenant Party.  If Tenant breaches the obligation stated in the preceding sentence, or if the presence of Hazardous Materials in the Premises during the Term or any holding over results in contamination of the Premises, the Project or any adjacent property or if contamination of the Premises, the Project or any adjacent property by Hazardous Materials brought into, kept, used, stored, handled, treated, generated in or about, or released or disposed of from, the Premises by anyone other than Landlord and Landlord's employees, agents and contractors otherwise occurs during the Term or any holding over, Tenant hereby indemnifies and shall defend and hold Landlord, its officers, directors, employees, agents and contractors harmless from any and all actions (including, without limitation, remedial or enforcement actions of any kind, administrative or judicial proceedings, and orders or judgments arising out of or resulting therefrom), costs, claims, damages (including, without limitation, punitive damages and damages based upon diminution in value of the Premises or the Project, or the loss of, or restriction on, use of the Premises or any portion of the Project), expenses (including, without limitation, attorneys', consultants' and experts' fees, court costs and amounts paid in settlement of any claims or actions), fines, forfeitures or other civil, administrative or criminal penalties, injunctive or other relief (whether or not based upon personal injury, property damage, or contamination of, or adverse effects upon, the environment, water tables or natural resources), liabilities or losses (collectively, "**Environmental Claims**") which arise during or after the Term as a result of such contamination.  This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, treatment, remedial, removal, or restoration work required by any federal, state or local Governmental Authority because of Hazardous Materials present in the air, soil or ground water above, on, or under the Premises.  Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises, the Building, the Project or any adjacent property caused or permitted by Tenant or any Tenant Party results in any contamination of the Premises, the Building, the Project or any adjacent property, Tenant shall promptly take all actions at its sole expense and in accordance with applicable Environmental Requirements as are necessary to return the Premises, the Building, the Project or any adjacent property to the condition existing prior to the time of such contamination, provided that Landlord's approval of such action shall first be obtained, which approval shall not unreasonably be withheld so long as such actions would not potentially have any material adverse long-term or short-term effect on the Premises or the Project. Notwithstanding anything to the contrary contained in Section 28 or this Section 30, Tenant shall not be responsible for, and the indemnification and hold harmless obligation set forth in this paragraph shall not apply to (i) contamination in the Premises which Tenant can reasonably prove existed in the Premises immediately prior to the Commencement Date, or (ii) the presence of any Hazardous Materials in the Premises which Tenant can reasonably prove migrated from outside of the Premises into the Premises, unless in either case, the presence of such Hazardous Materials (x) is the result of a breach by Tenant of any of its obligations under this Lease, or (y) was caused, contributed to or exacerbated by Tenant or any Tenant Party.

(b)     **Business**.  Landlord acknowledges that it is not the intent of this Section 30 to prohibit Tenant from using the Premises for the Permitted Use.  Tenant may operate its business according to prudent industry practices so long as the use or presence of Hazardous Materials is strictly and properly monitored according to all then applicable Environmental Requirements.  As a material inducement to Landlord to allow Tenant to use Hazardous Materials in connection with its business, Tenant agrees to deliver to Landlord prior to the Commencement Date a list identifying each type of Hazardous Materials to be brought upon, kept, used, stored, handled, treated, generated on, or released or disposed of from, the Premises and setting forth any and all governmental approvals or permits required in connection with the presence, use, storage, handling, treatment, generation, release or disposal of such Hazardous Materials on or from the Premises ("**Hazardous Materials List**").  Upon Landlord's request, or any time that Tenant is required to deliver a Hazardous Materials List to any Governmental Authority (e.g., the fire department) in connection with Tenant's use or occupancy of the Premises, Tenant shall deliver to Landlord a copy of such Hazardous Materials List.  Tenant shall deliver to Landlord true and correct copies of the following documents (the "**Haz Mat Documents**") relating to the use, storage, handling, treatment, generation,

ALEXANDRIA.     Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW    Document 34-1    Filed 11/25/20    Page 154 of 396

release or disposal of Hazardous Materials prior to the Commencement Date, or if unavailable at that time, concurrent with the receipt from or submission to a Governmental Authority:  permits; approvals; reports and correspondence; storage and management plans, notice of violations of any Legal Requirements; plans relating to the installation of any storage tanks to be installed in or under the Project (provided, said installation of tanks shall only be permitted after Landlord has given Tenant its written consent to do so, which consent may be withheld in Landlord's sole and absolute discretion); all closure plans or any other documents required by any and all federal, state and local Governmental Authorities for any storage tanks installed in, on or under the Project for the closure of any such tanks; and a Decommissioning and HazMat Closure Plan (to the extent surrender in accordance with Section 28 cannot be accomplished in 3 months).  Tenant is not required, however, to provide Landlord with any portion(s) of the Haz Mat Documents containing information of a proprietary nature which, in and of themselves, do not contain a reference to any Hazardous Materials or hazardous activities.  It is not the intent of this Section to provide Landlord with information which could be detrimental to Tenant's business should such information become possessed by Tenant's competitors.

(c)      **Tenant Representation and Warranty**.  Tenant hereby represents and warrants to Landlord that (i) neither Tenant nor any of its legal predecessors has been required by any prior landlord, lender or Governmental Authority at any time to take remedial action in connection with Hazardous Materials contaminating a property which contamination was permitted by Tenant of such predecessor or resulted from Tenant's or such predecessor's action or use of the property in question, and (ii) Tenant is not subject to any enforcement order issued by any Governmental Authority in connection with the use, storage, handling, treatment, generation, release or disposal of Hazardous Materials (including, without limitation, any order related to the failure to make a required reporting to any Governmental Authority).  If Landlord determines that this representation and warranty was not true as of the date of this lease, Landlord shall have the right to terminate this Lease in Landlord's sole and absolute discretion.

(d)      **Testing**.  Landlord shall have the right to conduct annual tests of the Premises to determine whether any contamination of the Premises or the Project has occurred as a result of Tenant's use.  Tenant shall be required to pay the cost of such annual test of the Premises only if there is violation of this Section 30 or if contamination for which Tenant is responsible under this Section 30 is identified; provided, however, that if Tenant conducts its own tests of the Premises using third party contractors and test procedures acceptable to Landlord which tests are certified to Landlord, Landlord shall accept such tests in lieu of the annual tests.  In addition, at any time, and from time to time, prior to the expiration or earlier termination of the Term, Landlord shall have the right to conduct appropriate tests of the Premises and the Project to determine if contamination has occurred as a result of Tenant's use of the Premises.  In connection with such testing, upon the request of Landlord, Tenant shall deliver to Landlord or its consultant such non-proprietary information concerning the use of Hazardous Materials in or about the Premises by Tenant or any Tenant Party.  If contamination has occurred for which Tenant is liable under this Section 30, Tenant shall pay all costs to conduct such tests.  If no such contamination is found, Landlord shall pay the costs of such tests (which shall not constitute an Operating Expense).  Landlord shall provide Tenant with a copy of all third party, non-confidential reports and tests of the Premises made by or on behalf of Landlord during the Term without representation or warranty and subject to a confidentiality agreement.  Tenant shall, at its sole cost and expense, promptly and satisfactorily remediate any environmental conditions identified by such testing for which Tenant or any Tenant Party is responsible in accordance with all Environmental Requirements.  Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights which Landlord may have against Tenant.

(e)      **Control Areas**.  Tenant shall be allowed to utilize up to its pro rata share of the Hazardous Materials inventory within any control area or zone (located within the Premises), as designated by the applicable building code, for chemical use or storage.  As used in the preceding sentence, Tenant's pro rata share of any control areas or zones located within the Premises shall be determined based on the rentable square footage that Tenant leases within the applicable control area or zone.  For purposes of example only, if a control area or zone contains 10,000 rentable square feet and 2,000 rentable square feet of a tenant's premises are located within such control area or zone (while such premises as a whole contains 5,000 rentable square feet), the applicable tenant's pro rata share of such control area would be 20%.

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW    Document 34-1    Filed 11/25/20    Page 155 of 396

(f)        **Underground Tanks**.  Tenant shall have no right to use or install any underground or other storage tanks at the Project.

(g)        **Tenant's Obligations**.  Tenant's obligations under this Section 30 shall survive the expiration or earlier termination of this Lease.  During any period of time after the expiration or earlier termination of this Lease required by Tenant or Landlord to complete the removal from the Premises of any Hazardous Materials (including, without limitation, the release and termination of any licenses or permits restricting the use of the Premises and the completion of the approved Decommissioning and HazMat Closure Plan), Tenant shall continue to pay the full Rent in accordance with this Lease for any portion of the Premises not relet by Landlord in Landlord's sole discretion, which Rent shall be prorated daily.

(h)        **Definitions**.  As used herein, the term "**Environmental Requirements**" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any Governmental Authority regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the Project, or the environment, including without limitation, the following:  the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder.  As used herein, the term "**Hazardous Materials**" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, or regulated by reason of its impact or potential impact on humans, animals and/or the environment under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).  As defined in Environmental Requirements, Tenant is and shall be deemed to be the "**operator**" of Tenant's "**facility**" and the "**owner**" of all Hazardous Materials brought on the Premises by Tenant or any Tenant Party, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

31.        **Tenant's Remedies/Limitation of Liability**.  Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary).  Upon any default by Landlord, Tenant shall give notice by registered or certified mail to any Holder of a Mortgage covering the Premises and to any landlord of any lease of property in or on which the Premises are located and Tenant shall offer such Holder and/or landlord a reasonable opportunity to cure the default, including time to obtain possession of the Project by power of sale or a judicial action if such should prove necessary to effect a cure; provided Landlord shall have furnished to Tenant in writing the names and addresses of all such persons who are to receive such notices.  All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of Landlord's obligations hereunder.

All obligations of Landlord under this Lease will be binding upon Landlord only to the extent accruing during the period of its ownership of the Premises and not thereafter.  The term "**Landlord**" in this Lease shall mean only the owner for the time being of the Premises.  Upon the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

32.        **Inspection and Access**.  Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make such repairs as may be required or permitted pursuant to this Lease and for any other business purpose.  Landlord and Landlord's representatives may enter the Premises during business hours on not less than 48 hours advance written notice (except in the case of emergencies in which case no such notice shall be required and such entry may be at any time) for the purpose of effecting any such repairs, inspecting the Premises, showing the Premises to prospective purchasers and, during the last 12 months of the Term, to prospective tenants or for any other business purpose.  Landlord shall use reasonable efforts to minimize interference with

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 156 of 396

Tenant's operations in the Premises during any entry into the Premises by Landlord pursuant to this Section 32. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or that the Project is available for sale. Landlord may grant easements, make public dedications, designate Common Areas and create restrictions on or about the Premises, underlined provided that no such easement, dedication, designation or restriction materially, adversely affects Tenant's use or occupancy of the Premises for the Permitted Use. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions. Tenant shall at all times, except in the case of emergencies, have the right to escort Landlord or its agents, representatives, contractors or guests while the same are in the Premises, provided such escort does not materially and adversely affect Landlord's access rights hereunder. Landlord shall use reasonable efforts to comply with Tenant's reasonable security, confidentiality and safety requirements with respect to entering restricted portions of the Premises; provided, however, that Tenant has notified Landlord of such security, confidentiality and safety requirements reasonably prior to Landlord's entry into the Premises.

33.     **Security**.  Tenant acknowledges and agrees that security devices and services, if any, while intended to deter crime may not in given instances prevent theft or other criminal acts and that Landlord is not providing any security services with respect to the Premises. Tenant agrees that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises. Tenant shall be solely responsible for the personal safety of Tenant's officers, employees, agents, contractors, guests and invitees while any such person is in, on or about the Premises and/or the Project. Tenant shall at Tenant's cost obtain insurance coverage to the extent Tenant desires protection against such criminal acts.

34.     **Force Majeure**.  Except for the payment of Rent, neither Landlord nor Tenant shall be held responsible or liable for delays in the performance of its obligations hereunder when caused by, related to, or arising out of acts of God, sinkholes or subsidence, strikes, lockouts, or other labor disputes, embargoes, quarantines, weather, national, regional, or local disasters, calamities, or catastrophes, inability to obtain labor or materials (or reasonable substitutes therefor) at reasonable costs or failure of, or inability to obtain, utilities necessary for performance, governmental restrictions, orders, limitations, regulations, or controls, national emergencies, delay in issuance or revocation of permits, enemy or hostile governmental action, terrorism, insurrection, riots, civil disturbance or commotion, fire or other casualty, and other causes or events beyond their reasonable ("**Force Majeure**").

35.     **Brokers**.  Landlord and Tenant each represents and warrants that it has not dealt with any broker, agent or other person (collectively, "**Broker**") in connection with this transaction and that no Broker brought about this transaction, other than T3 Advisors, Jones Lang LaSalle and Newmark Cornish & Carey. Landlord and Tenant each hereby agree to indemnify and hold the other harmless from and against any claims by any Broker, other than T3 Advisors, Jones Lang LaSalle and Newmark Cornish & Carey, claiming a commission or other form of compensation by virtue of having dealt with Tenant or Landlord, as applicable, with regard to this leasing transaction. Landlord shall be responsible for all commissions due to T3 Advisors, Jones Lang LaSalle and Newmark Cornish & Carey arising out of the execution of this Lease in accordance with the terms of a separate written agreement between Landlord, on the one hand, and T3 Advisors, Jones Lang LaSalle and Newmark Cornish & Carey, on the other hand.

36.     **Limitation on Landlord's Liability**.  NOTWITHSTANDING ANYTHING SET FORTH HEREIN OR IN ANY OTHER AGREEMENT BETWEEN LANDLORD AND TENANT TO THE CONTRARY:  (A) LANDLORD SHALL NOT BE LIABLE TO TENANT OR ANY OTHER PERSON FOR (AND TENANT AND EACH SUCH OTHER PERSON ASSUME ALL RISK OF) LOSS, DAMAGE OR INJURY, WHETHER ACTUAL OR CONSEQUENTIAL TO:  TENANT'S PERSONAL PROPERTY OF EVERY KIND AND DESCRIPTION, INCLUDING, WITHOUT LIMITATION TRADE FIXTURES, EQUIPMENT, INVENTORY, SCIENTIFIC RESEARCH, SCIENTIFIC EXPERIMENTS, LABORATORY ANIMALS, PRODUCT, SPECIMENS, SAMPLES, AND/OR SCIENTIFIC, BUSINESS, ACCOUNTING AND OTHER RECORDS OF EVERY KIND AND DESCRIPTION KEPT AT THE PREMISES AND ANY AND ALL INCOME DERIVED OR DERIVABLE THEREFROM; (B) THERE SHALL BE NO PERSONAL RECOURSE TO LANDLORD FOR ANY ACT OR OCCURRENCE IN, ON OR ABOUT THE PREMISES OR ARISING IN ANY WAY

ALEXANDRIA.     Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 157 of 396

UNDER THIS LEASE OR ANY OTHER AGREEMENT BETWEEN LANDLORD AND TENANT WITH RESPECT TO THE SUBJECT MATTER HEREOF AND ANY LIABILITY OF LANDLORD HEREUNDER SHALL BE STRICTLY LIMITED SOLELY TO LANDLORD'S INTEREST IN THE PROJECT OR ANY PROCEEDS FROM SALE OR CONDEMNATION THEREOF AND ANY INSURANCE PROCEEDS PAYABLE IN RESPECT OF LANDLORD'S INTEREST IN THE PROJECT OR IN CONNECTION WITH ANY SUCH LOSS; AND (C) IN NO EVENT SHALL ANY PERSONAL LIABILITY BE ASSERTED AGAINST LANDLORD IN CONNECTION WITH THIS LEASE NOR SHALL ANY RECOURSE BE HAD TO ANY OTHER PROPERTY OR ASSETS OF LANDLORD OR ANY OF LANDLORD'S OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR CONTRACTORS.  UNDER NO CIRCUMSTANCES SHALL LANDLORD OR ANY OF LANDLORD'S OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR CONTRACTORS BE LIABLE FOR INJURY TO TENANT'S BUSINESS OR FOR ANY LOSS OF INCOME OR PROFIT THEREFROM.

37.          **Severability**.  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby.  It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in effect to such illegal, invalid or unenforceable clause or provision as shall be legal, valid and enforceable.

38.          **Signs; Exterior Appearance**.  Tenant shall not, without the prior written consent of Landlord, which may be granted or withheld in Landlord's sole discretion:  (i) attach any awnings, exterior lights, decorations, balloons, flags, pennants, banners, painting or other projection to any outside wall of the Project, (ii) use any curtains, blinds, shades or screens other than Landlord's standard window coverings, (iii) coat or otherwise sunscreen the interior or exterior of any windows, (iv) place any bottles, parcels, or other articles on the window sills, (v) place any equipment, furniture or other items of personal property on any exterior balcony, or (vi) paint, affix or exhibit on any part of the Premises or the Project any signs, notices, window or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises.  Suite entry signage and signage on the lobby directory shall be inscribed, painted or affixed for Tenant by Landlord at the sole cost and expense of Landlord, and shall be of a size, color and type reasonably acceptable to Landlord.  Nothing may be placed on the exterior of corridor walls or corridor doors other than Landlord's standard lettering.  The directory tablet shall be provided exclusively for the display of the name and location of tenants.

Tenant shall also have the non-exclusive right to display, at Tenant's cost and expense, a sign bearing Tenant's name and/or logo at a location on the Building façade facing the 101 freeway and otherwise in a location designated by Landlord and reasonably acceptable to Tenant ("**Building Sign**").  Tenant shall be entitled to its pro-rata share of available Building façade signage.  Notwithstanding the foregoing, Tenant acknowledges and agrees that Tenant's Building Sign including, without limitation, the size, color and type, shall be subject to Landlord's prior written approval (which approval shall not be unreasonably withheld, conditioned or delayed) and shall be consistent with Landlord's signage program at the Project and applicable Legal Requirements.  Tenant shall be responsible, at Tenant's sole cost and expense, for the maintenance of Tenant's Building Sign, for the removal of Tenant's Building Sign at the expiration or earlier termination of this Lease and for the repair all damage resulting from such removal.

39.          **Right to Expand**.

(a)          **Right of First Refusal**.  Subject to the terms of this Section 39(a), the first time after the mutual execution and delivery of this Lease by the parties through the date that is 12 months after the Rent Commencement Date (the "**ROFR Expiration Date**") that Landlord intends to accept a bona fide written proposal (the "**Pending Deal**") to lease all or a portion the ROFR Space (as hereinafter defined) to a third party, Landlord shall deliver to Tenant written notice (the "**Pending Deal Notice**") of the existence of such Pending Deal and the material terms of such Pending Deal.  For purposes of this Section 39(a), "**ROFR Space**" shall mean all leasable space located on the fourth floor of the Building.  For the avoidance of doubt, Tenant shall be required to exercise its right under this Section 39(a) with respect to all of the space

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 158 of 396

described in the Pending Deal Notice, including, at Landlord's option, any space in addition to the ROFR Space that is described in the Pending Deal Notice, which additional space shall be deemed to be included as part of the ROFR Space (the "**Identified Space**"). Within 10 business days after Tenant's receipt of the Pending Deal Notice, Tenant shall deliver to Landlord written notice (the "**Acceptance Notice**") if Tenant elects to lease the Identified Space. Tenant's right to receive the Pending Deal Notice and election to lease or not lease the Identified Space pursuant to this Section 39(a) is hereinafter referred to as the "**Right of First Refusal**." If Tenant elects to lease the Identified Space described in the Pending Deal Notice by delivering the Space Acceptance Notice within the required 10 business day period, Tenant shall be deemed to agree to expand the Premises to include the Identified Space and to lease the Identified Space on the same general terms and conditions as this Lease except that the terms of this Lease shall be modified to reflect the terms of the Pending Deal Notice for the rental of the Identified Space. Tenant acknowledges that the term of this Lease with respect to the Identified Space and the Term of this Lease with respect to the existing Premises may not be co-terminous. Notwithstanding anything to the contrary contained herein, in no event shall the Work Letter apply to the Identified Space. If Tenant fails to deliver a Space Acceptance Notice to Landlord within the required 10 business day period, Tenant shall have deemed to have waived its rights under this Section 39(a) with respect to the Identified Space. Notwithstanding anything to the contrary contained herein, Tenant's rights under this Section 39(a) shall terminate and be of no further force or effect as of the ROFR Expiration Date. Notwithstanding anything to the contrary contained herein, if Landlord fails to execute a lease for the Identified Space within 6 months after the above-referenced 10 business day period, Tenant's Right of Refusal shall be restored with respect to the next Pending Deal with respect to such Identified Space. Notwithstanding anything to the contrary contained herein, Tenant's rights under this Section 39(a) shall terminate and be of no further force or effect after the date that is 12 months prior to the expiration of the Base Term if Tenant has not exercised its Extension Right (as defined in Section 40 below) pursuant to the terms of Section 40.

(b)          **Amended Lease**. If: (i) Tenant fails to timely deliver an Acceptance Notice, or (ii) after the expiration of a period of 120 days after Landlord's delivery to Tenant of a lease amendment for Tenant's lease of the Identified Space, no lease amendment for the Identified Space acceptable to both parties each in their reasonable discretion after using diligent good faith efforts negotiate the same, has been executed, Tenant shall, notwithstanding anything to the contrary contained herein, be deemed to have forever waived its right to lease such Identified Space.

(c)          **Exceptions**. Notwithstanding the above, the Right of First Refusal shall, at Landlord's option, not be in effect and may not be exercised by Tenant:

(i)                          during any period of time that Tenant is in Default under any provision of this Lease; or

(ii)                          if Tenant has been in Default under any provision of this Lease 3 or more times, whether or not the Defaults are cured, during the 12 month period prior to the date on which Tenant seeks to exercise the Right of First Refusal.

(d)          **Termination**. The Right of First Refusal shall, at Landlord's option, terminate and be of no further force or effect even after Tenant's due and timely exercise of Right of First Refusal if, after such exercise, but prior to the commencement date of the lease of the Identified Space, (i) Tenant fails to cure any default by Tenant under this Lease within the applicable notice and cure period; or (ii) Tenant has Defaulted 3 or more times during the period from the date of the exercise of the Right of First Refusal to the date of the commencement of the lease of the Identified Space, whether or not such Defaults are cured.

(e)          **Rights Personal**. The Right of First Refusal is personal to Tenant and is not assignable without Landlord's consent, which may be granted or withheld in Landlord's sole discretion separate and apart from any consent by Landlord to an assignment of Tenant's interest in this Lease, except that it may be assigned in connection with any Permitted Assignment of this Lease.

 Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 159 of 396

(f)          **No Extensions**.  The period of time within which the Right of First Refusal may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise the Right of First Refusal.

40.          **Right to Extend Term**.  Tenant shall have the right to extend the Term of this Lease upon the following terms and conditions:

(a)          **Extension Rights**.  Tenant shall have 1 right (the "**Extension Right**") to extend the term of this Lease for 5 years (the "**Extension Term**") on the same terms and conditions as this Lease (other than with respect to Base Rent and the Work Letter) by giving Landlord written notice of its election to exercise the Extension Right at least 12 months prior, and no earlier than 15 months prior, to the expiration of the Base Term of this Lease.

Upon the commencement of the Extension Term, Base Rent shall be payable at the Market Rate (as defined below).  Base Rent shall thereafter be adjusted on each annual anniversary of the commencement of such Extension Term by a percentage as determined by Landlord and agreed to by Tenant at the time the Market Rate is determined.  As used herein, "**Market Rate**" shall mean the rate that comparable landlords of comparable buildings have accepted in current transactions from non-equity (i.e., not being offered equity in the buildings) and nonaffiliated tenants of similar financial strength for space of comparable size, quality (including all Tenant Improvements, Alterations and other improvements) and floor height in Class A laboratory/office buildings in the San Mateo/San Carlos/Redwood City area for a comparable term, with the determination of the Market Rate to take into account all relevant factors, including tenant inducements, views, available amenities, parking costs, leasing commissions, allowances or concessions, if any.  In addition, if the Market Rate then includes rent for parking, Landlord may impose a market rent for the parking rights provided hereunder.

If, on or before the date which is 270 days prior to the expiration of the Base Term of this Lease, Tenant has not agreed with Landlord's determination of the Market Rate and the rent escalations during the Extension Term after negotiating in good faith, Tenant shall be deemed to have elected arbitration as described in Section 40(b).  Tenant acknowledges and agrees that, if Tenant has elected to exercise the Extension Right by delivering notice to Landlord as required in this Section 40(a), Tenant shall have no right thereafter to rescind or elect not to extend the term of this Lease for the Extension Term.

(b)          **Arbitration**.

(i)          Within 10 days of Tenant's notice to Landlord of its election (or deemed election) to arbitrate Market Rate and escalations, each party shall deliver to the other a proposal containing the Market Rate and escalations that the submitting party believes to be correct ("**Extension Proposal**").  If either party fails to timely submit an Extension Proposal, the other party's submitted proposal shall determine the Base Rent and escalations for the Extension Term.  If both parties submit Extension Proposals, then Landlord and Tenant shall meet within 7 days after delivery of the last Extension Proposal and make a good faith attempt to mutually appoint a single Arbitrator (and defined below) to determine the Market Rate and escalations.  If Landlord and Tenant are unable to agree upon a single Arbitrator, then each shall, by written notice delivered to the other within 10 days after the meeting, select an Arbitrator.  If either party fails to timely give notice of its selection for an Arbitrator, the other party's submitted proposal shall determine the Base Rent for the Extension Term.  The 2 Arbitrators so appointed shall, within 5 business days after their appointment, appoint a third Arbitrator.  If the 2 Arbitrators so selected cannot agree on the selection of the third Arbitrator within the time above specified, then either party, on behalf of both parties, may request such appointment of such third Arbitrator by application to any state court of general jurisdiction in the jurisdiction in which the Premises are located, upon 10 days prior written notice to the other party of such intent.

(ii)          The decision of the Arbitrator(s) shall be made within 30 days after the appointment of a single Arbitrator or the third Arbitrator, as applicable.  The decision of the single Arbitrator shall

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 160 of 396

be final and binding upon the parties.  The average of the two closest Arbitrators in a three Arbitrator panel shall be final and binding upon the parties.  Each party shall pay the fees and expenses of the Arbitrator appointed by or on behalf of such party and the fees and expenses of the third Arbitrator shall be borne equally by both parties.  If the Market Rate and escalations are not determined by the first day of the Extension Term, then Tenant shall pay Landlord Base Rent in an amount equal to the Base Rent in effect immediately prior to the Extension Term and increased by the Rent Adjustment Percentage until such determination is made.  After the determination of the Market Rate and escalations, the parties shall make any necessary adjustments to such payments made by Tenant.  Landlord and Tenant shall then execute an amendment recognizing the Market Rate and escalations for the Extension Term.

(iii)             An "**Arbitrator**" shall be any person appointed by or on behalf of either party or appointed pursuant to the provisions hereof and:  (i) shall be (A) a member of the American Institute of Real Estate Appraisers with not less than 10 years of experience in the appraisal of improved office and high tech industrial real estate in the San Francisco peninsula area, or (B) a licensed commercial real estate broker with not less than 15 years' experience representing landlords and/or tenants in the leasing of high tech or life sciences space in the San Francisco peninsula area, (ii) devoting substantially all of their time to professional appraisal or brokerage work, as applicable, at the time of appointment and (iii) be in all respects impartial and disinterested.

(c)             **Rights Personal**.  The Extension Right is personal to Tenant and is not assignable without Landlord's consent, which may be granted or withheld in Landlord's sole discretion separate and apart from any consent by Landlord to an assignment of Tenant's interest in this Lease, except that they may be assigned in connection with any Permitted Assignment of this Lease.

(d)             **Exceptions**.  Notwithstanding anything set forth above to the contrary, the Extension Right shall, at Landlord's option, not be in effect and Tenant may not exercise any of the Extension Right:

(i)                  during any period of time that Tenant is in Default under any provision of this Lease; or

(ii)                 if Tenant has been in Default under any provision of this Lease 3 or more times, whether or not the Defaults are cured, during the 12 month period immediately prior to the date that Tenant intends to exercise the Extension Right, whether or not the Defaults are cured.

(e)             **No Extensions**.  The period of time within which the Extension Right may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise the Extension Right.

(f)             **Termination**.  The Extension Right shall, at Landlord's option, terminate and be of no further force or effect even after Tenant's due and timely exercise of the Extension Right, if, after such exercise, but prior to the commencement date of the Extension Term, (i) Tenant fails to cure any default by Tenant under this Lease within the applicable notice and cure period; or (ii) Tenant has Defaulted 3 or more times during the period from the date of the exercise of the Extension Right to the date of the commencement of the Extension Term, whether or not such Defaults are cured.

41.             **Roof Equipment**.  As long as Tenant is not in default under this Lease, Tenant shall have the right at its sole cost and expense, subject to compliance with all Legal Requirements, to install, maintain, and remove on the top of the roof of the Building in a location designated by Landlord a satellite dish, communication antennae, or other telecommunications equipment (all of which having a size, diameter and height acceptable to Landlord) for the transmission or reception of communication of signals as Tenant may from time to time desire (collectively, the "**Roof Equipment**") on the following terms and conditions:

(a)             **Requirements**.  Tenant shall submit to Landlord (i) the plans and specifications for the installation of the Roof Equipment, (ii) copies of all required governmental and quasi-governmental permits, licenses, and authorizations that Tenant will and must obtain at its own expense, with the cooperation of

ALEXANDRIA.   Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 161 of 396

Landlord, if necessary for the installation and operation of the Roof Equipment, and (ii) an insurance policy or certificate of insurance evidencing insurance coverage as required by this Lease and any other insurance as reasonably required by Landlord for the installation and operation of the Roof Equipment.  Landlord shall not unreasonably withhold or delay its approval for the installation and operation of the Roof Equipment; provided, however, that Landlord may reasonably withhold its approval if the installation or operation of the Roof Equipment (A) may damage the structural integrity of the Building, (B) may void, terminate, or invalidate any applicable roof warranty, (C) may interfere with any service provided by Landlord or any tenant of the Building, (D) may reduce the leasable space in the Building, or (E) is not properly screened from the viewing public.

(b) **No Damage to Roof**.  If installation of the Roof Equipment requires Tenant to make any roof cuts or perform any other roofing work, such cuts shall only be made to the roof area of the Building located directly above the Premises and only in the manner designated in writing by Landlord; and any such installation work (including any roof cuts or other roofing work) shall be performed by Tenant, at Tenant's sole cost and expense by a roofing contractor designated by Landlord.  If Tenant or its agents shall otherwise cause any damage to the roof during the installation, operation, and removal of the Roof Equipment such damage shall be repaired promptly at Tenant's expense and the roof shall be restored in the same condition it was in before the damage.  Landlord shall not charge Tenant Additional Rent for the installation and use of the Roof Equipment.  If, however, Landlord's insurance premium or Tax assessment increases as a result of the Roof Equipment, Tenant shall pay such increase as Additional Rent within ten (10) days after receipt of a reasonably detailed invoice from Landlord.  Tenant shall not be entitled to any abatement or reduction in the amount of Rent payable under this Lease if for any reason Tenant is unable to use the Roof Equipment.  In no event whatsoever shall the installation, operation, maintenance, or removal of the Roof Equipment by Tenant or its agents void, terminate, or invalidate any applicable roof warranty.

(c) **Protection**.  The installation, operation, and removal of the Roof Equipment shall be at Tenant's sole risk.  Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all claims, costs, damages, liabilities and expenses (including, but not limited to, attorneys' fees) of every kind and description that may arise out of or be connected in any way with Tenant's installation, operation, or removal of the Roof Equipment.

(d) **Removal**.  At the expiration or earlier termination of this Lease or the discontinuance of the use of the Roof Equipment by Tenant, Tenant shall, at its sole cost and expense, remove the Roof Equipment from the Building.  Tenant shall leave the portion of the roof where the Roof Equipment was located in good order and repair, reasonable wear and tear excepted.  If Tenant does not so remove the Roof Equipment, Tenant hereby authorizes Landlord to remove and dispose of the Roof Equipment and charge Tenant as Additional Rent for all costs and expenses incurred by Landlord in such removal and disposal.  Tenant agrees that Landlord shall not be liable for any Roof Equipment or related property disposed of or removed by Landlord.

(e) **No Interference**.  The Roof Equipment shall not interfere with the proper functioning of any telecommunications equipment or devices that have been installed or will be installed by Landlord or for any other tenant or future tenant of the Building.  Tenant acknowledges that other tenant(s) may have approval rights over the installation and operation of telecommunications equipment and devices on or about the roof, and that Tenant's right to install and operate the Roof Equipment is subject and subordinate to the rights of such other tenants.  Tenant agrees that any other tenant of the Building that currently has or in the future takes possession of any portion of the Building will be permitted to install such telecommunication equipment that is of a type and frequency that will not cause unreasonable interference to the Roof Equipment.

(f) **Relocation**.  Landlord shall have the right, at its expense and after 60 days prior notice to Tenant, to relocate the Roof Equipment to another site on the roof of the Building as long as such site reasonably meets Tenant's sight line and interference requirements and does not unreasonably interfere with Tenant's use and operation of the Roof Equipment.

ALEXANDRIA.   Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 162 of 396

(g)          **Access**.  Landlord grants to Tenant the right of ingress and egress to install, operate, and maintain the Roof Equipment; provided, however, that Tenant shall have no right to exercise any such ingress and egress right unless Tenant is accompanied by a representative of Landlord at all times while Tenant is accessing the roof.  Upon Tenant's request, Landlord shall supply Tenant with the name, telephone, and pager numbers of the contact individual(s) responsible for providing access.

(h)          **Appearance**.  If permissible by Legal Requirements, the Roof Equipment shall be painted the same color as the Building so as to render the Roof Equipment virtually invisible from ground level.

(i)          **No Assignment**.  Except as otherwise expressly provided herein, the right of Tenant to use and operate the Roof Equipment shall be personal solely to Tenant, and (i) no other person or entity shall have any right to use or operate the Roof Equipment, and (ii) Tenant shall not assign, convey, or otherwise transfer to any person or entity any right, title, or interest in all or any portion of the Roof Equipment or the use and operation thereof other than in connection with a sublease of the Premises or an assignment of the Lease pursuant to Section 22(b).

42.          **Miscellaneous**.

(a)          **Notices**.  All notices or other communications between the parties shall be in writing and shall be deemed duly given upon delivery or refusal to accept delivery by the addressee thereof if delivered in person, or upon actual receipt if delivered by reputable overnight guaranty courier, addressed and sent to the parties at their addresses set forth above.  Landlord and Tenant may from time to time by written notice to the other designate another address for receipt of future notices.

(b)          **Joint and Several Liability**.  If and when included within the term "**Tenant**," as used in this instrument, there is more than one person or entity, each shall be jointly and severally liable for the obligations of Tenant.

(c)          **Financial Information**.  Tenant shall furnish Landlord  with true and complete copies of (i) Tenant's most recent audited annual financial statements within 90 days of the end of each of Tenant's fiscal years during the Term, (ii) Tenant's most recent unaudited quarterly financial statements within 45 days of the end of each of Tenant's first three fiscal quarters of each of Tenant's fiscal years during the Term, and (iii) any other financial information or summaries that Tenant typically provides to its lenders or shareholders. So long as Tenant is a "public company" and its financial information is publicly available, then the foregoing delivery requirements of this Section 41(c) shall not apply.  Landlord shall treat Tenant's financial information as confidential information belonging to Tenant and will not disclose the same other than on a need-to-know basis to Landlord's affiliates, legal, financial or tax advisors, consultants, potential lenders and potential purchasers and as required by Legal Requirements.

(d)          **Recordation**.  Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record.  Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

(e)          **Interpretation**.  The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.  Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.  The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(f)          **Not Binding Until Executed**.  The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

ALEXANDRIA.     Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW Document 34-1 Filed 11/25/20 Page 163 of 396

(g)        **Limitations on Interest**.  It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease.  If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(h)        **Choice of Law**.  Construction and interpretation of this Lease shall be governed by the internal laws of the state in which the Premises are located, excluding any principles of conflicts of laws.

(i)        **Time**.  Time is of the essence as to the performance of Tenant's obligations under this Lease.

(j)        **OFAC**.  Tenant and all beneficial owners of Tenant are currently (a) in compliance with and shall at all times during the Term of this Lease remain in compliance with the regulations of the Office of Foreign Assets Control ("**OFAC**") of the U.S. Department of Treasury and any statute, executive order, or regulation relating thereto (collectively, the "**OFAC Rules**"), (b) not listed on, and shall not during the term of this Lease be listed on, the Specially Designated Nationals and Blocked Persons List, Foreign Sanctions Evaders List, or the Sectoral Sanctions Identification List, which are all maintained by OFAC and/or on any other similar list maintained by OFAC or other governmental authority pursuant to any authorizing statute, executive order, or regulation, and (c) not a person or entity with whom a U.S. person is prohibited from conducting business under the OFAC Rules.

(k)        **Incorporation by Reference**.  All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof.  If there is any conflict between such exhibits or addenda and the terms of this Lease, such exhibits or addenda shall control.

(l)        **Entire Agreement**.  This Lease, including the exhibits attached hereto, constitutes the entire agreement between Landlord and Tenant pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, letters of intent, negotiations and discussions, whether oral or written, of the parties, and there are no warranties, representations or other agreements, express or implied, made to either party by the other party in connection with the subject matter hereof except as specifically set forth herein.

(m)        **No Accord and Satisfaction**.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly installment of Base Rent or any Additional Rent will be other than on account of the earliest stipulated Base Rent and Additional Rent, nor will any endorsement or statement on any check or letter accompanying a check for payment of any Base Rent or Additional Rent be an accord and satisfaction.  Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedy provided in this Lease.

(n)        **Hazardous Activities**.  Notwithstanding any other provision of this Lease, Landlord, for itself and its employees, agents and contractors, reserves the right to refuse to perform any repairs or services in any portion of the Premises which, pursuant to Tenant's routine safety guidelines, practices or custom or prudent industry practices, require any form of protective clothing or equipment other than safety glasses.  In any such case, Tenant shall contract with parties who are acceptable to Landlord, in Landlord's reasonable discretion, for all such repairs and services, and Landlord shall, to the extent required, equitably adjust Tenant's Share of Operating Expenses in respect of such repairs or services to reflect that Landlord is not providing such repairs or services to Tenant.

(o)        **Intentionally Omitted**.

ALEXANDRIA.    Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

(p)      **EV Charging Stations**.  Landlord shall not unreasonably withhold its consent to Tenant's written request to install 1 or more electric vehicle car charging stations ("**EV Stations**") in the parking area serving the Project; provided, however, that Tenant complies with all reasonable requirements, standards, rules and regulations which may be imposed by Landlord, at the time Landlord's consent is granted, in connection with Tenant's installation, maintenance, repair and operation of such EV Stations, which may include, without limitation, the charge to Tenant of a reasonable monthly rental amount for the parking spaces used by Tenant for such EV Stations, Landlord's designation of the location of Tenant's EV Stations, and Tenant's payment of all costs whether incurred by Landlord or Tenant in connection with the installation, maintenance, repair and operation of each Tenant's EV Station(s).  Nothing contained in this paragraph is intended to increase the number of parking spaces which Tenant is otherwise entitled to use at the Project under Section 10 of this Lease nor impose any additional obligations on Landlord with respect to Tenant's parking rights at the Project.

(q)      **California Accessibility Disclosure**.  For purposes of Section 1938(a) of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Project has not undergone inspection by a Certified Access Specialist (CASp).  In addition, the following notice is hereby provided pursuant to Section 1938(e) of the California Civil Code:  "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law.  Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant.  The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises."  In furtherance of and in connection with such notice:  (i) Tenant, having read such notice and understanding Tenant's right to request and obtain a CASp inspection, hereby elects not to obtain such CASp inspection and forever waives its rights to obtain a CASp inspection with respect to the Premises, Building and/or Project to the extent permitted by Legal Requirements; and (ii) if the waiver set forth in clause (i) hereinabove is not enforceable pursuant to Legal Requirements, then Landlord and Tenant hereby agree as follows (which constitutes the mutual agreement of the parties as to the matters described in the last sentence of the foregoing notice):  (A) Tenant shall have the one-time right to request for and obtain a CASp inspection, which request must be made, if at all, in a written notice delivered by Tenant to Landlord; (B) any CASp inspection timely requested by Tenant shall be conducted (1) at a time mutually agreed to by Landlord and Tenant, (2) in a professional manner by a CASp designated by Landlord and without any testing that would damage the Premises, Building or Project in any way, and (3) at Tenant's sole cost and expense, including, without limitation, Tenant's payment of the fee for such CASp inspection, the fee for any reports prepared by the CASp in connection with such CASp inspection (collectively, the "**CASp Reports**") and all other costs and expenses in connection therewith; (C) the CASp Reports shall be delivered by the CASp simultaneously to Landlord and Tenant; (D) Tenant, at its sole cost and expense, shall be responsible for making any improvements, alterations, modifications and/or repairs to or within the Premises to correct violations of construction-related accessibility standards including, without limitation, any violations disclosed by such CASp inspection; and (E) if such CASp inspection identifies any improvements, alterations, modifications and/or repairs necessary to correct violations of construction-related accessibility standards relating to those items of the Building and Project located outside the Premises that are Landlord's obligation to repair as set forth in this Lease, then Landlord shall perform such improvements, alterations, modifications and/or repairs as and to the extent required by Legal Requirements to correct such violations, and Tenant shall reimburse Landlord for the cost of such improvements, alterations, modifications and/or repairs within 10 business days after Tenant's receipt of an invoice therefor from Landlord.

(r)      **Counterparts**.  This Lease may be executed in 2 or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature process complying with the U.S. federal ESIGN Act of 2000) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

 ALEXANDRIA.  Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 165 of 396

Electronic signatures shall be deemed original signatures for purposes of this Lease and all matters related thereto, with such electronic signatures having the same legal effect as original signatures.

**[ Signatures on next page ]**


Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 165 of 396

Electronic signatures shall be deemed original signatures for purposes of this Lease and all matters related thereto, with such electronic signatures having the same legal effect as original signatures.

**[ Signatures on next page ]**

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 166 of 396

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

**TENANT:**

**ALLAKOS INC.**,
a Delaware corporation


By:  /s/ Robert Alexander
Its:  CEO_____


**LANDLORD:**

**ARE-SAN FRANCISCO NO. 63, LLC**,
a Delaware limited liability company

By:        ALEXANDRIA REAL ESTATE EQUITIES, L.P.,
           a Delaware limited partnership,
           managing member

     By:        ARE-QRS CORP.,
                a Maryland corporation,
                general partner


        By:  /s/ Jennifer Banks
        Its:  Co-Chief Operating Officer
              & General Counsel

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

EXHIBIT A TO LEASE

**DESCRIPTION OF PREMISES**



Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL
RIGHTS RESERVED.  Confidential and Proprietary – Do Not
Copy or Distribute.  Alexandria and the Alexandria Logo are
registered trademarks of Alexandria Real Estate Equities, Inc.

ALEXANDRIA.



Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

825 Industrial/Allakos - Page 2

EXHIBIT B TO LEASE

**DESCRIPTION OF PROJECT**

ALEXANDRIA.     Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Area Tabulations for
**Alexandria Properties**
825-835 Industrial Road
San Carlos, CA

BAYSHORE FREEWAY

845 INDUSTRIAL ROAD

BRANSTEN ROAD

825 INDUSTRIAL ROAD

835 INDUSTRIAL ROAD

INDUSTRIAL ROAD

ARC TEC

ALEXANDRIA.

DATE:   April 2019

**Site Plan**

PROJECT NO:   17447101

**EXHIBIT C TO LEASE**

## WORK LETTER

THIS WORK LETTER (this "**Work Letter**") is incorporated into that certain Lease Agreement (the "**Lease**") dated as of November ____, 2019 by and between **ARE-SAN FRANCISCO NO. 63, LLC**, a Delaware limited liability company ("**Landlord**"), and **ALLAKOS INC.**, a Delaware corporation ("**Tenant**").  Any initially capitalized terms used but not defined herein shall have the meanings given them in the Lease.

    1.             **General Requirements**.

    (a)             **Tenant's Authorized Representative**.  Tenant designates XXXXXXXXX ("**Tenant's Representative**") as the only person authorized to act for Tenant pursuant to this Work Letter.  Landlord shall not be obligated to respond to or act upon any request, approval, inquiry or other communication ("**Communication**") from or on behalf of Tenant in connection with this Work Letter unless such Communication is in writing from Tenant's Representative.  Tenant may change Tenant's Representative at any time upon not less than 5 business days advance written notice to Landlord.

    (b)             **Landlord's Authorized Representative**.  Landlord designates Dan Tsang and Dan Stoddard (either such individual acting alone, "**Landlord's Representative**") as the only persons authorized to act for Landlord pursuant to this Work Letter.  Tenant shall not be obligated to respond to or act upon any request, approval, inquiry or other Communication from or on behalf of Landlord in connection with this Work Letter unless such Communication is in writing from Landlord's Representative.  Landlord may change either Landlord's Representative at any time upon not less than 5 business days advance written notice to Tenant.

    (c)             **Architects, Consultants and Contractors**.  Landlord and Tenant hereby acknowledge and agree that the architect (the "**TI Architect**") for the Tenant Improvements (as defined in Section 2(a) below), the general contractor and any subcontractors for the Tenant Improvements shall be selected by Tenant, subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Landlord shall be named a third party beneficiary of any contract entered into by Tenant with the TI Architect and the general contractor and of any warranty given by such parties.

ARC-TEC shall be the architect (the "**Architect**") for Landlord's Work (as defined below) and Truebeck shall be the general contractor for Landlord's Work.  Landlord shall select any subcontractors for Landlord's Work in Landlord's sole and absolute discretion.

    2.             **Landlord's Work and Tenant Improvements**.

    (a)             **Landlord's Work and Tenant Improvements Defined**.  As used herein, (i) "**Landlord's Work**" shall mean the design and construction of the building shell and related site improvements ("**Building Shell**") consisting of the elements described on the Basis of Design attached hereto as **Schedule 1** under the categories of "Cold Shell" and "Full Shell Warm Up" and related site improvements marked with an "X" (collectively, the "**Basis of Design**") and the index referencing plans attached hereto as **Schedule 2** ("**Building Shell Construction Drawings**"), and (ii) "**Tenant Improvements**" shall mean the design and construction of improvements to the Premises of a fixed and permanent nature as more particularly provided for in this Work Letter.  The design of the Building Shell shall be generally consistent with the Basis of Design and the Building Shell Construction Drawings described on **Schedule 1** and **Schedule 2**, respectively; provided, however, that Tenant acknowledges that Landlord may make changes to the Building Shell, as determined by Landlord in its reasonable discretion; provided, however, that Landlord shall not make any changes to the Building Shell that would materially adversely affect Tenant's use of the Premises or result in a material increase in the cost of the Tenant Improvements (as reflected in the Budget (as defined in Section 5(a) below)) or a material delay in the schedule for the construction of the Tenant Improvements or require material changes to the Space Plans or TI Construction Drawings, without Tenant's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

ALEXANDRIA.  Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Landlord shall promptly notify Tenant in writing of any material changes made by Landlord to the Building Shell that could be reasonably anticipated to result in a material increase in the cost of the Tenant Improvements or a material delay in the schedule for the construction of the Tenant Improvements or require changes to the Space Plans or TI Construction Drawings.  Notwithstanding anything to the contrary contained herein, Landlord is under no obligation to make any changes that may be requested by Tenant to the Building Shell except as set forth below.  Other than (i) completing Landlord's Work, at Landlord's sole cost and expense, and (ii) funding the TI Allowance, Landlord shall not have any obligation whatsoever with respect to the finishing of the Premises or the Project for Tenant's use and occupancy. Landlord shall perform Landlord's Work in a good and workmanlike manner and in compliance with Legal Requirements.

(b)        **Tenant's Space Plans**.  Tenant shall deliver to Landlord schematic drawings and outline specifications (the "**Space Plans**") detailing Tenant's requirements for the Tenant Improvements.  Not more than 10 days thereafter, Landlord shall deliver to Tenant the written objections, questions or comments of Landlord and the TI Architect with regard to the Space Plans.  Tenant shall cause the Space Plans to be revised to address such written comments and shall resubmit said drawings to Landlord for approval (which approval shall not be unreasonably withheld) within 5 business days thereafter.  Such process shall continue until Landlord has approved the Space Plans.  Landlord shall not unreasonably withhold, condition or delay its approval of the Space Plans.  Landlord and Tenant acknowledge and agree that the Tenant Improvements shall comply in all respects with the LEED Standards set forth on **Schedule 3** attached hereto; provided, however, that Landlord shall install the HVAC systems necessary to comply with the same.

(c)        **Working Drawings**.  Tenant shall cause the TI Architect to prepare and deliver to Landlord for review and comment construction plans, specifications and drawings for the Tenant Improvements ("**TI Construction Drawings**"), which TI Construction Drawings shall be prepared substantially in accordance with the Space Plans.  Tenant shall be solely responsible for ensuring that the TI Construction Drawings reflect Tenant's requirements for the Tenant Improvements.  Landlord shall deliver its written comments on the TI Construction Drawings to Tenant not later than 10 days after Landlord's receipt of the same; provided, however, that Landlord may not disapprove any matter that is consistent with the Space Plans.  Landlord shall not unreasonably withhold, condition or delay its approval of the TI Construction Drawings so long as such TI Construction Drawings are consistent with the Space Plans.  Tenant and the TI Architect shall consider all such comments in good faith and shall, within 10 business days after receipt, notify Landlord how Tenant proposes to respond to such comments.  Any disputes in connection with such comments shall be resolved in accordance with Section 2(d) hereof.  Provided that the design reflected in the TI Construction Drawings is consistent with the Space Plans, Landlord shall approve the TI Construction Drawings submitted by Tenant.  Once approved by Landlord, subject to the provisions of Section 4 below, Tenant shall not materially modify the TI Construction Drawings except as may be reasonably required in connection with the issuance of the TI Permit (as defined in Section 3(a) below).

(d)        **Approval and Completion**.  If any dispute regarding the design of the Tenant Improvements is not settled within 10 business days after notice of such dispute is delivered by one party to the other, Tenant may make the final decision regarding the design of the Tenant Improvements, provided (i) Tenant acts reasonably and such final decision is either consistent with or a compromise between Landlord's and Tenant's positions with respect to such dispute, (ii) that all costs and expenses resulting from any such decision by Tenant shall be payable out of the TI Fund (as defined in Section 5(d) below), and (iii) Tenant's decision will not affect the base Building, structural components of the Building or any Building systems (in which case Landlord shall make the final decision).  Any changes to the TI Construction Drawings following Landlord's and Tenant's approval of same requested by Tenant shall be processed as provided in Section 4 hereof.

(e)        **Coordination Obligations**.  Tenant acknowledges that Landlord shall continue to require access to the Building following Landlord's delivery to Tenant of the Premises for the construction of the Tenant Improvements in order to complete Landlord's Work and Tenant agrees to comply with the Site Logistics Instructions attached to this Work Letter as **Schedule 4**.  "**Tenant Improvement Work Readiness Condition**" shall mean the point in the construction of Landlord's Work when the elements described on **Schedule 5** have been achieved. When Tenant Improvement Work Readiness Condition has been

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

ALEXANDRIA.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 173 of 396

achieved, Landlord shall notify Tenant in writing of the same and Deliver the Premises to Tenant. Commencing on the Commencement Date, Landlord and Tenant shall work together in a cooperative manner, and shall likewise require each of their respective architects and engineers and contractors to work together in a cooperative manner, to coordinate the remaining Landlord's Work and the Tenant Improvements and to achieve the substantial completion of all such work in as prompt and efficient manner as reasonably practicable.  Landlord shall provide the anticipated schedule for the performance of Landlord's Work within a reasonable period following the mutual execution and delivery of the Lease by the parties..

       3.      **Performance of the Tenant Improvements**.

       (a)      **Commencement and Permitting of the Tenant Improvements**.  Tenant shall commence construction of the Tenant Improvements upon obtaining and delivering to Landlord a building permit (the "**TI Permit**") authorizing the construction of the Tenant Improvements consistent with the TI Construction Drawings approved by Landlord.  The cost of obtaining the TI Permit shall be payable from the TI Fund.  Landlord shall assist Tenant in obtaining the TI Permit.  Prior to the commencement of the Tenant Improvements, Tenant shall deliver to Landlord a copy of any contract with Tenant's contractors (including the TI Architect), and certificates of insurance from any contractor performing any part of the Tenant Improvement evidencing industry standard commercial general liability, automotive liability, "builder's risk", and workers' compensation insurance.  Tenant shall cause the general contractor to provide a certificate of insurance naming Landlord, Alexandria Real Estate Equities, Inc., and Landlord's lender (if any) as additional insureds for the general contractor's liability coverages required above.

       (b)      **Selection of Materials, Etc**.  Where more than one type of material or structure is indicated on the TI Construction Drawings approved by Tenant and Landlord, the option will be within Tenant's reasonable discretion if the matter concerns the Tenant Improvements, and within Landlord's sole and absolute subjective discretion if the matter concerns the structural components of the Building or any Building system.

       (c)      **Tenant Liability**.  Tenant shall be responsible for correcting any deficiencies or defects in the Tenant Improvements.

       (d)      **Substantial Completion**.  Tenant shall substantially complete or cause to be substantially completed the Tenant Improvements in a good and workmanlike manner, in accordance with the TI Permit subject, in each case, to Minor Variations and normal "punch list" items of a non-material nature which do not interfere with the use of the Premises ("**Substantial Completion**" or "**Substantially Complete**").  Upon Substantial Completion of the Tenant Improvements, Tenant shall require the TI Architect and the general contractor to execute and deliver, for the benefit of Tenant and Landlord, a Certificate of Substantial Completion in the form of the American Institute of Architects ("**AIA**") document G704.  For purposes of this Work Letter, "**Minor Variations**" shall mean any modifications reasonably required:  (i) to comply with all applicable Legal Requirements and/or to obtain or to comply with any required permit (including the TI Permit); (ii) to comport with good design, engineering, and construction practices which are not material; or (iii) to make reasonable adjustments for field deviations or conditions encountered during the construction of the Tenant Improvements.

       4.      **Changes**.  Any changes requested by Tenant to the Tenant Improvements after the delivery and approval by Landlord of the Space Plans, shall be requested and instituted in accordance with the provisions of this <u>Section 4</u> and shall be subject to the written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord's consent shall not be required for minor changes to the Tenant Improvements customarily made in the field.

       (a)      **Tenant's Right to Request Changes**.  If Tenant shall request changes to the Tenant Improvements ("**Changes**"), Tenant shall request such Changes by notifying Landlord in writing in substantially the same form as the AIA standard change order form (a "**Change Request**"), which Change Request shall detail the nature and extent of any such Change.  Such Change Request must be signed by

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 174 of 396

Tenant's Representative. Landlord shall review and approve or disapprove such Change Request within 10 days thereafter (but such 10 day period shall be reduced to 5 days if Tenant already commenced construction of the Tenant Improvements), provided that Landlord's approval shall not be unreasonably withheld, conditioned or delayed.

(b)         **Implementation of Changes**.  If Landlord approves such Change, Tenant may cause the approved Change to be instituted.  If any TI Permit modification or change is required as a result of such Change, Tenant shall promptly provide Landlord with a copy of such TI Permit modification or change.

5.         **Costs**.

(a)         **Budget For Tenant Improvements**.  Before the commencement of construction of the Tenant Improvements, Tenant shall obtain a detailed breakdown, by trade, of the costs incurred or that will be incurred, in connection with the design and construction of the Tenant Improvements (the "**Budget**"), and deliver a copy of the Budget to Landlord for Landlord's approval, which shall not be unreasonably withheld or delayed.  The Budget shall be based upon the TI Construction Drawings approved by Landlord. The Budget shall include a payment to Landlord of administrative rent ("**Administrative Rent**") equal to 1% of the TI Costs (as hereinafter defined), for monitoring and inspecting the construction of the Tenant Improvements, which sum shall be payable from the TI Fund.  Except for the Administrative Rent provided for in the preceding sentence, Landlord shall not charge Tenant any other fees in connection with Landlord's review, coordination, scheduling, monitoring and inspection of the Tenant Improvements.

(b)         **TI Allowance**.  Landlord shall provide to Tenant a tenant improvement allowance (collectively, the "**TI Allowance**") as follows:

1.         a "**Tenant Improvement Allowance**" in the maximum amount of $150.00 per rentable square foot in the Premises, which is included in the Base Rent set forth in the Lease; and

2.         an "**Additional Tenant Improvement Allowance**" in the maximum amount of $60.00 per rentable square foot in the Premises, which shall, to the extent used, result in TI Rent as set forth in Section 4(b) of the Lease.

Before commencing the construction of the Tenant Improvements, Tenant shall notify Landlord how much Additional Tenant Improvement Allowance Tenant has elected to receive from Landlord.  Such election shall be final and binding on Tenant, and may not thereafter be modified without Landlord's consent, which may be granted or withheld in Landlord's sole and absolute subjective discretion The TI Allowance shall be disbursed in accordance with this Work Letter.

In addition to the TI Allowance, Landlord shall pay for an initial test fit for the Premises prepared by the Architect, plus one revision.

Tenant shall have no right to the use or benefit (including any reduction to Base Rent) of any portion of the TI Allowance not required for the construction of (i) the Tenant Improvements described in the TI Construction Drawings approved pursuant to Section 2(d) or (ii) any Changes pursuant to Section 4.  Tenant shall have no right to any portion of the TI Allowance that is not disbursed before the last day of the month that is 18 months after the Commencement Date (with such 18 month period being extended on a day for day basis by Force Majeure).

(c)         **Costs Includable in TI Fund**.  The TI Fund shall be used solely for the payment of design, permits and construction costs in connection with the construction of the Tenant Improvements, including, without limitation, the cost of electrical power and other utilities used in connection with the construction of the Tenant Improvements, the cost of preparing the TI Design Drawings and the TI Construction Drawings, construction management, all costs set forth in the Budget, including Landlord's Administrative Rent, and the cost of Changes (collectively, "**TI Costs**").  Notwithstanding anything to the contrary contained herein, the TI Fund shall not be used to purchase any furniture, personal property or other non-Building system

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4/20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 175 of 396

materials or equipment (other than installations installed as part of the Tenant Improvements) including, but not be limited to, Tenant's voice or data cabling, non-ducted biological safety cabinets and other scientific equipment not incorporated into the Tenant Improvements.

(d)          **Excess TI Costs**.  Landlord shall have no obligation to bear any portion of the cost of any of the Tenant Improvements except to the extent of the TI Allowance.  If at any time and from time-to-time, the remaining TI Costs under the Budget exceed the remaining unexpended TI Allowance ("**Excess TI Costs**"), monthly disbursements of the TI Allowance shall be made in the proportion that the remaining TI Allowance bears to the outstanding TI Costs under the Budget, and Tenant shall fund the balance of each such monthly draw.  For purposes of any litigation instituted with regard to such amounts, those amounts required to be paid by Tenant will be deemed Rent under the Lease.  The TI Allowance and Excess TI Costs are herein referred to as the "**TI Fund**."  Notwithstanding anything to the contrary set forth in this <u>Section 5(d)</u>, Tenant shall be fully and solely liable for TI Costs and the cost of Minor Variations in excess of the TI Allowance.

(e)          **Payment for TI Costs**.  During the course of design and construction of the Tenant Improvements, subject to the terms of <u>Section 5(d)</u>, Landlord shall reimburse Tenant for TI Costs once a month against a draw request in Landlord's standard form, containing evidence of payment of such TI Costs by Tenant and such certifications, lien waivers (including a conditional lien release for each progress payment and unconditional lien releases for the prior month's progress payments), inspection reports and other matters as Landlord customarily obtains, to the extent of Landlord's approval thereof for payment, no later than 30 days following receipt of such draw request.  Upon completion of the Tenant Improvements (and prior to any final disbursement of the TI Fund), Tenant shall deliver to Landlord:  (i) sworn statements setting forth the names of all contractors and first tier subcontractors who did the work and final, unconditional lien waivers from all such contractors and first tier subcontractors; (ii) as-built plans (one copy in print format and two copies in electronic CAD format) for such Tenant Improvements; (iii) a certification of substantial completion in Form AIA G704, (iv) a certificate of occupancy for the Premises; and (v) copies of all operation and maintenance manuals and warranties affecting the Premises

(f)          **Failure to Disburse TI Allowance**.  If Landlord fails to make a disbursement from the TI Allowance in accordance with the terms hereof, and the amount thereof remains unpaid by Landlord for 30 days after written notice from Tenant to Landlord and any Holder and which notice describes in detail the basis on which Tenant asserts that Landlord has wrongfully failed to disburse such amount, Tenant may, after Landlord's failure to pay such amounts within 10 business days after Tenant's second written notice to Landlord and any Holder stating in bold and all caps 12 point font that Tenant intends to offset against Base Rent the amount which Landlord has wrongfully failed to disburse, offset the amount thereof against the Base Rent payment(s) next due and owing under the Lease.  However, if Landlord notifies Tenant prior to the expiration of such 10 business day period that Landlord disputes whether Landlord has wrongfully failed to disburse funds and/or the amount claimed by Tenant, and if Landlord and Tenant are not able to reach agreement with respect to the disputed matters (with Landlord disbursing any undisputed amounts which Landlord is required to disburse under this Work Letter) within 10 days after Tenant's receipt of a such notice from Landlord, the parties shall submit such dispute to arbitration conducted by the American Arbitration Association in San Francisco in accordance with the "Expedited Procedures" of its Commercial Arbitration Rules in which case Tenant shall not withhold Base Rent unless and until Tenant prevails in such arbitration and the arbitrator concludes that Tenant has the right to exercise such offset right and determines the amount owed to Tenant by Landlord, if any.  All costs associated with arbitration shall be awarded to the prevailing party as determined by the arbitrator.

6.          **Miscellaneous**.

(a)          **Consents**.  Whenever consent or approval of either party is required under this Work Letter, that party shall not unreasonably withhold, condition or delay such consent or approval, except as may be expressly set forth herein to the contrary.

ALEXANDRIA.          Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

(b)          **Modification**.  No modification, waiver or amendment of this Work Letter or of any of its conditions or provisions shall be binding upon Landlord or Tenant unless in writing signed by Landlord and Tenant.

(c)                    **No Default Funding**.  In no event shall Landlord have any obligation to fund any portion of the TI Allowance during any period that Tenant is in Default under the Lease.

ALEXANDRIA.     Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

**Basis of Design**

Tenant Improvement Standards
Shell / TI Coordination Matrix



ALEXANDRIA.

**Shell / Tenant Improvement Responsibilities Matrix**
North Building Only - 825 Industrial                                                                                11/11/2015

| Description of Scope | Cold Shell by ARE | Full Shell Warm-up by ARE | Tenant Work see also TI detail | Construction Notes |
|---|---|---|---|---|
| **1.2 SITE REQUIREMENTS** | | • | | |
| Access Roads | X | • | • | during shell construction only |
| Temporary Project Fencing | X | • | • | during shell construction only |
| Construction Lift Equipment | X | • | • | during shell construction only |
| Man lift / Material Hoist / Service Elevator | X | • | • | during shell construction only |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **3.0 SITE WORK** | | • | | |
| Earthwork | X | • | | |
| Site underground water, fire, storm and sanitary service to 5' of building | X | • | | |
| Site Lab Waste Underground (to within 5' of the building) | X | • | • | |
| Sampling Vaults | X | • | • | |
| Exterior hardscape and landscape | X | • | | |
| Gas service up to exterior meter location at Building | X | | • | |
| Subsurface Investigation | X | • | • | |
| Site preparation / Grade Building Pad | X | • | • | |
| Dewatering of Site / Groundwater Control | X | • | • | |
| Shoring Underpinning | X | • | • | |
| Soil Stabilization | X | • | • | |
| Erosion Control | X | • | | |
| Paving & Surfacing (excluding roof pavers) | X | • | | |
| Pavement Striping | X | • | • | |
| Parking Bumpers | X | • | • | |
| Site / Landscape Lighting | X | • | | |
| Irrigation Systems | X | • | • | |
| Fences & Gates | X | • | | |
| Site Furnishings | X | • | | |
| Signage / Monuments | X | | | Tenant signage by tenant. |
| Site Concrete | X | • | | |
| Service Yard on garage podium level | X | | • | |
| Service Yard Equipment Pads | • | | X | |
| South Building Generator, Enclosure / Roof | • | X | • | remaining prorata capaicty for TI after life safety requirements. |
| Haz Mat Storage Units | • | X | • | |
| Service Yard Gates | • | X | • | |
| Utilities to North and South Buildings | X | • | • | |
| Electrical | X | • | • | |
| AT&T (Phone) | X | • | • | |
| Comcast (Cable) | X | • | • | |
| Interconnect | X | • | • | |
| Storm | X | • | • | |
| Sanitary Sewer | X | • | • | |
| Lab Waste | X | • | • | |
| Gas | X | • | • | |
| Water | X | • | • | |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **3.1 FOUNDATIONS** | | • | | |
| All Foundation Work - Building | X | • | • | |
| Foundation - Service Yard | X | • | • | At garage podium |
| Foundation - Shipping/ Receiving Area | X | • | • | |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **3.2 SUBSTRUCTURE** | | • | | |
| Slab-on-grade | X | • | • | |
| Soil Vapor Mitigation Membrane System under grade level slab | X | • | | |
| Elevator Pit | X | • | | |
| Structural Backfill | X | • | • | |
| Sub drainage System | X | • | • | |
| Below Grade Walls | X | • | • | |
| Depressed Slabs | | | | |
| Public area depressed slabs for common area finishes | X | • | • | |
| Depressed Slabs for Tenant Specific Requirements | | • | X | |
| Floor Matts | X | | • | |
| Utility Vaults | X | • | • | |
| Substructure Waterproofing | X | • | • | |

Page 1 of 5


ALEXANDRIA.

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.


ALEXANDRIA.

**Shell / Tenant Improvement Responsibilities Matrix**

North Building Only - 825 Industrial

11/11/2019

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **5.0 SUPERSTRUCTURE** | | - | | |
| Structural Frame | X | - | - | |
| Upgraded seismic performance if requested by tenant. | - | - | X | |
| Structural Floor and Roof Decks | X | - | - | |
| Main Duct Penetrations for Shell Ductwork in Decks | - | X | - | |
| Pipe penetrations for Shell HVAC system | - | X | - | |
| Penetrations for main electrical service to each floor | - | X | - | |
| Penetrations for main communications distribution to each floor | - | X | - | One per floor |
| Secondary and Pipe penetrations | - | - | X | |
| Roof Structure & Framing | X | - | - | |
| Building code required primary structure fireproofing | X | - | - | |
| Fireproofing patching after tenant start of construction | - | - | X | |
| Building code required stairs | X | - | - | |
| Building code required stair rails | X | - | - | |
| Stairs (non code required) | - | - | X | |
| Stair & Railing Upgrades | - | - | X | |
| Expansion Joints | X | - | - | |
| Stair to Roof | - | X | - | |
| Elevator Guide Rail Supports | - | X | - | |
| Elevator Over-run | X | - | - | |
| Roof Davits | X | - | - | |
| Roof Screen Steel | - | X | - | |
| Structural Framing Supporting MEP Shafts / Pads | | | | |
| Equip steel that penetrates roof outside penthouse | - | X | - | for Shell Equipment only |
| All other equip support steel for chillers etc. | - | X | - | for Shell Equipment only |
| Mechanical Equipment Pads | - | X | - | |
| Equipment pads inside roof screen | - | X | - | Shell Equipment only |
| Equipment pads on roof outside roof screen | - | X | - | Shell Equipment only |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **7.0 EXTERIOR SKIN** | | | | |
| Building Envelope | X | - | - | |
| Main Building Entrance, including Storefronts, Doors, etc. | X | - | - | |
| Canopies | X | - | - | |
| Roof Screen | - | X | - | |
| Penthouse Enclosures | - | - | - | |
| Exterior Insulation Under Penthouse | - | - | - | |
| Exterior Flashing | X | - | - | |
| Exterior Door Assemblies (Code Required B Occupancy) | X | - | - | |
| Additional exterior doors for TI occupancies or requirements | - | - | X | |
| Doors at loading dock | X | - | - | |
| Exterior Painting | X | - | - | |
| Louvers & Vents for Shell Equipment | - | X | - | |
| Balcony Railings | X | - | - | |
| Firestopping at floor level at exterior walls - edge of deck | X | - | - | |
| Sunshades | - | - | - | |
| Light Shelves | - | - | - | |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **7.2 ROOFING** | | - | | |
| Roof Membrane | X | - | - | |
| Insulation (Bat & Rigid) | X | - | - | |
| Roof Insulation | X | - | - | |
| Exterior Wall Insulation | - | X | - | At exterior spandrel glass as required by Title 24 |
| Other Insulation including sound insulation | - | X | - | Sound insulation at core walls |
| Flashing & Sheet Metal - Roof to Exterior Wall | X | - | - | |
| Flashing & Sheet Metal - Penthouse, Roof Screen | - | X | - | |
| MEP Penetrations for Shell | - | X | - | |
| Roof Hatches | - | - | - | |
| Skylights | - | - | X | |
| Roof Pavers | X | - | - | |
| Exterior Landscape at Terraces & Balconies | - | - | X | |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **9.0 INTERIOR CONSTRUCTION** | | - | | |

Page 2 of 5

**Tenant Improvement Standards**
Shell / TI Coordination Matrix


ALEXANDRIA.

**Shell / Tenant Improvement Responsibilities Matrix**

North Building Only - 825 Industrial

11/11/2019

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work | Notes |
|---|---|---|---|---|
| Shell Space Warm-up (Sheet rock and finish on interior only) | | - | | |
| Stair Enclosures | - | X | - | |
| Changes to base building stair enclosures | - | - | X | |
| HVAC Shaft Enclosures for Shell Only. | - | X | - | |
| Changes to base building shaft enclosures | - | - | X | |
| Elevator Shaft Enclosures | - | X | - | |
| Core Toilet Rooms | - | X | - | |
| Changes to base building toilet rooms | - | - | X | |
| First Floor Lobby | - | X | - | |
| 1 Janitor's Closet in the core area | - | X | - | |
| Main Electrical Room (1st Floor) | - | X | - | |
| Electrical distribution | - | X | X | (2) Shell electrical rooms on each floor for shell distribution; TI electrical room(s) by tenant |
| Floor phone MPOE room | - | X | - | (1) IDF Room per Floor |
| Data / Phone Distribution Rooms on each floor | - | - | X | |
| Mechanical Room | - | - | X | |
| Backside of Exterior Wall and outside of Shell Space Warm-up rooms | - | - | X | |
| Tenant Spaces | - | - | X | |
| Offices | - | - | X | |
| Conference Rooms | - | - | X | |
| Break Areas | - | - | X | |
| Lobbies / reception on upper floors | - | - | X | |
| IT rooms IDF / MDF/ server / data centers | - | - | X | |
| Equipment Rooms | - | - | X | |
| Warehouse, Shipping & Rec. | - | - | X | |
| Storage Rooms | - | - | X | |

| | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| Floor service areas | - | - | X | |
| All other Tenant occupied spaces | - | - | X | |
| Elected finishes upgrading | - | - | X | |
| Window Treatments | - | - | X | |
| Interior Planters | - | | X | |
| Recessed floor mats | - | | X | |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **11.0 EQUIPMENT** | | - | | |
| Window Washing Equipment & Associated Utilities | - | X | - | |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **14.0 CONVEYING** | | | | |
| Elevator installation | - | X | - | |
| Elevator Cab finishes | - | X | - | |
| Elevator Floor Finishes | - | X | - | |
| TI changes to standard finishes | - | - | X | |
| All elevator equipment necessary for complete & operable assembly | - | X | - | |
| Smoke Curtains | - | X | - | |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **15.0  FIRE PROTECTION** | | | | |
| Shell Wet fire protection (risers, loops, branches and up heads for Shell B Occ) | X | - | - | |
| Wet fire protection head location modifications due to TI walls | - | - | X | |
| Restroom Core /Lobby Heads | - | X | - | |
| Down heads as required for TI construction | - | - | X | T included in Shell for TI connection |
| Smoke Control and Smoke Evacuation | - | - | X | Not required for shell project & building design. Only required if modified by tenant. |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **15.2 PLUMBING /PROCESS** | | - | | |
| Building Roof Drainage w/ a Piped Overflow System | X | - | - | |
| Sanitary Waste: | | - | | |
| Under floor Sanitary Waste system for Toilet Rooms and Shower on First Floor | - | X | - | |
| Under floor sanitary waste main trunk lines | - | X | - | |
| Under floor Sanitary Waste branch piping for TI use | - | - | X | |
| Sanitary Waste Risers | - | X | - | |

Tenant Improvement Standards

ALEXANDRIA.

**Shell / Tenant Improvement Responsibilities Matrix**                                                          11/11/2019
North Building Only - 825 Industrial

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| Sanitary Waste Branch Piping | · | · | X | |
| Sanitary Waste system for Toilet Rooms on 2nd - 6th Floor | · | X | · | |
| Sanitary Waste & Vent System for 2 Toilet Rooms per floor | · | X | · | |
| Domestic Water: | | · | | |
| Water Meter | · | X | · | |
| Domestic Water Under slab Piping | · | X | · | |
| Domestic Water Risers | · | X | · | |
| Domestic Water Distribution and Branch Piping | · | · | X | |
| Hot Water Heaters for Toilet Rooms | · | X | · | |
| Hot Water Heaters (for TI break areas, etc.) | · | · | X | |
| Lab Waste: | | · | | |
| Under slab lab waste risers | · | X | · | |
| Under floor lab waste branch piping | · | · | X | |
| Gas: | | · | | |
| Gas Meter | · | X | · | |
| Gas service to shell mechanical equipment point of use | · | X | · | |
| Branch Distributions - Gas for TI (if required) | · | · | X | |
| Plumbing Fixtures @ Toilet Rooms for floors | · | X | · | |
| Cold & Hot water Branch | · | · | X | |
| Cold & Hot Water Supply | · | X | · | |
| Piping Insulation | Installed with associated piping system | | | |
| Generator Fuel Storage Tanks | · | X | · | |
| Process Piping (Generation, Storage, and Distribution) | · | · | X | |
| **Description of Scope** | **Cold Shell** | **Full Shell Warm-up** | **Tenant Work** see also TI detail | **Notes** |
| **15.3 HVAC** | | · | | |
| HVAC Equipment | | · | | |
| Rooftop Airhandlers | · | X | · | |
| Chillers | · | X | · | |
| Boilers | · | X | · | |
| Exhaust Fans | · | X | · | |
| Pumps & Other Misc. Equipment req for HVAC System | · | X | · | |
| Data Center/ Server Room HVAC | · | · | X | |
| Building Management Systems (BMS): | | · | | |
| BMS Equipment main CPU and programming, control components and wiring to base building equipment | · | X | · | |
| BMS Zone level controlling and monitoring | · | · | X | |
| HVAC vertical Ductwork Riser | · | X | · | |
| HVAC Horizontal Ductwork Mains | · | · | X | |
| HVAC Ductwork Zone Distribution | · | · | X | |
| VAV's & Grills from main Riser | · | · | X | |
| CW/HHW S&R Risers | · | X | · | |
| CW/HHW S&R Branch Piping | · | · | X | |
| Insulation - Duct & Pipe Risers | · | X | · | |
| DDC Controls damper at main duct at shaft | · | X | · | |
| Insulation - Duct & Piping T.I. | · | · | X | |
| Air & Water Balance | · | · | X | |
| System Test & Startup | · | · | X | |
| Toilet Exhaust System install duct riser and full system | · | X | · | |
| Fire stopping | Installed with associated penetrations | | | |
| Smoke / Fire Dampers | Installed with associated penetrations | | | |
| | | · | | |
| **Description of Scope** | **Cold Shell** | **Full Shell Warm-up** | **Tenant Work** see also TI detail | **Notes** |
| **16.0 ELECTRICAL** | | · | | |
| Primary Electrical Power conduits wire | X | · | · | |
| Electrical utility pad and transformer (by PG&E) | X | · | · | |
| Secondary Power Conduits & Wire | · | X | · | |
| Window washing utilities | · | X | · | |
| Main Switchboard | X | · | · | |
| Remaining breakers for TI work | · | X | · | |
| Electrical distribution to the building mechanical equipment point of use | · | X | · | |
| Elevator power distribution to point of use | · | X | · | |
| Electrical Transformers, Panels & Power Distribution within TI Area | · | · | X | |
| Code compliant Shell Fire Alarm System (Flow and tamper) | X | · | · | |
| Fire alarm System (FAS) | | · | | |
| Fire Alarm Controls including equip main CPU and programming, control components and wiring to base bldg equipment, and central area | · | X | · | For shell fire alarm devices only |
| Controlling / Monitoring TI space | · | · | X | |
| Lighting & Lighting Controls within TI Area | · | · | X | |
| Lighting & Electrical - Toilet Core 1st - 6fl as well as Shower on 1 | · | X | · | |



**Tenant Improvement Standards**

**Shell / Tenant Improvement Responsibilities Matrix**    11/11/2019

North Building Only - 825 Industrial

| | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| Lighting & Electrical - Ground Floor Lobby | - | X | - | |
| Lighting & Electrical - Mechanical & Electrical Rooms | - | X | - | |
| Generator / ATS Emergency Power | - | X | - | |
| Generator / ATS for TI use | - | X | - | Remaining prorata capaicty for TI after life safety requirements. |
| Temp Power / Lighting for TI | | - | X | |
| Security | | | | |
| Cameras | | | X | |
| Access Control/ Card Readers | | X | | Card Readers on Shell perimeter doors, stair doors, and elevator cabs are included in Shell. |

| Description of Scope | Cold Shell | Full Shell Warm-up | Tenant Work see also TI detail | Notes |
|---|---|---|---|---|
| **16.2 COMMUNICATIONS** | | - | | |
| Site Underground conduit terminated within building at MPOE | X | - | - | |
| AT&T | X | - | - | |
| Interconnect | X | - | - | |
| Telecom Room (MPOE) | - | X | - | |
| Modifications to MPOE infrastructure | - | - | X | |
| Telecom Infrastructure from MPOE | - | - | X | |
| Emergency radio responder system | | X | | |

Page 5 of 5

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.



**LEED Standards for Tenant Improvements**

**TENANT IMPROVEMENT COMPLIANCE REQUIREMENTS**

Landlord to strive for LEED Gold level rating for the Core & Shell project. Landlord is seeking LEED-CS v3 certification of the Base Building Project. Tenant supports that effort and agrees to comply with the following requirements as listed below to support LEED Core & Shell Certification within the Tenant Improvements.

The tenant shall meet all State of California Title 24 2016-Part 6, California Green Building Code, energy efficiency, and sustainable operations requirements for first time tenant improvements, including but not limited to the following:

The tenant plumbing scope of work shall include fixtures with flush and flow rates that do not exceed the following:
Break sink (in kitchen break rooms only) – 1.5 gpm
Pre-Rinse Spray Valves (for kitchen equipment) – 1.3 gpm
(Water Efficiency credit 3, Indoor Water Use Reduction, 40%)

The tenant HVAC design scope of work must meet the mandatory provisions of ASHRAE 90.1-2010. The tenant lighting scope of work shall comply with Title 24, 2016 prescriptive code lighting power densities, daylighting, and occupancy sensor controls and meet the following maximum lighting power density values 30% below Title 24 requirements:
Conference/Meeting:            0.8 W/SF
Corridor:            0.4 W/SF
Dining Area:            0.67 W/SF
Food Prepare:            0.8 W/SF
Lobby:            0.4 W/SF
Open Office:            0.5 W/SF
Lab/Vivarium:            0.93 W/SF
Stairwells:            0.6 W/SF
(Energy & Atmosphere credit 1, Optimize Energy Performance)

The tenant HVAC and/or refrigeration equipment scope of work shall include zero use of chlorofluorocarbon (CFC)-based refrigerants in new base building heating, ventilating, air conditioning and refrigeration (HVAC&R) systems. Additionally, for all equipment over 0.5lbs of refrigerant, select refrigerants and heating, ventilating, air conditioning and refrigeration (HVAC&R) equipment that minimize or eliminate the emission of compounds that contribute to ozone depletion and global climate change such that all equipment is in compliance with the following formula: $LCGWP + LCODP \times 10^5 \leq 100$
(Energy & Atmosphere prerequisite 3 and credit 4, Fundamental & Enhanced Refrigeration Management)

The tenant HVAC scope of work shall meet the minimum requirements of Sections 4 through 7 of ASHRAE Standard 62.1 - 2007, Ventilation for Acceptable Indoor Air Quality. Mechanical ventilation systems must be designed using the ventilation rate procedure or the applicable local code, whichever is more stringent. The tenant HVAC scope of work shall include permanent monitoring systems to ensure that ventilation systems maintain design minimum requirements.
(Environmental Quality prerequisite 1, Minimum IAQ Performance)

Provide a direct outdoor airflow measurement device capable of measuring the minimum outdoor air intake flow with an accuracy of plus or minus 15% of the design minimum outdoor air rate, as defined by ASHRAE 62.1-2007 for mechanical ventilation systems where 20% or


ALEXANDRIA.   Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW Document 34-1 Filed 11/25/20 Page 185 of 396

more of the design supply airflow serves non-densely occupied spaces. The tenant HVAC scope of work shall include permanent monitoring systems to ensure that ventilation systems maintain design minimum requirements. Configure all monitoring equipment to generate an alarm when the airflow values or carbon dioxide (CO2) levels vary by 10% or more from the design values via either a building automation system alarm to the building operator or a visual or audible alert to the building occupants. Monitor CO2 concentrations within all densely occupied spaces (those with a design occupant density of 25 people or more per 1,000 square feet). CO2 monitors must be between 3 and 6 feet above the floor
(Environmental Quality credit 1, Outdoor Delivery Air Monitoring)

The tenant HVAC scope of work shall increase mechanical ventilation systems to perform 30% better than Sections 4 through 7 of ASHRAE Standard 62.1-2007, Ventilation for Acceptable Indoor Air Quality.
(Environmental Quality credit 2, Increased Ventilation)

The tenant scope of work shall meet California Green Building Code and LEED requirements to develop and implement a plan to manage indoor air quality (IAQ) during construction that meets or exceeds SMANCA Guidelines for Occupied Buildings Under Construction, 2nd Edition 2007, ANSI/SMACNA 008-2008, protect stored on-site and installed absorptive materials from moisture damage, and if permanently installed air handlers are used during construction, filtration media with a minimum efficiency reporting value (MERV) of 8 must be used at each return air grille, as determined by ASHRAE Standard 52.2-1999 (with errata but without addenda). Replace all filtration media immediately prior to occupancy.
(Environmental Quality credit 3, Construction IAQ, During Construction)

The tenant scope of work shall meet California Green Building Code and LEED requirements to ensure that all adhesives and sealants used on the project site must comply with the volatile organic compounds (VOCs) emissions established by South Coast Air Quality Management District (SCAQMD) Rule 1168 and Green Seal Standard GS-36.
(Environmental Quality credit 4.1, Low-Emitting Materials, Adhesives & Sealants)

The tenant scope of work shall meet California Green Building Code and LEED requirements to ensure that all paints and coatings used on the project site must comply with the designated standard: Green Seal Standard GS-11, Green Seal Standard GS-03, and South Coast Air Quality Management District (SCAQMD) Rule 1113.
(Environmental Quality credit 4.2, Low-Emitting Materials, Paints & Coatings)

The tenant scope of work shall meet California Green Building Code and LEED requirements to ensure that all flooring and flooring adhesives used in the building have to comply with designated flooring standards, such as Carpet and Rug Institute's Green Label Plus, Scientific Certification Systems' FloorScore, and/or California Dept of Health Volatile Organic Emissions.
(Environmental Quality credit 4.3, Low-Emitting Materials, Flooring Systems)

The tenant scope of work shall meet California Green Building Code and LEED requirements to ensure that all composite wood, agrifiber products and laminating adhesives used on the interior of the building can't have added urea-formaldehyde resins and those used in the exterior should meet California Air Resources Board standard.
(Environmental Quality credit 4.4, Low-Emitting Materials, Composite Wood & Agrifiber Products)

The tenant shall sufficiently exhaust each space where hazardous gases or chemicals may be present or used (e.g., garages, housekeeping and laundry areas, copying and printing rooms), using the exhaust rates determined in EQ Prerequisite Minimum Indoor Air Quality Performance or a minimum of 0.50 cfm per square foot (2.54 l/s per square meter), to create negative pressure with respect to adjacent spaces when the doors to the room are closed.


ALEXANDRIA.

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW Document 34-1 Filed 11/25/20 Page 186 of 396

For each of these spaces, provide self-closing doors and deck-to-deck partitions or a hard-lid ceiling. Each ventilation system that supplies outdoor air to occupied spaces must have particle filters or air-cleaning devices that meet one of the following filtration media requirements: a minimum efficiency reporting value (MERV) of 13 or higher, in accordance with ASHRAE Standard 52.2–2010; or Class F7 or higher as defined by CEN Standard EN 779–2002, Particulate Air Filters for General Ventilation, Determination of the Filtration Performance.
(Environmental Quality credit 5, Indoor and Chemical Pollutant Source Control)

The Tenant is responsible for pest management services. The Tenant's pest management vendor is to implement an Integrated Pest Management Program based on the Integrated Pest Management Policy developed for the Core and Shell of this project. Refer to Attachment A - Integrated Pest Management Policy. Tenant shall provide as evidence a signed contract, financials omitted, showing that an ongoing, 2 year Integrated Pest Management is to be provided by the pest management vendor.
(Innovation in Design credit 1.3, Integrated Pest Management)

The Tenant is responsible janitorial services. The Tenant's janitorial vendor is to implement a Green Cleaning Program based on the Green Cleaning Policy developed for the Core and Shell of this project. Refer to Attachment B - Green Cleaning Policy. Tenant shall provide as evidence a signed contract, financials omitted, showing that an ongoing, 2 year Green Cleaning Program is to be provided by the janitorial vendor.
(Innovation in Design credit 1.4, Green Cleaning)


ALEXANDRIA.

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Schedule 4

**Site Logistic Instructions**

**Site Logistics Instructions to Tenant**

1. **Site Control:** The site is under the care, custody and control of Truebeck through campus completion of all Shell & Core, Parking Structure, and Sitework activities.

2. **Site Security:** Site security system for multiple GC on site should be considered by ARE. Having multiple GCs will require a system of identification of who is a member of the Industrial Road team to prevent people entering the site that should not be here.

3. **Power and Water:** TI contractor to provide their own temporary power and water.  Note design based on infrastructure under construction per Schedule for base buildings, depending on the start time of TI, source of power may change.

4. **Union:** Landlord requires that all TI contractors and subcontractors must be union labor.  If non-union trades are hired, the TI contractor would be required to implement dual gates, which may not be feasible to due complex site logistics.  Impacts to Shell cost and schedule due to dual gates would be by TI. Any modifications to site logistics must be coordinated and approved by Truebeck.

5. **Wheel Wash**: Provisions for wheel washing of vehicular traffic on site - trucking, delivery, etc. should be by the TI contractor and follow all conditions of approval.

6. **Parking:** All TI personnel must park in the designated parking area behind 960 Industrial.  The designated parking lot will be provided by ARE, management of the TI workers in the parking area by the TI contractor – signage, trash, toilets, etc.

7. **Trucking/Deliveries:** All delivery and trucking requirements must be per the Conditions of Approval and the trucking routes are attached to the Work Letter as **Schedule 6**. Deliveries on site must be coordinated with Truebeck activities and only approved 'live' deliveries and drop offs of equipment will be allowed.

8. **Lay Down/Logistics:** There is no space for laydown onsite.  Plan for zero lot line deliveries.  Coordinate any staging on floors prior to Shell completion with Truebeck. Due to constrained site logistics, temp toilets and debris management plan need to be consider the tight site logistics. Debris removal will need to plan for daily off haul without a standing dumpster.

9. **Loading:** Leave out bays, hoisting bays, off hours use of the personnel hoist, would be the TI responsibility to coordinate, pay for, or coordinate the use agreement of.

10. **Lift**: Personnel lift will be running on the exterior of the building through the construction and sign-off of the freight elevator. Freight elevator capacity 5000lb.  Loads must be spread in accordance with elevator requirements to prevent damage.  TI contractor will be responsible for a portion of operator costs through shell completion.  TI contractor will be responsible for monthly charges for Kone temp use of interior freight elevator if extended beyond Shell schedule. Current costs, which are subject to change, are as follows: Manlift & Freight Elevator for Construction Use - $98/hr. Standard Time & $124/hr. OT & $150/hr. DT.

11. **Walls**: To allow Shell work adequate space to complete, construction of TI work within 10' of exterior wall, stairs, shafts, or cores cannot not begin until the skin is substantially complete, or through coordination and approval following rock on interior walls.

12. **Roof**: Roof access is restricted.  Access by TI contractor will be allowed following coordination and permission by Truebeck Construction.

13. **Specialty TI Work:** Specialty work such as a bridge between buildings, interconnecting floor stairs, etc. would need to be coordinated as to the impacts to the Shell permit and schedule.

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

## Tenant Improvement Work Readiness Condition

**General**

1.       Tenant has the right to commence tenant improvement construction once the below requirements have been met by the landlord and accepted by the tenant .

2.       Floors that are released to begin TI work should be in a condition to safely allow Tenant's work to commence in an efficient and safe manner. Each floor released shall be delivered in broom-clean condition, free of any debris or material , with the exception of material and tools related to ongoing work for the warm shell construction or commissioning as indicated by the shell schedule.

3.       Floors that are released to begin TI work should be complete to allow layout to begin off floor surfaces, column lines, control lines or Trimble reference points.

4.       Shell contractor will be responsible for coordination with TI contractor and TI contractor will work collaboratively with the Shell contractor to minimize any TI construction disruption.  Once the schedule and work sequences have been agreed to by both contractors, a) Shell contractor shall pay for any damage or removal to any completed TI work or any disruption of the agreed to TI schedule.  b) TI contractor shall pay for any damage or removal to any completed Shell Core work or any disruption of the agreed to Shell Core schedule.  To facilitate this coordination effort, TI contractors are required to have a representative with the knowledge of their daily work plans and authority to make/ change/ adjust plans attend a morning huddle to coordinate daily site logistics.

5.       TI contractor shall have shared access to exterior personnel hoist man-lift and crane and once the main lift is removed the freight elevator during construction (construction elevator).  There will be one personnel hoist or construction elevator per building.  Tenant shall be responsible for a pro-rata share of the elevator operating cost based on elevator usage.  TI contractor shall coordinate use of the construction elevators with the Shell contractor.  In the case of crane, C&S contractor has priority of use .  Personnel hoist or freight elevator use is for moving personnel and small hand tools between floors. Loading of the building for construction materials is through after hours use of the lifts. If removal of curtain wall is required to load TI materials, TI contractor is responsible to coordinate and contract with Walters & Wolf to remove and replace glass. Current costs, which are subject to change,  are as follows: Manlift & Freight Elevator for Construction Use - $98/hr. Standard Time & $124/hr. OT & $150/hr. DT. With respect to glass removal, TI contractor to determine the need and cost for removal and associated logistics

6.       Because elevators will be in the process of being installed concurrent with the tenant improvements, the skin will not be completely installed.  Once the elevators are complete and approved by the state, the exterior man-lift can be removed and the TI contractor will work collaboratively with the Shell contractor to allow building exterior enclosure to be completed.  All elevators to be signed off no later than 5 months after delivery of the final floors.  Site improvements and infrastructure will be ongoing during TI loading of materials.  TI contractor to provide protection of sitework and finishes.

7.       Prior start of construction, TI contractor shall fully coordinate HVAC, Plumbing, Electrical, and Fire Sprinkler systems with core and shell model.  Points of connection to the warm shell infrastructure by TI build out will need to be coordinated between teams. Warm shell systems will be commissioned to the point of completion less required loads prior to connection to completed and tested TI systems. Connection is by TI contractor.

8.       TI Plumbing systems to be fully coordinated between the base building and the tenant improvements in the form of a clash free Building information Model (BIM).

9.       TI Fire Sprinkler to be fully coordinated between the base building and the tenant improvements in the form of a clash free Building information Model (BIM).

10.        TI Electrical system to be fully coordinated between the base building and the tenant improvements in the form of a clash free Building information Model (BIM).


ALEXANDRIA.    Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 189 of 396

11.          Where practical building shell commissioning will be concurrent with the TI commissioning.  This will allow the TI will provide the necessary loads to allow the base building equipment to be commissioned and the Building Automations System to be coordinated between the base building and the tenant improvements . Warm shell commissioning will be completed as far as possible, short of the portion of work requiring a TI load. Commissioning of the building systems requiring a load shall occur after the TI contractor has completed their documentation of functional testing.

12.          Water to be available to tenant use for construction proposes . Temp water is available through the Janitor Closet on each floor. The Janitor closet construction at turn over to TI construction with 'end state' finishes. Any additional temp water requirements would be by the TI contractor.

13.          Tenant contractor will at all times have access to sufficient power at the house panel to allow for TI construction  hand tools.  Power for welding is by TI contractor. Temp Power requirements are to be coordinated with warm shell contractor.

14.          Core & Shell logistical plan, inclusive of location of cranes, concrete pumps and booms, and any other item that would impact TI construction, to be communicated and closely coordinated with the design and construction of the Tenant Improvements . Overall Site Logistics for the campus is very congested. There is no laydown area available for TI construction outside the building. Delivery coordination is through StruxHub.  To facilitate this coordination effort, TI contractor to attend weekly coordination meetings in addition to daily morning huddles.

15.          Tenant contractor will allow shell contractor access and laydown area sufficient to complete the shell components on each floor.  Laydown areas and work areas will be coordinated between the Shell and TI contractors prior to TI contractor starting work on each floor in order to minimize the impact and not cause any delay to the construction of either the Shell or the TI work.

Export of the editable BIM model can be provided to Tenant's construction team upon Landlord's design team's release of the same.

**Building Core and Shell Condition**:

In addition to the general requirements stated above the following building shell components will be in the following state of completion at the time of TI rough-in starting on each floor to satisfy the Tenant Improvement Work Readiness Condition:

1.          Building floor decks will need to be poured at least three floors above the floors that are released.

2.          The floors as they are released shall be free of any shoring or temporary supports and shall meet, floor flatness standards referenced in shell specifications.

3.          Building enclosure on each floor will be 75 % complete at the start of TI rough-in and 90% complete at the time of starting TI interior finishes.  90% completion shall occur no later than 4 weeks following 75% completion.  It is understood that a portion of the façade and the floor slab may be open to provide access to the exterior manlift(s) and/or tower cranes but any such opening shall be protected by TI contractor through temporary measures to create a "water-tight" condition.  TI contractor will allow Shell contractor access required to complete the building shell exterior skin.

4.          Building code required stairs on each floor will be installed but not completed.

5.          "Exterior shell" of all base building rooms within or adjacent to the Premises (stairs, electrical rooms, mechanical rooms, MPOE, etc.) to be fully complete with Tenant's side fire taped and sanded to level IV finish.

6.          Exterior shell" of MPOE room to be complete with interior walls.

7.          Fire Sprinklers main loops and upheads installed on each floor as it is released ready for TI connections to the extent allowed by local jurisdiction having authority.

8.          Prior to starting TI interior Finishes "Interior shell" of MPOE room to be complete with Interior walls taped and sanded to level IV finish and plywood back boards installed.

 Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW    Document 34-1    Filed 11/25/20    Page 190 of 396

9.      Prior to starting IV Interior Finishes. Interior shell of Structured Cable Distribution Closet on each floor to be complete with Exterior walls taped and sanded to level IV finish.

10.      See also Site Logistics Instructions to Tenant sent to ARE 4/3/2019. See Schedule 6 to the Work Letter.

11.      Skin is substantially complete as required per Section 11 of Schedule 4.

ALEXANDRIA.

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW     Document 34-1     Filed 11/25/20     Page 191 of 396



# Attachment K - Trucking Routes
## 04/06/2018

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Mass Excavation Haul Route

### Trucks Entering Site:

7am – 4pm: Brittan off-ramp.

 - Hwy 101 North Bound Trucks will use the Holly exit clover leafs to head back south on 101 for the Brittan exit. They will turn right onto Brittan, right onto Industrial and right onto Bransten to enter the site.
- Hwy 101 South Bound Trucks will use the Brittan exit. They will turn right onto Brittan, right onto Industrial and right onto Bransten to enter the site.

9am-4pm: Holly off-ramps.

 -Hwy 101 North Bound Trucks will exit the clover leaf onto Holly. Trucks will turn left onto Industrial Road and left onto Bransten to enter the site.
-Hwy 101 South Bound Trucks will exit right onto Holly. Trucks will turn left onto Industrial Road and left onto Bransten to enter the site.

### Trucks Exiting Site:

7am – 4pm: Brittan off-ramp.

 - Trucks will leave the site and enter onto Bransten. Trucks will turn left onto Industrial Road and left onto Brittan to the South Bound on-ramp.
- If trucks need to head North they will use the Whipple clover leaf to change direction from South to North.

9am – 4pm Holly off-ramps

 - Trucks will leave the site and enter onto Bransten. Trucks will turn right onto Industrial Road and right onto Holly to either North or South bound on-ramps.
- **No contaminated soil allowed on the Holly off ramp. (Trucks must use Brittan off ramp.)**

*Hours and trucking route subject to adjustment by City Officials







Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW    Document 34-1    Filed 11/25/20    Page 197 of 396

EXHIBIT D TO LEASE

## ACKNOWLEDGMENT OF COMMENCEMENT DATE

This **ACKNOWLEDGMENT OF COMMENCEMENT DATE** is made this _____ day of _____, ____, between **ARE-SAN FRANCISCO NO. 63, LLC**, a Delaware limited liability company ("**Landlord**"), and **ALLAKOS INC.**, a Delaware corporation ("**Tenant**"), and is attached to and made a part of the Lease dated _____, _____ (the "**Lease**"), by and between Landlord and Tenant.  Any initially capitalized terms used but not defined herein shall have the meanings given them in the Lease.

Landlord and Tenant hereby acknowledge and agree, for all purposes of the Lease, that the Commencement Date of the Base Term of the Lease is _____, _____, the Rent Commencement Date is _____, _____, and the termination date of the Base Term of the Lease shall be midnight on _____, _____.  In case of a conflict between the terms of the Lease and the terms of this Acknowledgment of Commencement Date, this Acknowledgment of Commencement Date shall control for all purposes.

IN WITNESS WHEREOF, Landlord and Tenant have executed this ACKNOWLEDGMENT OF COMMENCEMENT DATE to be effective on the date first above written.

**TENANT:**

**ALLAKOS INC.**,
a Delaware corporation


By:
Its:


**LANDLORD:**

**ARE-SAN FRANCISCO NO. 63, LLC**,
a Delaware limited liability company

By:        ALEXANDRIA REAL ESTATE EQUITIES, L.P.,
           a Delaware limited partnership,
           managing member

    By:        ARE-QRS CORP.,
               a Maryland corporation,
               general partner

           By:
    Its:

Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

EXHIBIT E TO LEASE

**Rules and Regulations**

1.              The sidewalk, entries, and driveways of the Project shall not be obstructed by Tenant, or any Tenant Party, or used by them for any purpose other than ingress and egress to and from the Premises.

2.              Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project.

3.              Except for animals assisting the disabled, no animals shall be allowed in the offices, halls, or corridors in the Project.

4.              Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5.              If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted.  Any such installation or connection shall be made at Tenant's expense.

6.              Tenant shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Premises, except as specifically approved in the Lease.  The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited.  Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7.              Parking any type of recreational vehicles is specifically prohibited on or about the Project.  Except for the overnight parking of operative vehicles, no vehicle of any type shall be stored in the parking areas at any time.  In the event that a vehicle is disabled, it shall be removed within 48 hours.  There shall be no "For Sale" or other advertising signs on or about any parked vehicle.  All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings. All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord.

8.              Tenant shall maintain the Premises free from rodents, insects and other pests.

9.              Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of these Rules and Regulations.

10.            Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness.  Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11.            Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

12.            Tenant shall not permit storage outside the Premises, including without limitation, outside storage of trucks and other vehicles, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13.            All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

ALEXANDRIA.  Copyright © 2005, Alexandria Real Estate Equities, Inc.  ALL RIGHTS RESERVED.  Confidential and Proprietary – Do Not Copy or Distribute.  Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

Case 4:20-cv-01720-JSW Document 34-1 Filed 11/25/20 Page 199 of 396

14. No auction, public or private, will be permitted on the Premises or the Project.

15. No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16. The Premises shall not be used for lodging, sleeping or cooking (except for cooking by licensed caterers (e.g., for Tenant's company events) and except that Tenant may use microwave ovens, toasters and coffee makers in the Premises for the benefit of Tenant employees and contractors in areas designated for such items, but only if the use thereof is at all times supervised by the individual using the same) or for any immoral or illegal purposes or for any purpose other than that specified in the Lease. No illegal gaming devices shall be operated in the Premises.

17. Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18. Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

19. Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

20. Tenant shall cause any vendors and other service providers hired by Tenant to perform services at the Premises or the Project to maintain in effect workers' compensation insurance as required by Legal Requirements and commercial general liability insurance with coverage amounts reasonably acceptable to Landlord. Tenant shall cause such vendors and service providers to name Landlord and Alexandria Real Estate Equities, Inc. as additional insureds under such policies and shall provide Landlord with certificates of insurance evidencing the required coverages (and showing Landlord and Alexandria Real Estate Equities, Inc. as additional insureds under such policies) prior to the applicable vendor or service provider providing any services to Tenant at the Project.

21. Neither Tenant nor any of the Tenant Parties shall have the right to photograph, videotape, film, digitally record or by any other means record, transmit and/or distribute any images, pictures or videos of areas outside of the Premises at the Project.

ALEXANDRIA. Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL RIGHTS RESERVED. Confidential and Proprietary – Do Not Copy or Distribute. Alexandria and the Alexandria Logo are registered trademarks of Alexandria Real Estate Equities, Inc.

**EXHIBIT F TO LEASE**

## TENANT'S PERSONAL PROPERTY

None.

Copyright © 2005, Alexandria Real Estate Equities, Inc. ALL
RIGHTS RESERVED. Confidential and Proprietary – Do Not
Copy or Distribute. Alexandria and the Alexandria Logo are
registered trademarks of Alexandria Real Estate Equities, Inc.

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statements:

 (1) Registration Statement (Form S-3 No. 333-233018) of Allakos Inc.,

 (2) Registration Statement (Form S-8 No. 333-226247) pertaining to the 2018 Equity Incentive Plan, the 2018 Employee Stock Purchase Plan and the amended 2012 Equity Incentive Plan of Allakos Inc.

 (3) Registration Statement (Form S-8 No. 333-231276) pertaining to the 2018 Equity Incentive Plan, and the 2018 Employee Stock Purchase Plan

of our report dated February 25, 2020, with respect to the financial statements of Allakos Inc. and the effectiveness of internal control over financial reporting of Allakos Inc., included in this Annual Report (Form 10-K) for the year ended December 31, 2019.

/s/ Ernst & Young LLP

Redwood City, California
February 25, 2020

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert Alexander, certify that:

1.    I have reviewed this Annual Report on Form 10-K of Allakos Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2020

By:    /s/ Robert Alexander

**Robert Alexander**
**President and Chief Executive Officer**
**(Principal Executive Officer)**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Leo Redmond, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Allakos Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2020

By:       /s/ Leo Redmond
     **Leo Redmond**
     **Chief Financial Officer**
     **(Principal Financial and Accounting Officer)**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Allakos Inc. (the "Company") on Form 10-K for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 25, 2020                    By:            /s/ Robert Alexander

**Robert Alexander**
**President and Chief Executive Officer**
**(Principal Executive Officer)**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Allakos Inc. (the "Company") on Form 10-K for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 25, 2020                                    By:                    /s/ Leo Redmond
                                                                                              **Leo Redmond**
                                                                                    **Chief Financial Officer**
                                                                        **(Principal Financial and Accounting Officer)**

Exhibit B

 

# 1. GLOSSARY

## 1.1 Adverse Drug Reaction (ADR)

In the pre-approval clinical experience with a new medicinal product or its new usages, particularly as the therapeutic dose(s) may not be established: all noxious and unintended responses to a medicinal product related to any dose should be considered adverse drug reactions. The phrase responses to a medicinal product means that a causal relationship between a medicinal product and an adverse event is at least a reasonable possibility, i.e. the relationship cannot be ruled out.

Regarding marketed medicinal products: a response to a drug which is noxious and unintended and which occurs at doses normally used in man for prophylaxis, diagnosis, or therapy of diseases or for modification of physiological function (see the ICH Guideline for Clinical Safety Data Management: Definitions and Standards for Expedited Reporting).

## 1.2 Adverse Event (AE)

Any untoward medical occurrence in a patient or clinical investigation subject administered a pharmaceutical product and which does not necessarily have a causal relationship with this treatment. An adverse event (AE) can therefore be any unfavourable and unintended sign (including an abnormal laboratory finding), symptom, or disease temporally associated with the use of a medicinal (investigational) product, whether or not related to the medicinal (investigational) product (see the ICH Guideline for Clinical Safety Data Management: Definitions and Standards for Expedited Reporting).

## 1.3 Amendment to the protocol

See **Protocol Amendment.**

## 1.4 Applicable Regulatory Requirement(s)

Any law(s) and regulation(s) addressing the conduct of clinical trials of investigational products.

## 1.5 Approval (in relation to Institutional Review Boards)

The affirmative decision of the IRB that the clinical trial has been reviewed and may be conducted

at the institution site within the constraints set forth by the IRB, the institution, Good Clinical Practice (GCP), and the applicable regulatory requirements.

### 1.6 Audit

A systematic and independent examination of trial related activities and documents to determine whether the evaluated trial related activities were conducted, and the data were recorded, analyzed and accurately reported according to the protocol, sponsor's standard operating procedures (SOPs), Good Clinical Practice (GCP), and the applicable regulatory requirement(s).

### 1.7 Audit Certificate

A declaration of confirmation by the auditor that an audit has taken place.

### 1.8 Audit Report

A written evaluation by the sponsor's auditor of the results of the audit.

### 1.9 Audit Trail

Documentation that allows reconstruction of the course of events.

### 1.10 Blinding/Masking

A procedure in which one or more parties to the trial are kept unaware of the treatment assignment(s). Single-blinding usually refers to the subject(s) being unaware, and double-blinding usually refers to the subject(s), investigator(s), monitor, and, in some cases, data analyst(s) being unaware of the treatment assignment(s).

### 1.11 Case Report Form (CRF)

A printed, optical, or electronic document designed to record all of the protocol required information to be reported to the sponsor on each trial subject.

### 1.12 Clinical Trial/Study

Any investigation in human subjects intended to discover or verify the clinical, pharmacological and/or other pharmacodynamic effects of an investigational product(s), and/or to identify any adverse reactions to an investigational product(s), and/or to study absorption, distribution, metabolism, and excretion of an investigational product(s) with the object of ascertaining its safety and/or efficacy. The terms clinical trial and clinical study are synonymous.

### 1.13 Clinical Trial/Study Report

A written description of a trial/study of any therapeutic, prophylactic, or diagnostic agent conducted in human subjects, in which the clinical and statistical description, presentations, and analyses are fully integrated into a single report (see the ICH Guideline for Structure and Content of Clinical Study Reports).

### 1.14 Comparator (Product)

An investigational or marketed product (i.e., active control), or placebo, used as a reference in a clinical trial.

### 1.15 Compliance (in relation to trials)

Adherence to all the trial-related requirements, Good Clinical Practice (GCP) requirements, and the applicable regulatory requirements.

### 1.16 Confidentiality

Prevention of disclosure, to other than authorized individuals, of a sponsor's proprietary information or of a subject's identity.

### 1.17 Contract

A written, dated, and signed agreement between two or more involved parties that sets out any arrangements on delegation and distribution of tasks and obligations and, if appropriate, on financial matters. The protocol may serve as the basis of a contract.

### 1.18 Coordinating Committee

A committee that a sponsor may organize to coordinate the conduct of a multicentre trial.

### 1.19 Coordinating Investigator

An investigator assigned the responsibility for the coordination of investigators at different centres participating in a multicentre trial.

### 1.20 Contract Research Organization (CRO)

A person or an organization (commercial, academic, or other) contracted by the sponsor to perform one or more of a sponsor's trial-related duties and functions.

### 1.21 Direct Access

Permission to examine, analyze, verify, and reproduce any records and reports that are important to evaluation of a clinical trial. Any party (e.g., domestic and foreign regulatory authorities, sponsor's

monitors and auditors) with direct access should
take all reasonable precautions within the constraints of the applicable regulatory requirement(s) to maintain the confidentiality of subjects' identities and sponsor's proprietary information.

## 1.22 Documentation

All records, in any form (including, but not limited to, written, electronic, magnetic, and optical records, and scans, x-rays, and electrocardiograms) that describe or record the methods, conduct, and/or results of a trial, the factors affecting a trial, and the
actions taken.

### 1.23 Essential Documents

Documents which individually and collectively permit evaluation of the conduct of a study and the quality of the data produced (see 8. Essential Documents for the Conduct of a Clinical Trial).

### 1.24 Good Clinical Practice (GCP)

A standard for the design, conduct, performance, monitoring, auditing, recording, analyses, and reporting of clinical trials that provides assurance that the data and reported results are credible and accurate, and that the rights, integrity, and confidentiality of trial subjects are protected.

### 1.25 Monitoring Board, Monitoring Committee, Data Monitoring Committee

An independent data-monitoring committee that may be established by the sponsor to assess at intervals the progress of a clinical trial, the safety data, and the critical efficacy endpoints, and to recommend to the sponsor whether to continue, modify, or stop a trial.

### 1.26 Impartial Witness

A person, who is independent of the trial, who cannot be unfairly influenced by people involved with the trial, who attends the informed consent process if the subject or the subject's legally acceptable representative cannot read, and who reads the informed
consent form and any other written information supplied to the subject.

### 1.27 Independent Ethics Committee (IEC)

An independent body (a review board or a committee, institutional, regional, national, or supranational), constituted of medical professionals and non-medical members, whose responsibility it is to ensure the protection of the rights, safety and well-being
of human subjects involved in a trial and to provide public assurance of that protection, by, among

other things, reviewing and approving / providing favourableopinion on, the trial protocol, the suitability of the investigator(s), facilities, and the methods and material to be used in obtaining and documenting informed consent of the trial subjects.

The legal status, composition, function, operations and regulatory requirements pertaining to Independent Ethics Committees may differ among countries, but should allow the Independent Ethics Committee to act in agreement with GCP as described in this guideline.

### 1.28 Informed Consent

A process by which a subject voluntarily confirms his or her willingness to participate in a particular trial, after having been informed of all aspects of the trial that are relevant to the subject's decision to participate. Informed consent is documented by
means of a written, signed and dated informed consent form.

### 1.29 Inspection

The act by a regulatory authority(ies) of conducting an official review of documents, facilities, records, and any other resources that are deemed by the authority(ies) to be related to the clinical trial and that may be located at the site of the trial, at the sponsor's and/or contract research organization's (CRO's) facilities, or at other establishments deemed appropriate by the regulatory authority(ies).

### 1.30 Institution (medical)

Any public or private entity or agency or medical or dental facility where clinical
trials are conducted.

### 1.31 Institutional Review Board (IRB)

An independent body constituted of medical, scientific, and non-scientific members, whose responsibility is to ensure the protection of the rights, safety and well-being of human subjects involved in a trial by, among other things, reviewing, approving, and
providing continuing review of trial protocol and amendments and of the methods and material to be used in obtaining and documenting informed consent of the trial subjects.

### 1.32 Interim Clinical Trial/Study Report

A report of intermediate results and their evaluation based on analyses performed during the course of a trial.

### 1.33 Investigational Product

A pharmaceutical form of an active ingredient or placebo being tested or used as a reference in a clinical trial, including a product with a marketing authorization when used or assembled (formulated or packaged) in a way different from the approved form, or when used for an unapproved indication, or when used to gain further information about an approved use.

### 1.34 Investigator

A person responsible for the conduct of the clinical trial at a trial site. If a trial is conducted by a team of individuals at a trial site, the investigator is the responsible leader of the team and may be called the principal investigator. See also Subinvestigator.

### 1.35 Investigator / Institution

An expression meaning "the investigator and/or institution, where required by the applicable regulatory requirements".

### 1.36 Investigator's Brochure

A compilation of the clinical and nonclinical data on the investigational product(s) which is relevant to the study of the investigational product(s) in human subjects (see 7. Investigator's Brochure).

### 1.37 Legally Acceptable Representative

An individual or juridical or other body authorized under applicable law to consent, on behalf of a prospective subject, to the subject's participation in the clinical trial.

### 1.38 Monitoring

The act of overseeing the progress of a clinical trial, and of ensuring that it is conducted, recorded, and reported in accordance with the protocol, Standard Operating Procedures (SOPs), Good Clinical Practice (GCP), and the applicable regulatory requirement(s).

### 1.39 Monitoring Report

A written report from the monitor to the sponsor after each site visit and/or other trial-related communication according to the sponsor's SOPs.

### 1.40 Multicentre Trial

A clinical trial conducted according to a single protocol but at more than one site, and therefore, carried out by more than one investigator.

### 1.41 Nonclinical Study

Biomedical studies not performed on human subjects.

**1.42 Opinion (in relation to Independent Ethics Committee)**

The judgement and/or the advice provided by an Independent Ethics Committee (IEC).

**1.43 Original Medical Record**

See Source Documents.

**1.44 Protocol**

A document that describes the objective(s), design, methodology, statistical considerations, and organization of a trial. The protocol usually also gives the background and rationale for the trial, but these could be provided in other protocol referenced documents. Throughout the ICH GCP Guideline the term protocol refers to protocol and protocol amendments.

**1.45 Protocol Amendment**

A written description of a change(s) to or formal clarification of a protocol.

**1.46 Quality Assurance (QA)**

All those planned and systematic actions that are established to ensure that the trial is performed and the data are generated, documented (recorded), and reported in compliance with Good Clinical Practice (GCP) and the applicable regulatory requirement(s).

**1.47 Quality Control (QC)**

The operational techniques and activities undertaken within the quality assurance system to verify that the requirements for quality of the trial-related activities have been fulfilled.

**1.48 Randomization**

The process of assigning trial subjects to treatment or control groups using an element of chance to determine the assignments in order to reduce bias.

**1.49 Regulatory Authorities**

Bodies having the power to regulate. In the ICH GCP guideline the expression Regulatory Authorities includes the authorities that review submitted clinical data and those that conduct inspections (see 1.29). These bodies are sometimes referred to as competent authorities.

**1.50 Serious Adverse Event (SAE) or Serious Adverse Drug Reaction**

(Serious ADR)

Any untoward medical occurrence that at any dose:

– results in death,

– is life-threatening,

– requires inpatient hospitalization or prolongation of existing hospitalization,

– results in persistent or significant disability/incapacity,

or

– is a congenital anomaly/birth defect

(see the ICH Guideline for Clinical Safety Data Management: Definitions and Standards for Expedited Reporting).

## 1.51 Source Data

All information in original records and certified copies of original records of clinical findings, observations, or other activities in a clinical trial necessary for the reconstruction and evaluation of the trial. Source data are contained in source documents (original records or certified copies).

## 1.52 Source Documents

Original documents, data, and records (e.g., hospital records, clinical and office charts, laboratory notes, memoranda, subjects' diaries or evaluation checklists, pharmacy dispensing records, recorded data from automated instruments, copies or
transcriptions certified after verification as being accurate copies, microfiches, photographic negatives, microfilm or magnetic media, x-rays, subject files, and records kept at the pharmacy, at the laboratories and at medico-technical departments involved in the clinical trial).

## 1.53 Sponsor

An individual, company, institution, or organization which takes responsibility for the initiation, management, and/or financing of a clinical trial.

## 1.54 Sponsor-Investigator

An individual who both initiates and conducts, alone or with others, a clinical trial, and under whose immediate direction the investigational product is administered to, dispensed to, or used by a subject. The term does not include any person other than an individual (e.g., it does not include a corporation or an agency). The obligations of a sponsor-investigator include both those of a sponsor and those of an investigator.

## 1.55 Standard Operating Procedures (SOPs)

Detailed, written instructions to achieve uniformity of the performance of a specific function.

## 1.56 Subinvestigator

Any individual member of the clinical trial team designated and supervised by the investigator at a trial site to perform critical trial-related procedures and/or to make important trial-related decisions (e.g., associates, residents, research fellows). See also Investigator.

### 1.57 Subject/Trial Subject

An individual who participates in a clinical trial, either as a recipient of the investigational product(s) or as a control.

### 1.58 Subject Identification Code

A unique identifier assigned by the investigator to each trial subject to protect the subject's identity and used in lieu of the subject's name when the investigator reports adverse events and/or other trial related data.

### 1.59 Trial Site

The location(s) where trial-related activities are actually conducted.

### 1.60 Unexpected Adverse Drug Reaction

An adverse reaction, the nature or severity of which is not consistent with the applicable product information (e.g., Investigator's Brochure for an unapproved investigational product or package insert/summary of product characteristics for an approved product) (see the ICH Guideline for Clinical Safety Data Management: Definitions and Standards for Expedited Reporting).

### 1.61 Vulnerable Subjects

Individuals whose willingness to volunteer in a clinical trial may be unduly influenced by the expectation, whether justified or not, of benefits associated with participation, or of a retaliatory response from senior members of a hierarchy in case of refusal to participate. Examples are members of a group with a hierarchical structure, such as medical, pharmacy, dental, and nursing students, subordinate hospital and laboratory personnel, employees of the pharmaceutical industry, members of the armed forces, and persons kept in detention. Other vulnerable subjects include patients with incurable diseases, persons in nursing homes, unemployed or impoverished persons, patients in emergency situations, ethnic minority groups, homeless persons, nomads, refugees, minors, and those incapable of giving consent.

### 1.62 Well-being (of the trial subjects)

The physical and mental integrity of the subjects participating in a clinical trial.

**ADDENDUM**

**1.63 Certified Copy**

A copy (irrespective of the type of media used) of the original record that has been verified (i.e., by a dated signature or by generation through a validated process) to have the same information, including data that describe the context, content, and structure, as the original.

**1.64 Monitoring Plan**

A document that describes the strategy, methods, responsibilities, and requirements for monitoring the trial.

**1.65 Validation of Computerized Systems**

A process of establishing and documenting that the specified requirements of a computerized system can be consistently fulfilled from design until decommissioning of the system or transition to a new system. The approach to validation should be based on a risk assessment that takes into consideration the intended use of the system and the potential of the system to affect human subject protection and reliability of trial results.

# Clinical Research News

Nov 24

US research hospital strarts the clinical trial of Body-Machine Interface for Recovering Muscle Control

Nov 24

The Belgian Society of Medical Oncology started a study to examine the value of Broad Agnostic Next Generation Sequencing (NGS) Panel Testing Versus Reimbursed Organ-directed NGS

Nov 24

Health care organization studies the Effect of Menstrual Phase Endometrial Scratch

Nov 24

New guidance issued on policies to protect populations in vulnerable situations in context of COVID-19

Nov 24

Exhibit C

# Multiple Endpoints in Clinical Trials

# Guidance for Industry

## *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments and suggestions regarding this draft document should be submitted within 60 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance.  Submit electronic comments to http://www.regulations.gov.  Submit written comments to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD  20852.  All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft document contact (CDER) Scott Goldie at 301-796-2055 or (CBER) Office of Communication, Outreach, and Development, 800-835-4709 or 240-402-8010.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**[January 2017]**
**Clinical/Medical**

# Multiple Endpoints in Clinical Trials

# Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

*or*

*Office of Communication, Outreach and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 71, Room 3128*
*Silver Spring, MD 20993-0002*
*Phone: 800-835-4709 or 240-402-8010*
*Email: ocod@fda.hhs.gov*
*http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**[January 2017]**
**Clinical/Medical**

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

# Multiple Endpoints in Clinical Trials
# Guidance for Industry[1]

> This draft guidance, when finalized, will represent the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

## I.   INTRODUCTION

This guidance provides sponsors and review staff with the Agency's thinking about the problems posed by multiple endpoints in the analysis and interpretation of study results and how these problems can be managed in clinical trials for human drugs, including drugs subject to licensing as biological products. Most clinical trials performed in drug development contain multiple endpoints to assess the effects of the drug and to document the ability of the drug to favorably affect one or more disease characteristics. As the number of endpoints analyzed in a single trial increases, the likelihood of making false conclusions about a drug's effects with respect to one or more of those endpoints becomes a concern if there is not appropriate adjustment for multiplicity. The purpose of this guidance is to describe various strategies for grouping and ordering endpoints for analysis and applying some well-recognized statistical methods for managing multiplicity within a study in order to control the chance of making erroneous conclusions about a drug's effects. Basing a conclusion on an analysis where the risk of false conclusions has not been appropriately controlled can lead to false or misleading representations regarding a drug's effects.

FDA's guidance for industry *E9 Statistical Principles for Clinical Trials* (International Council on Harmonisation E9 guidance, or "ICH E9")[2] is a broad ranging guidance that includes discussion of multiple endpoints. This guidance on multiple endpoints in clinical trials for human drugs provides greater detail on the topic. The issuance of this guidance represents partial fulfillment of an FDA commitment under the Food and Drug Administration Amendments Act (FDAAA) of 2007.

---

[1] This guidance has been prepared by the Office of Biostatistics in the Office of Translational Sciences in the Center for Drug Evaluation and Research at the Food and Drug Administration.

[2] The ICH E9 guidance is available on the FDA Drugs Web page under ICH – Efficacy. We update guidances periodically. To make sure you have the most recent version of a guidance, check the FDA Drugs Web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

In general, FDA's guidance documents do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.    BACKGROUND AND SCOPE

Failure to account for multiplicity when there are several clinical endpoints evaluated in a study can lead to false conclusions regarding the effects of the drug. The regulatory concern regarding multiplicity arises principally in the evaluation of clinical trials intended to demonstrate effectiveness and support drug approval; however, this issue is important throughout the drug development process.

### A.    Introduction to Study Endpoints

Efficacy endpoints are measures intended to reflect the effects of a drug. They include assessments of clinical events (e.g., mortality, stroke, pulmonary exacerbation, venous thromboembolism), patient symptoms (e.g., pain, dyspnea, depression), measures of function (e.g., ability to walk or exercise), or surrogates of these events or symptoms.

Because most diseases have more than one consequence, many trials are designed to examine the effect of a drug on more than one endpoint. In some cases, efficacy cannot be adequately established on the basis of a single endpoint. In other cases, an effect on any of several endpoints could be sufficient to support approval of a marketing application. When the rate of occurrence of a single event is expected to be low, it is common to combine several events (e.g., cardiovascular death, heart attack, and stroke) in a "composite event endpoint" where the occurrence of any of the events would constitute an "endpoint event."

When there are many endpoints prespecified in a clinical trial, they are usually classified into three families: primary, secondary, and exploratory.

- The set of primary endpoints consists of the outcome or outcomes (based on the drug's expected effects) that establish the effectiveness, and/or safety features, of the drug in order to support regulatory action. When there is more than one primary endpoint and success on any one alone could be considered sufficient to demonstrate the drug's effectiveness, the rate of falsely concluding the drug is effective is increased due to multiple comparisons (see section II.E).

- Secondary endpoints may be selected to demonstrate additional effects after success on the primary endpoint. For instance, a drug may demonstrate effectiveness on the primary endpoint of survival, after which the data regarding an effect on a secondary endpoint, such as functional status, would be tested. Secondary endpoints may also provide evidence that a particular mechanism underlies a demonstrated clinical effect (e.g., a drug for osteoporosis with fractures as the primary endpoint, and improved bone density as a secondary endpoint).

- All other endpoints are referred to as exploratory in this document (see section III.A).

# Exhibit D

Case 4:20-cv-01720-JSW Document 34-1 Filed 11/25/20 Page 223 of 306

COVID-19 is an emerging, rapidly evolving situation.

Get the latest public health information from CDC: https://www.coronavirus.gov.

Get the latest research information from NIH: https://www.nih.gov/coronavirus.

 NIH U.S. National Library of Medicine

*ClinicalTrials.gov*



# A Study of AK002 in Patients With Eosinophilic Gastritis and/or Eosinophilic Gastroenteritis (ENIGMA)

 The safety and scientific validity of this study is the responsibility of the study sponsor and investigators. Listing a study does not mean it has been evaluated by the U.S. Federal Government. Read our disclaimer for details.

ClinicalTrials.gov Identifier: NCT03496571

Recruitment Status ❶ : Completed
First Posted ❶ : April 12, 2018
Last Update Posted ❶ : June 12, 2020

**Sponsor:**

Allakos, Inc.

**Information provided by (Responsible Party):**

Allakos, Inc.

| Study Details | Tabular View | No Results Posted | Disclaimer | ? How to Read a Study Record |

## Study Description

Go to ▼

Brief Summary:

This is a Phase 2, double-blind, randomized, placebo-controlled study to assess the effects of AK002, given monthly for 4 doses. It is hypothesized that AK002 is more effective than placebo control (alternative hypothesis) in reducing the number of eosinophils per high power field (HPF) in gastric and/or duodenal biopsies before and after receiving AK002 or placebo versus no difference between AK002 and placebo control (null hypothesis).

Case 4:20-cv-01720-JSW  Document 34-1  Filed 11/25/20  Page 224 of 396

| Condition or disease ❶ | Intervention/treatment ❶ | Phase ❶ |
|---|---|---|
| Eosinophilic Gastritis | Drug: AK002 | Phase 2 |
| Eosinophilic Gastroenteritis | Other: Placebo | |

## Study Design

Go to

**Study Type ❶ :**

Interventional  (Clinical Trial)

**Actual Enrollment ❶ :**

65 participants

**Allocation:**

Randomized

**Intervention Model:**

Parallel Assignment

**Masking:**

Quadruple (Participant, Care Provider, Investigator, Outcomes Assessor)

**Primary Purpose:**

Treatment

**Official Title:**

A Phase 2, Multicenter, Randomized, Double-Blind, Placebo-Controlled Study to Evaluate the Efficacy, Safety, Tolerability, and Pharmacodynamic Effect of AK002 in Patients With Eosinophilic Gastritis and/or Eosinophilic Gastroenteritis

**Actual Study Start Date ❶ :**

July 18, 2018

**Actual Primary Completion Date ❶ :**

June 24, 2019

**Actual Study Completion Date ❶ :**

June 24, 2019

**Resource links provided by the National Library of Medicine**

MedlinePlus related topics:    Eosinophilic Esophagitis   Gastroenteritis

Genetic and Rare Diseases Information Center resources:    Eosinophilic Gastroenteritis

U.S. FDA Resources

## Arms and Interventions

Go to ▼

| Arm ⓘ | Intervention/treatment ⓘ |
|---|---|
| Placebo Comparator: Placebo<br><br>Subjects in this arm will receive 4 monthly doses of placebo. | Other: Placebo<br><br>Placebo |
| Experimental: 1 mg/kg of AK002<br><br>Subjects in this arm will receive 4 monthly doses of AK002: a first dose of 0.3 mg/kg, a second dose of 1 mg/kg, a third dose of 1 mg/kg, and a fourth dose of 1 mg/kg | Drug: AK002<br><br>AK002 is a humanized non-fucosylated immunoglobulin G1 (IgG1) monoclonal antibody directed against Siglec-8, a member of the CD33-related family of sialic acid-binding, immunoglobulin-like lectins (Siglecs). |
| Experimental: 3 mg/kg of AK002<br><br>Subjects in this arm will receive 4 monthly doses of AK002: a first dose of 0.3 mg/kg, a second dose of 1 mg/kg, a third dose of 3 mg/kg, and a fourth dose of 3 mg/kg | Drug: AK002<br><br>AK002 is a humanized non-fucosylated immunoglobulin G1 (IgG1) monoclonal antibody directed against Siglec-8, a member of the CD33-related family of sialic acid-binding, immunoglobulin-like lectins (Siglecs). |

## Outcome Measures

Go to ▼

Primary Outcome Measures ⓘ  :

1. The efficacy of AK002 in patients with Eosinophilic Gastritis (EG) and/or Eosinophilic Gastroenteritis (EGE) as estimated by number of eosinophils per high power field (HPF) in gastric and/or duodenal biopsies before and after receiving AK002 or placebo. [ Time Frame: Day 0 (baseline) to Day 99 ]

Secondary Outcome Measures ⓘ :

1. Changes in symptoms of EG and/or EGE in a Patient Reported Outcome (PRO) questionnaire [ Time Frame: Day -28 (Screening) to Day 141 (End of Study) ]

## Eligibility Criteria

Go to ▼

 

---

**Information from the National Library of Medicine**

*Choosing to participate in a study is an important personal decision. Talk with your doctor and family members or friends about deciding to join a study. To learn more about this study, you or your doctor may contact the study research staff using the contacts provided below. For general information, Learn About Clinical Studies.*

---

**Ages Eligible for Study:**

18 Years to 80 Years   (Adult, Older Adult)

**Sexes Eligible for Study:**

All

**Accepts Healthy Volunteers:**

No

**Criteria**

Inclusion Criteria:

1. Male or female aged ≥18 and ≤80 years at the time of signing ICF.

2. Average weekly score of ≥3 (on a scale from 0-10, recorded for either abdominal pain, diarrhea and/or nausea on the PRO questionnaire during at least 2 out of 3 weeks of PRO collection. A minimum of four questionnaires must be completed each qualifying week.

3. Eosinophilia of the gastric mucosa ≥30 eosinophils/HPF in 5 HPFs and/or eosinophilia of the duodenal mucosa ≥30 eosinophils/HPF in 3 HPFs from the EGD performed during the screening period, without any other cause for the gastric eosinophilia (e.g., parasitic or other infection or malignancy).

4. Subjects must have failed or not be adequately controlled on standard-of-care treatments for EG or EGE symptoms (which could include PPIs, systemic or topical corticosteroids, and/or diet, among others).

5. If on other treatments for EG, EGE, or EoE at enrollment, stable dose for at least 5 half-lives prior to screening and willingness to continue on that dose for the duration of the study.

6. If subject is on pre-existing dietary restrictions, willingness to maintain dietary restrictions throughout the study, as much as possible.

7. Able and willing to comply with all study procedures.

8. Female subjects must be either post-menopausal for at least 1 year with FSH level >40 mIU/mL at screening or surgically sterile (tubal ligation, hysterectomy or bilateral oophorectomy) for at least 3 months, or if of childbearing potential, have a negative pregnancy test and agree to use dual methods of contraception, or abstain from sexual activity from screening until the end of the study, or for 120 days

Case 4:20-cv-01720-JSW Document 34-1 Filed 11/25/20 Page 227 of 396

following the last dose of study drug, whichever is longer. Male subjects with female partners of childbearing potential must agree to use a highly effective method of contraception from screening until the end of the study or for 120 days following the last dose of study drug, whichever is longer. All fertile men with female partners of childbearing potential should be instructed to contact the Investigator immediately if they suspect their partner might be pregnant at any time during study participation.

Exclusion Criteria:

1. Known hypersensitivity to any constituent of the study drug.

2. Diagnosis of celiac disease or H. pylori infection as determined by screening EGD or a history of celiac disease diagnosed by prior EGD.

3. Presence of abnormal laboratory values considered by the Investigator to be clinically significant.

4. Grade 2 or higher lymphopenia (<0.8 × 109/L lymphocytes).

5. Any disease or condition (medical or surgical) or cardiac abnormality, which, in the opinion of the Investigator, would place the subject at increased risk.

6. History of malignancy; except carcinoma in situ in the cervix, early stage prostate cancer, or non-melanoma skin cancers. However, cancers that have been in remission for more than 5 years and are considered cured, can be enrolled (with the exception of breast cancer). All history of malignancy (including diagnosis, dates, and compliance with cancer screening recommendations) must be documented and certified by the Investigator, along with the statement that in their clinical judgment the tissue eosinophilia is attributable to EGID, rather than recurrence of malignancy.

7. Treatment with chemotherapy or radiotherapy in the preceding 6 months.

8. Treatment for a clinically significant helminthic parasitic infection within 6 months of screening and/or a positive helminthic test at screening.

9. Use of any medications that may interfere with the study such as immunosuppressive or immunomodulatory drugs (including azathioprine, 6-mercaptopurine, methotrexate, cyclosporine, tacrolimus, anti-TNF, anti-IL-5, anti-IL-5 receptor, dupilumab, anti-IgE antibodies, omalizumab) or systemic corticosteroids with a daily dose >10 mg of prednisone or equivalent, during 5 half-lives prior to screening or during the screening period, except for omalizumab taken in asthma and/or urticaria patients where their asthma and/or urticaria cannot be controlled on other medications. In such cases, the dose of omalizumab should remain stable during screening and throughout the study.

10. Vaccination with live attenuated vaccines within 30 days prior to initiation of treatment in the study, during the treatment period, or vaccination expected within 5 half-lives of the study drug administration.

11. Known history of alcohol, drug, or other substance abuse or dependence.

12. Participation in a concurrent interventional study with the last intervention occurring within 30 days prior to administration of study drug (or 90 days or 5 half-lives, whichever is longer, for biologic products).

13. Women who are pregnant, breastfeeding, or planning to become pregnant while participating in the study.

Case 4:20-cv-01720-JSW Document 34-1 Filed 11/25/20 Page 228 of 396

14. Any other reason that in the opinion of the Investigator or Medical Monitor makes the patient unsuitable for enrollment.

## Contacts and Locations

Go to ▾

---

**Information from the National Library of Medicine**



To learn more about this study, you or your doctor may contact the study research staff using the contact information provided by the sponsor.

Please refer to this study by its ClinicalTrials.gov identifier (NCT number): **NCT03496571**

---

### Locations

▼ Hide 21 study locations

**United States, Arizona**

Phoenician Centers for Research and Innovation
Phoenix, Arizona, United States, 85021

Mayo Clinic
Scottsdale, Arizona, United States, 85259

**United States, California**

Ventura Clinical Trials
Ventura, California, United States, 93003

**United States, Colorado**

UC Denver
Aurora, Colorado, United States, 80045

**United States, Florida**

Riverside Clinical Research
Edgewater, Florida, United States, 32132

Advanced Research Institute
New Port Richey, Florida, United States, 34653

**United States, Illinois**

Northwestern
Chicago, Illinois, United States, 60611

**United States, Indiana**

Indiana University Health

Indianapolis, Indiana, United States, 46202

**United States, Iowa**

University of Iowa

Iowa City, Iowa, United States, 52242

**United States, Maryland**

National Institutes of Health

Bethesda, Maryland, United States, 20892

**United States, Massachusetts**

Tufts Medical Center

Boston, Massachusetts, United States, 02111

**United States, Minnesota**

Mayo Clinic

Rochester, Minnesota, United States, 55905

**United States, New York**

Icahn School of Medicine at Mount Sinai

New York, New York, United States, 10029

**United States, North Carolina**

University of North Carolina - Chapel Hill

Chapel Hill, North Carolina, United States, 27599

**United States, Ohio**

Cincinnati Children's Hospital

Cincinnati, Ohio, United States, 45229

**United States, Pennsylvania**

University of Pennsylvania, Perelman Center for Advanced Medicine

Philadelphia, Pennsylvania, United States, 19104

Care Access Research

Pottsville, Pennsylvania, United States, 17901

**United States, Tennessee**

ClinSearch

Chattanooga, Tennessee, United States, 37421

Vanderbilt University

Nashville, Tennessee, United States, 37212

**United States, Texas**

Avant Research Associates

Austin, Texas, United States, 78704

**United States, Utah**

University of Utah

Salt Lake City, Utah, United States, 84132

**Sponsors and Collaborators**

Allakos, Inc.

**Investigators**

Study Director:    Henrik Rasmussen, MD, PhD    Allakos, Inc.

## More Information

Go to  

**Publications automatically indexed to this study by ClinicalTrials.gov Identifier (NCT Number):**

Dellon ES, Peterson KA, Murray JA, Falk GW, Gonsalves N, Chehade M, Genta RM, Leung J, Khoury P, Klion AD, Hazan S, Vaezi M, Bledsoe AC, Durrani SR, Wang C, Shaw C, Chang AT, Singh B, Kamboj AP, Rasmussen HS, Rothenberg ME, Hirano I. Anti-Siglec-8 Antibody for Eosinophilic Gastritis and Duodenitis. N Engl J Med. 2020 Oct 22;383(17):1624-1634. doi: 10.1056/NEJMoa2012047.

**Responsible Party:**

Allakos, Inc.

**ClinicalTrials.gov Identifier:**

NCT03496571    History of Changes

**Other Study ID Numbers:**

AK002-003

**First Posted:**

April 12, 2018    Key Record Dates

**Last Update Posted:**

June 12, 2020

**Last Verified:**

June 2020

**Individual Participant Data (IPD) Sharing Statement:**

Case 4:20-cv-01720-JSW Document 34-1 Filed 11/25/20 Page 231 of 396

## Plan to Share IPD:

No

## Studies a U.S. FDA-regulated Drug Product:

Yes

## Studies a U.S. FDA-regulated Device Product:

No

## Keywords provided by Allakos, Inc.:

Eosinophilic Gastritis        EGE

Eosinophilic Gastroenteritis        Eosinophilic gastrointestinal disorders

Eosinophil        EGID

EG

## Additional relevant MeSH terms:

Gastroenteritis

Gastritis

Eosinophilic Esophagitis

Enteritis

Eosinophilia

Gastrointestinal Diseases

Digestive System Diseases

Stomach Diseases

Esophagitis

Esophageal Diseases

Leukocyte Disorders

Hematologic Diseases

Hypersensitivity, Immediate

Hypersensitivity

Immune System Diseases

Intestinal Diseases

Exhibit E

# Investors



## Press Release

**Allakos Announces AK002 Met All Prespecified Primary and Secondary Endpoints in Phase 2 Randomized, Double-Blind, Placebo-Controlled Study in Patients with Eosinophilic Gastritis (EG) and/or Eosinophilic Gastroenteritis (EGE)**

August 5, 2019 at 7:00 AM EDT

- *Primary efficacy endpoint met with 95% reduction in gastrointestinal tissue eosinophils vs. 10% increase on placebo (p < 0.0001)*

- *Treatment response secondary endpoint met with 69% of AK002 treated patients meeting the response criteria vs. 5% on placebo (p = 0.0008)*

- *Total symptom score secondary endpoint met with 53% reduction in patient reported total symptom score vs. 24% on placebo (p = 0.0012)*

- *In the 14 patients with eosinophilic esophagitis ("EoE"), 13 (93%) patients had esophageal eosinophils reduced to <5 Eos/HPF and dysphagia was reduced 53% on AK002 vs. 17% on placebo*

- *Allakos plans to initiate studies in EG/EGE and EoE in Q1 2020*

*-- Management to host conference call and webcast today at 8:00 am ET --*

REDWOOD CITY, Calif., Aug. 05, 2019 (GLOBE NEWSWIRE) -- Allakos Inc. (the "Company") (Nasdaq: ALLK) today announced positive results from its Phase 2 randomized, double-blind, placebo-controlled trial of AK002 in patients with eosinophilic gastritis and/or eosinophilic gastroenteritis. All AK002 dose arms showed clinically meaningful and statistically significant benefits compared to placebo on all prespecified primary and secondary endpoints, including gastrointestinal tissue eosinophil counts and patient reported disease symptoms. Statistically significant differences in patient symptoms between the active and placebo groups occurred one day following AK002 administration. In addition, patients with comorbid eosinophilic esophagitis treated with AK002 experienced statistically significant decreases in esophageal eosinophil counts and substantial reductions in patient reported dysphagia symptoms.

"Eosinophilic gastritis, eosinophilic gastroenteritis, and eosinophilic esophagitis are severe debilitating diseases with no approved therapies. AK002 is unique in that it targets both eosinophils and mast cells, two major effector cell types that cause disease-related tissue damage. In this study, AK002 reduced eosinophil and mast cell counts and showed a statistically significant improvement in disease symptoms one day after administration," said Dr. Evan Dellon, M.D., a principal investigator of the study and Professor of Gastroenterology at the University of North Carolina, Chapel Hill. "These are clinically meaningful changes, and these data suggest that AK002 could provide rapid and sustained benefit in patients with eosinophil gastrointestinal diseases. I look forward to the continued development of AK002 in these severe orphan conditions."

### Phase 2 ENIGMA Study Design

This randomized, double-blind, placebo-controlled Phase 2 trial of AK002 enrolled patients with active, biopsy-confirmed EG and/or EGE. Patients were required to be moderately to severely symptomatic based on a patient reported symptom questionnaire and have biopsy confirmed eosinophilia of the stomach (≥30 eosinophils/HPF in 5 HPFs) and/or duodenum (≥30 eosinophils/HPF in 3 HPFs). Qualifying patients were randomized 1:1:1 to receive: (a) 0.3 mg/kg of AK002 for the first month followed by three doses of 1.0 mg/kg given monthly, (b) 0.3 mg/kg of AK002 for the first month followed by 1.0 mg/kg, 3.0 mg/kg and 3.0 mg/kg given monthly, or (c) a monthly placebo. Disease symptoms were measured daily using a patient reported symptom questionnaire that scored 8 symptoms on a scale from 0 to 10 (abdominal pain, nausea, vomiting, early satiety, loss of appetite, abdominal cramping, bloating, and diarrhea).

Endpoints were assessed per protocol in a prespecified hierarchical order using biopsies collected at the end of study and symptoms collected over the last two weeks of study prior to biopsy. The primary endpoint was the percent change from baseline in the number of tissue eosinophils obtained from gastric or duodenal biopsies. The secondary endpoints were (1) proportion of patients with a greater than 75% reduction in tissue eosinophil counts from biopsies and a greater than 30% reduction in Total Symptom Score (TSS) from the patient reported questionnaire and (2) the percent change from baseline in the TSS.

### Study Results

AK002 showed a statistically significant benefit when compared to placebo on all primary and secondary endpoints for each of the high dose, the low dose, and the combined high/low dose AK002 groups. The data demonstrate that AK002 produced histological resolution of gastrointestinal tissue eosinophilia and improved disease symptoms, and that these benefits occurred in the same individuals.

Data are presented below; more detailed results from the study will be presented during the conference call being held today.

| Primary and Secondary Endpoints | | Placebo (N=20) | High Dose AK002 (n=20) | Low Dose AK002 (n=19) | Combined AK002 (n=39) |
|---|---|---|---|---|---|
| 1° Endpoint: % change in gastric or duodenal eosinophil counts | | +10% | -97% | -92% | -95% |
| | *p*−value | - | <0.0001 | <0.0001 | <0.0001 |
| 2° Endpoint: treatment responders[1] | | 5% | 70% | 68% | 69% |
| | *p*−value | - | 0.0009 | 0.0019 | 0.0008 |
| 2° Endpoint: % change in total symptom score (TSS)[2] | | -24% | -58% | -49% | -53% |
| | *p*−value | - | 0.0012 | 0.0150 | 0.0012 |

[1] Treatment responders defined as greater than a 75% reduction in biopsy eosinophil counts and a greater than 30% reduction in TSS

[2] TSS is comprised of all 8 patient reported symptoms each measured on a scale from 0 to 10 (abdominal pain, nausea, vomiting, early satiety, loss of appetite, abdominal cramping, bloating, and diarrhea)

### Safety

AK002 was generally well tolerated. The only treatment emergent adverse event occurring more frequently on AK002 than on placebo was mild to moderate infusion-related reactions (including flushing, feeling of warmth, headache, nausea, and/or dizziness) which occurred in 60% of AK002 treated patients and

23% of placebo treated patients. There was 1 drug-related serious adverse event (SAE) in the study, consisting of an infusion-related reaction which recovered within 24 hours. Treatment emergent SAEs occurred in 9% of patients on AK002 versus 14% on placebo.

### Results in Eosinophilic Esophagitis Patients

Esophageal eosinophil counts and dysphagia improved in patients with comorbid eosinophilic esophagitis.

| Exploratory Endpoints | Placebo | Combined AK002 |
| --- | --- | --- |
| EoE: proportion of patients with esophageal eosinophil counts <5/HPF | 1/9 (11%) | 13/14 (93%) |
| EoE: % change in patient reported dysphagia questionnaire | -17% | -53% |

### Steroid Use

Steroid use was balanced between drug and placebo groups. Statistically significant results were also observed on all primary and secondary endpoints in the subgroup of patients who did not receive steroids.

### Extension Study

Ninety-two percent of patients in the Phase 2 study elected to enter a long-term AK002 extension study. Efficacy and safety results from the long-term extension study are expected in 2020.

Based on the results from the Phase 2 study, Allakos will request an end of Phase 2 meeting to discuss the design of the planned Phase 3 study in EG and/or EGE and Phase 2/3 study in EoE.

### Conference Call and Live Webcast

The Company will host a conference call and webcast with slides today at 8:00 a.m. Eastern Time / 5:00 a.m. Pacific Time. To participate by telephone, please dial 877-407-9039 (domestic) or 201-689-8470 (international). The conference ID number is 13693475. A live and archived audio webcast can be accessed through the Investors section of the Company's website at www.allakos.com (https://www.globenewswire.com/Tracker?data=-Bvivn8LFcldzCaK2oMs9krtuZ7rgezEE_P4xwnvYRyzHXoNha_H6J2rk2r6YoEBRV5YBtAj3fCOLYORhA_e-Q==). The archived audio webcast will remain available on the Company's website for 30 days following the conference call.

### About Eosinophilic Gastritis, Eosinophilic Gastroenteritis, and Eosinophilic Esophagitis

Eosinophilic gastritis, eosinophilic gastroenteritis, and Eosinophilic Esophagitis are severe orphan inflammatory diseases characterized by the presence of high levels of eosinophils in the stomach, duodenum, or esophagitis, respectively. Common symptoms of the diseases include severe abdominal pain, nausea, diarrhea, bloating, cramping, early satiety, loss of appetite, vomiting, dysphagia, and weight loss. The estimated prevalence of eosinophilic gastritis and eosinophilic gastroenteritis in the United States is approximately 50,000 patients. The estimated prevalence of eosinophilic esophagitis in the United States is approximately 150,000 patients. There are no treatments approved specifically for these diseases. Treatment with systemic steroids can provide symptomatic improvements, but long-term treatment with steroids is generally not possible due to the numerous side effects caused by steroids. Allakos has received orphan drug designation for AK002 in eosinophilic gastritis and eosinophilic gastroenteritis.

### About Allakos

Allakos is a clinical stage biotechnology company developing antibodies that target immunomodulatory receptors present on immune effector cells involved in allergic, inflammatory, and proliferative diseases. The Company's lead antibody, AK002, targets Siglec-8, an inhibitory receptor selectively expressed on human mast cells and eosinophils. AK002 has been shown to inhibit mast cells and deplete eosinophils. Inappropriately activated eosinophils and mast cells have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. AK002 has been tested in five clinical studies. In these studies, AK002 eliminated blood eosinophils and improved disease symptoms in patients with eosinophilic gastritis and/or eosinophilic gastroenteritis, eosinophilic esophagitis, severe allergic conjunctivitis, chronic urticaria, and indolent systemic mastocytosis. For more information, please visit the Company's website at www.allakos.com (https://www.globenewswire.com/Tracker?data=-Bvivn8LFcldzCaK2oMs9hMyhspJVSaKcsrbc605vd4jfOUkeT-wL9aJD_YxMTR3zzExeynPaDhhE8wjdOkYtF6NLJNl1kJZZ1oVaSIAXMfYEKWjrGtaapgSJb3avswhECmVnosagsGQm_IkmisRKD9TQ0uUM0sw8CXcnMU5BKFdZ0P-IlSvGVzE-vMDsRGsfaxWY3cy7PvVIfuYeWHuRk_UqQNg1JllLFGOnH9L17OmmpqXL-JnArZrEfKOkzhFDk3v6ANQOnw3dGnD8U6mxyrtoMeFzzEEnLu7eu5kYpaL7JQsm-W9N2x7qP5pycxnLgD7j8i9-6H12AKWtMSnXLdfuXVMiRpsaQ5Uor2F9BClG2sHs4zvI5vkS_o9P534U5SoueiCGABFfOZkCVJSgEnfPpJX71CFMh3AZQVsaxA=).

### Forward-Looking Statements

This press release contains forward-looking statements within the meaning of The Private Securities Litigation Reform Act of 1995. Such forward-looking statements include, but are not limited to, the ability of AK002 to continue to demonstrate rapid and sustained benefit in patients with eosinophil gastrointestinal diseases, the timing of the Company's long-term extension study and the efficacy and safety results from such study, the timing and outcome of its end of the phase 2 meeting and Allakos' ability to conduct a phase 3 study in EG and/or EGE and a phase 2/3 study in EoE. Such statements are subject to numerous important factors, risks and uncertainties that may cause actual events or results to differ materially from current expectations and beliefs, including but not limited to: Allakos' early stages of clinical drug development; Allakos' ability to timely complete clinical trials for, and if approved, commercialize AK002, its lead compound; Allakos' ability to obtain required regulatory approvals for its product candidates; uncertainties related to the enrollment of patients in its clinical trials; Allakos' ability to demonstrate sufficient safety and efficacy of its product candidates in its clinical trials; uncertainties related to the success of later-stage clinical trials, regardless of the outcomes of preclinical testing and early-stage trials; market acceptance of Allakos' product candidates; uncertainties related to the projections of the size of patient populations suffering from the diseases Allakos is targeting; Allakos' ability to advance additional product candidates beyond AK002; Allakos' ability to obtain additional capital to finance its operations; and other important risk factors set forth in Allakos' most recent Annual Report on Form 10-K filed with the SEC on March 14, 2019, Quarterly Report on Form 10-Q filed with the SEC on August 5, 2019 and future reports to be filed with the SEC. These documents contain and identify important factors that could cause the actual results for Allakos to differ materially from those contained in Allakos' forward-looking statements. Any forward-looking statements contained in this press release speak only as of the date hereof, and Allakos specifically disclaims any obligation to update any forward-looking statement, except as required by law.

Source: Allakos Inc.

2

**Investor Contact:**
Adam Tomasi, President and COO
ir@allakos.com

**Media Contact:**
Denise Powell
denise@redhousecomms.com

 (https://www.globenewswire.com/NewsRoom/AttachmentNg/f89b0145-2cbf-46ee-9d99-caadaf911e77)

Source: Allakos Inc.

**Investor Contact:**
Adam Tomasi, President and COO
ir@allakos.com

**Media Contact:**
Denise Powell
denise@redhousecomms.com

# Exhibit F

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 8/1/2019 | 34.6 | 34.84 | 32.33 | 32.49 |
| 8/2/2019 | 32.4 | 32.43 | 30.32 | 31 |
| 8/5/2019 | 61 | 73.25 | 60.34 | 65.26 |
| 8/6/2019 | 66 | 85.4 | 66 | 79.47 |
| 8/7/2019 | 79.52 | 92.84 | 79.05 | 87.5 |
| 8/8/2019 | 86.56 | 86.56 | 81.34 | 83.81 |
| 8/9/2019 | 83.37 | 86 | 81.62 | 84.88 |
| 8/12/2019 | 85.52 | 90.9 | 85.51 | 88.11 |
| 8/13/2019 | 88.1 | 90.06 | 82.3 | 87.6 |
| 8/14/2019 | 85 | 87.42 | 83.64 | 84 |
| 8/15/2019 | 84.67 | 85.07 | 81 | 83.34 |
| 8/16/2019 | 84.12 | 89.6 | 82.63 | 88.72 |
| 8/19/2019 | 89.07 | 90.57 | 87.62 | 89.12 |
| 8/20/2019 | 88.72 | 90.32 | 86.32 | 88 |
| 8/21/2019 | 88.25 | 92.25 | 86.03 | 89.73 |
| 8/22/2019 | 90.38 | 90.38 | 86.5 | 87.5 |
| 8/23/2019 | 87.07 | 89.99 | 85.76 | 86.55 |
| 8/26/2019 | 88.19 | 88.19 | 85.49 | 87.4 |
| 8/27/2019 | 87.74 | 88.93 | 86.01 | 87.65 |
| 8/28/2019 | 87.14 | 88.36 | 86.29 | 86.8 |
| 8/29/2019 | 87.6 | 88.33 | 85.15 | 87.86 |
| 8/30/2019 | 88.32 | 88.9 | 86.82 | 88.46 |
| 9/3/2019 | 88.46 | 91.81 | 84 | 84.66 |
| 9/4/2019 | 85.29 | 86.27 | 81.94 | 83.85 |
| 9/5/2019 | 83.36 | 85.62 | 82.66 | 85 |
| 9/6/2019 | 84.44 | 86.8 | 83.29 | 85.32 |
| 9/9/2019 | 85.39 | 85.39 | 76.53 | 78.26 |
| 9/10/2019 | 76.75 | 81.17 | 76.08 | 81.08 |
| 9/11/2019 | 81.59 | 84.77 | 77.7 | 83.16 |
| 9/12/2019 | 83.28 | 86.19 | 82.37 | 83.64 |
| 9/13/2019 | 83.1 | 85.81 | 82.29 | 85.42 |
| 9/16/2019 | 85 | 87.6 | 84.71 | 85.3 |
| 9/17/2019 | 85.39 | 87.66 | 83.74 | 84.26 |
| 9/18/2019 | 83.95 | 84.45 | 80.4 | 81.36 |
| 9/19/2019 | 81.36 | 84.66 | 80.82 | 82.7 |
| 9/20/2019 | 82.37 | 88.73 | 82 | 87.37 |
| 9/23/2019 | 87.1 | 88.41 | 82.06 | 83.1 |
| 9/24/2019 | 83.17 | 85.41 | 80.66 | 81.4 |
| 9/25/2019 | 80.81 | 82.42 | 80.19 | 81.57 |
| 9/26/2019 | 81.19 | 81.49 | 77.26 | 79 |
| 9/27/2019 | 79.17 | 80.36 | 77.55 | 79.07 |
| 9/30/2019 | 78.88 | 80.21 | 76.57 | 78.63 |
| 10/1/2019 | 78.94 | 81.44 | 77.2 | 79.64 |
| 10/2/2019 | 78.69 | 82.97 | 77.65 | 81.92 |
| 10/3/2019 | 81.79 | 82.67 | 79.26 | 80.78 |
| 10/4/2019 | 81 | 81.69 | 76.05 | 77.35 |

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 10/7/2019 | 76.85 | 77.8 | 69.62 | 70.1 |
| 10/8/2019 | 69.65 | 70.75 | 66.49 | 66.5 |
| 10/9/2019 | 67.8 | 67.8 | 65.33 | 66.49 |
| 10/10/2019 | 66.7 | 69.85 | 66.27 | 67.4 |
| 10/11/2019 | 68.03 | 69.58 | 65.62 | 66.87 |
| 10/14/2019 | 66.6 | 68.2 | 66.01 | 66.73 |
| 10/15/2019 | 67 | 70.49 | 66.97 | 69.97 |
| 10/16/2019 | 69.71 | 71.74 | 68.72 | 71.33 |
| 10/17/2019 | 71.33 | 73.35 | 70.7 | 73.1 |
| 10/18/2019 | 72.86 | 73.6 | 72.14 | 72.61 |
| 10/21/2019 | 72.94 | 73.53 | 70.86 | 73.44 |
| 10/22/2019 | 73.62 | 74.89 | 72.57 | 73.86 |
| 10/23/2019 | 73.51 | 74.45 | 71.86 | 72.67 |
| 10/24/2019 | 73.12 | 74.65 | 68.3 | 69.39 |
| 10/25/2019 | 67.95 | 70.3 | 66.31 | 70.22 |
| 10/28/2019 | 70.38 | 74.99 | 70.34 | 73.72 |
| 10/29/2019 | 73.61 | 74.98 | 72.93 | 74 |
| 10/30/2019 | 73.94 | 74.19 | 72.54 | 73.14 |
| 10/31/2019 | 73.06 | 73.37 | 68.28 | 68.6 |
| 11/1/2019 | 69.35 | 71.78 | 67.56 | 70.95 |
| 11/4/2019 | 71.24 | 72.45 | 68.82 | 70 |
| 11/5/2019 | 70.41 | 72.46 | 69.1 | 71.72 |
| 11/6/2019 | 71.5 | 72.89 | 68.47 | 68.65 |
| 11/7/2019 | 69.16 | 71.96 | 68.12 | 71.47 |
| 11/8/2019 | 71.28 | 75.17 | 71.28 | 74.73 |
| 11/11/2019 | 74.46 | 75.89 | 72.22 | 73.77 |
| 11/12/2019 | 73.73 | 77.4 | 73.73 | 74.99 |
| 11/13/2019 | 72.77 | 77.48 | 71.58 | 75.09 |
| 11/14/2019 | 74.74 | 77.26 | 74.55 | 76.17 |
| 11/15/2019 | 77.04 | 77.04 | 72.4 | 72.72 |
| 11/18/2019 | 72.8 | 76.83 | 71.53 | 76.55 |
| 11/19/2019 | 77.18 | 83.48 | 77.18 | 81.66 |
| 11/20/2019 | 81.09 | 89.47 | 80.58 | 88.58 |
| 11/21/2019 | 87.64 | 88.35 | 83.12 | 84.06 |
| 11/22/2019 | 84.3 | 87.31 | 83.11 | 87.02 |
| 11/25/2019 | 87.99 | 91.5 | 87.44 | 90.75 |
| 11/26/2019 | 91.9 | 93.92 | 89.3 | 93.46 |
| 11/27/2019 | 93.46 | 97.66 | 93.37 | 96.92 |
| 11/29/2019 | 97.2 | 98.37 | 94.59 | 95 |
| 12/2/2019 | 95.45 | 97.04 | 93.62 | 95.98 |
| 12/3/2019 | 95.02 | 97.98 | 93.36 | 95.94 |
| 12/4/2019 | 96.19 | 139.99 | 94.02 | 137.73 |
| 12/5/2019 | 132.84 | 133.63 | 115.5 | 123.06 |
| 12/6/2019 | 123.58 | 123.82 | 114.67 | 117.36 |
| 12/9/2019 | 114.01 | 121.93 | 114.01 | 121.07 |
| 12/10/2019 | 121.48 | 123.37 | 118.7 | 120.89 |

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 12/11/2019 | 120.9 | 123.41 | 118 | 121.26 |
| 12/12/2019 | 121.26 | 127.32 | 121.26 | 125.97 |
| 12/13/2019 | 124.29 | 127.49 | 121.57 | 123.19 |
| 12/16/2019 | 123.58 | 126.86 | 122.24 | 125.33 |
| 12/17/2019 | 125.7 | 132.79 | 122.88 | 132.53 |
| 12/18/2019 | 132.57 | 132.57 | 108.23 | 119.28 |
| 12/19/2019 | 116.01 | 116.41 | 108.15 | 109.8 |
| 12/20/2019 | 108.91 | 110.22 | 105.6 | 108.76 |
| 12/23/2019 | 108.82 | 108.82 | 101.82 | 102.46 |
| 12/24/2019 | 102.45 | 103.11 | 100.97 | 102.44 |
| 12/26/2019 | 102.79 | 103.49 | 99.59 | 100.51 |
| 12/27/2019 | 100.62 | 100.62 | 95.54 | 97.69 |
| 12/30/2019 | 97.53 | 99.55 | 95.14 | 96.1 |
| 12/31/2019 | 95.77 | 97.58 | 95 | 95.36 |
| 1/2/2020 | 95.36 | 97.5 | 92.13 | 93.29 |
| 1/3/2020 | 92.01 | 95.98 | 90.75 | 93.39 |
| 1/6/2020 | 92.01 | 92.81 | 90.86 | 91.96 |
| 1/7/2020 | 92.21 | 92.32 | 89.42 | 89.44 |
| 1/8/2020 | 89.58 | 92.17 | 88.89 | 89.5 |
| 1/9/2020 | 91 | 93.53 | 86.5 | 88.34 |
| 1/10/2020 | 88.3 | 90.43 | 87.76 | 88.13 |
| 1/13/2020 | 87.91 | 87.91 | 81.85 | 82.57 |
| 1/14/2020 | 81.03 | 82.9 | 80.3 | 82.07 |
| 1/15/2020 | 82.04 | 83.5 | 81.32 | 82.71 |
| 1/16/2020 | 83.45 | 84.66 | 82.23 | 84.15 |
| 1/17/2020 | 84.85 | 84.85 | 82.46 | 83.07 |
| 1/21/2020 | 82.94 | 84.74 | 82.4 | 82.6 |
| 1/22/2020 | 83.12 | 84.37 | 82.17 | 83.25 |
| 1/23/2020 | 79.75 | 79.75 | 71.75 | 75.62 |
| 1/24/2020 | 75.69 | 76.34 | 69.89 | 69.89 |
| 1/27/2020 | 68.49 | 73.82 | 68.49 | 73.6 |
| 1/28/2020 | 73.79 | 78.19 | 73.69 | 77.45 |
| 1/29/2020 | 77.55 | 77.55 | 74.61 | 75.49 |
| 1/30/2020 | 74.5 | 77.38 | 74.05 | 77.04 |
| 1/31/2020 | 76.77 | 76.77 | 71.73 | 72.2 |
| 2/3/2020 | 72.85 | 74.44 | 71.64 | 74.04 |
| 2/4/2020 | 71.84 | 75.77 | 70.91 | 73.99 |
| 2/5/2020 | 74.75 | 77.57 | 73.82 | 76.67 |
| 2/6/2020 | 77.11 | 78.26 | 69.79 | 70.43 |
| 2/7/2020 | 70.25 | 71.43 | 68.42 | 69.73 |
| 2/10/2020 | 69.87 | 70.43 | 68.99 | 69.73 |
| 2/11/2020 | 69.9 | 70.53 | 66.82 | 67.15 |
| 2/12/2020 | 67.57 | 68.86 | 66.66 | 68.71 |
| 2/13/2020 | 68.39 | 70.05 | 67.66 | 69.9 |
| 2/14/2020 | 70.05 | 70.56 | 65.76 | 66.33 |
| 2/18/2020 | 66.33 | 67.78 | 63.21 | 63.58 |

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 2/19/2020 | 63.46 | 65.58 | 62.44 | 63.61 |
| 2/20/2020 | 63.4 | 64.3 | 61.52 | 63.86 |
| 2/21/2020 | 63.81 | 66.94 | 62.82 | 65.62 |
| 2/24/2020 | 63.62 | 66.41 | 62.51 | 65.35 |
| 2/25/2020 | 65.68 | 66.84 | 63.53 | 64.67 |
| 2/26/2020 | 64.2 | 64.3 | 57.04 | 61.99 |
| 2/27/2020 | 60 | 65.35 | 58.09 | 62.18 |
| 2/28/2020 | 59.59 | 63.93 | 59.59 | 62.33 |
| 3/2/2020 | 62.48 | 65.7 | 62.46 | 65.5 |
| 3/3/2020 | 65.26 | 65.61 | 63.03 | 63.66 |
| 3/4/2020 | 65.8 | 66.64 | 63.75 | 66.38 |
| 3/5/2020 | 65.23 | 66.99 | 58.59 | 59.54 |
| 3/6/2020 | 59.2 | 62.74 | 58.24 | 61.42 |
| 3/9/2020 | 58.59 | 61.37 | 56.41 | 59.3 |
| 3/10/2020 | 61.05 | 62.89 | 56.6 | 62.89 |
| 3/11/2020 | 62.37 | 63.26 | 56.35 | 58.3 |
| 3/12/2020 | 53.7 | 55.27 | 50.34 | 51.74 |
| 3/13/2020 | 52.83 | 54.4 | 48.42 | 52.61 |
| 3/16/2020 | 48.3 | 50.86 | 46.08 | 47.07 |
| 3/17/2020 | 46.2 | 51.08 | 41.61 | 49.27 |
| 3/18/2020 | 47.21 | 54.1 | 44.91 | 53.27 |
| 3/19/2020 | 53 | 62.01 | 49.63 | 59.31 |
| 3/20/2020 | 59.91 | 61.06 | 53.92 | 58.92 |
| 3/23/2020 | 60.02 | 61.45 | 54.35 | 56.62 |
| 3/24/2020 | 58.2 | 62.24 | 57.27 | 59.12 |
| 3/25/2020 | 61.99 | 61.99 | 50.02 | 50.89 |
| 3/26/2020 | 50.77 | 55.3 | 48.01 | 50.64 |
| 3/27/2020 | 49.61 | 50 | 47.4 | 47.94 |
| 3/30/2020 | 47.99 | 48.73 | 43.93 | 44.77 |
| 3/31/2020 | 44.37 | 46.38 | 43.23 | 44.49 |
| 4/1/2020 | 44.17 | 47.58 | 43.03 | 44.04 |
| 4/2/2020 | 42.89 | 45.94 | 42.89 | 45.39 |
| 4/3/2020 | 44.55 | 46.48 | 44.07 | 45.01 |
| 4/6/2020 | 45.32 | 48.29 | 44.85 | 48.15 |
| 4/7/2020 | 49.27 | 52.93 | 48.09 | 49.18 |
| 4/8/2020 | 49.5 | 55.53 | 49.3 | 54.51 |
| 4/9/2020 | 54.98 | 64.65 | 54.98 | 62.99 |
| 4/13/2020 | 61.78 | 63 | 60.06 | 62.69 |
| 4/14/2020 | 63.55 | 65.18 | 62.47 | 65.17 |
| 4/15/2020 | 64.12 | 65.19 | 60.38 | 61.46 |
| 4/16/2020 | 60.67 | 62.69 | 59.63 | 60.95 |
| 4/17/2020 | 61.78 | 64.3 | 58.56 | 63.06 |
| 4/20/2020 | 62.24 | 67.68 | 61.88 | 65.5 |
| 4/21/2020 | 64.99 | 65.69 | 62.88 | 63.86 |
| 4/22/2020 | 65.26 | 65.26 | 63.13 | 64.25 |
| 4/23/2020 | 65.31 | 67.07 | 64.23 | 65.08 |

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 4/24/2020 | 65.61 | 70.91 | 65.06 | 69.91 |
| 4/27/2020 | 70.87 | 77.21 | 70.26 | 73.36 |
| 4/28/2020 | 74.47 | 76.99 | 64.06 | 64.16 |
| 4/29/2020 | 65.8 | 67.07 | 62.34 | 65.93 |
| 4/30/2020 | 65.11 | 67.46 | 64.12 | 65.76 |
| 5/1/2020 | 64.44 | 66.67 | 58.03 | 60.16 |
| 5/4/2020 | 61 | 61 | 55.51 | 57.57 |
| 5/5/2020 | 58.07 | 61.9 | 57 | 59.58 |
| 5/6/2020 | 60 | 61.93 | 57.92 | 58.31 |
| 5/7/2020 | 59.49 | 62.37 | 58.7 | 61.4 |
| 5/8/2020 | 63.14 | 64.77 | 59.79 | 62.82 |
| 5/11/2020 | 64.99 | 75.12 | 60 | 75.02 |
| 5/12/2020 | 73.75 | 76.96 | 68.01 | 71.04 |
| 5/13/2020 | 63.75 | 71.04 | 63.75 | 65.57 |
| 5/14/2020 | 65 | 68.95 | 63.28 | 65.28 |
| 5/15/2020 | 64.93 | 69 | 62.21 | 67.65 |
| 5/18/2020 | 68.7 | 74.05 | 68.64 | 71.77 |
| 5/19/2020 | 70.81 | 74 | 68.83 | 70.99 |
| 5/20/2020 | 72.64 | 77.57 | 70.4 | 77.31 |
| 5/21/2020 | 77.32 | 79.02 | 74.38 | 74.63 |
| 5/22/2020 | 74.5 | 76.93 | 73.83 | 76.56 |
| 5/26/2020 | 77 | 77 | 67.69 | 72.54 |
| 5/27/2020 | 73.05 | 74.62 | 70.02 | 73.74 |
| 5/28/2020 | 75.56 | 75.67 | 68.26 | 69.42 |
| 5/29/2020 | 70.45 | 72.11 | 65 | 65 |
| 6/1/2020 | 65.7 | 67.98 | 64.13 | 65.58 |
| 6/2/2020 | 65.11 | 70.09 | 64.4 | 69.52 |
| 6/3/2020 | 69.57 | 70.89 | 65.31 | 66.2 |
| 6/4/2020 | 65.8 | 66.93 | 62.34 | 62.75 |
| 6/5/2020 | 64.84 | 68.05 | 64.22 | 66.81 |
| 6/8/2020 | 67.11 | 71.83 | 67.11 | 71.46 |
| 6/9/2020 | 71.04 | 73.29 | 69.46 | 71.2 |
| 6/10/2020 | 72.2 | 73.99 | 71.1 | 73.2 |
| 6/11/2020 | 71.12 | 71.71 | 69.37 | 69.8 |
| 6/12/2020 | 72.31 | 74 | 65.5 | 67.8 |
| 6/15/2020 | 67.18 | 74.72 | 66.36 | 73.85 |
| 6/16/2020 | 73.9 | 76.68 | 72.36 | 75.91 |
| 6/17/2020 | 77.2 | 78.72 | 73.98 | 74.87 |
| 6/18/2020 | 74.87 | 81.31 | 74.57 | 77.76 |
| 6/19/2020 | 78.33 | 85.17 | 78.12 | 79.71 |
| 6/22/2020 | 79.67 | 82.05 | 77.13 | 79.99 |
| 6/23/2020 | 81.67 | 83.02 | 79.31 | 79.6 |
| 6/24/2020 | 78.84 | 81.97 | 77.37 | 77.86 |
| 6/25/2020 | 78.4 | 82.88 | 74.17 | 80.69 |
| 6/26/2020 | 81.24 | 81.24 | 73.9 | 74.8 |
| 6/29/2020 | 75.96 | 76.51 | 71.91 | 72.78 |

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 6/30/2020 | 72.87 | 73.91 | 70.85 | 71.86 |
| 7/1/2020 | 72.41 | 74.38 | 66.41 | 67.29 |
| 7/2/2020 | 67.97 | 69.33 | 66.01 | 66.9 |
| 7/6/2020 | 68.11 | 68.21 | 66.11 | 66.43 |
| 7/7/2020 | 66.21 | 69.27 | 66.16 | 67.41 |
| 7/8/2020 | 67.37 | 69.05 | 66.78 | 68.86 |
| 7/9/2020 | 69.05 | 70.97 | 66.95 | 67.08 |
| 7/10/2020 | 66.57 | 69.08 | 66.17 | 68.38 |
| 7/13/2020 | 69.55 | 70.82 | 67.39 | 67.6 |
| 7/14/2020 | 67.11 | 72.79 | 66.78 | 72 |
| 7/15/2020 | 73.39 | 78.05 | 72.9 | 76.26 |
| 7/16/2020 | 75.92 | 81.27 | 74.02 | 79.39 |
| 7/17/2020 | 79.35 | 82.49 | 77.8 | 81.34 |
| 7/20/2020 | 80.98 | 85.97 | 80.46 | 83.87 |
| 7/21/2020 | 84.85 | 87.71 | 80.01 | 83.37 |
| 7/22/2020 | 82.56 | 84.79 | 80.99 | 82.92 |
| 7/23/2020 | 82.86 | 84.46 | 82.04 | 84.1 |
| 7/24/2020 | 84.29 | 84.29 | 82.43 | 83.53 |
| 7/27/2020 | 84.1 | 85 | 81.58 | 84.52 |
| 7/28/2020 | 83.98 | 85.14 | 80.87 | 81.02 |
| 7/29/2020 | 81.01 | 82.5 | 78.76 | 79.56 |
| 7/30/2020 | 78.71 | 83.45 | 77.24 | 77.59 |
| 7/31/2020 | 77.32 | 78.4 | 73.75 | 75.07 |
| 8/3/2020 | 75.42 | 79.83 | 74.68 | 79.55 |
| 8/4/2020 | 79.31 | 80.66 | 76.72 | 79.68 |
| 8/5/2020 | 81.11 | 83.11 | 79.54 | 80.96 |
| 8/6/2020 | 82.67 | 83.5 | 80.1 | 82.69 |
| 8/7/2020 | 82.86 | 87.32 | 82.37 | 84.99 |
| 8/10/2020 | 85.4 | 87.59 | 83.46 | 86.5 |
| 8/11/2020 | 87.59 | 89.24 | 83.73 | 84.53 |
| 8/12/2020 | 85.84 | 88.24 | 83.61 | 87.64 |
| 8/13/2020 | 88.33 | 89.59 | 86.47 | 87.49 |
| 8/14/2020 | 87.76 | 88 | 86 | 87.77 |
| 8/17/2020 | 88.68 | 90.89 | 87.09 | 90.72 |
| 8/18/2020 | 90.53 | 90.9 | 88.35 | 88.56 |
| 8/19/2020 | 89.45 | 90 | 88.21 | 88.35 |
| 8/20/2020 | 87.53 | 89.25 | 86.98 | 87.85 |
| 8/21/2020 | 88.05 | 89 | 87.13 | 87.97 |
| 8/24/2020 | 88.82 | 89.46 | 86.79 | 87.3 |
| 8/25/2020 | 87.89 | 92.06 | 86.6 | 90.99 |
| 8/26/2020 | 90.67 | 91.98 | 86.95 | 87.08 |
| 8/27/2020 | 86.88 | 89.23 | 85.79 | 88.28 |
| 8/28/2020 | 89.37 | 90.98 | 88.79 | 89.97 |
| 8/31/2020 | 90.19 | 90.71 | 88.41 | 89.58 |
| 9/1/2020 | 89.2 | 90.8 | 85.6 | 86.69 |
| 9/2/2020 | 86.69 | 86.69 | 81.46 | 84.08 |

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 9/3/2020 | 84.77 | 84.77 | 80.74 | 81.91 |
| 9/4/2020 | 82.88 | 86.63 | 78.36 | 83.72 |
| 9/8/2020 | 82.95 | 87.48 | 80.58 | 84.58 |
| 9/9/2020 | 84.87 | 90.48 | 84.75 | 90.15 |
| 9/10/2020 | 90.5 | 90.5 | 81.4 | 81.52 |
| 9/11/2020 | 81.95 | 82.55 | 77.27 | 77.43 |
| 9/14/2020 | 78.25 | 82.11 | 77.68 | 80.66 |
| 9/15/2020 | 81.86 | 84.56 | 81.29 | 82.59 |
| 9/16/2020 | 82.63 | 84.4 | 80.66 | 80.87 |
| 9/17/2020 | 79.55 | 82.18 | 77.82 | 81.23 |
| 9/18/2020 | 82.87 | 84.27 | 79.46 | 84.12 |
| 9/21/2020 | 82.38 | 82.59 | 78.92 | 79.93 |
| 9/22/2020 | 79.87 | 80.53 | 77.53 | 79.18 |
| 9/23/2020 | 79.34 | 81.19 | 78.19 | 78.51 |
| 9/24/2020 | 78.06 | 81.97 | 77.01 | 78.11 |
| 9/25/2020 | 77.5 | 80.63 | 77.5 | 80.28 |
| 9/28/2020 | 81.36 | 81.36 | 76.84 | 77.35 |
| 9/29/2020 | 77.1 | 81.33 | 77.1 | 79.88 |
| 9/30/2020 | 80.22 | 84.37 | 80.22 | 81.45 |
| 10/1/2020 | 81.45 | 82.65 | 78.93 | 80.63 |
| 10/2/2020 | 79.42 | 82.36 | 79.42 | 79.85 |
| 10/5/2020 | 81.09 | 85.14 | 80.69 | 84.66 |
| 10/6/2020 | 85.39 | 87.75 | 83.69 | 83.85 |
| 10/7/2020 | 85.31 | 86.08 | 83.68 | 84.41 |
| 10/8/2020 | 86.21 | 86.8 | 83.55 | 84.29 |
| 10/9/2020 | 85.11 | 86.65 | 82.02 | 82.49 |
| 10/12/2020 | 82.19 | 83.67 | 80.36 | 82.35 |
| 10/13/2020 | 81.52 | 84.48 | 81.08 | 82.42 |
| 10/14/2020 | 82.6 | 84.51 | 81.95 | 81.99 |
| 10/15/2020 | 81.4 | 82.73 | 80 | 81.5 |
| 10/16/2020 | 81.36 | 83.24 | 80.63 | 80.86 |
| 10/19/2020 | 81.35 | 82.26 | 80.44 | 80.89 |
| 10/20/2020 | 81.68 | 81.68 | 79.03 | 80.89 |
| 10/21/2020 | 80.41 | 82.43 | 79.44 | 79.58 |
| 10/22/2020 | 79.85 | 86.93 | 79.01 | 86.33 |
| 10/23/2020 | 87.05 | 91.09 | 86 | 89.84 |
| 10/26/2020 | 89.63 | 94.38 | 88.34 | 91.06 |
| 10/27/2020 | 90.84 | 94.06 | 88.56 | 93.53 |
| 10/28/2020 | 87.96 | 89.54 | 83.05 | 84.05 |
| 10/29/2020 | 87.25 | 93 | 86 | 88.83 |
| 10/30/2020 | 88 | 98.72 | 85.94 | 95.13 |
| 11/2/2020 | 96.5 | 97.82 | 81.25 | 87.85 |
| 11/3/2020 | 88.93 | 98.63 | 88.54 | 97.57 |
| 11/4/2020 | 98.05 | 107.12 | 97.37 | 102.42 |
| 11/5/2020 | 102.61 | 104.9 | 92.87 | 98.87 |
| 11/6/2020 | 99.35 | 101.04 | 95.88 | 99.27 |

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 11/9/2020 | 101.96 | 109.55 | 99.13 | 104.22 |
| 11/10/2020 | 100.93 | 104.6 | 99.19 | 100.99 |
| 11/11/2020 | 100 | 103.77 | 98.38 | 102.77 |
| 11/12/2020 | 102.5 | 103.76 | 98.41 | 99.87 |
| 11/13/2020 | 100.05 | 103.27 | 98.69 | 100.72 |
| 11/16/2020 | 102.5 | 104.18 | 98.93 | 100.03 |
| 11/17/2020 | 99.26 | 103.19 | 96.77 | 101.48 |
| 11/18/2020 | 102.62 | 103.75 | 98.48 | 98.48 |
| 11/19/2020 | 98.43 | 101.3 | 97.51 | 98.6 |
| 11/20/2020 | 97.35 | 102.08 | 95.96 | 101.41 |
| 11/23/2020 | 102.59 | 104.21 | 100.21 | 103.63 |
| 11/24/2020 | 103.95 | 106.96 | 102.63 | 105.2 |

Exhibit G

**Table of Contents**

**Filed Pursuant to Rule 424(b)(5)**
**Registration No. 333-233018**

### Calculation of Registration Fee

| Title of Each Class of Securities To Be Registered | Amount To Be Registered (1) | Maximum Offering Price Per Share | Maximum Aggregate Offering Price | Amount of Registration Fee (2) |
|---|---|---|---|---|
| Common Stock, $0.001 par value | 5,227,272 | $77.00 | $402,499,944.00 | $48,782.99 |
| Total | 5,227,272 | $77.00 | $402,499,944.00 | $48,782.99 |

(1)    Includes shares of Common Stock that may be purchased by the underwriters pursuant to their option to purchase additional shares of Common Stock.

(2)    Calculated in accordance with Rule 456(b) and Rule 457(r) under the Securities Act of 1933, as amended. Represents deferred payment of the registration fees in connection with the registrant's Registration Statement on Form S-3 (Registration No. 333-233018) being paid herewith.

**Table of Contents**

**Prospectus Supplement to Prospectus dated August 5, 2019**

## 4,545,454 Shares



# Allakos Inc.

## Common Stock

We are offering 4,545,454 shares of our common stock in this offering.

We are an "emerging growth company" as defined under the federal securities laws and, as such, have elected to comply with certain reduced reporting requirements for this prospectus supplement and may elect to do so in future filings.

Our common stock is traded on the Nasdaq Global Select Market ("NASDAQ") under the symbol "ALLK." The last reported sale price of our common stock on August 6, 2019, as reported on NASDAQ, was $79.47 per share.

*Investing in our common stock involves risks. You should carefully consider the risks described under "Risk Factors" on page S-10 of this prospectus supplement, page 2 of the accompanying prospectus and in the reports we file with the Securities and Exchange Commission (the "SEC") pursuant to the Securities Exchange Act of 1934, as amended, incorporated by reference in this prospectus supplement before making a decision to invest in our common stock.*

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus supplement or the accompanying prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | Total |
|---|---|---|
| Public offering price | $ 77.00 | $349,999,958 |
| Underwriting discounts and commissions(1) | $ 4.62 | $ 20,999,997 |
| Proceeds, before offering expenses, to us | $ 72.38 | $328,999,961 |

(1)     We have also agreed to reimburse the underwriters for certain expenses in connection with this offering. See "Underwriting" for a description of the compensation payable to the underwriters.

We have granted the underwriters an option to purchase from us up to 681,818 additional shares at the offering price less the underwriting discounts and commissions of $4.62 per share. The underwriters can exercise this option at any time within 30 days after the date of this prospectus supplement.

The underwriters expect to deliver the shares of common stock to purchasers on or about August 9, 2019.

# Goldman Sachs & Co. LLC                          Jefferies

# William Blair                          LifeSci Capital LLC

Prospectus Supplement dated August 6, 2019

Table of Contents

**TABLE OF CONTENTS**

**Prospectus Supplement**

| | Page |
|---|---|
| ABOUT THIS PROSPECTUS SUPPLEMENT | S-ii |
| SUMMARY | S-1 |
| THE OFFERING | S-6 |
| SUMMARY CONSOLIDATED FINANCIAL DATA | S-8 |
| RISK FACTORS | S-10 |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | S-18 |
| USE OF PROCEEDS | S-20 |
| MARKET INFORMATION | S-21 |
| DIVIDEND POLICY | S-21 |
| CAPITALIZATION | S-22 |
| DILUTION | S-23 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS FOR NON-U.S. HOLDERS | S-25 |
| UNDERWRITING | S-29 |
| LEGAL MATTERS | S-36 |
| WHERE YOU CAN FIND MORE INFORMATION | S-37 |
| INFORMATION INCORPORATED BY REFERENCE | S-37 |

**Prospectus**

| | Page |
|---|---|
| ABOUT THIS PROSPECTUS | ii |
| THE COMPANY | 1 |
| RISK FACTORS | 2 |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 5 |
| SELLING STOCKHOLDERS | 6 |
| DESCRIPTION OF CAPITAL STOCK | 7 |
| PLAN OF DISTRIBUTION | 13 |
| LEGAL MATTERS | 15 |
| EXPERTS | 15 |
| WHERE YOU CAN FIND MORE INFORMATION | 16 |
| INCORPORATION BY REFERENCE | 16 |

———————

Unless we have indicated otherwise, references in this prospectus supplement to "Allakos," "we," "us," "our" and similar terms refer to Allakos Inc.

Table of Contents

**ABOUT THIS PROSPECTUS SUPPLEMENT**

We and the underwriters have not authorized anyone to provide you any information other than that contained or incorporated by reference in this prospectus supplement, the accompanying prospectus or in any free writing prospectus prepared by or on behalf of us or to which we have referred you. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. We are not, and the underwriters are not, making an offer to sell the securities in any jurisdiction where the offer or sale is not permitted or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation. You should not assume that the information in this prospectus supplement, the accompanying prospectus or any document incorporated by reference is accurate or complete as of any date other than the date of the applicable document. Our business, financial condition, results of operations and prospects may have changed since that date.

This document is in two parts. The first part is this prospectus supplement, which describes the specific terms of this offering and also adds to and updates information contained in the accompanying prospectus and the documents incorporated by reference into this prospectus supplement and the accompanying prospectus. The second part, the accompanying prospectus, gives more general information, some of which may not apply to this offering. Generally, when we refer to this prospectus, we are referring to both parts of this document combined. In this prospectus supplement, as permitted by law, we "incorporate by reference" information from other documents that we file with the Securities and Exchange Commission ("SEC"). This means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus supplement and the accompanying prospectus and should be read with the same care. When we update the information contained in documents that have been incorporated by reference by making future filings with the SEC, the information included or incorporated by reference in this prospectus supplement is considered to be automatically updated and superseded. In other words, in case of a conflict or inconsistency between information contained in this prospectus supplement and information in the accompanying prospectus or incorporated by reference into this prospectus supplement, you should rely on the information contained in the document that was filed later.

You should not consider any information in this prospectus supplement or the accompanying prospectus to be investment, legal or tax advice. You should consult your own counsel, accountants and other advisers for legal, tax, business, financial and related advice regarding the purchase of the common stock offered by this prospectus supplement. If the description of the offering varies between this prospectus supplement and the accompanying prospectus, you should rely on the information contained in this prospectus supplement.

S-ii

**Table of Contents**

**SUMMARY**

*This summary highlights information contained or incorporated by reference elsewhere in this prospectus supplement, the accompanying prospectus and the documents incorporated by reference. This summary sets forth the material terms of this offering, but does not contain all of the information you should consider before investing in our common stock. You should read carefully this entire prospectus supplement and the accompanying prospectus, including the documents incorporated by reference in this prospectus supplement and the accompanying prospectus, before making an investment decision to purchase our common stock, especially the risks of investing in our common stock discussed in the section titled "Risk Factors" in this prospectus supplement as well as the risk factors and financial statements and notes to those financial statements incorporated by reference into this prospectus supplement and the accompanying prospectus.*

**Allakos Inc.**

We are a clinical stage biotechnology company developing AK002, our wholly owned monoclonal antibody, for the treatment of various eosinophil and mast cell related diseases. AK002 selectively targets both eosinophils and mast cells, white blood cells that are widely distributed in the body and play a central role in the inflammatory response. Inappropriately activated eosinophils and mast cells have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. As such, AK002 has the potential to treat a large number of severe diseases. AK002 has demonstrated activity in clinical trials in patients with eosinophilic gastritis ("EG"), eosinophilic gastroenteritis ("EGE"), eosinophilic esophagitis ("EoE"), chronic urticaria ("CU"), indolent systemic mastocytosis ("ISM"), and severe allergic conjunctivitis ("SAC"). In addition, improvements were also observed in atopic comorbidities such as asthma, atopic dermatitis, and allergic rhinitis. The activity observed in these studies suggest that AK002 could provide significant benefit to patients suffering from these diseases and highlight AK002's potential to broadly inhibit mast cells and deplete eosinophils in different disease settings.

S-1

Table of Contents

**Figure 1. Select Eosinophil and Mast Cell Related Diseases**



**Figure 1: We are focusing our development efforts on AK002 for the treatment of the diseases shown in bold and are evaluating additional indications for future development.**

Despite the knowledge that eosinophils and mast cells drive a number of pathological conditions, there are no approved therapies that selectively target both eosinophils and mast cells. AK002 binds to Siglec-8, an inhibitory receptor found on eosinophils and mast cells, which represents a novel way to selectively deplete or inhibit these important immune cells and thereby resolve or reduce inflammation. We believe AK002 is the only Siglec-8 targeting antibody currently in clinical development, and has the potential to have advantages over current treatments for the diseases we are pursuing.

Based on the positive results from a randomized, double-blind, placebo-controlled phase 2 study in patients with EG, EGE, and EoE, we plan to develop AK002 for the treatment of these conditions. EG, EGE, and EoE are a group of severe orphan gastrointestinal diseases characterized by severe abdominal pain, nausea, diarrhea, bloating, cramping, early satiety, loss of appetite, vomiting, and/or dysphagia resulting from inflammation caused by eosinophils and mast cells. The estimated prevalence of eosinophilic gastritis and eosinophilic gastroenteritis in the United States is approximately 50,000 patients. The estimated prevalence of eosinophilic esophagitis in the United States is approximately 150,000 patients. There are no treatments approved specifically for these diseases. AK002 has received orphan drug designation for EG and EGE from the U.S. Food and Drug Administration ("FDA"). In the phase 2 study, EG and EGE patients treated with AK002 had tissue eosinophils reduced by 95% and symptoms were reduced by 53%. These results were statistically significant relative to placebo. In addition, 13 of 14 patients with eosinophilic esophagitis had their

Table of Contents

tissue eosinophil levels reduced below 5 eosinophils/per high-powered field, or HPF, and dysphagia symptoms were reduced by 53%. See "Recent Developments" below for further information on the results of this study.

AK002 has also shown activity in patients with SAC, CU and ISM. In the SAC study, patients administered AK002 reported a 78% median improvement in ocular symptoms by Allergic Conjunctivitis Symptom (ACS) Score and a 71% median improvement in physician assessed signs and symptoms using the Ocular Symptom Score (OSS). In addition, patients suffering from comorbid atopic dermatitis, asthma and allergic rhinitis, despite treatment with currently available therapies, reported improvements in their symptoms while receiving AK002. In the CU study, patients with antihistamine refractory chronic spontaneous urticaria, cholinergic urticaria or dermatographic urticaria reported high levels of disease control and many patients experienced complete resolution of symptoms while receiving AK002. Importantly, AK002 also produced high levels of response in patients that were refractory to Xolair, the only approved biologic treatment option, suggesting that AK002, if approved, could be the treatment of choice for antihistamine refractory CU patients. In the ISM study, patients reported clinically meaningful improvements in symptoms and quality of life measures. The activity observed in these studies suggest that AK002 could provide significant benefit to patients suffering from these diseases and highlight AK002's potential to broadly inhibit mast cells in different disease settings. The status of our clinical trials is shown below.

**Figure 2. AK002 Development Status**

| AK002 | Preclinical | Phase 1 | Phase 2 | Phase 3 |
|---|---|---|---|---|
| Eosinophilic Gastritis and Eosinophilic Gastroenteritis | ■ | ■ | ■ | ☐ |
| Eosinophilic Esophagitis | ■ | ■ | ■ | ☐ |
| Severe Allergic Conjunctivitis | ■ | ■ | ☐ | ☐ |
| Chronic Urticaria | ■ | ■ | ◐ | ☐ |
| Indolent Systemic Mastocytosis | ■ | ■ | ☐ | ☐ |

*Recent Developments*

We recently reported data from a randomized, double-blind, placebo-controlled phase 2 trial of AK002 in patients with active, biopsy-confirmed EG and/or EGE. 38% of the patients in the study also had EoE, allowing us to evaluate the effects of AK002 on EoE. All AK002 dose arms showed clinically meaningful and statistically significant benefit compared to placebo on all prespecified primary and secondary endpoints, including gastrointestinal tissue eosinophil counts and patient reported disease symptoms. Statistically significant differences in patient symptoms between the active and placebo groups occurred one day following AK002 administration. In addition, patients with comorbid

S-3

Table of Contents

eosinophilic esophagitis treated with AK002 experienced statistically significant decreases in esophageal eosinophil counts and substantial reductions in patient reported dysphagia symptoms. Based on the positive results from this phase 2 study, we plan to develop AK002 for the treatment of these conditions.

### Phase 2 ENIGMA Study Design

The randomized, double-blind, placebo-controlled phase 2 trial of AK002 enrolled patients with active, biopsy-confirmed EG and/or EGE. Patients were required to be moderately to severely symptomatic based on a patient reported symptom questionnaire and have biopsy confirmed eosinophilia of the stomach ($\geq$30 eosinophils/HPF in 5 HPFs) and/or duodenum ($\geq$30 eosinophils/HPF in 3 HPFs). Qualifying patients were randomized 1:1:1 to receive: (a) 0.3 of AK002 mg/kg for the first month followed by three doses of 1.0 mg/kg given monthly, (b) 0.3 mg/kg of AK002 for the first month followed by 1.0 mg/kg, 3.0 mg/kg and 3.0 mg/kg given monthly, or (c) a monthly placebo. Disease symptoms were measured daily using a patient reported symptom questionnaire that scored 8 symptoms on a scale from 0 to 10 (abdominal pain, nausea, vomiting, early satiety, loss of appetite, abdominal cramping, bloating, and diarrhea). Endpoints were assessed per protocol in a prespecified hierarchical order using biopsies collected at the end of study and symptom questionnaires collected over the last two weeks of study prior to biopsy. The primary endpoint was the percent change from baseline in the number of tissue eosinophils obtained from gastric or duodenal biopsies. The secondary endpoints were (1) proportion of patients with a greater than 75% reduction in tissue eosinophil counts from biopsies and a greater than 30% reduction in Total Symptom Score (TSS) from the patient reported questionnaire and (2) the percent change from baseline in the TSS.

### Study Results

AK002 showed a statistically significant benefit when compared to placebo on all primary and secondary endpoints for each of the high dose, the low dose, and the combined high/low dose AK002 groups. The data demonstrate that AK002 produced histological resolution of gastrointestinal tissue eosinophilia and improved disease symptoms, and that these benefits occurred in the same individuals.

| Primary and Secondary Endpoints | Placebo (N=20) | High Dose AK002 (n=20) | Low Dose AK002 (n=19) | Combined AK002 (n=39) |
|---|---|---|---|---|
| 1° Endpoint:  % change in gastric or duodenal eosinophil counts | +10% | -97% | -92% | -95% |
| *p*–value | — | **<0.0001** | **<0.0001** | **<0.0001** |
| 2° Endpoint: treatment responders[1] | 5% | 70% | 68% | 69% |
| *p*–value | — | **0.0009** | **0.0019** | **0.0008** |
| 2° Endpoint:  % change in total symptom score (TSS)[2] | -24% | -58% | -49% | -53% |
| *p*–value | — | **0.0012** | **0.0150** | **0.0012** |

[1]  Treatment responders defined as patients with greater than a 75% reduction in biopsy eosinophil counts and a greater than 30% reduction in TSS.

[2]  TSS is the sum of all 8 patient reported symptoms each measured on a scale from 0 to 10 (abdominal pain, nausea, vomiting, early satiety, loss of appetite, abdominal cramping, bloating, and diarrhea).

Table of Contents

*Safety*

AK002 was generally well tolerated. The only treatment emergent adverse event occurring more frequently on AK002 than on placebo was mild to moderate infusion-related reactions (including flushing, feeling of warmth, headache, nausea, and/or dizziness), which occurred in 60% of AK002 treated patients and 23% of placebo treated patients. There was 1 drug-related serious adverse event (SAE) in the study, consisting of an infusion-related reaction that resolved within 24 hours. Treatment emergent SAEs occurred in 9% of patients on AK002 versus 14% on placebo.

*Results in Eosinophilic Esophagitis Patients*

Esophageal eosinophil counts and dysphagia improved in patients with comorbid eosinophilic esophagitis.

| Exploratory Endpoints | Placebo | Combined AK002 |
|---|---|---|
| EoE: proportion of patients with esophageal eosinophil counts <5/HPF | 1/9 (11%) | 13/14 (93%) |
| EoE:    % change in patient reported dysphagia questionnaire | -17% | -53% |

*Steroid Use*

Steroid use was balanced between drug and placebo groups. Statistically significant results were also observed on all primary and secondary endpoints in the subgroup of patients who did not receive steroids.

*Extension Study*

Ninety-two percent of patients in the phase 2 study elected to enter a long-term AK002 extension study. Efficacy and safety results from the long-term extension study are expected in 2020.

Based on the results from the phase 2 study, we will request an end of phase 2 meeting with the FDA to discuss the design of the phase 3 study in EG and/or EGE and phase 2/3 study in EoE.

The expected timing of certain anticipated events and other near-term milestones are set forth below:

• Q1 2020 Phase 1 mast cell enteritis study results

• Q4 2019/Q1 2020 End of phase 2 FDA meeting

• Q1 2020 Phase 3 EG and/or EGE study start

• Q1 2020 Phase 2/3 EoE study start

• H1 2020 Phase 2 EG and/or EGE long-term extension study results

• H2 2020 Phase 1 AK002 Subcutaneous formulation bioavailability study results

Actual results or events could differ materially from these expectations and are subject to risks and uncertainties, including those set forth under the heading "Risk Factors" in this prospectus supplement and in our filings with the SEC that are incorporated by reference herein.

**Table of Contents**

**THE OFFERING**

| | |
|---|---|
| Issuer | Allakos Inc., a Delaware corporation |
| Common stock we are offering | 4,545,454 shares (or 5,227,272 shares if the underwriters exercise their option to purchase additional shares in full). |
| Common stock to be outstanding after this offering | 47,729,849 shares (or 48,411,667 shares if the underwriters exercise their option to purchase additional shares in full). |
| Use of proceeds | We expect to receive net proceeds from this offering of approximately $328.2 million (or approximately $377.5 million if the underwriters exercise their option to purchase additional shares in full) after deducting the underwriting discounts and commissions and our estimated offering expenses. |
| | We intend to use the net proceeds from this common stock offering for general corporate purposes. See "Use of Proceeds." |
| Risk factors | See "Risk Factors" beginning on page S-10 and other information included or incorporated by reference in this prospectus supplement and the accompanying prospectus for a discussion of factors you should consider carefully before investing in our common stock. |
| NASDAQ symbol | "ALLK" |

The number of shares of common stock that will be outstanding after this offering is based on 43,184,395 shares of common stock outstanding as of June 30, 2019, and excludes the following:

- 6,976,438 shares of common stock issuable upon exercise of options to purchase shares of our common stock outstanding as of June 30, 2019, at a weighted-average exercise price of $10.64 per share;

- 254,000 shares of common stock issuable upon exercise of options to purchase shares of our common stock that we granted after June 30, 2019, at a weighted-average exercise price of $33.44 per share;

- 5,579,341 shares of common stock reserved for future issuance under our stock-based compensation plans, consisting of:

    - 4,697,055 shares of common stock reserved for future issuance under our 2018 Equity Incentive Plan (the "2018 Plan") and shares that become available under the 2018 Plan pursuant to provisions thereof that automatically increase the share reserves under such plan each year; and

**Table of Contents**

- 882,286 shares of common stock reserved for future issuance under our 2018 Employee Stock Purchase Plan (the "ESPP") and shares that become available under the ESPP pursuant to provisions thereof that automatically increase the share reserves under such plan each year.

Unless otherwise indicated, all information in this prospectus supplement assumes no exercise by the underwriters of their option to purchase from us additional shares of common stock in this offering.

S-7

**Table of Contents**

**SUMMARY CONSOLIDATED FINANCIAL DATA**

The summary consolidated statements of operations and comprehensive loss for the years ended December 31, 2016, 2017 and 2018 shown below are derived from our audited financial statements that are included in our Annual Report on Form 10-K for the year ended December 31, 2018, which is incorporated by reference into this prospectus supplement and should be read in conjunction with such financial statements and the notes thereto. The statements of operations and comprehensive loss data for the six months ended June 30, 2018 and 2019 shown below are derived from our unaudited interim financial statements that are included in our Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2019, which is incorporated by reference into this prospectus supplement and have been prepared in accordance with generally accepted accounting principles in the United States on the same basis as the annual audited financial statements. In the opinion of management, the unaudited data reflects all adjustments, consisting only of normal recurring adjustments, necessary for the fair presentation of the financial information in those statements. The statements of operations and comprehensive loss data presented below should be read in conjunction with such financial statements and the notes thereto. The historical results presented below are not necessarily indicative of financial results to be achieved in future periods and results for the six months ended June 30, 2019 are not necessarily indicative of results to be expected for the full years.

| | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2018** | **2019** |
| | (in thousands, except per share data) | | | | |
| **Statements of Operations Data:** | | | | | |
| Operating expenses | | | | | |
|    Research and development | $ 14,672 | $ 18,506 | $ 33,287 | $ 13,550 | $ 29,209 |
|    General and administrative | 2,388 | 3,748 | 12,434 | 4,683 | 11,775 |
|      Total operating expenses | 17,060 | 22,254 | 45,721 | 18,233 | 40,984 |
| Loss from operations | (17,060) | (22,254) | (45,721) | (18,233) | (40,984) |
| Interest income (expense), net | (51) | (1,302) | 2,375 | 516 | 2,001 |
| Other income (expense), net | 11 | (287) | (192) | (145) | (42) |
| Loss before benefit from income taxes | (17,100) | (23,843) | (43,538) | (17,862) | (39,025) |
| Provision for (benefit from) income taxes | — | (291) | — | — | — |
| Net loss | (17,100) | (23,552) | (43,538) | (17,862) | (39,025) |
|    Unrealized gain (loss) on marketable securities, net of tax | — | — | (15) | 3 | 129 |
| Comprehensive loss | $(17,100) | $(23,552) | $(43,553) | $(17,859) | $(38,896) |
| Net loss per common share: | | | | | |
|    Basic and diluted | $ (13.03) | $ (14.54) | $ (2.20) | $ (8.36) | $ (0.91) |
| Weighted-average number of common shares outstanding: | | | | | |
|    Basic and diluted | 1,312 | 1,620 | 19,833 | 2,137 | 42,868 |

Our consolidated balance sheet data as of June 30, 2019 is presented (1) on an actual basis and (2) on an as-adjusted basis to give effect to the sale of the shares of common stock offered hereby, as set forth on the cover page of this prospectus supplement (assuming the underwriters do not exercise their option to purchase additional shares), after deducting the underwriting discounts and commissions and our estimated offering expenses.

S-8

**Table of Contents**

| | As of June 30, 2019 (unaudited) | |
| --- | --- | --- |
| | **Actual** | **As Adjusted** |
| | **(in thousands)** | |
| Cash, cash equivalents and investments in marketable securities | $ 153,071 | $ 481,246 |
| Working capital | 145,032 | 473,207 |
| Total assets | 169,785 | 497,960 |
| Total liabilities | 17,635 | 17,635 |
| Accumulated deficit | (143,137) | (143,137) |
| Total stockholders' equity | 152,150 | 480,325 |

S-9

Table of Contents

## RISK FACTORS

*Investing in our common stock involves a high degree of risk. In addition to the other information contained in this prospectus supplement, the accompanying prospectus and in documents that we incorporate by reference, you should carefully consider the risks discussed below and in Part II, Item 1A, Risk Factors, in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018 and in our Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2019 before making a decision about investing in our securities. The risks and uncertainties discussed below, in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018 and in our Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2019 are not the only ones facing us. Additional risks and uncertainties not presently known to us, or that we currently see as immaterial, may also harm our business. If any of these risks occur, our business, financial condition and operating results could be harmed, the trading price of our common stock could decline and you could lose part or all of your investment.*

### Risks Related to the Offering and Our Common Stock

***The market price of our stock may continue to be volatile, which could result in substantial losses for investors.***

The trading price of our common stock has been, and is likely to continue to be, highly volatile and subject to wide fluctuations in response to various factors, some of which we cannot control. We priced our initial public offering at $18.00 per share on July 19, 2018 and, our common stock reached a high of $85.40 per share during the third quarter of 2019. On August 6, 2019 the last reported sale price of our common stock was $79.47 per share. The trading price of our common stock could be subject to wide fluctuations in response to various factors, which in addition to the factors discussed in this "Risk Factors" section and others such as:

- the timing and results of preclinical studies and clinical trials of our product candidates or those of our competitors;

- the success of competitive products or announcements by potential competitors of their product development efforts;

- regulatory actions with respect to our products or our competitors' products;

- actual or anticipated changes in our growth rate relative to our competitors;

- regulatory or legal developments in the United States and other countries;

- developments or disputes concerning patent applications, issued patents or other proprietary rights;

- the recruitment or departure of key scientific or management personnel;

- announcements by us or our competitors of significant acquisitions, strategic collaborations, joint ventures, collaborations or capital commitments;

- actual or anticipated changes in estimates as to financial results, development timelines or recommendations by securities analysts;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- market conditions in the pharmaceutical and biotechnology sector;

- changes in the structure of healthcare payment systems;

- share price and volume fluctuations attributable to inconsistent trading volume levels of our shares;

Table of Contents

- announcement or expectation of additional financing efforts;

- sales of our common stock by us, our insiders or our other stockholders;

- expiration of market stand-off or lock-up agreements; and

- general economic, industry and market conditions.

In addition, the stock market in general, and pharmaceutical and biotechnology companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. Broad market and industry factors may negatively affect the market price of our common stock, regardless of our actual operating performance. The realization of any of the above risks or any of a broad range of other risks, including those described in this "Risk Factors" section, could have a dramatic and adverse impact on the market price of our common stock.

***Our operating results may fluctuate significantly, which makes our future operating results difficult to predict and could cause our operating results to fall below expectations or our guidance.***

Our quarterly and annual operating results may fluctuate significantly in the future, which makes it difficult for us to predict our future operating results. From time to time, we may enter into license or collaboration agreements or strategic partnerships with other companies that include development funding and significant upfront and milestone payments and/or royalties, which may become an important source of our revenue. These upfront and milestone payments may vary significantly from period to period and any such variance could cause a significant fluctuation in our operating results from one period to the next.

In addition, we measure compensation cost for stock-based awards made to employees at the grant date of the award, based on the fair value of the award as determined by our board of directors, and recognize the cost as an expense over the employee's requisite service period. As the variables that we use as a basis for valuing these awards change over time, including our underlying stock price and stock price volatility, the magnitude of the expense that we must recognize may vary significantly.

Furthermore, our operating results may fluctuate due to a variety of other factors, many of which are outside of our control and may be difficult to predict, including the following:

- the timing and cost of, and level of investment in, research and development activities relating to our current and any future product candidates, which will change from time to time;

- our ability to enroll patients in clinical trials and the timing of enrollment;

- the cost of manufacturing our current and any future product candidates, which may vary depending on FDA guidelines and requirements, the quantity of production and the terms of our agreements with manufacturers;

- expenditures that we will or may incur to acquire or develop additional product candidates and technologies;

- the timing and outcomes of clinical trials for AK002 and any of our future product candidates or competing product candidates;

- the need to conduct unanticipated clinical trials or trials that are larger or more complex than anticipated;

- competition from existing and potential future products that compete with AK002 and any of our future product candidates, and changes in the competitive landscape of our industry, including consolidation among our competitors or partners;

S-11

Table of Contents

- any delays in regulatory review or approval of AK002 or any of our future product candidates;

- the level of demand for AK002 and any of our future product candidates, if approved, which may fluctuate significantly and be difficult to predict;

- the risk/benefit profile, cost and reimbursement policies with respect to our product candidates, if approved, and existing and potential future products that compete with AK002 and any of our future product candidates;

- our ability to commercialize AK002 and any of our future product candidates, if approved, inside and outside of the United States, either independently or working with third parties;

- our ability to establish and maintain collaborations, licensing or other arrangements;

- our ability to adequately support future growth;

- potential unforeseen business disruptions that increase our costs or expenses;

- future accounting pronouncements or changes in our accounting policies; and

- the changing and volatile global economic environment.

The cumulative effect of these factors could result in large fluctuations and unpredictability in our quarterly and annual operating results. As a result, comparing our operating results on a period-to-period basis may not be meaningful. Investors should not rely on our past results as an indication of our future performance. This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our revenue or operating results fall below the expectations of analysts or investors or below any forecasts we may provide to the market, or if the forecasts we provide to the market are below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any previously publicly stated guidance we may provide.

***If securities or industry analysts do not publish research or reports about our business, or if they issue an adverse or misleading opinion regarding our stock, our stock price and trading volume could decline.***

The trading market for our common stock is influenced by the research and reports that industry or securities analysts publish about us or our business. If any of the analysts covering us issue an adverse or misleading opinion regarding us, our business model, our intellectual property or our stock performance, or if our operating results fail to meet the expectations of analysts, our stock price would likely decline. In addition, if one or more of these analysts cease coverage of us or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline.

***Purchasers in this offering will experience immediate and substantial dilution in the book value of their investment.***

The public offering price of our common stock is substantially higher than the net tangible book value per share of our common stock before giving effect to this offering. Accordingly, if you purchase our common stock in this offering, you will incur immediate and substantial dilution of approximately $66.94 per share, based on our net tangible book value as of June 30, 2019. Furthermore, if the underwriters exercise their option to purchase additional shares, or outstanding options are exercised, you could experience further dilution. For a further description of the dilution that you will experience immediately after this offering, see the section titled "Dilution."

Table of Contents

***Raising additional capital may restrict our operations or require us to relinquish rights to our technologies or product candidates, and if we sell shares of our common stock in future financings, stockholders may experience immediate dilution and, as a result, our stock price may decline.***

Until such time, if ever, as we can generate substantial product revenues, we expect to finance our cash needs through a combination of equity offerings, debt financings, partnerships and marketing, distribution or licensing arrangements. We do not have any committed external source of funds. We may also from time to time issue additional shares of common stock at a discount from the then current trading price of our common stock. As a result, our stockholders would experience immediate dilution upon the purchase of any shares of our common stock sold at such discount. In addition, as opportunities present themselves, we may enter into financing or similar arrangements in the future, including the issuance of debt securities, preferred stock or common stock. If we issue common stock or securities convertible into common stock, our common stockholders would experience additional dilution and, as a result, our stock price may decline. Debt financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends.

If we raise additional funds through partnerships or marketing, distribution or licensing arrangements with third parties, we may have to relinquish valuable rights to our technologies, future revenue streams or product candidates or to grant licenses on terms that may not be favorable to us. If we are unable to raise additional funds through equity or debt financings when needed, we may be required to delay, limit, reduce or terminate our product development or future commercialization efforts or grant rights to develop and market product candidates that we would otherwise prefer to develop and market ourselves.

***Our principal stockholders and management own a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.***

As of June 30, 2019, our executive officers, directors, holders of 5% or more of our capital stock and their respective affiliates beneficially owned approximately 79.5% of our outstanding voting stock. As a result, this group of stockholders has the ability to significantly influence all matters requiring stockholder approval, including the election of directors, amendments of our organizational documents or approval of any merger, sale of assets or other major corporate transaction. This may prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may feel are in your best interest as one of our stockholders. The interests of this group of stockholders may not always coincide with your interests or the interests of other stockholders and they may act in a manner that advances their best interests and not necessarily those of other stockholders, including seeking a premium value for their common stock, and might affect the prevailing market price for our common stock.

***Sales of a substantial number of shares of our common stock in the public market could cause our stock price to fall.***

If our existing stockholders sell, or indicate an intention to sell, substantial amounts of our common stock in the public market after any lock-up or other legal restrictions on resale discussed in this prospectus supplement lapse, the trading price of our common stock could decline. Based upon the number of shares outstanding as of June 30, 2019, upon the closing of this offering, we will have outstanding a total of 47,729,849 shares of common stock, assuming no exercise of the underwriters' option to purchase additional shares of common stock and no exercise of outstanding options.

The lock-up agreements pertaining to this offering will expire 90 days from the date of this prospectus supplement. After the lock-up agreements expire, up to approximately 21.0 million of

S-13

Table of Contents

additional shares of common stock held by directors, executive officers and other affiliates will be eligible for sale in the public market, subject to Rule 144 under the Securities Act of 1933, as amended (the "Securities Act"). Goldman Sachs & Co. LLC and Jefferies LLC may, however, in their sole discretion, permit our officers, directors and other stockholders who are subject to these lock-up agreements to sell shares prior to the expiration of the lock-up agreements.

Further, the holders of a majority of the shares of our common stock are entitled to rights with respect to the registration of their shares under the Securities Act, subject to the lock-up agreements described above. Registration of these shares under the Securities Act would result in the shares becoming freely tradable without restriction under the Securities Act, except for shares purchased by affiliates. Any sales of securities by these stockholders could have a material adverse effect on the trading price of our common stock.

***We are an emerging growth company, and we cannot be certain if the reduced reporting requirements applicable to emerging growth companies will make our common stock less attractive to investors.***

We are an emerging growth company, as defined in the JOBS Act. For as long as we continue to be an emerging growth company, we may take advantage of exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, as amended ("Sarbanes-Oxley Act"), reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements and exemptions from the requirements of holding nonbinding advisory stockholder votes on executive compensation and stockholder approval of any golden parachute payments not previously approved. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

We will remain an emerging growth company until the earlier of (i) the last day of the fiscal year (a) following the fifth anniversary of the closing of our initial public offering, (b) in which we have total annual gross revenue of at least $1.07 billion or (c) in which we are deemed to be a large accelerated filer, which requires the market value of our common stock that is held by non-affiliates to exceed $700 million as of the prior June 30th, and (ii) the date on which we have issued more than $1 billion in non-convertible debt during the prior three-year period.

Based on our public float at June 30, 2019, we will cease to be an emerging growth company at December 31, 2019 and, accordingly, we will be required to comply with the auditor attestation requirements of Section 404 to include an opinion from our independent registered public accounting firm on the effectiveness of our internal control over financial reporting for our Annual Report on Form 10-K for the year ended December 31, 2019.

Under the JOBS Act, emerging growth companies can also delay adopting new or revised accounting standards until such time as those standards apply to private companies. We have irrevocably elected not to avail ourselves of this exemption from new or revised accounting standards and, therefore, will be subject to the same new or revised accounting standards as other public companies that are not emerging growth companies. As a result, changes in rules of U.S. generally accepted accounting principles or their interpretation, the adoption of new guidance or the application of existing guidance to changes in our business could significantly affect our financial position and results of operations.

Table of Contents

***We have incurred and will continue to incur significant additional costs in order to comply with the SEC rules implementing Section 404 of the Sarbanes-Oxley Act.***

We have incurred and will continue to incur significant costs in order to comply with the SEC rules implementing Section 404 of the Sarbanes-Oxley Act. Under these rules, beginning with our Annual Report on Form 10-K for the year ending December 31, 2019, we will be required to make a formal assessment of the effectiveness of our internal control over financial reporting every year, and once we cease to be an emerging growth company as noted above, we will be required to include an attestation report on internal control over financial reporting issued by our independent registered public accounting firm. To achieve compliance with Section 404 within the prescribed period, we will be engaging in a process to document and evaluate our internal control over financial reporting, which is both costly and challenging. In this regard, we will need to continue to dedicate internal resources, potentially engage outside consultants and adopt a detailed work plan to assess and document the adequacy of our internal control over financial reporting, continue steps to improve control processes as appropriate, validate through testing that controls are designed and operating effectively, and implement a continuous reporting and improvement process for internal control over financial reporting.

The rules governing the standards that must be met for management to assess our internal control over financial reporting are complex and require significant documentation, testing and possible remediation to meet the detailed standards under the rules. During the course of its testing, our management may identify material weaknesses or deficiencies which may not be remedied in time to meet the deadline imposed by the Sarbanes-Oxley Act. These reporting and other obligations place significant demands on our management and administrative and operational resources, including accounting resources.

***Our disclosure controls and procedures may not prevent or detect all errors or acts of fraud.***

We are subject to the periodic reporting requirements of the Securities Exchange Act of 1934, as amended ("Exchange Act"). We designed our disclosure controls and procedures to reasonably assure that information we must disclose in reports we file or submit under the Exchange Act is accumulated and communicated to management, and recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. We believe that any disclosure controls and procedures or internal controls and procedures, no matter how well-conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met.

These inherent limitations include the facts that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by an unauthorized override of the controls. Accordingly, because of the inherent limitations in our control system, misstatements due to error or fraud may occur and not be detected.

***We may be subject to securities litigation, which is expensive and could divert management attention.***

The market price of our common stock may continue to be volatile and, in the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. We may be the target of this type of litigation in the future. Securities litigation against us could result in substantial costs and divert our management's attention from other business concerns, which could seriously harm our business.

S-15

Table of Contents

***We have not paid and do not intend to pay dividends on our common stock so any returns will be limited to the value of our stock.***

We have never declared or paid any cash dividends on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any return to stockholders will therefore be limited to any appreciation in the value of their stock.

***Provisions in our amended and restated certificate of incorporation and amended and restated bylaws and Delaware law might discourage, delay or prevent a change in control of our company or changes in our management and, therefore, depress the market price of our common stock.***

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that could depress the market price of our common stock by acting to discourage, delay or prevent a change in control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions, among other things:

- establish a classified board of directors so that not all members of our board are elected at one time;

- permit only the board of directors to establish the number of directors and fill vacancies on the board;

- provide that directors may only be removed "for cause" and only with the approval of two-thirds of our stockholders;

- authorize the issuance of "blank check" preferred stock that our board could use to implement a stockholder rights plan (also known as a "poison pill");

- eliminate the ability of our stockholders to call special meetings of stockholders;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- prohibit cumulative voting;

- authorize our board of directors to amend the bylaws;

- establish advance notice requirements for nominations for election to our board or for proposing matters that can be acted upon by stockholders at annual stockholder meetings; and

- require a super-majority vote of stockholders to amend some provisions described above.

In addition, Section 203 of the General Corporation Law of the State of Delaware ("DGCL"), prohibits a publicly-held Delaware corporation from engaging in a business combination with an interested stockholder, generally a person which together with its affiliates owns, or within the last three years has owned, 15% of our voting stock, for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner.

Any provision of our amended and restated certificate of incorporation, amended and restated bylaws or DGCL that has the effect of delaying or preventing a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our capital stock and could also affect the price that some investors are willing to pay for our common stock.

Table of Contents

***Our amended and restated certificate of incorporation provides that the Court of Chancery of the State of Delaware and, if enforced, the federal district courts of the United States of America will be the exclusive forums for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our amended and restated certificate of incorporation provides that the Court of Chancery of the State of Delaware is the exclusive forum for:

- any derivative action or proceeding brought on our behalf;

- any action asserting a claim of breach of fiduciary duty;

- any action asserting a claim against us arising under the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws; and

- any action asserting a claim against us that is governed by the internal-affairs doctrine.

Our amended and restated certificate of incorporation further provides that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act (such provision, the "Federal Forum Provision"). However, on December 19, 2018, the Delaware Court of Chancery issued a decision in Matthew Sciabacucchi v. Matthew B. Salzberg et al., C.A. No. 2017-0931-JTL (Del. Ch.), finding that such provisions such as the Federal Forum Provision are not valid under Delaware law. In light of this decision of the Delaware Court of Chancery, we do not intend to enforce the federal forum provision in our amended and restated certificate of incorporation unless and until such time there is a final determination by the Delaware Supreme Court regarding the validity of such provisions. If the decision is not appealed or if the Delaware Supreme Court affirms the Delaware Chancery Court's decision, we currently plan to seek approval by our stockholders to amend our certificate of incorporation at our next regularly-scheduled annual meeting of stockholders to remove the Federal Forum Provision.

These exclusive-forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage lawsuits against us and our directors, officers and other employees. If a court were to find either exclusive-forum provision in our amended and restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could seriously harm our business.

Table of Contents

**SPECIAL NOTE REGARDING FORWARD LOOKING STATEMENTS**

This prospectus supplement and the accompanying prospectus may contain, the documents incorporated by reference herein may contain and management may make certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, may be forward-looking statements. Words such as "anticipate," "believe," "could," "estimate," "expects," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or the negative of those terms, and similar expressions that convey uncertainty of future events or outcomes.

These statements include, but are not limited to, statements about:

- the impact that the adoption of new accounting pronouncements will have on our financial statements;

- the ability of our clinical trials to demonstrate safety and efficacy of our product candidates, and other positive results;

- the timing and focus of our future clinical trials, and the reporting of data from those trials;

- our plans relating to commercializing AK002, if approved, including the geographic areas of focus and sales strategy;

- the size of the market opportunity for AK002 in each of the diseases we are targeting;

- the number of diseases represented in the patient population enrolled in our clinical trials, and our ability to evaluate response to treatment of AK002 in diseases other than the primary indication in our clinical trials;

- our estimates of the number of patients in the United States who suffer from the diseases we are targeting and the number of patients that will enroll in our clinical trials;

- the beneficial characteristics, safety, efficacy and therapeutic effects of AK002;

- the timing or likelihood of regulatory filings and approvals, including our expectation to seek special designations, such as orphan drug designation, for AK002 or our other product candidates for various diseases;

- our ability to obtain and maintain regulatory approval of AK002 or our other product candidates;

- our plans relating to the further development of AK002 and our other product candidates;

- existing regulations and regulatory developments in the United States and other jurisdictions;

- our plans and ability to obtain or protect intellectual property rights, including extensions of existing patent terms where available;

- our continued reliance on third parties to conduct additional clinical trials of AK002 and our other product candidates, and for the manufacture of our product candidates for preclinical studies and clinical trials;

- the need to hire additional personnel and our ability to attract and retain such personnel;

- the accuracy of our estimates regarding expenses, future revenue, capital requirements and needs for additional financing;

- our financial performance;

- the sufficiency of our existing cash, cash equivalents and marketable securities to fund our future operating expenses and capital expenditure requirements; and

- our anticipated use of the proceeds from this offering.

S-18

Case 4:20-cv-01720-JSW   Document 34-1   Filed 11/25/20   Page 268 of 396

**Table of Contents**

Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements that we make. These forward-looking statements involve risks and uncertainties that could cause our actual results to differ materially from those in the forward-looking statements, including, without limitation, the risks set forth under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, our most recent Quarterly Report on Form 10-Q, the prospectus supplement hereto and in our other filings with the SEC. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. Given these uncertainties, you should not place undue reliance on these forward-looking statements. We qualify all of the forward-looking statements in this prospectus supplement, the accompanying prospectus and the documents incorporated by reference herein by these cautionary statements. Our forward-looking statements speak only as of the date of this prospectus supplement, the date of the accompanying prospectus or as of the date of the documents incorporated herein by reference. Except as required by law, we assume no obligation to update these forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in any forward-looking statements, whether as a result of new information, future events or otherwise.

S-19

**Table of Contents**

Table of Contents

**USE OF PROCEEDS**

We estimate that the net proceeds from the sale of the shares of common stock in this offering will be approximately $328.2 million, after deducting underwriting discounts and commissions and estimated offering expenses payable by us. If the underwriters' option to purchase additional shares in this offering is exercised in full, we estimate that the net proceeds from this offering will be approximately $377.5 million, after deducting underwriting discounts and commissions and our estimated offering expenses.

We intend to use the net proceeds from this common stock offering for general corporate purposes. Pending their uses, we plan to invest the net proceeds of this offering in short-term, interest-bearing, investment-grade instruments, certificates of deposit or direct or guaranteed obligations of the U.S. government.

S-20

Table of Contents

## MARKET INFORMATION

Our common stock is traded on the NASDAQ under the symbol "ALLK." We estimate that there were approximately 32 holders of record of our common stock as of June 30, 2019.

## DIVIDEND POLICY

We have not declared or paid any cash dividends on our capital stock since our inception. We intend to retain future earnings, if any, to finance the operation and expansion of our business and do not anticipate paying any cash dividends in the foreseeable future. Payment of future cash dividends, if any, will be at the discretion of our board of directors after taking into account various factors, including our financial condition, operating results, current and anticipated cash needs, the requirements and contractual restrictions of then-existing debt instruments and other factors that our board of directors deems relevant.

S-21

**Table of Contents**

**CAPITALIZATION**

The following table sets forth our unaudited cash, cash equivalents and marketable securities and capitalization as of June 30, 2019 (1) on an actual basis and (2) on an as-adjusted basis to give effect to the sale of the shares of common stock offered hereby, as set forth on the cover page of this prospectus supplement (assuming the underwriters do not exercise their option to purchase additional shares), after deducting the underwriting discount and commissions and our estimated offering expenses.

You should read this table in conjunction with "Use of Proceeds" as well as our "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements, including the related notes, incorporated by reference into this prospectus supplement and the accompanying prospectus from our Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2019, incorporated by reference herein.

|  | As of June 30, 2019 (unaudited) | |
| --- | --- | --- |
|  | **Actual** | **As Adjusted** |
|  | **(in thousands, except share and per share data)** | |
| Cash, cash equivalents and investments in marketable securities | $ 153,071 | $ 481,246 |
| Stockholders' equity: | | |
| Preferred stock, par value $0.001 per share; 20,000,000 shares authorized, no shares issued and outstanding, actual and as adjusted | $ — | — |
| Common stock, par value $0.001 per share; 200,000,000 shares authorized, 43,184,395 shares issued and outstanding, actual and 47,729,849 shares issued and outstanding, as adjusted | 43 | 48 |
| Additional paid-in capital | 295,130 | 623,300 |
| Accumulated other comprehensive gain | 114 | 114 |
| Accumulated deficit | (143,137) | (143,137) |
| Total stockholders' equity | $ 152,150 | $ 480,325 |

The number of shares of common stock that will be outstanding after this offering is based on 43,184,395 shares of common stock outstanding as of June 30, 2019, and excludes the following:

- 6,976,438 shares of common stock issuable upon exercise of options to purchase shares of our common stock outstanding as of June 30, 2019, at a weighted-average exercise price of $10.64 per share;

- 254,000 shares of common stock issuable upon exercise of options to purchase shares of our common stock that we granted after June 30, 2019, at a weighted-average exercise price of $33.44 per share;

- 5,579,341 shares of common stock reserved for future issuance under our stock-based compensation plans, consisting of:

  - 4,697,055 shares of common stock reserved for future issuance under our 2018 Equity Incentive Plan (the "2018 Plan") and shares that become available under the 2018 Plan pursuant to provisions thereof that automatically increase the share reserves under such plan each year; and

  - 882,286 shares of common stock reserved for future issuance under our 2018 Employee Stock Purchase Plan (the "ESPP") and shares that become available under the ESPP pursuant to provisions thereof that automatically increase the share reserves under such plan each year.

**Table of Contents**

**DILUTION**

As of June 30, 2019, we had a net tangible book value of approximately $152.2 million or $3.52 per share of common stock, based upon 43,184,395 shares of common stock outstanding on such date. Net tangible book value per share represents the amount of our total tangible assets reduced by the amount of our total liabilities and divided by the total number of shares of common stock outstanding.

Dilution in net tangible book value per share to new investors in this offering represents the difference between the amount per share paid by purchasers of shares of common stock in this offering and the net tangible book value per share of common stock immediately after the completion of this offering. After giving effect to the sale of the shares of common stock offered by us hereby, as set forth on the cover page of this prospectus supplement, and after deducting the underwriting discounts and commissions and our estimated offering expenses, our as adjusted net tangible book value as of June 30, 2019 would have been $480.3 million, or $10.06 per share of common stock. This represents an immediate increase in net tangible book value of $6.54 per share to existing stockholders and an immediate dilution of $66.94 per share to new investors in our common stock. The following table illustrates this dilution on a per share basis.

| | | |
|---|---|---|
| Public offering price per share | | $77.00 |
| Net tangible book value per share as of June 30, 2019, before giving effect to this offering | $3.52 | |
| Increase in net tangible book value per share attributed to new investors purchasing shares in this offering | $6.54 | |
| As adjusted net tangible book value per share after giving effect to this offering | | $10.06 |
| Dilution per share to new investors in this offering | | $66.94 |

If the underwriters' option to purchase additional shares is exercised in full, the as adjusted net tangible book value per share after giving effect to the offering would be $10.94 per share, the increase in the net tangible book value per share to existing stockholders would be $7.42 per share and the dilution to the new investors would be $66.06 per share.

The foregoing table does not take into effect further dilution to new investors that could occur upon the exercise of outstanding options having a per share exercise price less than the public offering price per share in this offering.

The foregoing table is based upon 43,184,395 shares outstanding as of June 30, 2019 and excludes the following:

• 6,976,438 shares of common stock issuable upon exercise of options to purchase shares of our common stock outstanding as of June 30, 2019, at a weighted-average exercise price of $10.64 per share;

• 254,000 shares of common stock issuable upon exercise of options to purchase shares of our common stock that we granted after June 30, 2019, at a weighted-average exercise price of $33.44 per share;

• 5,579,341 shares of common stock reserved for future issuance under our stock-based compensation plans, consisting of:

• 4,697,055 shares of common stock reserved for future issuance under our 2018 Equity Incentive Plan (the "2018 Plan") and shares that become available under the 2018 Plan

S-23

Table of Contents

pursuant to provisions thereof that automatically increase the share reserves under such plan each year; and

- 882,286 shares of common stock reserved for future issuance under our 2018 Employee Stock Purchase Plan (the "ESPP") and shares that become available under the ESPP pursuant to provisions thereof that automatically increase the share reserves under such plan each year.

S-24

Table of Contents

**MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS
FOR NON-U.S. HOLDERS**

The following is a summary of the material U.S. federal income tax consequences of the purchase, ownership and disposition of our common stock to non-U.S. holders (as defined below), but does not purport to be a complete analysis of all the potential tax considerations relating thereto. This summary is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated thereunder, administrative rulings and judicial decisions, all as of the date hereof. These authorities may be changed, possibly retroactively, so as to result in U.S. federal income tax consequences different from those set forth below. We have not sought any ruling from the Internal Revenue Service (the "IRS"), with respect to the statements made and the conclusions reached in the following summary, and there can be no assurance that the IRS will agree with such statements and conclusions.

This summary also does not address the tax considerations arising under the laws of any State of the United States or any local, non-U.S. or other taxing jurisdiction or under U.S. federal non-income tax laws, such as gift and estate tax laws, or under any applicable tax treaty. In addition, this discussion does not address any potential application of the Medicare contribution tax on net investment income or any tax considerations applicable to an investor's particular circumstances or to investors that may be subject to special tax rules, including, without limitation:

- banks or other financial institutions;

- insurance companies;

- qualified foreign pension funds;

- persons subject to the alternative minimum tax;

- tax-exempt organizations or accounts;

- controlled foreign corporations, passive foreign investment companies or corporations that accumulate earnings to avoid U.S. federal income tax;

- dealers in securities or currencies;

- traders in securities that elect to use a mark-to-market method of accounting for their securities holdings;

- persons that own, or are deemed to own, more than 5% of our common stock (except to the extent specifically set forth below);

- certain former citizens or long-term residents of the United States;

- partnerships and other pass-through entities (and investors therein);

- persons who hold our common stock as a position in a hedging transaction, "straddle," "conversion transaction" or other risk reduction transaction;

- persons who receive our common stock pursuant to the exercise of an employee stock option or otherwise as compensation;

- persons who do not hold our common stock as a capital asset within the meaning of Section 1221 of the Code (generally, for investment purposes); or

- persons deemed to sell our common stock under the constructive sale provisions of the Code.

In addition, if a partnership, including any entity or arrangement, domestic or foreign, classified as a partnership for U.S. federal income tax purposes, holds our common stock, the tax treatment of a

S-25

Table of Contents

partner generally will depend on the status of the partner and the activities of the partnership. Accordingly, partnerships that hold our common stock, and partners in such partnerships, should consult their tax advisors.

**You are urged to consult your tax advisor with respect to the application of the U.S. federal income tax laws to your particular situation, as well as any tax consequences of the purchase, ownership and disposition of our common stock arising under the U.S. federal estate or gift tax rules or under the laws of any State of the United States or any local, non-U.S. or other taxing jurisdiction, or under any applicable tax treaty.**

### Non-U.S. Holder Defined

For purposes of this discussion, you are a non-U.S. holder if you are a beneficial owner of our common stock that is not, for U.S. federal income tax purposes, any of the following:

- an individual who is a citizen or resident of the United States;

- a corporation or other entity taxable as a corporation created or organized in the United States or under the laws of the United States, any State thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income tax regardless of its source;

- a trust (x) the administration of which is subject to the primary supervision of a U.S. court and that has one or more U.S. persons who have the authority to control all substantial decisions of the trust or (y) that has a valid election in effect to be treated as a U.S. person; or

- an entity or arrangement, domestic or foreign, classified as a partnership for U.S. federal income tax purposes.

### Distributions

If we make distributions on our common stock, those payments will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed both our current and our accumulated earnings and profits, they will constitute a return of capital and will first reduce your basis in our common stock (determined separately with respect to each share of our common stock), but not below zero, and then will be treated as gain from the sale of that stock.

Any dividend paid to you generally will be subject to U.S. withholding tax either at a rate of 30% of the gross amount of the dividend or such lower rate as may be specified by an applicable income tax treaty. In order to receive a reduced treaty rate, you must provide the applicable withholding agent with an IRS Form W-8BEN, IRS Form W-8BEN-E or other appropriate version of IRS Form W-8 certifying qualification for the reduced rate. If you hold our common stock through a financial institution or other agent acting on your behalf, you will be required to provide appropriate documentation to the agent, who then will be required to provide the required certification to the applicable withholding agent, either directly or through other intermediaries. You should consult your tax advisor regarding your entitlement to benefits under any applicable income tax treaty. You generally will be able to obtain a refund of any excess amounts currently withheld if you file an appropriate claim for refund with the IRS.

Dividends received by you that are effectively connected with your conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment or fixed base maintained by you in the United States) generally are exempt from such withholding tax. In order to obtain this exemption, you generally must provide the applicable withholding agent with an IRS

S-26

**Table of Contents**

Form W-8ECI properly certifying such exemption. Such effectively connected dividends, although not subject to withholding tax, are taxed at the same graduated rates applicable to U.S. persons, net of certain deductions and credits, subject to an applicable income tax treaty providing otherwise. In addition, if you are a corporate non-U.S. holder, dividends you receive that are effectively connected with your conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment or fixed base maintained by the you in the United States) may also be subject to a branch profits tax at a rate of 30% or such lower rate as may be specified by an applicable income tax treaty.

### Gain on Sale or Other Disposition of Common Stock

Subject to the discussion below under the heading "Backup Withholding and Information Reporting," you generally will not be required to pay U.S. federal income tax on any gain realized upon the sale or other disposition of our common stock unless:

- the gain is effectively connected with your conduct of a U.S. trade or business (and, if an income tax treaty applies, the gain is attributable to a permanent establishment or fixed base maintained by you in the United States), in which case you will be required to pay tax on the net gain derived from the sale or other disposition under regular graduated U.S. federal income tax rates. If you are a non-U.S. holder that is a corporation, you may also be subject to the branch profits tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty;

- you are an individual who is present in the United States for a period or periods aggregating 183 days or more during the calendar year in which the sale or other disposition occurs and certain other conditions are met, in which case you will be required to pay a flat 30% tax (or lower applicable treaty rate) on the gain derived from the sale or other disposition, which gain may be offset by certain U.S. source capital losses (even though you are not considered a resident of the United States); provided that you have timely filed U.S. federal income tax returns with respect to such losses; or

- our common stock constitutes a U.S. real property interest by reason of our status as a "United States real property holding corporation" for U.S. federal income tax purposes, or a USRPHC, at any time within the shorter of the five-year period preceding the disposition or your holding period for our common stock. We believe that we are not currently and will not become a USRPHC. However, even if we are or become a USRPHC, as long as our common stock is "regularly traded" (as defined by applicable Treasury regulations) on an established securities market at any time during the calendar year and you have not held more than 5% of our common stock (actually or constructively) at any time during the shorter of the five-year period preceding the disposition or your holding period for our common stock, you will not be subject to U.S. federal income tax on any gain derived from the sale or other disposition of our common stock.

### Backup Withholding and Information Reporting

The amount of dividends paid to you, your name and address, and the amount of tax withheld, if any, will generally be reported to the IRS annually. A similar report will be sent to you. Pursuant to applicable income tax treaties or other agreements, the IRS may make these reports available to tax authorities in your country of residence.

Your proceeds on the disposition of stock may be subject to information reporting, and payments of dividends and proceeds on the disposition of stock may be subject to backup withholding at a current rate of 24% unless you establish an exemption, for example by properly certifying your

S-27

Table of Contents

non-U.S. status on an IRS Form W-8BEN, IRS Form W-8BEN-E or another appropriate version of IRS Form W-8. Notwithstanding the foregoing, backup withholding and information reporting may apply if the applicable withholding agent has actual knowledge, or reason to know, that you are a U.S. person.

Backup withholding is not an additional tax; rather, the U.S. income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of taxes, a refund or credit may generally be obtained from the IRS, provided that the required information is furnished to the IRS in a timely manner.

## Foreign Accounts

Legislation and administrative guidance (referred to as the Foreign Account Tax Compliance Act or FATCA) generally will impose a U.S. federal withholding tax of 30% on any dividends paid to (i) a "foreign financial institution" (as specially defined under these rules), whether such foreign financial institution is the beneficial owner or an intermediary, unless such institution enters into an agreement with the U.S. government to withhold on certain payments and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are foreign entities with U.S. owners) or (ii) a "non-financial foreign entity" (as specially defined under these rules), whether such non-financial foreign entity is the beneficial owner or an intermediary, unless such entity provides a certification that the beneficial owner of the payment does not have any substantial U.S. owners or provides the withholding agent with a certification identifying the direct and indirect U.S. owners of the entity. While withholding under FATCA was also scheduled to apply to the payments of gross proceeds from the disposition of our common stock, proposed Treasury regulations (the preamble to which indicates that taxpayers may rely on the proposed regulations pending finalization) would eliminate FATCA withholding on gross proceeds. Under certain circumstances, a non-U.S. holder might be eligible for refunds or credits of such taxes. In certain cases, the relevant foreign financial institution or non-financial foreign entity may qualify for an exemption from, or be deemed to be in compliance with, these rules. If the country in which the payee is resident has entered into an "intergovernmental agreement" with the United States regarding FATCA, the payee may be permitted to report to that country instead of the United States, and the intergovernmental agreement may otherwise modify the requirements described in this paragraph. Prospective investors are encouraged to consult with their own tax advisors regarding the possible implications of FATCA on their investment in our common stock.

**The preceding discussion of U.S. federal income tax considerations is for general information only. It is not tax advice. Each prospective investor should consult its own tax advisor regarding the particular U.S. federal, state, local and non-U.S. tax consequences of purchasing, holding and disposing of our common stock, including the consequences of any proposed change in applicable laws.**

S-28

Table of Contents

**UNDERWRITING**

Under the terms and subject to the conditions in an underwriting agreement dated the date of this prospectus supplement, the underwriters named below, for whom Goldman Sachs & Co. LLC and Jefferies LLC are acting as representatives, have severally agreed to purchase, and we have agreed to sell to them, severally, the number of shares indicated below.

| Underwriters | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 1,954,592 |
| Jefferies LLC | 1,465,944 |
| William Blair & Company, L.L.C. | 681,818 |
| LifeSci Capital LLC | 443,100 |
| Total | 4,545,454 |

The underwriting agreement provides that the obligations of the underwriters to purchase the shares included in this offering are subject to approval of legal matters by counsel and to other conditions. The underwriters are obligated to purchase all the shares (other than those covered by the option to purchase additional shares described below) if they purchase any of the shares.

Shares sold by the underwriters to the public will initially be offered at the public offering price set forth on the cover page of this prospectus supplement. Any shares sold by the underwriters to securities dealers may be sold at a discount from the public offering price not to exceed $2.772 per share. If all the shares are not sold at the initial offering price, the underwriters may change the offering price and the other selling terms. The offering of the shares by the underwriters is subject to receipt and acceptance and subject to the underwriters' right to reject any order in whole or in part.

We have granted to the underwriters an option, exercisable for 30 days from the date of this prospectus supplement, to purchase up to 681,818 additional shares at the public offering price less the underwriting discounts and commissions. To the extent the option is exercised, each underwriter must purchase a number of additional shares approximately proportionate to that underwriter's initial purchase commitment. Any shares issued or sold under the option will be issued and sold on the same terms and conditions as the other shares that are the subject of this offering.

We have agreed that, for a period of 90 days from the date of this prospectus supplement, we will not, without the prior written consent of the representatives, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise transfer or dispose of, directly or indirectly, or file with the SEC a registration statement relating to, shares of our common stock, including but not limited to any options or warrants to purchase shares of our common stock or any securities that are convertible into or exchangeable for, or that represent the right to receive, shares of our common stock (collectively, "lock-up securities"), or publicly disclose the intention to make any such offer, sale, pledge, disposition or filing. We also will not, without the prior consent of the representatives, enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of lock-up securities. The foregoing restrictions do not apply to:

(A) the shares of our common stock to be sold by us in this offering;

(B) the issuance by us of shares of common stock upon the exercise or settlement of options pursuant to our equity plans that are described in this prospectus supplement, or upon the conversion of convertible securities outstanding as of the date of the underwriting agreement and as described in this prospectus supplement;

(C) the issuance by us of lock-up securities pursuant to our stock plans that are described in this prospectus supplement;

S-29

Table of Contents

(D) the issuance by us of lock-up securities in connection with (1) the acquisition by us of the business, technology, not less than a majority or controlling portion of the securities, property or other assets of another person or entity or pursuant to an employee benefit plan assumed by us in connection with such acquisition and the issuance of any such securities pursuant to any such agreement, or (2) our bona fide commercial transactions (including joint ventures, commercial relationships or other strategic transactions); or

(E) the filing of any registration statement on Form S-8 relating to securities granted or to be granted pursuant to our stock plans that are described in this prospectus supplement or any assumed employee benefit plan contemplated by clause (D) above.

The aggregate number of shares of common stock that we may sell or issue or agree to sell or issue pursuant to clause (D) above and, with respect to securities to be granted pursuant to any assumed employee benefit plan, pursuant to clause (E) above, shall not exceed 7.5% of the total number of shares of our common stock outstanding immediately following this offering. In the case of clauses (C) through (E) above, each recipient of such securities shall execute and deliver to the representatives, on or prior to the issuance of such securities, a lock-up agreement substantially to the effect set forth above.

Additionally, our officers and directors and certain stockholders affiliated with our directors have entered into lock-up agreements pursuant to which, for a period of 90 days from the date of this prospectus supplement, we and they will not, without the prior written consent of the representatives, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of any lock-up securities. The foregoing is subject to several exceptions including:

(A) The following transfers of lock-up securities:

(i)     as a bona fide gift or gifts;

(ii)    to any member of the lock-up signatory's immediate family or to any trust or other legal entity for the direct benefit of the lock-up signatory or his or her immediate family, or if the signatory is a trust, to a trustor or beneficiary of the trust or to the estate of a beneficiary of such trust, provided that any such transfer shall not involve a disposition for value;

(iii)   by will, other testamentary document or the laws of intestate succession;

(iv)    in connection with a sale of the lock-up signatory's shares acquired in the offering or in the open market following the offering;

(v)     if the lock-up signatory is a corporation, partnership, limited liability company, trust or other business entity, (A) to any of its affiliates, or to any investment fund or other entity controlling, controlled by, managing or managed by or under common control with the lock-up signatory or its affiliates or (B) as part of a distribution, transfer or disposition to its affiliates, directors, officers, employees, managers, managing members, members, stockholders, partners, beneficiaries or other equity holders;

(vi)    by surrender or forfeiture to us of shares of our common stock (A) in connection with "net" or "cashless" exercise or settlement of stock options, other rights to purchase lock-up securities or other awards expiring during the lock-up period, for payment of tax withholdings or remittance payments due as a result of the vesting, settlement or exercise of such awards pursuant to an equity incentive plan, stock purchase plan or other employee benefit plan or (B) upon the conversion of a convertible security of the Company in order to cover withholding tax obligations in connection with such conversion;

S-30

**Table of Contents**

(vii)    to us in connection with any contractual arrangement in effect on the date of this prospectus supplement that provides for the repurchase of the lock-up signatory's equity securities by us in connection with the signatory's termination of service with us;

(viii)    in connection with the conversion of any convertible security into shares of common stock in a manner consistent with the description of such securities contained in this prospectus supplement, provided that such shares of common stock will remain subject to the provisions of the lock-up agreement;

(ix)    to a nominee or custodian of a person or entity to whom a transfer would be permissible under (i), (ii), (iii) or (v) above;

(x)    pursuant to a bona fide third-party tender offer, merger, consolidation or other similar transaction that is approved by our board of directors and made to all holders of our capital stock on substantially the same terms for holders of a majority of the voting power of our outstanding shares of capital stock involving a change of control of the Company;

(xi)    by operation of law, including pursuant to orders of a court, a qualified domestic order or in connection with a divorce settlement; or

(xii)    with the prior written consent of the representatives on behalf of the underwriters; or

(xiii)    by making a pledge of such shares to a bona fide third-party lender.

In the case of any transfer pursuant to (i), (ii), (iii), (v), (ix) and (xi) above, the donee, transfereer or distributee must agree in writing to be bound by the lock-up restrictions. In the case of any transfer pursuant to (i), (ii), (iii), (iv) and (v) above, no filing under Section 16 of the Exchange Act or other public filing, report or announcement reporting a reduction in beneficial ownership of shares of common stock shall be required or voluntarily made during the lock-up period (other than a required filing on Form 5, Schedule 13G (or Schedule 13G/A) or Schedule 13F). In the case of (vi) above, if the lock-up signatory is required to file a report under Section 16 of the Exchange Act during the lock-up period, the lock-up signatory shall include a statement to the effect that such report relates to the circumstances described in (vi) above. In the case of (i), (ii), (iii), (v) and (ix) above, any transfer of lock-up securities must not involve a disposition for value. In the case of (vii) above, if the lock-up signatory is required to file a report under Section 16 of the Exchange Act during the lock-up period, the lock-up signatory shall include a statement in such report to the effect that such transfer is to the Company in connection with the repurchase of shares of common stock, as the case may be. In the case of (xiii) above, the lender taking beneficial or legal ownership of shares of common stock pursuant to such loan during the lock-up period shall agree in writing to be bound by the restrictions set forth in the lock-up agreement, and if the lock-up signatory is required to file a report under Section 16 of the Exchange Act during the lock-up period as a result of such loan, the lock-up signatory shall include a statement in such report to the effect that the lender will agree to be bound by the restrictions set forth in the lock-up agreement should the lender take beneficial or legal ownership of such shares of common stock during the lock-up period.

(B) Receipt from us of shares of common stock in connection with the exercise of options or other rights granted under a stock incentive plan or other equity award plan; or

(C) Entry into a written plan meeting the requirements of Rule 10b5-1 under the Exchange Act after the date of the lock-up agreement relating to the sale of the lock-up signatory's shares, provided that (i) the securities subject to such plan may not be transferred until after the lock-up period expires and (ii) no public announcement or filing under the Exchange Act shall be voluntarily made regarding the establishment of such plan during the lock-up period.

Our common stock is listed on the NASDAQ under the symbol "ALLK."

**Table of Contents**

The following table shows the per share and total underwriting discounts and commissions to be paid to the underwriters by us. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase additional shares.

**Paid by Us**

|  | No Exercise | Full Exercise |
|---|---|---|
| Per Share | $ 4.62 | $ 4.62 |
| Total | $ 20,999,997 | $ 24,149,997 |

We estimate that our total expenses of this offering will be approximately $0.8 million, excluding underwriter discounts and commission. We have agreed to reimburse the underwriters for certain expenses in an amount up to $35,000.

In connection with the offering, the underwriters may purchase and sell shares of common stock in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of shares than they are required to purchase in the offering, and a short position represents the amount of such sales that have not been covered by subsequent purchases. A "covered short position" is a short position that is not greater than the amount of additional shares for which the underwriters' option described above may be exercised. The underwriters may cover any covered short position by either exercising their option to purchase additional shares or purchasing shares in the open market. In determining the source of shares to cover the covered short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase additional shares pursuant to the option described above. "Naked" short sales are any short sales that create a short position greater than the amount of additional shares for which the option described above may be exercised. The underwriters must cover any such naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for or purchases of common stock made by the underwriters in the open market prior to the completion of the offering.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discounts and commissions received by it because the representatives have repurchased shares sold by or for the account of such underwriter in stabilizing or short covering transactions.

Purchases to cover a short position and stabilizing transactions, as well as other purchases by the underwriters for their own accounts, may have the effect of preventing or retarding a decline in the market price of the shares. They may also cause the price of the shares to be higher than the price that would otherwise exist in the open market in the absence of these transactions. The underwriters may conduct these transactions on NASDAQ, in an over-the-counter market or otherwise. If the underwriters commence any of these transactions, they may discontinue them at any time.

The underwriters and their respective affiliates are full-service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, financing and brokerage activities. Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for us, for which they received or will receive customary fees and reimbursement of expenses.

Table of Contents

In the ordinary course of their various business activities, the underwriters and their respective affiliates may purchase, sell or hold a broad array of instruments and actively trade debt and equity securities (or related derivative securities), commodities, currencies, credit default swaps and other financial instruments (including bank loans) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve or relate to our assets, securities and instruments (directly, as collateral serving other obligations or otherwise) and/or persons and entities with relationships with the issuer. The underwriters and their respective affiliates may also communicate independent investment recommendations, market color or trading ideas and/or publish or express independent research views in respect of such assets, securities or instruments and may at any time hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and instruments.

We have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make because of any of those liabilities.

### European Economic Area

The shares are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area ("EEA"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); or (ii) a customer within the meaning of Directive EU 2016/97 (as amended or superseded, the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in Directive 2003/71/EC (as amended or superseded, the "Prospectus Directive"). Consequently no key information document required by Regulation (EU) No 1286/2014 (as amended, the "PRIIPs Regulation") for offering or selling the shares or otherwise making them available to retail investors in the EEA has been prepared and therefore offering or selling the shares or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This prospectus supplement has been prepared on the basis that any offer of shares in any member state of the EEA will be made pursuant to an exemption under the Prospectus Directive from the requirement to publish a prospectus for offers of shares. This prospectus supplement and the accompanying prospectus are not a prospectus for the purposes of the Prospectus Directive.

### United Kingdom

In the United Kingdom, this prospectus supplement is being distributed only to, and is directed only at, persons who are "qualified investors" (as defined in the Prospectus Directive) who are (i) persons having professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the Order), or (ii) high net worth entities falling within Article 49(2)(a) to (d) of the Order or (iii) persons to whom it would otherwise be lawful to distribute it, all such persons together being referred to as Relevant Persons. The shares are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such shares will be engaged in only with, Relevant Persons. This prospectus supplement and its contents should not be distributed, published or reproduced (in whole or in part) or disclosed by any recipients to any other person in the United Kingdom. Any person in the United Kingdom that is not a Relevant Person should not act or rely on this prospectus supplement or its contents.

S-33

Table of Contents

*Canada*

The shares may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the shares must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus supplement (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

*Hong Kong*

The shares may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap.32 of the Laws of Hong Kong) ("Companies (Winding Up and Miscellaneous Provisions) Ordinance"), or (ii) to "professional investors" as defined in the Securities and Futures Ordinance (Cap.571 of the Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies (Winding Up and Miscellaneous Provisions) Ordinance, and no advertisement, invitation or document relating to the shares may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" in Hong Kong as defined in the Securities and Futures Ordinance and any rules made thereunder.

*Japan*

The securities have not been and will not be registered under the Financial Instruments and Exchange Act of Japan (Act No. 25 of 1948, as amended), or the FIEA. The securities may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (including any person resident in Japan or any corporation or other entity organized under the laws of Japan) or to others for re-offering or resale, directly or indirectly, in Japan or to or for the benefit of any resident of Japan, except pursuant to an exemption from the registration requirements of the FIEA and otherwise in compliance with any other applicable laws, regulations and ministerial guidelines of Japan.

*Singapore*

This prospectus supplement and the accompanying prospectus have not been registered as a prospectus with the Monetary Authority of Singapore ("MAS"). Accordingly, this prospectus supplement

S-34

Table of Contents

and the accompanying prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the shares may not be circulated or distributed, nor may the shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275(1A) and in accordance with the conditions, specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the shares are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the shares under Section 275, except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A) and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

Solely for the purposes of its obligations pursuant to Sections 309B(1)(a) and 309B(1)(c) of the SFA, we have determined, and hereby notify all relevant persons (as defined in Section 309A of the SFA) that the shares are "prescribed capital markets products" (as defined in the Securities and Futures (Capital Markets Products) Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

S-35

**Table of Contents**

**LEGAL MATTERS**

The validity of the issuance of our common stock offered in this prospectus supplement will be passed upon for us by Simpson Thacher & Bartlett LLP, Palo Alto, California. Davis Polk & Wardwell LLP, Menlo Park, California, is acting as counsel for the underwriters.

**EXPERTS**

Ernst & Young LLP, independent registered public accounting firm, has audited our financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2018, as set forth in their report, which is incorporated by reference in this prospectus supplement and elsewhere in the registration statement. Our financial statements are incorporated by reference in reliance on Ernst & Young LLP's report, given on their authority as experts in accounting and auditing.

S-36

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-3 under the Securities Act, with respect to the common stock offered by this prospectus supplement. This prospectus supplement, filed as part of the registration statement, does not contain all the information set forth in the registration statement and its exhibits and schedules, portions of which have been omitted as permitted by the rules and regulations of the SEC. For further information about us, we refer you to the registration statement and to its exhibits and schedules.

We file annual, quarterly and current reports and other information with the SEC. The SEC maintains an internet website at www.sec.gov that contains periodic and current reports, proxy and information statements, and other information regarding registrants that are filed electronically with the SEC.

These documents are also available, free of charge, through the Investors section of our website, which is located at www.allakos.com. Information contained on, or that can be accessed through, our website is not incorporated by reference into this prospectus supplement or the accompanying prospectus and you should not consider such information to be part of this prospectus supplement or the accompanying prospectus.

## INFORMATION INCORPORATED BY REFERENCE

The SEC allows us to incorporate by reference information into this prospectus supplement. This means that we can disclose important information to you by referring you to another document. Any information referred to in this way is considered part of this prospectus supplement from the date we file that document. Any reports filed by us with the SEC after the date of this prospectus supplement and before the date that the offering of the Common Stock by means of this prospectus supplement is terminated will automatically update and, where applicable, supersede any information contained in this prospectus supplement or incorporated by reference in this prospectus supplement.

We incorporate by reference in this prospectus supplement the documents set forth below that have been previously filed with the SEC; provided, however, that we are not incorporating any documents or information deemed to have been furnished rather than filed in accordance with SEC rules:

- our Annual Report on Form 10-K for the fiscal year ended December 31, 2018;

- the information specifically incorporated by reference into our Annual Report on Form 10-K for the fiscal year ended December 31, 2018 from our Definitive Proxy Statement on Schedule 14A filed on April 30, 2019;

- our Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2019 and June 30, 2019;

- our Current Reports on Form 8-K filed on January 7, 2019, January 29, 2019, February 4, 2019, February 11, 2019, February 19, 2019, May 7, 2019, June 10, 2019 and August 5, 2019 (other than the information furnished under Item 2.02);

- the description of our Common Stock contained in our registration statement on Form 8-A, filed with the SEC on July 11, 2018, including any subsequent filed amendments and reports updating such description; and

- any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act on or after the date of this prospectus supplement and before the termination of this offering but excluding any information furnished to, rather than filed with, the SEC.

S-37

**Table of Contents**

You may request a free copy of any of the documents incorporated by reference in this prospectus (other than exhibits, unless they are specifically incorporated in the documents) by writing or telephoning us at the following address:

Allakos Inc.
975 Island Drive, Suite 201
Redwood City, California 94065
(650) 597-5002

Exhibits to the filings will not be sent, however, unless those exhibits have specifically been incorporated by reference in this prospectus supplement and accompanying prospectus.

You should rely only on the information incorporated by reference or provided in this prospectus supplement. Neither we nor any selling stockholder has authorized anyone else to provide you with different information.

S-38

**Table of Contents**

**PROSPECTUS**



# Allakos Inc.

## Common Stock

We may offer and sell shares of our common stock from time to time. In addition, selling stockholders, as may be named in one or more prospectus supplements, may offer and sell from time to time and in one or more offerings, shares of our common stock. We will determine when we sell shares of our common stock, which may be sold on a continuous or delayed basis directly to or through agents, dealers or underwriters as designated from time to time, or through a combination of these methods. We reserve the sole right to accept, and we and any agents, dealers and underwriters reserve the right to reject, in whole or in part, any proposed purchase of shares of our common stock. If any agents, dealers or underwriters are involved in the sale of any of shares of our common stock, the applicable prospectus supplement will set forth any applicable commissions or discounts payable to them. Our net proceeds from the sale of shares of our common stock also will be set forth in the applicable prospectus supplement. We also may provide investors with a free writing prospectus that includes this information. In addition, one or more selling stockholders to be named in a prospectus supplement hereto may offer and sell shares of our common stock from time to time, together or separately, in amounts, at prices and on terms that will be determined at the time of any such offering.

Each time that we or any selling stockholders sell shares of our common stock using this prospectus, we or any selling stockholders will provide a prospectus supplement and attach it to this prospectus if required. The prospectus supplement or a free writing prospectus will contain more specific information about the offering and the shares of our common stock being offered, including the prices and our net proceeds from the sales of such shares of our common stock. The selling stockholders will receive all of the proceeds from any sales of shares of our common stock owned by them. We will not receive any proceeds from the sale of shares of our common stock by selling stockholders. We may bear a portion of the expenses of the offering of shares of our common stock by one or more selling stockholders, except that the selling stockholders may pay any applicable underwriting fees, discounts or commissions and certain transfer taxes. The prospectus supplement or free writing prospectus may also add, update or change information contained in this prospectus. This prospectus may not be used to sell shares of our common stock unless accompanied by a prospectus supplement describing the method and terms of the offering.

You should carefully read this prospectus and any applicable prospectus supplement and free writing prospectus, together with any documents we incorporate by reference, before you invest in shares of our common stock.

---

**We are an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012 and, as such, have elected to comply with certain reduced public company reporting requirements for this prospectus and future filings.**

*INVESTING IN OUR COMMON STOCK INVOLVES RISKS. SEE "RISK FACTORS" BEGINNING ON PAGE 2 OF THIS PROSPECTUS AND IN ANY SIMILAR SECTION CONTAINED IN OUR PROSPECTUS SUPPLEMENT CONCERNING FACTORS YOU SHOULD CONSIDER BEFORE INVESTING IN OUR COMMON STOCK.*

Our common stock is listed on The Nasdaq Global Select Market ("NASDAQ") under the symbol "ALLK."

---

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

---

This prospectus is dated August 5, 2019

**Table of Contents**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| ABOUT THIS PROSPECTUS | ii |
| THE COMPANY | 1 |
| RISK FACTORS | 2 |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 5 |
| SELLING STOCKHOLDERS | 6 |
| DESCRIPTION OF CAPITAL STOCK | 7 |
| PLAN OF DISTRIBUTION | 13 |
| LEGAL MATTERS | 15 |
| EXPERTS | 15 |
| WHERE YOU CAN FIND MORE INFORMATION | 16 |
| INCORPORATION BY REFERENCE | 16 |

**Neither we nor any selling stockholder has authorized anyone to provide you with information other than that contained or incorporated by reference in this prospectus, in any accompanying prospectus supplement or in any free writing prospectus prepared by or on behalf of us or to which we have referred you. We and any selling stockholders take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. You should not assume that the information contained or incorporated by reference in this prospectus and any accompanying prospectus supplement or free writing prospectus is accurate as of any date other than the respective dates thereof. This prospectus and any accompanying prospectus supplement do not constitute an offer to sell or the solicitation of an offer to buy any securities other than the registered securities to which they relate, nor do this prospectus and any accompanying prospectus supplement constitute an offer to sell or the solicitation of an offer to buy securities in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction.**

i

Table of Contents

**ABOUT THIS PROSPECTUS**

This prospectus is part of a registration statement on Form S-3 that we filed with the Securities and Exchange Commission (the "SEC"), as a "well-known seasoned issuer" or "WKSI" as defined in Rule 405 under the Securities Act of 1933, as amended (the "Securities Act") using a "shelf" registration process. Under this shelf registration process, we and/or one or more selling stockholders, if applicable, may, from time to time, offer and/or sell shares of our common stock in one or more offerings or resales. This prospectus provides you with a general description of the common stock that we and/or one or more selling stockholders may offer. Each time we sell shares of our common stock using this prospectus, we will provide a prospectus supplement and attach it to this prospectus and may also provide you with a free writing prospectus. The prospectus supplement and any free writing prospectus will contain more specific information about the offering, including the names of any selling stockholders, if applicable. The prospectus supplement may also add, update, change or clarify information contained in or incorporated by reference into this prospectus. Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a prospectus supplement. If there is any inconsistency between the information in this prospectus and the information in the prospectus supplement, you should rely on the information in the prospectus supplement.

The rules of the SEC allow us to incorporate by reference information into this prospectus. This means that important information is contained in other documents that are considered to be a part of this prospectus. Additionally, information that we file later with the SEC will automatically update and supersede this information. You should carefully read both this prospectus and the applicable prospectus supplement together with the additional information that is incorporated or deemed incorporated by reference in this prospectus as described under the heading "Information Incorporated by Reference" and any additional information described under the heading "Where You Can Find More Information" before making an investment in our common stock. This prospectus contains summaries of certain provisions contained in some of the documents described herein, but reference is made to the actual documents for complete information. All of the summaries are qualified in their entirety by the actual documents. Copies of the documents referred to herein have been filed, or will be filed or incorporated by reference, as exhibits to the registration statement of which this prospectus is a part. The registration statement, including the exhibits and documents incorporated or deemed incorporated by reference in this prospectus can be read on the SEC website mentioned under the headings "Information Incorporated by Reference" and "Where You Can Find More Information."

**THIS PROSPECTUS MAY NOT BE USED TO SELL ANY SECURITIES UNLESS ACCOMPANIED BY A PROSPECTUS SUPPLEMENT.**

We are an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act and Section 3(a)(80) of the Securities Exchange Act of 1934, as amended ("Exchange Act"). Pursuant to Section 102 of the Jumpstart Our Business Startups Act, or the JOBS Act, we have provided reduced executive compensation disclosure and have omitted a compensation discussion and analysis from the documents incorporated by reference herein.

This prospectus incorporates by reference, and any prospectus supplement or free writing prospectus may contain and incorporate by reference, market data and industry statistics and forecasts that are based on independent industry publications and other publicly available information. Although we believe these sources are reliable, we do not guarantee the accuracy or completeness of this information and we have not independently verified this information. Although we are not aware of any misstatements regarding the market and industry data presented in this prospectus and the documents incorporated herein by reference, these estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors"

ii

Table of Contents

contained or incorporated by reference in this prospectus, the applicable prospectus supplement and any related free writing prospectus and under similar headings in other documents that are incorporated by reference into this prospectus. Accordingly, investors should not place undue reliance on this information.

When we refer to "Allakos," "we," "our," "us" and the "Company" in this prospectus, we mean Allakos Inc., unless the context indicates otherwise or unless otherwise specified. When we refer to "you," we mean the holders of shares of our common stock.

iii

Table of Contents

**THE COMPANY**

We are a clinical stage biotechnology company developing AK002, our wholly owned monoclonal antibody, for the treatment of various eosinophil and mast cell related diseases. AK002 selectively targets both eosinophils and mast cells, white blood cells that are widely distributed in the body and play a central role in the inflammatory response. Inappropriately activated eosinophils and mast cells have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. As such, AK002 has the potential to treat a large number of severe diseases. AK002 has demonstrated activity in clinical trials in patients with eosinophilic gastritis, eosinophilic gastroenteritis, eosinophilic esophagitis, chronic urticaria, indolent systemic mastocytosis, and severe allergic conjunctivitis. In addition, improvements were also observed in atopic comorbidities such as asthma, atopic dermatitis, and allergic rhinitis. The activity observed in these studies suggest that AK002 could provide significant benefit to patients suffering from these diseases and highlight AK002's potential to broadly inhibit mast cells and deplete eosinophils in different disease settings.

We were incorporated in Delaware in March 2012. Our common stock is listed on the NASDAQ under the symbol "ALLK." Our principal executive office is located at 975 Island Drive, Suite 201, Redwood City, California 94065, and our telephone number is (650) 597-5002. Our website address is www.allakos.com. This website address is not intended to be an active link, and information on, or accessible through, our website should not be construed to be a part of this prospectus. We do, however, use our website as a means of disclosing material non-public information and for complying with our disclosure obligations under Regulation FD.

Additional information about us is included in documents incorporated by reference in this prospectus. See "Where You Can Find More Information" and "Incorporation by Reference."

1

**Table of Contents**

**RISK FACTORS**

Investing in our common stock involves a high degree of risk. Before making a decision to invest in our common stock, in addition to carefully considering the other information contained in this prospectus, in any accompanying prospectus supplement and incorporated by reference herein or therein, you should carefully consider the risks described under the caption "Risk Factors" contained in the applicable prospectus supplement, and any related free writing prospectus, and the risks discussed under the caption "Risk Factors" contained in our most recent Annual Report on Form 10-K and in our most recent Quarterly Report on Form 10-Q, which are incorporated by reference in their entirety, together with other information in this prospectus, the prospectus supplement, the documents incorporated by reference herein and therein and any free writing prospectus that we may authorize for use in connection with a specific offering. See "Where You Can Find More Information" and "Incorporation by Reference."

2

Table of Contents

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus may contain, the documents incorporated by reference herein may contain and management may make certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, may be forward-looking statements. Words such as "anticipate," "believe," "could," "estimate," "expects," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or the negative of those terms, and similar expressions that convey uncertainty of future events or outcomes.

These statements include, but are not limited to, statements about:

- the impact that the adoption of new accounting pronouncements will have on our financial statements;

- the ability of our clinical trials to demonstrate safety and efficacy of our product candidates, and other positive results;

- the timing and focus of our future clinical trials, and the reporting of data from those trials;

- our plans relating to commercializing AK002, if approved, including the geographic areas of focus and sales strategy;

- the size of the market opportunity for AK002 in each of the diseases we are targeting;

- the number of diseases represented in the patient population enrolled in our clinical trials, and our ability to evaluate response to treatment of AK002 in diseases other than the primary indication in our clinical trials;

- our estimates of the number of patients in the United States who suffer from the diseases we are targeting and the number of patients that will enroll in our clinical trials;

- the beneficial characteristics, safety, efficacy and therapeutic effects of AK002;

- the timing or likelihood of regulatory filings and approvals, including our expectation to seek special designations, such as orphan drug designation, for AK002 or our other product candidates for various diseases;

- our ability to obtain and maintain regulatory approval of AK002 or our other product candidates;

- our plans relating to the further development of AK002 and our other product candidates;

- existing regulations and regulatory developments in the United States and other jurisdictions;

- our plans and ability to obtain or protect intellectual property rights, including extensions of existing patent terms where available;

- our continued reliance on third parties to conduct additional clinical trials of AK002 and our other product candidates, and for the manufacture of our product candidates for preclinical studies and clinical trials;

- the need to hire additional personnel and our ability to attract and retain such personnel;

- the accuracy of our estimates regarding expenses, future revenue, capital requirements and needs for additional financing;

- our financial performance;

- the sufficiency of our existing cash, cash equivalents and marketable securities to fund our future operating expenses and capital expenditure requirements; and

- our anticipated use of the proceeds from this offering.

3

Table of Contents

Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements that we make. These forward-looking statements involve risks and uncertainties that could cause our actual results to differ materially from those in the forward-looking statements, including, without limitation, the risks set forth under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, our most recent Quarterly Report on Form 10-Q, any prospectus supplement hereto and in our other filings with the SEC. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. Given these uncertainties, you should not place undue reliance on these forward-looking statements. We qualify all of the forward-looking statements in this prospectus and the documents incorporated by reference herein by these cautionary statements. Our forward-looking statements speak only as of the date of this prospectus or as of the date of the documents incorporated herein by reference. Except as required by law, we assume no obligation to update these forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in any forward-looking statements, whether as a result of new information, future events or otherwise.

4

Table of Contents

**USE OF PROCEEDS**

In the case of a sale of shares of our common stock by us, the use of proceeds will be specified in the applicable prospectus supplement. In the case of a sale of shares of our common stock by any selling stockholders, we will not receive any of the proceeds from such sale.

5

Table of Contents

**SELLING STOCKHOLDERS**

We may register the shares of our common stock for resale by certain selling stockholders. Information about selling stockholders, where applicable, including their identities, the number of shares of common stock registered and offered on their behalf, their beneficial ownership and their relationship with us will be set forth in a prospectus supplement, in a post-effective amendment or in documents incorporated by reference into this prospectus that we file with the SEC. No selling stockholder shall sell any shares of our common stock pursuant to this prospectus until we have identified such selling stockholder and the shares being offered for resale by such selling stockholder in a subsequent prospectus supplement or in a post-effective amendment. However, selling stockholders may sell or transfer all or a portion of their shares of our common stock pursuant to any available exemption from the registration requirements of the Securities Act.

6

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

The following descriptions of our capital stock and certain provisions of our amended and restated certificate of incorporation and amended and restated bylaws. The following description may not contain all of the information that is important to you. To understand the material terms of our common stock, you should read our amended and restated certificate of incorporation and amended and restated bylaws, copies of which have been filed with the SEC.

### General

Our amended and restated certificate of incorporation authorizes capital stock consisting of:

- 200,000,000 shares of common stock, par value $0.001 per share; and

- 20,000,000 shares of preferred stock, par value $0.001 per share.

As of June 30, 2019, we had 43,184,395 shares of our common stock issued and outstanding.

### Common Stock

#### Voting Rights

Each holder of common stock is entitled to one vote for each share on all matters submitted to a vote of the stockholders, including the election of directors. Our certificate of incorporation and bylaws do not provide for cumulative voting rights. Because of this, the holders of a plurality of the shares of common stock entitled to vote in any election of directors can elect all of the directors standing for election, if they should so choose. With respect to matters other than the election of directors, at any meeting of the stockholders at which a quorum is present or represented, the affirmative vote of a majority of the voting power of the shares present in person or represented by proxy at such meeting and entitled to vote on the subject matter shall be the act of the stockholders, except as otherwise required by law. The holders of a majority of the stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders.

#### Dividends

Subject to preferences that may be applicable to any then-outstanding preferred stock, holders of our common stock are entitled to receive dividends, if any, as may be declared from time to time by our board of directors out of legally available funds.

#### Liquidation

In the event of our liquidation, dissolution or winding up, holders of our common stock will be entitled to share ratably in the net assets legally available for distribution to stockholders after the payment of all of our debts and other liabilities and the satisfaction of any liquidation preference granted to the holders of any then-outstanding shares of preferred stock.

#### Rights and Preferences

Holders of our common stock have no preemptive, conversion, subscription or other rights, and there are no redemption or sinking fund provisions applicable to our common stock. The rights, preferences and privileges of the holders of our common stock are subject to and may be adversely affected by the rights of the holders of shares of any series of preferred stock that we may designate in the future.

7

Table of Contents

### Fully Paid and Nonassessable

All of our outstanding shares of common stock are fully paid and nonassessable.

## Preferred Stock

Our board of directors has the authority, without further action by the stockholders, to issue up to 20,000,000 shares of preferred stock in one or more series and to fix the rights, preferences, privileges and restrictions thereof. These rights, preferences and privileges could include dividend rights, conversion rights, voting rights, redemption rights, liquidation preferences, sinking fund terms and the number of shares constituting any series or the designation of such series, any or all of which may be greater than the rights of our common stock. The issuance of preferred stock could adversely affect the voting power of holders of our common stock and the likelihood that such holders will receive dividend payments and payments upon liquidation. In addition, the issuance of preferred stock could have the effect of delaying, deferring or preventing change in our control or other corporate action. No shares of preferred stock are outstanding.

## Registration Rights

Under our Amended and Restated Investors' Rights Agreement, as amended, holders of a majority of our common stock or their transferees, have the right to require us to register the offer and sale of their shares, or to include their shares in any registration statement we file, in each case as described below.

### Demand Registration Rights

The holders of a majority of our common stock are entitled to certain demand registration rights. At any time, the holders of at least 50% of the shares having registration rights then outstanding can request that we file a registration statement to register the offer and sale of their shares. We are only obligated to effect up to two such registrations. Each such request for registration must cover securities the anticipated aggregate public offering price of which, before deducting underwriting discounts and commissions, is at least $10 million. These demand registration rights are subject to specified conditions and limitations, including the right of the underwriters to limit the number of shares included in any such registration under certain circumstances. If we determine that it would be seriously detrimental to us and our stockholders to effect such a demand registration, we have the right to defer such registration, not more than twice in any twelve-month period, for a period of up to 120 days.

### Form S-3 Registration Rights

The holders of a majority of our common stock are entitled to certain Form S-3 registration rights. At any time when we are eligible to file a registration statement on Form S-3, the holders of the shares having these rights then outstanding can request that we register the offer and sale of their shares of our common stock on a registration statement on Form S-3 so long as the request covers securities the anticipated aggregate public offering price of which is at least $1 million. These stockholders may make an unlimited number of requests for registration on a registration statement on Form S-3. However, we will not be required to effect a registration on Form S-3 if we have effected two such registrations within the twelve month period preceding the date of the request. Additionally, if we determine that it would be seriously detrimental to us and our stockholders to effect such a demand registration, we have the right to defer such registration, not more than twice in any twelve month period, for a period of up to 120 days.

8

Table of Contents

***Piggyback Registration Rights***

The holders of a majority of our common stock are entitled to certain "piggyback" registration rights. If we propose to register the offer and sale of shares of our common stock under the Securities Act, all holders of these shares then outstanding can request that we include their shares in such registration, subject to certain marketing and other limitations, including the right of the underwriters to limit the number of shares included in any such registration statement under certain circumstances. As a result, whenever we propose to file a registration statement under the Securities Act, other than with respect to (1) a registration related to any employee benefit plan or a corporate reorganization or other transaction covered by Rule 145 promulgated under the Securities Act, (2) a registration in which the only stock being registered is common stock issuable upon conversion of debt securities also being registered, (3) a registration on any registration form that does not permit secondary sales or (4) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of our common stock, the holders of these shares are entitled to notice of the registration and have the right, subject to certain limitations, to include their shares in the registration.

***Expenses of Registration***

We will pay all expenses relating to any demand registrations, Form S-3 registrations and piggyback registrations, subject to specified exceptions.

***Termination***

The registration rights terminate upon the earliest of (1) the date that is three years after the closing of our initial public offering and (2) as to a given holder of registration rights, the date when such holder of registration rights can sell all of such holder's registrable securities during any ninety day period pursuant to Rule 144 promulgated under the Securities Act.

**Anti-Takeover Effects of Certain Provisions of Delaware Law, Our Amended and Restated Certificate of Incorporation and Our Amended and Restated Bylaws**

Certain provisions of Delaware law and certain provisions in our amended and restated certificate of incorporation and amended and restated bylaws summarized below may be deemed to have an anti-takeover effect and may delay, deter or prevent a tender offer or takeover attempt that a stockholder might consider to be in its best interests, including attempts that might result in a premium being paid over the market price for the shares held by stockholders.

***Preferred Stock***

Our amended and restated certificate of incorporation contains provisions that permit our board of directors to issue, without any further vote or action by the stockholders, shares of preferred stock in one or more series and, with respect to each such series, to fix the number of shares constituting the series and the designation of the series, the voting rights (if any) of the shares of the series and the powers, preferences or relative, participation, optional and other special rights, if any, and any qualifications, limitations or restrictions, of the shares of such series.

***Classified Board***

Our amended and restated certificate of incorporation provides that our board of directors is divided into three classes, designated Class I, Class II and Class III. Each class is an equal number of directors, as nearly as possible, consisting of one-third of the total number of directors constituting the

9

Table of Contents

entire board of directors. The term of the Class II directors shall terminate on the date of the 2020 annual meeting, the term of the initial Class III directors shall terminate on the date of the 2021 annual meeting and the term of the Class I directors will terminate on the date of the 2022 annual meeting. At each annual meeting of stockholders, successors to the class of directors whose term expires at that annual meeting will be elected for a three-year term.

### Removal of Directors

Our amended and restated certificate of incorporation provides that stockholders may only remove a director for cause by a vote of no less than a majority of the shares present in person or by proxy at the meeting and entitled to vote.

### Director Vacancies

Our amended and restated certificate of incorporation authorizes only our board of directors to fill vacant directorships.

### No Cumulative Voting

Our amended and restated certificate of incorporation provides that stockholders do not have the right to cumulate votes in the election of directors.

### Special Meetings of Stockholders

Our amended and restated certificate of incorporation and amended and restated bylaws provide that, except as otherwise required by law, special meetings of the stockholders may be called only by an officer at the request of a majority of our board of directors, by the Chair of our board of directors or by our Chief Executive Officer.

### Advance Notice Procedures for Director Nominations

Our bylaws provide that stockholders seeking to nominate candidates for election as directors at an annual or special meeting of stockholders must provide timely notice thereof in writing. To be timely, a stockholder's notice generally will have to be delivered to and received at our principal executive offices before notice of the meeting is issued by the secretary of the company, with such notice being served not less than 90 nor more than 120 days before the meeting. Although the amended and restated bylaws do not give the board of directors the power to approve or disapprove stockholder nominations of candidates to be elected at an annual meeting, the amended and restated bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of the company.

### Action by Written Consent

Our amended and restated certificate of incorporation and amended and restated bylaws provide that any action to be taken by the stockholders must be effected at a duly called annual or special meeting of stockholders and may not be effected by written consent.

### Amending our Certificate of Incorporation and Bylaws

Our amended and restated certificate of incorporation may be amended or altered in any manner provided by the Delaware General Corporation Law ("DGCL"). Our amended and restated bylaws may

10

Table of Contents

be adopted, amended, altered or repealed by stockholders only upon approval of at least majority of the voting power of all the then outstanding shares of the common stock, except for any amendment of the above provisions, which would require the approval of a two-thirds majority of our then outstanding common stock. Our amended and restated certificate of incorporation provides that our bylaws may be amended, altered or repealed by the board of directors.

### Authorized but Unissued Shares

Our authorized but unissued shares of common stock and preferred stock will be available for future issuances without stockholder approval, except as required by the listing standards of NASDAQ, and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved common stock and preferred stock could render more difficult or discourage an attempt to obtain control of the company by means of a proxy contest, tender offer, merger or otherwise.

### Exclusive Jurisdiction

Our amended and restated certificate of incorporation provides that, unless we consent to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any derivative action or proceeding brought on our behalf, any action asserting a claim of breach of fiduciary duty, any action asserting a claim arising pursuant to the DGCL, any action regarding our amended and restated certificate of incorporation or our amended and restated bylaws, or any action asserting a claim against us that is governed by the internal affairs doctrine. Our amended and restated certificate of incorporation provides further that the federal district courts of the United States of America is the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act.

On December 19, 2018, the Delaware Chancery Court issued an opinion in *Sciabacucchi v. Salzberg*, C.A. No. 2017-0931-JTL, invalidating a provision in the certificates of incorporation of three Delaware corporations that each purported to limit to federal court the forum in which a stockholder could bring a claim under the Securities Act . The Delaware Chancery Court held that a Delaware corporation can only use its constitutive documents to bind a plaintiff to a particular forum where the claim involves rights or relationships that were established by or under Delaware's corporate law.

In light of the recent *Sciabacucchi* decision, the Company does not currently intend to enforce the federal forum selection provision in its certificate of incorporation unless the *Sciabacucchi* decision is reversed on appeal. If the decision is not appealed or if the Delaware Supreme Court affirms the Delaware Chancery Court's decision, then we will seek approval by our stockholders to amend our certificate of incorporation at our next regularly-scheduled annual meeting of stockholders to remove the invalid provision.

### Business Combinations with Interested Stockholders

We are governed by Section 203 of the DGCL. Subject to certain exceptions, Section 203 of the DGCL prohibits a public Delaware corporation from engaging in a business combination (as defined in such section) with an "interested stockholder" (defined generally as any person who beneficially owns 15% or more of the outstanding voting stock of such corporation or any person affiliated with such person) for a period of three years following the time that such stockholder became an interested stockholder, unless (i) prior to such time the board of directors of such corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder; (ii) upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of such

11

Table of Contents

corporation at the time the transaction commenced (excluding for purposes of determining the voting stock of such corporation outstanding (but not the outstanding voting stock owned by the interested stockholder) those shares owned (A) by persons who are directors and also officers of such corporation and (B) by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer); or (iii) at or subsequent to such time the business combination is approved by the board of directors of such corporation and authorized at a meeting of stockholders (and not by written consent) by the affirmative vote of at least 66 2/3% of the outstanding voting stock of such corporation not owned by the interested stockholder.

Our amended and restated certificate of incorporation and our amended and restated bylaws provide that we must indemnify our directors and officers to the fullest extent authorized by the DGCL. We are expressly authorized to, and do, carry directors' and officers' insurance providing coverage for our directors, officers and certain employees for some liabilities. We believe that these indemnification provisions and insurance are useful to attract and retain qualified directors and executive directors.

The limitation on liability and indemnification provisions in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. These provisions may also have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. In addition, your investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

**Listing**

Our common stock is listed on the NASDAQ under the symbol "ALLK."

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is American Stock Transfer & Trust Company, LLC. The transfer agent and registrar's address is 6201 15th Avenue, Brooklyn, New York 11219.

12

**Table of Contents**

**PLAN OF DISTRIBUTION**

We and/or one or more selling stockholders, if applicable, may sell the shares of common stock covered by this prospectus in any of the following ways (or in any combination):

- directly to one or more purchasers;

- to or through underwriters or dealers; or

- through agents.

We will prepare a prospectus supplement or supplements, if required, that will describe the method of distribution and disclose the terms and conditions of any offering of shares of common stock, including:

- the name or names of any underwriters, dealers or agents and the amounts of common stock underwritten or purchased by each of them;

- the offering price of the shares of common stock and the proceeds to us and/or any selling stockholders, if applicable, and any underwriting discounts, commissions, concessions or agency fees allowed or reallowed or paid to dealers; and

- any options under which underwriters may purchase additional shares of common stock from us and/or any selling stockholder.

Any offering price and any discounts, commissions, concessions or agency fees allowed or reallowed or paid to dealers may be changed from time to time.

Pursuant to our Amended and Restated Investors' Rights Agreement with certain stockholders, as amended, we will pay certain registration expenses of such selling stockholders.

We and/or any selling stockholders, if applicable, may distribute the common stock from time to time in one or more transactions at:

- a fixed price or prices, which may be changed from time to time;

- market prices prevailing at the time of sale;

- prices relating to such prevailing market prices; or

- negotiated prices.

Underwriters, dealers or any other third parties described above may offer and sell the offered common stock from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices determined at the time of sale. If underwriters or dealers are used in the sale of any shares of common stock, the common stock will be acquired by the underwriters or dealers for their own account and may be resold from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices determined at the time of sale. The common stock may be either offered to the public through underwriting syndicates represented by managing underwriters, or directly by underwriters. Generally, the underwriters' obligations to purchase the shares of common stock will be subject to certain conditions precedent. The underwriters will be obligated to purchase all of the shares of common stock if they purchase any of the shares of common stock (other than any shares of common stock purchased upon exercise of any overallotment option), unless otherwise specified in the prospectus supplement. We and/or one or more selling stockholders may use underwriters with whom we and/or such selling stockholders have a material relationship. We will describe the nature of any such relationship in the prospectus supplement, as required, naming the underwriter.

13

Table of Contents

We and/or one or more selling stockholders, if applicable, may sell the common stock through agents from time to time. The prospectus supplement will name any agent involved in the offer or sale of the common stock and any commissions paid to them. Generally, any agent will be acting on a best efforts basis for the period of its appointment. We may engage in "at the market" offerings into an existing trading market in accordance with Rule 415(a)(4) under the Securities Act. We may authorize underwriters, dealers or agents to solicit offers by certain purchasers to purchase the shares of common stock from us at the public offering price set forth in the prospectus supplement pursuant to delayed delivery contracts providing for payment and delivery on a specified date in the future. These contracts will be subject only to those conditions set forth in the prospectus supplement, and the prospectus supplement will set forth any commissions to be paid for solicitation of these contracts. Any underwriters, dealers and agents that participate in the distribution of the common stock may be deemed to be "underwriters" as defined in the Securities Act. Any commissions paid or any discounts or concessions allowed to any such persons, and any profits they receive on resale of the common stock, may be deemed to be underwriting discounts and commissions under the Securities Act. We will identify any underwriters or agents and describe their compensation in a prospectus supplement.

The applicable prospectus supplement will set forth whether or not underwriters may over-allot or effect transactions that stabilize, maintain or otherwise affect the market price of the shares of common stock at levels above those that might otherwise prevail in the open market, including, for example, by entering stabilizing bids, effecting syndicate covering transactions or imposing penalty bids.

If at the time of any offering made under this prospectus a member of FINRA participating in the offering has a "conflict of interest" as defined in FINRA Rule 5121 ("Rule 5121"), that offering will be conducted in accordance with the relevant provisions of Rule 5121.

We and/or any selling stockholders may agree to indemnify an underwriter, dealer or agent against certain liabilities related to the selling of the common stock, including liabilities arising under the Securities Act.

The specific terms of the lock-up provisions in respect of any given offering will be described in the applicable prospectus supplement.

Selling stockholders may also sell securities under Rule 144 under the Securities Act, if available, or pursuant to other available exemptions from the registration requirements under the Securities Act, rather than under this prospectus. Registration of the shares of common stock covered by this prospectus does not mean that any shares of common stock will be offered or sold.

14

Table of Contents

**LEGAL MATTERS**

The validity of our common stock will be passed upon for us by Simpson Thacher & Bartlett LLP, Palo Alto, California. Additional legal matters may be passed upon for us or any underwriters, dealers or agents, by counsel that we will name in the applicable prospectus supplement.

**EXPERTS**

Ernst & Young LLP, independent registered public accounting firm, has audited our financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2018, as set forth in their report, which is incorporated by reference in this prospectus and elsewhere in the registration statement. Our financial statements are incorporated by reference in reliance on Ernst & Young LLP's report, given on their authority as experts in accounting and auditing.

15

Table of Contents

**WHERE YOU CAN FIND MORE INFORMATION**

We file annual, quarterly and current reports, proxy statements and other information with the SEC. The SEC maintains an Internet web site that contains reports, proxy and information statements, and other information regarding issuers, including us, that file electronically with the SEC. The public can obtain any documents that we file electronically with the SEC at *http://www.sec.gov*.

Our website address is www.allakos.com. The information on our website, or that can be accessed through our website, however, is not, and should not be deemed to be, a part of this prospectus.

This prospectus is a part of the registration statement and does not contain all the information in the registration statement and the exhibits to the registration statement. Whenever a reference is made in this prospectus to a contract or other document of ours, the reference is only a summary and you should refer to the exhibits that are a part of the registration statement for a copy of the contract or other document. You may review a copy of the registration statement and the documents incorporated by reference herein through the SEC's Internet website referred to above.

**INCORPORATION BY REFERENCE**

The SEC allows us to incorporate by reference information into this prospectus. This means that we can disclose important information to you by referring you to another document. Any information referred to in this way is considered part of this prospectus from the date we file that document. Any reports filed by us with the SEC after the date of this prospectus and before the date that the offering of the common stock by means of this prospectus is terminated will automatically update and, where applicable, supersede any information contained in this prospectus or incorporated by reference in this prospectus.

We incorporate by reference in this prospectus the documents set forth below that have been previously filed with the SEC; provided, however, that we are not incorporating any documents or information deemed to have been furnished rather than filed in accordance with SEC rules:

- our Annual Report on Form 10-K for the fiscal year ended December 31, 2018;

- the information specifically incorporated by reference into our Annual Report on Form 10-K for the fiscal year ended December 31, 2018 from our Definitive Proxy Statement on Schedule 14A filed on April 30, 2019;

- our Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2019 and June 30, 2019;

- our Current Reports on Form 8-K filed on January 7, 2019, January 29, 2019, February 4, 2019, February 11, 2019, February 19, 2019, May 7, 2019, June 10, 2019 and August 5, 2019 (other than the information furnished under Item 2.02);

- the description of our common stock contained in our registration statement on Form 8-A, filed with the SEC on July 11, 2018, including any subsequent filed amendments and reports updating such description; and

- any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act on or after the date of this prospectus and before the termination of this offering but excluding any information furnished to, rather than filed with, the SEC.

16

**Table of Contents**

You may request a free copy of any of the documents incorporated by reference in this prospectus (other than exhibits, unless they are specifically incorporated in the documents) by writing or telephoning us at the following address:

Allakos Inc.
975 Island Drive, Suite 201
Redwood City, California 94065
(650) 597-5002

Exhibits to the filings will not be sent, however, unless those exhibits have specifically been incorporated by reference in this prospectus and any accompanying prospectus supplement.

You should rely only on the information incorporated by reference or provided in this prospectus. Neither we nor any selling stockholder has authorized anyone else to provide you with different information.

17

Table of Contents

4,545,454 Shares

# Allakos Inc.

Common Stock



**Goldman Sachs & Co. LLC**                    **Jefferies**

**William Blair**                    **LifeSci Capital LLC**

# Exhibit H

# Investors



## Press Release

Allakos Announces the Initiation of Antolimab (AK002) Clinical Studies

March 24, 2020 at 4:01 PM EDT

- *Phase 3 study of antolimab for the treatment of eosinophilic gastritis and/or eosinophilic duodenitis (previously referred to as eosinophilic gastroenteritis)*
- *Phase 2/3 study of antolimab for the treatment of eosinophilic esophagitis*
- *Phase 1 study of subcutaneously administered antolimab in healthy volunteers*

*-- Management to host conference call and webcast today at 5:00 pm ET --*

REDWOOD CITY, Calif., March 24, 2020 (GLOBE NEWSWIRE) -- Allakos Inc. (Nasdaq: ALLK), a biotechnology company developing antolimab (AK002) for the treatment of eosinophil and mast cell related diseases, today reported the initiation of three clinical studies of antolimab: a Phase 3 study in eosinophilic gastritis (EG) and/or eosinophilic duodenitis (EoD), a Phase 2/3 study in eosinophilic esophagitis (EoE), and a Phase 1 study of subcutaneously administered antolimab in healthy volunteers. The Phase 3 EG and/or EoD study and the Phase 2/3 EoE study follow positive results from ENIGMA, the Company's multicenter, randomized, double-blind, placebo-controlled Phase 2 study in patients with EG and/or EoD.

### Phase 3 Eosinophilic Gastritis (EG) and/or Eosinophilic Duodenitis (EoD) Study Design

The multicenter, randomized, double-blind, placebo-controlled Phase 3 trial will enroll approximately 160 patients with active, biopsy-confirmed EG (eosinophil count of ≥30 eosinophils in 5 high powered fields [hpfs] in the stomach) and/or EoD (eosinophil count of ≥30 eosinophils in 3 hpfs in duodenum). Patients will be randomized 1:1 to receive: (a) 1.0 mg/kg of antolimab for the first month followed by five doses of 3.0 mg/kg given monthly, or (b) monthly placebo. The co-primary endpoints of the study are: 1) the proportion of patients achieving ≤ 4 eosinophils in 5hpfs in the stomach and/or ≤15 eosinophils in 3hpfs in the duodenum and 2) absolute change in Total Symptom Score (TSS-6: abdominal pain, nausea, bloating, early satiety, abdominal cramping, loss of appetite) measured using the daily patient reported symptom questionnaire used in ENIGMA. The TSS-6 consists of the six most frequent and severe symptoms reported in ENIGMA.

### Phase 2/3 Eosinophilic Esophagitis (EoE) Study Design

The multicenter, randomized, double-blind, placebo-controlled Phase 2/3 trial will enroll approximately 300 patients with active, biopsy-confirmed EoE (eosinophil count of ≥15 eosinophils in a single hpf). Patients will be randomized 1:1:1 to receive: (a) six antolimab doses of 1.0 mg/kg given monthly, (b) 1.0 mg/kg of antolimab for the first month followed by five doses of 3.0 mg/kg given monthly, or (c) monthly placebo. The co-primary endpoints of the study are: (1) the proportion of patients achieving ≤6 eosinophils in a single hpf and (2) absolute change in dysphagia symptoms measured using a daily patient reported symptom questionnaire known as the Dysphagia Symptom Questionnaire (DSQ).

### Phase 1 Study of Subcutaneously Administered Antolimab in Healthy Volunteers

The randomized, double-blind, placebo-controlled Phase 1 trial will evaluate the safety, pharmacokinetics, and pharmacodynamics of subcutaneously administered antolimab in healthy volunteers.

### Conference Call and Live Webcast

The Company will host a conference call and webcast with slides today at 5:00 p.m. Eastern Time / 2:00 p.m. Pacific Time. To participate by telephone, please dial 877-407-9039 (domestic) or 201-689-8470 (international). The conference ID number is 13700828. A live and archived audio webcast can be accessed through the Investors section of the Company's website at www.allakos.com (https://www.globenewswire.com/Tracker?data=onQZ8qlocZpur1XdaZaFcly6Lcu6YkZddHAWZhWPBeB4f2bEyL2R4QPmNaaG6HsskF7y-Hd7RlVSF4vexczykLEStMc9tc9umVUFmfOHlrfLE4MLf6shM2dR7N_MQmWVVm62SIAZjoZntpOyYxFqZ5sEvonVEIDo0YW0PfCT6LZH9Rv0KaXTcBN8WTgdMVjrBiaKL1UNLbh kulgvXuH17ScFJpjNVoI=). The archived audio webcast will remain available on the Company's website for 30 days following the conference call.

### About Eosinophilic Gastritis, Eosinophilic Duodenitis, and Eosinophilic Esophagitis

Eosinophilic gastritis, eosinophilic duodenitis (previously referred to as eosinophilic gastroenteritis), and eosinophilic esophagitis are severe inflammatory orphan diseases characterized by the presence of high levels of eosinophils in the stomach, duodenum, or esophagus, respectively. Common symptoms of the diseases include severe abdominal pain, nausea, diarrhea, bloating, cramping, early satiety, loss of appetite, vomiting, dysphagia, and weight loss. The current estimated prevalence of eosinophilic gastritis and eosinophilic duodenitis in the United States is approximately 50,000 people. The estimated prevalence of eosinophilic esophagitis in the United States is approximately 150,000 people. There are no treatments approved specifically for these diseases. Treatment with systemic steroids can provide symptomatic improvement, but long-term treatment with steroids is generally not possible due to the numerous side effects. Allakos has received orphan drug designation for antolimab in eosinophilic gastritis, eosinophilic gastroenteritis, and eosinophilic esophagitis.

### About Allakos

Allakos is a clinical stage biotechnology company developing antibodies that target immunomodulatory receptors present on immune effector cells involved in allergic, inflammatory, and proliferative diseases. The Company's lead antibody, antolimab (AK002), targets Siglec-8, an inhibitory receptor selectively expressed on human mast cells and eosinophils. Antolimab has been shown to inhibit mast cells and deplete eosinophils. Inappropriately activated eosinophils and mast cells have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. Antolimab has been tested in six clinical studies. In these studies, antolimab eliminated blood and tissue eosinophils, inhibited mast cells and improved disease symptoms in patients with eosinophilic gastritis and/or eosinophilic duodenitis, eosinophilic esophagitis, mast cell gastrointestinal disease, severe allergic conjunctivitis, chronic urticaria, and indolent systemic mastocytosis. For more information, please visit the Company's website at www.allakos.com (https://www.globenewswire.com/Tracker?data=onQZ8qlocZpur1XdaZaFch6Ime527hNbyYfT-ObEipbBt2RZjaaCLyWegjx7Y28xxJBFtvUApzMMax8Uxm0cTg==).

### Forward-Looking Statements

This press release contains forward-looking statements within the meaning of The Private Securities Litigation Reform Act of 1995 as contained in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Such forward-looking statements include, but are not limited to, Allakos' progress and business plans and plans relating to its future clinical trials. Such statements are subject to numerous important factors, risks and uncertainties that may cause actual events or results to differ materially from current expectations and beliefs, including but not limited to: Allakos' early stages of clinical drug development; Allakos' ability to timely complete clinical trials for, and if approved, commercialize antolimab, its lead compound; Allakos' ability to obtain required regulatory approvals and appropriate labelling for its product candidates; uncertainties related to the enrollment of patients in its clinical trials; Allakos' ability to demonstrate sufficient safety and efficacy of its product candidates in its clinical trials; uncertainties related to the success of later-stage clinical trials, regardless of the outcomes of preclinical testing and early-stage trials; market acceptance of Allakos' product candidates; uncertainties related to the projections of the size of patient

1

populations suffering from the diseases Allakos is targeting; Allakos' ability to advance additional product candidates beyond antolimab; Allakos' ability to obtain additional capital to finance its operations; and other important risk factors set forth in Allakos' most recent Annual Report on Form 10-K filed with the SEC on February 25, 2020, and future reports to be filed with the SEC. These documents contain and identify important factors that could cause the actual results for Allakos to differ materially from those contained in Allakos' forward-looking statements. Any forward-looking statements contained in this press release speak only as of the date hereof, and Allakos specifically disclaims any obligation to update any forward-looking statement, except as required by law. These forward-looking statements should not be relied upon as representing Allakos' views as of any date subsequent to the date of this press release.

Source: Allakos Inc.

Investor Contact:
Adam Tomasi, President and COO
ir@allakos.com (mailto:ir@allakos.com)

Media Contact:
Denise Powelldenise@redhousecomms.com (mailto:denise@redhousecomms.com)

Allakos (https://www.globenewswire.com/NewsRoom/AttachmentNg/58aeb59e-2de0-4f25-a39b-cd7e644f9fc1)

Source: Allakos Inc.

# Exhibit I

**S&P Global**
Market Intelligence

# Allakos Inc. NasdaqGS:ALLK

# Special Call

## Tuesday, March 24, 2020 9:00 PM GMT

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

spglobal.com/marketintelligence

# Table of Contents

Call Participants ............................................................................ 3

Presentation ............................................................................ 4

Question and Answer ............................................................................ 10

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

**EXECUTIVES**

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

**Robert Alexander**
*CEO & Director*

**ANALYSTS**

**Kyuwon Choi**
*Goldman Sachs Group Inc.,
Research Division*

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research
Division*

**Timothy Francis Lugo**
*William Blair & Company L.L.C.,
Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Greetings, and welcome to the Allakos trial initiation and corporate update. [Operator Instructions] As a reminder, this conference is being recorded. I would now like to turn the conference over to our host, Robert Alexander, Chief Financial -- Chief Executive Officer. Thank you. You may begin.

**Robert Alexander**
*CEO & Director*

Thank you, and I'd like to thank everybody for joining our call.

A reminder that I will be making forward-looking statements. So please refer to our most recent regulatory filings, in particular, our 10-K for a broader discussion of our risk factors.

On Slide 3. In terms of agenda, I will go through an overview and then turn it over to Henrik to go through the clinical trials details, and then at the end, we'll have a Q&A.

Okay. So on Slide 5. In terms of an overview, we recently initiated our Phase III study in eosinophilic gastritis and/or eosinophilic duodenitis. We previously referred to this as EGE, but it's simply a name change to be more precise. We also recently initiated a Phase II/III in eosinophilic esophagitis. Recently, we dosed our first group of patients in our Phase I subcutaneous healthy volunteer study. We also announced today positive results from a Phase I study in mast cell gastritis, and Henrik will go through that data a bit later as well. And then in terms of an update, our study in -- our prevalence study looking at EGID and MGID patients who have a history of functional GI disease is well underway, and that study has been enrolling quite well since late January.

Okay. So on Slide 6, a few words about the coronavirus and the effect it's having on our clinical trials and, as everybody knows, others' clinical trials as well.

We did initiate the Phase III EG study and the Phase II/III EoE study, as I mentioned. But after careful consideration over the last couple of weeks and given how much things have changed just in the last week or 10 days, we've decided to delay enrollment in those 2 studies until we have some additional clarity on how the infection rates go and how states and the government are dealing with the crisis.

In terms of an impact on our time lines, our current estimate for completion of our EG and our EoE study is second half of '21. That could be at risk, but we won't have any specific information on that until we get a little further down the road.

In terms of our subcutaneous and our prevalence studies, those -- as I mentioned, those studies are enrolling. They continue to enroll, although recently over the last, I'd say, week, they've slowed down a bit due to the pandemic. Those studies will read out in the second half of 2020, but again, depending on how things develop over the next few weeks or so, they may be impacted as well. And like everybody else, we'll continue to monitor the situation as carefully as we can and do whatever we can to minimize the impact on our development programs.

Okay. On Slide 7, just some background to reorient everybody on the story. So our drug antolimab, which is also known as AK002, targets Siglec-8, which is expressed on mast cells and eosinophils. If you look at the left side of the cartoon, Siglec-8 is a transmembrane protein. Again, it's constitutively expressed on mast cells and eosinophils. Its physiologic function is to be an inhibitory receptor, so it antagonizes activating signals delivered to these 2 cell types. On the right side, you could see antolimab engaged on Siglec-8. So what essentially we're doing with antolimab is we're pharmacologically activating the inhibitory function of Siglec-8. So we're antagonizing activating signals. The upshot of that is that we broadly inhibit mast cells and we kill the eosinophils.

Right. On Slide 8. This is the cartoon that represents a kind of a classic inflammatory reaction. To orient everybody, in the center is the mast cell. Off to the right are different cells of the innate immune system

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

and some additional cell types, in particular, the eosinophils over there. And on the left side, you can see T cells and B cells, put another way, that's the adaptive immune response. And what we're trying to do here is to put in context what inhibition of Siglec-8 potentially can do and what we have shown in our clinical studies to date. We know that we broadly inhibit the mast cell, and we've demonstrated that by showing inhibition of IL-33 and TSLP. We know we do that because we inhibit IL-4, 13 production from the mast cell. We've published data on the inhibition of IgE signaling on the mast cell, a toll-like receptors inhibition in the mast cell. We'll publish additional data on the breadth of inhibition going forward. Suffice to say that it does appear to be pretty broad inhibition. This includes not only inhibition of degranulation of the mast cell, but also de novo production of inflammatory mediators. And so the idea here was that by killing the eosinophil and broadly inhibiting the mast cell, that we could potentially collapse this inflammatory cascade. And the idea then is we could see clinical benefit in patients.

And if you go to the next slide, Slide 9, this is a list of indications that we actually have generated clinical data in or where we have strong scientific evidence that we should work there. And so this hypothesis of being able to kill -- having killing eos and inhibiting mast cells, having a potential benefit in patients has been borne out in the data sets that we've generated.

So in the upper right are 3 different forms of chronic conjunctivitis. We published that data last winter -- I guess, last -- I guess, in May of last year, showing a very nice treatment effect in all 3 forms of severe conjunctivitis. This was assessed both by patients and physicians. Embedded in those studies were people that had comorbid asthma and atopic dermatitis. And anecdotally, we also saw benefits in those populations. We also announced last year a study in chronic urticaria. This included both spontaneous urticaria as well as 2 different forms of inducible urticaria. Again, we saw a very nice treatment effect there. And then more recently, we published the data on eosinophilic gastritis and eosinophilic duodenitis. And again, that data was very robust and showed a significant treatment benefit in that patient population. And then in some of these other indications, for example, ulcerative colitis, there's a lot of scientific evidence that mast cells and eosinophils are involved in the pathogenesis of that indication as well as others, so there's strong scientific rationale beyond the areas where we've actually generated data to date.

On Slide 10 is a little bit of background on our lead indication, which are in the EGIDs. So this includes both -- or this includes eosinophilic esophagitis as well as eosinophilic gastritis and eosinophilic duodenitis. We have some prevalence numbers here on the slides. EoE currently is the largest of the 3 indications at roughly, call it, 200,000 people. EG and EoD both are around 25,000 people. So in total, about 50,000 people. We suspect that all 3 of these forms of eosinophilia will grow over time given more disease awareness and also the approval of drugs to treat these indications. Currently, there's nothing on the market to specifically treat these diseases. Patients use intermittent steroids or try diet modification. And in both cases, they're not really suitable for long-term use. And so as a result here, there's a high unmet medical need and, consequently, a large market opportunity.

So a little bit of data here. These were -- on Slide 11, these were biopsies that were taken from patients that were enrolled in the ENIGMA study, and these are their baseline measures. And what we're showing here is our eosinophil counts in the esophagus and stomach as well as mast cell counts. So not surprisingly, you see elevated eosinophils in patients that have EGIDs. But what was a surprise was that mast cells were also elevated here. And what we also found is that these 2 cell types were the only 2 cell types that were elevated in the tissue. In addition to that, we phenotype these same cells from these biopsies and found that both the eosinophils and mast cells were in activated phenotype. So this suggests that both of these cell types play a pathogenic role and also suggests that you would need to target both of them to see an optimal treatment benefit.

Okay. So Slide 13. We wanted to give a little bit of color on the end of Phase II meeting we recently had with the FDA. And I'd say big picture, this was a positive, very constructive meeting that we had.

And on Slide 14, we've listed some of the key takeaways here.

The first bullet point there is on our histologic co-primary end point. So consistent with the EoE guidance that came out in February of '19, the FDA recommended that we use a responder analysis. This is something that we anticipated. So we were prepared for this ask, and we're perfectly happy to modify the

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

histologic end point to be a responder analysis. What we did was we proposed the treatment threshold levels, so what would be considered a treatment success. That was our proposal to the FDA based on the ENIGMA data as well as additional data that we had generated over time. The FDA agreed with us, and we settled on the treatment threshold of less than or equal to 4 EoS per high-powered field in the stomach as being the threshold for a responder and less than or equal 15 per high-powered field in the duodenum.

On the symptom co-primary end point, there are a couple of points here to emphasize. I think number one is that we are using, per the FDA, the same PRO questionnaire that was used in ENIGMA will be used in the Phase III study. The FDA did recommend that we use a total symptom score consisting of the 6 most frequent and severe symptoms, which we're calling TSS-6. For clarity, those include abdominal pain, nausea, bloating, early satiety, abdominal cramping and loss of appetite. Vomiting and diarrhea are measured, but they are excluded from the primary -- the co-primary analysis. And what's behind this is the FDA wanted there to be a common set of symptoms that all patients suffered from, which is how we and the FDA landed on the TSS-6. As we've mentioned to the street for a long time now, vomiting and diarrhea were not as frequent and not as severe as the other 6 symptoms. With that said, we'll measure them. We had a very nice treatment effect on both. So those will be measured in the Phase III. They just won't be part of the co-primary symptomatic analysis.

Third bullet point is duration of study. Again, to be consistent with EoE, the FDA recommended a 6-month study. We are totally fine with that. We had proposed 4 months, but we were fine with 6, I think, as we have made clear to everyone. Part of the reason for that is that the longer patients are treated on antolimab, the better the data gets, so the 6-month change was something that was quite easy. And then as I mentioned before, we're changing the name of EGE to duodenitis. This is simply cleaning up the nomenclature in the field. It's somewhat ambiguous when it comes to duodenitis. Duodenitis is called a variety of things, including EGE or enteritis, and we decided to go ahead and clarify that and be precise. So we proposed to the FDA to call it eosinophilic duodenitis, which is what we measured and it's what everybody measures when they do these studies.

So that -- those were the key takeaways. As I said, this was a very positive constructive meeting, and we're very happy with the outcome and are looking forward to getting patients enrolled in the Phase III study.

So with that, I will turn it over to Henrik to provide some more detail on the development programs.

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

Yes. Thanks, Rob. And so our Phase III study in eosinophilic gastritis and/or duodenitis is a multicenter, randomized, double-blind, placebo-controlled study in adult patients with active moderate-to-severe symptoms as determined by our PRO. And they also must have biopsy-confirmed EG and/or EoD as defined by equal to or more than 30 eosinophils per high-powered field in 5 fields in the stomach and/or equal to or more than 30 eosinophils per high-powered field in 3 fields in the duodenum. The patients will be randomized in a 1:1 ratio between placebo or antolimab with a starting dose of 1 followed by 5 monthly doses thereafter for a total of 6 doses. And importantly, the patient population we are going to study are the same as we started in the Phase II ENIGMA study.

The symptoms in the study will be assessed with the same PRO questionnaire we used in ENIGMA, which, as you remember, was developed in accordance with the FDA guidance on PRO development, which capture the symptoms of EG and EoE on a daily basis throughout the baseline period followed by 6 months of treatment and measure all 8 symptoms on a scale from 0 to 10, 0 being no symptoms, 10 being the worst possible.

As Robert outlined, the co-primary symptomatic end point will consist of what we now call the TSS-6, namely abdominal pain, nausea, early satiety, loss of appetite, abdominal cramping and bloating. And we will measure vomiting and diarrhea, but because of the fact that they are less frequent and less severe than the other 6, we agreed with the FDA not to include them in the primary end point.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The study will have a co-primary end point, a histology end point and a symptom end point. The histology end point will be a proportional analysis where a responder is defined as a patient who, after treatment, has stomach eosinophils equal to or less than 4 in 5 fields and duodenum eos less than or equal to 15 in 3 high-powered fields. The symptom end point is going to be the absolute change in patient-reported TSS-6 from baseline until the end of the treatment. And we also have, of course, a couple of important secondary end point, namely, percent change in tissue eosinophils as well as treatment responders, where a total treatment responder is defined as a patient who achieved the tissue eosinophil threshold combined with at least a 30% improvement in TSS. For the 2 co-primary end points, the study has well more than 90% power to meet these end points, so very well powered study.

After we agreed, as you can see on the next slide, with the FDA on the slight change in the end point, we applied those Phase III end points on the ENIGMA Phase II data. And the data are shown on Slide #19, as you can see, using the intent-to-treat analysis that included all 65 patients enrolled in the ENIGMA study. And we then looked at the high dose because that is the dose we are using in the Phase III study. The histological end point, applying this criteria, we had 95% patients, who were responders, on antolimab as compared to 0 on placebo. And for everybody who knows statistics, not surprisingly, the p value is very, very small, less than 0.00001 and even smaller than that. The symptom end point were met with the changed end points as well. If you look at mean absolute change in TSS from baseline, applying that to the ENIGMA data, you will see that we ended up with a p value of 0.0162. And if you look at the mean percent change in TSS, you will see that the data are very similar to what we have already presented with the all 8 symptoms. 59% improvement from baseline on the antolimab 3 mg/kg dose versus 27% on placebo, which was statistically significant with a p value of 0.0031. So the p values here were slightly less, so more significant than they were looking at the TSS-8, the data we presented previously. So all working in the right direction.

Moving on now to the Phase II/III study in eosinophilic esophagitis, which we also recently started. That study is also a multi-center randomized, double-blind, placebo-controlled study in patients ranging from 12 to 80 years of age with active moderate-to-severe symptoms. You'll note here that we expanded the age range to include adolescents down to the age of 12. We did that to follow the FDA EoE guidance. The patients also need to -- in addition to be symptomatic, they also need to have confirmed eosinophilic esophagitis as defined by an equal to or greater than 15 eosinophils in 1 high-powered field from the esophagus. Once they meet the criteria, they'll be randomized in a 1:1:1 ratio to 2 active dose levels versus placebo; 100 patients per arm; a lower dose of 1 mg per kg for 6 months infusions; and a higher dose, starting with 1 mg per kg and then receiving 3 mg per kg for the following 5 months, for a total of 6 monthly doses. In that study, we're also looking at using co-primary end points, a histologic co-primary end point where a responder is defined as a patient who has less than or equal to 6 eosinophils per high-powered field in 1 high-powered field, and we are looking at a symptom co-primary end point, we are looking at absolute change in patient-reported Dysphagia Symptom Questionnaire, the so-called DSQ questionnaire.

And we are also looking at a couple of key and secondary end points, including percent change in esophageal tissue eosinophil count and percent change in DSQ score from baseline to the end of treatment. And the endpoints were composed in accordance with the FDA 2019 EoE guidance.

We also, as Robert indicated, recently started a study, Phase I study, with our subcutaneous formulation in healthy volunteers. It is the Phase I single-dose placebo-controlled study in a total of 50 healthy volunteers, where we're going to look at 4 different doses of subcutaneous antolimab with a starting dose of 0.3, then going to 1, then going to 3 and then finishing at 5 mg per kg. Each of these arms will have a placebo component. And then we are looking at 2 cohorts of intravenous antolimab 1 and 3 mg per kg. The study is underway, and we expect data in the fourth quarter of this year.

Moving on now on Slide 26 to the mast cell gastritis -- gastrointestinal disease study. And as a background, when we screened for ENIGMA, we entered a total of 113 patients into screening, of whom 88 met the symptom threshold. Of those 88 patients, 72 met the threshold for eosinophilic gastritis or eosinophilic duodenitis and were either included -- or could be included in the ENIGMA study, whereas, the remaining 16 patients were highly symptomatic, but they did not meet the eosinophilic criteria. But all of

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

these patients had increased mast cells, which we define as being equal to or more than 30 mast cells per high-powered field in the stomach and/or the duodenum.

On the next slide, Slide 27. It was a multi-center, open-label, multi-dose, Phase I study in patients with active moderate-to-severe symptoms, again, using the same PRO we used in ENIGMA. And they all had biopsy-confirmed elevated mast cells and didn't meet the criteria for eosinophils. In the study, they got -- received a total of 6 monthly doses, starting the dose of 0.3, then going to 1 and then received 4 doses of 3 mg per kg over the subsequent 4 months.

On the next slide, you can see the eosinophils and the mast cells in the ENIGMA study on the left side of the slide and in the MGID study on the right side. And not surprisingly, you'll see that the number of eosinophils per high-powered field were obviously way higher in the ENIGMA study than in the MGID study. But you also note that the mean mast cell number was very similar between ENIGMA and the MGID study, 64 at baseline in the ENIGMA study versus 55 in the MGID study.

On the next slide, we depicted the symptoms in patients in the ENIGMA study, as illustrated by the dark blue bars, versus patients in the MGID study in the gray color. And what is remarkable here is the similarity in constellation of symptoms as well as symptom severity between the ENIGMA study on one hand and the MGID-only patients on the other hand. So very similar disease symptom constellation and severity between the 2 groups.

On the next slide show you the change in total symptom score from baseline and until the end of the 6 months of treatment. You can see that we found in the MGID study an average reduction or mean reduction of 64% from baseline. That's very similar to what we found at the top dose of 3 mg per kg in the ENIGMA study, namely where we found a 58% mean reduction or improvement in symptoms, and that compared, as you will remember, to a 24% improvement on placebo. So very similar improvements in the mast cell-only patients as we found in the EG patients as well.

The improvement in total symptoms score, again, similar to ENIGMA, was not driven by 1 single symptom. We saw consistent improvements across all 8 symptoms which constituted the PRO, as you can see on the next slide. So very similar consistent improvement across the various symptoms.

Looking at histology, not surprisingly, the tissue eosinophils were wiped out at the end of the treatment. And we did see an approximately 18% decrease in the number of mast cells, which is similar to what we have seen in other preclinical and clinical studies. In terms of safety, antolimab was well tolerated. The most common adverse event was, again, the infusion-related reactions, all of which were mild and classified as Grade 1 in this study, and we had no drug-related serious adverse events.

As part of the ENIGMA study and also the MGID study, we found that a number of patients who ended up qualifying for ENIGMA did not have a prior history of eosinophilic gastritis or duodenitis. These patients were highly symptomatic. A number of them had previously been misdiagnosed as having irritable bowel syndrome and/or functional dyspepsia. And we found the same in patients who had increased mast cells. So we basically decided to try to get a better feel for the prevalence of increased eosinophils and/or increased mast cells in patients with functional gastrointestinal disorders. And to get a better feel for that, we kicked off, as Rob has said, back in late January an EGID and MGID prevalence study. It is a multicenter study throughout the United States, a total of 22 sites, to assess the prevalence of eosinophil -- EGID and MGID in patients with a diagnosis of irritable bowel syndrome, functional dyspepsia, chronic gastritis, and all of them would have chronic GI symptoms for at least 6 months without any other good reasons for their symptoms. So this is a typical IBS and/or functional dyspepsia patient population. And we plan to take biopsies from 200 such patients with active moderate-to-severe symptoms as assessed by the PRO questionnaire, the same PRO question we used in ENIGMA and which we are using in the Phase III EG/EoD study. The primary end point in that study is going to proportion of these 200 patients who turn out to have eosinophilic gastritis, eosinophilic duodenitis, a combination thereof or increased mast cells. So as Robert was indicating, the study is enrolling very well, we started in late January, and we are expecting to present data from that study in the second half of this year.

So in summary, we recently initiated our Phase III study in patients with eosinophilic gastritis and/or duodenitis as well as a Phase II/III study in eosinophilic esophagitis. So both studies have been activated.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

We have also started -- have dosed the first group of patients in our subcutaneous healthy volunteer study, so that study is ongoing. We demonstrated that antolimab improves symptoms in patients with chronic GI symptoms and elevated mast cells, so-called MGID patients, and starting to evaluate the prevalence of EGID and MGID in patients with chronic functional GI disease is well under way.

So without further ado, I pass it back to Robert.

**Robert Alexander**
*CEO & Director*

Okay. Thanks, Henrik.

Okay. So I'm now on Slide 38.

So we finished the year with $495 million in cash, cash equivalents. Our Q4 2019 operating expenses were roughly $27 million. This -- the cash, the $495 million will get us well past the 2 pivotal studies and at the current burn into 2023 without having to raise additional capital. If there are additional delays due to the pandemic, the money goes a little further, but that will give you a rough idea of what our burn is against the development programs.

On Slide 39 are the anticipated near-term milestones. So we will announce in the second quarter of this year the Phase II extension data. So this is the ENIGMA data. And these patients will all have been treated for minimally 12 months when we present the data. The next milestone is the Phase I subcutaneous data for antolimab. We expect that data to be second half of 2020. In addition, we would expect to announce the data from the prevalence studies in EGIDs and MGIDs in patients that have a history of functional GI disease, which includes functional dyspepsia as well as IBS.

Currently, we're projecting the results from our Phase III EG study and our Phase II/III EoE study to land in the second half of '21. We are qualifying that we have to see how the coronavirus pandemic plays out over the next few weeks or so to months to see how those delays might materialize or not. And we'll certainly provide updates on that as we get more information.
And that was all we plan to present. So I can turn it back over to the operator for questions.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Maury Raycroft with Jefferies.

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Congrats on the progress. First question is just on the PRO. Just to clarify there. Are you using the same PRO in the Phase III that was used in the Phase II? But it seems like you're not including those 2 symptoms, vomiting and diarrhea. But then when you take those out and analyze the Phase II data, you still see a 0.01 statistic difference. Is that right?

**Robert Alexander**
*CEO & Director*

Yes. That's correct. So yes -- I mean, there's maybe a subtlety there. So the PRO that the patients will take on a daily basis is the same PRO the patient -- this is in the Phase III study. This is the same PRO that patients took in the ENIGMA study. What the FDA asked us to do was to analyze the symptoms and find what we call the common set of symptoms that were experienced by the majority of the patients. And when you do that analysis, what very clearly emerges from the data is that the 6 symptoms that are in the TSS-6 cluster tightly together, and then there's a drop-off in terms of frequency and severity when you look at vomiting and diarrhea.

So what they asked us to do is to collect all the data but only include those 6 in the primary end point. And as it turns out, when you run the -- when you take the ENIGMA data on an intent-to-treat basis, and as Henrik said, we looked at the 3 mg per kg dose because that's the group that will go into -- that's the dose group that will be used in the Phase III study. You see that the results are essentially identical. I think numerically, they're actually better with the TSS-6, but it kind of is what it is. We would call them numerically similar.

Did that -- Maury, does that answer the question?

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Yes. Yes. That's helpful. And for the end of Phase II meeting and coming up with the Phase III design, can you comment on how closely FDA looked at your Phase II data? And can you provide any more context on the discussion in getting to the final design, given that there's not a lot of precedent in this area?

**Robert Alexander**
*CEO & Director*

Yes. I mean I would characterize the meeting. I think there was a tremendous amount of intellectual curiosity from the FDA with our data because we are the first people to have generated this type of data in patients with EG and EoD. And so the interaction, again, was constructive and kind of science-driven, and there were questions about some of the -- what we are finding in the data sets. And some of that kind of emerged in what we showed you in the key takeaways with respect to the symptoms, for example, where the literature is a little bit all over the place in terms of symptomatology. And there's this belief that the patients -- the most frequent, most severe symptoms are vomiting, diarrhea and abdominal pain. And it turns out vomiting and diarrhea are symptoms these patients suffer from, but they're not the most frequent or severe. So things like that, that the FDA was curious about. Fortunately, we had a very robust data set that allowed us to answer all those questions and provide analyses that gave them a lot of comfort that we have the right set of symptoms and that we're able to find the robust treatment effects on drug compared to placebo. And so that was kind of the tenor of the meeting as we went through the various things.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The histology, them requesting us to use a responder analysis, I think you have to remember we started the EG study back in 2018 and had conversations with the agency as far back as 2017. The EoE guidance came out in 2019. So once we saw that guidance, I think we had a pretty good idea of what the key issues would be around the Phase II meeting. So we were prepared for those discussions. And so that was actually quite helpful to have that information out there. Aside from that, it was really a lot of -- the majority of the conversation was around efficacy. The FDA had no concerns on safety. And so that was basically the meeting.

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Great. And last quick question. Just for the Phase III and the Phase II/III, is there a pre-medication protocol? And can you run through some of the details for that?

**Robert Alexander**
*CEO & Director*

Yes. Sure. Yes, so for both the EG and the EoE study, patients will be given a dose of pred 12 to 24 hours before they get their first dose of 1 mg per kg. And I think as we talked about on the August 5th call and have discussed with a variety of folks, with the 012 study, which was the dosing study that kind of made the rounds recently was that we found in the open-label extension data in ENIGMA that if we pretreated with pred 12 to 24 hours before going straight to a 1 mg per kg dose, we did not see any IRRs. We confirmed that finding in a small dosing study that we began a couple of weeks after we announced the ENIGMA data. And again, using that treatment protocol, we did not see a single IRR. So that's why we've made the decision to go forward with the pred predosing and then going straight to the 1 mg per kg. And the FDA had absolutely 0 comments about that.

**Operator**

Our next question comes from Tim Lugo with William Blair.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

For the TSS-6, is there going to be any changes in maybe how you anchor and discuss with patients what will be defined as a 1-point, 2-point, 3-point improvement for the components?

**Robert Alexander**
*CEO & Director*

No, no, no. It's -- again, it is exactly the same PRO. So patients will have the electronic device, they'll enter their symptoms on a daily basis. That data gets sent to a secure database. And all those symptoms are scored on 0 to 10 scale. So there -- absolutely nothing changes from the patient perspective.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Okay. Great. And going back to steroid use, after the pred predosing, will you allow further steroids in either arm on the trial? Or maybe will you allow adjustments if you do allow further steroid use? Can you talk about the steroid use through the length of the trial versus just the initial dose?

**Robert Alexander**
*CEO & Director*

Well, so the -- yes, the protocol says that it should be used on the first dose. And then after that, we -- there's a -- I forget exactly how the protocol is written, but it says something to the effect not to use it. But of course, we can't -- it's up to the doctor's discretion whether to prophylax or therapeutically treat a patient if they develop an IRR. So we can't tell them not to do that, but given what we know about IRRs throughout all the studies we've run, they are rare on subsequent infusions. And once we've landed on the pred predose, it appears that we have a very good handle on -- right now it looks like we've eliminated

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

those, but certainly, somewhere between eliminating and significantly reducing on the first dose. And then there really wouldn't be suspicion to treat with steroid on the subsequent doses unless someone had a significant IRR. So it's basically the same as what happened in ENIGMA. It was up to the doctor's discretion based on their medical opinion. So we don't have control over that.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Okay. And for the subcu study, it's obviously only a single dose study if you're able to start dosing patients again in, hopefully, a few weeks or maybe a couple of months. Do you still expect that to read out this year? And then moving forward, does that go into EoD, EoE patients? Or does it maybe go -- or to carrier patients? Is there a bridging study which will be necessary? Can you just talk about that?

**Robert Alexander**
*CEO & Director*

Yes. So the subcutaneous study is a single-dose study, and those patients are capped in the unit for, I believe, the first -- is it first 5 days? Yes, first 5 days. So that's logistically an easier study to continue to enroll. And so we expected that -- again, that study should be easier to enroll and to maintain. Now of course, we -- if things change again with respect to the pandemic, then we could have to make adjustments there, but we would expect that, that study will continue to enroll perhaps at a slightly slower pace but continue to enroll. This is the first subcu study we've done. So again, what we're looking for here is safety and bioavailability.

We will be doing other subcutaneous studies. We imagine that we'll go into EG next, and that would be the first approval for subcu assuming it has the right characteristics and right bioavailability, and that would be in the form of a supplemental application to the BLA. And then as it relates to additional indications, I believe that EoE would be the next logical place and then -- with an eye towards supplemental approval. And then for the additional indications, I think the ones that we're still evaluating, and part of this is dependent on what we find in the EGID, MGID prevalence study, but certainly high on our list are ulcerative colitis, urticaria, atopic dermatitis. Those are all things that we have a lot of interest in. And based on what we find from the EGID, MGID prevalence and what the subcutaneous data looks like, we'll inform how -- what we go and do next outside of the EGID.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Okay. Fair enough. And maybe just a housekeeping question, the Phase IIIs and maybe even some of the earlier Phase I work, would that all be added on the ClinicalTrials.gov?

**Robert Alexander**
*CEO & Director*

So the phase -- the subcu study is on ClinicalTrials.gov, the -- or will be, it's somewhere in the ether. It should be up there. The EG study will be. The EoE study will be. The prevalence study is not on there. It's a noninterventional study. And yes, I think that covers what you're asking about.

**Operator**

Our next question comes from Paul Choi with Goldman Sachs.

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

My first question is just in the development plans for the MGID program. You -- in the press release, you guys talked about TSS-8 here. But just given your commentary earlier on, on diarrhea and vomiting, as you think about the development plan there, is the goal or the plan to alter sort of the -- down to the 6 criteria here as well in MGID? And just how should we think about that affecting sort of the patient responses in the MGID population?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Robert Alexander**
*CEO & Director*

Yes. Yes. No, it's a good question. Sorry, we didn't talk about that in the presentation. So what we plan on doing with MGID? So we -- going back to the -- when we were screening patients for ENIGMA, we did not expect to find mast cell-only patients at all. So that was a complete surprise. So we reacted in real time and just put those patients on the PRO that we developed for EG. So that's why those patients were on that.

What we're doing in the -- what we'll do for MGID is we have a whole program to characterize these patients. So what I mean by that is in the prevalence study, as we find patients that have mast cell gastritis only -- so patients have to be symptomatic at the same threshold that we use for ENIGMA. They have to be symptomatic over a minimum of a 2-week period, and then they get biopsied. If they're found to have MGID, one, that will be information to determine prevalence, but then secondarily, those patients will go into a PRO development study, where we do all the things you need to do to develop a PRO for a given indication. So it's the same thing we did with the PRO for EGIDs. So you look -- you do concept elicitation. Once you identify the symptoms and hit saturation, you then run a longitudinal study. And what you're looking for there is to make sure that your inter and intra symptom variability is tight so you can actually run a study and see a difference between treated and untreated groups. So all that work will -- is ongoing now.

In addition to that, we will also run a study where we biopsy healthy volunteers to establish a true normal mast cell count. And so taking all those different efforts together, the prevalence, the data from the MGID study, the healthy volunteer study and the PRO development work, we should have our arms around characterizing MGID, have a really good handle on that. And then that would be what we would take to the FDA to present it to them. So maybe it's a long answer to -- I don't know exactly what the MGID PRO will look like, but I suspect it will look very much like the EGIDs. So I just wanted to make sure you had all the detail on that.

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

Okay. Then on the Phase II/III EoE study, just with regard to enrollment and inclusion, exclusion criteria, you guys did talk about the eosinophil count and so forth as an entry criteria. But could you maybe, I guess, at this point, give us any more little granularity as to -- is there a subpopulation of EoEs or premedications or prior medications or prior lines of treatment or anything that you're going to allow or either allow in or exclude as we think about how you're going to -- what type of patients you're going to enroll?

**Robert Alexander**
*CEO & Director*

So for the EG study, it's the same criteria we use for ENIGMA on -- so in that case, for example, if a patient is on 10 mgs or less of steroids and they have been stable on that dose and don't alter that dose in the study and are symptomatic and/or biopsy-confirmed to have disease, then they're allowed in the study.

In EoE, we do not allow orally adjusted steroids because it would confound the results in the esophagus. And so I'm looking at Adam. Do we have any other key inclusion/exclusion for EoE? Yes. And then, of course, in both populations, you have to have to have failed standard therapy or have to be medically contraindicated to have taken it, kind of the standard stuff that you do when you do the biologic studies.

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

Got it. And then just in terms of baselines for things like the DSQ, is there -- do you have a sense as to what, I guess, the literature for this population establishes just on dysphagia in particular? And just how we should think about -- what would sort of the patient characteristics look like there? And that's my last question.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Robert Alexander**
*CEO & Director*

Yes. In DSQ, I think if you look in the literature, I believe the average is around 30. And I believe the total score is, I think, 80 -- 84, is that the number? Yes, 84. Sorry, did I -- I don't know if I heard the last part. Did that answer the question, Paul? Or did I miss the back half of it?

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

Yes. No, that is the question.

**Operator**

Our next question comes from Sam Slutsky with LifeSci Capital.

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

Just in terms of the EGID prevalence study, depending on the findings, curious on how you might use this for future studies. Like, for example, if you find a bunch of EG patients misdiagnosed with IBS, would you enroll them into the Phase III potentially? And I think if you have MGID and things like IBS, functional dyspepsia, how might you use that data?

**Robert Alexander**
*CEO & Director*

Yes. So the prevalence study, which you may hear us also call 019 as the numeric designation, as we said, that study started in January, and up until just a few days ago was enrolling incredibly well. Certainly, patients that -- what we have embedded in that protocol is patients that we find that have an EGID get referred to the EGID study. So that's a place where you will get EGID patients coming in. And then as I mentioned a few minutes ago, on the MGID side, those patients will go into a PRO development work, where we characterize the symptoms that those patients suffer from per the FDA guidance for PRO development. So we'll use those patients to develop that data set.

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

Okay. Got it. And then in terms of enrollment in the Phase III studies, I guess, what would you want to see from the COVID standpoint to make the go decision to activate sites in terms of enrollment? And then would it be state-specific or more nationally?

**Robert Alexander**
*CEO & Director*

Yes. I mean it's a good question. I mean in terms of maybe some more color on this, I mean there are sites that have said that they are shut down now because of COVID-19. But we also have sites that are up and ready to enroll patients. And so we had to make the call to not include those -- to not allow those patients to enroll because I think the situation is just -- it's too fluid right now. And we don't know what next week is going to bring.

So I think what's embedded in your question, I do think it's going to be kind of a state-by-state or perhaps a site-by-site situation. And I think we'll have to feel comfortable that the general trend in the country is moving towards relaxing some of the social distancing and the shutdown that's going on and making sure that hospitals are back on their feet. And we don't want to occupy any surgical suites or anything like that where we're doing these endoscopies for people that might have a more emergent need for it. So we just need to have our arms around that type of thing and feel generally good about us having the virus under control to the extent that it makes us and health care providers comfortable. And I think once we get there, we'll start to enroll patients. And I suspect that likely will be on a geographical, regional, case-by-case basis.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Operator**

Thank you, ladies and gentlemen. That's all the time we have for questions. I'll now turn it back to management for closing remarks. Thank you.

**Robert Alexander**
*CEO & Director*

So yes, I don't have any other comments specifically. Really appreciate everybody dialing in. If you have any further questions, we're more than happy to talk, so please reach out to us. All right? Thanks a lot. Bye-bye.

**Operator**

That concludes today's call. All parties may disconnect. Have a good day.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.

# Exhibit J

PRESS RELEASE



**Allakos Announces Positive Interim Results from an Open-Label Extension Study of Antolimab (AK002) in Patients with Eosinophilic Gastritis and/or Eosinophilic Duodenitis**

*-- Antolimab treatment provided durable symptom improvement and blood and tissue eosinophil depletion --*

*-- Symptomatic benefit increased with duration of antolimab treatment --*

REDWOOD CITY, Calif., May 4, 2020 (GLOBE NEWSWIRE) -- Allakos Inc. (the "Company") (Nasdaq: ALLK), a biotechnology company developing antolimab (AK002) for the treatment of eosinophil and mast cell-related diseases, today reported results from a long-term open-label extension (OLE) study of antolimab for the treatment of patients with eosinophilic gastritis (EG) and/or eosinophilic duodenitis (EoD). The results were accepted for oral presentation and presented virtually at the Digestive Disease Week (DDW) Annual Meeting. The Company previously announced the initiation of a Phase 3 study in EG and/or EoD and initiation of a Phase 2/3 study in eosinophilic esophagitis.

**Phase 2 ENIGMA and Open-Label Extension Study Design**
ENIGMA was a multi-center, randomized, double-blind, placebo-controlled Phase 2 study that enrolled symptomatic patients with biopsy-confirmed eosinophilia of the stomach (≥30 eosinophils/HPF in 5 HPFs) and/or duodenum (≥30 eosinophils/HPF in 3 HPFs). Total symptom score (TSS) was measured daily using a patient reported questionnaire that scored symptoms on a scale from 0 to 10 (abdominal pain, nausea, vomiting, early satiety, loss of appetite, abdominal cramping, bloating, and diarrhea). Patients treated with antolimab showed statistically significant reductions in tissue eosinophil counts and improvements in patient reported symptoms. Patients who completed the Phase 2 ENIGMA study were eligible to enroll in the OLE study and received monthly doses of antolimab. In the OLE study, symptoms were assessed daily and tissue eosinophil levels were assessed on days 323 and 659. The goal of the OLE study was to examine the long-term use of 3.0 mg/kg antolimab for treatment of EG and/or EoD.

**Open-Label Extension (OLE) Interim Results**
Fifty-eight of 59 eligible ENIGMA patients elected to enter the long-term extension study. As of April 28, 2020, 35 patients completed at least 52 weeks of antolimab treatment, 12 patients discontinued prior to reaching 52 weeks of treatment, and 11 patients are active and have less than 52 weeks of treatment. Patients treated with antolimab experienced sustained eosinophil depletion in blood and tissue. Blood eosinophil levels rapidly decreased and remained suppressed (Figure 1). Histologic remission was achieved in 94% of patients (45/48). Disease symptoms improved over time with patients reaching 68% mean decrease in TSS at weeks 51-52 (Figure 2).

PRESS RELEASE

**Figure 1. Blood Eosinophils Levels Over Time from ENIGMA Baseline**



**Figure 2. Change in TSS Over Time**



**OLE Treatment Responses**

| Endpoint | Response |
| --- | --- |
| % of Patients with Histologic Remission[1] | 94% (45/48) |
| % Change in TSS at Weeks 51-52[2] | -68% |
| % of Patients with ≥50% Improvement in TSS Weeks 51-52 | 70% |
| % of Patients with ≥70% Improvement in TSS Weeks 51-52 | 57% |
| % of Patients with ≥90% Improvement in TSS Weeks 51-52 | 30% |

[1] *Biopsies were collected on day 323 from entering ENIGMA. Histologic remission was defined as eosinophil counts of ≤4 eosinophil/hpf in the stomach and/or ≤15 eosinophils/hpf in the duodenum*

[2] *TSS was measured daily and is comprised of all 8 patient-reported symptoms each measured on a scale from 0 to 10 (abdominal pain, nausea, vomiting, early satiety, loss of appetite, abdominal cramping, bloating, and diarrhea)*

PRESS RELEASE



Antolimab was generally well tolerated in the OLE study. The most common adverse event was infusion-related reactions (including flushing, feeling of warmth, headache, nausea, and/or dizziness) which occurred mostly on the first infusion. No infusion-related reactions occurred in patients who received a single dose of oral prednisone the day prior to first infusion. There were no drug-related serious adverse events in the OLE.

Access to accepted abstracts, ePosters and ePapers is available from the DDW website. In addition, abstracts will publish in the May 2020 online supplement to the American Gastroenterological Society's journal - Gastroenterology. The posters and slides from multiple presentations made by the Company and its collaborators will also be made available on the Allakos website following each presentation.

**About Eosinophilic Gastritis, Eosinophilic Duodenitis, and Eosinophilic Esophagitis**
Eosinophilic gastritis, eosinophilic duodenitis (previously referred to as eosinophilic gastroenteritis), and eosinophilic esophagitis are severe inflammatory orphan diseases characterized by the presence of high levels of eosinophils in the stomach, duodenum, or esophagus, respectively. Common symptoms of the diseases include severe abdominal pain, nausea, diarrhea, bloating, cramping, early satiety, loss of appetite, vomiting, dysphagia, and weight loss. The current estimated prevalence of eosinophilic gastritis and eosinophilic duodenitis in the United States is approximately 50,000 people. The estimated prevalence of eosinophilic esophagitis in the United States is approximately 150,000 people. There are no treatments approved specifically for these diseases. Treatment with systemic steroids can provide symptomatic improvement, but long-term treatment with steroids is generally not possible due to the numerous side effects. Allakos has received orphan drug designation for antolimab in eosinophilic gastritis, eosinophilic gastroenteritis, and eosinophilic esophagitis.

**About Allakos**

Allakos is a clinical stage biotechnology company developing antibodies that target immunomodulatory receptors present on immune effector cells involved in allergic, inflammatory, and proliferative diseases. The Company's lead antibody, antolimab (AK002), targets Siglec-8, an inhibitory receptor selectively expressed on human mast cells and eosinophils. Antolimab has been shown to inhibit mast cells and deplete eosinophils. Inappropriately activated eosinophils and mast cells have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. Antolimab has been tested in multiple clinical studies. In these studies, antolimab eliminated blood and tissue eosinophils, inhibited mast cells and improved disease symptoms in patients with eosinophilic gastritis and/or eosinophilic duodenitis, eosinophilic esophagitis, mast cell gastrointestinal disease, severe allergic conjunctivitis, chronic urticaria, and indolent systemic mastocytosis. For more information, please visit the Company's website at www.allakos.com.

**Forward-Looking Statements**
This press release contains forward-looking statements within the meaning of The Private Securities Litigation Reform Act of 1995 as contained in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Such forward-looking statements include, but are not limited to, Allakos' progress and business plans and plans relating to its future clinical trials. Such statements are subject to numerous important factors, risks and uncertainties that may cause actual events or results to differ materially from current expectations and beliefs, including but not limited to: Allakos' early stages of

PRESS RELEASE



clinical drug development; Allakos' ability to timely complete clinical trials for, and if approved, commercialize antolimab (AK002), its lead compound; Allakos' ability to obtain required regulatory approvals and appropriate labelling for its product candidates; uncertainties related to the enrollment of patients in its clinical trials; Allakos' ability to demonstrate sufficient safety and efficacy of its product candidates in its clinical trials; uncertainties related to the success of later-stage clinical trials, regardless of the outcomes of preclinical testing and early-stage trials; market acceptance of Allakos' product candidates; uncertainties related to the projections of the size of patient populations suffering from the diseases Allakos is targeting; Allakos' ability to advance additional product candidates beyond antolimab (AK002); Allakos' ability to obtain additional capital to finance its operations; and other important risk factors set forth in Allakos' most recent Annual Report on Form 10-K filed with the SEC on February 25, 2020, and future reports to be filed with the SEC. These documents contain and identify important factors that could cause the actual results for Allakos to differ materially from those contained in Allakos' forward-looking statements. Any forward-looking statements contained in this press release speak only as of the date hereof, and Allakos specifically disclaims any obligation to update any forward-looking statement, except as required by law. These forward-looking statements should not be relied upon as representing Allakos' views as of any date subsequent to the date of this press release.

###

Source: Allakos Inc.

**Investor Contact:**                                      **Media Contact:**
Adam Tomasi, President & COO                       Denise Powell
investors@allakos.com                                      denise@redhousecomms.com

4

Exhibit K

# Investors



## Press Release

### Allakos Initiates Patient Recruitment for AK002 Registrational Studies

June 3, 2020 at 8:01 AM EDT

*-- Phase 3 study in eosinophilic gastritis and/or eosinophilic duodenitis and Phase 2/3 study in eosinophilic esophagitis --*

*-- Top-line safety and efficacy results from both studies expected in the second half of 2021 --*

REDWOOD CITY, Calif., June 03, 2020 (GLOBE NEWSWIRE) -- Allakos Inc. (Nasdaq: ALLK), a biotechnology company developing antolimab (AK002) for the treatment of eosinophil and mast cell related diseases, today announced that it is recruiting patients for two previously announced registrational clinical studies of AK002; a Phase 3 study in eosinophilic gastritis (EG) and/or eosinophilic duodenitis (EoD) and a Phase 2/3 study in eosinophilic esophagitis (EoE). Top-line safety and efficacy results from both studies are expected in the second half of 2021. The Phase 3 EG and/or EoD study and the Phase 2/3 EoE study follow positive results from ENIGMA, the Company's multicenter, randomized, double-blind, placebo-controlled Phase 2 study in patients with EG and/or EoD.

### Phase 3 Eosinophilic Gastritis (EG) and/or Eosinophilic Duodenitis (EoD) Study Design

The multicenter, randomized, double-blind, placebo-controlled Phase 3 study will enroll approximately 160 patients with active, biopsy-confirmed EG (eosinophil count of ≥30 eosinophils in 5 high powered fields [hpfs] in the stomach) and/or EoD (eosinophil count of ≥30 eosinophils in 3 hpfs in duodenum). Patients will be randomized 1:1 to receive: (a) 1.0 mg/kg of antolimab for the first month followed by five doses of 3.0 mg/kg given monthly, or (b) monthly placebo. The co-primary endpoints of the study are: 1) the proportion of patients achieving ≤ 4 eosinophils in 5 hpfs in the stomach and/or ≤15 eosinophils in 3 hpfs in the duodenum and 2) absolute change in Total Symptom Score (TSS-6: abdominal pain, nausea, bloating, early satiety, abdominal cramping, loss of appetite) measured using the daily patient reported symptom questionnaire used in ENIGMA. The TSS-6 comprises the six most frequent and severe symptoms reported in ENIGMA.

### Phase 2/3 Eosinophilic Esophagitis (EoE) Study Design

The multicenter, randomized, double-blind, placebo-controlled Phase 2/3 study will enroll approximately 300 patients with active, biopsy-confirmed EoE (eosinophil count of ≥15 eosinophils in a single hpf). Patients will be randomized 1:1:1 to receive: (a) six antolimab doses of 1.0 mg/kg given monthly, (b) 1.0 mg/kg of antolimab for the first month followed by five doses of 3.0 mg/kg given monthly, or (c) monthly placebo. The co-primary endpoints of the study are: (1) the proportion of patients achieving ≤6 eosinophils in a single hpf and (2) absolute change in dysphagia symptoms measured using a daily patient reported symptom questionnaire known as the Dysphagia Symptom Questionnaire (DSQ).

### About Eosinophilic Gastritis, Eosinophilic Duodenitis, and Eosinophilic Esophagitis

Eosinophilic gastritis, eosinophilic duodenitis (previously referred to as eosinophilic gastroenteritis), and eosinophilic esophagitis are severe inflammatory orphan diseases characterized by the presence of high levels of eosinophils in the stomach, duodenum, or esophagus, respectively. Common symptoms of the diseases include severe abdominal pain, nausea, diarrhea, bloating, cramping, early satiety, loss of appetite, vomiting, dysphagia, and weight loss. The current estimated prevalence of eosinophilic gastritis and eosinophilic duodenitis in the United States is approximately 50,000 people. The estimated prevalence of eosinophilic esophagitis in the United States is approximately 150,000 people. The Company believes that

these diseases may be significantly under-diagnosed, or misdiagnosed, as other gastrointestinal diseases. There are no treatments approved specifically for these diseases. Treatment with systemic steroids can provide symptomatic improvement, but long-term treatment with steroids is generally not possible due to the numerous side effects. Allakos has received orphan drug designation for antolimab in eosinophilic gastritis, eosinophilic gastroenteritis, and eosinophilic esophagitis.

### About Allakos

Allakos is a late-stage biotechnology company developing antibodies that target immunomodulatory receptors present on immune effector cells involved in allergic, inflammatory, and proliferative diseases. The Company's lead antibody, antolimab (AK002), is being evaluated in a Phase 3 study in eosinophilic gastritis (EG) and/or eosinophilic duodenitis (EoD) and a Phase 2/3 study in eosinophilic esophagitis (EoE). Antolimab targets Siglec-8, an inhibitory receptor selectively expressed on human mast cells and eosinophils. Inappropriately activated eosinophils and mast cells have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. Antolimab has been tested in multiple clinical studies, in which antolimab eliminated blood and tissue eosinophils, inhibited mast cells and improved disease symptoms in patients with eosinophilic gastritis and/or eosinophilic duodenitis, eosinophilic esophagitis, mast cell gastrointestinal disease, severe allergic conjunctivitis, chronic urticaria and indolent systemic mastocytosis. For more information, please visit the Company's website at www.allakos.com (https://www.globenewswire.com/Tracker?data=nFFJlEVTlj1kkPvND4WgWOhsaEIvLi-6Lep7akTAEj7zVZVsdiSBxya0EfULnLLplyVkR98KCrfCLJrAv6Q3ew==).

### Forward-Looking Statements

This press release contains forward-looking statements within the meaning of The Private Securities Litigation Reform Act of 1995 as contained in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Such forward-looking statements include, but are not limited to, Allakos' progress and business plans. Such statements are subject to numerous important factors, risks and uncertainties that may cause actual events or results to differ materially from current expectations and beliefs, including but not limited to: Allakos' stages of clinical drug development; Allakos' ability to timely complete clinical trials for, and if approved, commercialize antolimab (AK002), its lead compound; Allakos' ability to obtain required regulatory approvals for its product candidates; uncertainties related to the enrollment of patients in its clinical trials; Allakos' ability to demonstrate sufficient safety and efficacy of its product candidates in its clinical trials; uncertainties related to the success of later-stage clinical trials, regardless of the outcomes of preclinical testing and early-stage trials; market acceptance of Allakos' product candidates; uncertainties related to the projections of the size of patient populations suffering from the diseases Allakos is targeting; Allakos' ability to advance additional product candidates beyond antolimab (AK002); Allakos' ability to obtain additional capital to finance its operations; and other important risk factors set forth in Allakos' most recent Annual Report on Form 10-K filed with the SEC on February 25, 2020, Quarterly Report on Form 10-Q filed with the SEC on May 11, 2020 and future reports to be filed with the SEC. These documents contain and identify important factors that could cause the actual results for Allakos to differ materially from those contained in Allakos' forward-looking statements. Any forward-looking statements contained in this press release speak only as of the date hereof, and Allakos specifically disclaims any obligation to update any forward-looking statement, except as required by law. These forward-looking statements should not be relied upon as representing Allakos' views as of any date subsequent to the date of this press release.

Source: Allakos Inc.

```
Investor Contact:
Adam Tomasi, President and COO
ir@allakos.com (mailto:ir@allakos.com)
```

Media Contact:

Denise Powell denise@redhousecomms.com (mailto:denise@redhousecomms.com)

Allakos (https://www.globenewswire.com/NewsRoom/AttachmentNg/58aeb59e-2de0-4f25-a39b-cd7e644f9fc1)

Source: Allakos Inc.

# Exhibit L

# Investors



## Press Release

Allakos Announces Publication of Results from the Phase 2 Study of Lirentelimab (AK002) in Patients with Eosinophilic Gastritis and/or Eosinophilic Duodenitis (ENIGMA) in the New England Journal of Medicine

October 21, 2020 at 5:00 PM EDT

REDWOOD CITY, Calif., Oct. 21, 2020 (GLOBE NEWSWIRE) -- Allakos Inc. (Nasdaq: ALLK), a biotechnology company developing lirentelimab (AK002) for the treatment of eosinophil and mast cell-related diseases, today announced the publication of results from the multicenter, randomized, double-blind, placebo-controlled Phase 2 study of lirentelimab (AK002) in patients with eosinophilic gastritis and/or eosinophilic duodenitis (ENIGMA) in the *New England Journal of Medicine* (NEJM). All AK002 dose arms showed clinically meaningful and statistically significant benefits compared to placebo on all prespecified primary and secondary endpoints, including gastrointestinal tissue eosinophil counts and patient-reported disease symptoms. Previously announced, top-line data from the study are available here (https://www.globenewswire.com/Tracker?
data=gMXtdr8QO6WeZbQ6KldfPJlsDRRTv0rphnCRxA6GpwTYjFn9Uk6ZNYRNuIxtv1SM4P40tpQsly5CoSer771EfnxSsEiNx1UwDbAwhqFzzN13JpSGKXm_bcVrsKdfwSbR8g4L
70fwdBgHFk7R92sydQ0b-O1MVwd0plZPVVH8LUv9w-E09LPx2IM3OE6y2bHsRd2Tg==). The peer-reviewed article, "Anti-Siglec-8 Antibody for Eosinophilic Gastritis and Duodenitis", will also appear in the journal's print issue.

### About Eosinophilic Gastritis, Eosinophilic Duodenitis, and Eosinophilic Esophagitis

Eosinophilic gastritis, eosinophilic duodenitis (previously referred to as eosinophilic gastroenteritis), and eosinophilic esophagitis are severe inflammatory orphan diseases characterized by the presence of high levels of eosinophils in the stomach, duodenum, or esophagus, respectively. Common symptoms of the diseases include severe abdominal pain, nausea, diarrhea, bloating, cramping, early satiety, loss of appetite, vomiting, dysphagia, and weight loss. The current estimated prevalence of eosinophilic gastritis and eosinophilic duodenitis in the United States is approximately 50,000 people. The estimated prevalence of eosinophilic esophagitis in the United States is approximately 150,000 people. The Company believes that these diseases may be significantly under-diagnosed, or misdiagnosed, as other gastrointestinal diseases. There are no treatments approved specifically for these diseases. Treatment with systemic steroids can provide symptomatic improvement, but long-term treatment with steroids is generally not possible due to the numerous side effects. Allakos has received orphan drug designation for lirentelimab in eosinophilic gastritis, eosinophilic gastroenteritis, and eosinophilic esophagitis.

### About Allakos

Allakos is a clinical-stage biotechnology company developing antibodies that target immunomodulatory receptors present on immune effector cells involved in allergic, inflammatory, and proliferative diseases. The Company's lead antibody, lirentelimab (AK002), is being evaluated in a Phase 3 study in eosinophilic gastritis (EG) and/or eosinophilic duodenitis (EoD) and a Phase 2/3 study in eosinophilic esophagitis (EoE). Lirentelimab targets Siglec-8, an inhibitory receptor selectively expressed on human mast cells and eosinophils. Inappropriately activated eosinophils and mast cells have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. Lirentelimab has been tested in multiple clinical studies, in which lirentelimab eliminated blood and tissue eosinophils, inhibited mast cells and improved disease symptoms in patients with EG and/or EoD, EoE, mast cell gastrointestinal disease, severe allergic conjunctivitis, chronic urticaria and indolent systemic mastocytosis. For more information, please visit the Company's website at www.allakos.com (https://www.globenewswire.com/Tracker?data=KdqB24FsK5vgPd4mDmawfes0DYaxidAzIEFVLwbUBA1n5YpyOtF_ie4On7lhLKV2_HaW46EzOaVYaogQ8vaiPw==).

### Forward-Looking Statements

This press release contains forward-looking statements within the meaning of The Private Securities Litigation Reform Act of 1995 as contained in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Such forward-looking statements include, but are not limited to, Allakos' progress and business plans. Such statements are subject to numerous important factors, risks and uncertainties that may cause actual events or results to differ materially from current expectations and beliefs, including but not limited to: Allakos' early stages of clinical drug development; Allakos' ability to timely complete clinical trials for, and if approved, commercialize lirentelimab, its lead compound; Allakos' ability to obtain required regulatory approvals for its product candidates; uncertainties related to the enrollment of patients in its clinical trials; Allakos' ability to demonstrate sufficient safety and efficacy of its product candidates in its clinical trials; uncertainties related to the success of later-stage clinical trials, regardless of the outcomes of preclinical testing and early-stage trials; market acceptance of Allakos' product candidates; uncertainties related to the projections of the size of patient populations suffering from the diseases Allakos is targeting; Allakos' ability to advance additional product candidates beyond lirentelimab; Allakos' ability to obtain additional capital to finance its operations; and other important risk factors set forth in Allakos' most recent Annual Report on Form 10-K filed with the SEC on February 25, 2020, Quarterly Report on Form 10-Q filed with the SEC on August 10, 2020 and future reports to be filed with the SEC. These documents contain and identify important factors that could cause the actual results for Allakos to differ materially from those contained in Allakos' forward-looking statements. Any forward-looking statements contained in this press release speak only as of the date hereof, and Allakos specifically disclaims any obligation to update any forward-looking statement, except as required by law. These forward-looking statements should not be relied upon as representing Allakos' views as of any date subsequent to the date of this press release.

Source: Allakos Inc.

```
Investor Contact:
Adam Tomasi, President and COO
ir@allakos.com (mailto:ir@allakos.com)

Media Contact:
Denise Powell denise@redhousecomms.com (mailto:denise@redhousecomms.com)
```

Allakos (https://www.globenewswire.com/NewsRoom/AttachmentNg/58aeb59e-2de0-4f25-a39b-cd7e644f9fc1)

Source: Allakos Inc.

# Exhibit M

*The* NEW ENGLAND JOURNAL *of* MEDICINE

> ORIGINAL ARTICLE

# Anti–Siglec-8 Antibody for Eosinophilic Gastritis and Duodenitis

Evan S. Dellon, M.D., M.P.H., Kathryn A. Peterson, M.D., Joseph A. Murray, M.D., Gary W. Falk, M.D., Nirmala Gonsalves, M.D., Mirna Chehade, M.D., M.P.H., Robert M. Genta, M.D., John Leung, M.D., Paneez Khoury, M.D., Amy D. Klion, M.D., Sabine Hazan, M.D., Michael Vaezi, M.D., Adam C. Bledsoe, M.D., Sandy R. Durrani, M.D., Chao Wang, Ph.D., Camilla Shaw, B.S.N., R.N., Alan T. Chang, B.S., Bhupinder Singh, M.D., Amol P. Kamboj, M.D., Henrik S. Rasmussen, M.D., Ph.D., Marc E. Rothenberg, M.D., Ph.D., and Ikuo Hirano, M.D.

## ABSTRACT

### BACKGROUND

Eosinophilic gastritis and duodenitis are characterized by gastrointestinal mucosal eosinophilia, chronic symptoms, impaired quality of life, and a lack of adequate treatments. Mast-cell activity may contribute to the pathogenesis of the conditions. AK002 (lirentelimab) is an anti–Siglec-8 antibody that depletes eosinophils and inhibits mast cells and that has shown potential in animal models as a treatment for eosinophilic gastritis and duodenitis.

### METHODS

In this phase 2 trial, we randomly assigned adults who had symptomatic eosinophilic gastritis, eosinophilic duodenitis, or both conditions in a 1:1:1 ratio to receive four monthly infusions of low-dose AK002, high-dose AK002, or placebo. The primary end point was the change in gastrointestinal eosinophil count from baseline to 2 weeks after the final dose; to maximize statistical power, we evaluated this end point in the placebo group as compared with the combined AK002 group. Secondary end points were treatment response (>30% reduction in total symptom score and >75% reduction in gastrointestinal eosinophil count) and the change in total symptom score.

### RESULTS

Of the 65 patients who underwent randomization, 43 were assigned to receive AK002 and 22 were assigned to receive placebo. The mean percentage change in gastrointestinal eosinophil count was −86% in the combined AK002 group, as compared with 9% in the placebo group (least-squares mean difference, −98 percentage points; 95% confidence interval [CI], −121 to −76; P<0.001). Treatment response occurred in 63% of the patients who received AK002 and in 5% of the patients who received placebo (difference, 58 percentage points; 95% CI, 36 to 74; P<0.001). The mean change in total symptom score was −48% with AK002 and −22% with placebo (least-squares mean difference, −26 percentage points; 95% CI, −44 to −9; P=0.004). Adverse events associated with AK002 were similar to those with placebo, with the exception of higher percentages of patients having mild-to-moderate infusion-related reactions with AK002 (60% in the combined AK002 group and 23% in the placebo group).

### CONCLUSIONS

In patients with eosinophilic gastritis or duodenitis, AK002 reduced gastrointestinal eosinophils and symptoms. Infusion-related reactions were more common with AK002 than with placebo. (Funded by Allakos; ENIGMA ClinicalTrials.gov number, NCT03496571.)

From the University of North Carolina, Chapel Hill (E.S.D.); the University of Utah, Salt Lake City (K.A.P.); Mayo Clinic Rochester, Rochester, MN (J.A.M., A.C.B.); the University of Pennsylvania Perelman School of Medicine, Philadelphia (G.W.F.); Northwestern University, Chicago (N.G., I.H.); the Icahn School of Medicine at Mount Sinai, New York (M.C.); Baylor College of Medicine, Houston (R.M.G.); Tufts University, Boston (J.L.); the National Institute of Allergy and Infectious Diseases, National Institutes of Health, Bethesda, MD (P.K., A.D.K.); Ventura Clinical Trials, Ventura (S.H.), and Allakos, Redwood City (C.S., A.T.C., B.S., A.P.K., H.S.R.) — both in California; Vanderbilt University, Nashville (M.V.); the Division of Allergy and Immunology, Cincinnati Children's Hospital, University of Cincinnati College of Medicine, Cincinnati (S.R.D., M.E.R.); and Pharma Data Associates, Piscataway, NJ (C.W.). Address reprint requests to Dr. Dellon at CB #7080, Bioinformatics Bldg., 130 Mason Farm Rd., Chapel Hill, NC 27599-7080, or at edellon@med.unc.edu.

N Engl J Med 2020;383:1624-34.
DOI: 10.1056/NEJMoa2012047
*Copyright © 2020 Massachusetts Medical Society.*

The New England Journal of Medicine
Downloaded from nejm.org by Regina Wang on November 23, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

Exhibit N

# Guidance for Industry

## Patient-Reported Outcome Measures: Use in Medical Product Development to Support Labeling Claims

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**
**Center for Devices and Radiological Health (CDRH)**

**December 2009**
**Clinical/Medical**

# Guidance for Industry

## Patient-Reported Outcome Measures: Use in Medical Product Development to Support Labeling Claims

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 51, rm. 2201*
*Silver Spring, MD 20993-0002*
*Tel: 301-796-3400; Fax: 301-847-8714; E-mail: druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

*or*

*Office of Communication, Outreach, and Development, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Suite 200N, Rockville, MD 20852-1448*
*Tel: 800-835-4709 or 301-827-1800; E-mail: ocod@fda.hhs.gov*
*http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/default.htm*

*or*

*Office of Communication, Education, and Radiation Programs*
*Division of Small Manufacturers, International, and Consumer Assistance, HFZ-220*
*Center for Devices and Radiological Health*
*Food and Drug Administration*
*1350 Piccard Drive, Rockville, MD 20850-4307*
*DSMICA E-mail: dsmica@cdrh.fda.gov*
*DSMICA Fax: 301-443-8818*
*(Tel) Manufacturers Assistance: 800-638-2041 or 301-443-6597*
*(Tel) International Staff: 301-827-3993*
*http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**
**Center for Devices and Radiological Health (CDRH)**

**December 2009**
**Clinical/Medical**

*Contains Nonbinding Recommendations*

### 3. Culture or Language Subgroups

Because many development programs are multinational, application of PRO instruments to multiple cultures or languages is common in clinical trials. Regardless of whether the instrument was developed concurrently in multiple cultures or languages or whether a fully developed instrument was adapted or translated to new cultures or languages, we recommend that sponsors provide evidence that the content validity and other measurement properties are adequately similar between all versions used in the clinical trial. We will review the process used to translate and culturally adapt the instrument for populations that will use them in the trial.

## IV.   CLINICAL TRIAL DESIGN

The same clinical trial design principles that apply to other endpoint measures also apply to PROs. Therefore, this section is not a comprehensive overview of those principles but rather focuses primarily on issues unique to PRO endpoints.

### A.   General Protocol Considerations

If the PRO measurement goal is to support labeling claims, PRO concept measurement should be stated as a specific clinical trial objective or hypothesis. It is important that the case report form in the protocol include the exact format and version of the specific PRO instrument to be administered. If an electronic version of the instrument will be used, the protocol can include screen shots or other similar instrument representations. In the process of considering the new drug application (NDA)/biologics license application (BLA)/medical device premarket approval (PMA) or NDA/BLA/PMA supplement, we intend to compare both the planned and actual PRO instrument used and its analysis.

### 1. Blinding and Randomization

Open-label clinical trials, where patients and investigators are aware of assigned therapy, are rarely adequate to support labeling claims based on PRO instruments. Patients who know they are in an active treatment group may overestimate benefit whereas patients who know they are not receiving active treatment may underreport any improvement actually experienced. For the same reasons, to prevent influencing patient perceptions, PRO instruments administered during a clinic visit should be administered before other clinical assessments or procedures.

In blinded clinical trials, patients should be blinded to treatment assignment throughout the trial. If the treatment has obvious effects, such as adverse events, the clinical trial may be at risk for unintentional unblinding. In these situations, sponsors can use PRO instrument administration techniques that may minimize the effects of possible unblinding, such as using response options that ask for current status, not giving patients access to previous responses, and using instruments that include many items about the same concept.

Suspicion of inadvertent unblinding can be a problematic review consideration for the FDA when assessing PRO endpoints. Therefore, when PRO instruments are included in a clinical

22

# Exhibit O

**S&P Global**
Market Intelligence

# Allakos Inc. NasdaqGS:ALLK

# Special Call

## Monday, August 05, 2019 1:00 PM GMT

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................... | 3 |
| Presentation | ................................................................... | 4 |
| Question and Answer | ................................................................... | 12 |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

## EXECUTIVES

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

**Robert Alexander**
*CEO & Director*

## ANALYSTS

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

**Terence C. Flynn**
*Goldman Sachs Group Inc., Research Division*

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

## ATTENDEES

**Evan Dellon; UNC Chapel Hill**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Greetings. Welcome to Allakos Corporate Update Call. [Operator Instructions] As a reminder, this conference is being recorded.

I will now turn the conference over to Mr. Robert Alexander, CEO. Mr. Alexander, you may now begin your presentation.

**Robert Alexander**
*CEO & Director*

All right. Thank you. I'd like to thank everybody for joining the call. We're obviously very excited about the data we released this morning and we'll get to it momentarily.

I want to remind everybody that we will be making forward-looking statements. So please refer to our SEC filings for a discussion of our risk factors.

Today in the room with me, I'm joined by Dr. Adam Tomasi, our President and COO; Dr. Henrik Rasmussen, our Chief Medical Officer, and we're fortunate to have one of our principal investigators and key opinion leaders in the field of EGIDs, Dr. Evan Dellon, who is at the University of North Carolina Chapel Hill. And he'll be joining us to give his perspective on the data a bit later.

In terms of the agenda today, I will be going over an overview of the data as well as an overview of the company, putting all this in the context for everybody. Henrik will then jump in and go into some detail on the data. And as I just mentioned, Evan will also give his perspective. And then we'll go to Q&A.

Right. I'm now on Slide 5 for those that are following along. As I mentioned, we're extremely excited about the data. The AK002 met all pre-specified primary and secondary endpoints in our study. And those are in patients with gastritis, gastroenteritis as well as concomitant EoE. In terms of our primary and 2 key secondary endpoints, we saw a tremendous effect on all of them. And a reminder, this was a randomized, double-blind, placebo-controlled study.

As far as our primary endpoint goes, we saw a 95% reduction in tissue eosinophils, that's versus a 10% increase on placebo. That p-value is less than 0.0001. In terms of our responder analysis, we had a 69% response rate on active versus a 5% response rate on placebo. That p-value was equal to 0.0008.

And our second secondary, the Total Symptom Score, so this is where we assessed the effect of the drug on all 8 symptoms that comprise our PRO. We saw a 53% decrease on active versus a 24% decrease on placebo, and that p-value is equal to 0.0012.

In addition to the data that we collected on eosinophilic gastritis and gastroenteritis, as I mentioned, we also had a number of patients that had concomitant EoE. I believe the number ended up being somewhere between 35% and 40% of those patients. So we took advantage of that and looked at the effect of our drug on tissue eosinophilia in the esophagus as well as the effect on the key symptom of EoE, which is dysphasia. And we had 13 out of 14 patients, or 93%, had tissue eos of less than 5 per high-powered field. In terms of the symptomatic improvement, we saw a 53% decrease in dysphasia versus a 17% on placebo.

So again, across the board, we had overwhelmingly positive data in this study. And as I mentioned, Henrik will go into detail on this in a few minutes.

All right. Next slide, this is Slide 6. Again, just to level-set everybody about what we're doing. We are targeting 2 types of cells in the immune system, the mast cell and the eosinophil. As a reminder, these cells are found at the internal/external interface of the body. So in particular, you see them in tissues around blood vessels and in close association with peripheral nerves. They produce a broad range of inflammatory mediators. So think about things like vasoactive amines like histamine; lipid

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

mediators like leukotrienes, prostaglandins. They also produce many different types of proteases, cytokines and chemokines. As a consequence of this, they can participate in both chronic -- acute and chronic inflammation and they link the adaptive and the innate immune system. And because of all these things, they are key drivers or effector cells in many different disease states. And we now have very positive data in GI diseases, ophthalmic, dermatologic, respiratory and proliferative diseases.

On to Slide 7. So the way we target mast cells in the eosinophils, it's through a receptor that's expressed on these 2 cell types called Siglec-8. Its physiologic function is to be an inhibitory receptor. And so what we're doing with our antibody AK002 is we're pharmacologically activating that inhibitory function. And the upshot of that is that we are able to deplete eosinophils and we're able to significantly inhibit mast cells.

On Slide 8, here's a cartoon of an inflammatory cascade to try to put all this in context. What you can see there in the middle of the cartoon is the mast cell. And it's one of the key effector cells in the immune system. It's able to be activated probably in more ways than any other cell in the immune system. And as a consequence, it's a pivotal cell type. Just to the right of that, you can see the eosinophil.

And what our drug does, again, is we are taking the eosinophil out of the picture by depleting it and we're inhibiting the mast cell. So if you follow along in the cartoon, we know we can inhibit IL-33 and TSLP activation in the mast cell. We can inhibit IL-4, 13 production from the mast cell, which will have an impact on T-cell, B-cell priming. In addition to that, we can inhibit IgE signaling on the mast cell. So again, the coupling of the adaptive to the innate immune response.

And the consequence of all this is that we can cause this inflammatory cascade to collapse. And the hope was that we would see significant benefits in patients that are suffering from diseases that are driven by mast cells and the eosinophils. And I think we've convincingly shown that not only with the recent data but also the data in urticaria, ISM and severe conjunctivitis.

On Slide 9, there's the list of different therapeutic areas here and disease states. If you look at the top in the 12 o'clock position, we have eosinophilic gastritis, gastroenteritis and esophagitis. And of course, that's the data we just released today. Again, that data was overwhelmingly positive and unprecedented.

We've also -- if you move to the right, in 3 different forms of chronic conjunctivitis, we showed extremely positive data there. Embedded within that study, we looked at asthma, both eosinophilic and non-eosinophilic, and had a very nice effect there. We saw similar activity in atopic dermatitis in that study as well as in rhinitis, so a really nice proof of concept there. We also have very nice data in indolent systemic mastocytosis. And we've looked at 3 different forms of chronic urticaria, spontaneous urticaria as well as cholinergic and dermatographic. And also within there, we had activity on patients that were refractory to Xolair.

So again, taken together, the data tells us that we're having the effect that we hoped for, which again, is collapsing that inflammatory cascade. In addition, there are other diseases that we're quite interested in, including ulcerative colitis, IBS and Crohn's. These are GI diseases that have a strong mechanistic rationale for us to enter into, and we're continuing to evaluate those indications.

On Slide 10, a little bit of background to help put our data in context of the overall disease state. Again, we're focused on EGIDs, which are eosinophilic GI diseases. In particular, we're looking at EG, EGE and EoE. Again, these are -- these diseases, and we've shown this data many times in the past, are driven by eosinophils and mast cells. These patients have severe symptoms. We've listed all 8 there, and again, Henrik will go through these later. Currently, there are no approved treatments for any of these diseases, and patients are left with taking steroids or going on extremely restrictive diets, which in both cases, the steroids and diet, have a severe negative impact on the quality of life of the patient.

If you look at the incidence of these diseases, gastritis and gastroenteritis are roughly 50,000 people in the U.S. That's very likely an underestimate of the population, given the -- currently the poor diagnosis rate of these diseases. And EoE is roughly 200,000 or more patients. As you look at the treatment available proportion in these populations, the overwhelming majority of patients with EG and EGE would require treatment with a biologic, and probably approximately half of the EoE patients. So taken together, these -- this class -- this therapeutic class is potentially a multibillion-dollar opportunity.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Okay. So I'll turn it over to Henrik now to run through the clinical data.

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

Yes. Thank you, Robert. So basically, the study design of the ENIGMA study was randomized, double-blind, placebo-controlled study in patients with eosinophilic gastritis and/or gastroenteritis. They needed to have at the -- active disease with moderate-to-severe symptom histology. And they needed to have biopsy-confirmed EG or EGE, as defined by: At least 30 eosinophils per high-power field in 5 fields in the stomach or 3 fields in the esophagus.

We've randomized a total of 65 patients over a 6-month period in 1:1:1 ratio: A low dose of AK002, starting the dose at 0.3, then going to 1, 1 and 1 for the subsequent 3 infusions; a higher dose starting at 0.3 going to 1 and then going into 3 and 3 for the last 2 infusions; and 22 patients on placebo for a total of 4 monthly doses. The key endpoints were assessed 2 weeks after the last dose.

The symptoms were assessed using a proprietary patient-reported outcome questionnaire developed in accordance with FDA guidance on PRO development that basically capture the worst symptoms of EG/EGE patients on a daily basis. Our PRO measures 8 symptoms on a scale from 0 to 10, 10 being the most severe. So the Total Symptom Score is 80 points. So a reduction in Symptom Score is a good thing.

The 8 symptoms we looked at were: Abdominal pain; nausea; vomiting, early satiety, which means fulfillment before ending a meal; the loss of appetite; abdominal cramping; bloating; and/or diarrhea. We looked at the primary and secondary endpoint in a pre-specified hierarchal analysis per protocol and per statistical analysis plan to avoid multiplicity.

The primary endpoint was mean percent change in gastrointestinal eosinophil counts from baseline, and we had 2 secondary endpoint: A responder analysis, where a responder was defined as a patient who had a more than 75% decrease in tissue eosinophils and a more than 30% decrease in Total Symptom Score; and the other key secondary end point was a through symptoms, a mean percent change in Total Symptom Score from baseline. These end points were designed to show tissue eosinophil depletion, symptom improvement and also that these symptoms -- or these effects occurred in the same individuals.

These are the baseline characteristics of the patients that are typical for this patient population. You will see that the groups were well balanced. Also note that a substantial proportion of patients did have elevated eosinophils at baseline blood eosinophils.

The primary endpoint were met for all treatment -- for all active groups. We found a 97% reduction in eosinophils at the high dose, a 92% reduction at the low dose, 95% reduction in the combined dose as compared to a 10% increase on placebo. And that, obviously, for all these comparisons, were highly statistically significant with a p-value of less than 0.0001.

Another way of looking at the reduction in the eosinophils is to look at the number of patients who had less than 5 eosinophils per high-power field after treatment. As you will see from this slide, Slide #17, 37 out of 39 patients on active, illustrating 95% of all patients, met that criterion as compared to 0 on placebo.

We also met the key symptom endpoints, secondary symptom endpoint, as you can see on Slide '18, with a 58% reduction in Total Symptom Score on the high dose, a 49% reduction on the low dose, 53% reduction on the combined dose as compared to a 24% reduction on placebo. All of these comparisons, which were tested hierarchical -- in a hierarchical fashion, were highly statistically significant, with a p-value for the combined and the high dose being 0.0012. Also importantly, the effect was almost instantaneously, as we saw statistically significant improvements in symptoms within 1 day of the first infusion. And those differences between active and placebo were maintained throughout the treatment duration.

Another way of looking at the data is to assess the number of patients who had at least a 50% or more than 50% reduction in Total Symptom Score, and that is done on the slide here. And as you can see, about 2/3 of patients on active met their threshold as compared to only 15%, 1-5 percent, on placebo.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The improvement in symptoms were not driven by one single symptom. As you can see from the slide here, we saw significant improvements of reductions across the board in all the different components of the Total Symptom Score.

Looking at treatment response as using the definition we described before, and I'll repeat it here: Treatment response is defined as more than 75% reduction in tissue eosinophil counts and a more than 30% reduction in symptoms. And using those criterias, we had a 70% response rate at the top dose of AK002, 68% on the low dose. And then not surprisingly, give you a 69% response rate in the combined dose versus only 5% on placebo. And each one of these comparisons, again, was -- were highly statistically significant.

We did a number of additional analysis to further demonstrate the robustness of the data, the data I just shared with you from the protocol analysis, which was a primary analysis prespecified in the statistical analysis plan. The third protocol analysis, including 59 of the 65 randomized patients, 6 patients were excluded from the protocol analysis. The reasons are mentioned here: 2 patients only received 1 dose of study drug; 1 patient did not have any meaningful POs post dose; and 3 patients had substantial changes in their daily -- in their steroid doses, which could be a potential confounder. So these patients were excluded before the blind was broken in accordance with the statistical analysis plan.

Safety of course was evaluated in the entire ITT population. But to further test the robustness of the data, we did run the same analysis on the ITT population, including all 65 patients who received study drug.

In terms of steroid use, the protocol allowed low dose chronic background steroids as long as the patients were still symptomatic, as long as the patient still met the eosinophil inclusion criteria and as long as steroid had to be keep constant throughout the screening period as well as the study. Acute steroid use was allowed per site discretion as a premedication before infusion as a single dose of steroid to reduce the incidence of infusion-related reactions well as therapeutically to manage infusion-related reactions if they did occur.

And again, as you can see here, the acute steroids use was well balanced between groups, 28% on AK002 versus 35% on placebo. But again, we -- to test the robustness of the data, we did an analysis in which we excluded all patients who received steroids. And those analysis: Per protocol analysis, the patients excluding all steroid treatment and the ITT analysis are shown here. And as you can see, primary endpoint still met with very substantial p values, no matter what analysis you are looking at. The same was basically the case for the key secondary endpoints. So even looking at the ITT analysis or looking at analysis excluding all patients on steroids, we are getting the same compelling efficacy data, which is a testament to the robustness of the data in the study.

As Robert indicated, approximately 40% of the patients had concomitant symptomatic eosinophilic esophagitis with dysphagia. And we did look at those patients as an exploratory analysis as well. This basically gives you the baseline characteristics of these patients. And you can see that the patients were well matched with very similar mean baseline dysphagia score between treatment groups.

Looking at the number of eosinophils in the biopsies before and after, you will see that we found very similar data to what we found in the stomach and the duodenum. That is, if you define a histologic responder which is the standard according to the FDA guidance document for eosinophilic esophagitis, a histologic responder is a patient in whom you reduce the number of eosinophils to less than 5 per high-powered field. Applying that criteria on this data set, 13 of 14 patients, corresponding to 93%, had met that responder criteria as compared to only 1 on placebo. So again, a dramatic difference in effect between the 2.

We also look at dysphagia, which is the key symptom in eosinophilic esophagitis, basically asking the patient on a daily basis to rate the severity of their dysphagia on a scale from 0 to 10. And looking at dysphagia in that way, that's on Slide 28 -- here we go. Yes, Slide 28, we found, again, a significant and a very substantial difference between AK002 and placebo, with a 53% improvement on AK002 in dysphagia as compared to an only 17% improvement on placebo. So basically, we believe that this data, this histologic and symptomatic data provide strong proof-of-concept in -- for the effect of AK002 in eosinophilic esophagitis.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

We also look at mast cells, as you can see on the slide here. And we also found approximate 20% decrease in mast cell numbers in the biopsy after treatment as compared to basically no change on placebo. And the reduction in mast cells is very consistent with what we have found in various animal models. So it all fits very nicely together.

In terms of safety, the drug was very well tolerated. The only adverse event that occurred at a greater incidence on active as compared to placebo was infusion-related reactions, which occurred in 60% of patient on AK002 as compared to 23% of patients on placebo. All other adverse events occurred at equal, equal frequency -- or actually in many cases, appear to be slightly higher on placebo than on active.

We take a closer look at the infusion-related reactions. 93% of them were classified as being mild-to-moderate, stuff like flushing, feeling of warmth, headache, nausea, dizziness; and mostly on first infusion, consistent with other monoclonal antibody, greatly reduced or eliminated on subsequent infusion.

We had 1 drug-related serious adverse event, an infusion reaction which recovered within 24 hours with no sequelae. If you look at the total number of treatment-emergent serious adverse event, the incident was 9% on AK002 versus 14% on placebo. And we didn't find any other significant adverse event. So worthwhile to mention here that there don't seem to be any adverse event outside the infusion windows.

Patients in this study had an opportunity to elect to go into a longer-term extension study where they would receive AK002 on an open-labeled basis. And 92% of patients in this study elected to enter the long-term extension study. The few patients who did not was basically for logistical reasons, as transportation, moving away, that kind of stuff. So very large proportion of patients elected to go into the open-label extension. Again, a testament to the benefit the patients believe they are getting from the drug.

The current median duration in the extension study is about 3 months. But obviously, it's rapidly getting longer. And the efficacy does appear to improve with continued dosing. The extension study also allow us to take a closer look at trying to optimize the dose in terms of minimizing the risk of infusion-related reaction. So what we have introduced in the extension study now is pre-dosing with oral prednisone 1 day prior to the first and the second AK002 doses. And using that premedication schedule with single dose of prednisone before the first and the second dose, we have observed no infusion-related reactions in the patients who have gotten the steroid regimen.

That has also allowed us to bypass the 0.3 mg/kg starting dose and actually go straight into a 1 mg/kg starting dose. In addition, some sites have been experimenting a little bit with the infusion time and certainly been able to get it down significantly on second and subsequent doses.

So what's next? Based on these data, we are very keen to try to organize an end of Phase II meeting with the FDA as quickly as we can give the range. And we also, again, based on these data, plan to start a Phase III study in eosinophilic gastritis and/or eosinophilic gastroenteritis in the first quarter of next year. The FDA already indicated to us that we only need 1 Phase III study, because this is an open-drug indication, and we hope to start that Phase III study first quarter next year. And based on the data in concomitant eosinophilic esophagitis, we also plan to start a phase -- randomized, double-blind, placebo-controlled Phase II/III study in eosinophilic esophagitis in the third quarter of next year.

So that's where we are. That's what we plan to do in this indication. And without further ado, I want to pass on the microphone to Dr. Evan Dellon, who is one of the -- our key investigators in the program, who has been an invaluable source of advice to Allakos when we planned these studies. And I guess it's fair to say he's probably published more in the EE space than almost anybody else I can think of. So over to you, Evan.

**Evan Dellon; UNC Chapel Hill**

Thank you so much, Henrik. It's really a pleasure to be here to be able to provide my perspective on these really incredible results that you've just gone through. What I wanted to do to start out is to give everybody on the call really a sense, from a patient standpoint, what's going on, and just to do a brief anecdote.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

ALLAKOS INC. SPECIAL CALL | AUG 05, 2019

I've got, obviously, many patients with these conditions, but one who is particularly severe is someone in his mid-20s; he's had the condition since he was 4 or 5. It's profoundly affected his life. He's never been able to find a treatment that works for him. He has required more than 150 endoscopies to date over the last 20 years. He has had life-threatening complications, including GI bleeding from persistent ulcers that haven't healed. And he is the kind of person who is going to benefit from this kind of medication without any question.

And he is not by any means unique. Just yesterday in my -- last week in my clinic, I saw a new patient, I was the sixth opinion for her. And she has been suffering with symptoms 3, 4, 5 years, trying to get a diagnosis, bouncing between multiple physicians and having absolutely no treatment options right now.

And this is really what's common for the patients who have EG and EGE. It's -- these conditions are rare. And so because of that, they're not well recognized and well known and probably underdiagnosed. It takes people a long time to get diagnosed. And then once they are diagnosed, they basically have no treatment options. There are no FDA-approved medications for these conditions. This is the only treatment trial, the only prospective trial in all the entire field of EG and EGE. There are no other randomized trials and there are no other really prospective data.

And so what do we do for these patients? Well, we really are doing trial and error and fumbling around. A systemic steroid like prednisone will work for many patients, but it's not at all a long-term option. We've learned from inflammatory bowel disease, like Crohn's and ulcerative colitis, all kinds of autoimmune and rheumatologic conditions, that you just can't use prednisone and other systemic steroids long term because the side effects and toxicities are just too severe.

If you try to do diet elimination therapy and remove possibly food allergy triggers from these patients, it is either not effective or the number of foods that have to be removed is just so restrictive that it massively impacts the quality of life. There are liquid-only elemental formulas that have no food protein components in them and are hypoallergenic. But for the patients, like I mentioned to you, and thousands and thousands of like them, it's just not an option to stay on a liquid diet for their entire lives.

And then there really isn't anything else, where we try to use some topical steroids, but it's a very difficult to deliver these to the stomach and upper part of the small intestine.

And so in that context, when I found out about this trial and the mechanism of action of this medication, it was very exciting because there's a commitment to find a treatment for patients with EG and EGE. And then now to see how the results have come out is just incredible.

Now how many people might benefit from a medication like this? I've been involved in some of the epidemiologic studies of these conditions. And I think a reasonable estimate in the U.S. right now is about 50,000 patients as currently diagnosed by administrative billing codes. So most of the studies have been done, there have been at least a couple that have confirmed that number. And my suspicion is, is that there are many patients who are undiagnosed, where they're suffering with symptoms and they just haven't have the right diagnostic procedures. There's also data that show that the rates of diagnosis are increasing for these patients.

In my experience, the vast, vast majority of these patients need treatment, and they need chronic treatment; this is a chronic condition. And my suspicion is that probably 80%-plus of patients with this condition are moderate to severe and might -- would qualify to use a medication like this. Again, this is Grade 1 evidence, randomized, double-blind, placebo-controlled trial. There is nothing else like this in the condition. And so that's very exciting to me as a clinician.

When you look at the efficacy data that have just -- has just been presented, it's really great. And you see normalization of the biopsies, depletion of the eosinophils, decrease in the mast cells and improvement in symptoms, obviously, the most important thing to the patient.

And the safety profile is very, very favorable as well. As you saw, the infusion reactions are controllable, and in the most case, quite mild. And overall, it seemed that the placebo group had more adverse events reported than the active treatment group. So this is very, very encouraging for the safety profile.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And if you look at the histologic response rates, 90%, 95% plus, your complete normalization of the biopsies, this is an incredible result in the eosinophilic GI disorder field and is really not seen with any other treatments. If you use a comparison of eosinophilic esophagitis, on average, the topical steroid response rates might be 60% to 70%, and same thing with the diet elimination. And when you might compare this to, say, the results of biologics in other fields like Crohn's disease and ulcerative colitis, you may see 50% or 60% clinical response rates, but only 30% remission rates in a year. And so to see these kind of results come out with such an effective medication is exciting.

And the other thing that's exciting to me as well is the fact that about 30%, 40% plus of these patients had esophageal involvement with EoE as well, and we see incredible proof of concept now in the EoE population, too, which really expands the number of patients. There are at least 150,000 or more EoE cases in the U.S.

So what I'm thinking about this medication, I think this can apply to essentially all of the patients that I see. Many of them are struggling, poorly controlled on the types of less adequate treatments we have. I haven't seen any issue with -- in a study in terms of the logistics of getting this with an IV. And in the end, I really think this is going to be a game changer for my patients, certainly, and also for patients who have EG and EGE. This is a rare disease, but there are many, many patients with it and they have an absolute need for treatment. There is nothing available in the field. And this type of very rigorous data just pushes the field so far forward, and I think there's going to be an incredible benefit for patients with this condition to have this medication eventually available.

Thank you for listening.

**Robert Alexander**
*CEO & Director*

Thanks, Evan, really appreciate your time this morning.

Okay. So in terms of a corporate update, I'm now on Slide 37. So in terms of our cash, we have roughly $153 million as of June 30, that's approximately 18 months of cash. Operating expenses come in around $20 million. In terms of our patent protection for 002, those run until 2035 or later. And I think as we've mentioned many times in the past, we are manufacturing the drug at Lonza and are at commercial scale currently.

In terms of near-term milestones, on Slide 38. We have data in a mast cell gastritis study that will read out in Q1. And as a reminder, these are patients that we found in our EG study. So as we were screening patients for EG, a patient had to take the PRO for several weeks, had to reach a symptomatic threshold. If they met that threshold, they were then biopsied and had to meet a histologic threshold before they got randomized into our EG study.

Very early on, we started finding patients that were symptomatic, but upon biopsy did not have elevated eosinophils, but rather, they had elevated mast cells. And after we saw probably a half a dozen or more, we opened up an IND and offered those patients the opportunity to enroll in that study. And I believe we identified 16 or so initially. And by the time that we were able to get the IND open, we were able to get 8 into the study.

And we have called those patients mast cell gastritis patients. We're actively working to figure out if there's a more specific diagnosis that is out there, and we'll have more information on that coming later. I will tell you, those patients now have been treated for, I think most are out to at least 3 months or so. We'll have, as I said, a look at this data early next year, but the early results are incredibly positive. And those patients are seeing tremendous benefit on the drug. So stay tuned on that one.

As was mentioned earlier by Henrik, we anticipate having the end of Phase II meeting toward the end of this year or early next year. We're working as quickly as we can to get that request submitted and then are at the mercy of the FDA schedule a bit, but it should happen at the end of the year or early Q1. Also in Q1, we will have results from the -- or sorry, the Phase III and EG and EGE would begin in Q1 as well as the EoE study.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**ALLAKOS INC. SPECIAL CALL | AUG 05, 2019**

First half, we'll have data from our extension study. So these are the patients that elected to go into the extension study from the EG study, so we'll update you there. But as Henrik mentioned, again, that data is incredibly encouraging. And those patients seem to continue to improve from where they were when they left the randomized portion and entered the new protocol in the extension portion of the study -- or the extension protocol.

And then last but not least on this slide is data on our subcutaneous formulation. So we are -- we should be in the clinic late Q1, Q2 and then have data from the subcutaneous formulation in the second half of the year. What we're -- where we are currently on that is that we've manufactured GMP materials subcutaneously. We've gone through the GLP tox studies with no [ findings ]. We're preparing those reports which will allow us then to file the IND, and then we'll enter into the Human PK study. And really, the last unknown there for us is what the bioavailability is of the subcutaneous formulation. But it's stable, high concentration. It's plain vanilla in terms of its formulation, and we're very optimistic about the results of that study.

On Slide 39, it's just a snapshot of our management team. We -- one change here is we added Leo Redmond to our management team. Leo's a colleague of ours over the last 20 years. Several of us worked with him at Genentech. He is a very experienced finance executive. In particular, he has a lot of experience in manufacturing, commercial forecasting and launch. So we wanted to bring someone in with that expertise as we start moving more towards commercialization and getting ready for the potential launch of 002.

That resulted in a change in some titles. Adam is now President and COO. I remain Chief Executive Officer. There is absolutely no read-through on this. No one's going anywhere, and we're just adding to the team because of how positive the data was.

Okay. On Slide 40, just to pull it all together again. I don't want to belabor this, but we're obviously very excited about it. The trial was incredibly positive. We hit all pre-specified primary and secondary endpoints in EG and EGE, strong proof-of-concept in EoE. And as we touched on a bit, I believe that this data really builds upon the results that we have previously shown in urticaria, ISM and conjunctivitis and I think validates the mechanism that we're pursuing, especially given the randomized, controlled data and these positive results. But I think it also reads very significantly on other conditions that we've already looked at and ones that -- where mast cells and eos are involved, it provides strong proof of concept for those additional indications.

Okay. So with that, I appreciate everybody's attention, and we'll open it up to Q&A.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] The first question comes from the line of Maury Raycroft with Jefferies.

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Congrats on the data update today. First question is just on the 6 patients excluded from the per protocol analysis. You provide some info in the presentation on those patients, but just wondering if you can go into more details on those patients and contextualize the ITT results.

**Robert Alexander**
*CEO & Director*

Sure, yes, I can. Let me queue back to that. Henrik perhaps you -- Alan, can you queue back? Yes. Go ahead and take that, please.

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

Yes. So it's important to emphasize that it was all defined in the statistical analysis plan, what would exclude potential patients? And the rationale, of course, is that in the Phase II proof-of-concept study, the appropriate analysis is to include patients who are actually being treated according to protocol because that is what gives you the best scientific readout, and that's totally in accordance with FDA guidelines. And so applying those criteria, which was done before the blind was broken, we had those 6 patients who was -- who were excluded.

And while 2 of them only received one dose of study drug, 1 patient, for reasons unclear to us, did not. We just simply couldn't get him to fill in his PO. So obviously, it wasn't possible to assess the symptom improvement because he just didn't do it. And it wasn't for a lack of trying, but he didn't fill it in, so we didn't have the PO. And then we had 3 patients who, for various reasons -- actually, they had nothing to do with the site, but they, for other reasons, started or changed existing chronic steroid treatment. And that was also per SAP, or statistical analysis plan. Because it was a potential confounder, they were excluded from the analysis as well.

Having said that, 6 out of 65 patients is less than 10%, is actually a small number based on any public standard. But again, as you saw during my presentation, we did actually run the same p-values on the intent-to-treat analysis, and the data were basically the same. And then, of course, it is a testament to the robustness of the study.

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Got it. That's very helpful with the additional context there. Then the other question is just based on the Total Symptom Score for the PROs. You've got the subcomponents broken out there and you're seeing really nice trends across the board there. I'm just wondering for the vomiting subcomponent of the PRO, any thoughts on how that affected the Total Symptom Score overall? And do you plan on including or excluding that from the Phase III PRO?

**Robert Alexander**
*CEO & Director*

Yes. I mean, if you flip to Slide 20, I just want to make sure people understand is, it has absolutely no effect on the total score. Patients came into the study. And I think as we had guided folks over the last couple of months, that vomiting in particular, and then diarrhea also, were 2 symptoms that were not as frequent as the others and were not as severe. And in the case of vomiting, it was neither frequent nor

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

severe. So to -- I can't even -- I'd have to blow up our chart here, but to have a 100% reduction, from less than 1 to 0 numerically, is inconsequential. So it absolutely has no effect on the score.

And it just is what it is. We had similar data from our longitudinal study. In this patient population, there was the idea that vomiting and diarrhea were frequent and severe symptoms. And some patients, in fact, do have these. But as a population across EG and EGE, you just don't see it come up. The ones that you do see are abdominal pain, nausea, early satiety, loss of appetite, abdominal cramping and bloating.

Now in terms of what that means going forward with the PRO, I don't think anything. I think our point of view is that these are the symptoms that patients reported they suffer from and those are the symptoms that we should evaluate. And we'll have to wait till we have our conversation with the FDA, but I'd be surprised if they took a different view. Perhaps they would want to -- you can imagine them wanting to remove a symptom that a patient doesn't have because it's hard -- if someone is normal, it's hard to make them more normal. But certainly, we would continue to track it.

So from our perspective, we're indifferent whether it's in or out because the treatment effect is so robust across all the symptoms that patients actually have that are frequent and severe.

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Got it. That's very helpful. And last question is just on the Phase III and what you're going to go to FDA to request. And if there's any additional context you can provide on the endpoints that you're going to be assessing, potentially the trial size and the duration. And maybe anything on dose, too, the Phase III study.

**Robert Alexander**
*CEO & Director*

Sorry, Maury, I -- can you ask the question again?

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Sure. Just what you're going to be aiming for with the end of Phase II meeting with FDA for the Phase III design, just on the design of the trial, the size, duration. And anything on the dose, too, if you're going to start with the 1 mg and go to 3 mgs or just stick with 3 mgs?

**Robert Alexander**
*CEO & Director*

Yes. I mean all really good questions. I think very quickly, I -- my answer would be that we would change very, very little going from where we are today into a Phase III. Obviously, that's -- those are discussions we have not yet had with the FDA. But our point would be to essentially run exactly the same study.

Obviously, with these p values, we were overpowered with the end that we had. But I think also, as we've talked about with you and others, the Phase III is obviously going to be larger in number, but not substantially so. And we'll just make sure that we have enough patients in to robustly -- I guess, robustly overpower the study. And in terms of duration, our proposal would be to run exactly the same study. You could imagine that the FDA asking us go to 6 months, which is totally fine with us as well. But I think our plan would be to keep things as close to what we did in Phase II as possible.

**Operator**

The next question is from the line of Terence Flynn with Goldman Sachs.

**Terence C. Flynn**
*Goldman Sachs Group Inc., Research Division*

I was just wondering, in terms of this current Phase II, if that would definitively serve as one of the 2 pivotals. I think you guys have talked about that before. And then you talked about potentially EG or both

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

EG and EGE in the next Phase III. Just wondering what would dictate whether it was one population or both of those populations. And then after that, I had a second question.

**Robert Alexander**
*CEO & Director*

Sure. So yes, based on the conversations we've had with the FDA, this is one of the 2 trials that would go into the approval package. And so I would be stunned if the FDA changed their mind, especially after seeing the results. In terms of -- so I don't mean to confuse that. So we -- the study was always designed to look at stomach eosinophilia, duodenal eosinophilia or patients that had both. And so the Phase III will be exactly the same there. So this -- the label indication would be EG or EGE or both would be how we would do it. So exactly the same way we did it in the Phase II.

**Terence C. Flynn**
*Goldman Sachs Group Inc., Research Division*

Okay. Then on the treatment-emergent SAEs, it looked like, again, a lower rate than placebo, 9%. Just wondering any more context you can give around those SAEs? And then one for Dr. Dellon. You mentioned that about 50,000 patients with EG/EGE would be eligible potentially for treatment. Just wondering on the EoE side, if you could give us some more context there in terms of how many patients might be eligible for 002 if it's approved.

**Robert Alexander**
*CEO & Director*

Yes. So Evan, why don't you tackle that one, and then we'll have Henrik answer the first question.

**Evan Dellon; UNC Chapel Hill**

Okay. Sure. Thank you for the question. So EoE is a little bit -- quite different in terms of the amount of data and studies we have. And in that, we have already Level 1 data, randomized control trials on topical steroids. And so what would be -- and we also have a good data on dietary elimination in EoE as well. And so when thinking about the overall population in EoE, there are about 30% to 40% of patients at least right now who are refractory to the current treatments that we might consider first line, which would include the topical steroids and diet elimination. So that would be a natural first target population.

However, the data are so strong that these histologic response rates are actually better than what we see for the first-line diet and steroids. And so I think time would tell, but it's conceivable that if this treatment looks to be very -- more effective and equally safe, it's certainly conceivable that it could be applied to more than just the steroid-refractory EoE population, and it may be able to be applied to many more than that. So I think minimum would be 30%, 40% of the EoE population at least, but that's not at all the ceiling by any means.

**Robert Alexander**
*CEO & Director*

Thanks, Evan. Henrik, do you want to take that?

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

Yes. So in terms of serious adverse events. So they weren't in -- the 9% versus 14% where all treatment-emergent serious adverse event, and they were basically -- they're basically a combination of different things. This is a sick patient population who have a lot of problems. Many of them have a number of concomitant diseases. So typically, the serious adverse events were basically defined by a patient being hospitalized, in most cases, because of GI problems. And that's probably why the incidence was slightly higher on placebo as compared to on active.

So we had a couple of patients who were hospitalized because of severe abdominal pain and/or dehydration, which of course, is a common problem with these patients. So nothing remarkable, but

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

mostly GI-related. We did have one patient who had mental confusion, and turned out that she was on background drugs. So that kind of stuff.

**Operator**

Our next question is from Tim Lugo with William Blair.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Congrats on the data. We see strong p-values on the Slide 24 if you're using the strict ITT analysis. How does the TSS look when you're -- in terms of magnitude of difference, the magnitude reduction when you do -- when you do use the restrictive ITT analysis? Is it still -- we saw 50% changes. Is it still relatively robust? Or can you just comment on that?

**Robert Alexander**
*CEO & Director*

Yes. Henrik, go ahead.

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

Yes. So the magnitude of this was similar. It was slightly less on the ITT on the low dose, but the same sort of tendency in terms of magnitude, in terms of treatment effect, it really didn't make a big difference.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Understood. And as we start to look out into the Phase III, what are your opinions of using 2 dose arms in the Phase III? Is that given what the ITT looked like? And there's obviously clear trends, but will you also still look at a lower dose arm?

**Robert Alexander**
*CEO & Director*

Yes. Tim, it's a good question. I mean it's -- yes, as you look through the data, and of course, we're scouring the data, as you can imagine. But it does appear that there is a treatment -- there's slightly better results at the high dose compared to the low dose. So I think it's safe to say that the 3 mg/kg dose is going into Phase III. I think the question we're still debating is whether or not we would put the 1 mg/kg in.

With that said, I mean, there's not significant differences between the 2 when you look at them, but the high dose does seem to always be slightly favored compared to the low dose. So we still have to work through that. But certainly, we're in a good spot with actually both doses. But certainly the high dose, I think, is a no-brainer to take into the pivotal studies.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

And for that high dose, will you allow some sort of steroid pre-treatment? I know in the open label, it seems like these injection site reactions are managed very easily. And I have heard some kind of discussion around whether steroids should be used around dosing. I guess what are your thoughts for incorporating that into a Phase III?

**Robert Alexander**
*CEO & Director*

Yes. So I mean what -- obviously, what we're doing is we're developing a drug and figuring out how to administer it to make it as easy on the patient and the docs as possible, and that's an ongoing process. Certainly, what we've learned over the last year in our other studies as well as this study, and in particular in our extension study, is if you give a single dose of pred, you can immediately go to the 1 mg/kg dose,

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

but you've eliminated all IRRs. So that's pretty straightforward, I believe. And we'll continue to explore dosing.

In terms of the steroid, I mean, it had absolutely 0 effect on the results, and that was shown in the study. So the idea that steroids are confounding the results is specious.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Understood. And will you seek a breakthrough therapy status, given the physician's comments about how severe this patient population is and what looks like unprecedented results?

**Robert Alexander**
*CEO & Director*

Yes. Of course, that's something that we're -- that's crossed our minds. And we're looking into it, and we'll pursue that.

**Operator**

Our next question is from the line of Sam Slutsky with LifeSci.

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

Congrats on the results. Just wondering if you could give any more color around mast cell gastroenteritis, the disease itself as well as the study? And then also, how are you thinking about other GI conditions where mast cells and eos might play a role, such as IBD, for example?

**Robert Alexander**
*CEO & Director*

Yes. No -- sure. So yes, the mast cell gastritis study was really interesting because it's not something that we necessarily anticipated and weren't exactly -- I mean, we called it mast cell gastritis because we frankly didn't know what else to call it and because it really hasn't been described in the literature in any comprehensive way. And in fact, again, this is the first study that has been prospective and has unequivocally tied symptoms to objective histology. So this is the only data set in the world that has ever done this. And that's also true for that gastritis -- mast cell gastritis.

It's -- we have -- we're working with our key opinion leaders on exactly what this disease is, but there's a strong suspicion that it's IBD. And so we're going to continue to pursue that and figure out diagnostically exactly what it is. As I said, the upshot is that those patients are doing extremely well in the study, as well or better than what we've shown here, albeit it's an open label.

And then in terms of other GI conditions, I mean, we -- given these results, we very much want to leverage our investment in this space and our close working relationships with our key opinion leaders. So we are finishing up a development assessment on ulcerative colitis. There's very strong mechanistic rationale for why a drug that targets eos and mast cells has potential to be quite effective there.

And I think that is a -- that's a large market, although there are many drugs there, almost all those patients failed those medications. So we believe there's still significant unmet need and opportunity there. So we're actively looking there. And it shouldn't come as a surprise if we initiate a study on ulcerative colitis in the not-too-distant future.

And then as I said, we'll continue to get to the bottom of what we call mast cell gastritis patients, what their diagnosis is and figure that out. But that's also quite exciting because we've seen patients like them pop up in our other studies as well. So these people are out there, and we just need to figure out diagnostically what they are. But we'll pursue that if at all possible as well.

**Operator**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Thank you. At this time, our Q&A session has concluded, and I'll turn the floor back to management for closing remarks.

**Robert Alexander**
*CEO & Director*

Thanks, operator. So really don't have much more to add. We really appreciate your time this morning and the questions. And if anything else arises, please don't hesitate to give us a call. We're happy to go through the data. And if there's any confusion or clarification on any of the results, we're happy to do that as well.

And with that, I'll -- we will sign off. Thanks again.

**Operator**
This concludes today's conference. You may disconnect your lines at this time. Thank you for your participation.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

Exhibit P

INTERNATIONAL CONFERENCE ON HARMONISATION OF TECHNICAL REQUIREMENTS FOR REGISTRATION OF PHARMACEUTICALS FOR HUMAN USE

# ICH HARMONISED TRIPARTITE GUIDELINE

## STATISTICAL PRINCIPLES FOR CLINICAL TRIALS
## E9

Current *Step 4* version

dated 5 February 1998

*This Guideline has been developed by the appropriate ICH Expert Working Group and has been subject to consultation by the regulatory parties, in accordance with the ICH Process. At Step 4 of the Process the final draft is recommended for adoption to the regulatory bodies of the European Union, Japan and USA.*

comparison, usually in tables or graphs which focus on estimates plus confidence limits. The use of meta-analytic techniques to combine these estimates is often a useful addition, because it allows a more precise overall estimate of the size of the treatment effects to be generated, and provides a complete and concise summary of the results of the trials. Under exceptional circumstances a meta analytic approach may also be the most appropriate way, or the only way, of providing sufficient overall evidence of efficacy via an overall hypothesis test. When used for this purpose the meta-analysis should have its own prospectively written protocol.

### 7.2.2   Safety Data

In summarising safety data it is important to examine the safety database thoroughly for any indications of potential toxicity, and to follow up any indications by looking for an associated supportive pattern of observations. The combination of the safety data from all human exposure to the drug provides an important source of information, because its larger sample size provides the best chance of detecting the rarer adverse events and, perhaps, of estimating their approximate incidence. However, incidence data from this database are difficult to evaluate because of the lack of a comparator group, and data from comparative trials are especially valuable in overcoming this difficulty. The results from trials which use a common comparator (placebo or specific active comparator) should be combined and presented separately for each comparator providing sufficient data.

All indications of potential toxicity arising from exploration of the data should be reported. The evaluation of the reality of these potential adverse effects should take account of the issue of multiplicity arising from the numerous comparisons made. The evaluation should also make appropriate use of survival analysis methods to exploit the potential relationship of the incidence of adverse events to duration of exposure and/or follow-up. The risks associated with identified adverse effects should be appropriately quantified to allow a proper assessment of the risk/benefit relationship.

### GLOSSARY

#### Bayesian Approaches

Approaches to data analysis that provide a posterior probability distribution for some parameter (e.g. treatment effect), derived from the observed data and a prior probability distribution for the parameter. The posterior distribution is then used as the basis for statistical inference.

#### Bias (Statistical & Operational)

The systematic tendency of any factors associated with the design, conduct, analysis and evaluation of the results of a clinical trial to make the estimate of a treatment effect deviate from its true value. Bias introduced through deviations in conduct is referred to as 'operational' bias. The other sources of bias listed above are referred to as 'statistical'.

#### Blind Review

The checking and assessment of data during the period of time between trial completion (the last observation on the last subject) and the breaking of the blind, for the purpose of finalising the planned analysis.

#### Content Validity

The extent to which a variable (e.g. a rating scale) measures what it is supposed to measure.

other special safety tests (e.g. ECGs, ophthalmology). The tolerability of the medical product represents the degree to which overt adverse effects can be tolerated by the subject.

### Statistical Analysis Plan

A statistical analysis plan is a document that contains a more technical and detailed elaboration of the principal features of the analysis described in the protocol, and includes detailed procedures for executing the statistical analysis of the primary and secondary variables and other data.

### Superiority Trial

A trial with the primary objective of showing that the response to the investigational product is superior to a comparative agent (active or placebo control).

### Surrogate Variable

A variable that provides an indirect measurement of effect in situations where direct measurement of clinical effect is not feasible or practical.

### Treatment Effect

An effect attributed to a treatment in a clinical trial. In most clinical trials the treatment effect of interest is a comparison (or contrast) of two or more treatments.

### Treatment Emergent

An event that emerges during treatment having been absent pre-treatment, or worsens relative to the pre-treatment state.

### Trial Statistician

A statistician who has a combination of education/training and experience sufficient to implement the principles in this guidance and who is responsible for the statistical aspects of the trial.

# Exhibit Q

AMERICA'S BEST-SELLING DICTIONARY



# Merriam-Webster's Collegiate® Dictionary

## Eleventh Edition

## The Words You Need Today

AN ENCYCLOPÆDIA BRITANNICA® COMPANY



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 2012 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data

Merriam-Webster's collegiate dictionary. — Eleventh ed.
    p.    cm.
    Includes index.
ISBN 978-0-87779-807-1    (Laminated unindexed : alk. paper)
ISBN 978-0-87779-808-8    (Jacketed hardcover unindexed : alk. paper)
ISBN 978-0-87779-809-5    (Jacketed hardcover with digital download : alk. paper)
ISBN 978-0-87779-810-1    (Leatherlook with digital download : alk. paper)
ISBN 978-0-87779-813-2    (Canadian)
ISBN 978-0-87779-814-9    (International)
    1. English language—Dictionaries. I. Title: Collegiate dictionary. II. Merriam-Webster, Inc.
PE1628.M36    2003
423—dc21                  2003003674
                             CIP

Merriam-Webster's Collegiate® Dictionary, Eleventh Edition, principal copyright 2003

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

17th Printing Quad Graphics Versailles KY October 2012

~ refrigerator⟩ ⟨a ~ saw⟩   **b** : of or relating to manual operations **2** : of or relating to artisans or machinists ⟨the ~ trades⟩   **3 a** : done as if by machine : seemingly uninfluenced by the mind or emotions : AUTOMATIC   **b** : of or relating to technicalities or petty matters   **4 a** : relating to, governed by, or in accordance with the principles of mechanics ⟨~ energy⟩   **b** : relating to the quantitative relations of force and matter ⟨~ pressure of wind on a tower⟩   **5** : caused by, resulting from, or relating to a process that involves a purely physical as opposed to a chemical or biological change or process ⟨~ erosion of rock⟩   **syn** see SPONTANEOUS — **me·chan·i·cal·ly** \-ni-k(ə-)lē\ *adv*

²**mechanical** *n* (1600)   **1** *obs* : MECHANIC 1   **2** : a piece of finished copy consisting typically of type proofs and artwork positioned and mounted for photomechanical reproduction

**mechanical advantage** *n* (1852) : the advantage gained by the use of a mechanism in transmitting force; *specif* : the ratio of the force that performs the useful work of a machine to the force that is applied to the machine

**mechanical drawing** *n* (1811)   **1** : drawing done with the aid of instruments   **2** : a drawing made with instruments

**mechanical engineering** *n* (ca. 1890) : a branch of engineering concerned primarily with the industrial application of mechanics and with the production of tools, machinery, and their products — **mechanical engineer** *n*

**mech·a·ni·cian** \ˌme-kə-ˈni-shən\ *n* (1570) : MECHANIC, MACHINIST

**me·chan·ics** \mi-ˈka-niks\ *n pl but sing or pl in constr* (1612)   **1** : a branch of physical science that deals with energy and forces and their effect on bodies   **2** : the practical application of mechanics to the design, construction, or operation of machines or tools   **3** : mechanical or functional details or procedure ⟨the ~ of the brain⟩

**mech·a·nism** \ˈme-kə-ˌni-zəm\ *n* (1662)   **1 a** : a piece of machinery   **b** : a process, technique, or system for achieving a result   **2** : mechanical operation or action : WORKING 2   **3** : a doctrine that holds natural processes (as of life) to be mechanically determined and capable of complete explanation by the laws of physics and chemistry   **4** : the fundamental processes involved in or responsible for an action, reaction, or other natural phenomenon — compare DEFENSE MECHANISM

**mech·a·nist** \-nist\ *n* (1606)   **1** *archaic* : MECHANIC   **2** : an adherent of the doctrine of mechanism

**mech·a·nis·tic** \ˌme-kə-ˈnis-tik\ *adj* (1884)   **1** : mechanically determined   **2** : of or relating to a mechanism or the doctrine of mechanism   **3** : MECHANICAL — **mech·a·nis·ti·cal·ly** \-ti-k(ə-)lē\ *adv*

**mech·a·nize** \ˈme-kə-ˌnīz\ *vt* -**nized; -niz·ing** (1678)   **1** : to make mechanical; *esp* : to make automatic or routine   **2 a** : to equip with machinery esp. to replace human or animal labor   **b** : to equip with armed and armored motor vehicles   **c** : to provide with mechanical power   **3** : to produce by or as if by machine — **mech·a·niz·able** \-ˌnī-zə-bəl\ *adj* — **mech·a·ni·za·tion** \ˌme-kə-nə-ˈzā-shən\ *n* — **mech·a·niz·er** \ˈme-kə-ˌnī-zər\ *n*

**mech·a·no·chem·is·try** \ˌme-kə-nō-ˈke-mə-strē\ *n* (1928) : chemistry that deals with the conversion of chemical energy into mechanical work (as in the contraction of a muscle) — **mech·a·no·chem·i·cal** \-ˈke-mi-kəl\ *adj*

**mech·a·no·re·cep·tor** \-ri-ˈsep-tər\ *n* (1927) : a neural end organ (as a tactile receptor) that responds to a mechanical stimulus (as a change in pressure) — **mech·a·no·re·cep·tion** \-ˈsep-shən\ *n* — **mech·a·no·re·cep·tive** \-ˈsep-tiv\ *adj*

**Mech·lin** \ˈme-klən\ *n* [*Mechlin*, Belgium] (1701) : a delicate bobbin lace used for dresses and millinery

**mec·li·zine** \ˈme-klə-ˌzēn\ *n* [*methyl* + *chlor-* + *-izine* (alter. of *azine*)] (1954) : a drug $C_{25}H_{27}ClN_2$ used usu. in the form of its hydrochloride to treat vertigo and nausea (as in motion sickness)

**me·co·ni·um** \mi-ˈkō-nē-əm\ *n* [L, lit., poppy juice, fr. Gk *mēkōnion*, fr. *mēkōn* poppy; akin to OHG *mago* poppy] (ca. 1706) : a dark greenish mass that accumulates in the bowel during fetal life and is discharged shortly after birth

¹**med** \ˈmed\ *adj* (ca. 1933) : MEDICAL ⟨~ school⟩

²**med** *n* (1942) : MEDICATION 2 — usu. used in pl. ⟨took pain ~s⟩

³**med** *abbr*   **1** medicine   **2** medieval   **3** medium

**Med** *abbr* Mediterranean

**MEd** *abbr* master of education

**me·da·ka** \mə-ˈdä-kə\ *n* [Jp] (1933) : a small Japanese freshwater fish (*Oryzias latipes*) usu. silvery brown in the wild but from pale yellow to deep red in aquarium strains

¹**med·al** \ˈme-dᵊl\ *n* [MF *medaille*, fr. OIt *medaglia* coin worth half a denarius, medal, fr. VL *medalis* half, alter. of LL *medialis* middle, fr. L *medius* — more at MID] (ca. 1578)   **1** : a small usu. metal object bearing a religious emblem or picture   **2** : a piece of metal often resembling a coin and having a stamped design that is issued to commemorate a person or event or awarded for excellence or achievement

²**medal** *vi* **med·aled** *also* **med·alled; med·al·ing** *also* **med·al·ling** \ˈmed-liŋ, ˈme-dᵊl-iŋ\ (1979) : to win a medal ⟨~ed in figure skating⟩

**Medal for Merit** (1942) : a U.S. decoration awarded to civilians for highly meritorious conduct in the performance of outstanding services

**med·al·ist** *or* **med·al·list** \ˈme-dᵊl-ist\ *n* (1685)   **1** : a designer, engraver, or maker of medals   **2** : a recipient of a medal as an award

**me·dal·lic** \mə-ˈda-lik\ *adj* (1702) : of, relating to, or shown on a medal

**me·dal·lion** \mə-ˈdal-yən\ *n* [F *médaillon*, fr. It *medaglione*, aug. of *medaglia*] (1658)   **1** : a large medal   **2** : something resembling a large medal; *esp* : a tablet or panel in a wall or window bearing a figure in relief, a portrait, or an ornament   **3** *also* **me·dail·lon** \mā-dā-ˈyōⁿ\ : a small round or oval serving (as of meat)

**Medal of Freedom** (1945) : a U.S. decoration awarded to civilians for meritorious achievement in any of various fields

**Medal of Honor** (1861) : a U.S. military decoration awarded in the name of the Congress for conspicuous intrepidity at the risk of life in action with an enemy

**medal play** *n* (1816) : STROKE PLAY

**med·dle** \ˈme-dᵊl\ *vi* **med·dled; med·dling** \ˈmed-liŋ, ˈme-dᵊl-iŋ\ [ME *medlen*, fr. AF *mesler, medler*, fr. VL *misculare*, fr. L *miscēre* to mix — more at MIX] (14c) : to interest oneself in what is not one's concern : interfere without right or propriety — **med·dler** \ˈmed-lər, ˈme-dᵊl-ər\ *n*

**med·dle·some** \ˈme-dᵊl-səm\ *adj* (1615) : given to meddling   **syn** see IMPERTINENT — **med·dle·some·ness** *n*

**Mede** \ˈmēd\ *n* [ME, fr. L *Medus*, fr. Gk *Mēdos*] (14c) : a native or inhabitant of ancient Media in Persia

**Me·dea** \mə-ˈdē-ə\ *n* [L, fr. Gk *Mēdeia*] (14c) : an enchantress noted in Greek mythology for helping Jason gain the Golden Fleece and for repeatedly resorting to murder to gain her ends

¹**med·e·vac** *also* **med·i·vac** \ˈme-də-ˌvak, -dē-\ *n* [*medical evacuation*] (1966)   **1** : emergency evacuation of the sick or wounded (as from a combat area)   **2** : a helicopter used for medevac

²**medevac** *also* **medivac** *vt* **med·e·vaced** *also* **med·i·vaced** *or* **med·e·vacked** *or* **med·i·vacked; med·e·vac·ing** *also* **med·i·vac·ing** *or* **med·e·vack·ing** *or* **med·i·vack·ing** (1969) : to transport in a medevac helicopter

**med·fly** \ˈmed-ˌflī\ *n, often cap* (1935) : MEDITERRANEAN FRUIT FLY

¹**me·dia** \ˈmē-dē-ə\ *n, pl* **me·di·ae** \-dē-ˌē\ (1841)   **1** [LL, fr. L, fem. of *medius*; fr. the voiced stops' being regarded as intermediate between the tenues and the aspirates] : a voiced stop   **2** [NL, fr. L] : the middle coat of the wall of a blood or lymph vessel consisting chiefly of circular muscle fibers

²**media** *n, pl* **me·di·as** *often attrib* [pl. of *medium*] (1923)   **1** : a medium of cultivation, conveyance, or expression; *esp* : MEDIUM 2b   **2 a** *sing or pl in constr* : MASS MEDIA   **b** *pl* : members of the mass media   **usage** The singular *media* and its plural *medias* seem to have originated in the field of advertising over 70 years ago; they are still so used without stigma in that specialized field. In most other applications *media* is used as a plural of *medium*. The popularity of the word in references to the agencies of mass communication is leading to the formation of a mass noun, construed as a singular ⟨there's no basis for it. You know, the news *media* gets on to something —Edwin Meese 3d⟩ ⟨the *media* is less interested in the party's policies —James Lewis, *Guardian Weekly*⟩. This use is not as well established as the mass-noun use of *data* and is likely to incur criticism esp. in writing.

**me·di·ad** \ˈmē-dē-ˌad\ *adv* (1878) : toward the median line or plane of the body or part

**media event** *n* (1972) : a publicity event staged for coverage by the news media

**me·dia·gen·ic** \ˌmē-dē-ə-ˈje-nik\ *adj* (1971) : attractive or well-suited to the communications media

**me·di·al** \ˈmē-dē-əl\ *adj* [LL *medialis*, fr. L *medius*] (1570)   **1** : MEAN, AVERAGE   **2 a** : being or occurring in the middle   **b** : extending toward the middle; *esp* : lying or extending toward the median axis of the body   **3** : situated between the extremes of initial and final in a word or morpheme — **medial** *n* — **me·di·al·ly** \-ə-lē\ *adv*

**medial collateral ligament** *n* (1950) : a ligament of the inner knee that connects medial parts of the femur and tibia and helps to stabilize the knee joint — called also *MCL*

¹**me·di·an** \ˈmē-dē-ən\ *n* [ME *mediane*, fr. LL *mediana* (*vena*) median (vein), fr. fem. of L *medianus* in the middle, central, fr. *medius* middle — more at MID] (15c)   **1** : a medial part (as a vein or nerve)   **2 a** : a value in an ordered set of values below and above which there is an equal number of values or which is the arithmetic mean of the two middle values if there is no one middle number   **b** : a vertical line that divides the histogram of a frequency distribution into two parts of equal area   **c** : a value of a random variable for which all greater values make the cumulative distribution function greater than one half and all lesser values make it less than one half   **3 a** : a line from a vertex of a triangle to the midpoint of the opposite side   **b** : a line joining the midpoints of the nonparallel sides of a trapezoid   **4** : MEDIAN STRIP   **syn** see AVERAGE

²**median** *adj* [L *medianus*] (1592)   **1** : being in the middle or in an intermediate position : MEDIAL   **2** : lying in the plane dividing a bilateral animal into right and left halves   **3** : relating to or constituting a statistical median   **4** : produced without occlusion along the lengthwise middle line of the tongue — **me·di·an·ly** *adv*

**median nerve** *n* (1807) : a nerve that arises by two roots from the brachial plexus and passes down the middle of the front of the arm into lanes according to direction of travel

**median strip** *n* (1948) : a paved or planted strip dividing a highway into lanes according to direction of travel

**me·di·ant** \ˈmē-dē-ənt\ *n* [It *mediante*, fr. L *mediant-, medians*, prp. of *mediare* to be in the middle] (1822) : the third tone of a major or minor scale

**me·dia·scape** \ˈmē-dē-ə-ˌskāp\ *n* (1968)   **1** : the mélange of mass media within an area   **2** : the various images, sounds, and programs presented by the mass media

**me·di·as·ti·num** \ˌmē-dē-ə-ˈstī-nəm\ *n, pl* -**na** \-nə\ [NL, fr. ML, neut. of *mediastinus* medial, fr. L *medius*] (1541) : the space in the chest between the pleural sacs of the lungs that contains all the tissues and organs of the chest except the lungs and pleurae; *also* : this space with its contents — **me·di·as·ti·nal** \-ˈstī-nᵊl\ *adj*

¹**me·di·ate** \ˈmē-dē-ət\ *adj* [ME, fr. LL *mediatus* intermediate, fr. pp. of *mediare* ] (15c)   **1** : occupying a middle position   **2 a** : acting through an intervening agency   **b** : exhibiting indirect causation, connection, or relation — **me·di·a·cy** \-ə-sē\ *n* — **me·di·ate·ly** *adv*

²**me·di·ate** \ˈmē-dē-ˌāt\ *vb* **-at·ed; -at·ing** [ML *mediatus*, pp. of *mediare*, fr. LL, to be in the middle, fr. L *medius* middle] *vt* (1568)   **1** : to bring accord out of by action as an intermediary   **b** : to effect by action as an intermediary   **2 a** : to act as intermediary agent in bringing, effecting, or communicating : CONVEY   **b** : to transmit as intermediate mechanism or agency ~ *vi*   **1** : to interpose between parties in order to reconcile them   **2** : to reconcile differences   **syn** see INTERPOSE — **me·di·a·tive** \-ˌā-tiv\ *adj* — **me·di·a·to·ry** \-ə-ˌtōr-ē\ *adj*

**me·di·a·tion** \ˌmē-dē-ˈā-shən\ *n* (14c) : the act or process of mediating; *esp* : intervention between conflicting parties to promote reconciliation, settlement, or compromise — **me·di·a·tion·al** \-shnəl, -shə-nᵊl\ *adj*

**me·di·a·tor** \ˈmē-dē-ˌā-tər\ *n* (14c)   **1** : one that mediates; *esp* : one that mediates between parties at variance   **2** : a mediating agent in a physical, chemical, or biological process

**me·di·a·trix** \-ˈā-triks\ *n* (15c) : a woman who is a mediator

¹**med·ic** \ˈme-dik\ *n* [ME *medike*, fr. L *medica*, fr. Gk *mēdikē*, fr. fem. of *mēdikos* of Media, fr. *Mēdia* Media] (15c) : any of a genus (*Medicago*) of leguminous herbs (as alfalfa)

²**medic** *n* [L *medicus*] (1625) : one engaged in medical work or study; *esp* : CORPSMAN

**med·i·ca·ble** \ˈme-di-kə-bəl\ *adj* (ca. 1616) : CURABLE, REMEDIABLE

**Med·ic·aid** \ˈme-di-ˌkād\ *n* [*medical aid*] (1966) : ... aid designed for those unable to afford regular m ... nanced by the state and federal governments

**med·i·cal** \ˈme-di-kəl\ *adj* [F or LL; F *médical*, f ... *medicus* physician, fr. *mederi* to remedy, heal; ak ... er, Gk *medesthai* to be mindful of — more at ME ... lating to, or concerned with physicians or the pr ... : requiring or devoted to medical treatment — **m** ... *adv*

**medical examiner** *n* (1877) : a public officer wh ... on bodies to find the cause of death

**med·i·cal·ize** \ˈme-di-kə-ˌlīz\ *vt* **-ized; -izing** (19 ... as a medical concern, problem, or disorder ⟨thos ... of social problems by *medicalizing* them —Liam ... **cal·i·za·tion** \ˌme-di-kə-lə-ˈzā-shən\ *n*

**med·i·ca·ment** \mi-ˈdi-kə-mənt, ˈme-di-kə-\ *n* [M ... *camentum*, fr. *medicare*] (15c) : a substance used ... **ca·men·tous** \mi-ˌdi-kə-ˈmen-təs, ˌme-di-kə-\ *adj*

**Medi·care** \ˈme-di-ˌker\ *n* [blend of *medical* and *c* ... ment program of medical care esp. for the aged

**med·i·cate** \ˈme-di-ˌkāt\ *vt* **-cat·ed; -cat·ing** ... *medicare* to heal, fr. *medicus*] (ca. 1623)   **1** : to ... : to impregnate with a medicinal substance ⟨*med* ...

**med·i·ca·tion** \ˌme-di-ˈkā-shən\ *n* (15c)   **1** : the ... icating   **2** : a medicinal substance : MEDICAMEN ...

**me·dic·i·na·ble** \mi-ˈdis-nə-bəl, -ˈdi-sə-nə-, *in S* ... (14c) : MEDICINAL

**me·dic·i·nal** \mi-ˈdis-nəl, -ˈdi-sᵊn-əl; *in Shak & M* ... ˈmed-sə-nəl\ *adj* (14c)   **1** : tending or used to c ... pain   **2** : SALUTARY — **medicinal** *n* — **me·dic·** ...

**medicinal leech** *n* (1804) : a large European fres ... *medicinalis*) that is a source of hirudin, is som ... blood (as from newly grafted tissue), and was fo ... patients thought to have excess blood

**med·i·cine** \ˈme-də-sən, *Brit usu* ˈmed-sən\ *n* [ME ... *dicina*, fr. fem. of *medicinus* of a physician, fr. *m* ... substance or preparation used in treating disease ... affects well-being   **2** : the science and art dea ... nance of health and the prevention, alleviation, ... : the branch of medicine concerned with the nor ... disease   **3** : a substance (as a drug or potion) us ... other than disease   **4** : an object held in traditio ... belief to give control over natural or magical f ... power or a magical rite — **medicine** *vt*

**medicine ball** *n* (1895) : a heavy usu. large ball u ... ing and strengthening exercises

**medicine dropper** *n* (1868) : DROPPER 2

**medicine man** *n* (1801) : a priestly healer or sor ... American Indians : SHAMAN

**medicine show** *n* (1887) : a traveling show usi ... tract a crowd among which remedies or nostrum ...

**med·i·co** \ˈme-di-ˌkō\ *n, pl* -**cos** [It *medico* or S ... *medicus*] (1689) : PHYSICIAN 1; *also* : a medical s ...

**med·i·co·le·gal** \ˌme-di-kō-ˈlē-gəl\ *adj* [NL *medic* ... medical + *-o-* + *legalis* legal] (1835) : of or relating ... law

¹**me·di·e·val** *also* **me·di·ae·val** \ˌmē-dē-ˈvəl, mi- ... [NL *medium aevum* Middle Ages] (1827)   **1** : of, ... teristic of the Middle Ages   **2** : having a quality ( ... with the Middle Ages   **3** : extremely outmoded ... **di·e·val·ly** *adv*

²**medieval** *also* **mediaeval** *n* (1856) : a person of t ...

**me·di·e·val·ism** \-və-ˌli-zəm\ *n* (1853)   **1** : mediev ... or state   **2** : devotion to the institutions, arts, and ... dle Ages

**me·di·e·val·ist** \-ˈdēv-list, -ˈdē-və-, -dē-ˈēv-, -dē-ˈ ... specialist in medieval history and culture   **2** : a co ... of medieval arts and culture

**Medieval Latin** *n* (1855) : the Latin used esp. for ... purposes from the 7th to the 15th centuries inclu ...

**med·i·gap** \ˈme-di-ˌgap\ *n, often cap, often attr* ... (1975) : supplemental health insurance that cover ... care or a hospital stay) not covered by Medicare

**me·di·na** \mə-ˈdē-nə\ *n* [Ar *madīna* city] (1906) ... part of a northern African city

**me·di·o·cre** \ˌmē-dē-ˈō-kər\ *adj* [MF, fr. L *medioc* ... + OL *ocris* stony mountain; akin to L *acer* sharp - ... 1586) : of moderate or low quality, value, ability, ... DINARY, SO-SO

**me·di·oc·ri·ty** \ˌmē-dē-ˈä-krə-tē\ *n, pl* -**ties** (1588) ... state of being mediocre   **b** : moderate ability or v ... person

**med·i·tate** \ˈme-də-ˌtāt\ *vb* **-tat·ed; -tat·ing** [L *m* ... *tari*, freq. of *medēri* to remedy — more at MEDIC ... engage in contemplation or reflection   **2** : to enga ... (as concentration on one's breathing or repetition ... purpose of reaching a heightened level of spiritua ... : to focus one's thoughts on : reflect on or ponde ... project in the mind : INTEND, PURPOSE   **syn** see ... **ta·tor** \-ˌtā-tər\ *n*

**med·i·ta·tion** \ˌme-də-ˈtā-shən\ *n* (13c)   **1** : a disc ... press its author's reflections or to guide others ... : the act or process of meditating

**med·i·ta·tive** \ˈme-də-ˌtā-tiv\ *adj* (1611)   **1** : mar ... to meditation   **2** : disposed or given to meditation ... *adv* — **med·i·ta·tive·ness** *n*

**Med·i·ter·ra·nean** \ˌme-də-tə-ˈrā-nē-ən, -nyən\ *ad* ... lating to, or characteristic of the Mediterranean S ... or characteristic of the peoples, lands, or cultures ... terranean Sea   **2** *not cap* [L *mediterraneus*, fr. *n* ... land — more at TERRACE] : enclosed or nearly e ... : of or relating to a group or physical type of the ... acterized by medium or short stature, slender b ... and dark complexion

# AMERICA'S LEADING REFERENCE BRAND



## Merriam-Webster's
## Collegiate® Dictionary
### Eleventh Edition

**COMPLETELY REVISED AND UPDATED**

### THE MOST UP-TO-DATE DICTIONARY AVAILABLE

▶ 10,000 new words and senses from all fields of knowledge

▶ 165,000 entries and 225,000 definitions

▶ Detailed symbols show most common pronunciations and acceptable variants

### THE FEATURES YOU NEED

▶ More than 42,000 usage examples—the most in any desk dictionary

▶ Coverage of 7,500 phrases and idioms clarifies meanings and illustrates common use

▶ More than 700 illustrations and diagrams and dozens of informative tables

### EXPERT WORD GUIDANCE

▶ Synonym paragraphs explain different shades of meaning between words

▶ Usage paragraphs provide guidelines for words with confused or disputed usage

▶ A Handbook of Style offers essential information to improve writing skills

## USA $22.95

CC-807-A05-1111



## Merriam-Webster Inc.
AN ENCYCLOPÆDIA BRITANNICA® COMPANY
Springfield, MA 01102
Merriam-Webster.com
Merriam-WebsterUnabridged.com
LearnersDictionary.com





ISBN 978-0-87779-807-1

52295

9 780877 798071

# Exhibit R

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## FORM 8-K

---

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported)**
**October 29, 2019**

---

# Allakos Inc.
**(Exact name of registrant as specified in its charter)**

---

| | | |
|---|---|---|
| **Delaware** | **001-38582** | **45-4798831** |
| **(State or other jurisdiction** | **(Commission** | **(IRS Employer** |
| **of incorporation)** | **File Number)** | **Identification No.)** |

**975 Island Drive, Suite 201**
**Redwood City, California 94065**
**(Address of principal executive offices, including zip code)**

**(650) 597-5002**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☒

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, par value $0.001 | ALLK | The Nasdaq Global Select Market |

**Item 7.01  Regulation FD Disclosure**

On October 29, 2019, Dr. Evan Dellon made a presentation at the American College of Gastroenterology 2019 Annual Scientific Meeting titled "Efficacy and Safety of AK002 in Adult Patients with Active Eosinophilic Gastritis and/or Eosinophilic Gastroenteritis: Primary Results from a Randomized, Double-Blind Placebo- Controlled Phase 2 Trial (ENIGMA Study)" (the "Presentation"). A copy of the Presentation made is attached to this Current Report on Form 8-K as Exhibit 99.1.

The information contained in this Current Report on Form 8-K, including the attached Exhibit 99.1, is intended to be furnished and shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

**Forward-Looking Statements**

This Form 8-K, including the Presentation, contains forward-looking statements within the meaning of The Private Securities Litigation Reform Act of 1995. Such forward-looking statements include, but are not limited to, the ability of AK002 to continue to demonstrate rapid and sustained benefit in patients with eosinophil gastrointestinal diseases, the timing of the Company's long-term extension study and the efficacy and safety results from such study, the timing and outcome of its end of the phase 2 meeting and Allakos' ability to conduct a phase 3 study in EG and/or EGE and a phase 2/3 study in EoE. Such statements are subject to numerous important factors, risks and uncertainties that may cause actual events or results to differ materially from current expectations and beliefs, including but not limited to: Allakos' early stages of clinical drug development; Allakos' ability to timely complete clinical trials for, and if approved, commercialize AK002, its lead compound; Allakos' ability to obtain required regulatory approvals for its product candidates; uncertainties related to the enrollment of patients in its clinical trials; Allakos' ability to demonstrate sufficient safety and efficacy of its product candidates in its clinical trials; uncertainties related to the success of later-stage clinical trials, regardless of the outcomes of preclinical testing and early-stage trials; market acceptance of Allakos' product candidates; uncertainties related to the projections of the size of patient populations suffering from the diseases Allakos is targeting; Allakos' ability to advance additional product candidates beyond AK002; Allakos' ability to obtain additional capital to finance its operations; and other important risk factors set forth in Allakos' most recent Annual Report on Form 10-K filed with the SEC on March 14, 2019, Quarterly Report on Form 10-Q filed with the SEC on August 5, 2019 and future reports to be filed with the SEC. These documents contain and identify important factors that could cause the actual results for Allakos to differ materially from those contained in Allakos' forward-looking statements. Any forward-looking statements contained in this Form 8-K, including the Presentation[s], speak only as of the date hereof, and Allakos specifically disclaims any obligation to update any forward-looking statement, except as required by law.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 99.1 | American College Gastroenterology 2019 Annual Scientific Meeting Presentation dated October 29, 2019. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Allakos Inc.

Date: October 29, 2019                     By:        /s/ Robert Alexander
                                                        **Robert Alexander**
                                                        **Chief Executive Officer**

**Exhibit 99.1**

# AK002 (Antolimab) in Adult Patients with Active Eosinophilic Gastritis and/or Eosinophilic Gastroenteritis: Primary Results from a Randomized, Double-Blind, Placebo-Controlled Phase 2 Trial (ENIGMA Study; NCT03496571)

Evan S. Dellon[1], Kathryn A. Peterson[2], Joseph A. Murray[3], Gary W. Falk[4], Nirmala Gonsalves[5], Mirna Chehade[6], John Leung[7], Robert M. Genta[8], Marc E. Rothenberg[9], Paneez Khoury[10], Adam C. Bledsoe[3], Camilla Shaw[11], Henrik S. Rasmussen[11], Bhupinder Singh[11], Alan T. Chang[11], Amol P. Kamboj[11], Ikuo Hirano[5]

[1]University of North Carolina, Chapel Hill, NC; [2]University of Utah, Salt Lake City, UT; [3]Mayo Clinic Rochester, Rochester, MN; [4]University of Pennsylvania, Philadelphia, PA; [5]Northwestern University, Chicago, IL; [6]Icahn School of Medicine at Mount Sinai, New York, NY; [7]Tufts University, Boston, MA; [8]Baylor College of Medicine, Houston, TX; [9]Cincinnati Children's Hospital, Cincinnati, OH; [10]NIAID/NIH, Bethesda, MD; [11]Allakos, Inc., Redwood City, CA.



ACG 2019
October 25-30
San Antonio, TX

**ACG 2019**
San Antonio, TX October 25th-30th 2019

# Eosinophilic Gastrointestinal Diseases (EGIDs)



Eosinophilic Gastritis
(EG)

Eosinophilic Esophagitis
(EoE)

ESOPHAGUS

STOMACH

DUODENUM/
SMALL INTESTINE

Eosinophilic Gastroenteritis
(EGE)

## EG, EGE, EoE

**Chronic Eosinophilic Inflammation of the Stomach, Small Intestine, or Esophagus**

- Symptoms: abdominal pain, nausea, early satiety, loss of appetite, bloating, abdominal cramping, vomiting, diarrhea, and dysphagia

- Eosinophils and mast cells are important drivers of disease

- Current standard of care: steroids; diet

- No FDA-approved treatment for EG, EGE, or EoE

ACG 2019
October 25-30
San Antonio, TX

2



# ENIGMA Phase 2 Study Aim and Inclusion

**Study Aim**

- Determine safety and efficacy of AK002 for treatment of EG and/or EGE

**Key Inclusion Criteria**

- Active moderate to severe symptoms[1] using the daily 8 symptom EG/EGE-SQ© Questionnaire
- Biopsy confirmed EG/EGE
    - Stomach: ≥30 eos/hpf in 5 hpfs
    - Duodenum: ≥30 eos/hpf in 3 hpfs



**ACG 2019**
October 25-30
San Antonio, TX

1 PRO entry criteria: average weekly score over ≥2 weeks of ≥3 for either abdominal pain, diarrhea and/or nausea

4



# ENIGMA Phase 2 Study Design

**Screening**
2-4 Weeks

EGD w/
Biopsy
(Baseline)

**Treatment**
12 Weeks

Dose
Day 1

Dose
Day 29

Dose
Day 57

Dose
Day 85

**Follow-Up**
8 Weeks

EGD w/
Biopsy
(Day 99)

EG/EGE

**AK002 High (N=21)**
$0.3 \rightarrow 1.0 \rightarrow 3.0 \rightarrow 3.0$ mg/kg

**AK002 Low (N=22)**
$0.3 \rightarrow 1.0 \rightarrow 1.0 \rightarrow 1.0$ mg/kg

**Placebo (N=22)**



**ACG 2019**
October 25-30
San Antonio, TX

5

# Endpoints

**Primary Endpoint**
- Mean percent change in gastrointestinal eosinophil counts from baseline

**Symptoms Secondary Endpoint**
- Mean percent change in Total Symptom Score (TSS) from baseline

**Responder Secondary Endpoint**
- Proportion of patients who have:
    - >75% decrease in tissue eosinophils AND >30% benefit in TSS

**Primary analysis with a pre-specified hierarchical per protocol approach**
- Sensitivity analyses: ITT; subgroup with no steroid use



**ACG 2019**
October 25-30
San Antonio, TX

6

## Baseline Characteristics

| | AK002 Dose Groups | | | Placebo (n=20) | Total (N=59) |
|---|---|---|---|---|---|
| | High 0.3-3.0 mg/kg (n=20) | Low 0.3-1.0 mg/kg (n=19) | Combined High/Low (n=39) | | |
| Age, Mean (Range) | 42 (20-67) | 43 (18-74) | 42 (18-74) | 40 (18-67) | 41 (18-74) |
| Female | 60% | 84% | 72% | 50% | 64% |
| White | 85% | 95% | 90% | 100% | 93% |
| Mean Gastrointestinal[1] Eosinophils/hpf | 76 | 80 | 78 | 75 | 77 |
| Mean Gastrointestinal[1] Mast Cells/hpf | 59 | 70 | 64 | 56 | 62 |
| Mean Total Symptom Score (TSS) [0-80] | 34.1 | 34.7 | 34.4 | 30.1 | 32.9 |
| % of Patients (n) by AEC[2]/µL — <250 | 45% (9) | 26% (5) | 36% (14) | 45% (9) | 39% (23) |
| % of Patients (n) by AEC[2]/µL — 250 to <500 | 35% (7) | 42% (8) | 38% (15) | 15% (3) | 31% (18) |
| % of Patients (n) by AEC[2]/µL — 500 to <1500 | 20% (4) | 21% (4) | 21% (8) | 35% (7) | 25% (15) |
| % of Patients (n) by AEC[2]/µL — ≥1500 | 0% | 11% (2) | 5% (2) | 5% (1) | 5% (3) |



ACG 2019
October 25-30
San Antonio, TX

1 Gastric or duodenum site with highest eosinophil or mast cell counts
2 AEC: Absolute Eosinophil Count

7

# Primary Endpoint – Mean % Change in Eosinophil Count

| Treatment Arm | Baseline Eosinophil Counts / hpf | Mean %Δ in Eosinophil Counts | $p$ - value |
|---|---|---|---|
| High Dose AK002 (n=20) | 76 | -97% | **<0.0001** |
| Low Dose AK002 (n=19) | 80 | -92% | **<0.0001** |
| Combined AK002 (n=39) | 78 | -95% | **<0.0001** |
| Placebo (n=20) | 75 | +10% | - |



ACG 2019
October 25-30
San Antonio, TX

8

# Tissue Eosinophil Depletion



**Stomach/Duodenal Eos < 6/hpf**

37 of 39 patients had < 6 eos/hpf; 31/39 had 0 eos/hpf



ACG 2019
October 25-30
San Antonio, TX

9

# Patient Reported Symptoms Secondary Endpoint

| Treatment Arm | Baseline TSS | Mean % Change in TSS | p - value |
|---|---|---|---|
| High Dose AK002 (n=20) | 34 | -58% | **0.0012** |
| Low Dose AK002 (n=19) | 35 | -49% | **0.0150** |
| Combined AK002 (n=39) | 34 | -53% | **0.0012** |
| Placebo (n=20) | 30 | -24% | - |

 **ACG 2019**
October 25-30
San Antonio, TX

10









## Improvements in TSS Were Not Driven by Any Single Symptom

| Mean Reduction in TSS | Combined AK002 (N=39) | Placebo (N=20) | p - value |
|---|---|---|---|
| **Total Score** | **-53.5%** | **-24.3%** | **0.0012** |
| Minus Abdominal Pain | -53.1% | -22.5% | 0.0010 |
| Minus Nausea | -53.2% | -23.9% | 0.0009 |
| Minus Vomiting | -53.0% | -24.9% | 0.0018 |
| Minus Satiety | -51.8% | -25.4% | 0.0019 |
| Minus Loss of Appetite | -53.0% | -24.9% | 0.0009 |
| Minus Abdominal Cramping | -53.0% | -22.4% | 0.0011 |
| Minus Bloating | -55.9% | -26.9% | 0.0029 |
| Minus Diarrhea | -54.9% | -24.0% | 0.0010 |



**ACG 2019**
October 25-30
San Antonio, TX

13

# AK002 Met Treatment Responder Secondary Endpoint

| Treatment Arm | Treatment Responders | $p$ - value |
|---|---|---|
| High Dose AK002 (n=20) | 70% | **0.0009** |
| Low Dose AK002 (n=19) | 68% | **0.0019** |
| Combined AK002 (n=39) | 69% | **0.0008** |
| Placebo (n=20) | 5% | - |

Treatment responder defined as: >75% reduction in tissue eosinophil counts AND >30% reduction in symptoms (TSS)



**ACG 2019**
October 25-30
San Antonio, TX

14

# Response in Concomitant EoE[1]

## Esophageal Eos ≤ 6/hpf[2]



## Severity of Dysphagia[3]



1 25 patients with concomitant EoE (≥15 eos/hpf or history of EoE) and baseline dysphagia
2 Excludes patients with eos < 6/hpf at baseline. At end of treatment, 10/14 AK002 patients had 0 eos/hpf; 2/14 AK002 patients had 1 eos/hpf;
  1/14 AK002 patients had 3 eos/hpf; 1/14 AK002 patients had 105 eos/hpf (biopsy occurred 6 weeks post last dose instead of 2 weeks per protocol);
  1/9 placebo patients had 2 eos/hpf; 8/9 placebo patients had 19 – 200 eos/hpf
3 All EoE patients with end of treatment dysphagia scores
† p = 0.00015



**ACG 2019**
October 25-30
San Antonio, TX

15

# Safety Summary

**Treatment-Emergent AEs in ≥5% of Patients**

| % of Patients, (n) | AK002 (n=43) | Placebo (n=22) |
|---|---|---|
| Infusion related reaction | 60% (26) | 23% (5) |
| Headache | 9% (4) | 9% (2) |
| Upper respiratory tract infection | 9% (4) | 9% (2) |
| Urinary tract infection | 9% (4) | 5% (1) |
| Nausea | 7% (3) | 14% (3) |
| Fatigue | 7% (3) | 9% (2) |
| Diarrhea | 5% (2) | 9% (2) |
| Nasopharyngitis | 5% (2) | 9% (2) |
| Abdominal pain | 2% (1) | 9% (2) |
| Dehydration | 2% (1) | 9% (2) |
| Gastroenteritis viral | 2% (1) | 9% (2) |
| Pyrexia | 2% (1) | 9% (2) |
| Sinusitis | 2% (1) | 9% (2) |
| Cough | 0% (0) | 9% (2) |
| Influenza | 0% (0) | 9% (2) |
| White blood cell count increased | 0% (0) | 9% (2) |

- Generally well tolerated
- Most common AE was mild to moderate infusion related reactions (IRR)
  - 93% mild to moderate (flushing, feeling of warmth, headache, nausea, dizziness)
  - Mostly on first infusion, greatly reduced or does not occur on subsequent infusions
  - 1 drug-related serious adverse event, an IRR which recovered within 24 hours with no further sequelae
- Treatment-emergent SAEs: 9% on AK002, 14% on Placebo
- No other significant AEs



**ACG 2019**
October 25-30
San Antonio, TX

16

# ENIGMA Summary

- This was the first randomized study in EG/EGE
- Study met all primary and secondary endpoints, demonstrating significant histologic and symptom improvements in EG/EGE
- Strong histologic and symptom improvements in EoE
- Generally well-tolerated
- These results build on clinical activity of AK002 observed in other atopic and mast cell disorders (chronic urticaria, severe allergic conjunctivitis, asthma, atopic dermatitis, and indolent systemic mastocytosis)
- Further development of AK002 for EG/EGE is appropriate



**ACG 2019**
October 25-30
San Antonio, TX

17

We thank the patients who participated in this study, investigators, and study staff



ACG 2019
October 25-30
San Antonio, TX

18