Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNG KIM, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ALLAKOS INC., ROBERT ALEXANDER, LEO REDMOND, HENRIK RASMUSSEN, and ADAM TOMASI, <br> , <br><br> Defendants. | Case No: 4:20-cv-01720-JSW <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** <br><br> JUDGE: Hon. Jeffrey S. White <br> DATE: April 30, 2021 <br> TIME: 9 a.m. <br> CTRM: 5, 2nd floor |

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND ..............................................................................3

    A.    Background of Allakos and AK002.....................................................3

    B.    The "ENIGMA" Trial. ......................................................................4

    C.    Defendants' Numerous Misstatements About the ENIGMA Trial.........5

        1.    Misleading Statements About Use of a CRO. ............................5

        2.    Misleading Statements About Blinding. ......................................7

        3.    Misleading Statements About Steroid Use. ................................9

        4.    Misleading Statements About Serious Adverse Events.............10

    D.    After the Truth Was Revealed, Allakos' Stock Dropped, Harming Investors. ...........................................................................................10

ARGUMENT......................................................................................................11

    I.    Plaintiffs Allege Misrepresentations and Omissions. ...........................11

    A.    Defendants' Misstatements About Use of a CRO are Actionable.........11

    B.    Defendants' Misstatements About Blinding are Actionable. ................14

    C.    Defendants' Misstatements About Steroid Use are Actionable.............17

    D.    Defendants' Misstatements About Serious Adverse Events are Actionable. ........19

    II.    Plaintiffs Allege Scienter. ...................................................................19

    A.    Defendants Made Misstatements Knowingly or Recklessly. ...............20

    B.    Defendants Had a Motive to Commit Fraud.......................................22

    C.    A Holistic Assessment Supports a Strong Inference of Scienter..........23

CONCLUSION...................................................................................................25

OPPOSITION TO DEFENDANTS' MTD               CASE NO. 4:20-CV-01720-JSW

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abely v. Aeterna Zentaris Inc.*,
   No. 12 CIV. 4711 PKC, 2013 WL 2399869 (S.D.N.Y. May 29, 2013) ....................................15

*Applestein v. Medivation, Inc.*,
   561 F. App'x 598 (9th Cir. 2014) ............................................................................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................................11

*Azar v. Yelp, Inc.*,
   No. 18-CV-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)................................14

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .................................................................................................................13

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008)........................................................................................vi, 12, 20

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
   No. 19-CV-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ......................................18

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002)....................................................................................................12

*Cho v. UCBH Holdings, Inc.*,
   No. C 09-4208 JSW, 2011 WL 3809903 (N.D. Cal. May 17, 2011)...................................22, 25

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014)......................................................................................................25

*Colyer v. Acelrx Pharm., Inc.*,
   No. 14-CV-04416-LHK, 2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) .................................22

*Cozzarelli v. Inspire Pharm. Inc.*,
   549 F.3d 618 (4th Cir. 2008).....................................................................................................25

*Edenbrook Capital, LLC v. RhythmOne Plc*,
   No. 19-CV-00615-WHO, 2019 WL 1791419 (N.D. Cal. Apr. 24, 2019) ................................12

*Feyko v. Yuhe Int'l, Inc.*,
   No. CV 11-05511 DDP PJWX, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ...........................16

*Henning v. Orient Paper, Inc.*,
  No. CV 10-5887-VBF AJWX, 2011 WL 2909322 (C.D. Cal. July 20, 2011) .......................... 16

*Hoey v. Insmed Inc.*,
  No. CV 16-4323 (FLW), 2018 WL 902266 (D.N.J. Feb. 15, 2018).................................. 14, 25

*In re Adolor Corp. Sec. Litig.*,
  616 F. Supp. 2d 551 (E.D. Pa. 2009) ............................................................... 14, 15

*In re Amylin Pharm., Inc. Sec. Litig*,
  No. 01CV1455 BTM (NLS), 2003 WL 21500525 (S.D. Cal. May 1, 2003)........................ vi, 24

*In re Apple Inc. Sec. Litig.*,
  No. 19-CV-02033-YGR, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)................................. 21

*In re Avon Sec. Litig.*,
  No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ............................... 20

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)............................................................................... vi, 25

*In re China Educ. All., Inc. Sec. Litig.*,
  No. CV 10-9239 CAS JCX, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ............................. 16

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008).................................................................................. 11

*In re Intuitive Surgical Sec. Litig.*,
  No. 5:13-CV-01920-EJD, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) .................... vi, 18, 19

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011).......................................................................... 20

*In re Nektar Therapeutics*,
  No. 18-CV-06607-HSG, 2020 WL 3962004 (N.D. Cal. July 13, 2020)........................ 13, 16, 22

*In re Nuvelo, Inc. Sec. Litig.*,
  668 F. Supp. 2d 1217 (N.D. Cal. 2009) ....................................................................... 14

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F. Supp. 3d 329 (S.D.N.Y. 2020)........................................................................... 15

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)............................................................................... 15, 22

*In re Taleo Corp. Sec. Litig.*,
  No. C 09-00151 JSW, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ...................................... 22

- iii -

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993)...........................................................................................................23

*In re Verifone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012).....................................................................................................19

*In re Zillow Grp., Inc. Sec. Litig.*,
  No. C17-1387-JCC, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019).......................................21

*In re Zynga Inc. Sec. Litig.*,
  No. C 12-04007 JSW, 2015 WL 1382217 (N.D. Cal. Mar. 25, 2015)........................................10

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)......................................................................................................24

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013).......................................................................................................25

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580 (9th Cir. 2008)......................................................................................................11

*Lerner v. Nw. Biotherapeutics*,
  273 F. Supp. 3d 573 (D. Md. 2017) ...........................................................................................13

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008)......................................................................................................24

*McKinney v. Google, Inc.*,
  No. 5:10-CV-01177 EJD, 2011 WL 3862120 (N.D. Cal. Aug. 30, 2011)................................12

*Mulderrig v. Amyris, Inc.*,
  No. 19-CV-1765 YGR, 2020 WL 5903844 (N.D. Cal. Oct. 5, 2020) ............................vi, 19, 23

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020)................................................................................................vi, 24

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003)................................................................................................19, 25

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ...............................................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...............................................................................................................vi, 18

*Padnes v. Scios Nova Inc.*, No. C,
  95-1693 MHP, 1996 WL 539711 (N.D. Cal. Sept. 18, 1996)....................................................15

OPPOSITION TO DEFENDANTS' MTD                                    CASE NO. 4:20-CV-01720-JSW

*Patel v. Axesstel, Inc.*,
No. 3:14-CV-1037-CAB-BGS, 2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ......................vi, 21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014).............................................................................................22

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014)................................................................................................13

*Rihn v. Acadia Pharm. Inc.*,
No. 15CV00575 BTM(DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016).........................13

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)...........................................................................................20, 22

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016)............................................................................................vi, 14

*Skiadas v. Acer Therapeutics Inc.*,
No. 1:19-CV-6137-GHW, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) ................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................................20, 23

**Statutes**

15 U.S.C. § 78u - 4(b)(1)(B)................................................................................................11

**Regulations**

21 C.F.R. § 312.32(c)..........................................................................................................10

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 4:20-CV-01720-JSW

## SUMMARY OF ARGUMENT AND ISSUES TO BE DECIDED

*Falsity.* Defendants falsely stated that the ENIGMA Trial (1) used a contract research organization ("CRO"), (2) was "double-blinded," (3) was not affected by the patients' steroid use, and (4) only have one drug-related serious adverse event. *First*, Defendant's hyper-literal interpretation of the statement concerning CROs misconstrues the law. The relevant question is whether, in context, a statement would give a reasonable investor the impression that a state of affairs differs in a material way from one that actually exists. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-987 (9th Cir. 2008). *Second*, Defendants' argument that they intended the Trial to be a double-blind study is irrelevant — their statements that the study was "double-blinded" were misleading because they continued to make them after the blinding problems occurred. *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). *Third*, the statement that steroids had no effect on the Trial was misleading since poor steroids controls rendered it without a basis. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 196 (2015). *Four*, mischaracterizing serious adverse events is actionable. *In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *3 (N.D. Cal. Sept. 29, 2017).

*Scienter.* Given Allakos' small size and the importance of AK002 and the Trial to it, it is absurd to suggest that Defendants did not knowingly or recklessly make misstatements. *See Berson*, 527 F.3d at 987-988. Defendants also made clear they had intimate knowledge of the Trial in their public statements. *Patel v. Axesstel, Inc.*, 2015 WL 631525, at *10-*11 (S.D. Cal. Feb. 13, 2015). Defendants' announcement of a necessary secondary offering the same day as making misstatement shows motivation to commit fraud. *Mulderrig v. Amyris, Inc.*, 2020 WL 5903844, at *21 (N.D. Cal. Oct. 5, 2020). Defendants may be held liable for misrepresenting the regulatory risk to a drug even if they still hope it will be approved. *In re Amylin Pharm., Inc. Sec. Litig*, 2003 WL 21500525, at *5 (S.D. Cal. May 1, 2003). *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) is inapplicable since the Plaintiffs' theory is not that Defendants believed approval was impossible.

*Loss causation.* The Seligman Report was a corrective disclosure because it contained information previously unavailable to the market and the author was a well-established investment group. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795 (9th Cir. 2020).

- vi -

**INTRODUCTION**

Allakos, Inc. ("Allakos" or the "Company") is a clinical stage biopharmaceutical company that has never generated any revenue. Its future prospects rely entirely on a single drug, AK002, which it is developing to treat eosinophil and mast related cell diseases. According to Allakos, the lead indications — diseases that AK002 is furthest along in the FDA approval process for — are eosinophilic gastritis ("EG") and eosinophilic gastroenteritis ("EGE"), which are inflammatory diseases of the stomach and small intestine. During 2018 and the first half of 2019, Allakos conducted a Phase 2 clinical trial that tested AK002 on EG and EGE patients, which the Company referred to as the "ENIGMA" Trial. Given that those diseases are the lead indications for AK002, it was the most important clinical trial in Allakos' history. On August 5, 2019, Defendants announced "positive" results from the ENIGMA Trial and immediately capitalized by raising almost $377.5 million in a secondary offering.

On December 18, 2019, Seligman Investments ("Seligman") issued an extensive research report about the ENGIMA Trial entitled "A Suspect Biotech with a Phase 2 Farce, Incredulous Trial Investigators, and Warning Signs of Potential Fraud" (the "Seligman Report"). Seligman, among other things, interviewed trial investigators who worked on the ENIGMA Trial with Allakos and reviewed and reprinted numerous posts that ENIGMA Trial participants and their families made to a private Facebook group. The Seligman Report revealed the Defendants made numerous misstatements about the ENIGMA Trial. *First*, contrary to multiple statements in Allakos' public filings and how the vast majority of clinical trials are conducted, Allakos did not employ a third-party Contract Research Organization ("CRO") to conduct the ENIGMA Trial. Use of CROs are an important part of ensuring clinical trials are conducted with integrity and Allakos' own trial investigators were shocked that Allakos did not use one. *Second*, Defendants repeatedly referred to the ENIGMA Trial as "double-blinded" even though the blinding was compromised in multiple ways, including by adverse reactions to the AK002 infusions, trial investigators speculating to patients that they were getting the drug, and patients having access to test results. *Third*, the Report revealed that steroid use was rampant and poorly controlled in the Trial. And contrary to defendant Alexander's vehement assurances that steroids had zero effect on the results,

steroid use *was* a confounding factor since the current standard of care for EG and EGE is steroids. *Fourth*, Defendants falsely stated that there was only one drug-related serious adverse event during the ENIGMA Trial. After Seligman issued its report, Allakos' stock dropped 17% over the next two days.

*Falsity.* Defendants' argument that Plaintiffs' do not plead any false and misleading statements misconstrues both the law and the misstatements that Plaintiffs allege. Defendants rely on a hyper-literal reading of their CRO misstatements to argue they were accurate. The law, however, is that a statement is misleading when it gives investors an impression of a state of affairs that differs in a material way from one that actually exists, which Defendants' CRO statements clearly did.

Defendants further argue that their misstatements about blinding, steroid use, and serious adverse events in the ENIGMA Trial are not actionable because Plaintiffs are simply criticizing the design of the ENIGMA Trial. That is wrong. Defendants' statements concerning blinding were false and misleading because Defendants continued to refer to the Trial as double-blinded even after the blinding of the Trial had actually failed, not because Plaintiff had a methodological quibble with how the Trial was set up. Likewise, Defendant Alexander made an affirmative misstatement that steroids have no effect on the Trial even though he had no basis to make the statement. Finally, Defendants repeatedly stated that the ENIGMA Trial only had one drug-related serious adverse event even though Facebook posts by Trial participants showed that was not true.

*Scienter.* Plaintiffs have pled scienter because given Allakos' size and the ENIGMA Trial's importance to it, the Company's management certainly would have known that it did not use a CRO and about other problems with the Trial. Furthermore, Defendants Alexander and Rasmussen showed that they were deeply knowledgeable about the Trial during a conference call held the day that the results were announced. Defendants also had a strong motive to make misrepresentations — the survival of their business is entirely dependent on continuing to raise money. Allakos announced a secondary offering mere hours after they announced the ENIGMA Trial results. Defendants' try to counter these arguments by improperly disputing Plaintiff's allegations even though they must be accepted as true on a motion to dismiss. Defendants further claim that

Plaintiffs' scienter theory makes no sense because Defendants would not spend money advancing a drug candidate that they knew was doomed to fail, but Plaintiffs' theory is not dependent on Defendants' opinion of AK002 prospects. Instead, Plaintiff's position is that Defendants misstatements about specific aspects of the ENIGMA Trial mislead investors about the overall regulatory risk to the drug.

*Loss Causation*. Contrary to Defendants' contention, the Seligman Report did reveal new information to the market — Seligman interviewed Allakos' trial investigators and reviewed and reprinted posts from a private Facebook group. None of these sources were public knowledge.

## FACTUAL BACKGROUND

### A. Background of Allakos and AK002.

Allakos is a clinical stage biopharmaceutical company that describes itself as focused on the development of a single drug, AK002, to treat gastrointestinal inflammatory diseases, including EG, EGE, and eosinophilic esophagitis ("EoE"). (Amended Complaint ("Complaint" or "Compl.")) ¶¶ 17, 28.) The Company has never generated any revenue. (*Id.* ¶ 34.) In 2018, it had a net loss of $43.5 million and, as of June 30, 2019, it had accumulated a deficit of $143.1 million since its founding. (*Id.*) In its public filings, Allakos admits that its future prospects are entirely dependent on obtaining U.S. Food and Drug Administration ("FDA") approval for AK002. (*Id.* ¶ 32.) As of December 31, 2018, Allakos had only 62 full-time employees, 40 of whom were engaged in research and development activities. (*Id.* ¶ 33.)

Defendants Alexander, Redmond, Rasmussen, and Tomasi (collectively, the "Individual Defendants") were Allakos' Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief Medical Officer ("CMO"), and Chief Operating Officer ("COO") during the relevant time period and handled the day-to-day management of the Company. (*Id.* ¶¶ 18-23.) Tomasi also served as the Company's CFO until August 2019. (*Id.* ¶ 21.) Defendants Alexander, Rasmussen, and Tomasi all have Ph.Ds in scientific fields and all the Individual Defendants have significant prior experience at other pharmaceutical companies. (*Id.* ¶¶ 18-21; 144-145, 150.) Allakos' public filings state that the Company is "highly dependent" and Defendants Alexander and Tomasi. (*Id.* ¶¶ 144-145.)

**B. The "ENIGMA" Trial.**

During 2018 and the first half of 2019, Allakos conducted a Phase 2 clinical trial of Allakos on 65 patients with EG or EGE, which the Company refers to as the ENIGMA Trial. (*Id.* at 36.) The primary endpoint of the Trial was based on biopsies conducted on the patients and the secondary endpoints utilized a Patient Reported Outcome ("PRO") questionnaire measuring the changes in patient symptoms. (*Id.*) Defendants repeatedly described the ENIGMA Trial as a "randomized, double-blind, placebo controlled trial," which is defined as a trial where neither the patients nor the researcher know who is getting the treatment being tested and who is getting the placebo. (*Id.* ¶¶ 36-37.) The purpose of a double-blinded study is to eliminate bias caused by the researchers and patients' expectations that the treatment will work. (*Id.* ¶ 37.) Since EG and EGE are the lead indications for AK002, the ENGIMA Trial was the most important clinical trial in Allakos' history. (*Id.* ¶ 38.)

On August 5, 2019, Allakos issued a press release and hosted a conference call (the "August 5, 2019 Conference Call") where Defendants spoke in detail about how they conducted the ENIGMA Trial. (*Id.*¶¶ 42, 44.) On the August 5, 2019 Conference Call, Defendant Alexander stated that the ENIGMA Trial is one of the two trials that Allakos would use to try to gain FDA approval for use of AK002 (along with a yet to be conducted Phase 3 trial). (*Id.* ¶ 45.)

Mere hours after announcing the results of the ENIGMA Trial, Allakos announced a secondary public offering of $200 million of its common stock. (*Id.* ¶ 50.) On the next day, August 6, 2019, Allakos further capitalized on its announcement by upsizing its secondary offering to $350 million at an offering price of $77 per share. (*Id.* ¶ 53.) The Company ultimately raised $377.50 million in the offering. (*Id.*) Raising additional capital was absolutely crucial for Allakos because the Company has no revenue — their public filings during the class period stated: "We will continue to require additional capital to develop our product candidates and fund operations for the foreseeable future" and "if we are unable to raise additional funds when needed, we may be required to delay, reduce or terminate some or all of our development and commercialization efforts." (*Id.* ¶ 137.)

**C. Defendants' Numerous Misstatements About the ENIGMA Trial.**

Seligman manages long-only and long/short equity strategies and occasionally publishes research reports based on intensive, deep-dive fundamental research. (*Id.* ¶ 55.) It is an affiliate of Columbia Threadneedle Investments group, an asset manager overseeing $476 billion of client assets. (*Id.* ¶ 55 n.4.)  On December 18, 2019, Seligman issued the Seligman Report,  an extensive research report on the ENIGMA Trial (*Id.* ¶¶ 55-57.) Seligman, among other things, interviewed trial investigators who conducted the ENIGMA Trial with Allakos and reviewed and reprinted numerous posts that ENIGMA Trial participants and their families made to a private Facebook group for EG patients that Seligman believes most of the 65 participants in the ENIGMA Trial are members of. (*Id.*) During a clinical trial, the drug is dispensed under the immediate direction of the Trial Investigators. (*Id.* ¶ 56.) Therefore, the Trial Investigators had first-hand knowledge of what occurred during the ENIGMA Trial. (*Id.*) The interviews with the ENIGMA Trial Investigators and the Facebook posts of patients and their family members show that Defendants made numerous misstatements about the ENIGMA Trial.

1. <u>Misleading Statements About Use of a CRO.</u>

Allakos' 2018 Form 10-K and 10-Qs for the first, second, and third quarters of 2019, which Defendants Alexander, Redmond, and Tomasi signed, stated:

> ***We do not have the ability to independently conduct our clinical trials. We currently rely on third-parties, such as CROs***, clinical data management organizations, medical institutions and clinical investigators, ***to conduct our clinical trials of AK002 and expect to continue to rely upon third-parties to conduct additional clinical trials of AK002.***

(*Id.* ¶¶ 89-94. (emphasis added).)

This statement is precisely what investors would have expected since the use of an independent CRO to conduct clinical trials, such as the ENIGMA Trial, is the typical practice for all but the largest pharmaceutical companies and they play an important role in making sure that clinical trials are carried out with integrity. (*Id.* ¶ 40.) Accordingly, more than 90% of clinical trials use a CRO. (*Id.* ¶ 58.) CROs operate under standard operating procedures which impose rules of Good Clinical Practice, such as Source Document Verification, database lock, and a prospectively

defined statistical analysis plan, which prevent the company sponsoring the trial from making changes during the trial or otherwise manipulating the results to produce a better outcome. (*Id.* ¶ 40.) The absence of a CRO is a red flag for the FDA that would cause it to investigate whether a trial followed Good Clinical Practice, and if the FDA believes that a trial did not follow Good Clinical Practice, it is less likely the sponsor will be able to use the trial to gain approval for the drug. (*Id.* ¶ 41.)

Shockingly, given Defendants' statements and the fact that CROs are industry standard and extremely important to the integrity of clinical trials, the Seligman Report revealed that Allakos did not use a CRO to conduct the ENIGMA Trial. (*Id.* ¶¶ 58-62, Ex. 3 at 49-53.) Seligman confirmed with *four different* ENIGMA Trial Investigators that Allakos did not use a CRO. (*Id.*) Furthermore, each of those investigators told Seligman that the failure to use a CRO was highly unusual and they had never been involved in another clinical trial that did not use one. (*Id.*) Notably, three out of the four trial investigators indicated that Allakos was not upfront about the fact that it was using a CRO, and they were shocked to learn the truth. (*Id.* ¶¶ 59-62, Ex. 3 at 50-52.) The First Trial Investigator told Seligman he became suspicious that he was not working with a CRO because the people he interacted with behaved really aggressively. (*Id.* ¶ 59, Ex. 3 at 50) He then confirmed that they worked for Allakos and not a CRO (*Id.*). He further stated that Allakos was "aggressive" and "actively involved during the trial." (*Id.*)

The Second Trial investigator stated: "We always deal with a third party CRO that makes sure there's compliance with internal and external protocols and inclusion/exclusion criteria," "[i]t should be a third party to prevent bias," and that the failure to use a CRO "***would be a huge red flag in phase three and the FDA wouldn't like it.*** They would be stupid to have their own people do compliance, assessment, and auditing. It just won't fly with the FDA." (*Id.* ¶ 60, Ex. 3 at 51 (emphasis added).) The Second Trial Investigator further stated that he had probably done 20 clinical trials in the past five years and all of them had used a third-party CRO because "[t]hat's standard operating procedure" and its "the right thing to do. I was shocked to see that Allakos served as their own CRO." (*Id.*) Similarly, the Third Trial Investigator told Seligman that he "believe[d] the site monitors were employees of Allakos" and "[i]f it was an Allakos person and

- 6 -

not a CRO I'd be very bothered by that. It wouldn't be honest." (*Id*. ¶ 61, Ex. 3 at 52.)

The Fourth Trial Investigator knew all along that Allakos did not use a CRO and noted that for Allakos to have any chance of running the ENIGMA Trial properly without a CRO, some Allakos employees would need to be blinded and others unblinded. (*Id.* ¶ 62., Ex. 3 at 53.) Given that Allakos had only 40 employees who were engaged in research and development activities as of the end of 2018, it would have been very difficult for Allakos to maintain the necessary firewall to maintain the blinding even if it was honestly trying to do so. (*Id.* ¶ 62.) Unsurprisingly, as detailed below, the blinding of the ENIGMA Trial was compromised in numerous ways.

In light of Allakos' failure to use a CRO to independently maintain the proper standards for the ENGIMA Trial and Allakos' aggressive behavior, Seligman researched whether biopsies done for the ENIGMA Trial were sent directly to the Company or to a panel of third party pathologists for analysis. (*Id.* ¶ 63, Ex. 3 at 54-55.) Independent analysis of biopsies is important because they are highly subjective and can be significantly affected by the bias of the reader. (*Id.*) One of the ENIGMA trial investigators told Seligman that the biopsies were not sent to an independent panel — instead, they were sent to a single reader with financial ties to Allakos. (*Id.*)

### 2. Misleading Statements About Blinding.

Allakos stated in multiple public filings signed by Defendants Alexander, Tomasi, and Redmond that ENGIMA was "randomized, double-blind, [and] placebo controlled. (*Id.* ¶¶ 97-101; 104-106.) Additionally, on the August 5, 2019 Conference Call, Defendant Alexander specifically highlighted that the ENGIMA Trial was a double-blind study, stating: "In terms of our primary and 2 key secondary endpoints, we saw a tremendous effect on all of them. ***And a reminder, this was a randomized, double-blind, placebo-controlled study***." (emphasis added). Defendant Rasmussen also specifically stated and used a presentation that stated that "the ENIGMA study was randomized, double-blind, placebo-controlled." (*Id.* ¶¶ 101, 103-104.)

Seligman's interviews with ENGIMA Trial Investigators and review of the private EG Facebook group indicated that there were numerous blinding problems in the ENIGMA Trial. *First,* three of the ENIGMA Trial Investigators expressed concern that the entire Trial was unblinded because AK002 causes a significant reaction when infused that tipped off patients that

they were receiving AK002 instead of a placebo. (*Id.* ¶ 67, Ex. 3 at 65.) They stated that "[t]he infusion reactions could unblind you," "[y]ou could argue that from a symptom standpoint, the trial was unblinded" because "[i]f you have a reaction, you say as a patient that I can't be on placebo, and "unblinding through infusion is certainly a possibility, of a confounding factor." (*Id.*) The EG Facebook group shows that the trial investigators' fears were warranted — the Seligman Report reprinted eight posts in which ENIGMA Trial patients or their family members speculated about whether they received AK002 based on whether they had a reaction. (*Id.* ¶ 67, Ex. 3 at 68-69.) *Second*, five patients or their family members posted that the trial investigators themselves told the patients they were likely getting the drug. (*Id.* ¶ 68, Ex. 3 at 70.) *Third*, one patient in the ENIGMA Trial posted on Facebook that it was "so great" to be "able to see the test results, biopsies, bloodwork while on the drug" and seven more posted that they received endoscopy results during the trial, including one that stated that "clinically and by endoscopy we all should have a clear indication if we are getting the drug or placebo." (*Id.* ¶ 69, Ex. 3 at 72-73.) *Fourth*, posts in the EG Facebook group indicated that patients were told that they would be accepted into the extension study of AK002 if they were doing well in the ENIGMA Trial. (*Id.* ¶ 71, Ex. 3 at 74.) This biased the PRO scores by motivating patients to say they were improving. (*Id.*) *Fifth*, posts to the EG Facebook also show that Allakos was not blinded to the Trial results. Two ENIGMA patients or their family members posted that they were told during the Trial, in one case by a trial research coordinator, that Allakos was discontinuing the lowest dose (.3 mg) of AK002 mid-trial because it was ineffective. (*Id.* ¶ 73, Ex. 3 at 77.) This shows that Allakos had access to data during the Trial (was unblinded), which is a violation of Good Clinical Practice and, therefore, a red flag for the FDA. (*Id.*) A Facebook post also showed that a patient's parent spoke directly with Defendant Rasmussen, which one of the ENIGMA Trial investigators told Seligman was improper because "[t]he company should be blinded to the patient's name." (*Id.* ¶ 72, Ex. 75-76.)

For trials that use PRO questionnaires, compromised blinding is huge red flag for the FDA. (*Id.* ¶ 70.) In the FDA's Guidance for Industry on Patient-Reported Outcome Measures, issued in December 2009, the FDA stated: "In blinded clinical trials, patients should be blinded to treatment assignment throughout the trial. If the treatment has obvious effects, such as adverse events, the

clinical trial may be at risk for unintentional unblinding…. ***Suspicion of inadvertent unblinding can be a problematic review consideration for the FDA when assessing PRO endpoints***." (*Id.* (emphasis added).)

### 3. Misleading Statements About Steroid Use.

During the August 5, 2019 Conference Call, Defendant Alexander stated: "***In terms of the steroid, I mean, it had absolutely 0 effect on the results***, and that was shown in the study. ***So the idea that steroids are confounding the results is specious.***" (*Id.* ¶ 113 (emphasis added).) It is clear, however, that Defendants Alexander had no basis for that statement.

The current standard of care for EG and EGE is the use of steroids to reduce inflammation. (*Id.* ¶¶ 29, 76.) Ninety percent of EGE patients respond to steroid therapy and even 5 mg a day can suppress symptoms (*Id.* ¶ 76.) Therefore, proper control of steroids was very important to the reliability of the ENIGMA Trial. The FDA's draft guidance on EoE, a closely related disease to EG and EGE, specifically warned about the importance of steroid controls during clinical trials. (*Id.* ¶ 77.)

Steroids were, however, very poorly controlled in the ENIGMA Trial. As Defendant's Motion to Dismiss ("Motion" or "Mot.") admits, the group that Allakos classified as not using steroids only excluded patients who were on "acute steroids" (steroids used as premedication before infusion of AK002 or to manage after infusion reactions) — it included patients on up to 10 mg daily doses of prednisone (a powerful steroid). (Mot. at 12.) Defendants claim only 28% of the patients treated with AK002 received acute steroids, but did not disclose how many patients in the AK002 and placebo group were on daily steroids. (*Id.*) Furthermore, trial investigators that Seligman interviewed stated they had complete discretion to give steroids: one of them said he gave all of his patients 20 mg of prednisone prior to the first two infusions. Another said he only put some patients on steroids, but said he used 80 mg of prednisone. (Compl. ¶ 75, Ex. 3 at 97.) Given the haphazard nature of the steroid administration, one of the ENIGMA Trial Investigators also told Seligman that he believed steroids could be a confounding factor, stating "[c]ould steroids be a confounding factor here? Of course. With 80mg of prednisone, one shot can give you an acute effect." (*Id.* ¶ 77, Ex. 3 at 104.) A March 25, 2020 analyst report on Allakos issued by SMBC

- 9 -

Nikko Securities America, Inc. similarly stated that "it remains entirely possible that steroids are driving the majority of symptom benefits, which coincidentally occur together with the first dose of [AK002] when steroids are most likely to be given." (*Id.* ¶ 79.)

Finally, Allakos decided to add acute steroids to the infusion protocols for the extension study of the ENIGMA Trial and to its Phase 3 trial. (*Id.* ¶¶ 78-79.) Defendants' decision to change the steroids protocol for trials conducted after ENIGMA would not make any sense if steroids had no effect on the ENIGMA Trial.

### 4. Misleading Statements About Serious Adverse Events.

The FDA defines a serious adverse event as one that results in: "Death, a life-threatening adverse event, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant incapacity or substantial disruption of the ability to conduct normal life functions." (*Id.* ¶ 80.) Allakos stated in multiple public filings signed by Defendants Alexander and Redmond that there was only one drug-related serious adverse event in the ENIGMA Trial, consisting of an infusion-related reaction, which resolved within 24 hours. (*Id.* ¶¶ 117-120, 122.) Defendant Rasmussen also made a similar statement during the August 5, 2019 Conference Call. (*Id.* ¶ 121.)

Defendant Rasmussen stated that there were other serious adverse events on the August 5, 2019 Conference Call, but said they were not drug-related and instead had to do with the general health of the patients. (*Id.* ¶¶ 81, 124.) Facebook posts reprinted in the Seligman Report show that there were definitely more than one reaction to infusions that resulted either in hospitalization or "significant incapacity or substantial disruption of the ability to conduct normal life functions" (*Id.* ¶¶ 82-83, Ex. 3 at 144-145.) Serious adverse events are a very important consideration for the FDA when evaluating trials — both 21 C.F.R. § 312.32(c) and the FDA's Guidance on Safety Reporting Requirements for Investigational New Drug and Bioavailability/Bioequivalence Studies require sponsors of clinical trials to report serious adverse events to the FDA. (Compl. ¶ 84.)[1]

### D. After the Truth Was Revealed, Allakos' Stock Dropped, Harming Investors.

After Seligman published its Report on December 18, 2019, shares of Allakos common stock fell $22.73 per share over two days, or more than 17% from the closing price on December

---

[1] Plaintiffs are no longer contesting the alleged misstatements concerning vomiting.

17, 2019 ,to close at \$109.80 on December 19, 2019, damaging investors. (*Id.* ¶¶ 134-135.)

**ARGUMENT**

On a Rule 12(b)(6) motion to dismiss, "[t]he Court's 'inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff.'" *In re Zynga Inc. Sec. Litig.*, No. C 12-04007 JSW, 2015 WL 1382217, at *1 (N.D. Cal. Mar. 25, 2015) (White, J.) (quoting *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008)). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter…to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he court need not accept as true conclusory allegations, nor make unwarranted deductions or unreasonable inferences…..But so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (internal quotation marks omitted).

## I.   PLAINTIFFS ALLEGE MISREPRESENTATIONS AND OMISSIONS.

A securities fraud complaint adequately pleads a false or misleading statement by "specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u - 4(b)(1)(B). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake."

### A.  Defendants' Misstatements About Use of a CRO are Actionable.

Defendants' statements that "***[w]e do not have the ability to independently conduct our clinical trials. We currently rely on third-parties, such as CROs***, clinical data management organizations, medical institutions and clinical investigators, to conduct our clinical trials of AK002" (Compl. ¶ 94 (emphasis added)) were false and misleading because they did not use a CRO for the ENIGMA Trial, the most important trial in Allakos' history. Defendants' argue that based on a hyper-literal reading, that this statement is technically accurate because "CROs" is modified by "such as." (Mot. at 8.) Technical accuracy divorced from context is, however, not the standard for determining whether a statement is misleading. Instead, the question is whether the statement "affirmatively create[s] an impression of a state of affairs that differs in a material way

- 11 -

from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-987 (9th Cir. 2008) (holding that failure to explicitly disclose that a portion of its backlog were projects with stop work orders was misleading despite defendants argument that such projects fit into the definition of backlog they provided); *Edenbrook Capital, LLC v. RhythmOne Plc*, No. 19-CV-00615-WHO, 2019 WL 1791419, at *6 (N.D. Cal. Apr. 24, 2019) (holding statement was actionable because defendant "fail[ed] to explicitly state that non-tendering shareholders would not be given an option to electronically convert their stock" and the complaint alleged "that delivering paper stock certificates is not a typical practice in a merger").

The allegations of the Complaint make clear that any reasonable investor would expect that a company that did "not have the ability to independently conduct [its own] clinical trials" and used "third-parties, such as CROs" would use a CRO for a clinical trial of such great importance. The Complaint alleges that use of a CRO for a clinical trial is typical practice for all but the largest pharmaceutical companies and they are used in more than 90% of clinical trials. (Compl. ¶¶ 40, 58.) The use of a CRO is sufficiently standard that three of Allakos' own trial investigators assumed that Allakos was using a CRO and were shocked and concerned when they found out otherwise. (*Id.* ¶¶ 59-62, Ex. 3 at 50-52.) Defendants' argument that their statement was not misleading because they were assisted by some third parties on the ENIGMA Trial is further undermined by the fact that the statements mention CROs specifically and they are the first third party mentioned. In contrast, in the only case Defendants cite on this point, *McKinney v. Google, Inc.*, No. 5:10-CV-01177 EJD, 2011 WL 3862120, at *5 (N.D. Cal. Aug. 30, 2011), the plaintiff failed to identify any representation that mentioned the topic that he claimed the defendant misled him about. Accordingly, it is clear Defendants' statements created the misleading impression that Defendants used a CRO for the ENIGMA Trial.

Defendants also argue in a footnote that Allakos' failure to use a CRO was not material. (Mot. 9 n.5.) To satisfy the materiality requirement, a complaint must allege sufficient facts to support the inference that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of

- 12 -

information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (internal quotation marks omitted). Determining materiality in securities fraud cases should ordinarily be left to the trier of fact unless the allegations are conclusory and inferences are unwarranted. *Rihn v. Acadia Pharm. Inc.*, No. 15CV00575 BTM(DHB), 2016 WL 5076147, at *5 (S.D. Cal. Sept. 19, 2016) (citing *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014).

The Complaint's materiality allegations concerning Allakos' failure to use a CRO are certainly not conclusory. It describes the standard operating procedures that CROs impose on clinical trials to make sure they follow Good Clinical Practice and alleges that the absence of a CRO would be a red flag that would make the FDA investigate whether Good Clinical Practice was adhered to during the trial. (Compl. ¶¶ 40-41.) Allakos' own statement concerning the use of third parties to run its trial stated that the failure "to comply with applicable [Good Clinical Practice] requirements" could mean "the clinical data in our clinical trials may be deemed unreliable and the FDA…may require us to perform additional clinical trials." (*Id.* ¶ 39.) Furthermore, Allakos' own trial investigators express grave concerns about Allakos' failure to use a CRO. The First Investigator stated that it caused Allakos to be "actively involved during the trial" and "aggressive." (*Id.* ¶ 59, Ex. 3 at 50.) The Second Investigator stated that CROs were necessary to "prevent bias" and that "[t]his would be a huge red flag in phase three and the FDA wouldn't like it." (*Id.* ¶ 60, Ex. 3 at 51.) The Third Investigator stated that Allakos' failure to use a CRO was not "honest." (*Id.* ¶ 61., Ex. 3 at 52.) Finally, the Complaint alleges concrete problems with the ENIGMA Trial that could have been remedied by the use of a CRO, such as the use of a single biopsy reader who had financial ties to Allakos, the failure to properly blind Allakos employees (who served in the roles that CRO employees generally would), and numerous problems properly blinding the patients. (*Id.* ¶¶ 62-63, 65-73.)[2]

---

[2] Defendants' materiality cases are easily distinguishable. In *In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004, at *10 (N.D. Cal. July 13, 2020), the court held that the plaintiff did not plead any information about why short seller's opinions on highly-technical matters were reliable. Here. Seligman got the opinion of trial investigators that actually worked on the ENIGMA Trial. In *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 587 (D. Md. 2017), the plaintiff argued that the results touted by defendants were misleading because they were not substantiated by trial investigators and omitted that, in plaintiff's judgement, the results actually

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 4:20-CV-01720-JSW

## B.  Defendants' Misstatements About Blinding are Actionable.

Defendants argue that their repeated statements that the ENIGMA Trial was a "randomized, double-blind, placebo-controlled" trial (Compl. ¶¶ 96-106) were not misleading because Plaintiffs do not dispute that Allakos intended it to be a double-blind study. (Mot. at 9.) This is irrelevant, however, because Defendants made these statements *after the ENGIMA Trial was already conducted and had numerous problems with its blinding*. Once the blinding problems occurred, it became misleading for Defendants to tout the ENIGMA Trial as "double-blind" without disclosing the blinding problems. *See Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("[O]nce defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." (internal quotation marks omitted)); *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) (holding defendants misled investors by "repeatedly tout[ing] the 'real-time' nature of its identity theft alerts. According to the complaint, however, more than 70% of a particular type of alert (the 'Credit Check Alerts') were 'stale'—they were sent more than one week late."); *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *13 (N.D. Cal. Nov. 27, 2018) ("In this case, once Defendants chose to tout Yelp's local advertising model as 'fairly proven,' omitting any mention of the churn issues that would likely significantly and negatively impact revenue affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." (internal quotations marks omitted)); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1231 (N.D. Cal. 2009) (holding statements actionable because "the SAC focuses on known present risks about the interpretation of the phase 2 results and the design of phase 3. These statements were not allegedly misleading because they failed to predict the future, but because

---

failed to establish a response based on the industry standard. Here, there is a concrete misrepresentation — Allakos did not use a CRO — and the Complaint pleads that misrepresentation is material based in part on statements by trial investigators. In *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 566 (E.D. Pa. 2009),"Plaintiffs [did] not support their definitions with citations to FDA guidelines or assert that the definitions are the industry standard. These definitions are little more than conclusory allegations that we need not consider." Here, the Complaint alleges that CROs are industry standard and that was substantiated by Trial Investigators.

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 4:20-CV-01720-JSW

they concealed or downplayed known present risks related to regulatory approval").

The cases that Defendants cite (Mot. at 10) are irrelevant because unlike here, where Plaintiff make a specific misrepresentation — that Defendants continued to describe the Trial as double-blinded after the blinding failed — they involved situations where Defendants made general positive statements about clinical trial results and plaintiffs critiqued their methodology[3] or the plaintiffs did not adequately allege that the study design was not double-blinded.[4] Notably, *Padnes v. Scios Nova Inc.*, No. C 95-1693 MHP, 1996 WL 539711, at \*6-\*8 (N.D. Cal. Sept. 18, 1996), which Defendants also cite, supports Plaintiffs' position since that case held an abstract falsely describing the study as "randomized," when it was only partially randomized, would have been an actionable misstatement if the information had not been publicly disclosed.

Defendants further argue that Plaintiffs do not adequately plead that the blinding was meaningfully compromised in the ENIGMA Trial (Mot. at 10), but the evidence of blinding problems is overwhelming. Three of Allakos' *own trial investigators* for ENIGMA were concerned that reactions from the infusion of AK002 unblinded the patients by tipping them off about whether they were getting the drug. (Compl. ¶ 67, Ex. 3 at 65.) Furthermore, posts from the EG Facebook group confirmed the investigators' fears — the Seligman Report reprinted eight posts in which patients or their family members speculated about whether they received AK002 based on whether they had a reaction. (*Id.* ¶ 67, Ex. 3 at 68-69.) Eight posts is a significant number since the ENIGMA Trial only had 65 participants. (*Id.* at 57.) There were also another five posts in which patients or their family members stated that trial investigators told patients they were likely getting the drug. (*Id.* ¶ 68, Ex. 3 at 70.) Likewise, given the size of the Trial, seven posts by

---

[3]*See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876-879 (9th Cir. 2012) (plaintiff challenged general statements about efficacy based on statistical methodology used); *Hoey v. Insmed Inc.*, No. CV 16-4323 (FLW), 2018 WL 902266, at \*9 (D.N.J. Feb. 15, 2018) (plaintiff argued that statement that trial was statistically significant was false based on disagreement over methodology); *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 352-354 (S.D.N.Y. 2020) (general positive statements about clinical trial results were not misleading where they were not closely tied to omitted information).

[4] *Abely v. Aeterna Zentaris Inc.*, No. 12 CIV. 4711 PKC, 2013 WL 2399869, at \*6 (S.D.N.Y. May 29, 2013) (failed to plead why study design did not qualify as double-blind); *Adolor Corp.*, 616 F. Supp. 2d at 566-567 (Plaintiffs' did not adequately explain why the study was not "double-blinded" because the data packets were marked by study site number, principal investigator, and site coordinator).

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 4:20-CV-01720-JSW

patients or their family members about getting endoscopy results and another one saying the person got access to all sort of tests, including biopsies, is a strong indication of major blinding problems. (*Id.* ¶ 69, Ex. 3 at 72-73.) Furthermore, the fact that patients knew that reporting improvement would get them admitted to the extension study created a systematic bias in the PRO scores. (*Id.* ¶ 71, Ex. 3 at 74.) Finally, the Facebook posts indicating that Allakos employees were not properly blinded from the trial results while they were going on — Defendant Rasmussen's contact with the parent of a patient and Allakos discontinuing the .3 mg dose in the middle of the Trial — are consistent with the problem that Allakos failed to use a CRO to follow proper procedures and prevent improper influence and bias from being injected into the Trial by Allakos. (*Id.* ¶¶ 72-73, Ex. 3 at 75-77.)

Defendants also argue that all of these allegations should be discounted because they were contained in a short seller report, again citing *Nektar*, 2020 WL 3962004, at *10. That case is inapplicable, however, because that plaintiff tried to rely on the "expertise" of the short seller. *Id.* In contrast, Plaintiffs only rely on facts in the Seligman Report, not Seligman's opinion. Courts in this circuit have consistently held that factual allegations from short seller reports — like any other factual allegations in a Complaint — must be accepted as true on a motion to dismiss. See *Feyko v. Yuhe Int'l, Inc.*, No. CV 11-05511 DDP PJWX, 2013 WL 816409, at *11 (C.D. Cal. Mar. 5, 2013) ("[A]nalysis into the 'truth' of the GeoInvesting report would be inappropriate, because doing so would implicate a factual dispute that should not be decided at this stage."); *In re China Educ. All., Inc. Sec. Litig.*, No. CV 10-9239 CAS JCX, 2011 WL 4978483, at *4-*5 (C.D. Cal. Oct. 11, 2011) (whether short seller report was reliable was not appropriate for resolution on motion to dismiss); *Henning v. Orient Paper, Inc.*, No. CV 10-5887-VBF AJWX, 2011 WL 2909322, at *4 (C.D. Cal. July 20, 2011) ("The truth of the [short seller] report…is a factual dispute not appropriate for resolution at this stage.").

Defendants also make a few unpersuasive materiality arguments. (Mot. at 11.) They argue that the FDA guidance on Patient-Reported Outcome measures that Plaintiffs cite is not sufficient for materiality, but that argument is meritless because the guidance warns of precisely the same problem that the ENIGMA Trial had: "If the treatment has obvious effects, such as adverse events,

the clinical trial may be at risk for unintentional unblinding." (Compl. ¶ 70.) Furthermore, the guidance specifically stated that inadvertent unblinding would be a negative consideration when the FDA is reviewing an application for drug approval: "Suspicion of inadvertent unblinding can be a problematic review consideration for the FDA when assessing PRO endpoints." (*Id.*) The FDA also stated in that guidance that "patients should be blinded to treatment assignment throughout the trial," which makes clear that the numerous ways that the blinding failed in the ENIGMA Trial would be of serious concern to the FDA. (*Id.*) Defendants also speculates that Allakos may have used techniques to minimize possible unblinding. This is a completely inappropriate argument on a motion to dismiss where the allegations in the Complaint must be accepted as true and construed in favor of Plaintiffs. Furthermore, if Allakos had taken adequate precautions, it is exceedingly unlikely that their own trial investigators would have expressed concern that the infusion reaction unblinded the entire ENIGMA Trial. Finally, Defendants argue that the unblinding was not material because it only concerned the secondary endpoints of the Trial, the patient's PRO score. That is highly material, however, because the PRO score is the only evidence that the drug actually made the patients feel better. That is hugely significant for a drug that is supposed to treat chronic inflammatory diseases.

**C. Defendants' Misstatements About Steroid Use are Actionable.**

Defendant Alexander's statement during the August 5, 2019 Conference Call that steroids "***had absolutely 0 effect on the results, and that was shown in the [ENIGMA] study***" was false and misleading. (*Id.* ¶ 113 (emphasis added).) Based what we now know about the haphazard administration of steroids during the ENGIMA Trial, there is no way that the study could have shown steroids had "0 effect on the results."

As an initial matter, it is well established that steroids use had great potential to confound the results of the ENIGMA Trial. They are the current standard of care for both EG and EGE and 90% of EGE patients respond to even 5 mg a day of steroid therapy (*Id.* ¶¶ 29, 76.) Furthermore, the FDA's draft guidance of EoE (a closely related disease to EG and EGE), specifically warns that clinical trials may not be reliable if steroids are poorly controlled. (*Id.* ¶ 77.)

Accordingly, for steroids to have "0 effect on the results" of ENIGMA Trial, Allakos would

- 17 -

have had to establish very careful controls for them. But this is not what happened. As Defendants admit, the group that Allakos classified as having not been given steroids only excluded patients who did not receive acute steroids and still included patients who received up to 10 mg of prednisone daily. (Mot. at 12.) We also know that administration of acute steroids was completely inconsistent and uncontrolled — Seligman spoke to two ENGIMA Trial Investigators who said that acute steroid administration was completely at their discretion (Compl. ¶ 75, Ex. 3 at 97.) One told him he gave 20 mg of prednisone to every patient before the first two infusions and the second said he gave quadruple that dose to some of his patients and did not give others any steroids. (*Id.*) Unsurprisingly, one of the ENIGMA Trial Investigators told Seligman that steroids could be a confounding factor in the trial and Nikko Securities America, Inc.'s March 25, 2020 analyst report stated that was "entirely possible that steroids were driving the majority of the symptom benefits." (*Id.* ¶¶ 77, 79, Ex. 3 at 104.) In light of this, it was false and misleading for Defendant Alexander to flatly state that steroids had no effect on the ENIGMA Trial.

Defendants cite cases for the proposition that criticisms of study design decisions are not actionable misstatements, but these cases all concern omissions. (Mot. at 13.) None of them concern an unambiguous affirmative misstatement like the one at issue here. Defendants also cannot save themselves by arguing that Defendant Alexander was simply stating his opinion because it is well established that statements of opinion are false and misleading when, as here, a defendant has no basis to make them. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 196 (2015) (an opinion statement is misleading where an "excluded fact shows that [the defendant] lacked the basis for making those statements that a reasonable investor would expect"); *In re Intuitive Surgical Sec. Litig.*, No. 5:13-CV-01920-EJD, 2017 WL 4355072, at *2-*3 (N.D. Cal. Sept. 29, 2017) (holding that statements regarding surgical systems' safety and efficacy were misleading based on failure to disclose adverse events); *Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-CV-06361-RS, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (opinion statements that Defendant was "complying with the law, keeping its passengers safe, and performing well financially" were false and misleading because Defendants had no basis to make those statements). Notably, it appears likely that Defendant Alexander did not even believe his

own statement given that Allakos added a powerful steroid to the infusion protocol for the extension study and phase 3 trial. (Compl. ¶¶ 78-79.) There would have been no reason to change the protocol in later trials to include steroids for all patients if they had "absolutely 0 effect."

**D.  Defendants' Misstatements About Serious Adverse Events are Actionable.**

The FDA defines a serious adverse event as one that results in not just "inpatient hospitalization," but also "significant incapacity or substantial disruption of the ability to conduct normal life functions." (*Id.* ¶ 80.) The Facebook posts Seligman printed strongly suggests that more than one patient in the ENIGMA Trial suffered a significant incapacity of normal life function based on a reaction to AK002. They showed that (1) a patient was admitted to the hospital after an infusion for low Oxygen; (2) a patient was admitted to the hospital after an infusion in March (Defendants point out this patient was also admitted later after an extension study infusion); (3) a patient suffered "severe nausea, headache and super severe stomach pain" after every infusion; (4) a patient had a "horrific reaction" to her first infusion; (5) two patients complained of debilitating ocular migraines after infusions. (*Id.* ¶ 82-83, Ex. 3 at 144-145.) Given that all inference must be construed in favor of Plaintiffs on a motion to dismiss, these Facebook posts are sufficient to allege that Defendants miscategorized serious adverse events, which is actionable *See Intuitive Surgical* Sec. Litig., 2017 WL 4355072, at *3 (holding that misclassification of "numerous adverse event reports of serious injury under the 'other' category instead of in the 'serious injury' category" were actionable misstatements.")

**II.    PLAINTIFFS ALLEGE SCIENTER.**

A securities plaintiff may plead scienter by pleading "knowledge of the falsity as well as 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, No. 19-CV-1765 YGR, 2020 WL 5903844, at *8 (N.D. Cal. Oct. 5, 2020) (quoting *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003)) "It is not necessary for a complaint to establish a strong inference that defendants actually knew contradicting facts since '[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10(b)-5.'" *Id.* (quoting *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). An inference of scienter is strong "if a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (citations omitted). Accordingly, the inference of scienter need not be more likely than any plausible opposing inference; the tie goes to the plaintiff. *Id.* The proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The Complaint alleges both that the Defendants knowingly or recklessly made misstatements and that Defendants had a motive to do so.

## A. Defendants Made Misstatements Knowingly or Recklessly.

The Complaint adequately alleges that Defendants made misstatements knowingly or recklessly based on (1) the incredible importance of the ENGIMA Trial to Allakos and (2) Defendants Alexander and Rasmussen's statements during the August 5, 2019 conference call that show they were intimately familiar with how the ENIGMA Trial was conducted.

Core operations pleading is sufficient by itself "where the nature of the relevant facts is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). Here, it is absurd to suggest the management of Allakos did not know about the problems with the ENIGMA Trial. AK002 is not just one of Allakos' "core operations," it is just about Allakos' only operation and the Company is entirely dependent on AK002's success. (Compl. ¶¶ 28, 32.) Further, since EG and EGE are the lead indications for AK002 and Allakos intended to use ENIGMA for FDA approval, the ENIGMA Trial was the most important trial in Allakos' history. (*Id.* ¶¶ 38, 45.) Lastly, Allakos is an extremely small company — at the end of 2018, Allakos only had 40 research and development employees and 62 employees total. (*Id.* ¶ 33.) Courts have routinely inferred that top management made misstatements with knowledge or recklessly under similar facts. *See Berson*, 527 F.3d at 987-988 (Defendants' direct responsibility for day-to-day operations made it hard to believe they would not have known about stop work orders); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 814-815 (C.D. Cal. 2011) (holding that because the drug in question was MannKind's only advanced-stage product,"[d]efendants' positions within MannKind raise an

inference of scienter based on the falsity of the statements and Defendants' access to information contradicting those statements"); *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020) (holding that CEO had knowledge that statements about iPhone sales in China were misleading in the absence of particularized allegations because they concerned Apple's third largest market and CEO frequently traveled to China); *In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("[I]t would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market.")

The core operations argument is particularly strong concerning whether the ENIGMA Trial used a CRO. That was a hugely important decision and top management certainly would have known such a basic fact about how the Company was running the ENIGMA Trial. Accordingly, when Defendants Alexander, Redmond, and Tomasi signed the public filings containing those statements and their Sarbanes-Oxley certifications, they acted intentionally or recklessly. (Compl. ¶¶ 89-95.) It is also clear that Defendants would have known about the highly significant problems with the blinding, steroid use, and serious adverse events. Furthermore, the argument that Defendants Rasmussen and Alexander had knowledge of those issues or recklessly disregarded information available to them is bolstered by the in-depth comments that those Defendants made about those issues and the ENIGMA Trial during the August 5, 2019 Conference Call. *See Patel v. Axesstel, Inc.*, No. 3:14-CV-1037-CAB-BGS, 2015 WL 631525, at *10-*11 (S.D. Cal. Feb. 13, 2015) (holding that "it would be absurd to think that the CEO and CFO of a company with just thirty-five employees, of whom only ten are involved in sales, general or administration, would be unaware of the lack of written agreements or definitive payment terms with the five new customers" where defendants made statements showing awareness of the sales in question); *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019) (holding there was scienter where Defendants "made numerous statements displaying their familiarity with how the co-marketing program was designed and operated").

During the August 5, 2019 Conference Call, Defendant Alexander discussed the ENIGMA Trial in detail (*see* Blake Decl. (ECF No. 34-1) Ex. O at 4-5, 10, 12-17.) Among other things,

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 4:20-CV-01720-JSW

Defendant Alexander stated it would be one of two clinical trials that Allakos would use for FDA approval, specifically reminded investors that it was a "randomized, double-blind, placebo-controlled study," and asserted that steroids had "absolutely 0 effect on the results."  (Compl. ¶¶ 45, 102, 113.) Defendant Rasmussen, as Allakos' CMO, was introduced on to the call by Defendant Alexander to "run through the clinical data" and Rasmussen made detailed comments about many aspects of the ENIGMA Trial. (*see* Blake Decl. Ex. O at 6-8, 12, 14-15.) Rasmussen stated during the call that ENGIMA was a "randomized, double-blind, placebo-controlled study," spoke about the steroid protocol, and asserted there was only 1 drug-related serious adverse event. (Compl. ¶¶ 103, 112, 121, 124.) The deep knowledge of the ENIGMA Trial that Defendants Alexander and Rasmussen demonstrated during the August 5, 2019 Conference Call strongly bolsters the position that they made their misstatements about use of a CRO, blinding, steroid use, and serious adverse events knowingly or recklessly. *See South Ferry LP, No. 2*, 542 F.3d at 785 (core operations "allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling'")[5]

Finally, Defendants' citations to *Rigel Pharm,* 697 F.3d at 879-880, 883 and *Colyer v. Acelrx Pharm., Inc.*, No. 14-CV-04416-LHK, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015) are inapposite (Mot. at 22.) Both those cases concerned very general statements about a clinical trial's efficacy and it was not clear that the knowledge at issue even contradicted the statements. The misstatements here are much more specific and clear.

## B.  Defendants Had a Motive to Commit Fraud.

Although the desire to raise capital is not generally by itself sufficient to show scienter, there are multiple factors that distinguish this case. First, the announcement of Allakos' $200

---

[5] Defendants' core operations cases are easily distinguishable. *See Cho v. UCBH Holdings, Inc.*, No. C 09-4208 JSW, 2011 WL 3809903, at *15 (N.D. Cal. May 17, 2011) (holding that alleged misstatements did not concern bank's core operations); *In re Taleo Corp. Sec. Litig.*, No. C 09-00151 JSW, 2010 WL 597987, at *10 (N.D. Cal. Feb. 17, 2010) (holding that "Defendants applied [accounting rule] in such a consistent and transparent manner raises a plausible inference that Defendants' error was innocent"); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-1063 (9th Cir. 2014) (no indication from Defendants' statements that they would have had knowledge of sales issues in question); *In re Nektar Therapeutics*, 2020 WL 3962004, at *13 (failure to adequately allege falsity undermined core operations argument); *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 601 (9th Cir. 2014) (no statements indicating intimate knowledge of clinical trial).

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 4:20-CV-01720-JSW

million secondary offering was *mere hours* after Defendants announced the ENIGMA results (Compl. ¶ 50.) Then, as the stock shot up, Allakos upsized the offering to $350 million at $77 per share on the very next day — more than $40 dollars more than the stock's $31 closing price the last business day before the announcement. (*Id.* ¶¶ 52-53.) The proximity between the ENIGMA announcement and the secondary offering supports an inference of scienter. *See Mulderrig,*, 2020 WL 5903844, at *21 (holding that announcement of secondary offering "just one week" after misstating revenue "support[ed] an inference that defendants made their revenue statements with fraudulent intent."); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (desire to "rais[e] more capital by issuing the same number of shares" supported inference of scienter). Second, Allakos has never earned any revenue and it admitted that they needed additional capital to bring AK002 to market, stating: "[w]e will continue to require additional capital to develop our product candidates and fund operations for the foreseeable future" and "if we are unable to raise additional funds when needed, we may be required to delay, reduce or terminate some or all of our development and commercialization efforts." (Compl. ¶ 137.) The fact that it needed to raise additional capital to ever generate any revenue and the importance of the ENIGMA Trial to the company's prospects made Allakos' prospects precarious prior to the ENIGMA announcement, regardless of whether the Company could have survived for another 18 months. *See Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW, 2020 WL 4208442, at *4 (S.D.N.Y. July 21, 2020) (holding that company's admission that it needed to raise funds to remain viable supported an inference of scienter). Lastly, even if the Court does hold that the need to raise capital is not sufficient for scienter in isolation, it should consider it in combination with the allegations that Defendants made their misstatements knowingly or recklessly. *Id.* at *5 (considering desire to complete secondary offering as one factor, among others, supporting an inference of scienter).

### C. A Holistic Assessment Supports a Strong Inference of Scienter.

Plaintiffs' allegations show that Defendants knowingly or recklessly made misstatements and that they had a motive to lie. That is sufficient to show a strong inference of scienter. In an effort to refute this (Mot. 22-25), Defendants make several arguments that raise factual disputes that are not proper grounds to grant a motion to dismiss. *See Tellabs*, 551 U.S. at 322 (for § 10(b)

claims, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true").

First, Defendants dispute the credibility of the Seligman Report because it is by a short seller, citing out of circuit case law. As discussed above, in this Circuit, the credibility of a short seller is a factual dispute that cannot be properly resolved on a motion to dismiss (*See* Point I.B.).

Second, Plaintiffs do not object to Defendants requesting judicial notice of basic undisputed facts, such as: Allakos initiated a Phase 3 study of AK002, that the ENIGMA Trial was published in the New England Journal of Medicine, and Allakos had met with the FDA, but it is completely improper for them to argue based on those general facts that Defendants did not intentionally or recklessly make specific misstatements. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (holding that there is "a concerning pattern in securities cases [of] exploiting [judicial notice procedures] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage" and that "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery"). Furthermore, *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) does not stand for the proposition that, as Defendants seems to contend, that a defendants cannot have scienter if they continue investing in a drug. In that case, "[t]he central theory of the complaint [was] that defendants knew the FDA would not approve" the drug at issue. *Id.* at 415. Accordingly, there would have been little reason for Endologix to go forward with the drug. Here, Plaintiffs are not arguing that Defendants are certain that AK002 will not be approved. Instead, by misrepresenting aspects of the ENGIMA Trial, Defendants are misrepresenting the risks to future approval. *See In re Amylin Pharm., Inc. Sec. Litig*, No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *5 (S.D. Cal. May 1, 2003) ("There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable."); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a

considered, though because of the risk a reckless, gamble").[6]

Finally, the absence of stock sales does not undermine Plaintiffs' scienter allegations. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period....In other words, the lack of stock sales by a defendant is not dispositive as to scienter.") [7]

### CONCLUSION

Defendants' Motion should be denied. If the Court grants any portion it, Plaintiff respectfully requests leave to amend. *See Cho*, 2011 WL 3809903, at *3 ("A court should grant leave to amend unless it is clear that the complaint could not be saved by any amendment.")

DATED: January 29, 2021

**THE ROSEN LAW FIRM, P.A.**

By: /s/*Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

---

[6] The other cases Defendants cite are similarly inapplicable. In *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008), the plaintiff claimed defendants conducted a study even though endpoints were "almost impossible" to achieve. In *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014), *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013), and *Hoey*, 2018 WL 902266, at *17, the plaintiff argued that defendants did not believe their own interpretation of clinical trial results.

[7] Defendants' footnote loss causation argument is completely meritless. Defendants argue that *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795 (9th Cir. 2020), establishes a rule that a short seller report cannot constitute a corrective disclosure, but instead it held that courts should adopt a flexible rule based on the nature of the disclosure. Contrary to *BofI Holdings*, which concerned anonymous blog posts consisting of public information, this case concerns a report from an established investment group that contained a large amount of previously non-public information, including interviews with trial investigators from the ENIGMA Trial. *Id.* at 797. Defendants do not cite any cases in which a Court held the release of non-public information by a short seller was not a corrective disclosure.  Additionally, the disclosure the Seligman Report caused Allakos' stock to fall 17%. (Compl. ¶ 135.)

- 25 -

# CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 29, 2021                          /s/ *Laurence M. Rosen*
                                                  Laurence M. Rosen

- 26 -

CERTIFICATE OF SERVICE                                    CASE NO. 4:20-CV-01720-JSW