JAMES G. KREISSMAN (Bar No. 206740)
jkreissman@stblaw.com
STEPHEN P. BLAKE (Bar No. 260069)
sblake@stblaw.com
BO BRYAN JIN (Bar No. 278990)
bryan.jin@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000
Facsimile:  (650) 251-5002

*Attorneys for Defendants Allakos Inc.,
Robert Alexander, Leo Redmond,
Henrik Rasmussen, and Adam Tomasi*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| SUNG KIM, CHRISTIAN MAYO, AND ALLISON SKYE, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>ALLAKOS INC., ROBERT ALEXANDER, LEO REDMOND, HENRIK RASMUSSEN, and ADAM TOMASI,<br><br>    Defendants. | Case No. 4:20-cv-01720-JSW<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>**Date:**     April 30, 2021<br>**Time:**     9:00 a.m.<br>**Courtroom:** 5, 2nd floor<br>**Judge:**     Hon. Jeffrey S. White |

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ..................................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................................. ii

SUMMARY OF ARGUMENT ..........................................................................................................v

ARGUMENT ......................................................................................................................................1

I.    PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT OR
      OMISSION ...............................................................................................................................1

      A.    Allakos Did Not Mislead Investors About Use Of An Independent CRO .........................1

      B.    Allakos Did Not Mislead Investors About Flaws In The ENIGMA Study Design.............3

      C.    Allakos Did Not Mislead Investors About Patient Steroid Use..........................................6

      D.    Allakos Did Not Mislead Investors About Serious Adverse Effects...................................8

II.   PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER ..............................9

      A.    Plaintiffs' "Core Operations" Pleading Is Insufficient .......................................................10

      B.    Plaintiffs' Motive Pleading Is Insufficient...........................................................................12

      C.    A Holistic Review Clearly Supports Dismissal For Failure To Plead Scienter.................13

III.  THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE .........................................15

# TABLE OF AUTHORITIES

**Cases**

*Applestein v. Medivation, Inc.*,
  861 F. Supp. 2d 1030 (N.D. Cal. 2012) .............................................................................. 13

*Azar v. Yelp, Inc.*,
  No. 18-CV-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)............................... 4

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008)........................................................................................... 2, 11

*Bouman v. Block*,
  940 F.2d 1211 (9th Cir. 1991)............................................................................................... 8

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002)............................................................................................... 1, 2

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)................................................................................................. 8

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014)................................................................................................. 15

*Colyer v. Acelrx Pharmaceuticals, Inc.*,
  No. 14-CV-04416, 2015 WL 7566809 (N.D. Cal. Nov. 25, 2015)........................... 1, 10, 11

*Edenbrook Capital, LLC v. RhythmOne Plc*,
  No. 19-CV-00615, 2019 WL 1791419 (N.D. Cal. Apr. 24, 2019) ........................................ 2

*Feyko v. Yuhe Int'l, Inc.*,
  No. CV 11-05511 DDP PJWX, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ....................... 14

*Henning v. Orient Paper, Inc.*,
  No. CV 10-5887-VBF AJWX, 2011 WL 2909322 (C.D. Cal. July 20, 2011) ..................... 14

*Hoey v. Insmed Inc.*,
  No. 16-cv-4323, 2018 WL 902266 (D.N.J. Feb. 15, 2018) ................................................... 6

*In re Apple Inc. Sec. Litig.*,
  No. 19-CV-02033, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)......................................... 12

*In re Arrowhead Pharm., Inc. Sec. Litig.*,
  2017 WL 8791111 (C.D. Cal. Dec. 21, 2017) ................................................................... 15

*In re Arrowhead Pharm., Inc. Sec. Litig.*,
  782 F. App'x 572 (9th Cir. 2019)................................................................................... 10, 15

*In re Avon Sec. Litig.*,
  No. 19 CIV. 01420, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .................................... 12

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)............................................................................................... 15

*In re China Educ. All., Inc. Sec. Litig.*,
No. CV 10-9239 CAS JCX, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ........................................ 14

*In re High-Tech Employee Antitrust Litig.*,
No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014).............................................. 7, 8

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011)................................................................................................ 11

*In re Nektar Therapeutics*,
No. 18-CV-06607-HSG, 2020 WL 3962004 (N.D. Cal. July 13, 2020)........................................ 3, 13

*In re Nuvelo, Inc. Securities Litigation*,
668 F. Supp. 2d 1217 (N.D. Cal. 2009) ............................................................................................... 4

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)....................................................................................................... 11, 12

*In re Portal Software, Inc. Sec. Litig.*,
No. C-03-5138 VRW, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ................................................ 12

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)................................................................................................... 6, 10, 11

*In re Zillow Grp., Inc. Sec. Litig.*,
No. C17-1387-JCC, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ................................................ 11

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018).............................................................................................................. 14

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)........................................................................................................... 9, 15

*McGovney v. Aerohive Networks, Inc.*,
367 F. Supp. 3d 1038 (N.D. Cal. 2019) ............................................................................................... 1

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008).............................................................................................................. 11

*Mulderrig v. Amyris, Inc.*,
No. 19-CV-1765 YGR, 2020 WL 5903844 (N.D. Cal. Oct. 5, 2020) ................................................. 13

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020)............................................................................................................... 14

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019)........................................................................................................... 4

*Patel v. Axesstel, Inc.*,
No. 3:14-CV-1037-CAB-BGS, 2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ................................. 11, 12

*Philco Investments, Ltd. v. Martin*,
No. C-10-02785-CRB, 2011 WL 500694 (N.D. Cal. Feb. 9, 2011) ...................................................... 9

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ................................................................................................... 10

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ..................................................................................................... 4

*Skiadas v. Acer Therapeutics Inc.*,
  No. 1:19-CV-6137-GHW, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) ............................... 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ................................................................................................................ 14

*Westley v. Oclaro, Inc.*,
  897 F. Supp. 2d 902 (N.D. Cal. 2012) .............................................................................. 12, 13

*White v. City of San Diego*,
  605 F.2d 455 (9th Cir. 1979) ..................................................................................................... 8

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. Jan. 26, 2021) ...................................................................................... 2

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ................................................................................................... 13

**Federal Statutes**

21 C.F.R. 312.32 ............................................................................................................................. 9

21 C.F.R. 312.64 ............................................................................................................................. 9

# SUMMARY OF ARGUMENT

Plaintiffs' Opposition Brief abandons multiple theories advanced in the Complaint.  In trying to salvage their remaining claims, Plaintiffs repeatedly invite the Court to ignore both the literal wording of Allakos' disclosures and matters of undisputed fact (*e.g.*, that Allakos is conducting a Phase 3 clinical trial for AK002).  Once Plaintiffs' unsupportable, conclusory allegations are stripped away, it is clear that this lawsuit—like the Seligman Report upon which it exclusively relies—reflects, at most, a methodological criticism of Allakos' ENIGMA Phase 2 clinical trial, which is insufficient to support a securities fraud claim.  Moreover, rather than alleging well-pleaded facts that are needed to plead scienter, Plaintiffs instead argue that it would be "absurd" to believe Defendants were unaware of the allegedly adverse facts about the ENIGMA trial and therefore must have knowingly lied to investors. The Complaint is not well-pleaded, ignores relevant facts, and should be dismissed with prejudice.

**Plaintiffs fail to plead an actionable misstatement or omission**.  Clear precedent establishes that alleged flaws in the Phase 2 ENIGMA study do not state a claim for actionable misstatements.  *See, e.g.*, *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012).  Without "specific facts indicating why [alleged mis]statements were false," a complaint does not meet the PSLRA's "exacting requirements."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

**Plaintiffs fail to plead facts giving rise to a strong inference of scienter**.  Plaintiffs cannot rely exclusively on the "core operations" doctrine without some well-pleaded facts showing Defendants' awareness of the purported misrepresentations.  *See In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004, at *12 (N.D. Cal. July 13, 2020).  Plaintiffs cannot show a motive to commit fraud simply based on a generic need to raise capital.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009).  Moreover, when viewed holistically, Plaintiffs' claims—drawn exclusively from the self-serving report of a short-seller who does little more than misinterpret Allakos' own disclosed data—do not give rise to a strong inference of scienter.  Plaintiffs' theory defies common sense: why would Defendants proceed to a Phase 3 clinical trial for AK002 if they knew that the drug faced serious risks to FDA approval?  *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).

**Plaintiffs fail to plead loss causation.**  Finally, Plaintiffs' purported corrective disclosure—the Seligman Report—did not reveal new information to the market, only biased speculation.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

Based almost exclusively on the Seligman Report, the Complaint alleged five theories of misrepresentations.  ECF 25 ("Compl." or "Complaint") ¶¶ 89-133.  Plaintiffs' Opposition Brief drops the Complaint's fifth theory concerning vomiting, conceding that claim is not actionable.  ECF 37 ("Opposition" or "Opp.") at 10 n.1.  The Opposition Brief does little to salvage Plaintiffs' remaining theories, and their effort to re-plead several of them through their brief is unavailing.

#### A.    Allakos Did Not Mislead Investors About Use Of An Independent CRO

The Complaint accuses Allakos of misleading investors into believing that it employed a single, independent CRO to manage its ENIGMA trial.  Compl. ¶¶ 89-95.  Defendants' opening brief demonstrated that Allakos made no such statement.  ECF 33 ("Opening Brief" or "Mot.") at 8:1-9:2.  To the contrary, the challenged disclosure, which was not specific to the ENIGMA trial (a) states that Allakos relies on *various third parties* in clinical trials, (b) provides a non-exhaustive list of such third parties; and (c) rather than touting the use of a single, independent CRO, warns investors of the risks inherent in reliance on third parties.  *Id.* at 8:8-14 & n.3.  No reasonable shareholder could conclude from this statement that Allakos would use a single, independent CRO for ENIGMA or any other trial.

Plaintiffs claim that Allakos' reading of the challenged language is "hyper-literal," and that "[t]echnical accuracy divorced from context is . . . not the standard for determining whether a statement is misleading"; rather, the appropriate standard is whether a statement created "an impression of a state of affairs that differs in a material way from the one that actually exists."  Opp. at 11:20-12:9 (citing, *e.g.*, *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  Plaintiffs' argument fails because the law is clear that where, as here, a statement is "quite literally true," it is neither false nor misleading.  *See Colyer v. Acelrx Pharmaceuticals, Inc.*, No. 14-CV-04416, 2015 WL 7566809, at *6 (N.D. Cal. Nov. 25, 2015) (citing *Brody* and granting defendants' motion to dismiss where the court found the defendant pharmaceutical company's clinical history statements were "quite literally true," and provided "an accurate snapshot[]" of the company's work); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1059 (N.D. Cal. 2019) (citing *Brody* and finding plaintiff failed to plead falsity

where the statement at issue was "quite literally true").[1]

Plaintiffs' "hyper-literal" argument also falls short because Plaintiffs have failed to demonstrate that Allakos' statement is misleading in any way.  To make such a claim, Plaintiffs must "plead facts" that support the "crucial premise" that "the words used [by Allakos] have some special or nuanced meaning that differs from what the literal words suggest."  *Wochos v. Tesla, Inc*., 985 F.3d 1180, 1193 (9th Cir. Jan. 26, 2021).  Plaintiffs fail to even approach this standard.  Instead, Plaintiffs suggest, without support, that the mere inclusion of the term "CRO" among the third parties discussed in the risk disclosure would lead investors to conclude that Allakos would use a single, independent CRO to supervise each of its clinical trials.  Plaintiffs also fail to plead facts suggesting that investors expected or preferred the use of a single, independent CRO, rather than the multiple third-party clinical organizations relied on by Allakos in conducting the ENIGMA trial.  *See* Mot. at 8 n.4.[2]  Nor do Plaintiffs point to any FDA guidance or regulatory authority.[3]  Instead, Plaintiffs rely exclusively on the self-serving Seligman Report, which provides no support for its own claims, and explicitly disclaims

---

[1]  Plaintiffs' cases are consistent with this precedent and are, in fact, cited within this line of cases. *Brody* upheld the dismissal of a securities fraud action where the information provided was "entirely consistent" with the allegedly omitted information.  280 F.3d at 1007.  Here, Allakos' disclosure that it employed a variety of third parties to assist with its various trials is similarly "entirely consistent" with the fact that Allakos employed multiple third parties on the ENIGMA trial rather than a single, independent CRO.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-87 (9th Cir. 2008) found a statement misleading where defendant asked the court to look beyond the plain language of its disclosure to understand that its reporting of its order "back-log" included so-called stop-work orders, although there was no reference to this in the disclosure.  Here, by contrast, Allakos' disclosure, on its face, is consistent with the practice it followed.  And *Edenbrook Capital, LLC v. RhythmOne Plc*, No. 19-CV-00615, 2019 WL 1791419 (N.D. Cal. Apr. 24, 2019) is entirely inapposite because it deals with a material omission rather than misstatement, where the company failed to disclose that different groups of investors had different rights.  There is no such claim here.

[2]  Although Plaintiffs baldly assert that "any reasonable investor would expect that" Allakos "would use a CRO for a clinical trial of such great importance" since the use of CROs is "typical practice," Opp. at 12:10-13, they fail to support these conclusory assertions, offering no investor or analyst statement setting forth an expectation that Allakos would use a single, independent CRO, rather than the more than 20 well-known clinical organizations that worked with Allakos on the ENIGMA study.

[3]  Plaintiffs seem to suggest that Allakos violated the standards of Good Clinical Practice by failing to employ a single, independent CRO.  Opp. at 13:6-23.  However, Plaintiffs ignore Defendants' authority demonstrating that the FDA allows trials to be conducted by pharmaceutical companies without reliance on any third parties.  *See* Mot. at 9 n.5.  They also fail to point to any standard of Good Clinical Practice requiring or even recommending the use of a single, independent CRO.

---

responsibility for the accuracy of its statements.  Compl. ¶¶ 40, 58; Compl. Ex. 3 at 2, 50.  Such exclusive reliance on a short-seller report without further corroboration fatally undermines Plaintiffs' claim.  *See Nektar*, 2020 WL 3962004, at *11 (no misrepresentation where plaintiffs provided "no additional allegations to make the conclusions of the [short-seller] reliable").[4]

**B.      Allakos Did Not Mislead Investors About Flaws In The ENIGMA Study Design**

The Complaint alleges that Allakos touted the ENIGMA study as employing a double-blind methodology when, in fact, the blinding was compromised.  Compl. ¶¶ 65, 96-107.  However, as the Opening Brief established, (a) Plaintiffs have failed to plead that blinding was materially compromised, as speculation by patients and doctors does not constitute a lack of blinding; (b) Plaintiffs do not claim that the Primary Endpoint was compromised by alleged blinding issues and do not assert that Allakos failed to take steps to protect Secondary Endpoint data; and (c) even if Plaintiffs' criticisms were well-pleaded (and they are not), these allegations cannot serve as the basis for securities fraud because the criticism goes to the efficacy of Allakos' blinding efforts, rather than rendering Allakos' statements that ENIGMA employed a double-blind methodology false or misleading.  Mot. at 9:3-11:18.

Plaintiffs fail to meaningfully address any of these points, instead claiming that Allakos made false statements by continuing to describe ENIGMA as double-blind *after* the study was completed, despite the allegedly widespread evidence of blinding deficiencies.  Opp. at 14:5-8.[5]  In support of their argument, Plaintiffs cite almost exclusively to cases holding that a company cannot "tout" positive information while withholding related negative information.  These cases are inapposite because Allakos did not "tout" or even discuss the effectiveness of its double-blind controls; it merely (and accurately)

[4] Plaintiffs' attempt to buttress their strawman claims about the importance of CROs with out-of-context statements by trial investigators expressing "surprise" to Seligman is fruitless.  Opp. at 13:14-23.  Not only are such statements cherry-picked from the interviews of 3 of over 20 trial investigators, but they also have no bearing on whether Allakos misled investors.  Plaintiffs do not claim these investigators ever read Allakos' disclosure language or interpreted that language as indicating that Allakos would use a single, independent CRO.  At most, these investigators offered their personal opinions about the ENIGMA trial design.  However, as the Opening Brief established, methodological disagreements about trial design do not give rise to a claim for securities fraud.  Mot. at 9:12-10:12 & 10 n.6.

[5]  Plaintiffs do not contest the fact that any alleged blinding deficiency had no impact on ENIGMA's Primary Endpoint analysis.  This issue thus relates solely to ENIGMA's Secondary Endpoint, which is less indicative of ultimate FDA approval.  *See* Mot. at 3-4 (citing ECF 34 ("Blake Decl.") Ex. C at 2).

stated that ENIGMA was designed as a double-blind, placebo-controlled study.[6]  Thus, even if there were issues with the blinding, Plaintiffs have failed to allege falsity under their own line of cases.

Moreover, the Complaint contains no well-pleaded facts that materially question the efficacy of blinding for the ENIGMA trial.  Plaintiffs rely solely on *speculation* in Facebook posts by patients/families and out-of-context statements by trial investigators as to who received the drug vs. placebo, not *actual knowledge* or evidence that any party had access to patients' treatment group assignments prior to unbinding.  Opp. at 15:11-16:10.  Such speculation is insufficient to plead falsity.

Facebook Posts.  Plaintiffs allege that the following posts evidence blinding deficiencies: eight posts in which patients/family members "*speculated* about whether they received AK002" based on their reactions to infusions (Opp. at 15:5-8); five posts in which patients or their family "stated that trial investigators told patients they were *likely getting the drug*" (Opp. at 15: 8-9); seven posts by patients about having access to endoscopy results and other tests (Opp. at 15:21-16:3); and posts regarding a statement by Rasmussen that Plaintiffs allege implies contact with a patient's parent, as well as discontinuation of the 0.3 mg dose allegedly mid-trial (Opp. at 16:5-9).[7]  None of these posts reveals

---

[6] *See id.* at 14:6-15:1 (citing *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("once defendants cho[o]se to *tout positive information to the market*, they [are] bound to do so in a manner that wouldn't mislead investors") (emphasis added); *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) (defendants misled investors by "*repeatedly tout[ing]* the 'real-time' nature of its identity theft alerts") (emphasis added); *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *13 (N.D. Cal. Nov. 27, 2018) ("once Defendants chose *to tout Yelp's local advertising model as 'fairly proven,'*" failure to mention known issues created a misleading impression) (emphasis added).  Plaintiffs' only non-touting case, *In re Nuvelo, Inc. Securities Litigation*, 668 F. Supp. 2d 1217 (N.D. Cal. 2009), is equally inapplicable.  In *Nuvelo*, the court found defendant's failure to inform investors that it had entered into an agreement with the FDA that conditioned approval of its drug on a very high threshold of statistical significance plausibly misleading where defendant's press release labeled the study as "modeled after" another trial that required a much lower statistical significance threshold.  *Id.* at 1221, 1231.  Here, Allakos did not purport to follow the design of another study, and any alleged issues with the efficacy of ENIGMA's blinding are a far cry from the failure to disclose an agreement with the FDA that directly impacted the ability of the drug to gain regulatory approval, particularly as Plaintiffs do not contest the fact that their blinding deficiency allegations (even if well-pleaded) would not have impacted ENIGMA's Primary Endpoint analysis for FDA approval.

[7] Plaintiffs also rely on Facebook posts discussing PRO scores to claim blinding deficiencies, alleging that "the fact that patients knew that reporting improvement would get them admitted to the extension study created a systematic bias in the PRO scores."  Opp. at 16:3-5.  However, Plaintiffs fail to explain how this allegation would undermine the *blinding* of ENIGMA, as patients receiving both the drug and the placebo would have the same motivation to report positive PRO scores.

---

DEFENDANTS' REPLY ISO MOTION TO DISMISS AMENDED COMPLAINT          CASE NO. 4:20-CV-01720-JSW
- 4 -

actual knowledge of a patient's treatment status.  Indeed, these posts support the *contrary* conclusion: that patients, doctors, and families were *uncertain* about whether a given patient received AK002 or a placebo, demonstrating that ENIGMA was successfully conducted on a double-blind basis:

- "I just had my first infusion . . . *I obviously don't know if I got the placebo or not.*" Compl. Ex. 3 at 69.

- "We aren't sure if I have placebo or drug.  *It's easier to tell if you have an infusion reaction . . . but I know not everyone reacts to infusion . . . . Wondering about this for 4 months will drive me nuts until they unblind* . . . ." *Id.*

- "I slept like a baby after the infusion . . . *I was convinced I had placebo* because I don't feel so great.  I woke up today feeling amazing with lessened symptoms . . . *so now I'm thinking I have drug*." *Id.* at 70.

- "Are you placebo or are you AK002 [shrugging emoji]?"  *Id.* at 72 (caption to a photograph of poster's IV infusion).[8]

Equally unavailing is Plaintiffs' assertion—based on a single Facebook post—that "Allakos had access to data during the Trial" because it discontinued the .3 mg dose of AK002 allegedly mid-trial due to its ineffectiveness.  Compl. ¶ 73; Opp. at 16:5-10; Compl. Ex. 3 at 78 (Facebook post notes a coordinator explained "the .3mg dose will be dropped because the results indicated it was not effective").  This post fails to demonstrate any blinding deficiency in the ENIGMA trial because the change to the dosing regimen for ENIGMA occurred *at the start of enrollment* of the study in July 2018, not mid-trial, and the revised regimen was disclosed in July 2018, seven months before the Class Period began.[9]  Moreover, there is no evidence to support Plaintiffs' bald assertion that the "results" referenced by the post are ENIGMA results rather than the results of one of Allakos' many other trials.[10]

---

[8]  *See also id.* at 70 (posts describing doctors telling posters they "believe" "think[]" and "[are] convinced" that patients received the drug without confirmed knowledge); *id.* at 74 (post noting the doctor told the poster "we all don't find out [treatment group] until the study has ended").

[9]  *See* Blake Decl. Ex. D at 9 "History of Changes," hyperlinked to: https://clinicaltrials.gov/ct2/history/NCT03496571 (showing updates to Allakos' ENIGMA study design, including between July 3 and July 23, 2018, when Allakos revised the low-dose drug regimen from four monthly doses of .3 mg to doses of .3 mg, 1 mg, 1 mg, 1 mg).  Judicial notice of this public record is appropriate for the same reasons stated in Allakos' Request for Judicial Notice, ECF 35 at 9.

[10]  Plaintiffs' allegation that Rasmussen had "contact" with the parent of a patient, Compl. ¶ 72, based on a single Facebook post similarly falls short.  The post states "[t]he CMO at Allakos explained that they do believe the presence of gastric mast cells play a huge role in EG disease," Compl. Ex. 3 at 76.  This in no way indicates that a parent "had contact" with Rasmussen as the post is consistent with Allakos' public statements, *see e.g.*, Compl. Ex. 2 at 11, and the poster does not claim to have spoken

Investigators' Statements.  Plaintiffs also rely on out-of-context speculation by 3 of over 20 trial investigators that reactions to an AK002 infusion could tip off patients as to whether they were receiving the drug or the placebo.  This is not actionable.  It is nonsensical to claim that a study has been unblinded because some participants experienced a reaction to a drug.  The very purpose of a drug trial is to observe the effects of a candidate drug, both positive and negative.  If such reactions constituted unblinding, no trial could be considered to be blind.  Moreover, Plaintiffs exaggerate the statements in question.  *Compare* Opp. at 15:13-14 (noting Allakos' "own trial investigators for ENIGMA *were concerned* that reactions from the infusion of AK002 unblinded the patients") with Compl. Ex. 3 at 66 ("Unblinding through infusion is *certainly a possibility* . . . . A lot of times people *think* they're on the drug.") (emphasis added).  These statements must be viewed in appropriate context: they are based on purported interview excerpts cherry-picked by a self-interested short-seller.  *See* Mot. at 10:18-11:2; Compl. Ex. 3 at 2 (noting Seligman's quotations "do not reflect all information they have shared with us, including, without limitation, certain positive comments and experiences with respect to Allakos").

In any event, these allegations cannot give rise to a securities fraud claim because they go, at most, to the study's *efficacy*.  Mot. at 9:12-10:12 & 10 n.6.  The Opposition Brief attempts to distinguish Defendants' well-established precedent on this point by claiming those cases involved "general positive statements" whereas Plaintiffs have pled a "specific misrepresentation."  Opp. at 15:2-10.  However, the "specific misrepresentation" here—the reference to ENIGMA as "double-blind"—was even *more general* than the statements in the Opening Brief's cases.[11]

## C.      **Allakos Did Not Mislead Investors About Patient Steroid Use**

The Complaint alleged that Allakos "understated" the use of steroids in the ENGIMA trial by claiming that only 28% of ENIGMA study patients received steroids during the trial.  Compl. ¶¶ 74-75, 112, 114-16.  The Opening Brief demonstrated that Plaintiffs mischaracterized Allakos' disclosure.  In

---

with Rasmussen.  Plaintiffs additionally fail to explain how such contact would render the trial unblinded.

[11]  *See* Mot. at 9:12-10:12 (citing, *e.g.*, *Rigel*, 697 F.3d at 877 (specific statements as to the efficacy, safety, and future partner prospects were misleading); *Hoey v. Insmed Inc.*, No. 16-cv-4323, 2018 WL 902266, at *9 (D.N.J. Feb. 15, 2018) (statement regarding achieving "statistical significance with regard to the . . . key secondary endpoint . . . with 11 out of 44 patients treated with Arikayce . . . demonstrating negative cultures by day 84 of the study as compared to 3 out of 45 patients treated with placebo")).

fact, Allakos explained that 28% of study participants engaged in "*acute* steroid use," Mot. at 12:1-13:19; Compl. Ex. 2 at 24, and that the study design also expressly allowed for the ongoing use of low-dose steroids. Mot. at 12:17-20; Blake Decl. Ex. O at 7. Defendants also showed that Plaintiffs' claim—parroting the Seligman Report—that steroid use undermined the efficacy of the ENIGMA Trial amounted to nothing more than non-actionable criticism of the study's methodology. Mot. at 13:4-19.

The Opposition Brief concedes that Allakos accurately disclosed that there was only 28% *acute* steroid use. Opp. at 9:19-21. However, in an effort to re-characterize their claim, Plaintiffs now argue that "it was false and misleading for Defendant Alexander to flatly state that steroids had no effect on the ENIMGA Trial" because "there is no way that the study could have shown" no steroid effect while Allakos allowed ongoing use of lose-dose steroids and "administration of acute steroids was completely inconstant and uncontrolled." *Id.* at 18:18-19:13. This new contention fails for multiple reasons.

*First*, because this theory is not asserted in the Complaint, it should be disregarded. *See* Compl. ¶¶ 75-76 (alleging only "it was not plausible that only 28% of the patients given AK002 also received steroids" and that "misstatements about the number of patients on steroids was highly material").

*Second*, Plaintiffs offer no well-pleaded facts to show that Alexander's statement that steroids had no impact on the ENIGMA trial results was false or misleading. Plaintiffs point to one trial investigator's statement that he gave all his patients 20 mg of prednisone at the time of infusion, and another trial investigator's statement that he only gave some patients steroids at the time of infusion, and did so in 80 mg doses. Opp. at 9:15, 21-24. These statements are consistent with Rasmussen's disclosure to investors that "[a]cute steroid use was allowed per site discretion as a premedication before infusion [and] therapeutically to manage infusion-related reactions." Blake Decl. Ex. O at 7. Moreover, Allakos tracked these infusions of steroids and demonstrated that they had no statistically significant impact on the relative efficacy of AK002 compared to a placebo. As Rasmussen explained, Allakos conducted both an analysis of all patients in the ENIGMA trial and an analysis excluding all patients who received acute dosages of steroids. Compl. Ex. 2 at 25. These analyses showed highly similar and statistically significant results regardless of whether the steroid receiving patients were excluded. *Id.*[12]

---

[12] A p-value represents the probability that the relationship observed between two variables could have occurred by chance. *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL

Plaintiffs have not challenged the accuracy of this data, which is entirely consistent with Alexander's statement that steroid use had no impact on the study results.

*Third*, to the extent Plaintiffs question the decision to allow trial investigators to determine whether and how to administer acute steroid dosages to study patients, this criticism of the study design does not give rise to a securities fraud claim. *See* Mot. at 13:3-18.

*Finally*, the allegedly misleading statement is a statement of opinion, requiring Plaintiffs to plead why the statement was both objectively and subjectively false. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). In addition to failing to allege objective falsity, Plaintiffs fail to plead that Alexander did not believe his statement.

### D.    **Allakos Did Not Mislead Investors About Serious Adverse Effects**

The Complaint alleged that Allakos' statement that there was one drug-related serious adverse event ("SAE") "was flatly contradicted by posts by ENIGMA Trial patients on the EG Facebook group that the Seligman Report reprinted." Compl. ¶¶ 81-83, 119-28. The Opening Brief demonstrated that Allakos disclosed both one drug-related SAE and seven treatment-emergent SAEs, as well as a broad range of adverse events ("AEs") that did not qualify as serious. Mot. at 14:13-26. Seligman's data did not contradict these disclosures, and a dispute over whether a particular incident should be classified as drug-related or treatment-emergent provides no basis for a securities fraud claim. *Id.* at 15:14-20.

The Opposition Brief fails to meaningfully address these points, simply claiming that the Seligman Report shows "definitely more than one reaction to infusions that resulted either in hospitalization or 'significant incapacity or substantial disruption of the ability to conduct normal life

---

1351040, at *8 (N.D. Cal. Apr. 4, 2014) (citing Federal Judicial Center, Reference Manual on Scientific Evidence 336 (3d ed. 2011)). Here, the p-values both for the entire study population and for the population excluding acute steroid recipients were below .05 for all primary and secondary endpoints, Compl. Ex. 2 at 23, and were therefore statistically significant at the 95% significance level, a standard benchmark for statistical reliability. *See, e.g., White v. City of San Diego*, 605 F.2d 455, 460 (9th Cir. 1979) ("[A] .05 level of statistical significance indicates that the demonstrated relationship between the variables would occur in a random sample five times out of one hundred and is generally recognized as the point at which statisticians draw conclusions from statistical data."); *Bouman v. Block*, 940 F.2d 1211, 1226 (9th Cir. 1991) ("[S]tatistical significance at the .05 level. . . . indicates that . . . the disparity is statistically significant."). In addition to being statistically significant, the p-values both per protocol and without acute steroid use were very similar: <.0001 for the primary endpoint, <.002 for the treatment responder endpoint, and >.001 but <.004 for total symptom score. Compl. Ex. 2 at 25.

---

functions.'"  Opp. at 10:19-21 (quoting Compl. ¶¶ 82-83; Ex. 3 at 144-45).  However, Plaintiffs' focus on "reaction[s] to infusions" appears to assume the conclusion that a given reaction occurred *because* of treatment (a "drug-related" event), as opposed to occurring *after* treatment (a "treatment emergent" or "TE" event).  *See* Mot. at 14:4-12.  It is the responsibility of each trial investigator, not the sponsor, to report any serious adverse event and assess whether that event is drug-related.  21 C.F.R. 312.64(b).  Here, because Plaintiffs engage in second-guessing while providing no basis to disregard the investigator's conclusions, they have failed to state a claim for securities fraud.  *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013) ("no false statement" where "defendant's competing analysis or interpretation of data is itself reasonable."); *Philco Investments, Ltd. v. Martin*, No. C-10-02785-CRB, 2011 WL 500694, at *8 (N.D. Cal. Feb. 9, 2011) (requiring pleading of more than "the difference between two permissible judgments").

Moreover, the uncorroborated third-party reports from Facebook relied on by Seligman provide no basis to question the trial investigators' conclusion that there was only one drug-related SAE.  Plaintiffs point to only two posts that mentioned hospitalizations: "(1) a patient was admitted to the hospital after an infusion for low Oxygen" and "(2) a patient was admitted to the hospital after an infusion in March."  Opp. at 19:9-11.  These posts offer  no "evidence to suggest a causal relationship between the drug and the adverse event," 21 C.F.R. 312.32(c)(1)(i), as required for drug-related AEs, as opposed to treatment-emergent AEs.

Other posts mentioned "severe nausea, headache and super severe stomach pain"; "a 'horrific reaction'"; "a migraine"; "visual migraines" and "full blown ocular migraines," again without any indication that these AEs were drug-related or serious.  *See* Mot. at 14:4-9; Compl. ¶ 82.  These were all symptoms a trial investigator could reasonably determine did not constitute SAEs because they were not "persistent or significant incapacity or substantial disruption of the ability to conduct normal life functions," 21 C.F.R. 312.32(a).  Plaintiffs also offer no facts suggesting these events were drug-related.  Opp. at 10:16-18.  In sum, Plaintiffs plead no facts to support their claim that there was more than the one drug-related SAEs (as opposed to TE SAEs and AEs) that Allakos disclosed.

## II.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

The Opening Brief established that the Complaint lacks any of the typical hallmarks of scienter

pleading, such as confidential witnesses, internal reports, detailed allegations of misconduct, or insider sales, and instead relies exclusively on inferential pleading.  Defendants cited controlling case law which showed that merely alleging that ENIGMA was an "important study" or that Allakos contemporaneously raised capital is insufficient to plead scienter.  Mot. at 17:17-22:10.  Defendants also demonstrated that a holistic review of Plaintiffs' allegations clearly supports dismissal, as Plaintiffs rely almost exclusively on an unverified short-seller report, and it defies common sense that Allakos would continue investing in AK002—including incurring the considerable expense of proceeding to Phase 3 clinical trials—if it believed the drug unlikely to obtain FDA approval.  *Id.* at 22:12-25:4.

### A.    <u>Plaintiffs' "Core Operations" Pleading Is Insufficient</u>

Plaintiffs first argue that "[c]ore operations pleading is sufficient by itself" because it would be "absurd to suggest the management of Allakos did not know about the [alleged] problems" given (i) the "incredible importance of the ENIGMA Trial" and (ii) Defendants' statements showing "intimate[] familiar[ity]" with the trial.  Opp. at 20:10-22:19.  Yet, Plaintiffs' own citation to *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) undermines their claim.  The Ninth Circuit in *S. Ferry* wrote that core operations pleading only suffices in "rare circumstances," and that plaintiffs must generally allege "some additional allegation of specific information conveyed to management and related to the fraud."  *See id.* at 785-86; *see also id.* at 784 ("Where a complaint . . . does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard.").  Indeed, this Court has repeatedly rejected core operations allegations in the absence of pleading that defendants had access to contrary facts.  *See* Mot. at 20:9-18.  In *Rigel*, the Ninth Circuit affirmed this Court's dismissal of scienter allegations that defendants "had access to the clinical trial results and therefore knew [of alleged problems]" in the absence of allegations showing "defendants believed that they made false or misleading statements."  697 F.3d at 883; *see also In re Arrowhead Pharm.*, *Inc. Sec. Litig.*, 782 F. App'x 572, 574-75 (9th Cir. 2019) (affirming dismissal of claim that defendants "downplay[ed]" a drug's risks where "Plaintiff fails to specifically allege that Defendants knew any of their statements were materially misleading"); *Colyer*, 2015 WL 7566809, at *13 ("[K]nowing about the existence of certain optical system errors and knowing that one should report these errors to the public are two different things. . . . [It was] not 'patently obvious' to Defendants that

[the] errors would jeopardize Zalviso's chances for FDA approval.").[13]  *Rigel* is consistent with multiple Ninth Circuit cases which found no basis to presume scienter in allegations concerning a flagship product "[w]ithout factual allegations showing that at least someone at [the company] had knowledge." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014); *see also Metzler*, 540 F.3d at 1068.

Plaintiffs fail to offer such allegations here.[14]  Although Plaintiffs raise a variety of methodological issues with the ENIGMA trial, drawn exclusively from the biased claims of a short-seller, they plead no facts to suggest that Defendants—or anyone at Allakos—believed there were flaws with the study design that warranted disclosure.  This is not the "rare circumstance" where it would be "absurd" to believe that Defendants were not acting with scienter, and Plaintiffs' citation of a handful of cases where core operations pleading has been accepted serves to illustrate the inadequacy of their own pleading.  *See* Opp. at 20:14-22:19; *c.f. Berson*, 527 F.3d at 985-89 & 988 n.5 (finding scienter of two senior managers where four confidential witnesses highlighted internal knowledge of stop-work orders that halted tens of millions of dollars contracts); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809-812 (C.D. Cal. 2011) (finding scienter where defendants made affirmative misstatements that FDA had pre-approved their bioequivalence studies, even though the FDA had not done so); *Patel*, 2015 WL 631525, at *9, *11 (finding scienter where defendants affirmatively recognized revenue in express violation of their own policies requiring written agreements); *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033, 2020 WL 6482014, at *1-3, 9-12 (N.D. Cal. Nov. 4, 2020) (finding scienter where CEO later

---

[13]  Plaintiffs attempt to distinguish *Rigel*, 697 F.3d 869 and *Colyer*, 2015 WL 7566809 by claiming these cases involved general statements where it was not clear defendants were specifically involved or knew of contradictory information, Opp. at 22:15-19, but the same is true here: Plaintiffs have not identified any specific statements by Defendants contradicted by what they knew or must have known.  *See supra* at 1-10.  Plaintiffs attempt to distinguish Defendants' other core operations cases because it was plausible defendants did not know of their statements' falsity, Opp. at 22 n. 5, but the same is true here.

[14]  Plaintiffs' attempt to rely on Defendants' "in-depth comments" also fails, as the cases Plaintiffs cite involve far more evidence of defendants' knowledge of the alleged issues.  *See* Opp. at 21:9-26.  In *Patel v. Axesstel, Inc.*, No. 3:14-CV-1037-CAB-BGS, 2015 WL 631525, at *9, *11 (S.D. Cal. Feb. 13, 2015), defendants acknowledged that the revenue they had recognized required a sales agreement, and they did not have such agreements.  In *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2019 WL 1755293, at *5, 8, 18, 20 (W.D. Wash. Apr. 19, 2019), defendants were notified that a separate lawsuit alleged statutory violations; such violations were corroborated by confidential witnesses; and defendants stated they were monitoring the CFPB, which had entered a consent decree suggesting the company's program violated statutory requirements.  In contrast, Plaintiffs here allege no such corroboration.

---

admitted to emerging market problems and specific pleading that defendants made internal decision to reduce production within days of false statement).[15]  None of these cases found scienter where, like here, Defendants' statements were not contradicted by specific factual allegations (*e.g.*, contrary FDA holdings, violations of company policy, or statements of internal witnesses).  Nor should the Court here.

### B.    Plaintiffs' Motive Pleading Is Insufficient

Plaintiffs also argue that Defendants had a motive to commit fraud.  Opp. at 22:21-23:23.  Not only are motive allegations themselves insufficient, but Plaintiffs concede by their silence that (i) the Complaint's allegations that stock option grants supported motive were ill-founded, and (ii) the absence of stock sales by Defendants undermines an inference of motive.  Mot. at 19 n.15.

Plaintiffs nonetheless argue that an inference of scienter is appropriate because Allakos needed to raise additional capital.  Opp. at 22:21-23:23.  Although Plaintiffs concede that "the desire to raise capital is not generally by itself sufficient to show scienter," Opp. at 22:21, they argue that the "proximity between the ENIGMA announcement and the secondary offering supports an inference of scienter," *id.* at 23:4-5.  Yet multiple cases have rejected this contention where—like here—purported misrepresentations were made around the same time as a stock offering.  *See, e.g.*, *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (finding "plaintiffs' contention that defendants were motivated to [commit fraud] in order to conduct a successful secondary public offering and obtain much-needed operating capital" insufficient); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 927 (N.D. Cal. 2012) (claim "that Oclaro was planning [secondary] stock offering . . . only provides a marginally stronger case for motive" than "routine corporate objectives").[16]

---

[15]  *In re Avon Sec. Litig.*, No. 19 CIV. 01420, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) involved the Second Circuit's standard that "Plaintiffs can establish recklessness by adequately alleging that 'defendants knew facts or had access to non-public information contradicting their public statements' and therefore 'knew or should have known they were misrepresenting material facts.'"  *Id.* at *19 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)).  By contrast, in the Ninth Circuit, "the standard for recklessness is actually much closer to one of intent" and requires "some degree of intentional or conscious misconduct."  *NVIDIA*, 767 F.3d at 1053 (citation omitted).

[16]  Plaintiffs' cases are not to the contrary.  In *Mulderrig v. Amyris, Inc.*, No. 19-CV-1765 YGR, 2020 WL 5903844, at *18-22 (N.D. Cal. Oct. 5, 2020), the court found scienter in light of allegations of defendants' access to specific information that contradicted their statements and their failure to maintain an effective control environment.  No such allegations are present here.  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993) and *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW,

---

Plaintiffs also argue that Allakos' "precarious" financial condition supports an inference of scienter. Opp. at 23:10-23. Plaintiffs offer no response to the undisputed fact that Allakos had 18 months of operating capital at the time of the alleged misrepresentations, and simply ignore the multiple cases cited by Defendants that demonstrate that generic allegations of financial need are insufficient. *See* Mot. at 19:12-15 (citing*, e.g.*, *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1042 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) ("[C]apital [need] nearly two years after the results were released is itself insufficient to create a strong inference of scienter.").

**C.    A Holistic Review Clearly Supports Dismissal For Failure To Plead Scienter**

The Opening Brief explained that Plaintiffs had failed to establish scienter under the holistic *Tellabs* analysis. Mot. at 22:12-25:4. The Opposition Brief offers little in response. Opp. at 23:25-25:6.

Plaintiffs first ask the Court to ignore the fact that the sole basis for the Complaint—the Seligman Report—was issued by a short-seller, claiming that "the credibility of a short seller is a factual dispute." Opp. at 24:4-5. That claim is preposterous. The Seligman Report is attached to and incorporated by reference into the Complaint and states that it provides "opinions" without "diligence or other verification" and that its author "stand[s] to realize significant gains in the event that the price of [Allakos'] stock declines" and makes no "representations or warranties with respect to [its] accuracy." Compl. Ex. 3 at 2. The Court need not assume that Seligman is biased—that bias is clear on the report's face. As Judge Gilliam recently explained in *In re Nektar Therapeutics*, 2020 WL 3962004, "[g]iven [the short-seller]'s disclosures detailing that it stood to benefit from a poor performance in [defendants'] stock price and the lack of any information establishing why [the short-seller]'s opinions on the highly-technical matters at issue here are reliable, Plaintiffs fail to sufficiently show that the Report supports their allegations of falsity." *Id.* at *10. Multiple courts apply the same reasoning in weighing the nature of short-seller allegations as part of the *Tellabs* holistic scienter analysis.[17]

2020 WL 4208442, at *4 (S.D.N.Y. July 21, 2020) were decided under the Second Circuit's motive and opportunity standard, which has been rejected by the Ninth Circuit. *See Zucco*, 552 F.3d at 998.

[17] *See* Mot. 22:12-23 (citing cases). By contrast, Plaintiffs' cases, Opp. 16:11-24 do not support their exclusive reliance on the unsubstantiated claims of a short-seller report. *See Feyko v. Yuhe Int'l, Inc.*, No. CV 11-05511 DDP PJWX, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) (also relying on defendants' internally inconsistent statements, notes from plaintiff's attorney's multiple conversations with short-seller, and company's public filings and call transcripts); *In re China Educ. All., Inc. Sec. Litig.*, No. CV

Plaintiffs next argue that while they "do not object to . . . judicial notice of basic undisputed facts, such as [that] Allakos initiated a Phase 3 study of AK002,"[18] such facts cannot be considered by the Court in assessing scienter.  Opp. at 24:6-10.  To the contrary, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.* instructs that in weighing scienter inferences, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  551 U.S. 308, 322-23 (2007).  Courts routinely consider undisputed facts such as a company's progress through the clinical trial process in analyzing scienter.  *See* Mot. at 23:10-24:14.[19]

It is therefore entirely appropriate for the Court to consider the fact that Allakos completed the ENIGMA trial, met with the FDA to discuss its results, published those results in the prestigious New England Journal of Medicine, and then proceeded to commence a far more extensive and costly Phase III clinic trial, which is currently ongoing.  *See* Mot. at  6:3-15.  As the Ninth Circuit explained in *Endologix*, 962 F.3d at 408, faced with even less compelling facts, a theory "that the company invested in a U.S. clinical trial and made promising statements about FDA approval, yet knew from its experience . . . that the FDA would eventually reject the product—has no basis in logic or common experience."  Plaintiffs now claim they are "not arguing that Defendants are certain that AK002 will not be approved" but rather are "misrepresenting the risks to future approval,"  Opp. at 24:20-22, but this is a distinction without a difference.  Indeed, this argument was rejected in *Arrowhead Pharmaceuticals:*

> Plaintiffs in opposition now back away from the theory that Defendant knew its drug was bound to fail—instead arguing that Defendant "concealed bad news" about the drug from investors in the hopes that news would be "overtaken by good news."  Opp. 23. Concealing bad news . . . would support Plaintiffs' falsity claims.  To support their scienter claims, however, they need to allege facts demonstrating that Defendant knew its drug would not be approved—something Plaintiffs did not sufficiently plead in the SAC and which they no longer assert in their opposition.

10-9239 CAS JCX, 2011 WL 4978483, at *2 (C.D. Cal. Oct. 11, 2011) (noting plaintiffs' investigators compared verified figures in short-seller report with company filings); *Henning v. Orient Paper, Inc.*, No. CV 10-5887-VBF AJWX, 2011 WL 2909322, at *4 (C.D. Cal. July 20, 2011) (citing government agency report and credit reports from plaintiffs' investigator in addition to short-seller report).

[18]  Indeed, this fact is referenced—albeit obliquely—in the Amended Complaint.  *See* Compl. ¶ 79.

[19]  This is not a situation like *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), where the Ninth Circuit expressed concern that judicial notice was being used to contest factual allegations made in a complaint.  Instead, Defendants' argument relates exclusively to concededly "undisputed facts" to which Plaintiffs expressly do not "object."  Opp. at 24.

2017 WL 8791111, at *6 (C.D. Cal. Dec. 21, 2017), *aff'd*, 782 F. App'x 572 (9th Cir. 2019). Given Allakos' investment of tens of millions of dollars in Phase 3 trials, the absence of any stock sales by corporate executives, and Plaintiffs' near-exclusive reliance on a self-interested short-seller, the clear inference is an absence of scienter. *See, e.g.*, *Kleinman*, 706 F.3d at 148 (noting defendants "moved on to Phase 3 of the clinical trials—a step that can only be taken after there have been positive Phase 2 results sufficient to satisfy both business and regulatory interests," leaving "no reason to think . . . Defendants' statements were not honestly believed"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("[T]he initiation of Phase 3 cost millions of dollars and required FDA approval, rendering it improbable that defendants would have continued if they did not believe their interpretation of the interim results or if they thought the drug a complete failure.").[20]

## III.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Leave to amend would be "futile" here because Plaintiffs have already amended once and still rely almost exclusively on a self-interested short-seller report. *See* Mot. at 25:12-18.

March 12, 2021                                    Respectfully submitted,

                                                 SIMPSON THACHER & BARTLETT LLP


                                                 By: */s/ Stephen P. Blake*
                                                 STEPHEN P. BLAKE (Bar No. 260069)
                                                 sblake@stblaw.com

                                                 *Counsel for Defendants Allakos Inc., Robert Alexander,*
                                                 *Leo Redmond, Henrik Rasmussen, and Adam Tomasi*

---

[20] As explained in the Opening Brief, the Ninth Circuit recently found that even where a short-seller "disclosed information that the market was not previously aware of," claims premised on such information "have not plausibly alleged [a] corrective disclosure" and thus have not pled loss causation because "[a] reasonable investor reading [short-seller] posts would likely have taken their contents with a healthy grain of salt." Mot. at 23 n.18 (citing *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020)). Plaintiffs ignore this holding, and instead argue that Seligman's status as an "established investment group" should eliminate this issue. Opp. at 25 n.7. Not only does *BofI* make no such exception for "established" short sellers, this argument is also logically unsound. If anything, a reasonable investor would be likely to view publications by career short-sellers who make their livelihood from publishing reports to drive down stock prices for their own profit with *even more* skepticism than a firm or person engaged in this practice with less frequency.