Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff and Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUNG KIM, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALLAKOS INC., ROBERT ALEXANDER, LEO REDMOND, HENRIK RASMUSSEN, AND ADAM TOMASI,<br><br>Defendants. | **Case No: 4:20-cv-01720-JSW**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Sung Kim and Named Plaintiffs Christian Mayo and Allison Skye ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Allakos Inc. ("Allakos" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased the common stock of Allakos between March 14, 2019 and December 21, 2021, both dates inclusive (the "Class Period). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Allakos is a clinical stage biopharmaceutical company that has never generated any revenue. Allakos' business is focused on a single drug, AK002, which it is developing to treat eosinophil and mast related cell diseases. Accordingly, Allakos' business is entirely dependent on its ability to continue to raise money from investors until AK002 is approved by the U.S. Food and Drug Administration (the "FDA") and Allakos can commercialize the drug.

3. According to Allakos, the "lead indications" — diseases that AK002 is furthest along in the FDA approval process for — are eosinophilic gastritis ("EG") and eosinophilic duodenitis ("EoD"). Prior to 2020, Allakos referred to EoD as eosinophilic gastroenteritis ("EGE"). EG and EGE/EoD are inflammatory diseases of the stomach and small intestine. The current standard of care for those diseases is the use of steroids to decrease inflammation.

4. During 2018 and the first half of 2019, Allakos conducted a Phase 2 clinical trial that tested AK002 on EG and EGE/EoD patients for safety and effectiveness against those diseases, which the Company refers to as the "ENIGMA" Trial, and is referred to herein as "Phase 2 ENIGMA." Given that EG and EGE/EoD are the lead indications for AK002, Phase 2 ENIGMA was the most important trial in Allakos' history, at the time it was conducted.

5. On August 5, 2019, Defendants announced "positive" results for Phase 2 ENIGMA, and repeatedly emphasized that it was a "randomized, double-blind, placebo-controlled" clinical trial. Defendant Alexander, Allakos' CEO, told analysts that Phase 2 ENIGMA would be one of the two trials that Allakos intended to submit to the FDA when it tried to gain approval for the use of AK002 in EG and EGE/EoD patients in the future.

6. Allakos' stock shot up after the announcement and Defendants immediately

capitalized. Mere hours after announcing the Phase 2 ENIGMA results, Allakos announced that it was conducting a $200 million secondary offering of common stock, more than its $134.4 million July 2018 Initial Public Offering ("IPO"). The next day Allakos announced that it was upsizing its offering to $350 million and the Company ultimately raised $377.5 million in that secondary offering.

7. On December 18, 2019, Seligman Investments ("Seligman") issued an extensive research report about Phase 2 ENIGMA. Seligman, among other things, interviewed trial investigators who conducted Phase 2 ENIGMA for Allakos and reviewed and reprinted numerous posts that Phase 2 ENIGMA participants and their families made to a private Facebook group. Seligman's research showed that Defendants had made numerous material misstatements and/or omissions about Phase 2 ENIGMA:

- Contrary to multiple statements in Allakos' public filings and how the vast majority of clinical trials are conducted, Allakos did not employ a third-party Contract Research Organization ("CRO") to conduct Phase 2 ENIGMA. Use of CROs is an important part of ensuring the integrity of clinical trials and Allakos' own trial investigators believed that the Company's failure to use one undermined the reliability of Phase 2 ENIGMA.
- Due to poor controls, including the failure to use a CRO, the blinding of Phase 2 ENIGMA was severely compromised for multiple reasons, including: (1) adverse reactions to infusions of AK002 made patients aware of whether they were receiving AK002 or placebo, (2) trial investigators told patients whether they believed they were getting the drug instead of a placebo, (3) patients were able to see their test results during the Trial, (4) patients were told they would qualify for an extension study if they did well in the Trial, encouraging them to report symptom improvement, and (5) Allakos' executives had improper access to data and the patients during the Trial.
- The use of steroids was inconsistent and haphazard in Phase 2 ENIGMA and left to the discretion of the trial investigators. This was a significant confounding factor in

the Trial since steroids are the current standard of care for EG and EGE/EoD. The administration of steroids may very well have been a cause of the positive results Allakos reported in the trial.

8. All of these misstatements and/or omissions were highly material to investors because all of those issues will raise red flags with the FDA, making it less likely that Allakos will be able to use Phase 2 ENIGMA to gain approval of AK002 in the future. These misstatements and omissions also call into question the quality and integrity of the positive results Allakos reported for Phase 2 ENIGMA.

9. After Seligman issued its report, Allakos' stock dropped 17% from the closing price on December 17, 2019, over the next two days, harming investors

10. Despite the concerns that Seligman raised about Phase 2 ENIGMA, on March 24, 2020, Allakos announced that it was conducting a Phase 3 version of Phase 2 ENIGMA, which Allakos intended to be the second trial that it needed for FDA approval of AK002 for use in EG and EGE/EoD patients ("Phase 3 ENIGMA"). When announcing Phase 3 ENIGMA, Allakos emphasized that the patient population would be the same as Phase 2 ENIGMA. Allakos began enrolling patients in Phase 3 ENIGMA in June 2020.

11. On October 26, 2020, Allakos released results from a prospective prevalence study (the "Prevalence Study") it had conducted which it said showed EG and EGE/EoD were greatly underdiagnosed in patients with chronic unexplained gastrointestinal symptoms or functional gastrointestinal disorders, such as Irritable Bowel Syndrome ("IBS"). Allakos estimated there could potentially be 6 to 10 million EG and/or EGE/EoD patients to whom Allakos could market AK002 in the United States even though published literature put the number of patients with those diseases at 50,000.

12. During the presentation announcing the Prevalence Study results, Allakos noted that the characteristics of the patients identified in the Prevalence Study differed significantly from the patients identified for Phase 2 ENIGMA. Unlike in the Prevalence Study, very few Phase 2 ENIGMA patients had been diagnosed with IBS and the vast majority of the Phase 2 ENIGMA patients had previously been diagnosed with EG and/or EGE/EoD. Additionally, patients who were

identified for Phase 2 ENIGMA had nearly double the eosinophils in their blood as the patients identified in the Prevalence Study. Higher eosinophil counts are an indicator of disease and AK002's mechanism for treating EG and EGE/EoD is depletion of eosinophils.

13. Allakos announced that it had completed patient enrollment in Phase 3 ENIGMA on June 7, 2021.

14. On September 10, 2021, Defendant Tomasi, the President and COO of Allakos, was publicly interviewed about Phase 3 ENIGMA and the Prevalence Study by a Morgan Stanley analyst at the Morgan Stanley 19th Annual Global Healthcare Conference. During the interview, Defendant Tomasi repeatedly emphasized that it was very important to the expected success of Phase 3 ENIGMA that it have a similar patient population to Phase 2 ENIGMA. He assured investors that the patient populations of the two ENIGMA trials were "identical" and "very similar" and that he could say that because Phase 3 ENIGMA was fully enrolled.

15. On December 21, 2021, Allakos announced that Phase 3 ENIGMA had failed because it had not met its patient reported symptomatic co-primary endpoint. Remarkably, the symptoms of the patients in the placebo arm of the trial improved more than the patients who received AK002. Given that EG and EGE/EoD were AK002's lead indication and Allakos' business was entirely based on AK002, Allakos' stock completely collapsed, falling ***$75.84 per share, or almost 90%, to close at $8.55*** on December 22, 2021.

16. On February 15, 2022, Allakos hosted an Investor Day where its employees discussed the failure of Phase 3 ENIGMA. ***Directly contrary to Defendant Tomasi's prior statements, Allakos disclosed that the patient population of Phase 3 ENIGMA was significantly different from Phase 2 ENIGMA and blamed those differences for the failure of Phase 3 ENIGMA***.

17. The undisclosed differences between the patient populations for Phase 3 and Phase 2 ENIGMA were similar to the differences between the patients identified for Phase 2 ENIGMA and the Prevalence Study. The Phase 3 ENIGMA patient population had a much lower percentage of patients who had been previously diagnosed with EG and/or EGE/EoD than Phase 2 and a much higher rate of previous IBS diagnosis. Additionally, the Phase 3 ENIGMA patient population had

significantly lower levels of eosinophils in both their blood and tissue than Phase 2.

18. The differences between the patient population Allakos identified for Phase 2 ENIGMA and the Prevalence Study put Defendant Tomasi on notice that there could be similar differences between the patient population of Phase 2 and Phase 3 ENIGMA given that the Prevalence Study patients met Allakos' EG and/or EGE/EoD criteria despite those differences. Nevertheless, Defendant Tomasi misleadingly told investors that the patient populations were the same. Furthermore, Tomasi, by his own admission, had access to the Phase 3 ENIGMA patient demographics when he made his statements. Additionally, during the February 15, 2022 Investor Day, Allakos' CEO, Defendant Alexander, and its Chief Medical Officer both stated, when discussing another phase 3 clinical trial that Allakos was conducting on only EGE/EoD patients, that Allakos employees had access to patient demographic information from that trial because it was fully enrolled even though the trial was not yet complete.

19. Defendant Tomasi had a strong motive not to suggest to investors that differences between the patient population in Phase 2 and Phase 3 ENIGMA had any significance because any such suggestion would have called into question the results of the Prevalence Study and undermined Allakos' claims about AK002's enormous potential market. Accordingly, Allakos did not reveal the differences between the patient population of Phase 3 and Phase 2 ENIGMA until it needed to provide the market an explanation for why Phase 3 ENIGMA failed.

20. Additionally, prior to 2021, none of the Defendants sold a single share of Allakos common stock on the open market. However, in 2021, Defendants Tomasi, Alexander, and Rasmussen sold a combined 524,302 shares of Allakos common stock for proceeds of $56,099,224. Defendants sold their shares for the average price of almost $107, more than 12 times what the stock was worth after the Company announced the failure of Phase 3 ENIGMA. These unprecedented large scale sales by Defendants show that they lacked confidence in the outcome of Phase 3 ENIGMA.

21. As a result of Defendants' knowing and/or reckless false and misleading statements and omissions concerning the Phase 2 and 3 ENIGMA trials, the value of the price of Allakos common stock during the Class Period was artificially inflated. When Seligman's issuance of its

report revealed flaws with Phase 2 ENIGMA and when the risk of the different patient populations in Phase 3 ENIGMA and Phase 2 ENIGMA materialized with the failure of Phase 3 ENIGMA, Allakos' share price declined and Plaintiffs and other Class members suffered significant losses and damages.

**JURISDICTION AND VENUE**

22. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

24. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and the Company is headquartered in this Judicial District.

25. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

26. Lead Plaintiff, Sung Kim, as set forth in his previously filed certification incorporated by reference herein, purchased Allakos common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

27. Named Plaintiffs Christian Mayo and Allison Skye, as set forth in previously filed certifications, purchased Allakos common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosure.

28. Defendant Allakos is a clinical stage biopharmaceutical company that focuses on developing the drug AK002. The Company is incorporated in Delaware and its principal executive offices are located at 975 Island Drive, Suite 201 Redwood City, California. Allakos common stock are traded on the NASDAQ ("NASDAQ") under the ticker symbol "ALLK."

29. Defendant Robert Alexander ("Alexander") has been the Company's Chief Executive Officer ("CEO") since April 2017 and a member of its board of directors since May 2017. Defendant Alexander also served as President of the Company from November 29, 2017 until August 2019. Prior to becoming CEO of Allakos, Defendant Alexander served as CEO of another pharmaceutical company, ZS Pharma. He received a Ph.D. with a focus on immunology from the University of North Carolina.

30. Defendant Leo Redmond ("Redmond") served as the Company's Chief Financial Officer ("CFO") from August 1, 2019 until February 1, 2021. Prior to joining Allakos, Defendant Redmond served as CFO and President of Presidio Pharmaceuticals.

31. Defendant Henrik Rasmussen ("Rasmussen") served as the Company's Chief Medical Officer ("CMO") from June 2017 until June 11, 2021. Defendant Rasmussen previously served as CMO at three other pharmaceutical companies: ZS Pharma, Nabi Biopharmaceuticals, and Genvec. He also had held high level clinical positions at Novo Nordisk, British Biotech, and Pfizer. Defendant Rasmussen has led numerous global drug development programs and regulatory filings worldwide, including New Drug Application submissions to the FDA. He received his Ph.D. and M.D. from the University of Copenhagen in Denmark and is trained in internal medicine and cardiology.

32. Defendant Adam Tomasi ("Tomasi") has served as the Company's Chief Operating Officer since April 2017, its President since August 2019, and its Secretary since November 2017. He also served as Allakos' CFO from April 2017 to August 2019 and its acting CFO from February 1, 2021 until April 19, 2021. He previously served as Chief Scientific Officer and Head of Corporate Development at ZS Pharma. Defendant Tomasi received a Ph.D in Chemistry from the University of California Irvine and an MBA from the Massachusetts Institute of Technology.

33. Defendants Alexander, Redmond, Rasmussen, and Tomasi are sometimes referred to herein as the "Individual Defendants."

34. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

35. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

36. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under respondeat superior and agency principles.

37. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Allakos is Small Biotechnology Company Whose Prospects are Entirely Dependent of FDA Approval of a Single Drug, AK002.

38. Allakos was founded in March 2012 and became a public company through a July 2018 IPO that raised $134.4 million.

39. In the Company's Form 10-K for the fiscal year ended December 31, 2018, filed March 14, 2019 (the "2018 10-K"), Form 10-Q for the quarterly period ended March 31, 2019, filed on May 8, 2019 ("1Q 2019 10-Q"), Form 10-K for the fiscal year ended December 31, 2019, filed

February 25, 2020 (the "2019 10-K"), and Form 10-K for the fiscal year ended December 31, 2020, filed March 1, 2021 (the "2020 10-K"), Allakos described itself as entirely focused on the development of a single drug, AK002 (also known as "Lirentelimab" and "Antolimab"), stating "[w]e are a clinical stage biotechnology company developing AK002, our wholly owned monoclonal antibody, for the treatment of various eosinophil and mast cell related diseases. AK002 selectively targets both eosinophils and mast cells, white blood cells that are widely distributed in the body and play a central role in the inflammatory response." The Company further stated in its 2018 10-K and 1Q 2019 10-Q that it was "developing AK002 for the treatment of eosinophilic gastritis ('EG'), eosinophilic gastroenteritis ('EGE'), and eosinophilic esophagitis ('EoE')."

40. EG, EGE/EoD, and EoE are eosinophilic inflammatory diseases of the stomach, small intestine, and esophagus, respectively. The current standard of care for those diseases is the use of steroids to decrease the inflammation.

41. Although Allakos is also evaluating the use of AK002 in other medical conditions, obtaining FDA approval for the use of AK002 in EG, EGE/EoD, and/or EoE patients would be especially valuable to Allakos because AK002 has received orphan drug designation from the FDA for those diseases. An orphan drug designation is very valuable because it provides seven years of marketing exclusivity upon the approval of a drug intended to treat a rare condition. During that time, the FDA will not approve any other drug for the same indication unless it demonstrates clinical superiority.

42. All of Allakos' product candidates currently under development, other than AK002, are in preclinical development, meaning that they have not reached the state of development where the Company is testing the drug in clinical trials. Allakos previously conducted clinical trials for AK001, a compound similar to AK002, that was also supposed to treat eosinophil and mast cell related diseases, but the Company abandoned research on AK001 due to the drug's ineffectiveness.

43. In its 2018 10-K, 1Q 2019 10-Q, 2019 10-K, and 2020 10-K, Allakos admitted its future prospects were entirely dependent on FDA approval of AK002: "Our future success is dependent on our ability to timely complete clinical trials and obtain marketing approval for, and then successfully commercialize [AK002], our lead compound, for one or more indications…We

are not permitted to market or promote [AK002], or any other product candidates, before we receive marketing approval from the U.S. Food and Drug Administration ("FDA") and comparable foreign regulatory authorities…."

44. Despite reaching a market capitalization of more than $7 Billion during the Class Period, Allakos had a small number of employees throughout the Class Period. As of December 31, 2018, Allakos had only 62 full-time employees, 40 of whom were engaged in research and development activities. As of December 31, 2021, Allakos had 192 full-time employees, 132 of whom were engaged in research and development activities.

45. Allakos has never generated any revenue. In 2018, 2019, 2020, and 2021, it had net losses of $43.5 million, $85.4 million, $153.5 million, and $269.9 million, respectively, and as of December 31, 2021 it had accumulated a deficit of $612.8 million since its founding.

**B. Phase 2 ENIGMA, a Purported Phase 2, Double-Blind, Placebo-Controlled Trial of AK002 in Patients with EG and/or EGE/EoD.**

46. Drugs generally go through three phases of clinical trials prior to their approval by the FDA. In Phase 1 trials, the drug is administered to a small number of patients to test the drug's safety. If the drug is found to be safe enough, it can be tested in a Phase 2 trial. Phase 2 trials are conducted on larger groups of patients to continue to assess safety and to see if a drug is effective against a particular disease. Phase 3 trials generally enroll an even larger group of patients and focus on the effectiveness of the drug. The FDA generally requires a drug sponsor to demonstrate safety and efficacy in two adequate and well-controlled clinical trials to obtain marketing approval.

47. During 2018 and the first half of 2019, Allakos conducted Phase 2 ENIGMA a clinical trial it described in its 2018 10-K as "a randomized, double-blind, placebo-controlled Phase 2 trial with AK002 in approximately 60 patients with active, moderate to severe, biopsy-confirmed EG… and/or [EGE/EoD]."[1] Allakos further stated that the primary endpoint in the trial was "the reduction in gastric or duodenal eosinophils post-treatment" based on biopsies conducted on the patients. The secondary endpoint was "changes in EG and [EGE/EoD] patient symptoms, such as abdominal pain, nausea, vomiting and diarrhea, as reported by patients using Allakos' proprietary

[1] 38% of the patients in Phase 2 ENIGMA also had EoE.

daily Patient Reported Outcome ("PRO") questionnaire."

48. A randomized, double-blind, placebo controlled trial is defined as a trial where neither the patients nor the researcher know who is getting the treatment being tested and who is getting the placebo. The purpose of a double-blinded study is to eliminate biased caused by the researchers and patients' expectations that the treatment will work.

49. Defendants Alexander and Rasmussen both discussed Phase 2 ENIGMA in a May 7, 2019 conference call with market analysts, both stating that the Company's "lead indication" for AK002 was EG and EGE/EoD. Accordingly, since Phase 2 ENIGMA was Allakos' first Phase 2 trial testing AK002 on EG and EGE/EoD patients, it was the most important clinical trial in the Company's history at the time it was conducted.

50. In the 2010 10-K and 1Q 2019 10-Q, which the Company issued on March 14, 2019 and May 8, 2019, respectively, explained that Allakos, like most small pharmaceutical companies, "do[es] not have the ability to independently conduct [its] clinical trials" and instead "currently rel[ies] on third-parties, such as CROs, clinical data management organizations, medical institutions and clinical investigators, to conduct [its] clinical trials of AK002 and expect to continue to rely upon third-parties to conduct additional clinical trials of AK002 and [its] other product candidates." The 2010 10-K and 1Q 2019 10-Q further warned that "[i]f we or any of our CROs fail to comply with applicable [Good Clinical Practice] requirements, the clinical data generated in our clinical trials may be deemed unreliable and the FDA…or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications."

51. The use of an independent CRO to conduct clinical trials, such as Phase 2 ENIGMA, is the typical practice for all but the largest pharmaceutical companies because CROs play an important role in making sure that clinical trials are carried out with integrity. Without the independent oversight of a CRO, there are numerous opportunities for a company sponsoring the trial to make changes during the trial and otherwise manipulate results to produce a better outcome for that company's drug. CROs operate under standard operating procedures which impose rules of Good Clinical Practice, such as Source Document Verification ("SDV"), database lock, and a prospectively defined statistical analysis plan ("SAP"). SDV, which is the comparison of reported

trial data with information from primary health records of trial subjects, is an important component of ensuring the integrity of trial data. Database lock is the crucial practice of finalizing the database of trial data to prevent unauthorized or unintentional changes. Database lock is extremely important in randomized blinded trials since the database must be locked before the blind of the doctors and patients is broken to protect the integrity of the trial. Setting up an SAP prior to the trial protects the integrity of a clinical trial because it stops the company conducting the clinical trial from altering the statistical methodology mid-trial to obtain a more favorable result.

52. CROs also often have levels of expertise to pressure test the trial's integrity by challenging the study design, filtering out study biases, selecting the endpoints, defining the analysis approaches, and interacting on behalf of the sponsor with FDA. The absence of a CRO would be a red flag to encourage FDA to investigate whether a trial adhered to Good Clinical Practice. If the FDA believes that a trial did not follow Good Clinical Practice, it is less likely that a sponsor can use the trial to gain FDA approval for a drug.

### C. On August 5, 2019, Allakos Announces "Positive" Results From Phase 2 ENIGMA on the Same Day that it Announces a Secondary Offering of Stock.

53. On August 5, 2019, Allakos issued a Form 8-K signed by Defendant Alexander that attached a press release entitled "Allakos Announces AK002 Met All Prespecified Primary and Secondary Endpoints in Phase 2 Randomized, Double-Blind, Placebo-Controlled Study in Patients with Eosinophilic Gastritis (EG) and/or Eosinophilic Gastroenteritis (EGE)," which touted the "positive results" of the "randomized, double-blind, placebo-controlled" Phase 2 ENIGMA (The "August 5, 2019 ENIGMA Press Release").

54. On August 5, 2019, Allakos also hosted a conference call for analysts discussing the results of Phase 2 ENIGMA (the "August 5, 2019 Conference Call") and the Company issued a Form 8-K signed by Defendant Alexander on the same date with a presentation entitled "Phase 2 Eosinophil Gastritis and Gastroenteritis Study Results." Defendants Alexander and Rasmussen used that presentation during the August 5, 2019 Conference Call (the "August 5, 2019 Presentation," attached as Exhibit 1).

55. On the August 5, 2019 Conference Call, Defendant Alexander touted the results of

Phase 2 ENIGMA and specifically reminded analysts that it was a "randomized, double-blind, placebo-controlled study." Defendant Alexander further stated that Phase 2 ENIGMA would be one of two trials that Allakos would use to try to gain FDA approval for the use of AK002 in EG and EGE/EoD patients.

56. When analysts asked Defendant Alexander about the use of steroids around the dosing of AK002 during Phase 2 ENIGMA on the August 5, 2019 Conference Call, Defendant Alexander stated unequivocally that steroids had no effect on Phase 2 ENIGMA: "In terms of the steroid, I mean, it had absolutely 0 effect on the results, and that was shown in the study. So the idea that steroids are confounding the results is specious."

57. Defendant Rasmussen also stated during the August 5, 2019 Conference Call that "the study design of the ENIGMA study was randomized, double-blind, placebo-controlled study in patients with eosinophilic gastritis and/or gastroenteritis."

58. Mere hours after announcing the results of Phase 2 ENIGMA, Allakos announced a secondary public offering of $200 million of shares in its common stock and filed a Form S-3 registration statement, signed by Defendants Alexander and Redmond, and a preliminary prospectus supplement that continued to tout Phase 2 ENIGMA.

59. Allakos also issued its Form 10-Q for the quarterly period ended June 30, 2019, on August 5, 2019 ("2Q 2019 10-Q"). The 2Q 2019 10-Q stated, like the 2010 10-K and 1Q 2019 10-Q did, that Allakos does not have the ability to independently conduct its clinical trials and relies on third-parties, such as CROs, to conduct its clinical trials for AK002.

**D. Defendants Capitalize Immediately on their Statements About Phase 2 ENIGMA by Almost Doubling the Value of Their Secondary Offering and Granting Stock Options to Defendant Redmond that had Already Almost Tripled in Value.**

60. Defendants' statements concerning Phase 2 ENIGMA caused Allakos' stock to almost triple from its closing price of $31 on Friday, August 2, 2019 to a closing price of $87.5 on August 7, 2019.

61. On the evening of August 6, 2019, Allakos announced it was upsizing its secondary offering of common stock to $350 million at an offering price of $77 per share. The Company filed its final prospectus supplement for its offering on August 7, 2019. On August 9, 2019, the Company

announced it had raised $377.5 million.

62. On August 6, 2019, Allakos also filed a Form 4 stating that it had granted 120,000 stock options to Defendant Redmond on August 2, 2019 at a price of $31. Since Allakos' stock closed at $79.47 on August 6, 2019, by the time Allakos announced the options grant, Redmond's options were already worth almost $6 million.

**E. On December 18, 2019, Seligman Investments Issues a Detailed Report Showing That Defendants Made Numerous Misstatements About Phase 2 ENIGMA.**

63. On December 18, 2019, Seligman issued a report entitled "A Suspect Biotech with a Phase 2 Farce, Incredulous Trial Investigators, and Warning Signs of Potential Fraud" (the "Seligman Report," attached as Exhibit 2). Seligman manages long-only and long/short equity strategies and occasionally publishes research reports based on intensive, deep-dive fundamental research.[2]

64. The Seligman Report was the result of extensive research by Seligman into Allakos and Phase 2 ENIGMA. Seligman interviewed four people who served as Trial Investigators for Phase 2 ENIGMA. During a clinical trial, the drug is dispensed under the immediate direction of the Trial Investigators. Accordingly, the Trial Investigators had first-hand knowledge of what occurred during Phase 2 ENIGMA.

65. Seligman also reviewed the private Facebook group for EG, which contained hundreds of posts by Phase 2 ENIGMA participants and their families. Seligman believes that most of the 65 participants in Phase 2 ENIGMA are members of the EG Facebook group.

1. Contrary to Numerous Statements in its Public Filings, Allakos Did Not Use a CRO When it Conducted Phase 2 ENIGMA.

66. Seligman confirmed with four different Phase 2 ENIGMA Trial Investigators that Allakos did not use a CRO to conduct Phase 2 ENIGMA. According to Seligman's research, more than 90% of clinical trials employ a CRO. The trial investigators that Seligman interviewed confirmed that Allakos' failure to use a CRO was highly unusual and said that they had never been involved in another clinical trial that did not use a CRO.

[2] Seligman is an affiliate of Columbia Threadneedle Investments group, an asset manager overseeing $754 billion of client assets.

67. The First Trial Investigator that Seligman spoke with initially believed that he was interacting with employees of a CRO during Phase 2 ENIGMA, and was struck by how aggressively they behaved. Because of that, he asked them what company they worked with and they said they were employees of Allakos. He was surprised because he had never seen a biotech company conduct a clinical trial without a CRO before. He said that "[Allakos] was actively involved during the trial" and "aggressive." He added that "[t]hese guys are businesspeople. They think we made a couple hundred million and this could be one of these."

68. Seligman spoke with a Second Trial Investigator, who also initially assumed that Allakos used a CRO. Seligman asked him to verify that he had been working with a CRO. When the Second Trial Investigator asked his staff and confirmed that he had actually been working with Allakos employees, he was shocked. He stated: "We always deal with a third party CRO that makes sure there's compliance with internal and external protocols and inclusion/exclusion criteria." The Second Trial Investigator further explained that "***[i]t should be a third party to prevent bias.*** I don't know why they didn't use a third party. ***I'd say 95% of time it's a third party. It's never the company. We've conducted so many trials. It's never been the company. It's one of the biases that you definitely want to remove.*** Inherent bias from internal review shouldn't exist in these trials. ***This would be a huge red flag in phase three and the FDA wouldn't like it. They would be stupid to have their own people do compliance, assessment, and auditing. It just won't fly with the FDA.***" (emphasis added). The Second Trial Investigator added that he had probably done 20 trials in the past five years and all twenty used a third party CRO because "[t]hat's standard operating procedure" and its "the right thing to do. I was shocked to see that Allakos served as their own CRO."

69. The Third Trial Investigator that Seligman interviewed, like the first two, had assumed that he was working with a CRO. After he confirmed with his facility's clinical research coordinator that the person who visited the trial site was an employee of Allakos, not a CRO, he told Seligman: "I believe the site monitors were employees of Allakos. I just asked my clinical research coordinator. ***The person who came for site visits is an Allakos employee. My patient***

***coordinator worked directly with Allakos. If it was an Allakos person and not a CRO I'd be very bothered by that. It wouldn't be honest.***" (emphasis added).

70. Finally, Seligman interviewed a Fourth Trial Investigator, who appeared to know all along that Allakos conducted Phase 2 ENIGMA without a CRO, but he did not know why the Company chose that route. He said that for Allakos to run the Trial properly some employees would need to be blinded and others unblinded. Given the size of Allakos — the Company had only 40 employees who were engaged in research and development activities as of the end of 2018 — it would have been very difficult for it to maintain the necessary firewall between employees to maintain the blinding of Phase 2 ENIGMA even if the Company made an honest attempt to do so. Unsurprisingly, as discussed in the next section, the blinding of Phase 2 ENIGMA was severely compromised in numerous ways, including because Defendant Rasmussen had improper contact with a patient and because Allakos had improper access to interim data from the Trial.

71. Given that Allakos' failure to use a CRO and aggressive behavior during Phase 2 ENIGMA raised troubling questions, Seligman looked into whether the biopsies done for the Trial were sent to the Company or a panel of independent, third party pathologists for analysis, given the well-known issues around bias and subjectivity in biopsy measurements. One of the trial investigators for Phase 2 ENIGMA Trial told Seligman that all the biopsies were sent to one person who had ties to Allakos. Based on reviewing abstracts from the pathology lab, Seligman determined that the reader was either Diane S. Lidke or Tracy I. George. In an article entitled "Variability of PD-LI Expression in Mastocytosis" published in the February 13, 2018 issue of the journal *Blood Advances*, Lidke and George both disclosed that they received research funding from Allakos.

72. In addition to failing to use a CRO and using a single reader with a conflict of interest for Phase 2 ENIGMA Trial, Allakos' clinical staff is rife with nepotism. Defendant Rasmussen's son, Jacob Rasmussen, and daughter, Camilla Shaw, were VP of Clinical Operations[3] and a Clinical Program Manager, respectively. According to the Seligman Report, VP of Clinical

[3] According to Allakos' Proxy Statement filed on April 30, 2019, Jacob Rasmussen's position was Clinical Program Manager, but Seligman stated that based on its research, it believed that Jacob Rasmussen has either been promoted or the disclosure was wrong. Allakos' Proxy Statement filed on April 15, 2020, stated that Jacob Rasmussen was Senior Direct of Clinical Project Management.

Operations was likely the number two clinical role at Allakos after his father's role. Shaw held her role even though she is the only Allakos employee located in Utah and she graduated from college in 2012. Defendant Rasmussen and his son also, notably, held their roles even though they are located in Maryland, whereas virtually all other Allakos employees are located in the San Francisco area. As of the issuance of the Seligman Report, Allakos had granted Defendant Rasmussen's children stock options worth approximately $13 million.

2. Poor Controls Greatly Compromised the Blinding of Phase 2 ENIGMA — Purportedly Randomized and Double-blind — Rendering the Patient Reported Outcome Score Unreliable

73. Defendants told investors repeatedly that Phase 2 ENIGMA was a "randomized, double-blind, placebo-controlled" trial, but, unsurprisingly given Allakos' failure to use a CRO and its admission that it does not have the ability to independently conduct its clinical trials, Phase 2 ENIGMA had poor controls that greatly compromised its blinding. According to the Phase 2 ENIGMA Trial Investigators and posts on the EG Facebook group, the blinding was compromised because (1) adverse reactions to infusions of AK002 made patients aware of whether they were receiving AK002 or placebo, (2) trial investigators told patients whether they believed they were getting the drug instead of a placebo, (3) patients were able to see their test results during the trial, (4) patients were told they would qualify for an extension study if they did well in the trial, encouraging them to report symptom improvement, and (5) Allakos had improper access to data and the patients during the trial.

74. *First*, because AK002 causes a significant reaction in many patients when infused, three of the Phase 2 ENIGMA Trial Investigators that Seligman spoke with expressed concern that the entire Trial was unblinded because reactions to AK002 tipped the patients off about whether they were receiving AK002 or the placebo.

75. The EG Facebook group shows that the trial investigators' fears were warranted — the Seligman Report includes eight Facebook posts in which patients speculated that they were receiving AK002 because they had a reaction to the infusion or that they were not because they did not have a reaction.

76. *Second*, five patients or their family members posted that the *trial investigators*

*themselves* told the patients they were likely getting the drug. The posts stated:

- The symptoms I had: shortness of breat [sic], flushing, chest tightness are very typical generalized transfusion reactions. However with how quickly they happened and that I was able to restart the transfusion without continued reactions the doctors believe it's from the large amount of eosinophis going through lysis so quickly…
- The dr is convinced she got the drug and since she has so many [eosinophis], her reaction was due to a large kill off of [eosinophis].
- My daughter had a severe reaction 2 hours after the start of the first infusion. The dr thinks she is definitely getting the drug.
- Since the dr thinks she was getting the drug all along, it may be no different.
- Her 1st infusion was a "horrific reaction" and the dr firmly believes she did get the drug…

77. *Third*, remarkably, one patient in Phase 2 ENIGMA posted on Facebook that it was "so great" that he or she was "able to see the test results, biopsies, bloodwork while on the drug." Additionally, seven patients posted that they received endoscopy results during the trial, including one that stated that "clinically and by endoscopy we all should have a clear indication if we are getting the drug or placebo."

78. Control problems that tip patients off about whether they are receiving the drug or a placebo are red flags for the FDA that create doubt as to the integrity of the trial and its results. In the FDA's Guidance for Industry on Patient-Reported Outcome Measures: Use in Medical Product Development to Support Labeling Claims, issued in December 2009, the FDA warned that unblinding due to treatment reaction was a serious concern for the FDA when it reviewed Patient Reported Outcomes: "In blinded clinical trials, patients should be blinded to treatment assignment throughout the trial. If the treatment has obvious effects, such as adverse events, the clinical trial may be at risk for unintentional unblinding…. ***Suspicion of inadvertent unblinding can be a problematic review consideration for the FDA when assessing PRO endpoints***." (emphasis added).

79. *Fourth*, the Patient Reported Outcome scores of patients were also biased by the fact

that, according to posts on the EG Facebook group, patients in Phase 2 ENIGMA were informed that if they had success in Phase 2 ENIGMA, they would be accepted into the extension study where they would be guaranteed to receive the drug and avoid placebo. This provided patients with an improper incentive to report improvement in the Patient Reported Outcome surveys.

80. *Fifth*, posts to the EG Facebook group also showed that a patient's parent had direct contact with Defendant Rasmussen. Seligman told one of the trial investigators they spoke to about this and the investigator found it very concerning for the integrity of Phase 2 ENIGMA:

> If Rasmussen talked to a patient's parent, that's what I mean when I say they were heavily involved. That's unusual. It seems a little weird to me. The company should be blinded to the patient's name. It doesn't make any sense. The patient's ID is a private matter. Patients are desperate. Parents sometimes call the company. It's a gray area. Once a patient identifies themselves to the company, it's a HIPAA violation. It's concerning to some degree. He could be influencing them. Randomization should be done by investigational pharmacist at each site. It's unusual and is a little concerning.

81. Additionally, two patients or family members of patients posted to the EG Facebook group that they were told that Allakos was discontinuing the lowest (.3mg dose) of AK002 mid-trial because it was ineffective. One of the posts stated that a research coordinator told them that. This shows that Allakos had access to the data during Phase 2 ENIGMA and was, therefore, improperly unblinded. Accordingly, this was a violation of Good Clinical Practices and a red flag for the FDA.

3. <u>Defendant Alexander Misrepresented the Effect of Steroids on Phase 2 ENIGMA.</u>

82. During the August 5, 2019 Conference Call, Defendant Alexander flatly asserted "[i]n terms of the steroid, I mean, it had absolutely 0 effect on the results, and that was shown in the study. So the idea that steroids are confounding the results is specious."

83. According to Seligman's interviews with trial investigators, the administration of steroids during Phase 2 ENIGMA was extremely haphazard. Two of the investigators indicated that it was completely at their discretion whether to put patients on steroids. One of the trial investigators said ***he gave all of his patients 20 mg of prednisone (a powerful steroid)*** prior to the first two infusions. Another said he only put some patients on steroids, but said he used ***80mg of prednisone***.

84. The haphazard and inconsistent use of steroids created a significant danger to the

reliability of Phase 2 ENIGMA's results since steroids are the current standard of care for EG and EGE and highly effective against those diseases. For example, the study "Successful Treatment of Eosinophilic Gastroenteritis with Clarithromycin," which appeared in the December 2012 issue of the *Korean Journal of Internal Medicine*, stated that 90% of EGE/EoD patients respond to steroid therapy and even 5 mg a day could suppress symptoms.

85. The FDA's February 2019 Draft Guidance on EoE, a closely related disease to EG and EGE/EoD,[4] specifically warned about the importance of steroid controls during clinical trials. Accordingly, widespread steroid use in Phase 2 ENIGMA would be a red flag for the FDA when evaluating the trial. Furthermore, one of Allakos' own trial investigators told Seligman that he believed steroids could be a confounding factor, stating "[c]ould steroids be a confounding factor here? Of course. With 80mg of prednisone, one shot can give you an acute effect."

86. Notably, accordingly to Facebook posts by family members of participants in the extension study following Phase 2 ENIGMA Trial, Allakos added 80 mg of prednisone to the AK002 infusion protocol along with another steroid, Medrol, that is even stronger. The family members of the patients posted:

- I am still not sure why it was necessary to be cautious enough today that necessitated her to have 80 mgs [of prednisone] and then also include her medrol during the infusion today. The data that has come in must have shown it is necessary to avoid reaction. After all that is what the trial is for. There must have been reactions as the dose went up without predosing with prednisone. They just told us it was a new protocol to be given 80mgs prior to the infusion. In open label infusions here on.

- She was predosed with 80 mg of prednisone yesterday that has been a [sic] added protocol to the open label infusions along with getting Medrol during the infusion.

If Defendants were certain that only 11 of the 39 patients who received AK002 and completed Phase 2 ENIGMA received steroids and AK002 was effective without steroids, as Defendants claimed, there would have been no reason for Allakos to mandate steroids as part of the protocol for the extension study. The fact that Allakos did mandate pre-infusion steroids during the extension

[4] There is no FDA Guidance specifically for EG or EGE/EoD.

study strongly suggests that either more than 11 of the 39 AK002 patients in the ENIGMA study received them or that the no steroid group did not perform as well as Defendants contend.

87. In an analyst report on Allakos published on March 25, 2020, entitled "Phase 3 EGID Program Update Leaves Many Unanswered Questions – Reiterate Underperform," SMBC Nikko Securities America, Inc. rated Allakos' common stock as an underperform "[s]ince we still do not know the mean cumulative steroid doses received by [AK002] vs. placebo arms from the [Phase 2] ENIGMA trial, all of the confounding risk remains in [Phase 3]." The analyst report also indicated that Allakos' Phase 3 trial for EG and EGE/EoD would have a premedication regimen of prednisone before the first dose of AK002 and that investigators would be free to use steroids to manage infusion reactions, which (as with the steroid protocol in the ENIGMA extension study) is inexplicable if Defendants were certain that so few patients in Phase 2 ENIGMA received steroids and patients who did not receive steroids performed as well as Allakos claims. Regarding Allakos' decision to give prednisone, the analyst report stated that "it remains entirely possible that steroids are driving the majority of symptom benefits, which coincidentally occur together with the first dose of [AK002] when steroids are most likely to be given."

88. Accordingly, Defendant Alexander had no basis for stating steroids had no effect on the results of Phase 2 ENIGMA and that steroids were not a confounding factor.

**F. The Revelation that Defendants Made Misstatements About Phase 2 ENIGMA Caused Allakos' Stock to Decline by 17% Over Two Days, Harming Investors.**

89. After Seligman published its Report on December 18, 2019, Allakos' common stock fell $22.73 per share over two days, or more than 17% from the closing price on December 17, 2019 to close at $109.80 on December 19, 2019, damaging investors.

**G. Allakos Announces the Initiation of Phase 3 ENIGMA and Tells Investors That the Patient Population Would be the Same as Phase 2 ENIGMA.**

90. On March 24, 2020, Allakos announced in a press release that it was initiating Phase 3 ENIGMA, a "Phase 3 study of antolimab [AK002] for the treatment of eosinophilic gastritis and/or eosinophilic duodenitis (previously referred to as eosinophilic gastroenteritis)." Allakos sometimes referred to Phase 3 ENIGMA as "ENIGMA2," but, to avoid confusion, this Complaint replaces those references with "[Phase 3 ENIGMA]." The Defendants intended Phase 3 ENIGMA

to be the second of the two studies, along with the original Phase 2 ENIGMA Trial, that Defendants believed Allakos needed for FDA approval for the use of AK002 in EG and EGE/EoD.

91. As with Phase 2 ENIGMA, Phase 3 ENIGMA had two endpoints: (1) the reduction in gastric or duodenal eosinophils post-treatment based on biopsies conducted on the patients and (2) the change in patients reported symptoms based on a PRO questionnaire. The symptom based endpoint was considered a co-primary endpoint, however, instead of a secondary endpoint.

92. In addition to issuing a press release, the Company hosted a conference call for analysts and investors on March 24, 2020 (the "March 24, 2020 Conference Call"). During the March 24, 2020 Conference Call, Defendant Rasmussen specifically emphasized that Phase 3 ENIGMA would have a patient population with the same characteristics as Phase 2 ENIGMA by stating: ***"[a]nd importantly, the patient population we are going to study [in Phase 3 ENIGMA] are the same as… in the Phase 2 ENIGMA Study***." (emphasis added).

93. While speaking during the March 24, 2020 Conference Call, Defendant Rasmussen and other presenting for Allakos used a presentation that was also attached to a Form 8-K that was signed by Defendant Alexander and filed with the SEC on the same date. (Excerpts of the March 24, 2020 presentation are attached as Exhibit 3). One of the slides that Defendant Rasmussen used while he spoke during the March 24, 2020 Conference Call described the study design of Phase 3 ENIGMA. Across the bottom of that slide, in large lettering and in an individual box, it stated: "Same patient population as Phase 2 ENIGMA study." (*See* Exhibit 3 at 16).

94. On June 3, 2020, Allakos announced that it had begun recruiting patients for Phase 3 ENIGMA.

**H. Allakos Announces that its Prevalence Study Showed that EG and EGE/EoD Are Greatly Underdiagnosed.**

95. On October 26, 2020, Allakos issued a press release entitled "Results from Prospective Prevalence Study Indicate that Eosinophilic Gastritis and Eosinophilic Duodenitis May be Significantly Underdiagnosed" (the "October 26, 2020 Press Release"). The Company attached the October 26, 2020 Press Release to a Form 8-K that was filed with the SEC on the same day and was signed by Defendant Alexander. According to the October 26, 2020 Press Release, the

Prevalence Study suggested that based on the measurement of elevated eosinophil and mast cell levels in patients with chronic unexplained gastrointestinal symptoms or functional gastrointestinal disorders, such as IBS, EG and/or EGE/EoD were significantly undiagnosed in those patients.

96. The Company also held a conference call for analysts and investors on October 26, 2020 (the "October 26, 2020 Conference Call"). During the October 26, 2020 Conference Call, Allakos' Senior Director of Medical Affairs and Clinical Development, Amol Kamboj, discussed the Prevalence Study. Kamboj explained that Allakos decided to conduct the Prevalence Study because, while the majority of patients evaluated for participation in Phase 2 ENIGMA (62 of 113) entered into the screen for that trial with an established history of EG or EGE/EoD, of 51 patients who entered screening without an established history of those diseases, 26 met the symptom inclusion criteria. Out of those 26 patients, 15 were found to have EG and/or EGE/EoD based on screening endoscopies and biopsies. Out of those 15 patients, 13 were randomized into Phase 2 ENIGMA.

97. The discovery of those 15 patients led Allakos to believe that EG and EGE/EoD were significantly underdiagnosed. Notably, however, only 13 of 65 participants in Phase 2 ENIGMA was from the group of patients that did not have an established history of EG and/or EGE/EoD.

98. Later during his presentation, Kamboj highlighted that the patients who were identified as having EG and/or EGE/EoD in the Prevalence Study had peripheral eosinophils "notably lower" than the patients who were identified for Phase 2 ENIGMA. As discussed above, accordingly to Allakos, the mechanism by which AK002 treats EG and EGE/EoD is by depleting eosinophils in blood and tissue.

99. During the October 26, 2020 Conference Call, the speakers used a presentation (the "October 26, 2020 Presentation," excerpts are attached as Exhibit 4), which Allakos attached to a Form 8-K, which was signed by Defendant Alexander and filed with the SEC on the same date.

100. Kamboj's portion of the presentation contained a slide entitled "Baseline Characteristics of Patients in Prevalence Study Compared to ENIGMA," which compared the characteristics of the 181 patients identified as having EG and/or EGE/EoD in the Prevalence Study

to the 72 identified for Phase 2 ENIGMA.[5] (*See* Exhibit 4 at 25.) The slide states that the median peripheral blood eosinophils count for patients identified for Phase 2 ENIGMA was almost double that of the Prevalence Study patients: 325 versus 170 per microliter. The slide further states that 55% of the Prevalence Study EG and/or EGE/EoD patients had a previous diagnosis of IBS, whereas only 4% of the Phase 2 ENIGMA patients did.

101. The results of the Prevalence Study were very important to Allakos because they indicated that the market for AK002 was potentially much bigger than previously believed. According to Allakos' 2020 10-K, "[p]ublished literature reports the prevalence of EG and [EGE/EoD] in the United States to be approximately 50,000 people." In contrast, on Allakos' October 26, 2020 Conference Call, Dr. Nicholas J. Talley, a gastroenterologist at the University of Newcastle in Australia, stated that, based on the Prevalence Study, it would be reasonable to estimate that there were ***6 to 10 million*** potential EG and/or EGE/EoD patients in the United States.

### I. More than Three Months After the Completion of Patient Enrollment in Phase 3 ENIGMA, Defendant Tomasi States That the Patient Populations of Phase 2 ENIGMA and Phase 3 ENIGMA Are "Identical" and "Very Similar."

102. On June 7, 2021, Allakos issued a press release stating that Phase 3 ENIGMA had completed patient enrollment. On the same date, Allakos filed a Form 8-K signed by Defendant Alexander with that press release attached.

103. On September 10, 2021, Michael Ulz, an analyst from Morgan Stanley, interviewed Defendant Tomasi at the Morgan Stanley 19th Annual Global Healthcare Conference (the "Morgan Stanley Healthcare Conference"). During the interview, Defendant Tomasi showed great familiarity with the Phase 2 and 3 ENIGMA trials and the Prevalence Study. (A Bloomberg transcript of Defendant Tomasi's remarks at the Morgan Stanley Healthcare Conference is attached as Exhibit 5.)[6]

104. Ulz asked Defendant Tomasi why Allakos had prioritized Phase 2 and 3 trials for

---

[5] The slide considers all 72 patients who were identified as qualified for Phase 2 ENIGMA even though only 65 enrolled.

[6] The transcript notes that it "may not be 100 percent accurate and may contain misspellings and other inaccuracies." Plaintiffs' counsel reviewed an audio recording of Tomasi's remarks and made corrections, which appear in brackets, to the portions of it quoted in this Complaint.

AK002's use in EG and EGE/EoD. In response, Tomasi stated that EG and EGE/EoD was Allakos' lead indication and explained that the screening results from Phase 2 ENIGMA showed that the "prevalence of EG and EoD [] proved to be much higher than what was reported in the literature." Tomasi further explained that after getting that information from Phase 2 ENIGMA, Allakos "embarked on a prevalence study to really look at the incidence and prevalence [of] EG and EoD in the basket of people who have what are called functional diseases. These are diseases where patients have symptoms without an identifiable cause. And what we found within that patient population was that we found 45% of people that we biopsied actually met the criteria for EG and EoD and so a really significant finding and pointed to a market of likely millions of patients in the US given the prevalence of these functional diseases."

105. When Ulz asked Tomasi to elaborate further about the Prevalence study, Tomasi showed great familiarity with the patient screening for the Phase 2 and 3 ENIGMA trials and the Prevalence study: "what we saw in the prevalence study was [] of the patients who entered screening roughly 33% of those guys ended up meeting the criteria for EG and EoD of the people we biopsied that was a 45% rate. In the Phase 2 study, we saw a 31% from screen to hit rate, so very similar to the 33% that was observed in the prevalence study. And then since then we've obviously enrolled the Phase 3 study and we see a very similar hit rate again. So we've seen reproducibly the same kind of 30 odd percent of patients who go into screening end up meeting the criteria for EG and EoD, so it appears to be [] again a very repeatable result."

106. Ulz than asked Tomasi why Allakos had moved into Phase 3 for EG and EGE/EoD. Tomasi responded by citing the strength of the Phase 2 ENIGMA results and emphasized that ***"[t]he Phase 3 study is identical with regards to [the] patient population that we're [enrolling].***" (emphasis added).

107. Following that, Ulz asked Tomasi whether methodological changes to the symptom score and measurement of the eosinophil depletion that the FDA had asked Allakos to make between the Phase 2 and Phase 3 ENIGMA trials "could impact the outcome of the Phase 3?" Tomasi explained that that these "changes really have a small essentially negligible impact on the

probability of success." [7]

108. Given that Tomasi did not believe that the Phase 3 methodological changes would make any difference to the results, Ulz followed up by asking: "what's the risk in your view to the successful Phase 3"? In his response, Tomasi explained that enrolling the same patient population in Phase 3 as Phase 2 was of the utmost importance and assured investors that he knew that the patient populations were "very similar" because Phase 3 ENIGMA was already fully enrolled:

> ***And then probably the most important thing is to make sure that we enrolled the same patient population*** so that you're really -- you have the greatest chance to have to repeat the effect seen [in Phase 2].
>
> And so our focus is really making sure that we [had] the same enrollment criteria which we do. ***And then as making sure that we have the same type of demographics going into the phase 3 study***, making sure that the baseline [Total Symptom Score] [is] in the same or similar place. And the Phase 3 study as it was in Phase 2 and, ***and yeah the stud[y is] fully enrolled now***. So I can say that these two things are true. ***So we do have a very similar patient population in phase 3 as we do in phase 2, so I think that was really probably the most thing that, the most important thing that was in our control.***

(emphasis added).

109. Later in the conversation with Ulz, Tomasi stated that for AK002 to be approved based on Phase 3 ENIGMA, it would need to meet the co-primary endpoints, including symptom improvement.

**J. Allakos Announces that Phase 3 ENIGMA Did Not Meet its Symptomatic Co-Primary Endpoint, Causing Allakos' Common Stock to Lose Almost 90% of its Value.**

110. On December 21, 2021, Allakos issued a press release (the "December 21, 2021 Press Release") stating that Phase 3 ENIGMA met its histologic eosinophil depletion co-primary endpoint, it did not meet its patient reported symptomatic co-primary endpoint.

111. According to the December 21, 2021 Press Release, not only had Phase 3 ENIGMA

---

[7] Regarding the symptom score, Tomasi explained that the FDA suggested that Allakos no longer consider 2 of the 8 symptoms they measured in Phase 2 (diarrhea and vomiting) since they did not occur with the same frequency as the others. Tomasi explained that he did not expect this to make any difference because the exclusion of those symptoms would not have made any difference in Phase 2 and, to avoid confounding the results, the Phase 3 PRO was identical to the Phase 2 one with the diarrhea and vomiting scores excluded after the fact.

failed to meet its symptomatic endpoint, ***but the patients in the placebo arm of the trial's symptoms had actually improved more than the patients who received AK002.***

112. Given that EG and EGE/EoD was AK002's lead indication and Allakos' entire business is dependent on AK002, this news caused Allakos' common stock to completely collapse.

113. On December 21, 2021, Allakos' stock closed at $84.39 per share. Allakos released the December 21, 2021 Press Release after the market closed on December 21, 2021. On December 22, 2021, ***Allakos' stock dropped $75.84 per share, or almost 90%, to close at $8.55***, greatly harming shareholders.

**K. Allakos Admits, Contrary to Defendant Tomasi's Statements, That the Patient Populations of Phase 2 ENIGMA and Phase 3 ENIGMA Were Significantly Different and Blamed That for the Failure of Phase 3.**

114. On February 15, 2022, Allakos hosted an Investor Day. On the same day, they filed a Form 8-K with the SEC that attached a presentation used during the Investor Day (the "February 15, 2022 Presentation," excepts are attached as Exhibit 6) that was signed by the Company's CFO H. Baird Radford.[8]

115. During the February 15, 2022 Investor Day, Allakos admitted that — directly contrary to statements by Defendant Tomasi — the patient populations of Phase 3 and Phase 2 ENIGMA were different and blamed those differences for the failure of Phase 3.

116. Allakos' CMO Craig A. Paterson[9] presented on the Phase 3 ENIGMA results during the Investor Day. Paterson presented a slide from the February 15, 2022 Presentation that was entitled "Baseline Demographics & Patient Characteristics: [Phase 2 ENIGMA] and [Phase 3 ENIGMA]." (Exhibit 6 at 28.) This slide showed significant differences in both diagnosis history and baseline eosinophil measures between ENIGMA Phase 2 and Phase 3 patients.

117. The "Baseline Demographics & Patient Characteristics: [Phase 2 ENIGMA] and [Phase 3 ENIGMA]" slide showed that the patients in Phase 2 and 3 had three significant differences in diagnostic history: (1) 80% of Phase 2 patients had previously been diagnosed with EG or EGE/EoD, whereas only 32% in the AK002 arm of Phase 3 and 29% in the placebo arm of

[8] Allakos appointed Radford as CFO on April 19, 2021.
[9] Allakos appointed Paterson CMO after Defendant Rasmussen retired on June 11, 2021.

Phase 3 had previously been diagnosed with those diseases; (2) only 3% of Phase 2 patients had previously been diagnosed with IBS, whereas 40% in the AK002 arm of Phase 3 and 37% in the placebo arm of Phase 3 had previously been diagnosed with IBS; and (3) 54% of Phase 2 patients had previously been diagnosed with EoE, whereas only 23% in the AK002 arm of Phase 3 and 24% in the placebo arm of Phase 3 had previously been diagnosed with EoE. Paterson specifically discussed the difference in previous EG or EGE/EoD and IBS diagnoses when discussing the slide and those differences were highlighted on the slide.

118. The "Baseline Demographics & Patient Characteristics: [Phase 2 ENIGMA] and [Phase 3 ENIGMA]" slide also showed the Phase 2 ENIGMA Patients had much higher baseline eosinophil levels in both their tissue and blood than Phase 3 patients and higher serum immunoglobulin ("IgE"), which like elevated eosinophil levels, is an indicator of disease: (1) Phase 2 patients had a mean of 84 eosinophils in their tissue per high powered field, whereas patients in the AK002 arm of Phase 3 had only 65 and patients in the placebo arm of Phase 3 had only 52; (2) Phase 2 patients had a median of 330 eosinophils per microliter of their blood, whereas patients in the AK002 arm of Phase 3 had only 200 and patients in the placebo arm of Phase 3 had only 230; and (3) Phase 2 patients had a median of 141 kilounits of IgE in their blood, whereas patients in the AK002 arm of Phase 3 had only 59 and patients in the placebo arm of Phase 3 had only 61. Paterson specifically discussed the difference in tissue eosinophils, blood eosinophils, and IgE levels when discussing the slide and those differences were highlighted on the slide.

119. At the end of his discussion of the Phase 3 ENIGMA, Paterson presented a slide entitled "Summary of [Phase 3 ENIGMA]" which again indicated that the difference in patient characteristics explained the difference between the success of Phase 2 ENIGMA and the failure of Phase 3. (Exhibit 6 at 38.) It stated:

- [Phase 3 ENIGMA] patients with similar characteristics to those included in Phase 2 reproduced original study results.
- Key patient characteristics identified include:
  - Higher tissue [eosinophil] counts
  - Higher peripheral blood [eosinophil] counts
  - Higher IgE levels

120. Based on the February 15, 2022 Presentation, it is indisputable that — contrary to

Defendant Tomasi's statements — there were undisclosed material differences between the patient populations of Phase 3 and Phase 2 ENIGMA.

121. Furthermore, the differences between the patients in Phase 2 and 3 of ENIGMA were similar to the differences between the patients in Phase 2 ENIGMA and the Prevalence Study, including the differences in blood eosinophil counts and previous diagnosis of EG and/or EGE/EoD and IBS. Accordingly, Defendant Tomasi and others at Allakos were either aware of or were reckless in not being aware that the Phase 3 ENIGMA patient population could be significantly different than Phase 2 ENIGMA despite meeting the EG and EGE/EoD inclusion criteria. Despite this, Defendant Tomasi unequivocally told investors that the patient populations were the same.

122. Allakos was forced to highlight the differences in the Phase 2 and 3 populations during the February 15, 2022 Presentation because they needed an explanation for the failure of Phase 3 ENIGMA that left room for the possibility that the FDA could approved AK002 for use in EG and/or EGE/EoD patients in the future. Prior to that, however, Allakos had a strong incentive to downplay the possibility that the differences discussed during the February 15, 2022 Presentation could be significant. Any suggestion those differences were significant would have cast doubt on whether all the patients identified as having EG and/or EGE/EoD in the Prevalence Study were good candidates for AK002, which would have called into question whether the potential market for AK002 was as large as Allakos portrayed when Allakos released the Prevalence Study.

123. During the February 15, 2022 Presentation, Paterson also discussed a Phase 3 trial of only EGE/EoD patients that Allakos was conducting and did not expect results from until the middle of 2022. Paterson stated that since the study was fully enrolled in December 2021, Allakos knew that the population was more like the one in Phase 3 ENIGMA than the one in Phase 2. (*See* Exhibit 6 at 41.)

124. During the question and answer potion of the Investor Day, Tim Lugo, an analyst at William Blair asked if Allakos could exclude patients from the EoD only Phase 3 Trial for the purpose of creating a patient population that was similar to Phase 2 ENIGMA. Defendant Alexander responded that Allakos had access to the demographic characteristics of the patients and was free to change the criteria up until Allakos broke the blind of the study.

125. The fact that Allakos employees had access to patient demographics for the Phase 3 Trial for only EoD patients in February 2022 — where that trial was fully enrolled in December 2021 and results were not expected until the middle of 2022 — further shows that Defendant Tomasi and other Allakos employees had access to patient demographics for Phase 3 ENIGMA when Defendant Tomasi spoke at the Morgan Stanley Healthcare Conference in September 2021.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. Material Misstatements About Using a CRO to Conduct Clinical Trials.

126. On March 14, 2019, Allakos issued the 2018 10-K, which was signed by Defendants Alexander and Tomasi. Additionally, attached to the 2018 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Alexander and Tomasi, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that they have disclosed all fraud.

127. On May 8, 2019, Allakos issued its 1Q 2019 10-Q, signed by Defendants Alexander and Tomasi. Additionally, attached to the 1Q 2019 10-Q were certifications pursuant to SOX, signed by Defendants Alexander and Tomasi, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that they have disclosed all fraud.

128. On August 5, 2019, Allakos issued its 2Q 2019 10-Q, which was signed by Defendants Alexander and Redmond. Additionally, attached to the 2Q 2019 10-Q were certifications pursuant to SOX, signed by Defendants Alexander and Redmond, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that they have disclosed all fraud.

129. On August 5, 2019, the Company filed a Form S-3 registration statement, signed by Defendants Alexander and Redmond. That registration statement incorporated the 2018 10-K, 1Q 2019 10-Q, and 2Q 2019 10-Q.

130. On November 12, 2019, Allakos issued its Quarterly Report on Form 10-Q for the quarter ended September 30, 2019 (the "3Q 2019 10-Q"), which was signed by Defendants Alexander and Redmond. Additionally, attached to the 3Q 2019 10-Q were certifications pursuant to SOX, signed by Defendants Alexander and Redmond, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that they have disclosed all fraud.

131. The 2018 10-K, 1Q 2019 10-Q, 2Q 2019 10-Q, and 3Q 2019 10-Q all contained identical statements that Allakos does not have the ability to independently conduct clinical trials, and therefore it relies on third-parties, such as CROs, to conduct its clinical trials for AK002:

> ***We rely on third-parties to conduct our clinical trials and those third-parties may not perform satisfactorily, including failing to meet deadlines for the completion of such trials, research and studies.***
>
> ***We do not have the ability to independently conduct our clinical trials. We currently rely on third-parties, such as CROs, clinical data management organizations, medical institutions and clinical investigators, to conduct our clinical trials of AK002 and expect to continue to rely upon third-parties to conduct additional clinical trials of AK002 and our other product candidates. Third-parties have a significant role in the conduct of our clinical trials and the subsequent collection and analysis of data.*** These third-parties are not our employees, and except for remedies available to us under our agreements, we have limited ability to control the amount or timing of resources that any such third-party will devote to our clinical trials. Some of these third-parties may terminate their engagements with us at any time. If we need to enter into alternative arrangements, it would delay our drug development activities.

(emphasis in first three lines in original; other emphasis added).

132. The bold and italicized portion of the foregoing statements was materially false and misleading because Allakos did not use an independent CRO for Phase 2 ENIGMA, which was the most important clinical trial in Allakos' history at the time it was conducted. Instead, Allakos was

aggressively and improperly involved in Phase 2 ENIGMA and used a single reader who had financial ties to Allakos to read tissue samples. By misrepresenting and/or failing to disclose these facts, Allakos misled investors about the integrity and quality of the Phase 2 ENIGMA results and about the likelihood that Allakos will be able to use Phase 2 ENIGMA to gain FDA approval of AK002.

### B. Misstatements that Phase 2 ENIGMA was a Randomized, Double-blind, Placebo-Controlled Trial.

133. Defendants repeatedly told investors that Phase 2 ENIGMA was a "randomized, double-blind, placebo-controlled" trial.

134. On March 14, 2019, Allakos issued the 2018 10-K, which was signed by Defendants Alexander and Tomasi. Additionally, attached to the 2018 10-K were certifications pursuant to SOX, signed by Defendants Alexander and Tomasi, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that they have disclosed all fraud. The 2018 10-K was also incorporated by reference into the Form S-3 registration statement, signed by Defendants Alexander and Redmond, and filed by the Company on August 5, 2019.

135. The 2018 10-K referred to Phase 2 ENIGMA as a "randomized, double-blind, placebo controlled" trial: "***We have initiated a randomized, double-blind, placebo-controlled Phase 2 trial with AK002*** in approximately 60 patients with active, moderate to severe, biopsy-confirmed EG (stomach >30 eosinophils/hpf in 5 hpf) and/or EGE (duodenum >30 eosinophils/hpf in 3 hpf)."

136. On August 5, 2019, Allakos issued a Form 8-K signed by Defendant Alexander with the August 5, 2019 ENIGMA Press Release attached. The August 5, 2019 ENIGMA Press Release was also incorporated by reference into the Form S-3 registration statement, signed by Defendants Alexander and Redmond, and filed by the Company on August 5, 2019.

137. The August 5, 2019 ENIGMA Press Release stated:

> REDWOOD CITY, Calif., Aug. 05, 2019 (GLOBE NEWSWIRE) -- ***Allakos Inc. (the "Company") (Nasdaq: ALLK) today announced positive results from its Phase 2 randomized, double-blind, placebo-controlled trial of AK002 in patients with eosinophilic gastritis and/or eosinophilic gastroenteritis.*** All AK002 dose arms showed clinically meaningful and statistically significant benefits compared to placebo on all prespecified primary and secondary endpoints, including gastrointestinal tissue eosinophil counts and patient reported disease symptoms. Statistically significant differences in patient symptoms between the active and placebo groups occurred one day following AK002 administration…
>
> **Phase 2 ENIGMA Study Design**
>
> ***This randomized, double-blind, placebo-controlled Phase 2 trial of AK002*** enrolled patients with active, biopsy-confirmed EG and/or EGE. Patients were required to be moderately to severely symptomatic based on a patient reported symptom questionnaire and have biopsy confirmed eosinophilia of the stomach (≥30 eosinophils/HPF in 5 HPFs) and/or duodenum (≥30 eosinophils/HPF in 3 HPFs)…

(Emphasis in original for "Phase 2 ENIGMA Study Design"; other emphasis added).

138. On August 5, 2019, Allakos conducted the August 5, 2019 Conference Call and the Company issued a Form 8-K signed by Defendant Alexander on the same date with the August 5, 2019 Presentation attached. Defendants Alexander and Rasmussen used the August 5, 2019 Presentation during the August 5, 2019 Conference Call. The Form 8-K with the August 5, 2019 Presentation attached was incorporated by reference into the Form S-3 registration statement, signed by Defendants Alexander and Redmond, and filed by the Company on August 5, 2019.

139. Defendant Alexander stated during the August 5, 2019 Conference call that "[t]he AK002 met all pre-specified primary and secondary endpoints in our study. And those are in patients with gastritis, gastroenteritis as well as concomitant EoE. In terms of our primary and 2 key secondary endpoints, we saw a tremendous effect on all of them. ***And a reminder, this was a randomized, double-blind, placebo-controlled study.***" (emphasis added).

140. Defendant Rasmussen stated during the August 5, 2019 Conference Call that: "So basically, the study design of ***the ENIGMA study was randomized, double-blind, placebo-controlled study*** in patients with eosinophilic gastritis and/or gastroenteritis." (emphasis added).

141. Slides 5, 12, and 40 of the August 5, 2019 Presentation stated that Phase 2 ENIGMA was a "***Randomized, double-blind, placebo-controlled study***." (emphasis added).

142. Allakos filed a preliminary prospectus supplement on August 5, 2019 and a final prospectus supplement on August 7, 2019, both of which formed part of the Form S-3 registration statement filed by Allakos on August 5, 2019 and signed by Defendants Alexander and Redmond.

143. That preliminary prospectus supplement and final prospectus supplement stated:

> ***We recently reported data from a randomized, double-blind, placebo-controlled phase 2 trial of AK002 in patients with active, biopsy-confirmed EG and/or EGE.*** 38% of the patients in the study also had EoE, allowing us to evaluate the effects of AK002 on EoE. All AK002 dose arms showed clinically meaningful and statistically significant benefit compared to placebo on all prespecified primary and secondary endpoints, including gastrointestinal tissue eosinophil counts and patient reported disease symptoms….
>
> ***Phase 2 ENIGMA Study Design***
>
> ***The randomized, double-blind, placebo-controlled phase 2 trial of AK002 enrolled patients*** with active, biopsy-confirmed EG and/or EGE.

(Emphasis in original for "Phase 2 ENIGMA Study Design"; other emphasis added).

144. The bold and italicized portions of the statements in Paragraphs 135, 137, 139-141, and 143 are false and misleading because Phase 2 ENIGMA was not well controlled and the blinding was compromised. Defendants failed to disclose that Allakos conducted Phase 2 ENIGMA without an independent CRO. Using a CRO to conduct clinical trials is standard industry practice for maintaining proper controls and Good Clinical Practice in clinical trials. Additionally, the blinding of Phase 2 ENIGMA was severely compromised because: (1) infusion reactions made patients aware of whether they were receiving AK002 or the placebo; (2) the trial investigators told patients in the treatment group of the trial that they were likely getting the drug instead of the placebo; (3) patients were able to see their endoscopy results during the Trial; (4) patients in the Trial were told that if they had success in the Trial, they would qualify for an extension study in which they were sure to get the drug and avoid the placebo; and (5) Allakos had improper access to data and the patients during the Trial. By misrepresenting and/or failing to disclose these facts, Allakos misled investors about the reliability of the Patient Reported Outcomes from Phase 2 ENIGMA and about the likelihood that Allakos will be able to use Phase 2 ENIGMA to gain FDA approval of AK002.

**C. Misstatements Concerning Steroid Use in Phase 2 ENIGMA.**

145. On August 5, 2019, Allakos conducted the August 5, 2019 Conference Call and the Company issued a Form 8-K signed by Defendant Alexander on the same date with the August 5, 2019 Presentation attached. Defendants Alexander and Rasmussen used the August 5, 2019 Presentation during the August 5, 2019 Conference Call. The Form 8-K with the August 5, 2019 Presentation attached was incorporated by reference into the Form S-3 registration statement, signed by Defendants Alexander and Redmond, and filed by the Company on August 5, 2019.

146. During the August 5, 2019 Conference Call, Defendant Alexander stated that steroids "had absolutely 0 effect on the results" of Phase 2 ENIGMA: "***In terms of the steroid, I mean, it had absolutely 0 effect on the results, and that was shown in the study. So the idea that steroids are confounding the results is specious***." (emphasis added).

147. The bold and italicized portion of the statement in the foregoing Paragraph was false and misleading because the dosing of the steroids was inconsistent, haphazard, and left to the discretion of the trial investigators. Given that steroids are the current standard of care for EG and EGE/EoD and the poor controls of steroids in Phase 2 ENIGMA, Defendant Alexander lacked a basis to assert that steroids had "absolutely 0 effect on the Results" of Phase 2 ENIGMA. By misrepresenting and/or failing to disclose these facts, Allakos misled investors about the integrity and quality of the Phase 2 ENIGMA results and the likelihood that Allakos will be able to use Phase 2 ENIGMA to gain FDA approval of AK002.

**D. Misstatements Concerning the Patient Populations of Phase 3 ENIGMA and Phase 2 ENIGMA.**

148. On September 10, 2021, Michael Ulz, a Morgan Stanley analyst, conducted a public interview of Defendant Tomasi at the Morgan Stanley 19th Annual Global Healthcare Conference.

149. During the interview, Defendant Tomasi stated that the patient population of Phase 3 ENIGMA was identical to Phase 2 ENIGMA:

> ***The Phase 3 study is identical with regards to [the] patient population that we're [enrolling].*** Chief difference is that we're focusing [on] the high-dose group given greater efficacy that we saw in Phase 2[. T]hat study is 80 patients per arm instead of being 20 patients per arm, given the strong p-values that we saw in Phase 2, the

> phase 3 study will power on its end points.

(emphasis added).

150. Later in the interview Ulz asked Defendant Tomasi "what's the risk in your view to the successful Phase 3 [ENIGMA]…?" In his response, Defendant Tomasi stated that "we do have a very similar patient population in phase 3 as we do in phase 2":

> And then probably the most important thing is to make sure that we enrolled the same patient population so that you're really -- you have the greatest chance to have to repeat the effect seen [in Phase 2]."
>
> And so our focus is really making sure that we [had] the same enrollment criteria which we do. And then as making sure that we have the same type of demographics going into the phase 3 study, making sure that the baseline [Total Symptom Score] [is] in the same or similar place. And the Phase 3 study as it was in Phase 2 and, and yeah the stud[y is] fully enrolled now. So I can say that these two things are true. ***So we do have a very similar patient population in phase 3 as we do in phase 2, so I think that was really probably the most thing that, the most important thing that was in our control.***

(emphasis added).

151. The bold and italicized portions of the statements in Paragraphs 149 and 150 were false and misleading because the characteristics of the patient populations in Phase 2 and Phase 3 ENIGMA were materially different in both diagnostic history and in baseline eosinophil and IgE levels. Phase 2 and 3 had three significant differences in diagnostic history: (1) 80% of Phase 2 patients had previously been diagnosed with EG or EGE/EoD, whereas only 32% in the AK002 arm of Phase 3 and 29% in the placebo arm of Phase 3 had previously been diagnosed with those diseases; (2) only 3% of Phase 2 patients had previously been diagnosed with IBS, whereas 40% in the AK002 arm of Phase 3 and 37% in the placebo arm of Phase 3 had previously been diagnosed with IBS; and (3) 54% of Phase 2 patients had previously been diagnosed with EoE, whereas only 23% in the AK002 arm of Phase 3 and 24% in the placebo arm of Phase 3 had previously been diagnosed with EoE. Phase 2 ENIGMA Patients also had much higher baseline eosinophil levels in both their tissue and blood than Phase 3 patients and higher IgE, which like elevated eosinophil levels, is an indicator of disease: (1) Phase 2 patients had a mean of 84 eosinophils in their tissue per high powered field, whereas patients in the AK002 arm of Phase 3 had only 65 and patients in the placebo arm of Phase 3 had only 52; (2) Phase 2 patients had a median of 330 eosinophils per

microliter of their blood, whereas patients in the AK002 arm of Phase 3 had only 200 and patients in the placebo arm of Phase 3 had only 230; and (3) Phase 2 patients had a median of 141 kilounits of IgE in their blood, whereas patients in the AK002 arm of Phase 3 had only 59 and patients in the placebo arm of Phase 3 had only 61. Allakos believed that these differences in patient characteristics between Phase 2 and Phase 3 ENIGMA were so significant that they were the reason that Phase 3 failed.

## LOSS CAUSATION

152. On December 18, 2019, Seligman Investments published the Seligman Report.

153. On this news, shares of Allakos fell $22.73 per share over two days, or more than 17% from the closing price on December 17, 2019 to close at $109.80 on December 19, 2019, damaging investors.

154. On December 21, 2021, the risk of the difference in patient population between Phase 3 and Phase 2 ENIGMA materialized when Allakos announced after the close of the markets that Phase 3 ENIGMA failed to meet its patient reported symptomatic co-primary endpoint.

155. On that news, Allakos' stock fell $75.84 per share, or almost 90% from the closing price of $84.39 per share on December 21, 2021, to close at $8.55 on December 22, 2021, damaging investors.

156. As a result of Defendants' wrongful acts and omissions, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

### A. Defendants Were Motivated to Make False and Misleading Statements Because Allakos Could Not Continue its Operations or Drug Development Unless it Raised Additional Capital.

157. Allakos admitted in its 2018 10-K, 1Q 2019 10-Q, 2Q 2019 10-Q, 2019 10-K, Form 10-Q for the quarterly period ended March 31, 2020 (filed May 11, 2020), and Form 10-Q for the quarterly period ended June 30, 2020 (filed August 10, 2020) that it could not continue its operations if it did not raise additional capital and would have to delay, reduce, or terminate its development efforts: "We will continue to require additional capital to develop our product candidates and fund operations for the foreseeable future" and "if we are unable to raise additional

funds when needed, we may be required to delay, reduce or terminate some or all of our development and commercialization efforts."

158. On August 5, 2019, Allakos announced the results from Phase 2 ENIGMA. Phase 2 ENIGMA was the most important trial in Allakos' history, at that time, since AK002 is the Company's only clinical stage drug and EG and EGE/EoD are Allakos' lead indications for AK002. Additionally, Defendant Alexander stated during the August 5, 2019 Conference Call that Allakos intended to use Phase 2 ENIGMA as one of two clinical trials necessary for FDA approval of AK002. As detailed above, Defendants' announcement of Phase 2 ENIGMA's results contained numerous material misstatements that misled investors about the integrity and quality of the Phase 2 ENIGMA results and the likelihood that Allakos will be able to use Phase 2 ENIGMA to gain FDA approval of AK002.

159. Mere hours after announcing the results of Phase 2 ENIGMA, and making numerous material misstatements, Allakos announced a secondary public offering of $200 million shares of its common stock, the Company's first public offering of common stock since its IPO. The preliminary prospectus supplement, filed on August 5, 2019 and final prospectus supplement for that offering, filed on August 7, 2019, continued to make material misstatements about Phase 2 ENIGMA.

160. After Defendants' misstatements caused Allakos' share price to dramatically increase, Allakos announced it was upsizing its secondary offering of common stock to $350 million at an offering price of $77 per share. On August 9, 2019, the Company announced that it had raised $377.5 million.

161. On October 28, 2020, Allakos announced a public offering of $250 million of shares of its common stock at $82 per share two days after announcing the results of the Prevalence Study. Allakos closed the public offering in November 2020 and the net proceeds were $271.7 million.

162. Given that Allakos admitted that it could not continue its operations and would likely have reduce, terminate or delay development of AK002 if it could not raise money, Defendants were highly motivated and had the opportunity to make material misstatements concerning the success of the drug.

**B. Allakos Purportedly Granted Defendant Redmond 120,000 Stock Options One Business Day Prior to Making Misstatements About Phase 2 ENIGMA and Did Not Reveal the Options Grant Until it was Worth Almost $6 Million.**

163. Allakos' stock closed at $31 on Friday, August 2, 2019. After Defendants announced the results of Phase 2 ENIGMA, and made numerous material misstatements, the stock price shot up dramatically and closed at $79.47 on August 6, 2019.

164. On August 6, 2019, Allakos filed a Form 4 that stated it had granted 120,000 stock options to Defendant Redmond ***on August 2, 2019 at the price of $31.*** When Allakos announced Defendant Redmond's stock options, they were already worth almost $6 million.

**C. Defendants Behaved Intentionally or Recklessly When They Made Misstatements Concerning how Allakos Conducted Phase 2 ENIGMA.**

165. Given the importance of Phase 2 ENIGMA to the future of Allakos and the small size of the Company, it is inconceivable that Defendant Alexander, as CEO, would not be aware or have access to information about the aspects of Phase 2 ENIGMA that he made misrepresentations about including, Allakos' failure to use a CRO, the trial's poor blinding controls, and steroid use during the trial. Additionally, because of his Ph.D. in immunology and his previous experience as CEO of another pharmaceutical company, Defendant Alexander well understood the significance of these issues as to Good Clinical Practice and how they affect the reliability, integrity, and quality of the trial results. Furthermore, Defendant Alexander spoke knowledgably about Phase 2 ENIGMA during the August 5, 2019 Conference Call and represented that it would be one of two clinical trials used in Allakos' application to the FDA for approval of AK002 for EG and EGE/EoD patients. Allakos' 2018 10-K, 1Q 2019 10-Q, 2Q 2019 10-Q, and 3Q 2019 10-Q all warn that the Company is "highly dependent" on Defendant Alexander.

166. Given the importance of Phase 2 ENIGMA to the future of Allakos and the small size of the Company, it is inconceivable that Defendants Redmond and Tomasi as CFOs during various points during the Class Period, and therefore the principal financial officer of the Company, would not be aware or have access to the information that Allakos failed to use a CRO for Phase 2 ENIGMA. Defendants Redmond and Tomasi also would have been aware of or have access to information about the poor blinding controls during Phase 2 ENIGMA and steroid use during the trial. Additionally, because of Defendant Tomasi's Ph.D. in chemistry and his previous experience

as Chief Scientific Officer of another pharmaceutical company and Defendant Redmond's experience as President of another pharmaceutical company, Defendants Tomasi and Redmond well understood the significance of these issues as to Good Clinical Practice and how they affect the reliability, integrity, and quality of the trial results. Defendant Tomasi also served as the Company's President and COO during the class period and Allakos' 2018 10-K, 1Q 2019 10-Q, 2Q 2019 10-Q, and 3Q 2019 10-Q all warn that the Company is "highly dependent" on Defendant Tomasi.

167. Defendants Alexander, Redmond, and Tomasi were provided with copies of Company's SEC filings that they signed that contained misleading statements alleged herein before their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

168. Defendant Alexander was, at minimum, reckless when he authorized the issuance and signed the 2018 10-K, 1Q 2019 10-Q, 2Q 2019 10-Q, 3Q 2019 10-Q, the August 5, 2019 8-Ks with the August 5, 2019 ENIGMA Trial Press Release and the August 5, 2019 Presentation attached, and the August 5, 2019 S-3 registration statement which incorporated the August 5, 2019 preliminary prospectus supplement and August 7, 2019 final prospectus supplement. Defendant Alexander was also, at minimum, reckless when he signed the SOX certifications that accompanied the 2018 10-K, 1Q 2019 10-Q, 2Q 2019 10-Q, and 3Q 2019 10-Q. He was also, at minimum, reckless when he made misstatements about Phase 2 ENIGMA on the August 5, 2019 Conference Call.

169. Defendant Redmond was, at minimum, reckless when he authorized the issuance and signed the 2Q 2019 10-Q, 3Q 2019 10-Q, and the August 5, 2019 S-3 registration statement. The August 5, 2019 S-3 Registration Statement incorporated the August 5, 2019 preliminary prospectus supplement, the August 7, 2019 final prospectus supplement, the August 5, 2019 8-Ks with the August 5, 2019 ENIGMA Trial Press Release and the August 5, 2019 Presentation attached, the 2018 10-K, and the 1Q 2019 10-Q. Defendant Redmond was also, at minimum, reckless when he signed the SOX certifications that accompanied the 2Q 2019 10-Q and 3Q 2019 10-Q.

170. Defendant Tomasi was, at minimum, reckless when he signed and authorized the

issuance of the 2018 10-K and 1Q 2019 10-Q and when he signed the SOX certificates associated with those filings.

171. Given the importance of Phase 2 ENIGMA to the future of Allakos and the small size of the Company, it is inconceivable that Defendant Rasmussen, as CMO would not be aware or have access to information about the aspects of Phase 2 ENIGMA that he made misrepresentations about, including Allakos' failure to use a CRO, the trial's poor blinding controls, and steroid use during the trial. Furthermore, Defendant Rasmussen spoke to investors on the August 5, 2019 Conference Call specifically because he was knowledgeable about Phase 2 ENIGMA and he demonstrated his knowledge of Phase 2 ENIGMA on that call. Furthermore, Defendant Rasmussen was knowledgeable about Phase 2 ENIGMA because he is the top clinical officer at Allakos and the Company conducted the Trial without a CRO. He was so intimately involved in the Trial that he improperly spoke to the relative of a patient in the Trial. Additionally, because of his Ph.D. and M.D. and his previous experience in high level clinical positions at other pharmaceutical companies, Defendant Rasmussen well understood the significance of the issues discussed above as to Good Clinical Practice and how they affect the reliability, integrity, and quality of the trial results. Accordingly, Defendant Rasmussen was, at minimum, reckless when he made misstatements on the August 5, 2019 Conference Call and when he authorized the issuance of and used the August 5, 2019 Presentation on that call.

**D. Defendant Tomasi Behaved Intentionally or Recklessly When He Made Misstatements About the Patient Populations of Phase 3 ENIGMA and Phase 2 ENIGMA.**

172. Defendant Tomasi showed great familiarity about Phase 2 and Phase 3 ENIGMA during his remarks at Morgan Stanley Healthcare Conference. Accordingly, he would have known that the patient population of Phase 3 was not "identical" or "very similar" to the patient population of Phase 2. Furthermore, Defendant Tomasi also showed great familiarity with the Prevalence Study during the Morgan Stanley Healthcare Conference. Accordingly, since Allakos' Senior Director of Medical Affairs discussed the differences between the patient populations identified in the Prevalence Study and for Phase 2 ENIGMA during the October 26, 2020 Conference Call, Defendant Tomasi would have been aware of them. This put Defendant Tomasi on notice of the

possibility that the Phase 3 ENIGMA patient population could be different from Phase 2 ENIGMA patient population in the similar way that the Prevalence Study patient population study was different. Therefore, Defendant Tomasi was, at minimum, reckless when he assured investors that the patient population of Phase 3 was "identical" or "very similar" to the patient population of Phase 2 even though that was not the case.

173. Defendant Tomasi's statements were also, at minimum, reckless because he had access to information that the Phase 3 ENIGMA patient population was significantly different from Phase 2. Defendant Tomasi indicated this during his remarks at the Morgan Stanley Healthcare Conference when he said that he knew that patient population in Phase 3 was "very similar" to Phase 2 "because [Phase 3 ENIGMA is] fully enrolled now." Additionally, remarks by Allakos CMO Paterson and Defendant Alexander about the EGE/EoD only Phase 3 study during the February 15, 2022 Investor Day made clear that Allakos employees had access to patient characteristics for trials where enrollment was closed even if the trial was not yet complete. Accordingly, given that Defendant Tomasi is President and COO of the Company and the Company's public filings, including its 2020 10-K, warn that the Company is "highly dependent" on Defendant Tomasi, Defendant Tomasi would have had access to information about the characteristics of the patient population of Phase 3 ENIGMA when he made his remarks at the Morgan Stanley Healthcare Conference. Defendant Tomasi also could have easily interpreted that data considering that he has a Ph.D. in chemistry and previous experience as Chief Scientific Officer of another pharmaceutical company.

174. The specificity of Defendants Tomasi's statements are also indicative of their recklessness. Defendant Tomasi had no obligation to comment on the characteristics of the patient population for Phase 3 ENIGMA, but once he did, it was, at minimum, reckless of him to unequivocally state that the patient population was "identical" and "very similar" when he had access to contradictory information. Furthermore, given the importance of the patient population to the success of Phase 3 ENIGMA, Defendant Tomasi would have understood that investors would have expected such a specific statement to reflect all the information that Defendant Tomasi had access to.

**E. Defendant Tomasi Was Motivated to Downplay the Differences Between Phase 2 ENIGMA and Phase 3 ENIGMA Because of the Importance of the Prevalence Study to Allakos.**

175. The Prevalence Study was hugely important to Allakos given that, according to Dr. Talley's comments on Allakos' October 26, 2020 Conference Call, it showed there were potentially 6 to 10 million EG and/or EGE/EoD patients in the United States instead of the 50,000 reported in published literature.[10] This enormous increase to AK002's potential market made Allakos a much more attractive investment. The patient population identified as having EG and/or EGE/EoD in the Prevalence Study was significantly different than the patient population in Phase 2 ENIGMA — the patients in the Prevalence study had much lower blood eosinophils counts and a much higher likelihood of a previous diagnosis of IBS. And, of course, unlike the vast majority of patients in Phase 2 ENIGMA, the patients in the prevalence study had not been previously diagnosed with EG and/or EGE/EoD. Accordingly, Defendant Tomasi was strongly motivated not to suggest that differences between the patient population in Phase 2 and Phase 3 ENIGMA could have any significance because any such suggestion would have called into question the results of the Prevalence Study and undermined Allakos' claims about AK002's potential market. Accordingly, Allakos did not reveal the differences between the patient population of Phase 3 and Phase 2 ENIGMA until it needed to provide the market with an explanation for why Phase 3 ENIGMA failed.

**F. Defendants' Sale of Tens of Millions of Dollar in Allakos Common Stock in 2021 Showed That They Were Not Confident in the Results of Phase 3 ENIGMA.**

176. Prior to 2021, none of Defendants sold a single share of Allakos common stock on the open market. Then in 2021, Defendants Tomasi, Alexander, and Rasmussen sold a combined 524,302 shares of Allakos common stock for proceeds of $56,099,224. Defendants sold their shares for the average price of almost $107, more than 12 times what the stock was worth after the Company announced the failure of Phase 3 ENIGMA.

---

[10] During the Morgan Stanley Healthcare Conference, Defendant Tomasi estimated that the undiagnosed market of EGE/EoD was in the neighborhood of 2.5 million, but that could be an "arguably conservative estimate." Regardless of the precise number of undiagnosed patients, Allakos touted the Prevalence Study as representing a huge increase in the potential market for AK002.

177. Defendant Tomasi sold 226,318 shares of Allakos common stock for proceeds of $23,794,432.37.

| Date | Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 3/3/2021 | 3,189 | $113.56 | $362,142.84 |
| 3/8/2021 | 20,000 | $122.78 | $2,455,600.00 |
| 3/9/2021 | 20,000 | $121.78 | $2,435,600.00 |
| 3/10/2021 | 20,000 | $121.78 | $2,435,600.00 |
| 4/12/2021 | 20,000 | $104.40 | $2,088,000.00 |
| 4/13/2021 | 20,000 | $103.08 | $2,061,600.00 |
| 4/14/2021 | 20,000 | $107.77 | $2,155,400.00 |
| 5/10/2021 | 20,000 | $96.02 | $1,920,400.00 |
| 5/11/2021 | 20,000 | $97.79 | $1,955,800.00 |
| 5/12/2021 | 20,000 | $99.23 | $1,984,600.00 |
| 6/4/2021 | 642 | $90.26 | $57,946.92 |
| 6/7/2021 | 2,487 | $92.03 | $228,878.61 |
| 6/14/2021 | 20,000 | $91.62 | $1,832,362.00 |
| 6/15/2021 | 20,000 | $91.03 | $1,820,502.00 |
| **Total Shares:** | 226,318 | **Total Proceeds:** | $23,794,432.37 |

178. Defendant Alexander sold 183,597 shares of Allakos common stock for proceeds of $19,180,771.53.

| Date | Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 3/15/2021 | 20,000 | $122.78 | $2,455,600.00 |
| 3/16/2021 | 20,000 | $121.76 | $2,435,200.00 |
| 3/17/2021 | 20,000 | $121.14 | $2,422,800.00 |
| 5/17/2021 | 14,517 | $99.68 | $1,447,054.56 |
| 5/17/2021 | 5,484 | $99.69 | $546,699.96 |
| 5/18/2021 | 14,517 | $102.32 | $1,485,379.44 |
| 5/18/2021 | 5,484 | $102.29 | $560,958.36 |
| 5/19/2021 | 14,516 | $98.94 | $1,436,213.04 |
| 5/19/2021 | 5,482 | $98.89 | $542,114.98 |
| 6/2/2021 | 14,517 | $94.55 | $1,372,582.35 |
| 6/2/2021 | 5,484 | $94.56 | $518,567.04 |
| 6/3/2021 | 14,517 | $92.14 | $1,337,596.38 |
| 6/3/2021 | 5,484 | $92.09 | $505,021.56 |
| 6/4/2021 | 3,597 | $89.62 | $322,363.14 |
| 6/4/2021 | 14,516 | $89.64 | $1,301,214.24 |

| | | | |
|---|---|---|---|
| 6/4/2021 | 5,482 | $89.64 | $491,406.48 |
| **Total Shares:** | 183,597 | **Total Proceeds:** | $19,180,771.53 |

179. Defendant Rasmussen sold 114,387 shares of Allakos common stock for proceeds of $13,124,020.16.

| Date | Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 3/1/2021 | 20,000 | $120.66 | $2,413,200.00 |
| 3/2/2021 | 20,000 | $117.32 | $2,346,400.00 |
| 3/3/2021 | 20,000 | $113.00 | $2,260,000.00 |
| 3/3/2021 | 1,952 | $112.83 | $220,244.16 |
| 4/1/2021 | 20,000 | $114.40 | $2,288,000.00 |
| 4/5/2021 | 20,000 | $113.06 | $2,261,200.00 |
| 4/6/2021 | 10,000 | $111.68 | $1,116,800.00 |
| 6/4/2021 | 2,435 | $89.60 | $218,176.00 |
| **Total Shares:** | 114,387 | **Total Proceeds:** | $13,124,020.16 |

180. Defendant's sales of tens of millions of dollars of Allakos stock in 2021 after previously not selling any shares shows that they lacked confidence in the outcome in Phase 3 ENIGMA.

**G. There is a Strong Inference Allakos Acted With Scienter.**

181. Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Allakos, including each high-ranking officer or director, is imputable to the Company. The knowledge of each of these individuals should therefore be imputed to Allakos for the purposes of assessing corporate scienter.

182. The facts alleged herein raise a strong inference of corporate scienter as to Allakos as an entity. Corporate scienter may be alleged independent of the finding that any Individual Defendant had scienter where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading. Given the importance of the Phase 2 and Phase 3 ENIGMA to Allakos, the false and misleading statements alleged in this complaint would necessarily have required the approval of a corporate officer with knowledge that they were false and misleading.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

183. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Allakos common stock during the Class Period, held it until the end of the Class Period, and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

184. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Allakos common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

185. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

186. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

187. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of Allakos common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

188. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

189. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Allakos common stock are traded in an efficient market;
- the Company's common stock were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and
- Plaintiffs and members of the Class purchased and/or sold Allakos common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

190. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

191. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated *Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

192. Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

193. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

194. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

195. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Allakos common stock during the Class Period.

196. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

197. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

198. As a result of the foregoing, the market price of Allakos common stock was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Allakos common stock during the Class Period in purchasing Allakos common stock at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

199. Had Plaintiffs and the other members of the Class been aware that the market price of Allakos common stock had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Allakos common stock at the artificially inflated prices that they did, or at all.

200. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

201. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Allakos common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

202. Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

203. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

204. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

205. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to

cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Allakos common stock.

206. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

207. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 29, 2022

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Laurence M. Rosen*

Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Brian B. Alexander (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: balexander@rosenlegal.com

*Counsel for Plaintiff and Class*