JAMES G. KREISSMAN (Bar No. 206740)
jkreissman@stblaw.com
STEPHEN P. BLAKE (Bar No. 260069)
sblake@stblaw.com
BO BRYAN JIN (Bar No. 2789990)
bryan.jin@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile:  (650) 251-5002

*Attorneys for Defendants Allakos Inc.,*
*Robert Alexander, Leo Redmond,*
*Henrik Rasmussen, and Adam Tomasi*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNG KIM, CHRISTIAN MAYO, AND ALLISON SKYE, Individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>ALLAKOS INC., ROBERT ALEXANDER, LEO REDMOND, HENRIK RASMUSSEN, and ADAM TOMASI,<br><br>              Defendants. | Case No. 4:20-cv-01720-JSW<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hon. Jeffrey S. White<br>Date: September 30, 2022<br>Time: 9:00 a.m.<br>Oakland Courthouse, Courtroom 5 |

## TABLE OF CONTENTS

NOTICE OF MOTION & MOTION TO DISMISS ..................................................................... 1

MEMORANDUM OF POINTS & AUTHORITIES ................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................. 3

      A.    The Parties ........................................................................................................... 3

      B.    Summary Factual Background for the Phase 2 Claims ........................................... 3

      C.    Factual Background for the Phase 3 Claim ........................................................... 4

      D.    Procedural Background ......................................................................................... 5

ARGUMENT ......................................................................................................................... 6

I.     PLAINTIFFS MADE NO EFFORT TO RESUSCITATE THE PHASE 2 CLAIMS ........ 6

II.    THE PHASE 3 CLAIM FAILS BECAUSE THE CHALLENGED STATEMENTS
      ARE NOT ACTIONABLE .......................................................................................... 7

      A.    The Challenged Statements Are Neither False Nor Misleading ............................ 7

      B.    The Phase 3 Claim Is A Hindsight Driven Criticism of Allakos' Study
            Design .................................................................................................................. 9

III.   PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER FOR
      THE PHASE 3 CLAIM .............................................................................................. 10

      A.    Plaintiffs' Motive and Opportunity Allegations Are Insufficient ........................ 10

      B.    Plaintiffs' Allegations Regarding Mr. Tomasi's Knowledge Is Speculative
            and Not Well-Pleaded ......................................................................................... 12

      C.    The Balance of Inferences Further Demonstrates the Absence of Scienter .......... 14

IV.   PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM ........................................ 15

V.    THE DISMISSAL SHOULD BE WITH PREJUDICE ................................................... 15

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Abely v. Aeterna Zentaris Inc.*,
No. 12-cv-4711-PKC, 2013 WL 2399869 (S.D.N.Y. May 29, 2013)....................................... 10

*Applestein v. Medivation, Inc.*,
861 F. Supp. 2d 1030 (N.D. Cal. 2012) ................................................................................ 12

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) .................................................................................... 9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................................................ 15

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash.)......................................................................................... 9

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
No. 18-cv-04844-BLF, 2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)............................... 11, 12

*Colyer v. Acelrx Pharms., Inc.*,
No. 14-cv-04416-LHK, 2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ................................. 14

*DCD Programs, Ltd. v. Leighton*,
833 F.2d 183 (9th Cir. 1987) ................................................................................................ 15

*Eckert v. Paypal Holdings, Inc.*,
831 F. App'x 366 (9th Cir. 2020). ........................................................................................ 11

*Gompper v. VISX*,
298 F.3d 893 (9th Cir. 2002) ................................................................................................ 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).................................................................................................................. 6

*In re Fastly, Inc. Sec. Litig.*,
No. 20-cv-06024-PJH, 2021 WL 5494249 (N.D. Cal. Nov. 23, 2001) .................................. 12

*In re Leapfrog Enter., Inc. Sec. Litig.*,
200 F. Supp. 3d 987 (N.D. Cal. 2016)...................................................................................... 9

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012). .................................................................................. 6, 10, 14

*In re Rigel Pharms., Inc. Sec. Litig.*,
No. C 09-00546-JSW, 2010 WL 8816155 (N.D. Cal. Aug. 24, 2010)
(White, J.). .............................................................................................................................. 14

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999), ............................................................................................ 12

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020); ................................................................................ 12

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ............................................................................................................ 8

*Limantour v. Cray Inc.*,
   432 F. Supp. 2d 1129 (W.D. Wash. 2006) ......................................................................... 11

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...................................................................................... 11, 12

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ............................................................................................... 9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................................................ 9

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ............................................................................................. 10

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ............................................................................................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...................................................................................................... 10, 15

*Zack v. Allied Waste Indus., Inc.*,
   No. 04-cv-1640-MHM, 2005 WL 3501414 (D. Ariz. Dec. 15, 2005) .................................... 12

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .......................................................................................... 6, 10

**Federal Statutes**

15 U.S.C. § 78u-4(b)(1). .......................................................................................................... 6

15 U.S.C. § 78u–4(b)(2)(A) ..................................................................................................... 10

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 1, 10

Fed. R. Civ. P. 9(b) ................................................................................................................ 1, 6

## NOTICE OF MOTION & MOTION TO DISMISS

PLEASE TAKE NOTICE that on September 30, 2022, at 9:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Jeffrey S. White, Defendants Allakos Inc. ("Allakos" or the "Company"), Robert Alexander, Leo Redmond, Henrik Rasmussen, and Adam Tomasi (the "Individual Defendants," and collectively "Defendants") shall and hereby do move to dismiss the Second Amended Class Action Complaint (ECF. No. 41) ("SAC").

Defendants seek an order dismissing the SAC with prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") and the Private Securities Litigation Reform Act ("PSLRA") for failure to state a claim.

## MEMORANDUM OF POINTS & AUTHORITIES

Allakos is a biotechnology company that develops therapeutic antibodies to treat allergic and inflammatory diseases, including eosinophilic gastritis ("EG") and eosinophilic duodenitis ("EoD," f/k/a eosinophilic gastroenteritis or "EGE").  Plaintiffs originally filed this lawsuit after a short seller attacked Allakos' successful Phase 2 clinical trial for its principal drug compound, lirentelimab ("AK002").  Plaintiffs' Amended Complaint ("AC") claimed that Defendants misrepresented certain aspects of the Phase 2 trial (the "Phase 2 Claims").  The Court dismissed the AC in its entirety, but permitted Plaintiffs to further amend their allegations to rectify the defects.  Plaintiffs have not done so; the SAC includes no meaningful amendments to the Phase 2 Claims.  Accordingly, the Court should dismiss the Phase 2 Claims with prejudice.

Instead of amending the Phase 2 Claims, the SAC expands the putative class period and asserts an entirely new claim related to Allakos' Phase 3 clinical trial of AK002 (the "Phase 3 Claim").  The Phase 3 trial, which was conducted after the successful completion of the Phase 2 trial, met only one of its two predetermined goals or "endpoints."  Plaintiffs allege that Allakos falsely claimed the Phase 3 trial's patient population (the "Phase 3 Population") was similar to the Phase 2 trial's patient population (the "Phase 2 Population") when, in fact, there were material differences between the two populations, which allegedly led to the failure of the Phase 3 trial.

The Phase 3 Claim fails for two reasons.  *First*, Plaintiffs fail to plead that any of the challenged statements were false or misleading.  These statements correctly indicated that the

Phase 2 and Phase 3 trials used "identical," or the "same," enrollment criteria. They also accurately stated that the patient demographics for the two trials were of "the same type" and, more specifically, the patient baseline (*i.e.*, pre-study) Total Symptom Scores ("TSS") (*i.e.*, a self-reported score designed to measure the severity of symptoms) were "in the same or similar place." Based on these observations, the Phase 3 Population was described as "very similar" to the Phase 2 Population. Plaintiffs assert that the two populations were dissimilar because the Phase 3 Population included a higher percentage of patients with relatively milder conditions. But these differences, which Allakos only identified after conducting an intensive *post hoc* analysis, do not change the fact that the challenged statements were true at the time they were made.

*Second*, the SAC should also be dismissed because Plaintiffs fail to plead facts giving rise to a strong inference of scienter. Plaintiffs fail to plead any facts suggesting that Defendants knew, or recklessly disregarded, the fact that that the challenged statements were false. Indeed, the SAC does not refer to any internal Allakos documents, any statements by confidential witnesses regarding the challenged statements, or any other direct indicia of scienter. Moreover, even assuming *arguendo* that Defendants knew of differences between the two patient populations, the SAC fails to allege that any of the Defendants believed such differences should have been disclosed.

Plaintiffs also fail to plead facts showing a motive and opportunity to commit fraud. While Plaintiffs point to stock sales made by three Individual Defendants, these alleged sales took place <u>before</u> the challenged statements and thus do not give rise to a strong inference of scienter. The SAC also alleges that Defendants had a motive to show a larger market for AK002 that would include patients with mild diseases. But, by that logic, if Defendants knew that the Phase 3 Population included patients with milder diseases than the Phase 2 Population, they would have touted this fact to investors. This motive argument fails because Plaintiffs claim that this fact was <u>concealed</u> from investors. Accordingly, Plaintiffs have failed to plead any facts supporting scienter.

At its core, the SAC asks the Court to draw the highly implausible inference that Defendants knew the all-important Phase 3 trial was doomed by its inclusion of patients with mild

diseases, lied about the population to boost investors' confidence in the trial, conducted the trial, and, when it failed, readily admitted their deception to investors. This inference is neither cogent nor at least as compelling as opposing, non-fraud inferences. The far stronger inference is that Defendants spent millions of dollars to enroll and conduct the Phase 3 trial with every expectation of its success, truthfully disclosed the similarities between the Phase 2 and Phase 3 Populations based on available information, and identified certain, more granular, differences only after spending weeks analyzing the trial's surprising failure to meet one of its two endpoints.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    The Parties:** Allakos is a biotechnology company that develops therapeutic antibodies to treat allergic and inflammatory diseases, particularly gastrointestinal diseases. SAC ¶ 39. Allakos' lead drug compound, AK002, is an antibody that targets "mast cells" and "eosinophils," two types of white blood cells that play a central role in inflammatory response. *Id.* The Individual Defendants are Robert Alexander, Allakos' CEO; Leo Redmond, Allakos' former CFO; Henrik Rasmussen, Allakos' former Chief Medical Officer ("CMO"); and Adam Tomasi, Allakos' COO. *Id.* ¶¶ 29-33. Plaintiffs are Allakos investors holding collectively 212 shares (<0.0005% of shares outstanding). ECF No. 1-1; ECF No. 25-1; ECF No. 34-1, Ex. A at 106.

**B.    Summary Factual Background for the Phase 2 Claims**:[1] In April 2018, Allakos initiated "a randomized, double-blind, placebo-controlled Phase 2 trial with AK002 in approximately 60 patients," referred to as the ENIGMA study. SAC ¶ 47; *see also* Order at 2. Enrollment was limited to patients who (1) were "moderately to severely symptomatic" based on a Patient Reported Outcome ("PRO") questionnaire and (2) had "biopsy confirmed" EG and/or EoD. ECF No. 34-1, Ex. A at 8. EG is confirmed if the biopsy identifies at least five high power fields ("HPFs") that each include at least 30 eosinophils in the patient's stomach. *Id.* EoD is confirmed if the biopsy identifies at least three such HPFs in the duodenum. *Id.* On August 5, 2019, Allakos reported that the Phase 2 trial successfully met both its histologic endpoint (*i.e.*, the

---

[1] Defendants refer the Court to the Background section of their November 25, 2020 Notice of Motion and Motion to Dismiss Amended Complaint and Memorandum of Points and Authorities in Support (ECF No. 33, "MTD I") and this Court's March 31, 2022 Order granting that motion (ECF No. 40, "Order") for additional factual background relating to the Phase 2 Claims.

reduction in gastrointestinal tissue eosinophils count based on biopsies) and its symptomatic endpoint (*i.e.*, the improvement in symptoms based on the PRO questionnaire). ECF No. 34-1, Ex. E at 1.

On December 18, 2019, short-seller Seligman Research published a report criticizing the Phase 2 trial's methodology (the "Seligman Report"). SAC ¶ 63. Allakos' share price declined appreciably. ECF No. 34-1, Ex. F at 2-3. This lawsuit followed, repeating the Seligman Report's allegations and asserting the Phase 2 Claims. AC ¶¶ 58-88.

**C.** **Factual Background for the Phase 3 Claim**: Following the success of the Phase 2 trial, Allakos announced a randomized, double-blind, placebo-controlled Phase 3 clinical trial with both a biopsy-based eosinophil reduction endpoint and a PRO-based symptom improvement endpoint, referred to as ENIGMA 2. SAC ¶¶ 91, 110. The Phase 3 trial included 180 patients with "[a]ctive moderate to severe symptoms" and "[b]iopsy confirmed" EG (defined as "≥30 [eosinophils/HPF] in 5 [HPFs]") and/or EoD (defined as "≥30 [eosinophils/HPF] in 3 [HPFs]")— the same enrollment criteria as the Phase 2 trial. ECF No. 41-6 at 24. Patient enrollment for the Phase 3 trial began in June 2020 and was completed by June 7, 2021. SAC ¶¶ 94, 102.

On September 10, 2021—twenty-two months into the extended putative class period—Mr. Tomasi gave an interview at the Morgan Stanley 19th Annual Global Healthcare Conference (the "Interview"). SAC ¶ 103. Mr. Tomasi allegedly stated during the Interview that the Phase 2 and Phase 3 Populations were "very similar." *Id.* ¶ 108. More specifically, Mr. Tomasi explained that, in designing the Phase 3 trial, "probably the most important thing is to make sure that we enrolled the same patient population" and, as a result, Allakos' "focus is really making sure that we [had] the same enrollment criteria." *Id.*; *see also id.* ¶ 106 ("The Phase 3 study is identical with regards to [the] patient population that we're [enrolling]."). Mr. Tomasi also explained that another focus was "making sure that we have the same type of demographics going into the phase 3 study, making sure that the baseline [TSS] [is] in the same or similar place." *Id.* ¶ 108.

On December 21, 2021, Allakos announced that while the Phase 3 trial met the biopsy-based endpoint (*i.e.*, the reduction of eosinophils), it failed to meet the patient-reported symptom improvement endpoint. *Id.* ¶¶ 15, 110. In particular, patients in the AK002 arm (*i.e.*, patients who

received AK002) did not report statistically significant symptom improvements relative to patients in the placebo arm (*i.e.*, patients who received a placebo). *Id.* ¶ 15.

After receiving the "surprising results," Allakos "spent [] weeks analyzing the data, discussing it with [doctors,] to determine what, if anything went wrong." Ex. A at 4.[2] Allakos discovered, through this *post hoc* analysis, that notwithstanding Phase 2's and Phase 3's identical enrollment criteria and very similar baseline patient TSS, the Phase 3 Population had, on average, lower baseline eosinophil and IgE antibody levels and differing diagnostic history with respect to EG, EoD, and certain other diseases. SAC ¶¶ 117-118, 151. In particular, although, as a result of the enrollment criteria, all Phase 2 and Phase 3 patients had at least 30 eosinophils per HPF, the Phase 2 Population actually had on average 84 eosinophils per HPF—much higher than the minimum enrollment requirement—while the Phase 3 Population on average had 65 eosinophils per HPF in the AK002 arm and 52 eosinophils per HPF in the placebo arm. *Id.* ¶ 118. The Phase 3 Population's average eosinophil counts, while still higher than the 30-eosinophils-per-HPF enrollment requirement, were appreciably lower than the Phase 2 Population's average. The *post hoc* analysis also revealed that those Phase 3 Population patients with higher baseline eosinophil levels reported more significant symptom improvement than those with lower baseline eosinophil levels. *Id.* ¶ 119. In other words, the *post hoc* analysis indicated that Allakos may have inadvertently enrolled "a milder population," which "exaggerate[d] a placebo response" and led to the Phase 3 trial's unexpected failure to meet its symptom improvement endpoint. Ex. A at 28.

**D.**    **<u>Procedural Background</u>**: This action was initially filed on March, 10, 2020. ECF No. 1. On August 28, 2020, Plaintiffs filed the AC, ECF No. 25, which the Court dismissed in its entirety without prejudice on March 31, 2022. Order at 16. Both the initial complaint and the AC challenged Phase 2-related disclosures and alleged a putative class period between August 5, 2019 and December 17, 2019. *See* ECF Nos. 1, 25. On April 29, 2022, Plaintiffs filed the SAC. ECF No. 41. The SAC additionally asserts a claim relating to the Phase 3 trial and expands the putative class period by two years to end on December 21, 2021. *See* ECF No. 45-1 at 2, 48-49.

---

[2] Unless otherwise noted, all citations to "Ex. __" are to exhibits to the concurrently-filed Declaration of Stephen Blake.

## ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts that show, among other things, the defendant made a material misrepresentation or omission of fact and the defendant acted with scienter. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). Such a claim is subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012). Rule 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA simiarly imposes "more exacting pleading requirements," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), under which a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). In ruling on a motion to dismiss, "[t]he court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit," or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## I.    PLAINTIFFS MADE NO EFFORT TO RESUSCITATE THE PHASE 2 CLAIMS

The AC originally alleged five groups of misrepresentations relating to the Phase 2 trial. AC ¶¶ 58-84; 89-95; 96-128. Plaintiffs subsequently abandoned their claim relating to patient vomiting, before the Court rejected the four remaining claims, concluding that, as summarized in the chart below, "none of the alleged misrepresentations are actionable". Order at 9-15.

| The AC claimed: | The Court found: |
| --- | --- |
| Allakos falsely "represented that they would hire a [Contract Research Organization ("CRO")] for [Phase 2]." *Id.* at 9. | "[N]o reasonable investor could conclude that Allakos' general statement that it relied on multiple third parties, such as but not limited to CROs, was false or misleading." *Id.* |
| "[T]he description of [Phase 2] as a 'randomized, double blind, placebo-controlled' trial was false and misleading because '[Phase 2] was not well controlled and the blinding was compromised.'" *Id.* at 10. | "[P]laintiffs have failed to plead sufficient facts to indicate that the professed methodology of [Phase 2] was actually compromised thus rendering those statements misleading" and in any event the "allegations would merely support questioning the efficacy of the study and would not render the company's statements false or misleading." *Id.* |
| Allakos "significantly understat[ed] the number of patients in [Phase 2] who received steroids." *Id.* at 11. | "[T]he company did in fact disclose the use of steroids." *Id.* at 12. |

| The AC claimed: | The Court found: |
| --- | --- |
| "Allakos falsely indicated that there was only 'one drug-related serious adverse event' during [Phase 2].'"  *Id.* at 13. | "The uncorroborated reports . . . do not provide support for a finding that the company's representations, based on the reporting of its investigators, was false and misleading."  *Id.* at 14. |

The SAC completely fails to rectify these deficiencies.  Indeed, the SAC includes no substantive amendments to three of the four claims—those regarding the use of an independent CRO, the Phase 2 trial design, and serious adverse events.[3]  *See* ECF No. 45-1 at 36-41, 43-46. The only substantive change Plaintiffs made to the Phase 2 Claims was to allege that Defendants misrepresented, not the <u>extent,</u> but the <u>effect,</u> of steroid use in the Phase 2 trial.  *Id.* at 41-43.  But Plaintiffs already made, and the Court already rejected, this very argument.  *See* Order at 11-13. As the Court pointed out, this allegation was merely "a critique of the design of [Phase 2] and not a misrepresentation which could form the basis for a securities fraud claim."  *Id.* at 13.  In short, Plaintiffs have apparently abandoned the Phase 2 Claims, which the Court should summarily dismiss with prejudice for the fatal defects identified in the Order.[4]

## II. THE PHASE 3 CLAIM FAILS BECAUSE THE CHALLENGED STATEMENTS ARE NOT ACTIONABLE

### A. The Challenged Statements Are Neither False Nor Misleading

The Phase 3 Claim does not challenge Allakos' SEC disclosures.  Instead, Plaintiffs exclusively focus on statements that Mr. Tomasi allegedly made in the Interview about certain "similar" aspects of the Phase 2 and Phase 3 Populations.  SAC ¶¶ 148-51.  According to the SAC, these statements "were false and misleading because the characteristics of the patient populations in Phase 2 and Phase 3 ENIGMA were materially different in both diagnostic history and in baseline eosinophil and IgE levels."  *Id.* ¶ 151.[5]

---

[3] The SAC also formally drops the patient vomiting-related claim.  *See* ECF No. 45-1 at 46-47.

[4] The SAC also once again fails to plead a strong inference of scienter for the Phase 2 Claims. Although the Court, in dismissing the AC, did not reach the issue of scienter, it noted that there could be "no scienter where plaintiffs failed to adequately plead the alleged statements were false or misleading."  Order at 15.  The SAC includes no new scienter allegation for the Phase 2 Claims, providing an independent ground for dismissal for the reasons Defendants previously explained. *See* MTD I at 17-25.

[5] It is unclear whether the SAC claims Messrs. Alexander, Redmond, and Rasmussen are primarily liable for the Phase 3 Claim.  To the extent it does, such claims must be summarily dismissed

*First,* Plaintiffs challenge Mr. Tomasi's alleged statement that, for Phase 3, "our focus is really making sure that we [had] the same enrollment criteria which we do." *Id.* ¶ 108. But the Phase 2 and Phase 3 enrollment criteria were, in fact, identical. Both required self-reported moderate to severe symptoms and biopsy-confirmed EG and/or EoD, down to the same minimum numbers of HPFs (5 in stomach and/or 3 in duodenum) and the same minimum number of eosinophils (30) per HPF. *See supra* at 3-4. Mr. Tomasi's statement is thus "quite literally true" and not actionable. Order at 9-10.[6]

*Second,* Plaintiffs allege Mr. Tomasi stated that Phase 2 and Phase 3 had "the same type of demographics" and, more specifically, that "the baseline [TSS] [is] in the same or similar place." SAC ¶ 108. This statement is also true. In the Phase 2 trial, the population had a mean baseline TSS of 28 with a standard deviation of 12. ECF No. 41-6 at 28. In Phase 3, patients in the active arm had a mean baseline TSS of 29 with a standard deviation of 11, and patients in the placebo arm had a mean baseline TSS of 28 with a standard deviation of 11. *Id.* The SAC does not, as it cannot, claim these *de minimis* differences render the statement false or misleading.[7]

*Finally,* immediately after discussing the enrollment criteria and the baseline TSS, Mr. Tomasi summarized his earlier remarks by stating "[s]o we do have a very similar patient population in phase 3 as we do in phase 2." SAC ¶ 150. Plaintiffs allege that this statement is false or misleading because the Phase 3 Population differed from the Phase 2 Population in baseline eosinophil and IgE levels and diagnostic history. *Id.* ¶ 151. This statement is not false. It merely summarizes the points that Mr. Tomasi made in the immediately preceding sentences— that the Phase 3 trial had "a very similar patient population" to the Phase 2 trial, because both sets

because Plaintiffs do not challenge any Phase 3-related statement made by these Defendants. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011).

[6] The SAC challenges two additional enrollment criteria-related statements—that "[t]he Phase 3 study is identical with regards to [the] patient population that we're [en]rolling" and "the most important thing is to make sure that we enrolled the same patient population." SAC ¶¶ 106, 108 (emphases added). These statements are not actionable for the same reasons.

[7] Allakos also revealed, in its *post hoc* analysis, that the general demographics of the Phase 2 and Phase 3 Populations were very similar. For example, the median age of the Phase 2 Population was 40, with 62% of them being female. ECF No. 41-6 at 28. In the Phase 3 trial, the median age was approximately 42, and 65% were female. *Id.*

of patients were selected based on identical enrollment criteria and had extremely close baseline TSS. *See supra* at 5. These facts were true at the time of the statement and remain true after Allakos' *post hoc* analysis revealed differences in certain other aspects of the populations.

This statement is also not misleading. "A statement is misleading only if a reasonable investor, reading the statement fairly and in context, would be misled." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)). Here, Mr. Tomasi's more specific statements regarding enrollment criteria and baseline TSS "put the alleged misleading statement[] . . . in context" and "substantially mitigate[d] [any] potentially misleading nature of the challenged statement[]." *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1003-04 (N.D. Cal. 2016); *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (Courts must look to "[t]he fair and reasonable implication an ordinary investor would derive from [the disclosures].").

**B.     The Phase 3 Claim Is A Hindsight Driven Criticism of Allakos' Study Design**

The SAC, in essence, claims that Allakos' at-least-30-eosinophil-per-HPF enrollment criterion and its reliance on self-reported baseline TSS were insufficient to limit the Phase 3 Population to patients who would respond favorably to AK002, leading to Phase 3's failure to achieve its symptom improvement endpoint. *See* SAC ¶¶ 16, 115-119. The SAC insinuates that Allakos should have adopted a higher minimum baseline tissue eosinophil level and/or additionally focused on baseline blood eosinophil and IgE levels and diagnostic history, because Allakos should have known these characteristics "could be significant[]." *Id.* ¶¶ 119, 121. But these characteristics' significance to the Phase 3 trial's ability to meet its symptom improvement endpoint did not reveal itself until after Allakos' intensive, weeks-long *post hoc* analysis. Such a "fraud-by-hindsight claim is not actionable under securities laws." *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1119 (E.D. Wash. 2013).

In any event, even if Plaintiffs' criticisms were well-placed—and they are not—they cannot serve as the basis for a securities fraud claim. "[A] court does not judge the methodology of a drug trial, but whether a defendant's statements about that study were false and misleading." *Abely v. Aeterna Zentaris Inc.*, No. 12-cv-4711-PKC, 2013 WL 2399869, at *7 (S.D.N.Y. May 29,

2013).  Indeed, in dismissing Plaintiffs' Phase 2 Claims, the Court already made it clear that "critique of the design of the study" is not "proof of any actionable misrepresentation or omission."  Order at 12.  The Phase 3 Claim fails for the same reason.

## III.  PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER FOR THE PHASE 3 CLAIM

To adequately plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  An inference of scienter is "strong" only if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  In assessing scienter, "courts must take into account plausible opposing inferences."  *In re Rigel*, 697 F.3d at 883. "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  Plaintiffs' conclusory and speculative approach in the SAC falls dramatically short of this standard.

### A.     Plaintiffs' Motive and Opportunity Allegations Are Insufficient

The SAC alleges that Mr. Tomasi had two motives to defraud investors—to avoid "undermin[ing] Allakos' claims about AK002's potential market" and to sell Allakos stock at an inflated price.  SAC ¶¶ 172-180.  At the outset, under Ninth Circuit law, an "allegation [that] demonstrates only 'motive and opportunity' . . . is not enough to establish a cogent and compelling inference of scienter."  *Zucco*, 552 F.3d at 998.  Here, however, Plaintiffs' "motive and opportunity" allegations actually weigh against any inference of scienter.

*First*, Plaintiffs argue that Mr. Tomasi was motivated to "downplay the differences" between the Phase 2 and Phase 3 Populations.  SAC ¶¶ 172-74.  Plaintiffs point to a prospective study that Allakos conducted in 2020 to assess the prevalence of EG and EoD in symptomatic patients with chronic functional gastrointestinal symptoms (the "Prevalence Study").  *Id.* ¶ 11. The SAC alleges that the Prevalence Study was important to Allakos because it concluded that EG

and EoD were significantly underdiagnosed and, as a result, AK002 could be marketed to millions, not thousands, of patients.  *Id.* ¶ 175.  Plaintiffs then allege that "Defendant Tomasi [w]as [m]otivated to [d]ownplay the [d]ifferences [b]etween Phase 2 ENIGMA and Phase 3 ENIGMA [b]ecause of the [i]mportance of the Prevalence Study to Allakos."  *Id.*

This allegation is nonsensical.  If, as Plaintiffs claim, Mr. Tomasi wanted investors to believe that AK002 had a broader potential market, he should have been motivated to amplify the fact that the Phase 3 Population included patients with milder conditions than the Phase 2 Population.  Under Plaintiff's logic, hiding such a difference in the patient populations would be illogical and counterproductive.  This allegation thus suggests the absence of a motive to defraud.

***Second***, Defendants argue that Mr. Tomasi's sales of Allakos stocks between March and June 2021 gave rise to a strong inference of scienter.[8]  SAC ¶ 177.  They do not, because, first and foremost, all of the alleged stock sales took place before Mr. Tomasi made the challenged statements on September 10, 2021.  SAC ¶¶ 177-79.  These alleged stock sales, therefore, "provide no evidence of scienter with regard to allegedly false statements that were made after the stock sales ended."  *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1151-52 (W.D. Wash. 2006); *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2019 WL 6877195, at *21 (N.D. Cal. Dec. 17, 2019) (Stock sales that were not made "at times calculated to maximize the personal benefit from undisclosed inside information" were not "suspicious") (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066-67 (9th Cir. 2008)).  Indeed, Plaintiffs do not allege that any Individual Defendant or, for that matter, any insider sold Allakos shares after the alleged fraud supposedly inflated Allakos' stock price.  The absence of such allegations "underscore[s]" Plaintiffs' failure to plead scienter.  *Eckert v. Paypal Holdings, Inc.*, 831 F. App'x 366, 367 (9th Cir. 2020).

Also, all of Mr. Tomasi's alleged stock sales were made pursuant to a non-discretionary Rule 10b5-1 plan that was adopted on December 18, 2020, nine months before the challenged

---

[8] The SAC also includes allegations regarding Messrs. Alexander's and Rasmussen's stock sales. SAC ¶¶ 176, 178-79.  These allegations are not probative because Plaintiffs do not challenge any Phase 3-related statements made by either of these two Defendants.  *See supra* at 7-8 n.5.  In any event, these allegations suffer from the same defects discussed below.

statements were made and <u>six months</u> before the Phase 3 trial completed enrollment.  *See* Exs. B-1 to B-6.  Such "automatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter."  *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020); *see also In re Fastly, Inc. Sec. Litig.*, No. 20-cv-06024-PJH, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23, 2001) ("Defendants did not have immediate control over these planned sales, so these sales, made without concern for the market, cut against a finding of scienter.").

Moreover, the fact that the alleged sales only accounted for a small portion of Mr. Tomasi's holding further weighs against any inference of scienter.  Mr. Tomasi allegedly sold 226,318 shares of Allakos stock during the 33-month putative class period, but he still held 634,620 shares immediately after the last alleged sale.  Ex. B-6 at 1.  Mr. Tomasi thus sold only approximately a quarter of his Allakos stocks.  The Ninth Circuit has rejected similar scienter allegations where the defendants sold a greater percentage of their holdings.  *See, e.g.*, *City of Sunrise Firefighters' Pension Fund*, 2019 WL 6877195, at *21 (sale of one-third of holdings insufficient); *Metzler*, 540 F.3d at 1067 (sale of "only 37% of [the defendant's] total stock" insufficient); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999), *superseded by statute on other grounds* (sales of 43.6% and 75.3% of holdings insufficient).  Moreover, between March 2019 and March 2022, Mr. Tomasi actually <u>increased</u> his holdings in Allakos. *Compare* Ex. C at 52 *with* Ex. D at 30.  The fact that Mr. Tomasi "held *more* stock . . . at the end of the class period than [he] did at the beginning . . . strongly rebuts an inference of scienter." *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1042-43 (N.D. Cal. 2012) (emphasis in original); *see also Zack v. Allied Waste Indus., Inc.*, No. 04-cv-1640-MHM, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005) ("Finally, the individual defendants increased their stock holdings during the class period, which gives rise to an inference of good faith conduct, instead of the requisite scienter.").

**B.**    **<u>Plaintiffs' Allegations Regarding Mr. Tomasi's Knowledge Is Speculative and Not Well-Pleaded</u>**

The SAC speculates that, at the time of the Interview, Mr. Tomasi was aware of the two populations' differences in baseline eosinophil and IgE levels and diagnostic history.  SAC

¶¶ 172-74.  These allegations are not well-pleaded.  *First,* Plaintiffs allege that Mr. Tomasi knew of the differences because he "showed great familiarity about Phase 2 and Phase 3 ENIGMA during his remarks at the [Interview]."  *Id.* ¶ 172.  Familiarity with the two trials, though, does not necessarily mean that Mr. Tomasi had knowledge about specific characteristics for each individual patient in each patient population, especially characteristics that were only revealed months later after the double-blind Phase 3 trial concluded.

*Second,* Plaintiffs suggest Mr. Tomasi's "great familiarity" with the Prevalence Study meant he was "on notice of the possibility" that the Phase 3 Population would differ from the Phase 2 Population.  SAC ¶ 172.  However, the enrollment criteria for the Prevalence Study and the ENIGMA trials were not the same.  The Prevalence Study enrolled a wider range of patients who were required to satisfy only a symptom enrollment criteria (and not a histological enrollment criteria), and biopsies conducted during the study showed that fewer than half of the patients would have qualified for the Phase 2 or Phase 3 trials.  *See* ECF No. 41-4 at 20-23.

*Third,* Plaintiffs seize upon Allakos' CMO Craig Paterson's statement that, after the *post hoc* analysis, he "look[ed] at the baseline demographics and characteristics" of a separate, ongoing EoD-only trial and "realize[d] that this population is more similar to what we've seen in our ENIGMA 2, meaning they're [a] slightly milder population."  Ex. A at 9; *see also* SAC ¶ 123.[9] According to Plaintiffs, Mr. Paterson's statement was an admission that he had access to the EoD-only trial patients' baseline eosinophil and IgE levels and diagnostic history while that trial was ongoing.  SAC ¶¶ 123, 173.  By analogy, Plaintiffs claim that Mr. Tomasi must have had access to the same information for the Phase 3 Population at the time of his Interview.  *Id.* ¶ 173.  But the SAC fails to plead that the EoD-only trial and the Phase 3 trial had the same process and protocol or that Mr. Tomasi, who as the COO focused on the Company's operations, necessarily had the same level of knowledge as the Company's CMO on detailed patient characteristics.  Moreover, even if Mr. Tomasi had, at the time of the Interview, unfettered access to Phase 3 trial patients'

---

[9] The SAC also alleges that Mr. Alexander admitted that "Allakos had access to the demographic characteristics of the patients and was free to change the [enrollment] criteria up until Allakos broke the blind of the study."  SAC ¶ 124.  Not true.  Mr. Alexander merely discussed a "hypothetical[]" modification to post-trial statistical analysis plans.  Ex. A at 25.

data—which he did not because of, among other things, the double blind nature of the study—the SAC still fails to allege that he actually looked at that data prior to the Interview.  In other words, Plaintiffs' assertion is based entirely on speculation and they fail to plead any contemporaneous facts relating to Mr. Tomasi's state of mind at the time of the Interview.

*Finally,* the SAC fails to plead that, at the time of the Interview, Mr. Tomasi believed the Phase 3 Population's baseline eosinophil and IgE levels and diagnostic history should be disclosed.  As the Ninth Circuit explained in affirming this Court's dismissal of the *Rigel Pharmaceutical* case, "[e]ven assuming, *arguendo*, that Plaintiff adequately pled that all of the defendants had knowledge of the detailed clinical results at the time the allegedly false statements were made, such an allegation does not support a strong inference of scienter" because "Plaintiff points us to no allegations that . . . defendants believed that they made false or misleading statements."  *In re Rigel*, 697 F.3d at 883.  In its dismissal opinion below, this Court wrote:

> "Notably, Plaintiff does not submit or allege a single document, internal report, or other information to show that any Defendant actually believed the difference in response rates among patients in different countries, the less severe side effects, or the mild dose-dependent effect on blood-pressure should have been disclosed . . . and that without such information, the initial results revealed . . . were false and misleading."

*In re Rigel Pharms., Inc. Sec. Litig.*, No. C 09-00546-JSW, 2010 WL 8816155, at \*13 (N.D. Cal. Aug. 24, 2010) (White, J.).  *Rigel* is on point, and requires dismissal here.  *See also, e.g.*, *Colyer v. Acelrx Pharms., Inc.*, No. 14-cv-04416-LHK, 2015 WL 7566809, at \*13 (N.D. Cal. Nov. 25, 2015) ("[K]nowing about the existence of certain . . . errors and knowing that one should report these errors to the public are two different things. . . . It was . . . not 'patently obvious' to Defendants that Zalviso's . . . errors would jeopardize Zalviso's chances for FDA approval.").

### C.    The Balance of Inferences Further Demonstrates the Absence of Scienter

The required holistic review further demonstrates that the scienter inference Plaintiffs ask the Court to draw lacks logic and plausibility.  Plaintiffs' claim boils down to their allegation that, at the time of the Interview, Allakos knew that the Phase 3 Population had lower baseline eosinophil and IgE levels than, and different diagnostic history from, the Phase 2 Population and that these differences were significant because the Phase 3 trial was more likely to fail with such a

population.  But given AK002 and the Phase 3 trial's importance to the Company, Defendants had every reason to ensure that the study was a success.  Had they known that many of the enrolled patients had suffered from a relatively milder condition and that fact would negatively affect the outcome of the Phase 3 trial, they would have, of course, taken action to remedy the issue, as opposed to lying about the Phase 3 trial's likelihood of success knowing that it was doomed to fail in a few months.  Any scienter inference is thus neither "cogent [nor] at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

The far more plausible inference is that at the time of the Interview, Defendants were unaware of the Phase 3 Population's lower baseline eosinophil and IgE levels and different diagnostic history, or how these differences could affect the study, which Defendants only discovered after they spent weeks investigating the Phase 3 trial's surprising failure.  Defendants thus, as Mr. Tomasi accurately stated, believed that the Phase 2 and Phase 3 Populations were very similar, based on their identical enrollment criteria and extremely close baseline TSS scores.

## IV.    PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM

Because Plaintiffs fail to allege a primary Section 10(b) or Rule 10b-5 violation, their Section 20(a) claims also fail.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) ("[W]ithout 'a primary violation of federal securities law,' Plaintiff cannot establish control person liability.").

## V.    THE DISMISSAL SHOULD BE WITH PREJUDICE

Leave to amend should be denied where it "would [be] a futile exercise."  *Gompper v. VISX*, 298 F.3d 893, 898 (9th Cir. 2002).  Discretion to deny leave to amend "is especially broad" where, as here, "the court has already given a plaintiff one or more opportunities to amend his complaint."  *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 n.3 (9th Cir. 1987).  Indeed, Plaintiffs have already amended <u>twice</u> and yet the SAC still fails to state a claim.  Having filed three deficient complaints, Plaintiffs should not be permitted a fourth.

## CONCLUSION

For all of the reasons set forth above, Defendants respectfully request that the Court dismiss Plaintiffs' Second Amended Complaint with prejudice.

June 13, 2022                          Respectfully submitted,

                                       SIMPSON THACHER & BARTLETT LLP

                                       By  */s/ Stephen P. Blake*
                                       STEPHEN P. BLAKE (Bar No. 260069)
                                       sblake@stblaw.com

                                       *Counsel for Defendants Allakos Inc., Robert
                                       Alexander, Leo Redmond, Henrik Rasmussen, and
                                       Adam Tomasi*