# Exhibit C

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No.          )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material Pursuant to §240.14a-12

# ALLAKOS INC.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check all boxes that apply):

☒ No fee required

☐ Fee paid previously with preliminary materials

☐ Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11



825 Industrial Road, Suite 500
San Carlos, California 94070

April 14, 2022

To Stockholders of Allakos Inc.:

Our 2022 Annual Meeting of Stockholders ("2022 Annual Meeting") will be held on Wednesday, May 25, 2022 at 2:30 p.m., PDT. The 2022 Annual Meeting will be conducted exclusively online via a live webcast. You will be able to attend the meeting, submit your questions during the meeting and vote your shares electronically at the meeting by registering at www.proxydocs.com/ALLK. Because the meeting is completely virtual and being conducted via the Internet, stockholders will not be able to attend the meeting in person. In order to attend the meeting, you must register at www.proxydocs.com/ALLK. The attached notice and proxy statement describe the formal business to be transacted at the meeting.

In accordance with the rules of the Securities and Exchange Commission, we are advising our stockholders of the availability on the Internet of our proxy materials related to our forthcoming annual meeting. These rules allow companies to provide access to proxy materials in one of two ways. Because we have elected to utilize the "full set delivery" option, we are delivering paper copies of all proxy materials to each stockholder, as well as providing access to those proxy materials on a publicly accessible website. Beginning on April 14, 2022 you may read, print and download our 2021 Annual Report to Stockholders on Form 10-K and our Proxy Statement at www.proxydocs.com/ALLK.

You may vote your shares by regular mail, online or by telephone. The 2022 Annual Meeting is being held so that stockholders may consider the election of Class I directors and the ratification of the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2022.

Our board of directors determined that the matters to be considered at the 2022 Annual Meeting are in the best interests of us and our stockholders. For the reasons set forth in the Proxy Statement, the board of directors unanimously recommends a vote "FOR" the election of each Class I director and a vote "FOR" the ratification of the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2022.

On behalf of the board of directors and the officers and employees of Allakos Inc., I would like to take this opportunity to thank our stockholders for their continued support.

Sincerely,

Robert Alexander, Ph.D.
*Chief Executive Officer and Director*

**Table of Contents**

|  | Page |
|---|---|
| NOTICE OF ANNUAL MEETING OF STOCKHOLDERS | 1 |
| IMPORTANT INFORMATION ABOUT THE ANNUAL MEETING AND VOTING | 2 |
| PROPOSAL NO. 1 – ELECTION OF DIRECTORS | 5 |
| PROPOSAL NO. 2 – RATIFICATION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 8 |
| TRANSACTION OF OTHER BUSINESS | 10 |
| CORPORATE GOVERNANCE | 11 |
| EXECUTIVE MANAGEMENT | 18 |
| COMPENSATION DISCUSSION AND ANALYSIS | 20 |
| EXECUTIVE OFFICER AND DIRECTOR COMPENSATION | 33 |
| REPORT OF THE COMPENSATION COMMITTEE | 50 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 51 |
| PRINCIPAL STOCKHOLDERS | 52 |
| DELINQUENT SECTION 16(A) REPORTS | 55 |
| REPORT OF THE AUDIT COMMITTEE | 56 |
| STOCKHOLDER PROPOSALS | 57 |

**Allakos Inc.**

### NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

Notice is hereby given that our 2022 Annual Meeting of Stockholders ("2022 Annual Meeting") will be held virtually via live webcast on the Internet on Wednesday, May 25, 2022 at 2:30 p.m., PDT for the following purposes:

1.  Election of Class I director nominees;

2.  Ratification of the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2022; and

3.  To transact such other business as may properly come before the meeting or any adjournment thereof.

These proposals are more fully described in the Proxy Statement following this Notice.

Our board of directors recommends that you vote (i) FOR the election of the respective nominees for Class I directors named in this proxy statement to serve as directors of the Company and (ii) FOR the ratification of the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2022. You will be able to attend the meeting, submit your questions during the meeting, and vote your shares electronically at the meeting by registering at www.proxydocs.com/ALLK.

Along with the attached Proxy Statement, we are sending you copies of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021.

Our board of directors has fixed the close of business on March 28, 2022 as the record date for the determination of the stockholders entitled to notice of, and to vote at, the 2022 Annual Meeting. Accordingly, only stockholders of record at the close of business on that date will be entitled to vote at the 2022 Annual Meeting.

Stockholders are cordially invited to attend the 2022 Annual Meeting. Regardless of whether you plan to attend, please mark, date, sign and return the enclosed proxy to ensure that your shares are represented. If you are a stockholder of record and are voting by proxy, your vote must be received by **11:59 p.m., PDT on May 24, 2022** to be counted. You may also attend the 2022 Annual Meeting virtually and vote your shares then. Please note that if you hold your shares through a brokerage account or through a bank or another nominee, they may have an earlier deadline. Please refer to the voting instructions you received from such broker, bank or other record holder.

By order of the Board of Directors,

Robert Alexander, Ph.D.
*Chief Executive Officer and Director*

April 14, 2022

### YOUR VOTE IS IMPORTANT

**Please vote via the Internet or telephone.**
Internet: www.proxypush.com/ALLK
Phone: 1-866-490-6867

To vote by mail, please mark, sign and date the enclosed proxy card and
return it promptly in the self-addressed, stamped envelope provided.

1

**IMPORTANT INFORMATION ABOUT THE ANNUAL MEETING AND VOTING**

The Securities and Exchange Commission (the "SEC") has adopted rules regarding how companies must provide proxy materials to their stockholders. These rules are often referred to as "notice and access," under which a company may select either of the following options for making proxy materials available to its stockholders:

- the full set delivery option; or
- the notice only option.

A company may use a single method for all of its stockholders, or use full set delivery for some while adopting the notice only option for others.

### Full Set Delivery Option

Under the full set delivery option, a company delivers all proxy materials to its stockholders by mail as it would have done prior to the change in the rules. In addition to delivery of proxy materials to stockholders, the company must post all proxy materials on a publicly accessible website and provide information to stockholders about how to access the website.

In connection with our 2022 Annual Meeting, we have elected to use the full set delivery option. Accordingly, you will receive all proxy materials by mail. These proxy materials include the Notice of 2022 Annual Meeting of Stockholders, proxy statement, proxy card and our Annual Report on Form 10-K.

### Notice Only Option

Under the notice only option, which we have elected NOT to use for the 2022 Annual Meeting, a company must post all proxy materials on a publicly accessible website. Instead of delivering proxy materials to its stockholders, the company instead delivers a "Notice of Internet Availability of Proxy Material." The notice includes, among other things:

- information regarding the date and time of the 2022 Annual Meeting of stockholders as well as the items to be considered at the meeting;
- information regarding the website where the proxy materials are posted; and
- various means by which a stockholder can request paper or e-mail copies of the proxy materials.

If a stockholder requests paper copies of the proxy materials, these materials must be sent to the stockholder within three business days and by first class mail.

### We May Use the Notice Only Option in the Future

Although we have elected to use the full set delivery option in connection with the 2022 Annual Meeting, we may choose to use the notice only option in the future. By reducing the amount of materials that a company needs to print and mail, the notice only option provides an opportunity for cost savings as well as conservation of paper products. Many companies that have used the notice only option have also experienced a lower participation rate resulting in fewer stockholders voting at the 2022 Annual Meeting. We plan to evaluate the future possible cost savings as well as the possible impact on stockholder participation as we consider future use of the notice only option.

### Householding

We and some banks, brokers and other nominee record holders participate in the practice of "householding" proxy statements and annual reports. This means that we and such banks, brokers and other nominee record holders are permitted to mail only one copy of our documents, including the 2021 Annual Report and this proxy statement to any household in which two or more different stockholders reside and are members of the same household or in which one stockholder has multiple accounts. We will promptly deliver a separate copy of either document to you upon written or oral request to Allakos Inc., 825 Industrial Road, Suite 500, San Carlos, California 94070, Attention: Corporate Secretary, 1-650-597-5002. If you want to receive separate copies of the proxy statement or annual report to stockholders in the future, or if you are receiving multiple copies and would like to receive only one copy per household, you should contact your bank, broker or other nominee record holder, or you may contact us at the above address and phone number.

*When is the 2022 Annual Meeting?*

Our 2022 Annual Meeting will be held on Wednesday, May 25, 2022, at 2:30 p.m. PDT. This year's annual meeting will be a virtual meeting via live webcast on the Internet. In order to vote or submit a question during the 2022 Annual Meeting, you will need to follow the instructions posted at www.proxydocs.com/ALLK and will need the control number included on your Notice or proxy card. Any stockholder wishing to attend the 2022 Annual Meeting must visit www.proxydocs.com/ALLK to register before May 24, 2022 at 2:00 p.m. PDT.

*What is the purpose of the 2022 Annual Meeting?*

At our 2022 Annual Meeting, stockholders will act upon the matters outlined in the notice of meeting on the cover page of this proxy statement, consisting of:

- Proposal 1: The election of each of the Class I directors nominated by our Board of Directors and named in this Proxy Statement to serve for a three-year term and until their successors are duly elected and qualified;

- Proposal 2: The ratification of the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2022; and

- Proposal 3: To transact any other matters that properly come before the meeting.

*Who is entitled to vote at the 2022 Annual Meeting?*

Only holders of our common stock as of the close of business on March 28, 2022, the record date, are entitled to receive notice of and to vote at the 2022 Annual Meeting. In deciding all matters at the 2022 Annual Meeting, each stockholder will be entitled to one vote for each share of our common stock owned as of the record date. We do not have cumulative voting rights for the election of directors. As of the record date, there were 54,760,992 shares of our common stock outstanding and entitled to vote. We do not have any outstanding shares of preferred stock. A list of stockholders entitled to vote at the meeting will be available for examination during the meeting by any stockholder for any purpose germane to the 2022 Annual Meeting for a period of 10 days prior to the 2022 Annual Meeting at our principal executive offices at 825 Industrial Road, Suite 500, San Carlos, California 94070 and electronically during the meeting.

Any stockholder wishing to attend the 2022 Annual Meeting must register at www.proxydocs.com/ALLK before May 24, 2022 at 2:00 p.m. PDT.

*What constitutes a quorum?*

The presence at the meeting, in person or by proxy, of the holders of common stock representing a majority of the combined voting power of the outstanding shares of stock on the record date will constitute a quorum, permitting the meeting to conduct its business.

*What vote is required to approve each item?*

For purposes of electing directors at the 2022 Annual Meeting, the two nominees receiving the support of stockholders representing the greatest numbers of shares of common stock present or represented by proxy and entitled to vote, shall be elected as Class I directors.

The affirmative vote of a majority of the shares of common stock present or represented by proxy and entitled to vote is required for the ratification of the appointment of Ernst & Young LLP.
The affirmative vote of a majority of the shares of common stock present or represented by proxy and entitled to vote is required for the approval of any other matter that may be submitted to a vote of our stockholders.

The inspector of election for the 2022 Annual Meeting shall determine the number of shares of common stock represented at the meeting, the existence of a quorum and the validity and effect of proxies, and shall count and tabulate ballots and votes and determine the results thereof. Proxies received but marked as abstentions and broker non-votes will be included in the calculation of the number of shares considered to be present at the meeting for purposes of determining a quorum. A "broker non-vote" will occur when a nominee holding shares for a beneficial

owner does not vote on a particular proposal because the nominee does not have discretionary power with respect to that proposal and has not received instructions from the beneficial owner. Broker non-votes will not be counted as votes cast "FOR" or votes "WITHHELD" for the election of directors. On other matters submitted for a vote, broker non-votes will not be considered in tallying votes cast, and abstentions will be treated as a vote "against." Under the rules of NASDAQ, broker, bank or other nominees cannot vote on non-routine matters. Our Proposal No. 2 (ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022) is the only proposal in this proxy statement that is considered a routine matter. The other proposals are not considered routine matters, and without your instructions or attendance at the Annual Meeting, your shares will not be voted on these matters. If less than a majority of the combined voting power of the outstanding shares of common stock is represented at the 2022 Annual Meeting, a majority of the shares so represented may adjourn the 2022 Annual Meeting from time to time without further notice.

### What are the Board's recommendations?

As more fully discussed under the section titled "Matters to Come Before the 2022 Annual Meeting", our board of directors recommends that you vote:

- "FOR" the election of the respective nominees for the Class I directors named in this proxy statement; and

- "FOR" the ratification of the appointment of Ernst & Young LLP.

Unless contrary instructions are indicated on the enclosed proxy, all shares represented by valid proxies received pursuant to this solicitation (and which have not been revoked in accordance with the procedures set forth below) will be voted (1) FOR the election of the respective nominees for director named in this proxy statement; (2) FOR the ratification of the appointment of Ernst & Young LLP; and (3) in accordance with the recommendation of our board of directors, FOR or AGAINST all other matters as may properly come before the 2022 Annual Meeting. In the event a stockholder specifies a different choice by means of the enclosed proxy, such shares will be voted in accordance with the specification made.

### How do I vote?

You may vote by following the instructions set forth or on your proxy card or, if you are a street name holder (that is, if you hold your shares through a bank, broker or other holder of record), you must vote in accordance with the voting instruction form provided by your bank, broker or other holder of record. You may access the Notice, proxy materials and our annual report to stockholders at www.proxydocs.com/ALLK. If you are a street name holder, the availability of telephone or internet voting will depend upon your bank's, broker's, or other holder of record's voting process. If you are not voting at the 2022 Annual Meeting, your vote must be received by **11:59 p.m., PDT on May 24, 2022** to be counted.

### Can I change my vote after I return my proxy card?

Yes. The giving of a proxy does not eliminate the right to vote in person should any stockholder giving the proxy so desire. Stockholders have an unconditional right to revoke their proxy at any time prior to the exercise of that proxy, by voting in person at the 2022 Annual Meeting, by filing a written revocation or duly executed proxy bearing a later date with our Secretary at our headquarters.

### Who pays for costs relating to the proxy materials and annual meeting of stockholders?

The costs of preparing, assembling and mailing this proxy statement, the Notice of Annual Meeting of Stockholders and the enclosed Annual Report and proxy card, along with the cost of posting the proxy materials on a website, are to be borne by us. In addition to the use of mail, our directors, officers and employees may solicit proxies personally and by telephone, facsimile and other electronic means. They will receive no compensation in addition to their regular salaries. We may request banks, brokers and other custodians, nominees and fiduciaries to forward copies of the proxy material to their principals and to request authority for the execution of proxies. We may reimburse these persons for their expenses in so doing.

**PROPOSAL NO. 1 – ELECTION OF DIRECTORS**

Our board of directors currently consists of six members, with staggered three-year terms, pursuant to our amended and restated certificate of incorporation and restated bylaws. Our Class I Directors, Robert Alexander, Ph.D. and Steven P. James, will stand for election at the 2022 Annual Meeting. The terms of office of directors in Class II, which consists of John McKearn, Ph.D. and Paul Walker, and Class III, which consists of Daniel Janney and Robert E. Andreatta, expire at our Annual Meetings of Stockholders to be held in 2023 and 2024, respectively. At the recommendation of our nominating and corporate governance committee, our board of directors proposes that each of the Class I nominees named below and currently serving as a director in Class I, be elected as a Class I director for a three-year term expiring at our 2025 Annual Meeting of Stockholders, or until such director's successor is duly elected and qualified, or until their earlier death, resignation, disqualification or removal. If any nominee for any reason is unable to serve or will not serve, the proxies may be voted for such substitute nominee as the proxy holder may determine.

Our directors and their ages as of March 31, 2022 and positions with the Company are provided in the table below and in the additional biographical descriptions set forth in the text below the table.

| Name | Age | Position |
| --- | --- | --- |
| Robert Alexander, Ph.D. | 52 | Chief Executive Officer, Director and Director Nominee |
| Daniel Janney (2)(3) | 56 | Chair of Board and Director |
| Robert E. Andreatta (1) | 60 | Director |
| Steven P. James (1)(3) | 64 | Director and Director Nominee |
| John McKearn, Ph.D. (2)(3) | 68 | Director |
| Paul Walker (1)(2) | 47 | Director |

(1)     Member of audit committee

(2)     Member of compensation committee

(3)     Member of corporate governance and nominating committee

**Nominees**

Robert Alexander, Ph.D. has served as a member of our board of directors since May 2017 and as our Chief Executive Officer since April 2017. Dr. Alexander previously served as our President from November 2017 through August 2019 and as a member of our board of directors from December 2012 until June 2013. From December 2013 to April 2017, Dr. Alexander served as Chief Executive Officer of ZS Pharma (acquired by AstraZeneca in December 2015), where he also served as a member of the board of directors, including as Chairman from March 2013 to March 2014. From November 2005 to March 2013, Dr. Alexander served as a Director at Alta Partners, a venture capital firm in life sciences. In addition, he acted as Executive Chairman and interim Chief Executive Officer of SARcode Biosciences (acquired by Shire plc in April 2013), a biopharmaceutical company. During his time at Alta, he led investments in SARcode Biosciences, Lumena Pharmaceuticals, ZS Pharma and Allakos. Previously, Dr. Alexander was a Principal in MPM Capital's BioEquities fund where he sourced opportunities and led due diligence efforts for both public and private investments. Dr. Alexander also previously worked in the Business Development group at Genentech (now a member of the Roche Group), a biotechnology company, where he was responsible for sourcing and screening product opportunities based on scientific merit and strategic fit, leading diligence teams and negotiating terms and definitive agreements. Dr. Alexander joined Genentech after completing his post-doctoral fellowship at Stanford University in the Pathology department. He also holds a Ph.D. with a focus in immunology from the University of North Carolina and a B.A. in zoology from Miami University of Ohio.

We believe Dr. Alexander is qualified to serve on our board of directors because of the perspective and experience he provides as our CEO, as well as his broad experience within the pharmaceutical industry, particularly in the area of immunology.

Steven P. James has served as a member of our board of directors since April 2016. From July 2014 to present, Mr. James has been an independent director at several biotechnology companies and served as acting or interim Chief Executive Officer at Antiva Biosciences (previously Hera Therapeutics) and Pionyr Immunotherapeutics (previously Precision Immune). Mr. James served as President and Chief Executive Officer of Labrys Biologics, from December 2012 until its acquisition by Teva Pharmaceuticals in July 2014. He was President and Chief Executive Officer of KAI Pharmaceuticals, from October 2004 until its acquisition by Amgen in July 2012. He was Senior Vice President, Commercial Operations, at Exelixis, from 2003 until 2004. Previously he held senior business roles at Sunesis Pharmaceuticals and Isis Pharmaceuticals. He began his career in new product planning at Eli Lilly and Company. Mr. James was also a member of the board of directors of Cascadian Therapeutics and Ocera Therapeutics, and is currently a director of Antiva Biosciences, Soteria Biotherapeutics, Ventus Therapeutics and Pionyr Immunotherapeutics, where he has been President and Chief Executive Officer since January 2016. Mr. James earned a Bachelor of Arts degree in biology from Brown University and a Masters in Management degree from the Kellogg Graduate School of Management at Northwestern University.

We believe Mr. James is qualified to serve on our board of directors because of his experience as an executive of pharmaceutical companies, as well as his experience serving on the board of directors for several biotechnology companies.

**Continuing Directors**

John McKearn, Ph.D. has served as a member of our board of directors since December 2012. Dr. McKearn joined RiverVest Venture Partners, a venture capital firm, in April 2008 as a Venture Partner and has been a Managing Director since April 2011. Prior to joining RiverVest, Dr. McKearn was the Chief Executive Officer of Kalypsys, a biopharmaceutical company, from 2005 to December 2006, its President from 2004 to December 2006 and its Chief Scientific Officer from 2003 to 2005. From 2000 to June 2009, Dr. McKearn served on the board of IDM Pharma (acquired by Takeda), a biotechnology company. He also previously served on the board of directors of Epimmune, Keel Pharmaceuticals, ZS Pharma, Otonomy and Lumena Pharmaceuticals. Dr. McKearn currently serves as a member of the board of directors of Wugen, Inc., Arch Oncology, OncoResponse, Good Therapeutics and Adarza Biosystems. From 1987 to 2003, Dr. McKearn worked as a scientist with G.D. Searle & Company, which merged into Pharmacia Corporation in 2000, serving as the head of discovery research from 1997 to 2003. Before that, he was a senior scientist at E.I. DuPont de Nemours and Company, a member of the Basel Institute for Immunology in Basel, Switzerland and a research associate in the Department of Microbiology and Immunology at Washington University in St. Louis. Dr. McKearn holds a Bachelor's degree in biology from Northern Illinois University and a Ph.D. in immunology from the University of Chicago.

We believe Dr. McKearn is qualified to serve on our board of directors because of his experience as a venture capital investor, his industry expertise and his leadership experience with biotechnology and pharmaceutical companies.

Paul Walker has served as a member of our board of directors since November 2017. Mr. Walker started in April 2008 as a Partner and is now a General Partner at New Enterprise Associates, an investment firm focused on venture capital and growth equity investments, where Mr. Walker focuses on later-stage biotechnology and life sciences investments. From January 2001 to March 2008, Mr. Walker worked at MPM Capital, a life sciences venture capital firm, where he specialized in public, private-investment-in-public-equity and mezzanine-stage life sciences investing as a general partner with the MPM BioEquities Fund. From July 1996 to December 2000, Mr. Walker served as a portfolio manager at Franklin Resources, a global investment management organization known as Franklin Templeton Investments. Mr. Walker currently serves as a member of the board of directors of Trillium Therapeutics, and previously served as a member of the board of directors of TESARO and Tracon Pharmaceuticals. Mr. Walker also manages a number of NEA's other late-stage and public investments. Mr. Walker received a B.S. in biochemistry and cell biology from the University of California at San Diego and holds the designation of Chartered Financial Analyst.

We believe Mr. Walker is qualified to serve on our board of directors because of his experience in the life sciences and venture capital industries, his educational background and his experience as a public company director.

Daniel Janney has served as a member of our board of directors since March 2017 and as Chair of our board of directors since June 2017. Mr. Janney is a managing director at Alta Partners, a life sciences venture capital firm, which he joined in 1996. Prior to joining Alta, from 1993 to 1996, Mr. Janney was a Vice President in Montgomery Securities' healthcare and biotechnology investment banking group, focusing on life sciences companies. Mr. Janney is a director of a number of companies including Be Bio, Krystal Biotech, Lassen Therapeutics, ImmuneID, Novome Biotechnologies and Prolacta Bioscience. Mr. Janney is currently vice chair of the California Academy of Sciences Board of Trustees. He holds a Bachelor of Arts in history from Georgetown University and an M.B.A. from the Anderson School at the University of California, Los Angeles.

We believe Mr. Janney is qualified to serve on our board of directors because of his experience working with and serving on the boards of directors of life sciences companies and his experience working in the venture capital industry.

Robert E. Andreatta has served as a member of our board of directors since June 2018. Mr. Andreatta has served as Vice President, Finance - Business Controllership and Operations for Alphabet Inc. since June 2019. From March 2016 to June 2019, Mr. Andreatta was Vice President, Controller at Google LLC. Previously, at Genentech, he served as Director of Collaboration Finance from June 2003 to September 2004, Director of Corporate Accounting and Reporting from September 2004 to May 2005, Assistant Controller and Senior Director, Corporate Finance from May 2005 to June 2006, Controller from June 2006 to November 2008, Chief Accounting Officer from April 2007 to November 2008 and Vice President, Controller and Chief Accounting Officer from November 2008 to March 2016. Prior to joining Genentech, he held various officer positions at HopeLink Corporation, a healthcare information technology company, from 2000 to 2003 and was a member of the board of directors of HopeLink from 2002 to 2003. Mr. Andreatta worked for KPMG from 1983 to 2000, including service as an audit partner from 1995 to 2000. He earned a Bachelor of Science degree in accounting from Santa Clara University.

We believe Mr. Andreatta is qualified to serve on our board of directors because of his extensive financial and accounting expertise, his industry experience and his experience as a public company executive.

**Vote Required**

The election of Class I directors requires a plurality vote of the shares of our common stock present or represented by proxy at the 2022 Annual Meeting and entitled to vote thereon to be approved. Broker non-votes will have no effect on this proposal.

<div align="center">

**RECOMMENDATION OF THE BOARD OF DIRECTORS**

**THE BOARD OF DIRECTORS UNANIMOUSLY
RECOMMENDS A VOTE <u>FOR</u> THE ELECTION OF EACH NOMINEE UNDER PROPOSAL NUMBER ONE**

</div>

**PROPOSAL NO. 2 – RATIFICATION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Our audit committee has appointed Ernst & Young LLP, as our independent registered public accounting firm to audit our financial statements and internal control over financial reporting for our fiscal year ending December 31, 2022. Ernst & Young LLP has served as our independent registered public accounting firm since 2016.

Stockholder ratification of the appointment of Ernst & Young LLP is not required by our bylaws or other applicable legal requirements. However, our board of directors is submitting the appointment of Ernst & Young LLP to our stockholders for ratification as a matter of good corporate governance. In the event that this appointment is not ratified by the affirmative vote of a majority of the shares present in person or by proxy at the 2022 Annual Meeting and entitled to vote, such appointment will be reconsidered by our audit committee. Even if the appointment is ratified, our audit committee, in its sole discretion, may appoint another independent registered public accounting firm at any time during our fiscal year ending December 31, 2022 if our audit committee believes that such a change would be in the best interests of the Company and its stockholders. If the appointment is not ratified by our stockholders, the audit committee may reconsider whether it should appoint another independent registered public accounting firm.

We expect that representatives of Ernst & Young LLP will attend the 2022 Annual Meeting and will have the opportunity to make a statement if they so desire and to respond to appropriate questions.

**Fees Paid to the Independent Registered Public Accounting Firm**

The following table presents fees for professional audit services and other services rendered to us by Ernst & Young LLP for our fiscal years ended December 31, 2021 and 2020.

|  | 2021 | 2020 |
|---|---|---|
| Audit Fees (1) | $ 1,532,051 | $ 1,344,000 |
| Audit-Related Fees (2) | — | — |
| Tax Fees (3) | — | — |
| All Other Fees (4) | 3,600 | — |
| Total Fees | $ 1,535,651 | $ 1,344,000 |

(1)  Audit Fees in 2021 and 2020 consisted of fees and expenses billed for professional services performed by Ernst & Young LLP for the integrated audit of annual financial statements and internal control over financial reporting, the review of interim financial statements, accounting and financial reporting consultations. Audit fees also include services provided in connection with our equity offering and other SEC filings, including consents and comfort letters.

(2)  There were no Audit-Related Fees incurred.

(3)  There were no Tax Fees incurred.

(4)  All Other Fees incurred include subscription fees for access to Ernst & Young LLP's online library of accounting research literature.

**Auditor Independence**

The Audit Committee has concluded that the provision of the non-audit services listed above was compatible with maintaining the independence of Ernst & Young LLP.

8

**Audit Committee Policy on Pre-Approval of Audit and Permissible Non-Audit Services of Independent Registered Public Accounting Firm**

Our audit committee has established a policy governing our use of the services of our independent registered public accounting firm. Under the policy, our audit committee is required to pre-approve all audit and permissible non-audit services performed by our independent registered public accounting firm in order to ensure that the provision of such services does not impair such accounting firm's independence. All services provided by Ernst & Young LLP for our fiscal years ended December 31, 2021 and 2020 were pre-approved by our audit committee.

**Vote Required**

The affirmative vote of a majority of the shares of common stock present or represented by proxy and entitled to vote is required for the ratification of the appointment of Ernst & Young LLP.

<div align="center">

**RECOMMENDATION OF THE BOARD OF DIRECTORS**

**THE BOARD OF DIRECTORS UNANIMOUSLY
RECOMMENDS A VOTE <u>FOR</u> THE RATIFICATION OF ERNST & YOUNG LLP AS THE COMPANY'S INDEPENDENT PUBLIC
ACCOUNTING FIRM UNDER PROPOSAL NUMBER TWO**

</div>

**TRANSACTION OF OTHER BUSINESS**

Our board of directors does not know of any other matters to be raised at the 2022 Annual Meeting. If any other matters not mentioned in this proxy statement are properly brought before the meeting, the proxies will use their discretionary voting authority under the proxy to vote the proxy in accordance with their best judgment on those matters. If the meeting is adjourned or postponed, then proxies can vote your shares at the adjournment or postponement as well.

**CORPORATE GOVERNANCE**

**Director Independence**

Our common stock is listed on the NASDAQ Global Select Market ("NASDAQ"). Under the rules of NASDAQ, independent directors must comprise a majority of a listed company's board of directors. In addition, the rules of NASDAQ require that, subject to specified exceptions, each member of a listed company's audit, compensation and corporate governance and nominating committees be independent. Audit committee members and compensation committee members must also satisfy the independence criteria set forth in Rule 10A-3 and Rule 10C-1, respectively, under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Under the rules of NASDAQ, a director will only qualify as an "independent director" if, in the opinion of that company's board of directors, that person does not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

To be considered to be independent for purposes of Rule 10A-3 and under the rules of NASDAQ, a member of an audit committee of a listed company may not, other than in his or her capacity as a member of the audit committee, the board of directors or any other board committee: (1) accept, directly or indirectly, any consulting, advisory or other compensatory fee from the listed company or any of its subsidiaries or (2) be an affiliated person of the listed company or any of its subsidiaries.

To be considered independent for purposes of Rule 10C-1 and under the rules of NASDAQ, the board of directors must affirmatively determine that each member of the compensation committee is independent, including a consideration of all factors specifically relevant to determining whether the director has a relationship to the company which is material to that director's ability to be independent from management in connection with the duties of a compensation committee member, including, but not limited to: (i) the source of compensation of such director, including any consulting, advisory or other compensatory fee paid by the company to such director and (ii) whether such director is affiliated with the company, a subsidiary of the company or an affiliate of a subsidiary of the company.

Our board of directors undertook a review of its composition, the composition of its committees and the independence of our directors and considered whether any director has a material relationship with us that could compromise his or her ability to exercise independent judgment in carrying out his or her responsibilities. Based upon information requested from and provided by each director concerning his background, employment and affiliations, including family relationships, our board of directors has determined that each of Daniel Janney, Robert E. Andreatta, Steven P. James, John McKearn Ph.D. and Paul Walker, representing five of our six directors, do not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under the rules of NASDAQ.

In making these determinations, our board of directors considered the current and prior relationships that each nonemployee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our capital stock by each nonemployee director, and the transactions involving them described in the section titled "Certain Relationships and Related Party Transactions". There are no family relationships among any of our directors or executive officers.

**Board Leadership Structure**

Our board of directors is currently chaired by Mr. Janney. As a general policy, our board of directors believes that separation of the positions of nonemployee Chair of our board of directors and Chief Executive Officer reinforces the independence of our board of directors from management, creates an environment that encourages objective oversight of management's performance and enhances the effectiveness of our board of directors as a whole. As such, Robert Alexander, Ph.D. serves as our Chief Executive Officer while Mr. Janney serves as the nonemployee Chair of our board of directors but is not an officer. We currently expect and intend the positions of nonemployee Chair of our board of directors and Chief Executive Officer to continue to be held by two individuals in the future.

11

**Role of Board of Directors in Risk Oversight**

Our board of directors has an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our board of directors is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks and operational risks. The compensation committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. The audit committee is responsible for overseeing the management of risks relating to accounting matters and financial reporting. The corporate governance and nominating committee is responsible for overseeing the management of risks associated with the independence of our board of directors and potential conflicts of interest. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire board of directors is regularly informed through discussions from committee members about such risks. Our board of directors believes its administration of its risk oversight function has not negatively affected the board of directors' leadership structure.

**Board Diversity Matrix**

We are proud to have a well-balanced and diverse group of employees and believe that our current workforce structure demonstrates our commitment to diversity in all aspects of our business. We note that more than half of our employees as of December 31, 2021 identified as non-Caucasian and more than half as female. We also know that diversity is vital at every level, including the board of directors.

We began 2021 with 7 directors of which 6 identified as male and 1 as female. In August 2021, the female board member voluntarily resigned from her Allakos board seat as a condition of her employment to accept a chief executive officer position at another company. With her departure, we are seeking an additional board member. Improving our position on board diversity is a priority and we support the election and appointment of diverse candidates to the Board when appropriate opportunities arise.  The Nominating and Corporate Governance Committee values the diversity of thought and backgrounds of our Board members as well as their ability to work collaboratively with other Board members and the management team. The Nominating and Corporate Governance Committee instructs the search firms it engages to include qualified candidates with diverse backgrounds, including diversity by race, ethnicity, gender and sexual orientation. Given the stage of our company and the competition for Board members with the necessary experience, we are finding that it is taking longer to expand our Board. However, we remain committed to seeking diversity on our Board.

The table below provides certain highlights of the composition of our Board members and nominees as of March 31, 2022. Each of the categories listed in the table below has the meaning as it is used in Nasdaq Rule 5605(f).

**Total Number of Directors:**    6

| | Female | Male | Non-Binary | Did Not Disclose Gender |
|---|---|---|---|---|
| **Gender Identity** | | | | |
| Directors | - | 6 | - | - |
| **Demographic Background** | | | | |
| African American or Black | - | - | - | - |
| Alaskan Native or Native American | - | - | - | - |
| Asian | - | - | - | - |
| Hispanic or Latinx | - | - | - | - |
| Native Hawaiian or Pacific Islander | - | - | - | - |
| White | - | 5 | - | - |
| Two or More Races or Ethnicities | - | 1 | - | - |
| **LGBTQ+** | - | - | - | - |
| Did Not Disclose Demographic Background | - | - | - | - |

12

**Board and Committee Meetings**

During 2021, our board of directors held nine meetings (including regularly scheduled and special meetings), and each director attended at least 75% of the aggregate of (i) the total number of meetings of our board of directors held during the period for which he served as a director and (ii) the total number of meetings held by all committees of our board of directors on which he served during the periods that he served.

It is the policy of our board of directors to regularly have separate meeting times for independent directors without management. Although we do not have a formal policy regarding attendance by members of our board of directors at annual meetings of stockholders, we encourage, but do not require, our directors to attend. All of our directors attended our 2021 annual meeting of stockholders.

**Board Committees**

Our board of directors has established an audit committee, a compensation committee and a corporate governance and nominating committee. We believe that the composition of these committees meets the criteria for independence under, and the functioning of these committees comply with the requirements of, the Sarbanes-Oxley Act of 2002, the NASDAQ rules and SEC rules and regulations. We comply with NASDAQ requirements with respect to committee composition of independent directors. Each committee has the composition and responsibilities described below. Our board may from time to time establish other committees.

*Audit Committee*

The members of our audit committee are Messrs. Andreatta, James and Walker. Mr. Andreatta is the chair of our audit committee and is our audit committee financial expert, as that term is defined under the SEC rules implementing Section 407 of the Sarbanes-Oxley Act of 2002, and possesses financial sophistication, as defined under the rules of NASDAQ. Our audit committee oversees our corporate accounting and financial reporting process and assists our board of directors in monitoring our financial systems. Our audit committee also:

- selects and hires the independent registered public accounting firm to audit our financial statements;

- helps to ensure the independence and performance of the independent registered public accounting firm;

- approves audit and non-audit services and fees;

- reviews financial statements and discusses with management and the independent registered public accounting firm our annual audited and quarterly financial statements and the results of the independent audit and the quarterly reviews;

- prepares the audit committee report that the SEC requires to be included in our annual proxy statement;

- reviews reports and communications from the independent registered public accounting firm;

- reviews the adequacy and effectiveness of our internal controls and disclosure controls and procedure;

- reviews our policies on risk assessment and risk management;

- reviews related party transactions; and

- establishes and oversees procedures for the receipt, retention and treatment of accounting related complaints and the confidential submission by our employees of concerns regarding questionable accounting or auditing matters.

Our audit committee operates under a written charter which satisfies the applicable rules of the SEC and the listing standards of NASDAQ. A copy of the charter of our audit committee is available on our website at http://investor.allakos.com/investor-relations in the "Corporate Governance" section of our Investors webpage. During 2021, our audit committee held five meetings. The Board has determined that each of Messrs. Andreatta, James and Walker qualify as independent directors under the NASDAQ corporate governance standards and independence requirements of Rule 10A-3 of the Exchange Act.

13

*Compensation Committee*

The members of our compensation committee are Dr. McKearn and Messrs. Janney and Walker. Mr. Janney is the chair of our compensation committee. Our compensation committee oversees our compensation policies, plans and benefits programs. The compensation committee also:

- oversees our overall compensation philosophy and compensation policies, plans and benefit programs; and

- reviews and approves or recommends to the board for approval compensation for our executive officers and directors; and administers our equity compensation plans.

Our compensation committee operates under a written charter which satisfies the applicable rules of the SEC and the listing standards of NASDAQ. A copy of the charter of our compensation committee is available on our website at http://investor.allakos.com/investor-relations in the "Corporate Governance" section of our Investors webpage. During 2021, our compensation committee held five meetings. The Board has determined that each of Dr. McKearn and Messrs. Janney and Walker meet the independence qualifications applicable to members of a compensation committee under the NASDAQ corporate governance standards.

Our compensation committee has engaged Compensia, Inc. ("Compensia"), as its independent compensation consultant. The compensation committee has assessed the independence of Compensia, considering all relevant factors, including those set forth in Rule 10C-1(b)(4)(i) through (vi) under the Securities Exchange Act of 1934, as amended. Based on this review, the compensation committee concluded that there are no conflicts of interest raised and that Compensia is independent. Compensia provides analysis and recommendations to the compensation committee regarding:

- the Company's pay philosophy, including a review and update of the group peer comparators;

- the executive compensation program, including assisting in the development of recommendations covering salary, annual cash incentives and equity compensation;

- the equity compensation programming, including the development of guidelines to be used for future equity grant cycles, providing overall pool budgeting and modeling and providing updates with regards to long-term incentive trends among peers; and

- the non-executive compensation program and development of salary structure, including short-term incentive guidelines.

Compensia reports to the compensation committee and not to management, although Compensia meets with management for purposes of gathering information for its analyses and recommendations.

*Corporate Governance and Nominating Committee*

The members of our corporate governance and nominating committee are Dr. McKearn and Messrs. James and Janney. Dr. McKearn is the chairman of our corporate governance and nominating committee. Our corporate governance and nominating committee oversees and assists our board of directors in reviewing and recommending nominees for election as directors. Specifically, the corporate governance and nominating committee:

- identifies, evaluates and makes recommendations to our board of directors regarding nominees for election to our board of directors and its committees;

- considers and makes recommendations to our board of directors regarding the composition of our board of directors and its committees;

- reviews developments in corporate governance practices;

- evaluates the adequacy of our corporate governance practices and reporting; and

- evaluates the performance of our board of directors and of individual directors.

Our corporate governance and nominating committee operates under a written charter which satisfies the applicable rules of the SEC and the listing standards of NASDAQ. A copy of the charter of our corporate governance and nominating committee is available on our website at http://investor.allakos.com/investor-relations in the "Corporate Governance" section of our Investors webpage. During 2021, our corporate governance and nominating committee

held two meetings. The Board has determined that each of Dr. McKearn and Messrs. James and Janney qualify as independent directors under the NASDAQ corporate governance standards.

**Considerations in Evaluating Director Nominees**

It is the policy of the corporate governance and nominating committee of our board of directors to consider recommendations for candidates to our board of directors from stockholders holding no less than one percent (1%) of the outstanding shares of the Company's common stock continuously for at least 12 months prior to the date of the submission of the recommendation or nomination.

The corporate governance and nominating committee will consider candidates recommended by stockholders in the same manner as candidates recommended to the corporate governance and nominating committee from other sources. The corporate governance and nominating committee will use the following procedures to identify and evaluate any individual recommended or offered for nomination to our board of directors:

- In its evaluation of director candidates, including the members of our board of directors eligible for reelection, the corporate governance and nominating committee will conisder the following:

  - The current size and composition of our board of directors and the needs of our board of directors and the respective committees of our board of directors.

  - Such factors as character, integrity, judgment, diversity of background and experience that will contribute to the overall effectiveness and diversity of the Board, including diversity of race, ethnicity, gender and sexual orientation, independence, area of expertise, corporate experience, length of service, potential conflicts of interest, other commitments and the like. The corporate governance and nominating committee evaluates these factors, among others, and does not assign any particular weighting or priority to any of these factors.

  - Other factors that the corporate governance and nominating committee deems appropriate.

- The corporate governance and nominating committee require the following minimum qualifications to be satisfied by any nominee for a position on our board of directors:

  - The highest personal and professional ethics and integrity.

  - Proven achievement and competence in the nominee's field and the ability to exercise sound business judgment.

  - Skills that are complementary to those of the existing board of directors.

  - The ability to assist and support management and make significant contributions to the Company's success.

  - An understanding of the fiduciary responsibilities that is required of a member of our board of directors and the commitment of time and energy necessary to diligently carry out those responsibilities.

  - If the corporate governance and nominating committee determines that an additional or replacement director is required, the corporate governance and nominating committee may take such measures that it considers appropriate in connection with its evaluation of a director candidate, including candidate interviews, inquiry of the person or persons making the recommendation or nomination, engagement of an outside search firm to gather additional information, or reliance on the knowledge of the members of the corporate governance and nominating committee, our board directors or management.

The corporate governance and nominating committee may propose to our board of directors a candidate recommended or offered for nomination by a stockholder as a nominee for election to our board of directors. In the future, the corporate governance and nominating committee may pay fees to third parties to assist in identifying or evaluating director candidates.

15

**Stockholder Recommendations for Nominations to the Board of Directors**

A stockholder that wants to recommend a candidate for election to the board of directors should direct the recommendation in writing by letter to the Company, attention of the Secretary, at 825 Industrial Road, Suite 500, San Carlos, California 94070. The recommendation must include the candidate's name, home and business contact information, detailed biographical data, relevant qualifications, a signed letter from the candidate confirming willingness to serve, information regarding any relationships between the candidate and the Company and evidence of the recommending stockholder's ownership of Company stock. Such recommendations must also include a statement from the recommending stockholder in support of the candidate, particularly within the context of the criteria for board membership, including issues of character, integrity, judgment, diversity of experience, independence, area of expertise, corporate experience, length of service, potential conflicts of interest, other commitments and the like and personal references.

A stockholder that instead desires to nominate a person directly for election to the board of directors at an annual meeting of the stockholders must meet the deadlines and other requirements set forth in Section 2.4 of the Company's bylaws and the rules and regulations of the Securities and Exchange Commission. Section 2.4 of the Company's bylaws requires that a stockholder who seeks to nominate a candidate for director must provide a written notice to the Secretary of the Company not later than the 45th day nor earlier than the 75th day before the one-year anniversary of the date on which the corporation first mailed its proxy materials or a notice of availability of proxy materials (whichever is earlier) for the preceding year's annual meeting; provided, however, that in the event that no annual meeting was held in the previous year or if the date of the annual meeting is advanced by more than 30 days prior to or delayed by more than 60 days after the one-year anniversary of the date of the previous year's annual meeting, then notice by the stockholder to be timely must be so received by the Secretary of the Company not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of (i) the 90th day prior to such annual meeting and (ii) the 10th day following the day on which Public Announcement (as defined below) of the date of such annual meeting is first made. That notice must state the information required by Section 2.4 of the Company's bylaws, and otherwise must comply with applicable federal and state law. The Secretary of the Company will provide a copy of the bylaws upon request in writing from a stockholder. "Public Announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service or in a document publicly filed by the corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Securities Exchange Act of 1934, as amended, or any successor thereto.

Stockholders also have the right under our bylaws to propose director candidates for consideration by the committee or our board of directors and also directly nominate director candidates, without any action or recommendation on the part of the committee or our board of directors, by following the procedures set forth in the section of this proxy statement titled "Stockholder Proposals".

**Compensation Committee Interlocks and Inside Participation**

None of the members of our compensation committee is or has been an officer or employee of our company. None of our executive officers currently serves, or in the past fiscal year has served, as a member of the board of directors or compensation committee (or other board committee performing equivalent functions or, in the absence of any such committee, the entire board of directors) of any entity that has one or more executive officers serving on our board of directors or compensation committee.

**Code of Business Conduct and Ethics**

We have adopted a written code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The code of business conduct and ethics is available on our website at http://investor.allakos.com/investor-relations in the "Corporate Governance" section of our Investors webpage. We intend to disclose any future amendments to such code, or any waivers of its requirements, applicable to any principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions or our directors on our website identified above.

**Communications with the Board of Directors**

Our board of directors believes that management speaks for Allakos Inc. Individual board members may, from time to time, communicate with various constituencies that are involved with the Company, but it is expected that board members would do this with knowledge of management and, in most instances, only at the request of management.

In cases where stockholders and other interested parties wish to communicate directly with our non-management directors, messages can be sent to our Secretary, at 825 Industrial Road, Suite 500, San Carlos, California 94070. Our Secretary monitors these communications and will provide a summary of all received messages to the board of directors at each regularly scheduled meeting of the board of directors. Our board of directors generally meets on a quarterly basis. Where the nature of a communication warrants, our Secretary may determine, in his or her judgment, to obtain the more immediate attention of the appropriate committee of the board or non-management director, of independent advisors or of Company management, as our Secretary considers appropriate.

Our Secretary may decide in the exercise of his or her judgment whether a response to any stockholder or interested party communication is necessary.

This procedure for stockholder and other interested party communications with the non-management directors is administered by the Company's corporate governance and nominating committee. This procedure does not apply to (a) communications to non-management directors from officers or directors of the Company who are stockholders, (b) stockholder proposals submitted pursuant to Rule 14a-8 under the Exchange Act or (c) communications to the audit committee pursuant to the Complaint Procedures for Accounting and Auditing Matters.

**Stock Ownership and Policy on Trading, Pledging and Hedging of Company Stock**

Certain transactions in our securities (such as purchases and sales of publicly traded put and call options, and short sales) create a heightened compliance risk or could create the appearance of misalignment between management and stockholders. In addition, securities held in a margin account or pledged as collateral may be sold without consent if the owner fails to meet a margin call or defaults on the loan, thus creating the risk that a sale may occur at a time when an officer or director is aware of material, non-public information or otherwise is not permitted to trade in company securities. Our insider trading policy expressly prohibits, without prior approval from our general counsel or chief financial officer, in consultation with our board of directors or an independent committee thereof, short sales and derivative transactions of our stock by our officers, directors, employees and agents and their respective affiliates, purchases or sales of puts, calls or other derivative securities of the Company, or hedging transactions. In addition, our insider trading policy expressly prohibits our executive officers, directors, employees and agents and their respective affiliates from borrowing against Company securities held in a margin account, or, pledging our securities as collateral for a loan, in each case without prior approval from our general counsel or chief financial officer, in consultation with our board of directors or an independent committee thereof.

**Removal of Directors; Vacancies**

Our Certificate of Incorporation and Bylaws provide that the number of directors will be fixed from time to time exclusively pursuant to a resolution adopted by the Board. Newly created director positions resulting from an increase in size of the Board and vacancies may be filled by our Board of Directors, subject to certain exceptions. Any or all of the directors may be removed from office by the stockholders only for cause.

17

## EXECUTIVE MANAGEMENT

Our board of directors chooses our executive officers, who then serve at the discretion of our board of directors. There is no family relationship between any of the directors or executive officers and any of our other directors or executive officers. We have provided below summary biographies of our executive officers as of March 31, 2022 who are described in the section titled "Compensation Discussion & Analysis".

*Robert Alexander, Ph.D.* has served as a member of our board of directors since May 2017 and as our Chief Executive Officer since April 2017. Dr. Alexander previously served as our President from November 2017 through August 2019 and as a member of our board of directors from December 2012 until June 2013. From December 2013 to April 2017, Dr. Alexander served as Chief Executive Officer of ZS Pharma (acquired by AstraZeneca in December 2015), where he also served as a member of the board of directors, including as Chairman from March 2013 to March 2014. From November 2005 to March 2013, Dr. Alexander served as a Director at Alta Partners, a venture capital firm in life sciences. In addition, he acted as Executive Chairman and interim Chief Executive Officer of SARcode Biosciences (acquired by Shire plc in April 2013), a biopharmaceutical company. During his time at Alta, he led investments in SARcode Biosciences, Lumena Pharmaceuticals, ZS Pharma and Allakos. Previously, Dr. Alexander was a Principal in MPM Capital's BioEquities fund where he sourced opportunities and led due diligence efforts for both public and private investments. Dr. Alexander also previously worked in the Business Development group at Genentech (now a member of the Roche Group), a biotechnology company, where he was responsible for sourcing and screening product opportunities based on scientific merit and strategic fit, leading diligence teams and negotiating terms and definitive agreements. He is currently a director at Allena Pharmaceuticals. Dr. Alexander joined Genentech after completing his post-doctoral fellowship at Stanford University in the Pathology department. He also holds a Ph.D. with a focus in immunology from the University of North Carolina and a B.A. in zoology from Miami University of Ohio.

*Baird Radford* has served as our Chief Financial Officer since April 2021. Prior to Allakos, Mr. Radford served as Senior Vice President of Finance at Aimmune Therapeutics from January 2020 to February 2021, Mr. Radford was responsible for all aspects of strategic and operational finance activities supporting the launch of its first approved product, including financial planning, controllership, tax and treasury functions. Prior to working at Aimmune Therapeutics, he served as the Chief Financial Officer at HeartFlow from July 2014 to January 2020, a medical technology company with commercial operations in the United States, Canada, Europe and Japan. Prior to joining HeartFlow, Mr. Radford served as Vice President of Finance at Intuitive Surgical from August 2011 to July 2014, with responsibility for financial planning and analysis, investor relations and enterprise analytics. Prior to Intuitive Surgical, Mr. Radford held various positions at eBay from May 2001 to August 2011, including Vice President of Finance for Marketplaces Europe, as well as Vice President, Corporate Controller, and Chief Accounting Officer. Mr. Radford began his career in the audit practice of PricewaterhouseCoopers. Mr. Radford has a BBA from Ohio University.

*Adam Tomasi, Ph.D.* has served as our President since August 2019 and Chief Operating Officer since April 2017. Dr. Tomasi previously served as our Chief Financial Officer from April 2017 to August 2019 and then again from December 2020 to April 2021. Dr. Tomasi also served as Secretary from November 2017 until August 2019. Dr. Tomasi is on the board of directors of Attune Pharmaceuticals, a private biotechnology company. From August 2013 to January 2015, Dr. Tomasi served as Senior Vice President, Corporate Development of ZS Pharma, and from February 2015 to March 2017, he served as Chief Scientific Officer and Head of Corporate Development of ZS Pharma. Previously, Dr. Tomasi was a Principal at Alta Partners, where he was involved in the funding and development of notable medical technology and life science companies including Chemgenex, Excaliard, Lumena Pharmaceuticals, Achaogen, Immune Design, Allakos and ZS Pharma. Prior to joining Alta Partners, Dr. Tomasi was in the Harvard-MIT Biomedical Enterprise Program where he completed internships as an equity analyst at Lehman Brothers and at MPM Capital. Dr. Tomasi also previously worked as a medicinal chemist with Gilead Sciences and Cytokinetics, where he helped create the cardiovascular drug CK-1827452, which was licensed to Amgen. Dr. Tomasi holds a B.S. in Chemistry from the University of California, Berkeley, an MBA from the Massachusetts Institute of Technology Sloan School of Management and a Ph.D. in Chemistry from the University of California, Irvine.

18

*Mark Asbury* has served as our Secretary since August 2019 and as our Chief Legal Officer and General Counsel since November 2018. From 2016 to 2017, Mr. Asbury was General Counsel at Samsara BioCapital, a science-driven venture capital firm. From 2014 to 2016 Mr. Asbury was Chief Legal Officer and General Counsel at ZS Pharma (acquired by AstraZeneca) where he was responsible for all legal aspects of the organization, including intellectual property, SEC matters and strategic transactions. Prior to ZS Pharma, he was the Vice President and General Counsel of Pharmacyclics where he helped the company negotiate a $975 million deal with Johnson & Johnson for ibrutinib, its Phase 2 molecule. Prior to that, Mr. Asbury held a variety of positions at Genentech, most recently as Associate General Counsel and Senior Director of Transactional Law. Prior to joining Genentech, he worked for the law firm of Shearman & Sterling, where he specialized in corporate finance, mergers and acquisitions, and commercial debt financings. Mr. Asbury holds a B.A. in Soviet Studies from Vanderbilt University and a J.D. from Stanford Law School.

19

**COMPENSATION DISCUSSION AND ANALYSIS**

## Overview

This Compensation Discussion and Analysis describes the Company's executive compensation program as it relates to each of our "named executive officers." Our named executive officers for fiscal year 2021 and their positions with the Company are provided in the following table:

| Name | Position |
|---|---|
| Robert Alexander, Ph.D. | Chief Executive Officer and Director |
| Baird Radford (1) | Chief Financial Officer |
| Adam Tomasi, Ph.D. (2) | President and Chief Operating Officer |
| Mark Asbury | Chief Legal Officer and General Counsel |

(1)   Mr. Radford has served as Chief Financial Officer since April 2021.

(2)   Dr. Tomasi also served as acting Chief Financial Officer from December 2020 until Mr. Radford's appointment to Chief Financial Officer in April 2021.

## EXECUTIVE SUMMARY

### About Our Business and How We Approach Performance-Based Compensation

Allakos is a clinical stage biotechnology company developing therapeutics which target immunomodulatory receptors present on immune effector cells involved in allergy, inflammatory and proliferative diseases. Activating these immunomodulatory receptors allows us to directly target cells involved in disease pathogenesis and, in the setting of allergy and inflammation, has the potential to result in broad inhibition of inflammatory cells. The Company's most advanced antibodies are lirentelimab (AK002) and AK006. Lirentelimab selectively targets both mast cells and eosinophils, two types of white blood cells that are widely distributed in the body and play a central role in the inflammatory response. Inappropriately activated mast cells and eosinophils have been identified as key drivers in a number of severe diseases affecting the gastrointestinal tract, eyes, skin, lungs and other organs. We are developing lirentelimab for the treatment of eosinophilic esophagitis, eosinophilic gastritis, eosinophilic duodenitis, atopic dermatitis, chronic spontaneous urticaria and potentially additional indications. Lirentelimab has received orphan disease status for EG, EoD, and EoE from the U.S. Food and Drug Administration (the "FDA"). AK006 targets Siglec-6, an inhibitory receptor expressed selectively on mast cells. AK006 appears to provide deeper mast cell inhibition than lirentelimab and, in addition to its inhibitory activity, reduce mast cell numbers. We plan to begin human studies with AK006 in the first half of 2023. For more information, please visit the Company's website at www.allakos.com.

As the biopharmaceutical industry is characterized by a very long product development cycle, including a lengthy research and development period and a rigorous approval phase involving clinical studies and governmental regulatory and marketing approval, many of the traditional benchmarking metrics, such as product sales, revenues and profits are inappropriate for a mid- or late- stage biopharmaceutical company such as Allakos. Instead, like many of our peers, the specific performance factors our compensation committee considers when determining the compensation of our named executive officers include:

- key research and development achievements;

- initiation and progress of preclinical and clinical studies for our product candidates;

- establishment and maintenance of key strategic relationships and new business initiatives, including financings; and

- development of organizational capabilities and managing our growth.

These performance factors are considered by our board of directors and compensation committee in connection with our annual performance reviews described below and are a critical component in the determination of annual cash and equity incentive awards for our executives.

**2021 Say on Pay and Board Responsiveness**

In 2021, we held our first non-binding say-on-pay vote, in which 41.3% of the votes cast supported our executive compensation program. In response to the vote, and pursuant to our commitment to engage with our stockholders as our business continues to evolve, members of our management team initiated stockholder outreach to better understand the concerns and perspectives of our stockholders, including those who did not support our say-on-pay vote in 2021. As part of this outreach, we received feedback on our executive compensation programs from various stockholders.

These communications helped validate that our stockholders are generally supportive of the philosophy, objectives, and design of our overall compensation program. They also provided us with important perspectives on how to improve and better explain our program in the future. Based on these learnings, we made three key modifications to our executive compensation program impacting 2021 as summarized below:

| What We Heard | Actions We Took in Response |
|---|---|
| Preference for performance-based equity in future long-term incentive grants | Introduced the use of equity awards with performance-based vesting for a substantial portion (approximately 60%) of the 2021 awards granted to our Chief Executive Officer and our President and Chief Operating Officer *(see page 29 for details)* |
| Desire for more disclosure around annual cash incentive plan goals and decisions and how the selected metrics correlate to stockholder value creation | Included more detail about the goals in our 2021 annual cash incentive plan, their rationale, and how the NEOs executed against those goals, while not disclosing any aspects of those goals that contain confidential information the disclosure of which could result in competitive harm to the Company *(see page 27 for details)* |
| Increase transparency and clarify existing policies regarding compensation and the maximum possible cash incentive plan payout amounts | Actual bonus payouts depend on the achievement of pre-defined goals and can range from 0% to 150% of target award amounts. Maximum payouts are capped at 150% of target *(see page 27-28 for details)* |

**In addition to the adjustments listed above for 2021, the board of directors expanded performance-based equity awards in connection with long-term equity incentive awards granted to all of our named executive officers in February 2022 *(see page 30 for details).***

21

**CEO Pay At-A-Glance**

The charts below represent the mix of target total direct compensation awarded to our Chief Executive Officer in 2020 and 2021. Similar to 2020, approximately 93% of target total compensation for 2021 was based on elements (bonus and long-term incentives) that may vary from year to year depending on performance. However, consistent with our pay for performance philosophy and in response to feedback we received from our stockholders, 2021 compensation also incorporates performance-based restricted stock units that provide an even more direct link to performance outcomes that drive stockholder value creation.



**WHAT GUIDES OUR PROGRAMS**

**Objectives of the Executive Compensation Programs**

The goals of our executive compensation programs are to ensure that the interests of our employees, including our named executive officers, are aligned with the interests of our stockholders and our business goals, and that the total compensation paid to each of our named executive officers is fair, reasonable and competitive.

We provide our named executive officers with a significant portion of their compensation through cash incentive compensation based upon the achievement of corporate objectives for the year, including our operational and individual performance metrics, as well as through equity compensation. These two elements of executive compensation are aligned with the interests of our stockholders because the amount of compensation ultimately received will vary with our corporate and operational performance. Equity compensation derives its value from the appreciation of shares of our common stock, which in the future is likely to fluctuate based on our corporate and operational performance.

22

The compensation programs for our named executive officers are designed to provide the following:

| Compensation Element | Objective | Features |
|---|---|---|
| *Base salary* | To attract and retain highly skilled executives. | Fixed component of pay to provide financial stability, based on responsibilities, experience, individual contributions and peer company data. |
| *Short-term annual at-risk cash incentive program* | To promote and reward the achievement of pre-defined short-term strategic and business goals of the Company; to attract, retain and motivate executives as well as other employees. | Variable and at-risk component of pay, with annual payouts ranging from 0-150% of target bonus. Target bonus is determined based on peer company data. Payouts, if any, are determined by our board of directors, based on their objective measure of company performance against pre-defined corporate goals. Maximum payouts are capped at 150% of target. |
| *Long-term at-risk equity incentive compensation program* | To encourage executives and other employees to focus on long-term Company performance; to promote retention; to reward outstanding Company and individual performance. | Typically subject to multi-year vesting based on continued service, and are in the form of stock options and restricted stock units ("RSUs") to align employee interests with those of our stockholders over the longer-term. The value of such awards are determined based on peer company data. In 2021, we began granting performance-based RSUs ("PSUs") to further link vesting of such grants to pre-defined milestones linked to the potential creation of stockholder value. In connection with our December 2021 equity grants, a substantial portion of the awards granted to both Dr. Alexander and Dr. Tomasi included performance-based milestones that must be achieved prior to any portion of the PSUs vesting. February 2022, awards were granted using a mix of 50% PSUs and 50% RSUs for all of the named executive officers. |

23

In addition to our direct compensation elements, the following features of our compensation program are designed to align our executive team with stockholder interests and with market best practices:

| What We Do | What We Don't Do |
|---|---|
| •Obtain compensation related perspectives (levels, practices, etc.) from an independent consulting firm with direct oversight by our compensation committee of our board of directors | •Guarantee bonuses or base salary increases |
| •Target compensation with a majority of the total at-risk | •Allow hedging or pledging of equity unless pre-approved by our board of directors |
| •Benchmark cash-and-equity based compensation levels with an industry-specific peer group data with oversight and ultimate approval by the board of directors | •Provide excessive perquisites |
| •Align salaries with peer group data and individual performance | •Provide supplemental executive retirement plans |
| •Establish targets and payouts, if any, associated with our short-term annual cash incentive program bonuses based on peer group data and the objective measurement of company performance against predefined corporate objectives | |
| •Grant equity awards (stock options, RSUs and/or PSUs) with value, vesting and performance terms based on peer group data | |
| •Offer market-competitive benefits consistent with the benefits offered the rest of our employees | |

**Setting Executive Compensation**

*Role of the Board, the Compensation Committee and Management*

Our board of directors and/or the compensation committee annually review the compensation for all of our named executive officers. In setting executive base salaries and bonuses and granting equity incentive awards, our board of directors or the compensation committee, as the case may be, consider compensation for comparable positions in the market and our peer group (as described below), input from the compensation committee's independent compensation consultant and from Drs. Alexander and Tomasi, the qualifications, experience and historical compensation levels of our named executive officers, individual performance as compared to our expectations and objectives, our desire to motivate our employees to achieve short- and long-term results that are in the best interests of our stockholders, and a long-term commitment to the Company.

Taking into account the factors noted above, our compensation committee then approves, or recommends to the board of directors for approval, the compensation for each named executive officer. Drs. Alexander and Tomasi work closely with our board of directors and compensation committee in managing our executive compensation program, may attend meetings of the compensation committee, and may make recommendations to the compensation committee regarding compensation of our executive officers (including their own). Compensation determinations for our named executive officers are made by our compensation committee and/or board of directors without members of management present.

*Role of the Compensation Consultant*

We develop our compensation programs after reviewing publicly available compensation data and subscription survey data for our peer group, provided by Radford, a business unit of Aon plc ("Radford"), among other sources. For 2021, our compensation committee retained Compensia, as its independent compensation consultant, to advise on executive compensation matters including: overall compensation program design (including the design of our performance-based equity award program), annual updates to our peer group, and benchmarking executive officer and board of director compensation programs. Compensia reports directly to our compensation committee. Our compensation committee has assessed the independence of Compensia consistent with Nasdaq listing standards and has concluded that the engagement of Compensia does not raise any conflict of interest.

*Defining and Comparing Compensation to Market Benchmarks*

**2021 Peer Group**

Historically, our Compensation Committee met in November of each year to determine equity awards to be granted at that time and set cash compensation for the following year. In evaluating the total target compensation (cash and equity) of our named executive officers, our compensation committee establishes a peer group of publicly traded companies in the biopharmaceutical and biotechnology industries that is selected based on a balance of the following criteria:

- companies whose industry, geography, number of employees, stage of development and market capitalization are similar, at the time of the evaluation, though not necessarily identical, to ours;

- companies with similar executive positions to ours;

- companies against which we believe we compete for executive talent; and

- public companies based in the United States ("U.S.") whose compensation and financial data are available in proxy statements or through widely available compensation surveys.

Based on these criteria, our peer group for 2021, as approved by our compensation committee, included the following companies:

| | | |
|---|---|---|
| ACADIA Pharmaceuticals, Inc. | bluebird bio, Inc. | Nektar Therapeutics |
| Acceleron Pharma, Inc. | BridgeBio Pharma, Inc. | Portola Pharmaceuticals, Inc. |
| Alector, Inc. | Denali Therapeutics, Inc. | Sage Therapeutics, Inc. |
| Allogene Therapeutics, Inc. | Dicerna Pharmaceuticals, Inc. | Sarepta Therapeutics, Inc. |
| Alnylam Pharmaceuticals, Inc. | FibroGen, Inc. | Sorrento Therapeutics, Inc. |
| Amarin Corporation, PLC. | Global Blood Therapeutics, Inc. | TG Therapeutics, Inc. |
| Apellis Pharmaceutical, Inc. | Iovance Biotherapeutics, Inc | Ultragenyx Pharmaceutical, Inc. |
| Arena Pharmaceutical, Inc. | Mirati Therapeutics, Inc. | Xencor, Inc. |
| Arrowhead Pharmaceuticals, Inc. | Moderna, Inc. | |
| Biohaven Pharmaceutical Holding Company, Ltd. | MyoKardia, Inc. | |

We believe that the compensation practices of our approved peer group provided us with appropriate compensation data for evaluating the competitiveness of the compensation of our named executive officers during 2021.

Notwithstanding any potential similarities with the approved peer group, due to the nature of our business, we compete for executive talent with many public companies that are larger and more established than we are or that possess greater resources than we do, and with smaller private companies that may be able to offer greater equity compensation potential. In 2021, our compensation committee generally targeted both the annual cash compensation opportunities and the annual long-term incentive compensation opportunities for our named executive officers to fall between the 50th percentile and the 75th percentile, respectively, of our approved peer group, with the compensation committee using its own experience and judgment, including a consideration of market factors provided by our independent compensation consultant, the experience level of the executive and the executive's performance against established Company goals, in determining where each executive officer's 2021 base salary, short-term cash incentive plan and long-term incentive compensation opportunities should fall within this range.

**2022 Peer Group**

In early 2022, the compensation committee, with support from its independent compensation consultant, conducted an executive compensation analysis to help determine whether the peer group was still appropriate given the Company's lower market capitalization. The purpose of this peer group analysis was to ensure that the Company is using the appropriate comparator group and third-party data sources for our annual assessment of executive compensation. For 2022, following an extensive review by Compensia, the compensation committee determined that the peer group should be changed from what was adopted in 2021 to reflect the Company's current size, scope and characteristics of our business. The companies below compose the peer group for our February 2022 equity grants.

| | |
|---|---|
| Alector, Inc. | Kiniksa Pharmaceuticals, Ltd. |
| AnaptysBio, Inc. | Magenta Therapeutics, Inc. |
| Cogent Biosciences, Inc. | NextCure, Inc. |
| Cortexyme, Inc. | Outlook Therapeutics, Inc. |
| CytomX Therapeutics, Inc. | Pliant Therapeutics, Inc. |
| Enanta Pharmaceuticals, Inc. | Prometheus Biosciences, Inc. |
| Evelo Biosciences, Inc. | REGENXBIO Inc. |
| Fulcrum Therapeutics, Inc. | Rubius Therapeutics, Inc. |
| Immunovant, Inc. | Tricida, Inc. |
| Jounce Therapeutics, Inc. | Verastem, Inc. |

## 2021 EXECUTIVE COMPENSATION PROGRAM IN DETAIL

**2021 Base Salary**

We provide base salaries to our named executive officers to compensate them with a fair and competitive base level of compensation for services rendered during the year.

Effective January 1, 2021, our compensation committee approved base salary adjustments for each of our then-serving named executive officers to better align their salaries with the market. The table below sets forth the adjustments to base salary for each of our named executive officers:

| Name | 2020 Base Salary ($) | 2021 Base Salary ($) | % Increase over 2020 |
|---|---|---|---|
| Robert Alexander, Ph.D. | 710,000 | 745,000 | 4.9% |
| Baird Radford (1) | — | 464,000 | —% |
| Adam Tomasi, Ph.D. | 625,000 | 656,000 | 5.0% |
| Mark Asbury | 460,000 | 483,000 | 5.0% |

(1)   Mr. Radford was neither an employee nor a named executive officer of the Company in 2020.

**2021 Annual At-Risk Cash Incentive Program**

The Compensation Committee has historically met around November of each year to review the achievement of that year's goals and develop the goals for the upcoming year. The 2021 annual cash incentive plan provided our named executive officers the opportunity to earn a performance-based annual cash bonus. Actual bonus payouts depend on the achievement of pre-defined goals and can range from 0% to 150% of target award amounts. Each named executive officers has a target bonus opportunity, defined as a percentage of their annual base salary, that is based on peer group data and is considered in the determination of the amount of bonus payable, if any, to each individual. The final bonus payment of each named executive officer for 2021 was determined by our board of directors based on an objective review of performance in November 2021.

*2021 Goals and Results*

For 2021, our board of directors pre-defined the following strategic goals, which we believe drive long-term stockholder value and were intended to be reasonably challenging to achieve:

| 2021 Goal | Weighting | Assessment Results / Achievements | Payout |
|---|---|---|---|
| Clinical and pipeline development milestones | 65% | All required milestones were met within the timeframe allotted | 65% |
| Manufacturing initiatives | 20% | All manufacturing initiatives were completed within the timeframe allotted after considering allowances for items subject to COVID-related supply chain issues | 20% |
| Human capital and governance | 15% | Maintained employee engagement levels as measured by our employee engagement survey; Achieved other strategic and operational goals within the timeframe allotted | 15% |
| **Total** | **100%** | | **100%** |

Based on this evaluation by our board of directors, in November 2021, all of the pre-defined goals were met and cash incentive bonuses for our named executive officers for 2021 were determined to be paid at 100% of target levels.

27

*2021 Annual Cash Incentive Award Payouts*

The cash incentive bonus targets as a percentage of base salary for 2021 are listed in the table below. The bonus targets did not change from 2020 to 2021. The 2021 target cash incentive bonus amounts in dollars, the actual cash incentive bonus amounts paid to our named executive officers with respect to 2021 and the actual 2021 cash incentive bonus amounts paid as a percentage of the 2021 bonus targets are set forth in the table below.

| Name | 2021 Target Award Opportunity (% of 2021 Base Salary) | 2021 Target Cash Incentive Award Opportunity ($) | 2021 Cash Incentive Award Payment ($) | 2021 Actual Cash Incentive Award Payment (% of 2021 Target Cash Incentive Award Opportunity) |
| --- | --- | --- | --- | --- |
| Robert Alexander, Ph.D. | 85% | 633,250 | 633,000 | 100% |
| Baird Radford (1) | 45% | 208,800 | 146,000 | 100% |
| Adam Tomasi, Ph.D. | 60% | 393,600 | 394,000 | 100% |
| Mark Asbury | 45% | 217,350 | 217,000 | 100% |

(1)    The 2021 Cash Incentive Award Payment to Mr. Radford reflects the prorated amount for his partial year of service as an employee during 2021.

**Long-Term Equity Incentive Compensation Program**

Our long-term at-risk incentive compensation program is designed to:

- benchmark against peer group data;

- establish overall compensation for named executive officers such that a majority of total compensation is at-risk;

- reward demonstrated leadership and performance;

- align our named executive officers' interests with those of our stockholders;

- retain our named executive officers through the term of the awards;

- maintain competitive levels of executive compensation; and

- motivate our named executive officers for outstanding future performance.

The market for qualified and talented executives in the biopharmaceutical industry is highly competitive and we compete for talent with many companies that have greater resources than we do. Accordingly, we believe equity compensation is a crucial component of any competitive executive compensation package we offer.

28

*2021 Annual Equity Grants*

On December 1, 2021, our compensation committee approved the annual long term incentive grant to our named executive officers. The Compensation Committee considers a mix of equity vehicles when granting long-term incentives, and for 2021 approved target long-term equity incentives based on a mix of PSUs and RSUs depending on the role of the named executive officer as follows:

Awards for Robert Alexander, Ph.D. and Adam Tomasi, Ph.D.

On December 1, 2021, in an effort to respond to stockholder feedback and focus equity grants on metrics that will deliver long-term value creation for our stockholders, the Compensation Committee introduced a performance-based equity awards for Drs. Alexander and Tomasi as part of their overall annual equity grant. The table below shows the target annual long-term incentive award values granted for fiscal 2021:

| Name | 2021 PSUs | | | | 2021 RSUs | | Total Target Award Value ($) |
| | Subject to Three (3) Successful Trials* | | Subject to Submission of a Biologics License Application ("BLA") | | | | |
| | # of Units | Grant Date $ Value | # of Units | Grant Date $ Value | # of Units | Grant Date $ Value | |
|---|---|---|---|---|---|---|---|
| Robert Alexander, Ph.D. | 51,680 | $ 4,113,728 | 17,227 | $ 1,371,269 | 51,681 | $ 4,113,808 | $ 9,598,805 |
| Adam Tomasi, Ph.D. | 33,363 | $ 2,655,695 | 11,121 | $ 885,232 | 33,362 | $ 2,655,615 | $ 6,196,542 |

Award amounts for PSUs and RSUs were determined based on the closing price of our common stock on the date of grant on December 1, 2021, which was $79.60.

\* The number of PSUs that will ultimately vest, if any, is dependent on the achievement of the following pre-defined milestones:

(1)    the successful completion of the ENIGMA 2 Phase 3 study for patients with eosinophilic gastritis ("EG") and/or eosinophilic duodenitis ("EoD");

(2)    the successful completion of the KRYPTOS Phase 2/3 study for patients with eosinophilic esophagitis ("EoE");

(3)    the successful completion of the EoDyssey Phase 3 study for patients with EoD; and

(4)    the successful submission of a BLA.

Subsequent to the date of these equity grants, in December 2021, we announced that both our ENIGMA 2 study and our KRYPTOS study failed to meet their patient-reported symptomatic co-primary endpoints with the EoDyssey Phase 3 trial and potential BLA submission still outstanding. As a result, the maximum number of PSUs held by Drs. Alexander and Tomasi that can currently vest is 34,454 and 22,242, respectively.

The above-described RSUs are granted under our 2018 EIP and vest over four years, with 25% of the RSUs vesting on the first anniversary of the date of grant and the remainder vesting and in one-sixteenth increments each three-month period thereafter so long as the named executive officer remains employed by us through each applicable vesting date.

29

Awards for Baird Radford and Mark Asbury

On December 1, 2021, the Compensation Committee granted long-term equity awards to Mr. Radford and Mr. Asbury using 100% time-based RSUs. The table below shows the target annual long-term incentive award values granted for fiscal 2021:

| Name | Time-based Restricted Stock Awards ("RSUs") | |
| | # of Units | Grant Date $ Value |
| --- | --- | --- |
| Baird Radford | 24,255 | $ 1,930,698 |
| Mark Asbury | 26,003 | $ 2,069,839 |

These RSUs are granted under our 2018 EIP and vest over four years, with 25% of the RSUs vesting on the first anniversary of the date of grant and the remainder vesting and in one-sixteenth increments each three-month period thereafter so long as the named executive officer remains employed by us through each applicable vesting date.

One-Time, New-Hire Equity Awards for Mr. Radford

Upon commencement of his employment on April 19, 2021 (the "Commencement Date"), Mr. Radford was granted an option to purchase up to 27,600 shares of common stock of the Company (the "Stock Options"). The Stock Options will vest as to 25% of the underlying shares on the first anniversary of the Commencement Date and as to an additional 2.0833% of the shares at the end of each successive month following the first anniversary of the Commencement Date until the fourth anniversary of such date. The stock options have an exercise price per share equal to $105.16, the closing market price of the Company's common stock on the Commencement Date. Additionally, Mr. Radford was also granted 17,100 RSUs. The RSUs will vest as to 25% of the underlying shares on or about the first anniversary of the Commencement Date and as to an additional 6.25% of the shares every three-month anniversary of such date thereafter.

*2022 Annual Equity Grants*

For 2022, the Compensation Committee approved target long-term equity incentives based on a mix of 50% PSUs and 50% RSUs for all of the named executive officers. The table below shows the target annual long-term incentive award values granted for fiscal 2022:

| Name | 2022 PSUs* | | 2022 RSUs | | Total Target Award Value ($) |
| | # of Units | Grant Date $ Value | # of Units | Grant Date $ Value | |
| --- | --- | --- | --- | --- | --- |
| Robert Alexander, Ph.D. | 529,323 | $ 2,953,622 | 529,323 | $ 2,953,622 | $ 5,907,245 |
| Baird Radford | 237,608 | $ 1,325,853 | 237,608 | $ 1,325,853 | 2,651,705 |
| Adam Tomasi, Ph.D. | 344,060 | $ 1,919,855 | 344,060 | $ 1,919,855 | 3,839,710 |
| Mark Asbury | 140,490 | $ 783,934 | 140,490 | $ 783,934 | 1,567,868 |

Award amounts for PSUs and RSUs were determined based on the closing price of our common stock on the date of grant on February 25, 2022, which was $5.58.

*100% of each named executive officers PSUs shall vest, if ever, upon the achievement of a development milestone as pre-determined by the board of directors, so long as the named executive officer remains employed by us through each applicable vesting date.

RSUs vest 25% on March 1, 2023, and the remainder of the RSUs vest in 12 equal installments on each three-month anniversary thereafter, so long as the named executive officer remains employed by us through each applicable vesting date.

30

**OTHER COMPENSATION PRACTICES, POLICIES & GUIDELINES**

**Benefits and Other Compensation**

Other compensation to our executives consists primarily of the broad-based benefits we provide to all full-time employees, including medical, dental and vision insurance, medical and dependent care flexible spending accounts, group life and disability insurance, an employee stock purchase plan and a 401(k) plan. Named executive officers are eligible to participate in all our employee benefit plans, in each case on the same basis as other employees. Pursuant to our 2018 Employee Stock Purchase Plan (the "2018 ESPP"), employees, including our named executive officers, have an opportunity to purchase our common stock at a discount on a tax-qualified basis through payroll deductions. The 2018 ESPP is designed to qualify as an "employee stock purchase plan" under Section 423 of the Internal Revenue Code (the "Code"). The purpose of the 2018 ESPP is to encourage our employees, including our named executive officers, to become our stockholders and better align their interests with those of our other stockholders.

Our tax-qualified 401(k) plan provides eligible employees with an opportunity to save for retirement on a tax-advantaged basis. All participants' interests in their contributions are 100% vested when contributed. Pre-tax contributions are allocated to each participant's individual account and are then invested in selected investment alternatives according to each participant's directions. The retirement plan is intended to qualify under Section 401(a) of the Code. All eligible and participating employees receive a 401(k) match of 100% on pre-tax contributions, up to the first 3% of eligible compensation, and an additional match of 50% on incremental pre-tax contributions, up to 5% of eligible compensation.

Currently, we do not view perquisites or other personal benefits as a significant component of our executive compensation program. Accordingly, we do not provide perquisites to our named executive officers, except in situations where we believe it is appropriate to assist an individual in the performance of his or her duties, to make them more efficient and effective, and for recruitment and retention purposes. In the future, we may provide perquisites or other personal benefits in limited circumstances, such as where we believe it is appropriate to assist an individual named executive officer in the performance of his or her duties, to make him or her more efficient and effective, and for recruitment, motivation or retention purposes.

We do not offer any defined benefit pension plans or nonqualified defined compensation arrangements for our employees, including our named executive officers.

**Severance and Change in Control Benefits**

Each named executive is entitled to receive severance benefits under the terms of his amended offer letter, in the case of Drs. Alexander and Tomasi, or under our Change in Control and Severance Policy, in the case of each of our other named executive officers, upon either termination by us without cause or a resignation by the named executive officer for good reason. We provide these severance benefits in order to provide an overall compensation package that is competitive with that offered by the companies with whom we compete for executive talent. Additionally, severance benefits allow our executives to focus on our objectives without concern for their employment security in the event of a termination.

The severance benefits provided upon a qualifying termination of a named executive officer's employment in connection with a change in control are higher than severance benefits provided under other qualifying termination events, which is consistent with market practice. The compensation committee approved these enhanced severance and change in control benefits because it considers maintaining a stable and effective management team to be important to protecting and enhancing the best interests of the Company and its stockholders. To that end, the compensation committee recognizes that the possibility of a change in control may exist from time to time, and that this possibility, and the uncertainty and questions it may raise among management, could result in the departure or distraction of management to the detriment of the Company and its stockholders. Accordingly, the enhanced severance benefits have been put in place to encourage the attention, dedication and continuity of members of our management team to their assigned duties without the distraction that may arise from the possibility or occurrence of a change in control and concern for their employment security in the event of a termination. The compensation committee took into account the same factors in agreeing to a provision providing for the single trigger vesting upon

31

Table of Contents

a change in control of all then outstanding equity awards held by each of Drs. Alexander and Tomasi and Mr. Asbury in their offer letters, and also in agreeing to provide a gross up payment for excise taxes that Drs. Alexander and Tomasi may incur upon a change in control under Sections 280G and 4999 of the Code under certain circumstances in their offer letters. In each case, the compensation committee determined that providing the single trigger vesting and the excise tax gross up was critical in persuading the named executive officer to join us.

32

**EXECUTIVE OFFICER AND DIRECTOR COMPENSATION**

## Executive Officer Compensation

*Summary Compensation Table*

The following table sets forth the total compensation awarded to, earned by and paid during the fiscal years ended December 31, 2021, 2020 and 2019 for each of our named executive officers.

| Name and Principal Position | Year | Salary ($) | Option Awards ($)(1) | Stock Awards ($)(1) | Non-Equity Incentive Plan Compensation ($)(2) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|
| Robert Alexander, Ph.D | 2021 | 745,000 | — | 9,598,805 | 633,000 | 11,672 | 10,988,477 |
| *Chief Executive Officer* | 2020 | 710,000 | — | 12,795,968 | 724,200 | 11,472 | 14,241,640 |
| | 2019 | 600,000 | — | 11,552,000 | 396,000 | 11,272 | 12,559,272 |
| Baird Radford (4) | 2021 | 326,909 | 1,805,316 | 3,728,934 | 146,000 | 11,654 | 6,018,813 |
| *Chief Financial Officer* | | | | | | | |
| Adam Tomasi, Ph.D | 2021 | 656,000 | — | 6,196,542 | 394,000 | 11,672 | 7,258,214 |
| *President and Chief Operating* | 2020 | 625,000 | — | 8,260,555 | 450,001 | 11,472 | 8,722,028 |
| *Officer* | 2019 | 500,000 | — | 7,457,500 | 270,000 | 11,272 | 8,238,772 |
| Mark Asbury | 2021 | 483,000 | — | 2,069,839 | 217,000 | 1,686 | 2,771,525 |
| *Chief Legal Officer and General* | 2020 | 460,000 | — | 3,409,452 | 248,401 | 11,472 | 4,129,325 |
| *Counsel* | 2019 | 380,000 | 1,013,096 | 3,078,000 | 182,400 | 11,272 | 4,664,768 |

(1) The amounts disclosed represent the aggregate grant date fair value of stock option, RSU and PSU awards as calculated in accordance with the provisions of ASC 718. The assumptions used in calculating the grant date fair value of the award disclosed in this column are set forth in the notes to our audited financial statements.

(2) All bonus payments were made by the board of directors based on objective measures the performance of the company, as a whole, and each of the named executive officers, as individuals, against predefined short-term corporate objectives established for the period being evaluated as described under the heading "*2021 Annual At-Risk Cash Incentive Program*" above.

(3) The amounts reported in this column primarily reflect the dollar value of employer 401(k) matching contributions paid to each participating named officer.

(4) Mr. Radford's employment commenced on April 19, 2021. The 2021 salary and bonus payments to Mr. Radford reflect the prorated amounts for his partial year of service as an employee during 2021.

33

*Grants of Plan-Based Awards*

The following table shows information regarding grants of plan-based awards during the fiscal year ended December 31, 2021 to the Company's named executive officers.

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards (1) | | | Performance-based Restricted Stock Unit Awards (# Shares) (2) | All other Stock Awards (# Shares) (3) | Option Awards (# Shares) (4) | Exercise or Base Price of Stock and Option Awards ($/share) | Grant Date Fair Value of Stock and Option Awards ($) (5) |
| | | Threshold ($) | Target ($) | Maximum ($) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Robert Alexander, Ph.D. | 12/1/2021 | | | | 68,907 | 51,681 | | | 9,598,805 |
| | Cash Incentive | — | 633,250 | 949,875 | | | | | |
| Baird Radford | 12/1/2021 | | | | — | 24,255 | | | 1,930,698 |
| | 4/19/2021 | | | | — | 17,100 | | | 1,798,236 |
| | 4/19/2021 | | | | | | 27,000 | 105.16 | 1,805,316 |
| | Cash Incentive | — | 208,800 | 313,200 | | | | | |
| Adam Tomasi, Ph.D. | 12/1/2021 | | | | 44,484 | 33,362 | | | 6,196,542 |
| | Cash Incentive | — | 393,600 | 590,400 | | | | | |
| Mark Asbury | 12/1/2021 | | | | — | 26,003 | | | 2,069,839 |
| | Cash Incentive | — | 217,350 | 326,025 | | | | | |

(1)    Actual amounts paid under our annual bonus program were based on our Compensation Committee and Board of Director's review and evaluation of corporate performance in November 2021 and are included in the "Non-Equity Incentive Plan Compensation" column of the Summary Compensation Table.

(2)    PSUs subject to performance-based vesting criteria established by the board of directors or compensation committee and described in the footnotes to the Outstanding Equity Awards at Fiscal Year-End table below.

(2)    RSUs subject to service-based vesting criteria established by the board of directors or compensation committee and described in the footnotes to the Outstanding Equity Awards at Fiscal Year-End table below.

(4)    Option awards subject to service-based vesting criteria established by the board of directors or compensation committee and described in the footnotes to the Outstanding Equity Awards at Fiscal Year-End table below. The exercise price per share of each option granted was equal to the closing market price of our common stock on the grant date or the closing market price on the day before the grant date if the grant date is not on a business day.

(5)    Amounts represent the grant date fair value of the named executive officer's RSUs and PSUs, calculated in accordance with ASC 718. The assumptions used in calculating the grant date fair value of the award disclosed in this column are set forth in the notes to our audited financial statements.

34

### Outstanding Equity Awards at Fiscal Year-End

The following table presents information regarding all outstanding equity awards held by each of our named executive officers as of December 31, 2021.

| | | Option Awards | | | | Stock Awards | | Equity Incentive Plan Awards | |
| | | Number of Securities Underlying Unexercised Options | | | | | | | |
| Name | Grant Date (1) | Exercisable (#) | Unexercisable (#) | Option Exercise Price ($)(2) | Option Expiration Date | Number of Shares or Units of Stock Not Vested (#) | Market Value of Shares or Units of Stock Not Vested ($) | Number of Unearned Shares, Units or Other Rights Not Vested (#) | Market Value of Unearned Shares, Units or Other Rights Not Vested ($) |
|---|---|---|---|---|---|---|---|---|---|
| Robert Alexander, Ph.D. | 12/1/2021 | | | | | 51,681 (3) | 505,957 | 68,907 (4) | 674,600 |
| | 12/1/2020 | | | | | 91,200 (5) | 892,848 | | |
| | 11/29/2019 | | | | | 60,800 (6) | 595,232 | | |
| | 10/9/2018 | 197,916 (7) | 52,084 | 35.28 | 10/9/2028 | | | | |
| | 5/15/2018 | 274,126 (8) | 32,834 | 4.31 | 5/15/2028 | | | | |
| | 1/27/2018 | 290,022 (9) | — | 4.01 | 1/27/2028 | | | | |
| | 5/17/2017 | 912,500 (10) | — | 0.69 | 5/7/2027 | | | | |
| Baird Radford | 12/1/2021 | | | | | 24,255 (11) | 237,456 | | |
| | 4/19/2021 | — (12) | 27,600 | 105.16 | 4/19/2031 | 17,100 (13) | 167,409 | | |
| Adam Tomasi, Ph.D. | 12/1/2021 | | | | | 33,362 (14) | 326,614 | 44,484 (15) | 435,498 |
| | 12/1/2020 | | | | | 58,875 (16) | 576,386 | | |
| | 11/29/2019 | | | | | 39,250 (17) | 384,258 | | |
| | 10/9/2018 | 98,958 (18) | 26,042 | 35.28 | 10/9/2028 | | | | |
| | 5/15/2018 | 71,619 (19) | 16,417 | 4.31 | 5/15/2028 | | | | |
| | 1/27/2018 | 145,011 (20) | — | 4.01 | 1/27/2028 | | | | |
| | 5/17/2017 | 486,400 (21) | — | 0.69 | 5/7/2027 | | | | |
| Mark Asbury | 12/1/2021 | | | | | 26,003 (22) | 254,569 | | |
| | 12/1/2020 | | | | | 24,300 (23) | 237,897 | | |
| | 11/29/2019 | | | | | 16,200 (24) | 158,598 | | |
| | 4/26/2019 | 26,606 (25) | 13,304 | 40.62 | 4/26/2029 | | | | |
| | 11/7/2018 | 92,500 (26) | 27,500 | 57.30 | 11/7/2028 | | | | |

(1) The outstanding options to purchase shares of our common stock, RSUs and PSUs were granted pursuant to the 2018 EIP and 2012 EIP (as defined below). These awards are subject to vesting acceleration under certain circumstances as described under "*Potential Payments upon Termination or Change in Control*" and "*Agreements with Named Executive Officers*" below.

(2) The exercise price of each stock option is equal to the fair market value of a share of our common stock on the date of grant. Prior to our initial public offering on July 19, 2018, the fair market value of a share of our common stock on the date of grant was determined by our board of directors. Since our initial public offering on July 19, 2018, the fair market value of a share of our common stock equals the closing price of our common stock on the Nasdaq Global Market on the date of grant.

(3) The RSU award vests as to one-fourth of the shares on December 1, 2022, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Dr. Alexander continuing as a service provider through each such date.

(4) The PSU awards will be awarded upon vesting at the end of the performance periods, if specific performance goals set by the Compensation Committee of the Board of Directors are achieved. No PSUs will vest if the

35

performance goals are not met. Subsequent to the date of these PSU grants, in December 2021, we announced that both our ENIGMA 2 study and our KRYPTOS study failed to meet their patient-reported symptomatic co-primary endpoints. As a result, the maximum amount of at-risk PSUs that Dr. Alexander can currently achieve is 34,454, if any.

(5)   The RSU award vests as to one-fourth of the shares on December 1, 2021, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Dr. Alexander continuing as a service provider through each such date.

(6)   The RSU award vests as to one-fourth of the shares on December 1, 2020, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Dr. Alexander continuing as a service provider through each such date.

(7)   The option award vests as to one-fourth of the shares on October 9, 2019, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Dr. Alexander continuing as a service provider through each such date.

(8)   The option award vests as to one-fourth of the shares on May 15, 2019, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Dr. Alexander continuing as a service provider through each such date.

(9)   The option award vested as to one-fourth of the shares on April 1, 2018, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Dr. Alexander continuing as a service provider through each such date.

(10)   The option award is subject to an early exercise provision and is immediately exercisable. On May 10, 2018, Dr. Alexander partially exercised the option award with respect to 353,200 shares. The shares underlying the option award vested as to one-fourth of the total shares on April 3, 2018 and vested and continue to vest, subject to Dr. Alexander's continued role as a service provider to us, as to an additional one forty-eighth of the total shares on the same day of each month thereafter.

(11)   The RSU award vests as to one-fourth of the shares on December 1, 2022, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Mr. Radford continuing as a service provider through each such date.

(12)   The option award vests as to one-fourth of the shares on April 19, 2022, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Mr. Radford continuing as a service provider through each such date.

(13)   The RSU award vests as to one-fourth of the shares on June 1, 2022, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Mr. Radford continuing as a service provider through each such date.

(14)   The RSU award vests as to one-fourth of the shares on December 1, 2022, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Dr. Tomasi continuing as a service provider through each such date. The RSU award vests as to one-fourth of the shares on December 1, 2021, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Dr. Tomasi continuing as a service provider through each such date.

(15)   The PSU awards will be awarded upon vesting at the end of the performance periods, if specific performance goals set by the Compensation Committee of the Board of Directors are achieved. No PSUs will vest if the performance goals are not met. Subsequent to the date of these PSU grants, in December 2021, we announced that both our ENIGMA 2 study and our KRYPTOS study failed to meet their patient-reported symptomatic co-primary endpoints. As a result, the maximum amount of at-risk PSUs that Dr. Tomasi can currently achieve is 22,242, if any.

(16)   The RSU award vests as to one-fourth of the shares on December 1, 2020, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Dr. Tomasi continuing as a service provider through each such date.

(17)   The option award vests as to one-fourth of the shares on October 9, 2019, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Dr. Tomasi continuing as a service provider through each such date.

(18)   The option award vests as to one-fourth of the shares on May 15, 2019, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Dr. Tomasi continuing as a service provider through each such date.

36

(19)  The option award vested as to one-fourth of the shares on April 1, 2018, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Dr. Tomasi continuing as a service provider through each such date.

(20)  The option award is subject to an early exercise provision and is immediately exercisable. The shares underlying the option award vested as to one-fourth of the total shares on April 3, 2018 and vested and continue to vest, subject to Dr. Tomasi's continued role as a service provider to us, as to an additional one forty-eighth of the total shares on the same day of each month thereafter.

(21)  The RSU award vests as to one-fourth of the shares on December 1, 2022, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Mr. Asbury continuing as a service provider through each such date.

(22)  The RSU award vests as to one-fourth of the shares on December 1, 2021, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Mr. Asbury continuing as a service provider through each such date.

(23)  The RSU award vests as to one-fourth of the shares on December 1, 2020, and one-sixteenth of the shares subject to the award vesting each three-month period thereafter, subject to Mr. Asbury continuing as a service provider through each such date.

(24)  The option award vests as to one-fourth of the shares on April 26, 2020, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Mr. Asbury continuing as a service provider through each such date.

(25)  The option award vests as to one-fourth of the shares on November 7, 2019, and one forty-eighth of the shares subject to the option award vest each month thereafter, subject to Mr. Asbury continuing as a service provider through each such date.

## *Option Exercises and Stock Vested for Fiscal 2021*

The following table presents information regarding the value of equity awards realized by each of our named executive officers during 2021.

| Name | Option Awards | | Stock Awards | |
| --- | --- | --- | --- | --- |
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| Robert Alexander, Ph.D. | 147,100 | 15,592,274 | 60,800 | 5,351,008 |
| Baird Radford | — | — | — | — |
| Adam Tomasi, Ph.D. | 284,148 | 28,417,284 | 39,250 | 3,454,376 |
| Mark Asbury | — | — | 16,200 | 1,425,762 |

## Equity Incentive Plans

Our 2012 Equity Incentive Plan (the "2012 EIP") permitted the grant of incentive stock options to our employees and our subsidiary corporations' employees, and the grant of nonstatutory stock options, stock appreciation rights, restricted stock and restricted stock units to our employees, directors and consultants and our subsidiary corporations' employees and consultants. The 2012 EIP terminated in connection with our initial public offering in July 2018 but continues to govern outstanding awards granted thereunder.

Our 2018 Equity Incentive Plan (the "2018 EIP") provides for the grant of incentive stock options to our employees and any of our subsidiary corporations' employees, and for the grant of nonstatutory stock options, restricted stock, restricted stock units, stock appreciation rights, performance units and performance shares to our employees, directors and consultants and our subsidiary corporations' employees and consultants. Our compensation committee (or our board of directors acting as the committee under the 2018 EIP) makes all determinations deemed necessary or advisable for administering the 2018 EIP, including but not limited to, selecting the service providers to whom awards may be granted, determining the number of shares covered by each award, approving forms of award agreements for use under the 2018 EIP, determining the terms and conditions of awards (including, but not limited to, the exercise price, the time or times at which awards may be exercised, any vesting acceleration or waiver or forfeiture restrictions and any restriction or limitation regarding any award or the shares relating thereto).

*Potential Payments upon Termination or Change in Control*

Our 2018 EIP provides that in the event of a merger or change in control, as defined under our 2018 EIP, each outstanding award will be treated as the compensation committee determines, without requiring a participant's consent. The compensation committee is not required to treat all awards, all awards held by a participant or all awards of the same type, similarly.

If a successor corporation does not assume or substitute for any outstanding award, then the participant will fully vest in and have the right to exercise all of his or her outstanding options and stock appreciation rights, all restrictions on restricted stock and restricted stock units will lapse, and for awards with performance-based vesting, all performance goals or other vesting criteria will be deemed achieved at 100% of target levels and all other terms and conditions met. If an option or stock appreciation right is not assumed or substituted in the event of a change in control, the compensation committee will notify the participant in writing or electronically that such option or stock appreciation right will be exercisable for a period of time determined by the compensation committee in its sole discretion and the option or stock appreciation right will terminate upon the expiration of such period.

Our 2012 EIP provides that in the event of a merger or change in control, as defined under the 2012 EIP, each outstanding award will be treated as the compensation committee determines. If a successor corporation or its parent or subsidiary does not assume or substitute an equivalent award for any outstanding award, then such award will fully vest, all restrictions on the shares subject to such award will lapse, all performance goals or other vesting criteria applicable to the shares subject to such award will be deemed achieved at 100% of target levels and all of the shares subject to such award will become fully exercisable, if applicable, for a specified period prior to the transaction. The award will then terminate upon the expiration of the specified period of time. If an option or stock appreciation right is not assumed or substituted in the event of a merger or change in control, the compensation committee will notify the applicable participant in writing or electronically that the award will be exercisable for a period of time determined by the compensation committee, and the option or stock appreciation right will terminate upon the expiration of such period.

## Agreements with Named Executive Officers

*Offer Letters*

On July 6, 2018 we entered into an amended offer letter with each of Drs. Alexander and Tomasi, on November 7, 2018, we entered into an offer letter with Mr. Asbury and on April 15, 2021, we entered into an offer letter with Mr. Radford. The officers are employed "at will" so may be terminated by us or the executive officer at any time. The severance and change in control and severance protections available to each of our named executive officers are described in detail below.

## Change in Control and Severance Policy

We adopted a Change in Control and Severance Policy (the "severance policy") for Mr. Asbury and Mr. Radford and certain other of our key employees (other than Drs. Alexander and Tomasi whose agreements are described further below).

Under the severance policy, if we terminate Mr. Asbury or Mr. Radford other than for "cause," death or "disability" or they resign for "good reason", in each case, during the period beginning upon a "change in control", such terms as defined in the severance policy, and ending 24 months following the change in control, such period referred to as the "change in control period", they will be eligible to receive the following severance benefits (less applicable tax withholdings): (i) a lump sum cash amount equal to 12 months of their then-current annual base salary (or if they resign for good reason based on a material reduction in base salary, then their annual base salary in effect immediately prior to such reduction) or if greater, at the level in effect immediately before the change in control, (ii) a lump sum cash amount equal to 100% of their then-current target annual bonus opportunity, (iii) 100% of their then outstanding and unvested equity awards will become fully vested and exercisable, if applicable, and any applicable performance goals will be deemed achieved at 100% of target levels, and (iv) payment or reimbursement of continued health coverage for them and their dependents under COBRA for a period of up to 12 months, or a taxable lump sum payment in lieu of such payment or reimbursement, as applicable.

38

Further, under the severance policy, if Mr. Asbury or Mr. Radford is terminated other than for cause, death or disability outside the change in control period, they will be eligible to receive the following severance benefits (less applicable tax withholding): (i) a lump sum cash amount equal to 9 months of their then-current annual base salary, (ii) a lump sum cash amount equal to a pro rata portion of their then-current target annual bonus opportunity and (iii) payment or reimbursement of continued health coverage for them and their dependents for a period of up to 9 months, or a taxable lump sum payment in lieu of such payment or reimbursement, as applicable.

To receive any severance benefits under the severance policy, they must sign and not revoke our standard separation agreement and release of claims within the timeframe set forth in the severance policy.

If any of the payments provided for under the severance policy or otherwise payable to Mr. Asbury or Mr. Radford would constitute "parachute payments" within the meaning of Section 280G of the Code and would be subject to the related excise tax under Section 4999 of the Code, then they will be entitled to receive either full payment of benefits or such lesser amount which would result in no portion of the benefits being subject to the excise tax, whichever results in the greater amount of after-tax benefits to Mr. Asbury or Mr. Radford. The severance policy does not require us to provide any tax gross-up payments to Mr. Asbury, Mr. Radford or any other participant in the severance policy.

In addition to Mr. Asbury's and Mr. Radford's participation in the severance policy, pursuant to their respective offer letters, 100% of the total number of shares subject to Mr. Asbury's and Mr. Radford's stock options or other stock awards will immediately vest as of the date immediately preceding the change in control, subject to Mr. Asbury's and Mr. Radford's continued employment through such date.

Drs. Alexander and Tomasi are not eligible to participate in the severance policy and are only eligible to receive potential termination or change in control payments and benefits pursuant to their amended offer letters dated July 6, 2018.

### *Agreements with Drs. Alexander and Tomasi – Change in Control and Severance Provisions*

Dr. Alexander's and Dr. Tomasi's amended offer letters with us provide that in the event that:

- a "change in control", as defined in Dr. Alexander's and Dr. Tomasi's amended offer letters, occurs, 100% of the total number of shares subject to Dr. Alexander's and Dr. Tomasi's company options or other stock awards will immediately vest as of the date immediately preceding the change in control, subject to his continued employment through such date;

- during the period commencing 3 months before a change in control and ending upon a change in control, such period referred to as the pre-change in control period, Dr. Alexander's or Dr. Tomasi's employment is terminated (i) by us without cause, (ii) due to his death or disability or (iii) by him for good reason, then 100% of the total number of shares subject to his company options or other stock awards that have not vested will immediately vest and become exercisable; and

- Dr. Alexander's or Dr. Tomasi's employment is terminated by us without cause (and other than due to his death or disability) or by him for good reason, in either case, outside the pre-change in control period, then the total number of shares subject to his company options or other stock awards that have not vested but would have vested if he had remained employed on the first anniversary of the date of his termination will immediately vest and become exercisable.

To receive the vesting acceleration benefits above that require a qualifying termination of Dr. Alexander's or Dr. Tomasi's employment, he must timely sign and not revoke a separation agreement and release of claims in our favor.

Dr. Alexander's and Dr. Tomasi's amended offer letters provide that his existing company stock options and any future company stock options granted to him by us that are vested and outstanding on the date of termination will continue to be exercisable for a period of 24 months (or such longer period as provided in the company equity plan under which the applicable option was granted) after the earlier of: his termination of employment due to his death or "disability", as defined in the applicable company equity plan, or his termination of employment by us other than for "cause", death or "disability" or by him for "good reason", each such term as defined in Dr. Alexander's and Dr.

<div align="center">39</div>

Tomasi's amended offer letter, subject to earlier termination under the terms of the applicable company equity plan, except no company option of his will be exercisable after its expiration date.

Under Dr. Alexander's and Dr. Tomasi's amended offer letters, if we terminate his employment other than for cause, death or disability or he resigns for good reason, in each case, during the period beginning upon a change in control and ending 24 months after the change in control, such period referred to as the post-change in control period, he will be eligible to receive the following severance benefits (less applicable tax withholdings): (i) a lump sum cash amount equal to 24 months of his then-current annual base salary, (ii) a lump sum cash amount equal to 200% of his then-current target annual bonus opportunity and (iii) reimbursement of continued health coverage for him and his eligible dependents under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or COBRA, for a period of up to 24 months, or a taxable lump sum payment in lieu of such reimbursement.

Further, under Dr. Alexander's and Dr. Tomasi's amended offer letters, if his employment is terminated by us other than for cause, death or disability or by him for good reason outside the post-change in control period, he will be eligible to receive the following severance benefits (less applicable tax withholding): (i) continuation of his then-current annual base salary for 12 months following his termination date (ii) a lump sum cash amount equal to a pro rata portion of his then-current target annual bonus opportunity and (iii) reimbursement of continued health coverage for him and his eligible dependents for a period of up to 12 months, or a taxable lump sum payment in lieu of such reimbursement.

To receive any of the severance benefits described above, Dr. Alexander and Dr. Tomasi must timely sign and not revoke a separation agreement and release of claims in our favor.

Finally, Dr. Alexander's and Dr. Tomasi's amended offer letters provide that:

- if any severance or other benefits payable to Dr. Alexander or Dr. Tomasi constitute "parachute payments" within the meaning of Section 280G of the Code and could be subject to the related excise tax under Section 4999 of the Internal Revenue Code, he would be entitled to receive either full payment of benefits or such lesser amount (except such reduction will not exceed $50,000 of the full amount), whichever would result in his receipt in the greater amount of after-tax benefits; and

- if any portion of the severance or other benefits provided will be subject to the excise tax imposed by Section 4999 of the Code after applying the process in the paragraph above, he will receive a payment from us equal to the sum of (i) the amount sufficient to pay such excise tax, and (ii) the amount sufficient to pay the excise tax, employment tax, and federal and state income taxes arising from the payment described in this sentence.

### Estimated Payment and Benefits Upon Termination or Change of Control

The amount of compensation and benefits payable to each named executive officer under our current employment arrangements in various termination and change in control situations has been estimated in the tables below. The value of the equity vesting acceleration was calculated for each of the tables below based on the assumption that the change in control and the named executive officer's employment termination occurred on December 31, 2021. The per share closing price of the Company's stock on the Nasdaq Global Market as of December 31, 2021 was $9.79, which was used as the value of a share of the Company's stock in the change in control for the calculations below. The value of the option vesting acceleration was calculated by multiplying the number of shares underlying unvested options subject to vesting acceleration as of December 31, 2021, by the difference between the per share closing price of the Company's stock as of December 31, 2021, and the per share exercise price for such shares underlying unvested options. The value of restricted stock unit vesting acceleration was calculated by multiplying the number of unvested restricted stock units subject to vesting acceleration as of December 31, 2021, by the per share closing price of the Company's stock as of December 31, 2021.

40

*Robert Alexander, Ph.D.*

The following table describes the potential payments and benefits upon employment termination for Dr. Alexander, as if his employment terminated as of December 31, 2021.

| Executive Benefits and Payment upon Termination | Termination by Company without Cause or Resignation for Good Reason Not in Connection with a Change in Control ($) | Termination by Company due to Death or Disability ($) | Termination by Company without Cause or Resignation for Good Reason within 24 Months Following a Change in Control ($) |
|---|---|---|---|
| **Compensation:** | | | |
| Cash Severance Benefits (1) | 1,378,250 | — | 2,756,500 |
| Acceleration of Stock Options (2)(3) | 179,848 | 179,848 | 179,848 |
| Acceleration of RSUs (2)(3) | 721,719 | 1,994,037 | 1,994,037 |
| Acceleration of PSUs (2)(3) | — | — | 674,600 |
| Health Care Continuation (4) | 51,485 | — | 102,970 |
| **Total** | 2,331,302 | 2,173,885 | 5,707,955 |

(1) With respect to a termination by the Company without Cause or a resignation for Good Reason (a "qualifying termination") that is not within the 24 month period following a change in control (as defined in Dr. Alexander's amended offer letter), cash severance benefits include 12 months of base salary continuation payments and the pro rata portion of Dr. Alexander's target annual bonus opportunity for 2021 (which is shown as 100% of the target bonus opportunity based on a December 31, 2021 termination date). With respect to a qualifying termination within 24 months following a change in control, cash severance benefits include a lump sum cash amount equal to 24 months of Dr. Alexander's base salary, an additional lump sum cash amount equal to 200% of Dr. Alexander's target annual bonus opportunity for 2021 and the amount of the 280G excise tax gross up that would be payable by us to Dr. Alexander assuming for this purpose that a change in control occurred on December 31, 2021 and his employment terminated due to a qualifying termination on the same date.

(2) Upon a qualifying termination at any time other than during the three-month period prior to a change in control, Dr. Alexander will become vested in the total number of stock options, PSUs and RSUs that have not vested but would have vested if he had remained employed on the first anniversary of the date of his termination. In the event of a change in control or a qualifying termination during the three-month period prior to a change in control, 100% of the total number of shares subject to Dr. Alexander's stock options, PSUs and RSUs will immediately vest as of the date immediately preceding the change in control or the date of the qualifying termination, as applicable.

(3) Upon termination due to death or disability (as defined in Dr. Alexander's amended offer letter) during the three-month period prior to a change in control, 100% of the total number of shares subject to Dr. Alexander's stock options, PSUs and RSUs will immediately vest as of the date of such termination. If the termination due to death or disability does not occur within the three-month period prior to a change in control, no accelerated vesting will occur as a result of such termination and Dr. Alexander is not entitled to any other severance benefits on a termination due to death or disability.

(4) Amounts in this column reflect the cost of providing reimbursement of continued health coverage for Dr. Alexander and his eligible dependents under COBRA for 12 months following a qualifying termination if such termination is not within the 24-month period following a change in control or for 24 months following a qualifying termination if such termination is within the 24-month period following a change in control.

41

*Baird Radford*

The following table describes the potential payments and benefits upon employment termination for Mr. Radford, as if his employment terminated as of December 31, 2021.

| Executive Benefits and Payment upon Termination | Termination by Company without Cause or Resignation for Good Reason Not in Connection with a Change in Control ($) | Termination by Company without Cause or Resignation for Good Reason within 24 Months Following a Change in Control ($) |
|---|---|---|
| **Compensation:** | | |
| Cash Severance Benefits (1) | 556,800 | 672,800 |
| Acceleration of RSUs (2) | — | 404,865 |
| Health Care Continuation (3) | 38,614 | 51,485 |
| **Total** | 595,414 | 1,129,150 |

(1)  With respect to a termination by the Company without Cause or a resignation for Good Reason (a "qualifying termination") that is not within the 24 month period following a change in control (as defined in Mr. Radford's offer letter), cash severance benefits includes a lump sum payment equal to nine months of base salary payments and the pro rata portion of Mr. Radford's target annual bonus opportunity for 2021 (which is shown as 100% of the target bonus opportunity based on a December 31, 2021 termination date). With respect to a qualifying termination within 24 months following a change in control, cash severance benefits include a lump sum cash amount equal to 12 months of Mr. Radford's base salary and an additional lump sum cash amount equal to 100% of Mr. Radford's target annual bonus opportunity for 2021.

(2)  In the event of a change in control, 100% of the total number of shares subject to Mr. Radford's stock options and RSUs will immediately vest as of the date immediately preceding the change in control.

(3)  Amounts in this column reflect the cost of providing reimbursement of continued health coverage for Mr. Radford and his eligible dependents under COBRA for 9 months following a qualifying termination if such termination is not within the 24 month period following a change in control or for 12 months following a qualifying termination if such termination is within the 24 month period following a change in control.

*Adam Tomasi, Ph.D.*

The following table describes the potential payments and benefits upon employment termination for Dr. Tomasi, as if his employment terminated as of December 31, 2021.

| Executive Benefits and Payment upon Termination | Termination by Company without Cause or Resignation for Good Reason Not in Connection with a Change in Control ($) | Termination by Company due to Death or Disability ($) | Termination by Company without Cause or Resignation for Good Reason within 24 Months Following a Change in Control ($) |
|---|---|---|---|
| **Compensation:** | | | |
| Cash Severance Benefits (1) | 1,049,600 | — | 2,099,200 |
| Acceleration of Stock Options (2)(3) | 89,924 | 89,924 | 89,924 |
| Acceleration of RSUs (2)(3) | 465,906 | 1,287,258 | 1,287,258 |
| Acceleration of PSUs (2)(3) | — | — | 435,498 |
| Health Care Continuation (4) | 51,485 | — | 102,970 |
| **Total** | 1,656,915 | 1,377,182 | 4,014,850 |

(1) With respect to a termination by the Company without Cause or a resignation for Good Reason (a "qualifying termination") that is not within the 24 month period following a change in control (as defined in Dr. Tomasi's amended offer letter), cash severance benefits include 12 months of base salary continuation payments and the pro rata portion of Dr. Tomasi's target annual bonus opportunity for 2021 (which is shown as 100% of the target bonus opportunity based on a December 31, 2021 termination date). With respect to a qualifying termination within 24 months following a change in control, cash severance benefits include a lump sum cash amount equal to 24 months of Dr. Tomasi's base salary, an additional lump sum cash amount equal to 200% of Dr. Tomasi's target annual bonus opportunity for 2021 and the amount of the 280G excise tax gross up that would be payable to Dr. Tomasi assuming for this purpose that a change in control occurred on December 31, 2021 and his employment terminated due to a qualifying termination on the same date.

(2) Upon a qualifying termination at any time other than during the three-month period prior to a change in control, Dr. Tomasi will become vested in the total number of stock options, PSUs and RSUs that have not vested but would have vested if he had remained employed on the first anniversary of the date of his termination. In the event of a change in control or a qualifying termination during the three-month period prior to a change in control, 100% of the total number of shares subject to Dr. Tomasi's stock options, PSUs and RSUs will immediately vest as of the date immediately preceding the change in control or the date of the qualifying termination, as applicable.

(3) Upon termination due to death or disability (as defined in Dr. Tomasi's amended offer letter) during the three-month period prior to a change in control, 100% of the total number of shares subject to Dr. Tomasi's stock options, PSUs and RSUs will immediately vest as of the date of such termination. If the termination due to death or disability does not occur within the three-month period prior to a change in control, no accelerated vesting will occur as a result of such termination and Dr. Tomasi is not entitled to any other severance benefits on a termination due to death or disability.

(4) Amounts in this column reflect the cost of providing reimbursement of continued health coverage for Dr. Tomasi and his eligible dependents under COBRA for 12 months following a qualifying termination if such termination is not within the 24-month period following a change in control or for 24 months following a qualifying termination if such termination is within the 24-month period following a change in control.

43

*Mark Asbury*

The following table describes the potential payments and benefits upon employment termination for Mr. Asbury, as if his employment terminated as of December 31, 2020.

| Executive Benefits and Payment upon Termination | Termination by Company without Cause or Resignation for Good Reason Not in Connection with a Change in Control ($) | Termination by Company without Cause or Resignation for Good Reason within 24 Months Following a Change in Control ($) |
|---|---|---|
| **Compensation:** | | |
| Cash Severance Benefits (1) | 579,600 | 700,350 |
| Acceleration of Stock Options (2) | — | — |
| Acceleration of RSUs (2) | — | 651,064 |
| Health Care Continuation (3) | 38,614 | 51,485 |
| **Total** | 618,214 | 1,402,899 |

(1)     With respect to a termination by the Company without Cause or a resignation for Good Reason (a "qualifying termination") that is not within the 24 month period following a change in control (as defined in Mr. Asbury's offer letter), cash severance benefits includes a lump sum payment equal to nine months of base salary payments and the pro rata portion of Mr. Asbury's target annual bonus opportunity for 2021 (which is shown as 100% of the target bonus opportunity based on a December 31, 2021 termination date). With respect to a qualifying termination within 24 months following a change in control, cash severance benefits include a lump sum cash amount equal to 12 months of Mr. Asbury's base salary and an additional lump sum cash amount equal to 100% of Mr. Asbury's target annual bonus opportunity for 2021.

(2)     In the event of a change in control, 100% of the total number of shares subject to Mr. Asbury's stock options and RSUs will immediately vest as of the date immediately preceding the change in control.

(3)     Amounts in this column reflect the cost of providing reimbursement of continued health coverage for Mr. Asbury and his eligible dependents under COBRA for 9 months following a qualifying termination if such termination is not within the 24-month period following a change in control or for 12 months following a qualifying termination if such termination is within the 24-month period following a change in control.

**401(k) Plan**

We maintain a 401(k) retirement savings plan for the benefit of our employees, including our named executive officers, who satisfy certain eligibility requirements. Under the 401(k) plan, eligible employees may elect to defer a portion of their compensation, within the limits prescribed by the Code, on a pre-tax or after-tax (Roth) basis, through contributions to the 401(k) plan. The 401(k) plan authorizes employer safe harbor contributions. The 401(k) plan is intended to qualify under Sections 401(a) and 501(a) of the Code. As a tax-qualified retirement plan, pre-tax contributions to the 401(k) plan and earnings on those pre-tax contributions are not taxable to the employees until distributed from the 401(k) plan, and earnings on Roth contributions are not taxable when distributed from the 401(k) plan. We match 100% of the contributions that eligible participants make to the 401(k) plan up to 3.00% of the participant's eligible compensation. Contributions from 3.01% to 5.00% are matched at 50%.

**CEO Pay Ratio**

As required by Section 953(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act and Item 402(u) of Regulation S-K, we are required to disclose the ratio of our median employee's annual total compensation to the annual total compensation of our principal executive officer.

44

The purpose of this disclosure is to provide a measure of the equitability of pay within our company. We believe our compensation philosophy and process yield an equitable result for all of our employees. During fiscal year 2021, the principal executive officer was our Chief Executive Officer, Robert Alexander, Ph.D. For 2021, the annual total compensation, using the same methodology we use for our named executive officers as set forth in the summary compensation table, for Dr. Alexander was $10,988,477, and for our median employee was $336,570, resulting in an estimated pay ratio of 33 to 1.

The median employee used as the basis for comparison in 2021 is the same median employee selected in 2020.

The pay ratio reported above is a reasonable estimate calculated in a manner consistent with SEC rules based on our internal records and the methodology described above. Because the SEC rules for identifying the median compensated employee and calculating the pay ratio based on that employee's annual total compensation allow companies to adopt a variety of methodologies, to apply certain exclusions, and to make reasonable estimates and assumptions that reflect their employee populations and compensation practices, the pay ratio reported by other companies may not be comparable to the pay ratio reported above, as other companies have different employee populations and compensation practices and may utilize different methodologies, exclusions, estimates and assumptions in calculating their own pay ratios.

45

**Limitation of Liability and Indemnification**

Our amended and restated certificate of incorporation and amended and restated bylaws provide that we will indemnify our directors and officers, and may indemnify our employees and other agents, to the fullest extent permitted by Delaware law. Delaware law prohibits our amended and restated certificate of incorporation from limiting the liability of our directors for the following:

- any breach of the director's duty of loyalty to us or to our stockholders;
- acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law;
- unlawful payment of dividends or unlawful stock repurchases or redemptions; and
- any transaction from which the director derived an improper personal benefit.

If Delaware law is amended to authorize corporate action further eliminating or limiting the personal liability of a director, then the liability of our directors will be eliminated or limited to the fullest extent permitted by Delaware law, as so amended. Our amended and restated certificate of incorporation does not eliminate a director's duty of care and, in appropriate circumstances, equitable remedies, such as injunctive or other forms of non-monetary relief, remain available under Delaware law. This provision also does not affect a director's responsibilities under any other laws, such as the federal securities laws or other state or federal laws. Under our amended and restated bylaws, we will also be empowered to purchase insurance on behalf of any person whom we are required or permitted to indemnify.

In addition to the indemnification required in our amended and restated certificate of incorporation and amended and restated bylaws, we have entered into an indemnification agreement with each member of our board of directors and each of our officers. These agreements provide for the indemnification of our directors and officers for certain expenses and liabilities incurred in connection with any action, suit, proceeding or alternative dispute resolution mechanism or hearing, inquiry or investigation that may lead to the foregoing, to which they are a party, or are threatened to be made a party, by reason of the fact that they are or were a director, officer, employee, agent or fiduciary of our company, or any of our subsidiaries, by reason of any action or inaction by them while serving as an officer, director, agent or fiduciary, or by reason of the fact that they were serving at our request as a director, officer, employee, agent or fiduciary of another entity. In the case of an action or proceeding by or in the right of our company or any of our subsidiaries, no indemnification will be provided for any claim where a court determines that the indemnified party is prohibited from receiving indemnification. We believe that these charter and bylaw provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers.

The limitation of liability and indemnification provisions in our amended and restated certificate of incorporation and amended and restated bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against directors and officers, even though an action, if successful, might benefit us and our stockholders. Moreover, a stockholder's investment may be harmed to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act, and is, therefore, unenforceable.

46

**Equity Compensation Plan Information**

The following table provides information as of December 31, 2021 with respect to the shares of our common stock that may be issued under our existing equity compensation plans:

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Stock Options and Restricted Stock Units | Weighted Average Exercise Price of Outstanding Options and Rights (4) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in the First Column) |
|---|---|---|---|
| Equity compensation plans approved by stockholders | | | |
| 2012 Equity Incentive Plan (1) | 3,587,158 | $ 2.91 | — |
| 2018 Equity Incentive Plan (2) | 3,562,389 | $ 55.85 | 7,040,500 |
| 2018 Employee Stock Purchase Plan (3) | — | — | 1,765,958 |
| Equity compensation plans not approved by stockholders | — | — | — |
| Total | 7,149,547 | $ 21.51 | 8,806,458 |

(1) Our board of directors adopted, and our stockholders approved, the 2012 EIP. As a result of our initial public offering and the adoption of the 2018 EIP, we no longer grant awards under the 2012 EIP; however, all outstanding options issued pursuant to the 2012 EIP continue to be governed by their existing terms. To the extent that any such awards are forfeited or lapse unexercised or are repurchased, the shares of common stock subject to such awards will become available for issuance under the 2018 EIP.

(2) Our 2018 EIP provides that the number of shares available for issuance under the 2018 EIP will automatically increase on each January 1, beginning with the fiscal year ending December 31, 2019, equal to the least of (i) 5,000,000 shares, (ii) 5% of the outstanding shares of common stock as of the last day of the preceding fiscal year and (iii) such other amount as the board of directors may determine.

(3) Our board of directors adopted, and our stockholders approved, the 2018 ESPP in July 2018. Our 2018 ESPP provides that the number of shares available for issuance under the 2018 ESPP will automatically increase on each January 1, beginning with the fiscal year ending December 31, 2019, equal to the least of (i) 1,000,000 shares, (ii) 1% of the outstanding shares of common stock as of the last day of the immediately preceding fiscal year and (iii) such other amount determined by the compensation committee.

(4) Does not take into account 1.6 million restricted stock units or performance-based restricted stock units, which have no exercise price and were granted under our 2012 and 2018 Equity Incentive Plans.

**2021 Director Compensation**

The following table provides information regarding compensation earned during the fiscal year ended December 31, 2021 by each nonemployee director for their service on the board of directors and any committee(s).

| Name | Fees Paid In Cash ($) (1) | Option Awards ($) (2) | Total ($) |
|---|---|---|---|
| Daniel Janney | 112,500 | 461,769 | 574,269 |
| John McKearn, Ph.D. | 65,000 | 461,769 | 526,769 |
| Robert E. Andreatta | 67,500 | 461,769 | 529,269 |
| Paul Walker | 65,000 | 461,769 | 526,769 |
| Steven P. James | 62,500 | 461,769 | 524,269 |

(1) The fees paid to nonemployee directors are described further below.

(2) The amounts disclosed represent the aggregate grant date fair value of option awards as calculated in accordance with ASC 718. The assumptions used in calculating the grant date fair value of the award disclosed

47

in this column are set forth in the notes to our audited financial statements. As of December 31, 2021, each nonemployee director held vested and unvested stock options as follows: Mr. Janney, 61,300 vested stock options and 7,700 unvested stock options; Dr. McKearn, 61,300 vested stock options and 7,700 unvested stock options; Mr. Andreatta, 61,300 vested stock options and 7,700 unvested stock options; Mr. Walker, 61,300 vested stock options and 7,700 unvested stock options; and Mr. James, 97,880 vested stock options and 7,700 unvested stock options.

Directors who are also our employees receive no additional compensation for their service as directors. Dr. Alexander was our only employee director during 2021. See "Executive Officer and Director Compensation" for additional information about Dr. Alexander's compensation.

In May 2021, each of our nonemployee directors was granted an option to purchase 7,700 shares of our common stock, in each case, at a per share exercise price equal to $99.83. Each of these options fully vests on the earlier of (i) the one-year anniversary of the date of grant or (ii) the date of the next annual meeting of our stockholders that occurs following the grant, in each case, subject to each director's continued service through the vesting date.

**Outside Director Compensation Policy**

In 2020, our compensation committee engaged Compensia to assist in crafting our outside director compensation policy effective April 2020. Compensia provided our compensation committee with competitive data, analysis and recommendations regarding nonemployee director compensation. After careful consideration of this information and the scope of the duties and responsibilities of our nonemployee directors, our board of directors approved our outside director compensation policy effective April 2020 ("2020 Outside Director Compensation Policy"), which we believe provides reasonable compensation to our nonemployee directors that is commensurate with their contributions and appropriately aligned with our peers. We also reimburse our directors for expenses associated with attending meetings of our board of directors and committees of our board of directors. Outside director compensation was again reviewed in the fourth quarter of 2021, and the Compensation Committee determined that no adjustments were warranted at that time.

*2021 Cash Compensation*

Under the 2020 Outside Director Compensation Policy, our nonemployee directors are entitled to receive the following cash compensation for their services on an annual basis:

- $47,500 for service as a board member;

- $45,000 as an additional retainer for service as chair of the board of directors;

- $20,000 for service as chair of the audit committee;

- $10,000 for service as a member of the audit committee;

- $15,000 for service as chair of the compensation committee;

- $7,500 for service as a member of the compensation committee;

- $10,000 for service as chair of the nominating and governance committee; and

- $5,000 for service as a member of the nominating and governance committee.

All cash payments to nonemployee directors will be paid quarterly in arrears on a prorated basis.

*2021 Equity Compensation*

Initial Option: Subject to the limits in our 2018 EIP, each person who first becomes a nonemployee director (other than a person that ceases to be an employee of ours but remains a director of ours) on or following April 1, 2020, the effective date of the current outside director compensation policy, will be granted an option covering 15,400 shares of our common stock ("initial option"), which grant will be made no later than the date of our first board of directors or compensation committee meeting occurring on or after the date on which such individual first becomes a nonemployee director, whether through election by our stockholders or appointment by our board of directors. Each initial option will vest as to 1/36th of the shares subject to the initial option each month following the

commencement of the applicable nonemployee director's service as a nonemployee director, in each case, subject to continued service through each applicable vesting date.

Annual Option: Subject to the limits in the 2018 EIP, each nonemployee director will be automatically granted, on the date of each annual meeting of our stockholders, an option covering 7,700 shares of our common stock ("annual option"). Each annual option will fully vest on the earlier of (i) the one-year anniversary of the date of grant of the annual option or (ii) the date of the next annual meeting of our stockholders that occurs following the grant of such annual option, in each case, subject to continued service through the applicable vesting date.

In March 2022, our compensation committee again consulted with Compensia to perform an analysis of our nonemployee director compensation policy relative to prevailing market data. Based on its review, the Board decided to approve the following compensation for non-employee member of the Board as follows, effective April 14, 2022:

- The annual cash retainers paid to each nonemployee director remains the same as detailed in our 2020 Outside Director Compensation Policy.

- Initial option grants for new nonemployee directors were adjusted from a fixed share count level in our 2020 Outside Director Compensation Policy to a pre-determined fair value amount of $509,600 based on the 30-day moving average prior to the grant date. This represents the 75th percentile compared to our peer group. Each initial option grant will vest as to 1/36th of the shares subject to the initial option grant each month following the commencement of the applicable nonemployee director's service as a nonemployee director, in each case, subject to continued service through each applicable vesting date.

- Annual option grants for nonemployee directors, which are made on the date of each annual meeting of our stockholders, were adjusted from a fixed share count level to a pre-determined fair value amount of $243,100 based on the 30-day moving average prior to the grant date. Each annual option grant will fully vest on the earlier of (i) the one-year anniversary of the date of grant of the annual option grant or (ii) the date of the next annual meeting of our stockholders that occurs following the grant of such annual option grant, in each case, subject to continued service through the applicable vesting date.

We believe the 2022 Outside Director Policy, provides reasonable compensation to our nonemployee directors that is commensurate with their contributions and appropriately aligned with our current peers and the Company's current environment.

In the event of a change in control, as defined in the 2018 EIP, all of a nonemployee director's outstanding company awards (including his or her initial option and his or her annual options, as applicable) will become fully vested and exercisable (if applicable) immediately before such change in control.

49

**REPORT OF THE COMPENSATION COMMITTEE**

The information contained in this report shall not be deemed to be (1) "soliciting material," (2) "filed" with the SEC, (3) subject to Regulations 14A or 14C of the Exchange Act, or (4) subject to the liabilities of Section 18 of the Exchange Act. This report shall not be deemed incorporated by reference into any of our other filings under the Exchange Act or the Securities Act, except to the extent that we specifically incorporate it by reference into such filing.

The compensation committee has reviewed and discussed the Compensation Discussion and Analysis section of this proxy statement with management. Based on the review and discussions, the compensation committee recommended to the board of directors that the Compensation Discussion and Analysis section be included in this proxy statement, which is incorporated by reference in our Annual Report on Form 10-K for the fiscal year ended December 31, 2021.

THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS OF ALLAKOS INC.

Daniel Janney, Chairman
John McKearn, Ph.D.
Paul Walker

April 14, 2022

50

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

The following is a description of transactions from January 1, 2021 through December 31, 2021 to which we have been a party, in which the amount involved exceeds $120,000, and in which any of our directors, executive officers or holders of more than 5% of our capital stock, or an affiliate or immediate family member thereof, had or will have a direct or indirect material interest ("related party transactions").

Our previous Senior Director of Clinical Project Management, Jacob Rasmussen, and our current Senior Clinical Program Manager, Camilla Shaw, are the son and daughter of Dr. Henrik Rasmussen, our former Chief Medical Officer. Mr. Jacob Rasmussen and Ms. Shaw received an annual salary of $239,000 and $185,400, respectively, and certain benefits that are also provided to our other similarly situated employees, which benefits have an approximate annual value to Mr. Jacob Rasmussen and Ms. Shaw of $55,000 and $37,000, respectively. During the fiscal year ended December 31, 2021, Mr. Jacob Rasmussen and Ms. Shaw were also awarded discretionary cash bonuses in the amount of approximately $71,700 and $36,199, respectively, and 6,527 and 2,133 restricted stock units, respectively, which are subject to service-based vesting conditions.

**Review and Approval of Related Party Transactions**

Our audit committee has the primary responsibility for reviewing and approving or disapproving related party transactions. The charter of our audit committee provides that our audit committee shall review and approve in advance any related party transaction.

We have a formal written policy providing that we are not permitted to enter into any related party transaction without the consent of our audit committee. In approving or rejecting any such transaction, our audit committee is to consider the relevant facts and circumstances available and deemed relevant to our audit committee, including whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the related person's interest in the transaction.

Each transaction described above was approved by at least a majority of the disinterested members of our audit committee.

51

**PRINCIPAL STOCKHOLDERS**

The following table sets forth information, to the extent known by us or ascertainable from public filings, with respect to the beneficial ownership of our common stock as of March 31, 2022 by:

- each of our directors and director nominees;

- each of our named executive officers;

- all of our directors, director nominees and executive officers as a group; and

- each person, or group of affiliated persons, who is known by us to beneficially own greater than 5% of our common stock.

The column entitled "Percentage Beneficially Owned" is based on a total of 54,761,492 shares of our common stock outstanding as of March 31, 2022.

Beneficial ownership is determined in accordance with the rules and regulations of the SEC and includes voting or investment power with respect to our common stock. Shares of our common stock subject to options that are currently exercisable or exercisable within 60 days of March 31, 2022 are considered outstanding and beneficially owned by the person holding the options for the purpose of calculating the percentage ownership of that person but not for the purpose of calculating the percentage ownership of any other person. Except as otherwise noted, the persons and entities in this table have sole voting and investing power with respect to all of the shares of our common stock beneficially owned by them, subject to community property laws, where applicable. Except as otherwise indicated in the table below, addresses of named beneficial owners are in care of Allakos Inc., 825 Industrial Road, Suite 500, San Carlos, California 94070.

| Name of Beneficial Owner | Number of Shares Beneficially Owned | Percentage Beneficially Owned |
|---|---|---|
| **5% Stockholders:** | | |
| Entities affiliated with Alta Partners VIII, LP (1) | 8,575,493 | 14.82% |
| Entities affiliated with RiverVest Venture Fund III, L.P. (2) | 4,887,932 | 8.45% |
| Vanguard Group, Inc. (3) | 3,494,674 | 6.04% |
| **Named Executive Officers and Directors:** | | |
| Robert Alexander, Ph.D. (4) | 2,122,607 | 3.67% |
| Baird Radford (5) | 7,475 | * |
| Adam Tomasi, Ph.D. (6) | 938,752 | 1.62% |
| Mark Asbury (7) | 159,755 | * |
| Daniel Janney (8) | 8,644,493 | 14.94% |
| John McKearn, Ph.D. (9) | 4,956,932 | 8.57% |
| Paul Walker (10) | 2,233,704 | 3.86% |
| Steven P. James (11) | 105,580 | * |
| Robert E. Andreatta (12) | 69,000 | * |
| All directors, director nominees and executive officers as a group (9 persons) (13) | 19,238,298 | 33.25% |

\*    Represents beneficial ownership of less than one percent.

52

(1) Consists of (a) 6,448,053 shares held of record by Alta Partners VIII, LP ("Alta VIII") and (b) 2,071,147 shares held of record by Alta Partners NextGen Fund I, L.P. ("Alta I"). The shares directly held by Alta VIII are indirectly held by Alta Partners Management VIII, LLC ("Alta Management VIII"), which is the general partner of Alta VIII. The individual managing directors of Alta Management VIII are Guy Nohra and Mr. Janney, one of our directors. The managing directors of Alta Management VIII exercise sole voting and investment control with respect to the shares held by Alta VIII. The shares directly held by Alta I are indirectly held by Alta Partners NextGen Fund I Management, LLC ("Alta Management I"), which is the general partner of Alta I. The individual managing directors of Alta Management I are Robert More, Peter Hudson and Mr. Janney, one of our directors. The managing directors of Alta Management I exercise sole voting and investment control with respect to the shares held by Alta I. The individual managing directors of Alta Management VIII and Alta Management I disclaim beneficial ownership of all shares held by Alta VIII and Alta I, except to the extent of their pecuniary interests therein. The address of the above referenced entities is Four Embarcadero Center, Suite 2100, San Francisco, California 94111.

(2) Consists of (i) 694,669 shares held of record by RiverVest Venture Fund II, L.P ("RiverVest II"), (ii) 188,685 shares held of record by RiverVest Venture Fund II (Ohio), L.P. ("RiverVest (Ohio) II"), (iii) 2,341,594 shares held of record by RiverVest Venture Fund III, L.P ("RiverVest III"), (iv) 124,275 shares held of record by RiverVest Venture Fund III (Ohio), L.P. ("RiverVest (Ohio) III"), (v) 1,483,103 shares held of record by 3x5 RiverVest Fund II, L.P. ("3x5 II"), and (vi) 55,606 shares held of record by 3x5 RiverVest Fund II-B, L.P. ("3x5 II-B"). The shares directly held by RiverVest II are indirectly held by RiverVest Venture Partners II, L.P. ("RiverVest Partners II"), which is the general partner of RiverVest II. The shares directly held by RiverVest (Ohio) II are indirectly held by RiverVest Venture Partners II (Ohio), LLC ("RiverVest Partners (Ohio) II"), which is the general partner of RiverVest (Ohio) II. RiverVest Partners II is the sole member of RiverVest Partners (Ohio) II. RiverVest Venture Partners II, LLC is the general partner of RiverVest Partners II. Dr. McKearn, one of our directors, is an Authorized Person of RiverVest Venture Partners II, LLC and may be deemed to share dispositive voting and investment power with respect to the shares held by RiverVest II and RiverVest (Ohio) II. The shares directly held by RiverVest III are indirectly held by RiverVest Venture Partners III, L.P. ("RiverVest Partners III"), which is the general partner of RiverVest III. The shares directly held by RiverVest (Ohio) III are indirectly held by RiverVest Venture Partners III (Ohio), LLC ("RiverVest Partners (Ohio) III"), which is the general partner of RiverVest (Ohio) III. RiverVest Partners III is the sole member of RiverVest Partners (Ohio) III. RiverVest Venture Partners III, LLC is the general partner of RiverVest Partners III. Dr. McKearn, one of our directors, is a Manager of RiverVest Venture Partners III, LLC and may be deemed to share dispositive voting and investment power with respect to the shares held by RiverVest III and RiverVest (Ohio) III. The shares directly held by 3x5 II and 3x5 II-B are indirectly held by 3x5 RiverVest Partners II, LLC ("3x5 Partners II"), which is the general partner of 3x5 II and 3x5 II-B. RiverVest 3x5 Managers II, L.P. ("3x5 Managers II"), is a Member of 3x5 Partners II. RiverVest 3x5 Managers II, LLC is the general partner of 3x5 Managers II. Dr. McKearn, one of our directors, is a Member of RiverVest 3x5 Managers II, LLC and may be deemed to share dispositive voting and investment power with respect to the shares held by 3x5 II and 3x5 II-B. Dr. McKearn disclaims beneficial ownership of all shares held by RiverVest II, RiverVest (Ohio) II, RiverVest III, RiverVest (Ohio) III, 3x5 II and 3x5 II-B except to the extent of his pecuniary interests therein. The address of the above referenced entities is 101 S. Hanley Road, Suite 1850, St. Louis, MO 63105.

(3) Information regarding Vanguard Group Inc. is based solely upon Schedule 13F filed by Vanguard Group Inc. with the SEC on February 9, 2022. Schedule 13F provides that as of December 31, 2021, Vanguard Group Inc. is deemed to be the beneficial owner with respect to 3,494,674 shares of the Company's common stock. The address for Vanguard Group Inc. is PO Box 2600, V26, Valley Forge, PA 19482.

(4) Consists of (a) 68,867 shares held of record by Dr. Alexander, (b) 320,300 shares held of record by Dr. Alexander and Stacey Lee Alexander as Trustees of the Alexander 2018 Irrevocable Descendants' Trust, and (c) 1,733,440 options vested and exercisable within 60 days of March 31, 2022.

(5) Consists of 7,475 shares vested and exercisable within 60 days of March 31, 2022.

(6) Consists of (a) 103,373 shares held of record by Dr. Tomasi, (b) 3,953 shares held of record by Dr. Tomasi and Carrie Tomasi as Trustees of the Tomasi Living Trust dated July 14, 2017, and (c) 831,426 options vested and exercisable within 60 days of March 31, 2022.

(7) Consists of (a) 23,992 shares held of record by Mr. Asbury and (b) 135,763 options vested and exercisable within 60 days of March 31, 2022.

(8)    Consists of (a) the shares described in footnote (1) above and (b) 69,000 options vested and exercisable within 60 days of March 31, 2022. Mr. Janney is a managing director of Alta Management VIII and Alta Management I and shares voting and investment control with respect to these shares. Mr. Janney disclaims beneficial ownership of all shares held by Alta VIII and Alta I, except to the extent of any pecuniary interest therein. The address of Mr. Janney is Four Embarcadero Center, Suite 2100, San Francisco, California 94111.

(9)    Consists of (a) the shares described in footnote (2) above and (b) 69,000 options vested and exercisable within 60 days of March 31, 2022. Dr. McKearn is an Authorized Person of RiverVest Venture Partners II, LLC, a Manager of RiverVest Venture Partners III, LLC and a Member of RiverVest 3x5 Managers II, LLC and shares voting and investment control with respect to these shares. Dr. McKearn disclaims beneficial ownership of all shares held by RiverVest II, RiverVest (Ohio) II, RiverVest III, RiverVest (Ohio) III, 3x5 II and 3x5 II-B, except to the extent of any pecuniary interest therein. Dr. McKearn's address is 101 S. Hanley Road, Suite 1850, St. Louis, MO 63105.

(10)    Consists of (a) 2,163,260 shares held of record by New Enterprise Associates 16, L.P. ("NEA 16"), (b) 1,444 shares held of record by NEA Ventures 2017, L.P. ("Ven 2017") and (c) 69,000 options vested and exercisable within 60 days of March 31, 2022. Mr. Walker, a member of our board of directors, is a General Partner of New Enterprise Associates, Inc., an entity affiliated with NEA 16 and Ven 2017. Mr. Walker disclaims beneficial ownership of all shares owned by NEA 16 and Ven 2017, except to the extent of any pecuniary interest therein. The shares directly held by NEA 16 are indirectly held by NEA Partners 16, L.P. ("NEA Partners 16"), the sole general partner of NEA 16, NEA 16 GP, LLC ("NEA 16 LLC"), the sole general partner of NEA Partners 16, and each of the individual Managers of NEA 16 LLC. The individual Managers of NEA 16 LLC, (collectively, the "Managers"), are Forest Baskett, Ali Behbahani, Carmen Chang, Anthony A. Florence, Mohamad Makhzoumi, Joshua Makower, Peter Sonsini, Paul Walker and Scott D. Sandell. NEA Partners 16, NEA 16 LLC and the Managers share voting and dispositive power with regard to the Company's securities directly held by NEA 16. The shares held directly by Ven 2017 are indirectly held by Karen P. Welsh, the general partner of Ven 2017. Karen P. Welsh has voting and dispositive power with regard to the shares of the Company's securities directly held by Ven 2017. All indirect holders of the above referenced securities disclaim beneficial ownership of the above referenced securities except to the extent of their pecuniary interests therein. The address of the above referenced entities is 1954 Greenspring Drive, Suite 600, Timonium MD, 21093.

(11)    Consists of 105,580 options vested and exercisable within 60 days of March 31, 2022.

(12)    Consists of 69,000 options vested and exercisable within 60 days of March 31, 2022.

(13)    Consists of (a) 16,148,614 shares beneficially owned by our current named executive officers and nonemployee directors as of March 31, 2022, of which no shares may be repurchased by us at the original purchase price as of such date and (b) 3,089,684 shares subject to options vested and exercisable within 60 days of March 31, 2022.

54

**DELINQUENT SECTION 16(A) REPORTS**

Section 16(a) of the Exchange Act requires our executive officers and directors, among others, to file an initial report of ownership of our common stock on Form 3 and reports of changes in ownership on Form 4 or Form 5. The Company believes, based solely on a review of forms filed with the SEC and on written representations from reporting persons, that six transactions required to be filed under Section 16(a) were not timely filed during fiscal year 2021. The Form 4s required to be filed by Robert Andreatta, Steven James, Daniel Janney, John McKearn, Natalie Holles and Paul Walker, each relating to stock options granted on May 25, 2021, were not timely filed but were filed on October 14, 2021.

55

## REPORT OF THE AUDIT COMMITTEE

*Pursuant to rules adopted by the SEC designed to improve disclosures related to the functioning of corporate audit committees and to enhance the reliability and credibility of financial statements of public companies, the audit committee of our board of directors submits the report below. The material in this report is not "soliciting material," is not be deemed "filed" with the SEC, and is not to be incorporated by reference into any filing made by Allakos Inc. (the "Company") under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and irrespective of any general incorporation language in any such filing, except to the extent that the Company specifically incorporates it by reference in such filing.*

### Audit Committee Report to Stockholders

The audit committee of the board of directors is responsible for providing independent, objective oversight of the Company's accounting functions and internal controls. The audit committee is composed of three directors, each of whom is independent as defined under the rules of the NASDAQ Global Select Market. Our board of directors has determined that each member of the audit committee is independent and that Mr. Andreatta qualifies as an "audit committee financial expert" under the SEC rules. The audit committee operates under a written charter approved by the board of directors. A copy of the charter is available on the Company's website at http://investor.allakos.com/investor-relations in the "Corporate Governance" section of our Investors webpage.

Management is responsible for the Company's internal controls over financial reporting, disclosure controls and procedures and the financial reporting process. Ernst and Young LLP is responsible for performing an independent audit of the Company's financial statements in accordance with Public Company Accounting Oversight Board (PCAOB) standards and to issue reports thereon. The audit committee's responsibility is to monitor and oversee these processes. The audit committee has established a mechanism to receive, retain and process complaints on auditing, accounting and internal control issues, including the confidential, anonymous submission by employees, vendors, customers and others of concerns on questionable accounting and auditing matters.

In connection with these responsibilities, the audit committee met with management and Ernst & Young LLP to review and discuss the December 31, 2021 audited financial statements. The audit committee also discussed with Ernst & Young LLP the applicable requirements of the PCAOB. In addition, the audit committee received the written disclosures from Ernst & Young LLP required by applicable requirements of the PCAOB regarding Ernst & Young LLP's communications with the audit committee concerning independence, and the audit committee has discussed with Ernst and Young LLP its independence from the Company and its management.

Based upon the audit committee's discussions with management and Ernst & Young LLP, and the audit committee's review of the representations of management and Ernst & Young LLP, the audit committee recommended that the board of directors include the audited financial statements in the Company's Annual Report on Form 10-K for fiscal 2021 filed with the SEC.

The audit committee also has appointed, subject to stockholder ratification, Ernst & Young LLP as the Company's independent registered public accounting firm for fiscal 2022.

<div style="margin-left:50%">

Respectfully submitted,

THE AUDIT COMMITTEE OF
THE BOARD OF DIRECTORS OF ALLAKOS INC.

Robert E. Andreatta, Chairman
Steven P. James
Paul Walker

</div>

April 14, 2022

56

**STOCKHOLDER PROPOSALS**

Stockholders may present proper proposals for inclusion in our proxy statement and for consideration at the next annual meeting of stockholders by submitting their proposals in writing to our Secretary in a timely manner. For a stockholder proposal to be considered for inclusion in our proxy statement for our 2023 annual meeting of stockholders, our Secretary must receive the written proposal at our principal executive offices not later than December 15, 2022 unless we hold our 2023 annual meeting of stockholders more than 30 days before or more than 30 days after the first anniversary of the date of the 2022 Annual Meeting  annual meeting, then the deadline is a reasonable time before we begin to print and send our proxy materials. In addition, stockholder proposals must comply with the requirements of Rule 14a-8 under the Exchange Act, regarding the inclusion of stockholder proposals in company-sponsored proxy materials. Stockholder proposals should be addressed to:

<div align="center">

Allakos Inc.
Attention: Corporate Secretary
825 Industrial Road, Suite 500
San Carlos, California 94070

</div>

Our bylaws also establish an advance notice procedure for stockholders who wish to present a proposal before an annual meeting of stockholders but do not intend for the proposal to be included in our proxy statement. Our bylaws provide that the only business that may be conducted at an annual meeting is business that is (i) specified in our proxy materials with respect to such meeting, (ii) otherwise properly brought before the annual meeting by or at the direction of our board of directors, or (iii) properly brought before the annual meeting by a stockholder of record entitled to vote at the annual meeting who has delivered timely written notice to our Secretary, which notice must contain the information specified in our bylaws. To be timely for our 2023 annual meeting of stockholders, our Secretary must receive the written notice at our principal executive offices:

- not earlier than January 25, 2023; and
- not later than February 24, 2023.

In the event that we hold our 2023 annual meeting of stockholders more than 30 days before or more than 60 days after the first anniversary of the date of the 2022 Annual Meeting, then notice of a stockholder proposal that is not intended to be included in our proxy statement must be received no earlier than the close of business on the 120th day before such annual meeting and no later than the close of business on the later of the following two dates:

- the 90th day prior to such annual meeting; or
- the 10th day following the day on which public announcement of the date of such annual meeting is first made.

If a stockholder who has notified us of his, her or its intention to present a proposal at an annual meeting does not appear to present his, her or its proposal at such annual meeting, we are not required to present the proposal for a vote at such annual meeting.

***Nomination of Director Candidates***

You may propose director candidates for consideration by our corporate governance and nominating committee by providing the information required by our bylaws. Any such recommendations should include, among other things outlined in our bylaws, the nominee's name and qualifications for membership on our board of directors and should be directed to our Secretary at the address set forth above.

In addition, our bylaws permit stockholders to nominate directors for election at an annual meeting of stockholders. To nominate a director, the stockholder must provide the information required by our bylaws. In addition, the stockholder must give timely notice to our Secretary in accordance with our bylaws, which, in general, require that the notice be received by our Secretary within the time period described above that are not intended to be included in a proxy statement.

<div align="center">

57

</div>

*Availability of Bylaws*

A copy of our bylaws may be obtained by accessing our public filings on the SEC's website at www.sec.gov. You may also contact our Secretary at our principal executive office for a copy of the relevant bylaw provisions regarding the requirements for making stockholder proposals and nominating director candidates.

58

*Availability of Bylaws*

A copy of our bylaws may be obtained by accessing our public filings on the SEC's website at www.sec.gov. You may also contact our Secretary at our principal executive office for a copy of the relevant bylaw provisions regarding the requirements for making stockholder proposals and nominating director candidates.

**TRANSFER AGENT INFORMATION**

American Stock Transfer & Trust Company, LLC, or AST, is the transfer agent for the common stock of the Company. AST can be reached at (800) 937-5449 or via email at info@astfinancial.com. You should contact AST if you are a registered stockholder and have a question about your account or if you would like to report a change in your name or address. AST can also be contacted as follows:

**Regular, Registered or Overnight Mail**
American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219

**WEBSITES NOT INCORPORATED BY REFERENCE**

No information contained on or available through any website referenced in this proxy statement, our corporate website or any other website that we may maintain shall be deemed included or incorporated by reference into this proxy statement.



P.O. BOX 8016, CARY, NC 27512-9903

**YOUR VOTE IS IMPORTANT! PLEASE VOTE BY:**



**INTERNET**
Go To: **www.proxypush.com/ALLK**
- Cast your vote online
- **Have your Proxy Card ready**
- Follow the simple instructions to record your vote.
- **During the Meeting:** Go to proxydocs.com/ALLK
  You may attend the meeting via Internet and vote during the meeting by following the instructions at this website.



**PHONE**  Call **1-866-490-6867**
- Use any touch-tone telephone
- **Have your Proxy Card ready**
- Follow the simple recorded instructions



**MAIL**
- Mark, sign and date your Proxy Card
- Fold and return your Proxy Card in the postage-paid envelope provided

You must register to attend the meeting online no later than 5/24/22 2:00 PM PDT at www.proxydocs.com/ALLK

# Allakos Inc.

## Annual Meeting of Stockholders

For Stockholders of record as of March 28, 2022

**TIME:**    Wednesday, May 25, 2022 2:30 PM, PDT
**PLACE:**   Annual Meeting to be held live via the Internet - please visit
             www.proxydocs.com/ALLK for more details.

### This proxy is being solicited on behalf of the Board of Directors

The undersigned hereby appoints Baird Radford and Mark Asbury, and each or either of them, with full power of substitution and revocation, and authorizes them, and each of them, to vote all the shares of capital stock of ALLAKOS INC. which the undersigned is entitled to vote at said meeting and any adjournment thereof upon the matters specified and upon such other matters as may be properly brought before the meeting or any adjournment thereof, conferring authority to vote in their discretion on such other matters as may properly come before the meeting and revoking any proxy heretofore given.

THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS DIRECTED OR, **IF NO DIRECTION IS GIVEN, SHARES WILL BE VOTED "FOR" ALL NOMINEES FOR DIRECTORES IN PROPOSAL 1, AND "FOR" PROPOSAL 2.**

You are encouraged to specify your choice by marking the appropriate box (SEE REVERSE SIDE) but you need not mark any box if you wish to vote in accordance with the Board of Directors' recommendation. The Named Proxies cannot vote your shares unless you sign (on the reverse side) and return this card.

**TO ATTEND the Annual Meeting, please visit proxydocs.com/ALLK for virtual meeting registration details.**

PLEASE BE SURE TO SIGN AND DATE THIS PROXY CARD AND MARK ON THE REVERSE SIDE

# Allakos Inc.
## Annual Meeting of Stockholders

Please make your marks like this:  X

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE:**
**FOR** ON PROPOSALS 1 AND 2

| PROPOSAL | | YOUR VOTE | | | BOARD OF DIRECTORS RECOMMENDS |
|---|---|---|---|---|---|
| 1. The election of each of the Class I directors nominated by our Board of Directors and named in this Proxy Statement to serve for a three-year term and until their successors are duly elected and qualified; | | FOR | WITHHOLD | | |
| 1.01 Robert Alexander, Ph.D | | ☐ | ☐ | | FOR |
| 1.02 Steven P. James | | ☐ | ☐ | | FOR |
| | | FOR | AGAINST | ABSTAIN | |
| 2. The ratification of the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2022; and | | ☐ | ☐ | ☐ | FOR |
| 3. To transact such other business as may properly come before the meeting or any adjournment thereof. | | | | | |

**You must register to attend the meeting online no later than 5/24/22 2:00 PM PDT at www.proxydocs.com/ALLK**

Authorized Signatures - Must be completed for your instructions to be executed.

Please sign exactly as your name(s) appears on your account. If held in joint tenancy, all persons should sign. Trustees, administrators, etc., should include title and authority. Corporations should provide full name of corporation and title of authorized officer signing the Proxy/Vote Form.

_____     _____     _____     _____
Signature (and Title if applicable)          Date          Signature (if held jointly)                    Date