Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNG KIM, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ALLAKOS INC., ROBERT ALEXANDER, LEO REDMOND, HENRIK RASMUSSEN, and ADAM TOMASI, <br><br> Defendants. | Case No: 4:20-cv-01720-JSW <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> JUDGE:  Hon. Jeffrey S. White <br> DATE:  September 30, 2022 <br> TIME:  9 a.m. <br> CTRM:  5, 2nd floor |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

    A.    Background of Allakos and AK002 ........................................................2

    B.    Allakos Announces Phase 2 ENIGMA Results and Initiates Phase 3. ..................3

    C.    The Prevalence Study Purportedly Shows Underdiagnosis of EG and EoD, But the Patients it Identifies Differ From the Patients in Phase 2 ENIGMA. .........3

    D.    Tomasi Says the Patient Populations of Phase 2 and 3 ENIGMA are "Identical" and "Very Similar" and Stresses its Importance for Phase 3's Success. ..........................................................................................5

    E.    Phase 3's Failure Causes Allakos' Common Stock to Drop Almost 90%. .............6

    F.    Allakos Admits, Contrary to Tomasi's Statements, the Phase 2 and 3 Patient Characteristics Were Significantly Different and That it Caused the Failure. ....................................................................................................6

ARGUMENT .......................................................................................................................7

I.       PLAINTIFFS ALLEGE ACTIONABLE MISREPRESENTATIONS ..............................7

    A.    Tomasi's Statements Were False and Misleading. ....................................7

    B.    Plaintiffs' Claims are Not Hindsight Driven Criticism of Allakos' Study Design. ..........................................................................................10

II.     PLAINTIFFS ALLEGE SCIENTER ..........................................................................11

    A.    Tomasi Made the Misstatements Knowingly or Recklessly. ...................11

    B.    The SAC's Motive and Stock Sale Allegations Support Scienter. .........14

    C.    The Balance of Inferences Supports Scienter. ........................................15

CONCLUSION ...................................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .................................................................................9, 10

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) .........................................................................9

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ...................................................................10

*Edenbrook Capital, LLC v. RhythmOne Plc*,
    No. 19-CV-00615-WHO, 2019 WL 1791419 (N.D. Cal. Apr. 24, 2019) ....................8

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) .......................................................................................10

*In re Amylin Pharms., Inc. Sec. Litig.*,
    No. 01CV1455 BTM (NLS), 2003 WL 21500525 (S.D. Cal. May 1, 2003) ...............15

*In re Finisar Corp. Sec. Litig.*,
    No. 5:11-CV-01252-EJD, 2017 WL 1549485 (N.D. Cal. May 1, 2017) ....................13

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
    No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ...................................13

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) .........................................................................9

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .....................................................................................11

*In re Zillow Grp., Inc. Sec. Litig.*,
    No. C17-1387-JCC, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) .................11, 12

*In re Zynga Inc. Sec. Litig.*,
    No. C 12-04007 JSW, 2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) ..........................7

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) .......................................................................................7

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .......................................................................................9

OPPOSITION TO DEFENDANTS' MTD SAC                    CASE NO. 4:20-CV-01720-JSW

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ........................................................................11

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003)..............................................................................11, 15

*Reese v. BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011)...........................................................................................7

*Schueneman v. Arena Pharms.*, Inc.,
  840 F.3d 698 (9th Cir. 2016).....................................................................................9, 14

*Skiadas v. Acer Therapeutics Inc.*,
  No. 1:19-CV-6137-GHW, 2020 WL 3268495 (S.D.N.Y. June 16, 2020)...................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .........................................................................................11

OPPOSITION TO DEFENDANTS' MTD SAC                    CASE NO. 4:20-CV-01720-JSW

**INTRODUCTION**

Allakos, Inc. ("Allakos" or the "Company") is a clinical stage biopharmaceutical company whose future prospects rely entirely on a single drug, AK002. AK002's lead indications — the diseases it is furthest along in the FDA approval process for — are eosinophilic gastritis ("EG") and eosinophilic duodenitis ("EoD"). Prior to 2020, Allakos referred to EoD as eosinophilic gastroenteritis ("EGE"). During 2018 and 2019, Allakos conducted a Phase 2 clinical trial that tested AK002 on EG and EoD patients ("Phase 2 ENIGMA" or "Phase 2"). After announcing positive results for Phase 2, Allakos announced that it was conducting a Phase 3 version of the trial ("Phase 3 ENIGMA" or "Phase 3"). Three months after Allakos had fully enrolled the patients for Phase 3, in September 2021, Defendant Adam Tomasi, the President and Chief Operating Officer ("COO") of Allakos, was publicly interviewed. During that interview, Tomasi emphasized that it was very important to the expected success of Phase 3 that it have a similar patient population to Phase 2 and assured investors that the patient populations of the two ENIGMA Trials were "very similar" and "identical" and that he could say that because Phase 3 was fully enrolled. On December 21, 2021, Allakos announced that Phase 3 had not met its patient reported symptomatic co-primary endpoint, which caused Allakos' stock to lose almost ***90% of its value.*** On February 15, 2022, Allakos hosted an Investor Day where, directly contrary to Defendant Tomasi's prior statements, Allakos disclosed that the patient population of Phase 3 was significantly different from Phase 2 and blamed those differences for the failure of Phase 3.

*Falsity.* Defendants' arguments on falsity repeatedly ask the Court to construe Tomasi's statements in the light most favorable to them — precisely the opposite of the standard on a motion to dismiss. Furthermore, when taken in context, Tomasi's statements clearly gave investors the impression of a state of affairs that differed in a material way from the one that actually existed since the statements made reasonable investors believe that they had absolutely no reason to be concerned that the patient populations of Phase 2 and 3 might differ. Defendants' fraud-by-hindsight argument is also meritless since by the objective standard applied by courts, Tomasi's statements were false when made. Plaintiffs' claims are not a criticism of Phase 3's design since Tomasi made clear he was discussing the actually enrolled patients, not the design.

OPPOSITION TO DEFENDANTS' MTD SAC                    CASE NO. 4:20-CV-01720-JSW

*Scienter.* Defendants base their scienter argument heavily on the idea that Tomasi only could have known about the differences in the Phase 2 and 3 patient populations based on *post hoc* analysis. Tomasi was, however, put on notice that there was a clear possibility of differences by the results of a study that Allakos conducted, in 2020, to see if EG and EoD were underdiagnosed (the "Prevalence Study"). When announcing the results of the Prevalence Study, Allakos stated that it had identified additional EG and/or EoD patients, but noted that they had significantly different characteristics from the Phase 2 ENIGMA patients even though the patients that the Prevalence Study identified met the enrollment criteria for Phase 2 and 3. Some of those same differences are what later caused Phase 3 fail. Secondly, Tomasi clearly stated that he had access to the characteristics of the patients in Phase 3 and compared them to Phase 2 at the time he made his misstatements. Other allegations also show that access to patient characteristics after a trial was fully enrolled (but not completed) was standard at Allakos. Thus, Tomasi both had access to the data and should have known what differences to look for. And even if it were true he had no access to the data, Tomasi was reckless in assuring investors the study populations were the same in light of the results of the Prevalence Study. Tomasi also knew that such differences should be disclosed since he said twice that having similar patient populations in Phase 2 and Phase 3 was the "most important thing." For the same reason, he was motivated to downplay the differences between the patient populations of Phase 2 and 3 — saying anything else would have undermined investor confidence in Phase 3's success. Finally, contrary to Defendants' assertion, the SAC does not allege that Tomasi believed Phase 3 was "doomed to fail." Instead it alleges that Tomasi recklessly misrepresented the risk to Phase 3, which is actionable under the securities law.

## FACTUAL BACKGROUND

### A. Background of Allakos and AK002.

Allakos is a clinical stage biopharmaceutical company that describes itself as dependent on FDA approval of a single drug, AK002. ¶¶39, 43.[1] AK002's lead indications are the gastrointestinal inflammatory diseases EG and EoD. ¶¶39-40, 49. The Company has never

---

[1] All paragraph references are to the Second Amended Complaint ("SAC", ECF No. 41) and all citations to "Ex.__" are to exhibits to the SAC unless otherwise specified.

OPPOSITION TO DEFENDANTS' MTD SAC                    CASE NO. 4:20-CV-01720-JSW

generated any revenue and, as of December 31, 2021, had only 192 full-time employees. ¶¶44-45.

Defendant Tomasi has been an integral part of Allakos since before it became a public Company in 2018 and Allakos' public filings state that it is "highly dependent" on him. ¶¶38, 173. He has served as COO since April 2017, President since August 2019, Secretary since November 2017, and Chief Financial Officer ("CFO") from April 2017 to August 2019 and acting CFO from February 1, 2021 until April 19, 2021. ¶32. Tomasi holds a Ph.D in Chemistry and previously served as Chief Scientific Officer at ZS Pharma, where Defendant Robert Alexander, Allakos' Chief Executive Officer ("CEO"), was also the CEO. ¶¶ 29, 32.[2]

**B.  Allakos Announces Phase 2 ENIGMA Results and Initiates Phase 3.**

In 2018 and 2019, Allakos conducted Phase 2 ENIGMA on 65 patients with EG and/or EoD. ¶47. Phase 2's enrollment criteria was "Stomach ≥30 eos/high powered field (hpf) in 5 hpf [and/or] Duodenum: ≥30 eosinophils/hpf in 3 hpf" — *i.e.* greater or equal to 30 eosinophils per high powered field in 5 high power fields in the stomach or 3 in the duodenum. Ex. 1 at 12. On August 5, 2019, Allakos announced that Phase 2 met all primary and secondary endpoints. ¶53.[3]

After the purported success of Phase 2, on March 24, 2020, Allakos announced that it was initiating Phase 3 ENIGMA. ¶90. Allakos believed that if Phase 3 was successful, the combination of it and Phase 2 would be sufficient for FDA approval of AK002 for EG and EoD. *Id.* Phase 3 had the same enrollment criteria as Phase 2 — "Stomach ≥30 eos/high powered field (hpf) in 5 hpfs and/or Duodenum ≥30 eos/hpf in 3 hpfs." Ex. 3 at 16. When Allakos announced Phase 3, its CMO, Rasmussen, emphasized the importance of studying the same patient population by stating "[a]nd importantly, the patient population we are going to study [in Phase 3] are the same as… in the Phase 2 ENIGMA Study" and presented a slide that said in a box in large lettering that Phase 3 would have the "Same patient population as Phase 2 ENIGMA study." ¶¶92-93; Ex. 3 at 16.

**C.  The Prevalence Study Purportedly Shows Underdiagnosis of EG and EoD, But the Patients it Identifies Differ From the Patients in Phase 2 ENIGMA.**

On October 26, 2020, Allakos announced that its Prevalence Study showed that EG and

---

[2] Former CFO Redmond and former Chief Medical Officer Rasmussen are the other Defendants.
[3] The SAC repleads the claims concerning Phase 2 to preserve them for appeal.

OPPOSITION TO DEFENDANTS' MTD SAC                    CASE NO. 4:20-CV-01720-JSW

EoD were greatly underdiagnosed and there were up to 6 to 10 million people with the diseases instead of the 50,000 reported in medical literature. ¶¶ 95, 101. According to Allakos, those who were not properly diagnosed normally presented with chronic unexplained gastrointestinal symptoms or functional gastrointestinal disorders, such as Irritable Bowel Syndrome ("IBS"). ¶95. Since those patients were all candidates for AK002, this represented vast profits for Allakos.

While discussing the results of the Prevalence Study, Allakos' Senior Director of Medical Affairs and Clinical Development, Amol Kamboj, explained that Allakos had decided to conduct the Prevalence Study because, while 62 of 113 patients evaluated for enrollment in Phase 2 ENIGMA had an established history of EG and/or EoD, 51 did not. ¶96. Despite that, 15 of those of the 51 were determined to have EG and/or EoD based on biopsies and 13 of those patients were enrolled in Phase 2. ¶96. The discovery of those 15 led Allakos to believe that EG and EoD were underdiagnosed ¶97. Notably, however, Kamboj made clear that 52 of the 65 who enrolled in Phase 2 ENIGMA had an established history of EG and/or EoD. *Id.*

Thus, the enrollment criteria and endpoint of the Prevalence Study was modeled after Allakos' discovery during Phase 2 ENIGMA. The population enrolled consisted of "symptomatic patients with chronic [gastrointestinal] symptoms" and the endpoint for identifying EG and/or EoD patients was "≥30 eos/hpf in 5 gastric or 3 duodenal hpf" — the same as the enrollment criteria for Phase 2 and Phase 3 ENIGMA (gastric is the same as stomach). Ex. 4 at 20. Accordingly, any patient meeting the EG and/or EoD endpoint in the Prevalence Study also met the criteria for enrollment in the ENIGMA Trials. Kamboj further explained, however, that despite having met the enrollment criteria for Phase 2 ENIGMA, the patients who had met the endpoint in the Prevalence Study had significantly different characteristics than the patients in Phase 2. Kambloj presented a slide, which was part of a presentation attached to a Form 8-K filed with the SEC on October 26, 2020 and signed by CEO Alexander, entitled "Baseline Characteristics of Patients in Prevalence Study Compared to ENIGMA." ¶¶99-100; Ex. 4 at 25. The slide showed that the median peripheral blood eosinophils count for Phase 2 ENIGMA patients was almost double that of the 181 Prevalence Study patients who had met the EG and/or EoD endpoint (325 vs. 170) and that 55% of the Prevalence Study patients who had met the endpoint had a previous diagnosis of

- 4 -

IBS, whereas only 4% of the Phase 2 patients did. *Id.* Kamboj also said during his presentation that the patients who met the EG and/or EoD endpoint in the Prevalence Study had peripheral eosinophils "notably lower" than Phase 2 ENIGMA patients. ¶98. This difference was notable since the mechanism for action for AK002 is depletion of eosinophils. *Id.*

**D. Tomasi Says the Patient Populations of Phase 2 and 3 ENIGMA are "Identical" and "Very Similar" and Stresses its Importance for Phase 3's Success.**

On June 7, 2021, Allakos announced completion of Phase 3 ENIGMA's enrollment. ¶102. On September 10, 2021, Michael Ulz, an analyst from Morgan Stanley, interviewed Defendant Tomasi at the Morgan Stanley 19th Annual Global Healthcare Conference (the "Interview"). ¶103. In the Interview, Tomasi showed great familiarity with the ENIGMA Trials and the Prevalence Study. When Ulz asked why Allakos had prioritized Phase 2 and 3 trials for EG and EoD, Tomasi explained, in a similar way that Kamboj had when Allakos announced the Prevalence Study, that information from Phase 2 inspired Allakos to conduct the Prevalence Study and the Prevalence Study showed underdiagnosis because "45% of people that we biopsied actually met the criteria for EG and EoD and so a really significant finding and pointed to a market of likely millions of patients in the US given the prevalence of these functional diseases." ¶¶104-105; Ex. 5 at 3-4. Ulz than asked Tomasi why Allakos had moved into Phase 3 for EG and EoD. Tomasi responded by citing Phase 2's strong results and emphasizing that "*[t]he Phase 3 study is identical with regards to [the] patient population that we're [enrolling]*." ¶106; Ex. 5 at 5. (emphasis added).

Tomasi then spoke with great fluency about the minor methodological changes between Phase 2 and Phase 3 and said they did not pose any risk to Phase 3. ¶107; Ex. 5 at 5-6. When asked to elaborate on risks to Phase 3, Tomasi stated: "*And then probably the most important thing is to make sure that we enrolled the same patient population so that you're really -- you have the greatest chance to have to repeat the effect seen [in Phase 2]*." ¶108; Ex. 5 at 6 (emphasis added). He then assured investors that he was certain that the patient populations of Phase 2 and 3 was "very similar" because Phase 3 was "fully enrolled now" and stated again that it was the "most important thing":

And so our focus is really making sure that we [had] the same enrollment criteria

OPPOSITION TO DEFENDANTS' MTD SAC                    CASE NO. 4:20-CV-01720-JSW

which we do. ***And then as making sure that we have the same type of demographics going into the phase 3 study***, making sure that the baseline [Total Symptom Score] [is] in the same or similar place. ***And the Phase 3 study as it was in Phase 2 and, and yeah the stud[y is] fully enrolled now. So I can say that these two things are true. So we do have a very similar patient population in phase 3 as we do in phase 2, so I think that was really probably the most thing that, the most important thing that was in our control.***

*Id.* (emphasis added).

**E.    Phase 3's Failure Causes Allakos' Common Stock to Drop Almost 90%.**

On December 21, 2021, Allakos announced that Phase 3 ENIGMA had not met its patient reported symptomatic co-primary endpoint — in fact, the symptoms of the patients given the placebo ***actually improved more than the AK002 patients***. ¶¶110-111. Since Allakos' entire business is dependent on AK002, Allakos' stock completely collapsed on December 22, 2021, ***dropping $75.84 per share, or almost 90%, to close at $8.55***. ¶¶112-113.

**F.    Allakos Admits, Contrary to Tomasi's Statements, the Phase 2 and 3 Patient Characteristics Were Significantly Different and That it Caused the Failure.**

On February 15, 2022, Allakos hosted an Investor Day, where executives from the Company discussed Phase 3's failure. ¶114. Allakos' CMO Craig A. Paterson presented a slide entitled "Baseline Demographics & Patient Characteristics: [Phase 2 ENIGMA] and [Phase 3 ENIGMA]," which showed the significant differences between the demographics and patient characteristics of the patients enrolled in Phase 2 and Phase 3 that caused Phase 3 to fail. ¶¶117-118; Ex. 6 at 28. The slide showed that patients in Phase 2 and Phase 3 had three significant differences in diagnostic history — a much higher percentage of Phase 2 patients had been previously diagnosed with EG and/or EoD, the same was true of Eosinophilic Esophagitis ("EoE"), and a much lower percentage of Phase 2 patients had previous been diagnosed with IBS. ¶117; Ex. 6 at 28. It further showed that Phase 2 patients had much higher baseline eosinophil levels in their tissue and blood and higher serum immunoglobulin ("IgE") than Phase 3 patients, all indicators of more severe disease in the Phase 2 population. ¶118; Ex. 6 at 28. The difference in previous IBS diagnosis and blood eosinophil levels were the same differences that Allakos observed between the Phase 2 patients and the patients diagnosed with EG and EoD through the Prevalence Study.

During the February 15, 2022 investor day presentation, Paterson also discussed another

Phase 3 trial of only EoD patients that Allakos was conducting. Paterson stated that even though Allakos did not expect results until the middle of 2022, because that study was fully enrolled, he was able to look at the "baseline demographics and characteristics" and determined they were more like Phase 3 ENIGMA than Phase 2 and therefore the trial was likely to fail. ¶123; Ex. 6 at 41; Defs.' Ex. A at 9. An exchange during the investor day question and answer session again confirmed that Allakos executives had access to information about patient characteristics and demographics of trials once they were fully enrolled. In response to a question about whether Allakos could alter the statistical analysis plan for the EoD only Phase 3 trial to account for the lessons of Phase 3 ENIGMA, CEO Alexander confirmed that Allakos could modify it to "only include patients that have the requite qualities that we identified in [Phase 3 ENIGMA]." ¶124; Defs.' Ex. A at 25. Paterson then confirmed that "we've looked into the baseline demographics and characteristics of these patients and can identify a group." Defs.' Ex. A at 25.

## ARGUMENT

On a Rule 12(b)(6) motion, "[t]he Court's 'inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff.'" *In re Zynga Inc. Sec. Litig.*, No. C 12-04007 JSW, 2015 WL 1382217, at *1 (N.D. Cal. Mar. 25, 2015) (White, J.) (quoting *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008)).

### I.   PLAINTIFFS ALLEGE ACTIONABLE MISREPRESENTATIONS

"A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011).

#### A. Tomasi's Statements Were False and Misleading.

Defendants spend a significant amount of time arguing that the ENIGMA Trials had the same enrollment criteria and a similar baseline Total Symptom Scores ("TSS"). Motion to Dismiss SAC (ECF No. 46, "Mot.") at 8. That is a distraction, however, since Plaintiffs do not contest those points. Plaintiffs contend that Tomasi made two misstatements during the Interview. *First*, he stated "[s]o we do have a very similar patient population in phase 3 as we do in phase 2." ¶150. *Second*, Tomasi stated earlier in the interview that "[t]he Phase 3 study is identical with regards to

OPPOSITION TO DEFENDANTS' MTD SAC                    CASE NO. 4:20-CV-01720-JSW

[the] patient population that we're [enrolling]." ¶149.

"So we do have a very similar patient population" (¶150). Defendants claim that Tomasi's statement: "[s]o we do have a very similar patient population in phase 3 as we do in phase 2" is not misleading because it "merely summarizes" Tomasi's "immediately preceding sentences." ¶150; Mot. at 8-9. This argument is unavailing for two reasons.

*First*, the immediately preceding sentences are themselves misleading because Allakos did not have "the same type of demographics going into the phase 3 study." ¶150. As Allakos admitted in its "Baseline Demographics & Patient Characteristics: [Phase 2 ENIGMA] and [Phase 3 ENIGMA]" slide on the February 15, 2022 investor day, there were dramatic differences in previous diagnosis with  EG or EoD, IBS, and EoE and with the level of tissue and blood eosinophils and IgE between the patients in Phase 2 and Phase 3. ¶¶117-118; Ex. 6 at 28.

Defendants' only response is to argue that because Tomasi said "we have the same type of demographics going into the phase 3 study, making sure that the baseline [TSS] [is] in the same or similar place," that the only demographic measure he was referring to was TSS. ¶150; Mot. at 8. Defendants' interpretation of that statement is unpersuasive since he said "demographics," *plural*. Given that, the most reasonable interpretation is that Tomasi was using TSS as an example of a demographic measure, but was referring to multiple demographic measures. Defendants certainly cannot reasonably argue that TSS is a demographic characteristic and previous diagnosis with EG or EoD, IBS, and EoE and level of tissue and blood eosinophils and IgE are not. *At minimum*, Defendants do not have a colorable argument that their interpretation of the statement is so clearly correct that it would be proper for the Court to find that it is not misleading as a matter of law on a motion to dismiss. *See Edenbrook Capital, LLC v. RhythmOne Plc,* No. 19-CV-00615-WHO, 2019 WL 1791419, at *7 (N.D. Cal. Apr. 24, 2019) (denying motion to dismiss where "[defendant's] interpretation of its statements is plausible," but "not the only" interpretation); *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW, 2020 WL 3268495, at *9 (S.D.N.Y. June 16, 2020) ("Because the challenged statements are ambiguous, the Court cannot dismiss [plaintiff's] claims based on those statements as a matter of law. At the motion to dismiss stage of a securities fraud action, the court reads ambiguities in challenged statements in [the plaintiff's]

favor." (internal quotation marks omitted)).

*Second*, even if the sentences preceding"[s]o we do have a very similar patient population" were not misleading, that statement was still misleading because it gave a reasonable investor the impression of a state of affairs that differed from the one that actually existed. In context, that statement touted to investors that they did not have to worry about whether the patient populations of Phase 2 and Phase 3 were different, something that Tomasi twice said was the "most important thing." ¶150. Given the actual dramatic differences, the statement clearly would have given a reasonable investor a misleading impression. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of"); *Schueneman v. Arena Pharms.*, Inc., 840 F.3d 698, 707-708 (9th Cir. 2016) ("[d]efendants may not have had a duty to disclose the Rat Study had they not been representing that animal studies supported lorcaserin's safety and therefore its likelihood of being approved….[,b]ut…once defendants chose to tout [lorcaserin's likely approval by referencing allegedly positive animal and preclinical studies], they were bound to do so in a manner that wouldn't mislead" (internal quotation marks omitted)).

Defendants' cases just underscore that Tomasi's statements were misleading. Mot. at 9. In *Bodri* and *Leapfrog*, the defendants made statements which mitigated the strength of the alleged misstatements by warning they may not be accurate.[4] Here Tomasi did not hedge in any meaningful way — he emphasized that having the same patient population was the "most important thing" and did not express any doubt that the patient populations were the same. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) also supports Plaintiffs' position. There the court held that even though a statement was literally correct, "[t]he fair and reasonable implication" was something misleading. Here the fair and reasonable implication of Tomasi's statements was that the patient populations were "very similar' in all significant ways. That was misleading.

_____

[4] *See Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) (mitigated positive statement about sales of a product by saying that company was just "getting initial feedback" and that it was thus far "a small data set so I really wouldn't infer too much out of this at this point"); *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1003 (N.D. Cal. 2016) (defendants had issued public acknowledgments of company's hang-over inventory problem).

- 9 -

"The Phase 3 study is identical with regards to [the] patient population that we're [enrolling]." (¶149). Defendants lump this statement in with Tomasi's statement that the enrollment criteria was the same for Phase 2 and Phase 3 (Mot. at 8 n.6), but this statement does not specifically mention the enrollment criteria. Furthermore, the context of the statement would make a reasonable investor believe that it went beyond the enrollment criteria. Tomasi made this statement in September 2021, a year and a half after Allakos stated publicly what the Phase 3 enrollment criteria was and three months about Phase 3 was fully enrolled. ¶¶92, 102; Ex. 1 at 12. Also, during the same interview Tomasi stated that he could say that Phase 2 and Phase 3 had "the same type of demographics" and same TSS because Phase 3 "is fully enrolled now." ¶108. Accordingly, given that the enrollment criteria was extremely stale information and Tomasi indicated he knew *the actual makeup of the patient population*, a reasonable investor would not have expected him to say the "patient population that we're [enrolling]" is "identical" if the actual patients enrolled were not. Accordingly, Tomasi's statement gave a reasonable investor the impression of a state of affairs that differed from the one that actually existed. *See Berson*, 527 F.3d at 985-987 (touting backlog required disclosing it was compromised by stop work orders).

**B. Plaintiffs' Claims are Not Hindsight Driven Criticism of Allakos' Study Design.**

Plaintiffs' claims are not "fraud-by-hindsight." Courts apply an "objective standard…to determine whether a statement is misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). The statements were objectively false when made because at the time Tomasi made them, the demographics and characteristics of Phase 3's patients were significantly different than Phase 2's. Whether Tomasi knew or should have known does not make his statements any less objectively false[5] (as discussed in the scienter section, Tomasi was, at minimum, reckless).

Plaintiffs' claims are also not a criticism of Phase 3's design. If Tomasi's statements had been limited to stating that Phase 3's enrollment criteria was the same as Phase 2's and, based on that, he expected a positive result, he would not have made misstatements. Tomasi, however, made clear that his statements went beyond the methodology of the ENIGMA Trials when he said that,

---

[5]*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1118 (E.D. Wash. 2013), concerns statements were not false when made because all the information that plaintiffs used to argue falsity was disclosed by defendants at the same time as the statements.

OPPOSITION TO DEFENDANTS' MTD SAC                    CASE NO. 4:20-CV-01720-JSW

in addition to having the same enrollment criteria, that he could "say that" the Phase 2 and Phase 3 studies had "the same type of demographics" and "very similar" patient populations because "[Phase 3 ENIGMA is] fully enrolled now." ¶108. Accordingly, it was Tomasi who put *the actual patient population enrolled in the Phase 3 at issue* instead of the study's design.

## II.    PLAINTIFFS ALLEGE SCIENTER.

Scienter may be plead by pleading "knowledge of the falsity as well as 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (quoting *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003) ("*America West*")). An inference of scienter is strong "if a reasonable person would deem the inference…cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Thus, a tie goes to the plaintiff. *Id.* The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original).

### A.  Tomasi Made the Misstatements Knowingly or Recklessly.

"It is not necessary…to establish a strong inference that defendants actually knew contradicting facts since '[r]ecklessly turning a 'blind eye' to impropriety is equally culpable …under Rule 10(b)-5.'" *Mulderrig*, 492 F. Supp. 3d at 1013 (quoting *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012)). The SAC pleads Tomasi was reckless.

Tomasi is an integral employee of Allakos. The Company's public filings state that it is "highly dependent" on him and he has served in the role of COO since before Allakos became a public company in 2018. ¶¶32, 173. In addition, he serves as the Company's President and has twice served as its CFO. ¶32. Tomasi also has a scientific background — he holds a Ph.D in Chemistry and previously served as Chief Scientific Officer at another company where Defendant Alexander also served as CEO. *Id.* Because of this background and his incredible importance to Allakos, it is unsurprising that Tomasi demonstrated that he was very knowledgeable about the ENIGMA Trials and the Prevalence Study during the Interview where he made his misstatements. *See* ¶¶103-109; Ex. 5 at 3-8; Facts §D. This familiarity demonstrates recklessness. *In re Zillow*

- 11 -

*Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019) (defendants were reckless where they "made numerous statements displaying their familiarity with how the co-marketing program was designed and operated").

Defendants argue that Tomasi's deep familiarity with the ENIGMA Trials does not mean he had any reason to believe that his statements about their patient populations were misleading. Mot. at 13. It is clear, however, that the results of the Prevalence Study put Tomasi on notice of the exact differences in the Phase 2 and Phase 3 patient populations that caused Phase 3 to fail. Defendants irrelevantly point out that the Prevalence Study did not have the same enrollment criteria as the ENIGMA Trials. *Id*. As explained in the Facts (§C), the purpose of the Prevalence Study was to identify additional patients with EG and/or EoD and, accordingly, ***the EG and/or EoD endpoint of the Prevalence Study was the same as the enrollment criteria for the ENIGMA Trials and, therefore, the patients who met that endpoint would have qualified for enrollment in the ENIGMA Trials***. ¶¶95-101; Ex. 4 at 20. Given that, it was noteworthy that the demographics and characteristics of the 181 patients who reached that Prevalence Study endpoint were significantly different than the Phase 2 patients. Its noteworthiness is not conjecture — Senior Director of Medical Affairs and Clinical Development Kamboj highlighted during Allakos' October 26, 2020 Prevalence Study presentation that patients who reached the EG and/or EoD endpoint in the Prevalence Study had "notably lower" peripheral eosinophils. ¶98. Allakos also put the differences on a slide and filed it with the SEC attached to an 8-K signed by CEO Alexander and they included the dramatic differences in peripheral blood eosinophils and IBS diagnosis that Allakos later said were key differences between the patients in Phase 2 and Phase 3. ¶¶99-100, 116-118; Ex. 4 at 25; Ex. 6 at 28. Given Tomasi's familiarity with the Prevalence Study — he spoke in detail about the origin, design, and results of it during the Interview (¶¶104-105; Ex. 5 at 3-4) — he would have been aware of the differences in the patients who met the Prevalence Study endpoints and those enrolled in Phase 2. At minimum, he had easy access to that information.

It is also clear that Tomasi had access to the demographics and characteristics of patients enrolled in Phase 3 ENIGMA and that he actually accessed that information. We know this because Tomasi said he did — during the Interview he stated: "And then as making sure that we have the

same type of demographics going into the phase 3 study, making sure that the baseline [TSS] [is] in the same or similar place. And the Phase 3 study as it was in Phase 2 and, ***and yeah the stud[y is] fully enrolled now. So I can say that these two things are true.***" (emphasis added). ¶108; Ex. 5 at 6. The only reasonable interpretation of that statement is that Tomasi is saying he reviewed the data for the patients enrolled in Phase 3 and confirmed that it had the same demographics and TSS as Phase 2. Given that Allakos listed peripheral blood eosinophils and IBS diagnosis alongside TSS on its slide showing the difference between the patients who reached the Prevalence Study endpoint and Phase 2 ENIGMA patients, there is every reason to believe that Tomasi also had access to that information. Ex. 4 at 25. CMO Paterson and CEO Alexander's statements that they could and had accessed the demographics and characteristics of the Allakos' EoD only Phase 3 trial because it was fully enrolled (even though results were not due for months) simply confirms allowing such access is standard practice for Allakos. ¶¶123-125; Ex. 6 at 41; Defs' Ex. A at 9, 25; Facts §F. Defendants' argument that the EoD only Phase 3 may have had a different protocol (Mot. 13) than Phase 3 ENIGMA is far-fetched given they both were phase 3 trials for the same disease and there is no reason the protocols would differ concerning access to enrollment data.

That Tomasi had access to information showing that his statements were misleading strongly supports an inference of recklessness. *See In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2017 WL 1549485, at *6-7 (N.D. Cal. May 1, 2017) (scienter pled based on access to information); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128, at *13 (E.D. Pa. Mar. 25, 2020) (plaintiffs pled recklessness because allowing defendants to avoid liability by claiming they failed to review important information runs afoul of the policy objective of discouraging deliberate ignorance). Defendants' argument that Plaintiffs do not plead scienter because we cannot be absolutely certain that Tomasi looked at the data prior to his misstatements completely reads recklessness out of the scienter standard. Defendants also rely heavily on Alexander's statement that they spent weeks conducting *post hoc* analysis of the Phase 3 data after it failed (Defs.' Ex. A at 4), but it would be improper for the Court to credit such a self-serving statement on a motion to dismiss. The depth of the *post hoc* analysis provides no indication as to what information Tomasi knew or had accesses to during the Class Period. Moreover, even if he

OPPOSITION TO DEFENDANTS' MTD SAC                                     CASE NO. 4:20-CV-01720-JSW

accessed the data for the first time after he made the false statements, this does not relieve Tomasi of his obligation not to recklessly make statements he could easily verify were not true.

Finally, the cases that Defendants cite to argue that the SAC fails to plead that Tomasi believed the differences in Phase 2 and Phase 3 patient demographics and characteristics should have been disclosed are easily distinguishable. Mot. at 14. In those cases, defendants made general statements about the efficacy of drug trials or FDA approval and the plaintiffs claimed they were misleading because they omitted information that was not closely related to the statements. Here, Tomasi *affirmatively represented* that the ENIGMA Trials had very similar patient populations and that it was the "most important thing." *See Schueneman*, 840 F.3d at 708 (defendant was "free to express confidence in FDA approval," but could not claim "that all of the data was running in lorcaserin's favor"). Allakos also made the importance of these differences clear when it highlighted them in its presentation on the results of the Prevalence Study.

Thus, Tomasi was, at minimum, reckless because (1) he was highly knowledgeable about the ENIGMA Trials and the Prevalence Study, (2) he was tipped off by the Prevalence Study results that the demographics and characteristics of patients could be significantly different despite meeting the enrollment criteria of the ENIGMA Trials, and the Prevalence Study identified the precise differences that caused Phase 3 to fail, (3) he had access to the demographics and characteristics of the Phase 3 patients and indicated he reviewed them, and (4) he understood that whether the demographics and characteristics in Phase 2 and Phase 3 were the same was very important since he twice said during the Interview that it was the "most important thing."

**B. The SAC's Motive and Stock Sale Allegations Support Scienter.**

Defendants' argument that Tomasi would have been motivated to amplify the fact that the Phase 3 population was different than Phase 2 is nonsensical. Mot. at 10-11. The entire purpose of Tomasi comments was to reassure investors that the patient populations were the same so that they would believe that Phase 3 would be successful. Amplifying that the patient populations were different would have completely undermined that goal. Furthermore, amplifying the differences would have also implied that more research was needed to determine if the type of patients identified in the Prevalence Study were good candidates for AK002. Accordingly, Tomasi was

- 14 -

highly motivated to downplay the differences between the Phase 2 and Phase 3 patient populations.

Additionally, none of Defendants' arguments concerning Tomasi's stock sales refutes the allegations that he did not sell a single share of Allakos stock until after Allakos completed Phase 2 ENIGMA and the Prevalence Study (he adopted his Rule 10b5-1 plan on December 18, 2020 after they were completed), at which point he sold almost $24 million worth of stock. ¶¶176-177. These sales show that Tomasi did not have as much confidence in the Phase 3 results as he expressed to investors. Additionally, contrary to Defendants' claims, Tomasi held almost 200,000 more shares of Allakos stock at the beginning of the Class Period than on March 31, 2022 if unvested options are considered. Defs.' Ex. C at 53 n.6; Defs.' Ex. D at 32 n.8. Finally, even if the Court does not hold that the SAC's stock sale allegations support scienter, the allegations are unnecessary because "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *America West*, 320 F.3d at 944.

**C. The Balance of Inferences Supports Scienter.**

Defendants' "balance of the inferences" argument (Mot. 14-15) has little relationship to what is actually pled in the SAC. Nowhere in the SAC does it allege that Tomasi believed that Phase 3 ENIGMA was doomed to fail. Plaintiffs do not doubt that Tomasi hoped that the Phase 3 would be successful and if he had told investors only that, this claim would not exist. Instead, Tomasi recklessly misrepresented to investors that the demographics and characteristics of the Phase 3 population were "very similar" to the Phase 2 population, while emphasizing that was the "most important thing" for the success of the trial. Accordingly, Tomasi misrepresented the risks to the success of Phase 3, which is actionable. *See In re Amylin Pharms., Inc. Sec. Litig.*, No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *5 (S.D. Cal. May 1, 2003) ("[I]f, as Plaintiffs allege, Defendants misled Plaintiffs about…risk by making assurances regarding the completeness of the data…, Defendants may be held liable.").

**<u>CONCLUSION</u>**

Defendants' Motion should be denied. If the Court grants it, Plaintiffs respectfully request leave to amend the Phase 3 patient population claims since the SAC pleads them for the first time and they could not have been pled earlier.

DATED: July 28, 2022

THE ROSEN LAW FIRM, P.A.

By: /s/*Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Brian B. Alexander, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: balexander@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

- 16 -