JAMES G. KREISSMAN (Bar No. 206740)
jkreissman@stblaw.com
STEPHEN P. BLAKE (Bar No. 260069)
sblake@stblaw.com
BO BRYAN JIN (Bar No. 2789990)
bryan.jin@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile:  (650) 251-5002

*Attorneys for Defendants Allakos Inc.,*
*Robert Alexander, Leo Redmond,*
*Henrik Rasmussen, and Adam Tomasi*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNG KIM, CHRISTIAN MAYO, AND ALLISON SKYE, Individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>ALLAKOS INC., ROBERT ALEXANDER, LEO REDMOND, HENRIK RASMUSSEN, and ADAM TOMASI,<br><br>            Defendants. | Case No. 4:20-cv-01720-JSW<br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Hon. Jeffrey S. White<br>Date: September 30, 2022<br>Time: 9:00 a.m.<br>Oakland Courthouse, Courtroom 5 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................................ 1

ARGUMENT .................................................................................................................................. 3

I.      PLAINTIFFS ABANDON THE PHASE 2 CLAIMS, NECESSITATING THEIR
        DISMISSAL ................................................................................................................. 3

II.     PLAINTIFFS FAIL TO PLEAD FALSITY FOR THE PHASE 3 CLAIM ...................... 4

        A.      The Population Statement Was Neither False Nor Misleading .............................. 4

                1.      The Population Statement's Scope Was Not Ambiguous In View Of Its
                        Context ................................................................................................... 5

                2.      Investors Knew That The Phase 3 Population Likely Had Lower Eosinophil
                        Levels And Different Diagnostic History ................................................. 6

        B.      The Enrollment Statement Is Also Not Actionable ................................................. 8

III.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER ................ 10

        A.      Plaintiffs' Motive And Opportunity Allegations Weigh Against Any
                Inference Of Scienter ........................................................................................... 10

        B.      Plaintiffs Fail To Plead Recklessness .................................................................. 12

        C.      The Balance Of Inferences Further Demonstrates The Absence Of Scienter ....... 14

IV.     THE SECTION 20(a) CLAIM MUST ALSO BE DISMISSED ................................... 15

V.      THE DISMISSAL SHOULD BE WITH PREJUDICE ............................................... 15

CONCLUSION ............................................................................................................................ 15

**TABLE OF AUTHORITIES**

**Cases**

*Allstate Life Insur. Co. v. Robert W. Baird Co.*,
  756 F. Supp. 2d 1113 (D. Ariz. 2010) .................................................................................. 12

*Applestein v. Medivation, Inc.*,
  861 F. Supp. 2d 1030 (N.D. Cal. 2012) ................................................................................ 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................................. 10

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) .................................................................................... 6

*Camp v. Qualcomm Inc.*,
  No. 18-cv-1208-AJB, 2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ........................................ 4

*Chang v. Accelerate Diagnostics, Inc.*,
  No. 15-cv-00504-PHX, 2016 WL 3640023 (D. Ariz. Jan. 28, 2016) ........................................ 6

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ................................................................................................ 15

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
  963 F. Supp. 2d 1092 (E.D. Wash. 2013)............................................................................... 13

*Colyer v. Acelrx Pharms., Inc.*,
  No. 14-cv-04416-LHK, 2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) .................................... 13

*DSAM Global Value Fund v. Altris Software, Inc.*,
  288 F.3d 385 (9th Cir. 2002) ................................................................................................ 14

*Edw C. Levy Co. v. Rein*,
  1996 WL 89263 (9th Cir. 1996) ............................................................................................ 12

*Furher v. Ericsson LM Tel. Co.*,
  363 Fed. Appx. 763 (2d Cir. 2009).......................................................................................... 14

*Hillson Partners Ltd. Partnership v. Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994) .................................................................................................. 10

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) ........................................................................................ 12, 14

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) .................................................................................... 12

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ................................................................................................... 6

*In re Intel Corp. Sec. Litig.*,
  No. 18-cv-00507-YGR, 2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ................................... 4

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) .......................................................................................... 11, 12

*In re Stratosphere Corp. Sec. Litig.*,
  66 F. Supp. 2d 1182 (D. Nev. 1999) ..................................................................................... 10

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996) .................................................................................................... 4

*In re Twitter, Inc. Sec. Litig.*,
  506 F. Supp. 3d 867 (N.D. Cal. 2020); ................................................................................. 11

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) .......................................................................... 11, 12

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .............................................................................................................. 10

*Kelly v. Elec. Arts, Inc.*,
  71 F. Supp. 3d 1061 (N.D. Cal. 2014) ..................................................................................... 4

*Limantour v. Cray Inc.*,
  432 F. Supp. 2d 1129 (W.D. Wash. 2006) ............................................................................ 11

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) .............................................................................................. 11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................................. 11

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
  No. 13-cv-08440-DMG, 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .................................. 12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ......................................................................................................... 8, 10

*Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
  679 F.3d 952 (7th Cir. 2012) ................................................................................................ 14

**INTRODUCTION**

Plaintiffs' Opposition (the "Opposition" or "Opp.") confirms that the Second Amended Complaint ("SAC") should be dismissed in its entirety with prejudice.

**Plaintiffs Concede That Their Phase 2 Claims Fail.** Plaintiffs concede that they have failed to meaningfully amend their originally-asserted Phase 2 Claims[1] and do not oppose Defendants' motion for dismissal of these claims with prejudice. Indeed, the Opposition makes it abundantly clear that Plaintiffs used the Court's grant of leave to amend the Phase 2 Claims as an opportunity for them to assert their newly minted and unrelated Phase 3 Claim.

**The Phase 3 Claim Fails For Multiple Reasons.** Plaintiffs challenge two oral statements that Mr. Tomasi delivered in response to questions he received at an investor conference. There is no reason to believe that the challenged statements, as Plaintiffs suggest, misled or confused any analyst or investor. Indeed, Plaintiffs point to no commentary that adopted their implausible interpretation of those statements. Moreover, Plaintiffs ask the Court to draw the inference that Mr. Tomasi sought to mislead investors about the Phase 3 trial's potential for success only a few months before the trial results were to be released, without alleging that he would obtain any concrete or personal benefit through the purported fraud. Plaintiffs thus fail to plead a compelling or even cogent inference of scienter. The Phase 3 Claim should be recognized for what it is—an implausible theory that Plaintiffs' counsel concocted to salvage this lawsuit after the Court's dismissal of the Phase 2 Claims.

**Falsity**: In the Phase 3 Claim, Plaintiffs challenge two oral statements Mr. Tomasi made at the Interview.[2] Those statements, made informally in response to questions, were:

- "So we do have a very similar patient population in phase 3 as we do in phase 2" (the "Population Statement"); and

- "The Phase 3 study is identical with regards to [the] patient population that we're [enrolling]" (the "Enrollment Statement").

---

[1] Capitalized terms that are not defined in this brief have the same meanings as in Defendants' Memorandum of Points and Authorities in Support of Their Motion to Dismiss the Second Amended Complaint, ECF No. 46 ("MTD").

[2] Because Plaintiffs abandon the Phase 2 Claims and direct the Phase 3 Claim to only Allakos and Mr. Tomasi, the Court should dismiss Messrs. Alexander, Redmond, and Rasmussen from Count I for all claims in this action.

The Population Statement summarized Mr. Tomasi's observations that the Phase 3 trial had the same enrollment criteria as the Phase 2 trial and that they also had very similar baseline TSS, which Plaintiffs concede were true and accurate.  Plaintiffs argue that the scope of the Population Statement was ambiguous and ***could have*** implied that the Phase 3 Population had both similar baseline eosinophil and IgE levels and a similar diagnostic history to the Phase 2 Population.  This argument fails because it is contradicted by the context of the statement, which eliminated any ambiguity that may have existed in isolation.  In his immediately preceding remarks, Mr. Tomasi explained that Allakos sought to ensure the similarity of the Phase 2 and Phase 3 Populations by focusing on ***"two things"***—patient enrollment criteria and baseline TSS. Moreover, based on other statements made by Allakos personnel, investors were well aware of the fact that the Phase 3 Population could, and likely would, differ from the Phase 2 Population in certain aspects, including, in particular, baseline eosinophil levels and diagnostic history. Reasonable investors could not have found the Population Statement misleading.

Plaintiffs' argument regarding the Enrollment Statement is even weaker.  According to the Opposition, reasonable investors would be misled into believing that the Phase 3 Population consisted of either precisely the same patients who were in the Phase 2 Population or patients who were somehow otherwise "identical" to the Phase 2 patients.  To the contrary, this statement is obviously a reference to the identical enrollment criteria repeatedly discussed by Mr. Tomasi in the Interview.  Moreover, no reasonable investor would believe either that Allakos was studying the same patients in two separate trials or that two different groups of people would be somehow identical in all respects.  Both the context in which the Enrollment Statement was made and simple common sense demonstrate that Plaintiffs' claim is implausible and should be rejected.

**Scienter**:  Plaintiffs fall far short of pleading the strong inference of scienter that they need to sustain the Phase 3 Claim.  The Opposition all but concedes that Mr. Tomasi had no motive to commit securities fraud.  Indeed, Plaintiffs' stock sale allegations regarding Mr. Tomasi weigh against any inference of scienter, because Mr. Tomasi was ***not*** alleged to have sold any Allakos stock after he made the challenged statements, which Plaintiffs allege inflated the stock price. Instead, Mr. Tomasi retained his Allakos holdings following those statements and suffered

approximately $70 million in losses when the Phase 3 trial's surprising result was announced, strongly indicating good faith rather than scienter. Plaintiffs' additional motive allegations are self-contradictory and even less well-pleaded. In any event, they utterly fail to show that Mr. Tomasi obtained any concrete and personal benefits from the purported fraud and are thus insufficient for pleading motive as a matter of law.

Plaintiffs similarly fail to plead facts giving rise to an inference that Mr. Tomasi knowingly or recklessly made false or misleading statements that were aimed at concealing the fact that the Phase 3 Population had lower eosinophil levels and different diagnostic histories from that of the Phase 2 Population. First, Allakos disclosed the possibility that the Phase 3 Population could include patients with lower eosinophil levels and with diagnostic histories that did not include either EG or EoD. Accordingly, Mr. Tomasi's purported knowledge of these facts could not form the basis for scienter. Moreover, while *everyone* was aware of these potential differences, Plaintiffs fail to allege any facts giving rise to an inference that Mr. Tomasi knew or had reason to believe that these potential differences would impact the result of the Phase 3 trial at the time he made the statements challenged by Plaintiffs. Indeed, Plaintiffs have failed to plead any facts showing that anyone at Allakos believed or even suspected that any of these differences could impact the Phase 3 trial until weeks after it announced the trial's surprising results, and after it had conducted an in-depth *post hoc* analysis. Thus, viewed holistically, the scienter inference Plaintiffs ask the Court to draw is neither cogent nor at least as compelling as the competing non-fraud inference, mandating dismissal.

## ARGUMENT

### I.   PLAINTIFFS ABANDON THE PHASE 2 CLAIMS, NECESSITATING THEIR DISMISSAL

Plaintiffs do not oppose the dismissal of their original claims regarding the Phase 2 trial, which the Court already dismissed once without prejudice. *See* MTD at 6–7. Indeed, the Opposition references the Phase 2 Claims only once, in a one-sentence footnote that states "[t]he SAC repleads the claims concerning Phase 2 to preserve them for appeal." Opp. at 3 n.3. As a

result, and for the same reasons that the Court previously identified, the Phase 2 Claims should be dismissed with prejudice.  *See* Order at 9-15.[3]

## II.   PLAINTIFFS FAIL TO PLEAD FALSITY FOR THE PHASE 3 CLAIM

### A.   The Population Statement Was Neither False Nor Misleading

"Courts evaluate defendants' alleged false [or misleading] statements in the context in which they were made, specifically in regard to contemporaneous qualifying or clarifying language." *In re Intel Corp. Sec. Litig.*, No. 18-cv-00507-YGR, 2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) (citing *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996)).  In full, Mr. Tomasi made the following statement which Plaintiffs claim was false or misleading:

> And so our focus is really making sure that we [had] the same enrollment criteria which we do. And then as making sure that we have the same type of demographics going into the phase 3 study, making sure that the baseline [Total Symptom Score] [is] in the same or similar place. And the Phase 3 study as it was in Phase 2 and, and yeah the stud[y is] fully enrolled now. So I can say that these two things are true. ***So we do have a very similar patient population in phase 3 as we do in phase 2, so I think that was really probably the most thing that, the most important thing that was in our control.***

SAC ¶ 108 (modifications and emphasis added by Plaintiffs).  Plaintiffs do not dispute that the Population Statement—Mr. Tomasi's general comment on the similarity between the Phase 3 and the Phase 2 Populations—was a summary of his preceding sentences regarding the specific similarities.  Opp. at 8.  Plaintiffs also concede that the Phase 2 trial and the Phase 3 trial had the same enrollment criteria and similar baseline TSS, as Mr. Tomasi correctly stated in those preceding sentences.  *Id.* at 7.  Plaintiffs, however, contend that the Population Statement was misleading because it somehow also indicated to investors that the two populations had similar baseline eosinophil and IgE levels and diagnostic history, even though the statement contains

---

[3]  Plaintiffs' acknowledgement—for the first time—that they have jettisoned their Phase 2 Claims also dooms their Phase 3 Claim.  Lead Plaintiff allegedly purchased 50 shares of Allakos common stock on August 19, 2019, ***more than two years before*** the remaining alleged misrepresentations were made on September 10, 2021.  *See* ECF No. 1-1 at 1; *see also* ECF No. 25-1 at 2, 4 (alleging purchase of Allakos stock by Additional Plaintiffs in December 2019).  Because Plaintiffs "cannot plead Section 10(b) reliance as to the . . . purported misstatements that post-date their . . . stock purchase, those statements are inactionable as a matter of law." *Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1069–70 (N.D. Cal. 2014) (dismissing Rule 10b-5 claims based on post-stock purchase statements); *see also Camp v. Qualcomm Inc.*, No. 18-cv-1208-AJB, 2020 WL 1157192, at *4 (S.D. Cal. Mar. 10, 2020) (same).

absolutely no discussion of these issues. *Id.* at 7–11. Plaintiffs make two arguments; neither is persuasive.

### 1. The Population Statement's Scope Was Not Ambiguous In View Of Its Context

Plaintiffs claim that the Population Statement was ambiguous because Mr. Tomasi referred to "the same type of demographics" when describing the Phase 2 and the Phase 3 Populations' similar bassline TSS. Opp. at 8. According to Plaintiffs, if Mr. Tomasi meant to refer to baseline TSS, he would have used the singular form "demographic," not the plural form "demographics." *See id.* Plaintiffs claim that a reasonable investor could have understood "demographics" in plural form to mean baseline eosinophil and IgE levels or diagnostic history, as opposed, or in addition, to baseline TSS, and declare that the Court must resolve this "ambiguity" in Plaintiffs' favor. *See id.* at 8–9.

There is no such ambiguity. ***First,*** Plaintiffs' grammatical argument is fundamentally defective. When "demographics" is used to refer to "the statistical characteristics of human populations," as it was in the Population Statement, it is ***always*** in the plural form. Ex. E at 332.[4] The singular form "demographic" is only used to refer to a "segment of the population identified by demographics." *Id.* Plaintiffs' contention of an "ambiguity" is thus unfounded.[5]

***Second,*** the context of the Population Statement cuts against Plaintiffs' claim of ambiguity. At no point during the Interview—which spanned 10 pages of transcript—did Mr. Tomasi reference baseline eosinophil levels, baseline IgE levels, or diagnostic history. *See* ECF No. 41-5. Instead, Mr. Tomasi specifically limited his comment regarding the similarity between the Phase 2 and Phase 3 Populations to "***two things***"—"the same enrollment criteria" and a "baseline [Total Symptom Score]" that was "in the same or similar place." SAC ¶ 108. Therefore, even if the Court were to conclude that Mr. Tomasi's off-the-cuff reference to "the

---

[4] Citations to Ex. A through Ex. D refer to the exhibits to Declaration of Stephen Blake in Support of Defendants' Motion to Dismiss the Second Amended Complaint, ECF No. 47. Citations to Ex. E through Ex. H refer to the exhibits to the concurrently-filed Supplemental Declaration of Stephen Blake in Support of Defendants' Motion to Dismiss the Second Amended Complaint.

[5] In any event, the two populations did have multiple similar demographic characteristics, such as median age and ratio of male to female patients. ECF No. 41-6 at 28.

same type of demographics" was, read in isolation, somewhat generalized or imprecise, when read in context, the only reasonable conclusion is that Mr. Tomasi's mention of demographics relates to the second of the "two things" he discussed, baseline TSS. By looking at the statement as a whole, its meaning is clear and any potential ambiguity is eliminated. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 796 (9th Cir. 2017) (finding statement that a certain test was "FDA-cleared," albeit "less precise," not actionable in view of other statements regarding the limited scope of the clearance); *Chang v. Accelerate Diagnostics, Inc.*, No. 15-cv-00504-PHX, 2016 WL 3640023, at *7–8 (D. Ariz. Jan. 28, 2016) (holding that characterization of a medical diagnosis process as "culture-free" was not misleading even though the process did rely on a "positive blood culture," because the defendants clarified that the process eliminated a time-consuming "isolate culture"). The Population Statement thus would not mislead any "reasonable investor, reading the statement fairly and in context." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017).[6]

### 2. Investors Knew That The Phase 3 Population Likely Had Lower Eosinophil Levels And Different Diagnostic History

Plaintiffs also contend that the Population Statement was misleading because its "fair and reasonable implication . . . was that the [Phase 2 and Phase 3] patient populations were 'very similar' in all significant ways." Opp. at 9. According to Plaintiffs, Mr. Tomasi failed to warn investors that, notwithstanding the identical enrollment criteria and the very similar baseline TSS, the two populations could be—and, as Allakos later determined through the *post hoc* analysis, were indeed—dissimilar in other aspects, such as in baseline eosinophil and IgE levels and diagnostic history. *See id.* at 9–10.

Even if the scope of the Population Statement were to be construed in this expansive manner—which would be inappropriate as discussed above—Plaintiffs' argument still fails

---

[6] The Opposition claims that *Bodri* and two other cases cited by Defendants support ***Plaintiffs'*** positions because Mr. Tomasi allegedly "did not hedge in any meaningful way" when he made the Population Statement. *See* Opp. at 9. Plaintiffs are mistaken. These cases stand for the well-established rule that a challenged statement must be examined in its context. *See* MTD at 9. Such context could include, not only "warning [that the challenged statements] may not be accurate," on which Plaintiffs seem to focus, Opp. at 9, but also information that clarifies the scope of the statements at issue. *See In re Atossa Genetics*, 868 F.3d at 796; *Accelerate Diagnostics*, 2016 WL 3640023, at *8.

because *investors were fully aware of the risk Mr. Tomasi allegedly failed to disclose*. Indeed, Allakos disclosed that it identified, through the Prevalence Study, 181 previously undiagnosed EG and/or EoD patients. *See* ECF No. 41-4 at 20–23. Importantly, these patients "met the histologic criteria for EG and/or EoD (≥30 eos/hpf in 5 gastric or 3 duodenal hpf)"—which are identical to the enrollment criteria for the Phase 2 and Phase 3 trials. *Id.* at 20. Additionally, the mean TSS of the EG and/or EoD patients identified in the Prevalence Study was 31.3, which is very similar to the Phase 2 Population's mean TSS of 31.9. *Id.* at 25. However, Allakos also disclosed that these 181 Prevalence Study patients who met the ENIGMA enrollment criteria and had similar TSS to the Phase 2 and Phase 3 populations nevertheless had an average peripheral blood eosinophil count that was *roughly half* the level of the Phase 2 Population (170 per microliter v. 325 per microliter). The 181 patients also necessarily had different diagnostic histories than the Phase 2 Population, because the Prevalence Study targeted patients who were not previously diagnosed with EG or EoD, but instead had been diagnosed with other diseases, such as Irritable Bowel Syndrome ("IBS"). Allakos disclosed these differences in the slide below on October 26, 2020:

### Baseline Characteristics of Patients in Prevalence Study Compared to ENIGMA

| Patient Characteristics | Screened n=556 | EG/EoD n=181 | MGID n=204 | ENIGMA[a] n=72 |
|---|---|---|---|---|
| Mean age, years (range) | 45 (18–83) | 45 (19–78) | 44 (18–76) | 42 (18-74) |
| Female sex | 72% | 73% | 72% | 60% |
| White | 89% | 85% | 90% | 92% |
| Weight, median, kg | 82 | 83 | 82 | 82 |
| Peripheral blood eos count, /µL, median (IQR) | 130 (80–220) | 170 (100–250) | 110 (70–165) | 325 (138–673) |
| TSS [0-80], mean | 27.8 | 31.3 | 30.0 | 31.9 |
| History of GI symptoms, mean years | 11 | 11 | 9 | 9 |
| Prior diagnosis, n (%) | | | | |
| Gastroesophageal reflux | 53% | 65% | 55% | 33% |
| Irritable bowel syndrome | 46% | 55% | 51% | 4% |
| Functional dyspepsia | 16% | 15% | 18% | 1% |
| Chronic gastritis or duodenitis | 12% | 11% | 18% | 6% |
| Any of the above | 81% | 93% | 88% | 43% |

a 72 patients met histologic criteria for EG/EoD; 65 patients enrolled in ENIGMA



ECF No. 41-4 at 25 (emphases added). Investors were thus fully aware of—in Plaintiffs' words— "a clear possibility" that patients who met the enrollment criteria of the Phase 3 trial could

---

nevertheless have "significantly different characteristics from the Phase 2 ENIGMA patients," such as lower eosinophil levels and different diagnostic history—"the exact differences in the Phase 2 and Phase 3 patient populations that caused Phase 3 to fail."  Opp. at 2, 12.

Moreover, Allakos informed investors that the EG and/or EoD patients identified in the Prevalence Study "would be eligible to go into ENIGMA 2" (*i.e.*, the Phase 3 trial) and that Allakos was "actively" enrolling those patients.  Ex. F at 15; *see also* Ex. G at 14 (Question: "[I]f you find a bunch of EG patients misdiagnosed with IBS [in the Prevalence Study], would you enroll them into the Phase III potentially?"  Answer: "Certainly, patients that—what we have embedded in [the Prevalence Study] protocol is patients that we find that have an [eosinophil-associated gastrointestinal disorder ("EGID")] get referred to the EGID study.").  Investors thus knew that the Phase 3 patients could have lower eosinophil and IgE levels than those experienced by Phase 2 patients and that these patients could have different diagnostic histories, particularly given the eligibility of Prevalence Study patients for Phase 3.  As a result, no reasonable investor could have been misled by Mr. Tomasi's comment on the similarity between the two population. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (noting that investors interpret disclosures in view of "apparently conflicting information" and "customs and practices of the relevant industry").

**B.     The Enrollment Statement Is Also Not Actionable**

Plaintiffs concede that the Enrollment Statement was not false or misleading, if the word "identical" in that statement referred to the undisputed fact that the Phase 2 and the Phase 3 trials had the same enrollment criteria.  *See* Opp. at 10.  According to Plaintiffs, however, a reasonable investor would "expect[]," based on this statement, that the "actual patients enrolled" in the two studies were identical.  *Id.*  Plaintiffs' position is not supported by the context.  Mr. Tomasi stated:

> ***The Phase 3 study is identical with regards to [the] patient population that we're [enrolling].*** Chief difference is that we're focusing [on] the high-dose group given greater efficacy that we saw in Phase 2[. T]hat study is 80 patients per arm instead of being 20 patients per arm, given the strong p-values that we saw in Phase 2, the phase 3 study will power on its end points.

SAC ¶ 149 (modifications and emphasis added by Plaintiffs).  On its face, it is clear that Mr. Tomasi was discussing the ***design*** of the Phase 3 trial, including its "focus[] [on] the high-dose

group," its larger size than that of the Phase 2 trial, and the two trials' identical enrollment criteria. *See id.* The Opposition ignores this surrounding context and instead points to Mr. Tomasi's reference to the completion of the Phase 3 trial enrollment, which they contend shows Mr. Tomasi was referring to the "actual makeup of the patient population," not the "stale" enrollment criteria. *See* Opp. at 10. But Mr. Tomasi's only reference to the completion of enrollment was made in the context of his statement that the Phase 3 Population had a similar TSS to the Phase 2 Population. *See supra* at 1, 6. He did ***not*** mention the completion of enrollment in making the Enrollment Statement. *Compare* SAC ¶ 149 (no reference to enrollment completion in the context of the Enrollment Statement) *with id.* ¶ 150 (referencing enrollment completion in the context of the Population Statement). Accordingly, there is no reason to construe the Enrollment Statement as suggesting anything more than the undisputed fact that the Phase 2 and Phase 3 trials had the same enrollment criteria.

Moreover, no reasonable investor would, as Plaintiffs contend, expect Allakos to conduct the Phase 3 trial on the same group of patients who were evaluated in the Phase 2 trial or on a group of patients who were physiologically identical to the Phase 2 patient group. Indeed, investors would know that such equivalency would be ***impossible*** to achieve. Investors were aware, among other things, that:

- The Phase 3 Population was three times larger than the Phase 2 Population, *compare* SAC ¶ 47 ("approximately 60 patients" in the Phase 2 trial) *with* ECF No. 41-6 at 24 ("180 . . . patients" in the Phase 3 trial);

- Many patients in the Phase 2 Population had been successfully treated and would no longer meet the Phase 3 trial's at-least-30-eosinophil-per-high-powered-field ("hpf") enrollment criterion, *see* ECF 41-1 at 17 (noting that 37 out of the 39 patients in the high dose arm of the Phase 2 trial had fewer than 5 eosinophil per hpf at the conclusion of the Phase 2 trial); and

- The Phase 3 Population included patients who had participated in the Prevalence Study instead of the Phase 2 trial, *see supra* at 8.

Plaintiffs attempt to suggest that investors—who according to the Opposition were sophisticated enough to divine the implication of the plural as opposed to the singular form of the term "demographic" used in an off-the-cuff reference, *see supra* at 5—would nevertheless expect an identity between the Phase 2 Population and the Phase 3 Population. This implausible

interpretation of the Enrollment Statement should be rejected because the Court "must not 'attribute to investors a childlike simplicity.'" *In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1198 (D. Nev. 1999) (quoting *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir. 1994)); *see also Omnicare*, 575 U.S. at 190 ("[A]n investor reads each statement . . . in light of all its surrounding text, including . . . apparently conflicting information [and] takes into account the customs and practices of the relevant industry"). As a result, Plaintiffs have failed to "nudge[] their claims across the line from conceivable to plausible," mandating dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[7]

## III.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

### A.    Plaintiffs' Motive And Opportunity Allegations Weigh Against Any Inference Of Scienter

According to the SAC, it was important for Allakos to show that AK002 can be marketed to not only the "approximately 50,000" diagnosed, more severe EG and/or EoD patients, but also the "6 to 10 million" under-diagnosed, potentially less severe patients. *See* SAC ¶¶ 19, 101, 175. But, if this were his motivation, Mr. Tomasi would have been motivated to highlight the fact that the Phase 3 Population included patients with lower average baseline eosinophil and IgE levels than the Phase 2 Population and with diagnostic histories that included a lower percentage of diagnosed EG and/or EoD patients than the Phase 2 Population. Rather than taking this approach, Plaintiffs contend that Mr. Tomasi "[d]ownplay[ed]" the difference between the Phase 2 and Phase 3 Populations. *Id.* ¶ 175. Perhaps realizing that they cannot have it both ways, Plaintiffs appear to have abandoned this illogical theory. Instead, Plaintiffs now claim in the Opposition that "[t]he entire purpose of Tomasi comments was to reassure investors that . . . Phase 3 would be successful." Opp. at 14. This new allegation is not only unsupported and speculative, but also irrelevant because the SAC contains no such allegation. *See* SAC ¶¶ 157–82 (no allegation of such motivation in scienter pleading).

---

[7] Plaintiffs do not oppose the dismissal of their Phase 3 primary liability claims against Messrs. Alexander, Redmond, and Rasmussen. *See* MTD at 7 n.5. These claims should be dismissed because Plaintiffs do not challenge any statement made by these three individual defendants. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011) (holding that only defendants who have made the alleged misstatements can be held primarily liable under Section 10(b) and Rule 10b-5).

In any event, these motive allegations are fundamentally deficient because Plaintiffs do not allege that the purported fraud would benefit **Mr. Tomasi** "in some **concrete and personal way**." *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1177 (C.D. Cal. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)) (emphasis added).  "If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (citation omitted).

In particular, Plaintiffs do not allege that Mr. Tomasi sold any Allakos stock after he purportedly misled investors to artificially inflate the stock price.  Instead, the SAC alleges that Mr. Tomasi sold Allakos stock between March and June 2021—months **before** he made the challenged statements in September 2021.  SAC ¶ 177.  As Defendants explained, these alleged sales "provide no evidence of scienter with regard to allegedly false statements that were made after the stock sales ended."  MTD at 11 (quoting *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1151–52 (W.D. Wash. 2006)).  The Opposition completely fails to address *Limantour* and other cases cited by Defendants on this issue; nor does it point to any case law to the contrary.  *See* Opp. at 15.  Moreover, Plaintiffs do not dispute that:

- Mr. Tomasi's alleged stock sales were made pursuant to a non-discretionary Rule 10b5-1 plan that was adopted nine months before the Interview and thus "do not support a strong inference of scienter," *see* MTD at 11–12 (quoting *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020));

- The alleged sales accounted for only approximately a quarter of Mr. Tomasi's Allakos shares and the Ninth Circuit has rejected similar scienter allegations where the defendants sold a greater percentage of their holdings, *see id.* at 12 (collecting cases); and

- Mr. Tomasi's salable shares of Allakos stock increased in Allakos during the putative class period, which "strongly rebuts an inference of scienter," *see id.* (quoting *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1042–43 (N.D. Cal. 2012)).[8]

---

[8]  Plaintiffs contend that "Tomasi held almost 200,000 more shares of Allakos stock at the beginning of the Class Period than on March 31, 2022 if unvested options are considered."  Opp. at 15.  But the Ninth Circuit made it clear that, in assessing scienter, courts focus on "the volume of shares [a defendant] **could have sold**," *i.e.*, stocks (including those obtained through exercise of vested options) and vested options, but not unvested options.  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986–87 (9th Cir. 1999), as amended (Aug. 4, 1999) (emphasis added); *see*

Indeed, Plaintiffs have all but conceded their failure to plead motive and opportunity. Instead, they merely argue that their failure, in itself, should not foreclose a finding of scienter. *See* Opp. at 15.  Plaintiffs, however, cannot dispute that "the lack of *any* tangible, personal benefit here further weighs against [any inference of] scienter." *In re Wet Seal*, 518 F. Supp. 2d at 1178 (emphasis in original).

### B.    Plaintiffs Fail To Plead Recklessness

The SAC insinuates that Mr. Tomasi knowingly committed fraud. *See* SAC ¶¶ 172–74. The Opposition largely retreats from this position and instead contends that Plaintiffs' allegation demonstrates recklessness. *See* Opp. at 11–14.  "Under 10b-5, a false statement is actionable only if made with the intent to deceive, manipulate or defraud which requires actual knowledge or a heightened standard of recklessness; negligence is insufficient." *Edw C. Levy Co. v. Rein*, 1996 WL 89263 at *2 (9th Cir. 1996).  Reckless conduct must "involv[e] not merely simple, or inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (citation omitted).  Moreover, "recklessness only satisfies scienter when it 'reflects some degree of intentional or conscious misconduct.'" *Allstate Life Insur. Co. v. Robert W. Baird Co.*, 756 F. Supp. 2d 1113, 1141 (D. Ariz. 2010) (citing *In re Silicon Graphics*, 183 F.3d at 977).

The lynchpin of Plaintiffs' recklessness argument is that Mr. Tomasi had access to information—including in particular the results of the Prevalence Study[9]—that put him "on notice" of the differences between the Phase 2 and Phase 3 populations with respect to baseline

---

*also Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, No. 13-cv-08440-DMG, 2015 WL 1775221, at *38 (C.D. Cal. Apr. 14, 2015) (considering vested options, but not unvested options, in scienter analysis); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) (adopting "the Ninth Circuit's nuanced approach of distinguishing between vested stock options (*i.e.*, exercisable stock options) and unvested stock options, which cannot be converted into shares and sold immediately" and excluding unvested options in assessing scienter).

[9] Plaintiffs' related allegations regarding Mr. Tomasi's supposed familiarity with the clinical trials and statements made by other Allakos officers are speculative and/or based on misinterpretations. *See* MTD at 13–14.

eosinophil and IgE levels and diagnostic history.  Opp. at 2, 12–13.  Plaintiffs claim that Mr. Tomasi's alleged access to such information "strongly supports an inference of recklessness."  *Id.* at 13.  This contention fails for multiple reasons.

At the outset, the results of the Prevalence Study were ***publicly disclosed to investors***.  *See supra* at 6–8.  Plaintiffs cannot credibly argue that Mr. Tomasi's access to information that Allakos publicly disclosed to investors and analysts somehow supports an inference of scienter.  Indeed, the fact that Allakos disclosed the supposed "red flags" "negates an inference of scienter, because it shows that Defendants intended to place the investing public on the same footing as . . . management by providing investors with the same adverse information and allowing them to reach their own conclusions."  *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1132 (E.D. Wash. 2013).

Moreover, "knowing about the existence of certain . . . [facts] and knowing that one should report these [facts] to the public are two different things."  *Colyer v. Acelrx Pharms., Inc.*, No. 14-cv-04416-LHK, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015).  The SAC does not allege, at least not based on well-pleaded factual allegations, that Mr. Tomasi, at the time of the Interview, knew either the extent of the differences in baseline eosinophil and IgE levels and diagnostic history between the Phase 2 and Phase 3 Populations, or that any such differences could materially impact the Phase 3 trial's ability to meet its symptomatic endpoint.  Rather, Plaintiffs' claim assumes that Allakos and Mr. Tomasi could appreciate the significance of granular differences in the patient populations, at a time before the study was completed and before the *post hoc* analysis of the results were conducted.  This assumption flies in the face of why clinical trials are conducted—to test the safety and efficacy of drug candidates on patient populations.  To assume—without any well-pleaded factual basis—that Allakos appreciated, before completion of the Phase 3 trial, what would cause its failure to meet one of its two endpoints, and then sought to mislead investors, is simply not plausible.

Plaintiffs also fail to plead any facts giving rise to an inference that the connection between the differences in the patient populations and the outcome of the Phase 3 trial was so obvious that not knowing it in advance was "not merely simple, or inexcusable negligence, but an extreme

departure from the standards of ordinary care." *Hollinger*, 914 F.2d at 1569 (citation omitted). To the contrary, the SAC and other materials properly before the Court demonstrate that Allakos did not identify this connection until after the Phase 3 trial's surprising failure to meet its symptomatic endpoint and the Company's extensive *post hoc* analysis thereafter. *See* MTD at 5.[10] As a result, Plaintiffs' allegations "at best show negligence" and "do[] not strongly compel an inference of intentional or deliberately reckless conduct as opposed to ordinary carelessness." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (rejecting similar allegation that the defendant "had in its hands the very documentation" that showed the accounting violation at issue, "yet did not see the obvious").

Finally, the nature of the Challenged Statements weighs against a finding of recklessness. "Oral exchanges are less precise than written ones." *Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012). Where, as here, the allegedly misleading statements were made in response to an analyst's question, courts are less likely to find a strong inference of recklessness. *See id.* (finding no scienter because the defendant "did not know what question was coming, had to answer off the cuff, and did not have an opportunity to review the question and edit his answer before the next question was posed"); *Furher v. Ericsson LM Tel. Co.*, 363 Fed. Appx. 763, 765 (2d Cir. 2009) (holding that the inference of reckless was not compelling where "[t]he statements were made in the context of an informal back-and-forth with analysts").

### C.     The Balance Of Inferences Further Demonstrates The Absence Of Scienter

Plaintiffs' scienter allegations, when viewed holistically, simply make no sense. Why would Mr. Tomasi, as Plaintiffs allege, downplay a significant risk to the Phase 3 trial and paint a rosy picture, when the trial's result was only a few months away? After all, Mr. Tomasi did not

---

[10]  Plaintiffs contend that the significance of the Phase 3 Population's lower baseline eosinophil level was "notable since the mechanism for action for AK002 is depletion of eosinophils." Opp. at 5. But even this over-simplification of AK002's mechanism, which is still being studied, does not indicate that AK002 would not effectively improve the symptoms in patients whose baseline eosinophil levels were high enough to meet the Phase 3 trial's enrollment criteria, but not as high as that of the Phase 2 Population, much less make this finding "so obvious that [Mr. Tomasi] must have been aware of it." *Hollinger*, 914 F.2d at 1569 (citation omitted). Indeed, existing literature indicated "a ***dissociation*** between symptoms and histology" or, in other words, that "[t]he symptom score did ***not*** correlate with the peak eosinophil count." Ex. H at 1 (emphases added).

sell a single share of Allakos stock after making the alleged misrepresentations. *See supra* at 11. When the surprising result of the Phase 3 trial was announced, the value of Mr. Tomasi's holdings of Allakos stock declined by ***over $70 million***, *see* SAC ¶¶ 154–55, Ex. C at 52, dwarfing the $24 million proceeds (not profits) he allegedly ***ever received*** from selling Allakos stocks, *see* SAC ¶¶ 176–77. If Mr. Tomasi had truly defrauded investors to drive up the price of Allakos stock, why would he not sell his shares while the stock price was still inflated? The much more compelling inference is that Mr. Tomasi, along with the rest of the Allakos team, reasonably and in good faith believed at the time of the Interview that the Phase 3 Population was similar to the Phase 2 Population and that the Phase 3 trial should therefore produce a similar positive result to the Phase 2 trial. Similarly, the more reasonable inference is that Mr. Tomasi only discovered the significance of the Phase 3 Population's lower baseline eosinophil and IgE levels and different diagnostic history after Allakos spent weeks investigating the Phase 3 trial's surprising failure to meet its symptomatic endpoint.

## IV.    THE SECTION 20(a) CLAIM MUST ALSO BE DISMISSED

Plaintiffs do not dispute that they cannot maintain a Section 20(a) control person liability claim without a sufficiently-pleaded Section 10(b) primary liability claim. The Court should thus dismissed both claims. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017).

## V.    THE DISMISSAL SHOULD BE WITH PREJUDICE

Plaintiffs seek leave to submit yet another amended complaint. Opp. at 15. The SAC, however, demonstrates that Plaintiffs are more interested in using the amendment process to assert unrelated new claims, perpetuating the litigation and the burden it imposes on Defendants, as opposed to actually curing deficiencies that the Court identifies. Plaintiffs' request for leave should be rejected, and the SAC dismissed with prejudice.

## CONCLUSION

For all of the reasons set forth above, Defendants respectfully request that the Court dismiss Plaintiffs' Second Amended Complaint with prejudice.

August 29, 2022

Respectfully submitted

SIMPSON THACHER & BARTLETT LLP

By /s/ *Stephen P. Blake*
STEPHEN P. BLAKE (Bar No. 260069)
sblake@stblaw.com

*Counsel for Defendants Allakos Inc., Robert Alexander, Leo Redmond, Henrik Rasmussen, and Adam Tomasi*