# Exhibit G

**S&P Global**
Market Intelligence

# Allakos Inc. NasdaqGS:ALLK
# Special Call
## Tuesday, March 24, 2020 9:00 PM GMT

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

Call Participants ............................................................................ 3

Presentation ............................................................................ 4

Question and Answer ............................................................................ 10

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

# Call Participants

## EXECUTIVES

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

**Robert Alexander**
*CEO & Director*

## ANALYSTS

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Greetings and welcome to the Allakos trial initiation and corporate update. [Operator Instructions] As a reminder, this conference is being recorded. I would now like to turn the conference over to our host, Robert Alexander, Chief Financial -- Chief Executive Officer. Thank you. You may begin.

**Robert Alexander**
*CEO & Director*

Thank you and I'd like to thank everybody for joining our call.

A reminder that I will be making forward-looking statements. So please refer to our most recent regulatory filings, in particular, our 10-K for a broader discussion of our risk factors.

On Slide 3. In terms of agenda, I will go through an overview and then turn it over to Henrik to go through the clinical trials details, and then at the end, we'll have a Q&A.

Okay. So on Slide 5. In terms of an overview, we recently initiated our Phase III study in eosinophilic gastritis and/or eosinophilic duodenitis. We previously referred to this as EGE, but it's simply a name change to be more precise. We also recently initiated a Phase II/III in eosinophilic esophagitis. Recently, we dosed our first group of patients in our Phase I subcutaneous healthy volunteer study. We also announced today positive results from a Phase I study in mast cell gastritis, and Henrik will go through that data a bit later as well. And then in terms of an update, our study in -- our prevalence study looking at EGID and MGID patients who have a history of functional GI disease is well underway, and that study has been enrolling quite well since late January.

Okay. So on Slide 6, a few words about the coronavirus and the effect it's having on our clinical trials and, as everybody knows, others' clinical trials as well.

We did initiate the Phase III EG study and the Phase II/III EoE study, as I mentioned. But after careful consideration over the last couple of weeks and given how much things have changed just in the last week or 10 days, we've decided to delay enrollment in those 2 studies until we have some additional clarity on how the infection rates go and how states and the government are dealing with the crisis.

In terms of an impact on our time lines, our current estimate for completion of our EG and our EoE study is second half of '21. That could be at risk, but we won't have any specific information on that until we get a little further down the road.

In terms of our subcutaneous and our prevalence studies, those -- as I mentioned, those studies are enrolling. They continue to enroll, although recently over the last, I'd say, week, they've slowed down a bit due to the pandemic. Those studies will read out in the second half of 2020, but again, depending on how things develop over the next few weeks or so, they may be impacted as well. And like everybody else, we'll continue to monitor the situation as carefully as we can and do whatever we can to minimize the impact on our development programs.

Okay. On Slide 7, just some background to reorient everybody on the story. So our drug antolimab, which is also known as AK002, targets Siglec-8, which is expressed on mast cells and eosinophils. If you look at the left side of the cartoon, Siglec-8 is a transmembrane protein. Again, it's constitutively expressed on mast cells and eosinophils. Its physiologic function is to be an inhibitory receptor, so it antagonizes activating signals delivered to these 2 cell types. On the right side, you could see antolimab engaged on Siglec-8. So what essentially we're doing with antolimab is we're pharmacologically activating the inhibitory function of Siglec-8. So we're antagonizing activating signals. The upshot of that is that we broadly inhibit mast cells and we kill the eosinophils.

Right. On Slide 8. This is the cartoon that represents a kind of a classic inflammatory reaction. To orient everybody, in the center is the mast cell. Off to the right are different cells of the innate immune system

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

and some additional cell types, in particular, the eosinophils over there. And on the left side, you can see T cells and B cells, put another way, that's the adaptive immune response. And what we're trying to do here is to put in context what inhibition of Siglec-8 potentially can do and what we have shown in our clinical studies to date. We know that we broadly inhibit the mast cell, and we've demonstrated that by showing inhibition of IL-33 and TSLP. We know we do that because we inhibit IL-4, 13 production from the mast cell. We've published data on the inhibition of IgE signaling on the mast cell, a toll-like receptors inhibition in the mast cell. We'll publish additional data on the breadth of inhibition going forward. Suffice to say that it does appear to be pretty broad inhibition. This includes not only inhibition of degranulation of the mast cell, but also de novo production of inflammatory mediators. And so the idea here was that by killing the eosinophil and broadly inhibiting the mast cell, that we could potentially collapse this inflammatory cascade. And the idea then is we could see clinical benefit in patients.

And if you go to the next slide, Slide 9, this is a list of indications that we actually have generated clinical data in or where we have strong scientific evidence that we should work there. And so this hypothesis of being able to kill -- having killing eos and inhibiting mast cells, having a potential benefit in patients has been borne out in the data sets that we've generated.

So in the upper right are 3 different forms of chronic conjunctivitis. We published that data last winter -- I guess, last -- I guess, in May of last year, showing a very nice treatment effect in all 3 forms of severe conjunctivitis. This was assessed both by patients and physicians. Embedded in those studies were people that had comorbid asthma and atopic dermatitis. And anecdotally, we also saw benefits in those populations. We also announced last year a study in chronic urticaria. This included both spontaneous urticaria as well as 2 different forms of inducible urticaria. Again, we saw a very nice treatment effect there. And then more recently, we published the data on eosinophilic gastritis and eosinophilic duodenitis. And again, that data was very robust and showed a significant treatment benefit in that patient population. And then in some of these other indications, for example, ulcerative colitis, there's a lot of scientific evidence that mast cells and eosinophils are involved in the pathogenesis of that indication as well as others, so there's strong scientific rationale beyond the areas where we've actually generated data to date.

On Slide 10 is a little bit of background on our lead indication, which are in the EGIDs. So this includes both -- or this includes eosinophilic esophagitis as well as eosinophilic gastritis and eosinophilic duodenitis. We have some prevalence numbers here on the slides. EoE currently is the largest of the 3 indications at roughly, call it, 200,000 people. EG and EoD both are around 25,000 people. So in total, about 50,000 people. We suspect that all 3 of these forms of eosinophilia will grow over time given more disease awareness and also the approval of drugs to treat these indications. Currently, there's nothing on the market to specifically treat these diseases. Patients use intermittent steroids or try diet modification. And in both cases, they're not really suitable for long-term use. And so as a result here, there's a high unmet medical need and, consequently, a large market opportunity.

So a little bit of data here. These were -- on Slide 11, these were biopsies that were taken from patients that were enrolled in the ENIGMA study, and these are their baseline measures. And what we're showing here is our eosinophil counts in the esophagus and stomach as well as mast cell counts. So not surprisingly, you see elevated eosinophils in patients that have EGIDs. But what was a surprise was that mast cells were also elevated here. And what we also found is that these 2 cell types were the only 2 cell types that were elevated in the tissue. In addition to that, we phenotype these same cells from these biopsies and found that both the eosinophils and mast cells were in activated phenotype. So this suggests that both of these cell types play a pathogenic role and also suggests that you would need to target both of them to see an optimal treatment benefit.

Okay. So Slide 13. We wanted to give a little bit of color on the end of Phase II meeting we recently had with the FDA. And I'd say big picture, this was a positive, very constructive meeting that we had.

And on Slide 14, we've listed some of the key takeaways here.

The first bullet point there is on our histologic co-primary end point. So consistent with the EoE guidance that came out in February of '19, the FDA recommended that we use a responder analysis. This is something that we anticipated. So we were prepared for this ask, and we're perfectly happy to modify the

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

histologic end point to be a responder analysis. What we did was we proposed the treatment threshold levels, so what would be considered a treatment success. That was our proposal to the FDA based on the ENIGMA data as well as additional data that we had generated over time. The FDA agreed with us, and we settled on the treatment threshold of less than or equal to 4 EoS per high-powered field in the stomach as being the threshold for a responder and less than or equal 15 per high-powered field in the duodenum.

On the symptom co-primary end point, there are a couple of points here to emphasize. I think number one is that we are using, per the FDA, the same PRO questionnaire that was used in ENIGMA will be used in the Phase III study. The FDA did recommend that we use a total symptom score consisting of the 6 most frequent and severe symptoms, which we're calling TSS-6. For clarity, those include abdominal pain, nausea, bloating, early satiety, abdominal cramping and loss of appetite. Vomiting and diarrhea are measured, but they are excluded from the primary -- the co-primary analysis. And what's behind this is the FDA wanted there to be a common set of symptoms that all patients suffered from, which is how we and the FDA landed on the TSS-6. As we've mentioned to the street for a long time now, vomiting and diarrhea were not as frequent and not as severe as the other 6 symptoms. With that said, we'll measure them. We had a very nice treatment effect on both. So those will be measured in the Phase III. They just won't be part of the co-primary symptomatic analysis.

Third bullet point is duration of study. Again, to be consistent with EoE, the FDA recommended a 6-month study. We are totally fine with that. We had proposed 4 months, but we were fine with 6, I think, as we have made clear to everyone. Part of the reason for that is that the longer patients are treated on antolimab, the better the data gets, so the 6-month change was something that was quite easy. And then as I mentioned before, we're changing the name of EGE to duodenitis. This is simply cleaning up the nomenclature in the field. It's somewhat ambiguous when it comes to duodenitis. Duodenitis is called a variety of things, including EGE or enteritis, and we decided to go ahead and clarify that and be precise. So we proposed to the FDA to call it eosinophilic duodenitis, which is what we measured and it's what everybody measures when they do these studies.

So that -- those were the key takeaways. As I said, this was a very positive constructive meeting, and we're very happy with the outcome and are looking forward to getting patients enrolled in the Phase III study.

So with that, I will turn it over to Henrik to provide some more detail on the development programs.

**Henrik Sandvad Rasmussen**
*Chief Medical Officer*

Yes. Thanks, Rob. And so our Phase III study in eosinophilic gastritis and/or duodenitis is a multicenter, randomized, double-blind, placebo-controlled study in adult patients with active moderate-to-severe symptoms as determined by our PRO. And they also must have biopsy-confirmed EG and/or EoD as defined by equal to or more than 30 eosinophils per high-powered field in 5 fields in the stomach and/or equal to or more than 30 eosinophils per high-powered field in 3 fields in the duodenum. The patients will be randomized in a 1:1 ratio between placebo or antolimab with a starting dose of 1 followed by 5 monthly doses thereafter for a total of 6 doses. And importantly, the patient population we are going to study are the same as we started in the Phase II ENIGMA study.

The symptoms in the study will be assessed with the same PRO questionnaire we used in ENIGMA, which, as you remember, was developed in accordance with the FDA guidance on PRO development, which capture the symptoms of EG and EoE on a daily basis throughout the baseline period followed by 6 months of treatment and measure all 8 symptoms on a scale from 0 to 10, 0 being no symptoms, 10 being the worst possible.

As Robert outlined, the co-primary symptomatic end point will consist of what we now call the TSS-6, namely abdominal pain, nausea, early satiety, loss of appetite, abdominal cramping and bloating. And we will measure vomiting and diarrhea, but because of the fact that they are less frequent and less severe than the other 6, we agreed with the FDA not to include them in the primary end point.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

ALLAKOS INC. SPECIAL CALL  MAR 24, 2020

The study will have a co-primary end point, a histology end point and a symptom end point. The histology end point will be a proportional analysis where a responder is defined as a patient who, after treatment, has stomach eosinophils equal to or less than 4 in 5 fields and duodenum eos less than or equal to 15 in 3 high-powered fields. The symptom end point is going to be the absolute change in patient-reported TSS-6 from baseline until the end of the treatment. And we also have, of course, a couple of important secondary end point, namely, percent change in tissue eosinophils as well as treatment responders, where a total treatment responder is defined as a patient who achieved the tissue eosinophil threshold combined with at least a 30% improvement in TSS. For the 2 co-primary end points, the study has well more than 90% power to meet these end points, so very well powered study.

After we agreed, as you can see on the next slide, with the FDA on the slight change in the end point, we applied those Phase III end points on the ENIGMA Phase II data. And the data are shown on Slide #19, as you can see, using the intent-to-treat analysis that included all 65 patients enrolled in the ENIGMA study. And we then looked at the high dose because that is the dose we are using in the Phase III study. The histological end point, applying this criteria, we had 95% patients, who were responders, on antolimab as compared to 0 on placebo. And for everybody who knows statistics, not surprisingly, the p value is very, very small, less than 0.00001 and even smaller than that. The symptom end point were met with the changed end points as well. If you look at mean absolute change in TSS from baseline, applying that to the ENIGMA data, you will see that we ended up with a p value of 0.0162. And if you look at the mean percent change in TSS, you will see that the data are very similar to what we have already presented with the all 8 symptoms. 59% improvement from baseline on the antolimab 3 mg/kg dose versus 27% on placebo, which was statistically significant with a p value of 0.0031. So the p values here were slightly less, so more significant than they were looking at the TSS-8, the data we presented previously. So all working in the right direction.

Moving on now to the Phase II/III study in eosinophilic esophagitis, which we also recently started. That study is also a multi-center randomized, double-blind, placebo-controlled study in patients ranging from 12 to 80 years of age with active moderate-to-severe symptoms. You'll note here that we expanded the age range to include adolescents down to the age of 12. We did that to follow the FDA EoE guidance. The patients also need to -- in addition to be symptomatic, they also need to have confirmed eosinophilic esophagitis as defined by an equal to or greater than 15 eosinophils in 1 high-powered field from the esophagus. Once they meet the criteria, they'll be randomized in a 1:1:1 ratio to 2 active dose levels versus placebo; 100 patients per arm; a lower dose of 1 mg per kg for 6 months infusions; and a higher dose, starting with 1 mg per kg and then receiving 3 mg per kg for the following 5 months, for a total of 6 monthly doses. In that study, we're also looking at using co-primary end points, a histologic co-primary end point where a responder is defined as a patient who has less than or equal to 6 eosinophils per high-powered field in 1 high-powered field, and we are looking at a symptom co-primary end point, we are looking at absolute change in patient-reported Dysphagia Symptom Questionnaire, the so-called DSQ questionnaire.

And we are also looking at a couple of key and secondary end points, including percent change in esophageal tissue eosinophil count and percent change in DSQ score from baseline to the end of treatment. And the endpoints were composed in accordance with the FDA 2019 EoE guidance.

We also, as Robert indicated, recently started a study, Phase I study, with our subcutaneous formulation in healthy volunteers. It is the Phase I single-dose placebo-controlled study in a total of 50 healthy volunteers, where we're going to look at 4 different doses of subcutaneous antolimab with a starting dose of 0.3, then going to 1, then going to 3 and then finishing at 5 mg per kg. Each of these arms will have a placebo component. And then we are looking at 2 cohorts of intravenous antolimab 1 and 3 mg per kg. The study is underway, and we expect data in the fourth quarter of this year.

Moving on now on Slide 26 to the mast cell gastritis -- gastrointestinal disease study. And as a background, when we screened for ENIGMA, we entered a total of 113 patients into screening, of whom 88 met the symptom threshold. Of those 88 patients, 72 met the threshold for eosinophilic gastritis or eosinophilic duodenitis and were either included -- or could be included in the ENIGMA study, whereas, the remaining 16 patients were highly symptomatic, but they did not meet the eosinophilic criteria. But all of

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

these patients had increased mast cells, which we define as being equal to or more than 30 mast cells per high-powered field in the stomach and/or the duodenum.

On the next slide, Slide 27. It was a multi-center, open-label, multi-dose, Phase I study in patients with active moderate-to-severe symptoms, again, using the same PRO we used in ENIGMA. And they all had biopsy-confirmed elevated mast cells and didn't meet the criteria for eosinophils. In the study, they got -- received a total of 6 monthly doses, starting the dose of 0.3, then going to 1 and then received 4 doses of 3 mg per kg over the subsequent 4 months.

On the next slide, you can see the eosinophils and the mast cells in the ENIGMA study on the left side of the slide and in the MGID study on the right side. And not surprisingly, you'll see that the number of eosinophils per high-powered field were obviously way higher in the ENIGMA study than in the MGID study. But you also note that the mean mast cell number was very similar between ENIGMA and the MGID study, 64 at baseline in the ENIGMA study versus 55 in the MGID study.

On the next slide, we depicted the symptoms in patients in the ENIGMA study, as illustrated by the dark blue bars, versus patients in the MGID study in the gray color. And what is remarkable here is the similarity in constellation of symptoms as well as symptom severity between the ENIGMA study on one hand and the MGID-only patients on the other hand. So very similar disease symptom constellation and severity between the 2 groups.

On the next slide show you the change in total symptom score from baseline and until the end of the 6 months of treatment. You can see that we found in the MGID study an average reduction or mean reduction of 64% from baseline. That's very similar to what we found at the top dose of 3 mg per kg in the ENIGMA study, namely where we found a 58% mean reduction or improvement in symptoms, and that compared, as you will remember, to a 24% improvement on placebo. So very similar improvements in the mast cell-only patients as we found in the EG patients as well.

The improvement in total symptoms score, again, similar to ENIGMA, was not driven by 1 single symptom. We saw consistent improvements across all 8 symptoms which constituted the PRO, as you can see on the next slide. So very similar consistent improvement across the various symptoms.

Looking at histology, not surprisingly, the tissue eosinophils were wiped out at the end of the treatment. And we did see an approximately 18% decrease in the number of mast cells, which is similar to what we have seen in other preclinical and clinical studies. In terms of safety, antolimab was well tolerated. The most common adverse event was, again, the infusion-related reactions, all of which were mild and classified as Grade 1 in this study, and we had no drug-related serious adverse events.

As part of the ENIGMA study and also the MGID study, we found that a number of patients who ended up qualifying for ENIGMA did not have a prior history of eosinophilic gastritis or duodenitis. These patients were highly symptomatic. A number of them had previously been misdiagnosed as having irritable bowel syndrome and/or functional dyspepsia. And we found the same in patients who had increased mast cells. So we basically decided to try to get a better feel for the prevalence of increased eosinophils and/or increased mast cells in patients with functional gastrointestinal disorders. And to get a better feel for that, we kicked off, as Rob has said, back in late January an EGID and MGID prevalence study. It is a multicenter study throughout the United States, a total of 22 sites, to assess the prevalence of eosinophil -- EGID and MGID in patients with a diagnosis of irritable bowel syndrome, functional dyspepsia, chronic gastritis, and all of them would have chronic GI symptoms for at least 6 months without any other good reasons for their symptoms. So this is a typical IBS and/or functional dyspepsia patient population. And we plan to take biopsies from 200 such patients with active moderate-to-severe symptoms as assessed by the PRO questionnaire, the same PRO question we used in ENIGMA and which we are using in the Phase III EG/EoD study. The primary end point in that study is going to proportion of these 200 patients who turn out to have eosinophilic gastritis, eosinophilic duodenitis, a combination thereof or increased mast cells. So as Robert was indicating, the study is enrolling very well, we started in late January, and we are expecting to present data from that study in the second half of this year.

So in summary, we recently initiated our Phase III study in patients with eosinophilic gastritis and/or duodenitis as well as a Phase II/III study in eosinophilic esophagitis. So both studies have been activated.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

We have also started -- have dosed the first group of patients in our subcutaneous healthy volunteer study, so that study is ongoing. We demonstrated that antolimab improves symptoms in patients with chronic GI symptoms and elevated mast cells, so-called MGID patients, and starting to evaluate the prevalence of EGID and MGID in patients with chronic functional GI disease is well under way.

So without further ado, I pass it back to Robert.

**Robert Alexander**
*CEO & Director*

Okay. Thanks, Henrik.

Okay. So I'm now on Slide 38.

So we finished the year with $495 million in cash, cash equivalents. Our Q4 2019 operating expenses were roughly $27 million. This -- the cash, the $495 million will get us well past the 2 pivotal studies and at the current burn into 2023 without having to raise additional capital. If there are additional delays due to the pandemic, the money goes a little further, but that will give you a rough idea of what our burn is against the development programs.

On Slide 39 are the anticipated near-term milestones. So we will announce in the second quarter of this year the Phase II extension data. So this is the ENIGMA data. And these patients will all have been treated for minimally 12 months when we present the data. The next milestone is the Phase I subcutaneous data for antolimab. We expect that data to be second half of 2020. In addition, we would expect to announce the data from the prevalence studies in EGIDs and MGIDs in patients that have a history of functional GI disease, which includes functional dyspepsia as well as IBS.

Currently, we're projecting the results from our Phase III EG study and our Phase II/III EoE study to land in the second half of '21. We are qualifying that we have to see how the coronavirus pandemic plays out over the next few weeks or so to months to see how those delays might materialize or not. And we'll certainly provide updates on that as we get more information.
And that was all we plan to present. So I can turn it back over to the operator for questions.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Maury Raycroft with Jefferies.

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Congrats on the progress. First question is just on the PRO. Just to clarify there. Are you using the same PRO in the Phase III that was used in the Phase II? But it seems like you're not including those 2 symptoms, vomiting and diarrhea. But then when you take those out and analyze the Phase II data, you still see a 0.01 statistic difference. Is that right?

**Robert Alexander**
*CEO & Director*

Yes. That's correct. So yes -- I mean, there's maybe a subtlety there. So the PRO that the patients will take on a daily basis is the same PRO the patient -- this is in the Phase III study. This is the same PRO that patients took in the ENIGMA study. What the FDA asked us to do was to analyze the symptoms and find what we call the common set of symptoms that were experienced by the majority of the patients. And when you do that analysis, what very clearly emerges from the data is that the 6 symptoms that are in the TSS-6 cluster tightly together, and then there's a drop-off in terms of frequency and severity when you look at vomiting and diarrhea.

So what they asked us to do is to collect all the data but only include those 6 in the primary end point. And as it turns out, when you run the -- when you take the ENIGMA data on an intent-to-treat basis, and as Henrik said, we looked at the 3 mg per kg dose because that's the group that will go into -- that's the dose group that will be used in the Phase III study. You see that the results are essentially identical. I think numerically, they're actually better with the TSS-6, but it kind of is what it is. We would call them numerically similar.

Did that -- Maury, does that answer the question?

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Yes. Yes. That's helpful. And for the end of Phase II meeting and coming up with the Phase III design, can you comment on how closely FDA looked at your Phase II data? And can you provide any more context on the discussion in getting to the final design, given that there's not a lot of precedent in this area?

**Robert Alexander**
*CEO & Director*

Yes. I mean I would characterize the meeting. I think there was a tremendous amount of intellectual curiosity from the FDA with our data because we are the first people to have generated this type of data in patients with EG and EoD. And so the interaction, again, was constructive and kind of science-driven, and there were questions about some of the -- what we are finding in the data sets. And some of that kind of emerged in what we showed you in the key takeaways with respect to the symptoms, for example, where the literature is a little bit all over the place in terms of symptomatology. And there's this belief that the patients -- the most frequent, most severe symptoms are vomiting, diarrhea and abdominal pain. And it turns out vomiting and diarrhea are symptoms these patients suffer from, but they're not the most frequent or severe. So things like that, that the FDA was curious about. Fortunately, we had a very robust data set that allowed us to answer all those questions and provide analyses that gave them a lot of comfort that we have the right set of symptoms and that we're able to find the robust treatment effects on drug compared to placebo. And so that was kind of the tenor of the meeting as we went through the various things.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The histology, them requesting us to use a responder analysis, I think you have to remember we started the EG study back in 2018 and had conversations with the agency as far back as 2017. The EoE guidance came out in 2019. So once we saw that guidance, I think we had a pretty good idea of what the key issues would be around the Phase II meeting. So we were prepared for those discussions. And so that was actually quite helpful to have that information out there. Aside from that, it was really a lot of -- the majority of the conversation was around efficacy. The FDA had no concerns on safety. And so that was basically the meeting.

**Maurice Thomas Raycroft**
*Jefferies LLC, Research Division*

Great. And last quick question. Just for the Phase III and the Phase II/III, is there a pre-medication protocol? And can you run through some of the details for that?

**Robert Alexander**
*CEO & Director*

Yes. Sure. Yes, so for both the EG and the EoE study, patients will be given a dose of pred 12 to 24 hours before they get their first dose of 1 mg per kg. And I think as we talked about on the August 5th call and have discussed with a variety of folks, with the 012 study, which was the dosing study that kind of made the rounds recently was that we found in the open-label extension data in ENIGMA that if we pretreated with pred 12 to 24 hours before going straight to a 1 mg per kg dose, we did not see any IRRs. We confirmed that finding in a small dosing study that we began a couple of weeks after we announced the ENIGMA data. And again, using that treatment protocol, we did not see a single IRR. So that's why we've made the decision to go forward with the pred predosing and then going straight to the 1 mg per kg. And the FDA had absolutely 0 comments about that.

**Operator**

Our next question comes from Tim Lugo with William Blair.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

For the TSS-6, is there going to be any changes in maybe how you anchor and discuss with patients what will be defined as a 1-point, 2-point, 3-point improvement for the components?

**Robert Alexander**
*CEO & Director*

No, no, no. It's -- again, it is exactly the same PRO. So patients will have the electronic device, they'll enter their symptoms on a daily basis. That data gets sent to a secure database. And all those symptoms are scored on 0 to 10 scale. So there -- absolutely nothing changes from the patient perspective.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Okay. Great. And going back to steroid use, after the pred predosing, will you allow further steroids in either arm on the trial? Or maybe will you allow adjustments if you do allow further steroid use? Can you talk about the steroid use through the length of the trial versus just the initial dose?

**Robert Alexander**
*CEO & Director*

Well, so the -- yes, the protocol says that it should be used on the first dose. And then after that, we -- there's a -- I forget exactly how the protocol is written, but it says something to the effect not to use it. But of course, we can't -- it's up to the doctor's discretion whether to prophylax or therapeutically treat a patient if they develop an IRR. So we can't tell them not to do that, but given what we know about IRRs throughout all the studies we've run, they are rare on subsequent infusions. And once we've landed on the pred predose, it appears that we have a very good handle on -- right now it looks like we've eliminated

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

those, but certainly, somewhere between eliminating and significantly reducing on the first dose. And then there really wouldn't be suspicion to treat with steroid on the subsequent doses unless someone had a significant IRR. So it's basically the same as what happened in ENIGMA. It was up to the doctor's discretion based on their medical opinion. So we don't have control over that.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Okay. And for the subcu study, it's obviously only a single dose study if you're able to start dosing patients again in, hopefully, a few weeks or maybe a couple of months. Do you still expect that to read out this year? And then moving forward, does that go into EoD, EoE patients? Or does it maybe go -- or to carrier patients? Is there a bridging study which will be necessary? Can you just talk about that?

**Robert Alexander**
*CEO & Director*

Yes. So the subcutaneous study is a single-dose study, and those patients are capped in the unit for, I believe, the first -- is it first 5 days? Yes, first 5 days. So that's logistically an easier study to continue to enroll. And so we expected that -- again, that study should be easier to enroll and to maintain. Now of course, we -- if things change again with respect to the pandemic, then we could have to make adjustments there, but we would expect that, that study will continue to enroll perhaps at a slightly slower pace but continue to enroll. This is the first subcu study we've done. So again, what we're looking for here is safety and bioavailability.

We will be doing other subcutaneous studies. We imagine that we'll go into EG next, and that would be the first approval for subcu assuming it has the right characteristics and right bioavailability, and that would be in the form of a supplemental application to the BLA. And then as it relates to additional indications, I believe that EoE would be the next logical place and then -- with an eye towards supplemental approval. And then for the additional indications, I think the ones that we're still evaluating, and part of this is dependent on what we find in the EGID, MGID prevalence study, but certainly high on our list are ulcerative colitis, urticaria, atopic dermatitis. Those are all things that we have a lot of interest in. And based on what we find from the EGID, MGID prevalence and what the subcutaneous data looks like, we'll inform how -- what we go and do next outside of the EGID.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Okay. Fair enough. And maybe just a housekeeping question, the Phase IIIs and maybe even some of the earlier Phase I work, would that all be added on the ClinicalTrials.gov?

**Robert Alexander**
*CEO & Director*

So the phase -- the subcu study is on ClinicalTrials.gov, the -- or will be, it's somewhere in the ether. It should be up there. The EG study will be. The EoE study will be. The prevalence study is not on there. It's a noninterventional study. And yes, I think that covers what you're asking about.

**Operator**

Our next question comes from Paul Choi with Goldman Sachs.

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

My first question is just in the development plans for the MGID program. You -- in the press release, you guys talked about TSS-8 here. But just given your commentary earlier on, on diarrhea and vomiting, as you think about the development plan there, is the goal or the plan to alter sort of the -- down to the 6 criteria here as well in MGID? And just how should we think about that affecting sort of the patient responses in the MGID population?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Robert Alexander**
*CEO & Director*

Yes. Yes. No, it's a good question. Sorry, we didn't talk about that in the presentation. So what we plan on doing with MGID? So we -- going back to the -- when we were screening patients for ENIGMA, we did not expect to find mast cell-only patients at all. So that was a complete surprise. So we reacted in real time and just put those patients on the PRO that we developed for EG. So that's why those patients were on that.

What we're doing in the -- what we'll do for MGID is we have a whole program to characterize these patients. So what I mean by that is in the prevalence study, as we find patients that have mast cell gastritis only -- so patients have to be symptomatic at the same threshold that we use for ENIGMA. They have to be symptomatic over a minimum of a 2-week period, and then they get biopsied. If they're found to have MGID, one, that will be information to determine prevalence, but then secondarily, those patients will go into a PRO development study, where we do all the things you need to do to develop a PRO for a given indication. So it's the same thing we did with the PRO for EGIDs. So you look -- you do concept elicitation. Once you identify the symptoms and hit saturation, you then run a longitudinal study. And what you're looking for there is to make sure that your inter and intra symptom variability is tight so you can actually run a study and see a difference between treated and untreated groups. So all that work will -- is ongoing now.

In addition to that, we will also run a study where we biopsy healthy volunteers to establish a true normal mast cell count. And so taking all those different efforts together, the prevalence, the data from the MGID study, the healthy volunteer study and the PRO development work, we should have our arms around characterizing MGID, have a really good handle on that. And then that would be what we would take to the FDA to present it to them. So maybe it's a long answer to -- I don't know exactly what the MGID PRO will look like, but I suspect it will look very much like the EGIDs. So I just wanted to make sure you had all the detail on that.

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

Okay. Then on the Phase II/III EoE study, just with regard to enrollment and inclusion, exclusion criteria, you guys did talk about the eosinophil count and so forth as an entry criteria. But could you maybe, I guess, at this point, give us any more little granularity as to -- is there a subpopulation of EoEs or premedications or prior medications or prior lines of treatment or anything that you're going to allow or either allow in or exclude as we think about how you're going to -- what type of patients you're going to enroll?

**Robert Alexander**
*CEO & Director*

So for the EG study, it's the same criteria we use for ENIGMA on -- so in that case, for example, if a patient is on 10 mgs or less of steroids and they have been stable on that dose and don't alter that dose in the study and are symptomatic and/or biopsy-confirmed to have disease, then they're allowed in the study.

In EoE, we do not allow orally adjusted steroids because it would confound the results in the esophagus. And so I'm looking at Adam. Do we have any other key inclusion/exclusion for EoE? Yes. And then, of course, in both populations, you have to have to have failed standard therapy or have to be medically contraindicated to have taken it, kind of the standard stuff that you do when you do the biologic studies.

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

Got it. And then just in terms of baselines for things like the DSQ, is there -- do you have a sense as to what, I guess, the literature for this population establishes just on dysphagia in particular? And just how we should think about -- what would sort of the patient characteristics look like there? And that's my last question.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Robert Alexander**
*CEO & Director*

Yes. In DSQ, I think if you look in the literature, I believe the average is around 30. And I believe the total score is, I think, 80 -- 84, is that the number? Yes, 84. Sorry, did I -- I don't know if I heard the last part. Did that answer the question, Paul? Or did I miss the back half of it?

**Kyuwon Choi**
*Goldman Sachs Group Inc., Research Division*

Yes. No, that is the question.

**Operator**

Our next question comes from Sam Slutsky with LifeSci Capital.

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

Just in terms of the EGID prevalence study, depending on the findings, curious on how you might use this for future studies. Like, for example, if you find a bunch of EG patients misdiagnosed with IBS, would you enroll them into the Phase III potentially? And I think if you have MGID and things like IBS, functional dyspepsia, how might you use that data?

**Robert Alexander**
*CEO & Director*

Yes. So the prevalence study, which you may hear us also call 019 as the numeric designation, as we said, that study started in January, and up until just a few days ago was enrolling incredibly well. Certainly, patients that -- what we have embedded in that protocol is patients that we find that have an EGID get referred to the EGID study. So that's a place where you will get EGID patients coming in. And then as I mentioned a few minutes ago, on the MGID side, those patients will go into a PRO development work, where we characterize the symptoms that those patients suffer from per the FDA guidance for PRO development. So we'll use those patients to develop that data set.

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

Okay. Got it. And then in terms of enrollment in the Phase III studies, I guess, what would you want to see from the COVID standpoint to make the go decision to activate sites in terms of enrollment? And then would it be state-specific or more nationally?

**Robert Alexander**
*CEO & Director*

Yes. I mean it's a good question. I mean in terms of maybe some more color on this, I mean there are sites that have said that they are shut down now because of COVID-19. But we also have sites that are up and ready to enroll patients. And so we had to make the call to not include those -- to not allow those patients to enroll because I think the situation is just -- it's too fluid right now. And we don't know what next week is going to bring.

So I think what's embedded in your question, I do think it's going to be kind of a state-by-state or perhaps a site-by-site situation. And I think we'll have to feel comfortable that the general trend in the country is moving towards relaxing some of the social distancing and the shutdown that's going on and making sure that hospitals are back on their feet. And we don't want to occupy any surgical suites or anything like that where we're doing these endoscopies for people that might have a more emergent need for it. So we just need to have our arms around that type of thing and feel generally good about us having the virus under control to the extent that it makes us and health care providers comfortable. And I think once we get there, we'll start to enroll patients. And I suspect that likely will be on a geographical, regional, case-by-case basis.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**Operator**

Thank you, ladies and gentlemen. That's all the time we have for questions. I'll now turn it back to management for closing remarks. Thank you.

**Robert Alexander**
*CEO & Director*

So yes, I don't have any other comments specifically. Really appreciate everybody dialing in. If you have any further questions, we're more than happy to talk, so please reach out to us. All right? Thanks a lot. Bye-bye.

**Operator**

That concludes today's call. All parties may disconnect. Have a good day.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.